No. 25-1918

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY
COALITION, INC.; CAMERON PROSPERI,

*Plaintiffs-Appellants*,

JUDSON THOMAS; COLBY CANNIZZARO,

*Plaintiffs*,

v.

ANDREA J. CAMPBELL, in the official capacity as Attorney
General of the Commonwealth of Massachusetts; TERRENCE M.
REIDY, in the official capacity as Secretary of the Executive Office
of Public Safety and Security of the Commonwealth of
Massachusetts,

*Defendants-Appellees.*

**On Appeal from United States District Court
for the District of Massachusetts**
Civil Case No. 1:21-cv-10960-DJC
The Honorable Denise Jefferson Casper, Judge

## BRIEF OF PLAINTIFFS-APPELLANTS

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# DISCLOSURE STATEMENT

Appellant the Gun Runner, LLC is a nongovernmental corporation that has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Appellant Firearms Policy Coalition is a nongovernmental nonprofit corporation that has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ..................................................................i

TABLE OF AUTHORITIES ...............................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD................ix

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 3

ISSUE PRESENTED FOR REVIEW ................................................. 4

STATEMENT OF THE CASE ........................................................... 4

  I.    Massachusetts' Ban on Ordinary Handguns. ................................. 4

  II.    The Effect of the Handgun Ban on Plaintiffs.................................. 8

  III.  Procedural History. ....................................................... 11

SUMMARY OF THE ARGUMENT .......................................... 14

ARGUMENT .................................................................... 16

  I.    The Plain Text of the Second Amendment Covers Acquiring Handguns....................................................................... 16

      A. A Straightforward Reading of the Second Amendment Includes Purchasing Handguns. ........................................... 16

      B. The District Court Wrongly Imported a "Meaningful Constraint" Prerequisite to Second Amendment Scrutiny. . 21

  II.    There Is No Historical Justification for the Handgun Ban........... 30

A. The Supreme Court Has Already Done the Historical Work Necessary to Resolve this Case in Plaintiffs' Favor. ............ 30

B. The Historical Analogues the District Court Cited Are Inadequate to Support the Ban. ........................................... 40

    1. Proving Laws Cannot Justify the Handgun Ban. ............ 44

    2. Fire Safety Rules Are Also Irrelevant. ............................ 51

    3. Trap Gun Laws Restricted Unlawful Uses of Weapons, Not Types of Common Arms. .................................................. 54

    4. Laws Restricting Firearm Access By Minors Have Nothing to Do with the Handgun Ban's Restrictions on Adults.... 55

CONCLUSION ........................................................................... 57

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Andrews v. Tennessee,*
    50 Tenn. (3 Heisk.) 165 (1871) ........................................................ 18

*B&L Prods., Inc. v. Newsom,*
    104 F.4th 108 (9th Cir. 2024) ................................................. 25, 26

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ....................................................... 55

*Boland v. Bonta,*
    662 F. Supp. 3d 1077 (S.D. Cal. 2023) ........................................ 36

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ........................................................ 32, 34, 37

*Capen v. Campbell,*
    134 F.4th 660 (1st Cir. 2025) ................................................. 34, 35

*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977) ........................................................................ 20

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .... 1, 2, 11, 16, 17, 18, 19, 22, 24, 26, 31, 32, 33,
    35, 37, 38, 39, 40, 41, 50, 53

*Duncan v. Bonta,*
    133 F.4th 852 (9th Cir. 2025) ................................................. 43, 44

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ...................................................................... 48

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ................................................. 17, 33

*Gamble v. United States,*
    587 U.S. 678 (2019) ...................................................................... 41

*Gazzola v. Hochul,*
    88 F.4th 186 (2d Cir. 2023) ......................................................... 29

*Granata v. Campbell,*
    No. 22-1478, 2023 WL 4145911 (1st Cir. Apr. 7, 2023) ................ 11

*Hirschfeld v. BATFE*,
5 F.4th 407 (4th Cir. 2021).............................................. 23

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
961 F. Supp. 2d 928 (N.D. Ill. 2014) ............................... 17

*Kole v. Village of Norridge*,
No. 1:11-cv-03871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017)...... 17

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024) ............................................ 41

*Luis v. United States*,
578 U.S. 5 (2016) ................................................... 21, 25

*McCoy v. BATFE*,
140 F.4th 568 (4th Cir. 2025)..................................... 19, 20

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ................................................. 24, 25

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ............................................... 16, 36

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) .................................................... 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) 1, 11, 24, 26, 27, 30, 31, 33, 36, 41, 42, 43, 44, 48, 52

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
590 U.S. 336 (2020) ............................................... 20, 21

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .................................. 39, 42, 53

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ......................................... 37

*Reese v. BATFE*,
127 F.4th 583 (5th Cir. 2025)..................................... 20, 29

*Renna v. Bonta*,
667 F. Supp. 3d 1048 (S.D. Cal. 2023)...................... 2, 36, 37, 39

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) .................................................... 20

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
　605 U.S. 280 (2025) ........................................................ 38

*Teixeira v. City of Alameda,*
　873 F.3d 670 (9th Cir. 2017) ........................................ 17

*United States v. Fish,*
　758 F.3d 1 (1st. Cir. 2014) ........................................... 34

*United States v. Marzzarella,*
　614 F.3d 85 (3d Cir. 2010) ........................................... 23

*United States v. Miller,*
　307 U.S. 174 (1939) ................................................. 32, 35

*United States v. Rahimi,*
　602 U.S. 680 (2024) ....................................... 26, 30, 44

*United States v. Vlha,*
　142 F.4th 1194 (9th Cir. 2025) .................................... 28

*Worth v. Jacobson,*
　108 F.4th 677 (8th Cir. 2024) ...................................... 42

*Yukutake v. Lopez,*
　130 F.4th 1077 (9th Cir. 2025) .................................... 28

## Statutes, Codes, and Regulations

18 U.S.C.
　§ 922(a)(3) ..................................................................... 8
　§ 922(a)(5) ..................................................................... 8
　§ 922(b)(3) ..................................................................... 8

Mass. Gen. Laws ch. 140,
　§ 121 ................................................................................ 4
　§ 123(o) ..................................................................... 6, 51
　§ 123(p) ........................................................................... 6
　§ 128 ................................................................................ 4
　§ 129B(a) ...................................................................... 56
　§ 131 ......................................................................... 4, 56
　§ 131 ¾ ........................................................................... 6

Mass. Gen. Laws ch. 269, § 10(a) ................................... 4

501 Mass. Code Regs. §§ 7.02–7.07 .............................. 6

940 MASS. CODE REGS.
    § 16.01 ............................................................... 5, 47, 52
    § 16.03 ................................................................................ 5
    § 16.04(1) ........................................................................... 5
    § 16.04(2) ..................................................................... 51, 52
    § 16.05(1) ........................................................................... 5
    § 16.05(2) .................................................................... 5, 6, 9
    § 16.05(3) ........................................................................... 6

## Other Authorities

*Advanced manufacturing*, GLOCK, https://perma.cc/N3PM-MW63 ........ 47

J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13 (2025) ........ 43, 44

*Approved Firearms Rosters*, COMMONWEALTH OF MASS.,
    https://perma.cc/EHP9-8MPX ............................................................ 6

*Enforcement Notice: Attorney General's Handgun Safety Regulations,*
    THE COMMONWEALTH OF MASS. OFF. OF ATT'Y GEN.,
    https://perma.cc/MW37-DSTC ...................................................... 7, 8

*Firearms Examiner Training*, NAT'L INST. OF JUST. (July 11, 2023),
    https://perma.cc/J96K-2VD8 ............................................................ 9

*Formal Target Shooting Firearms Roster*, COMMONWEALTH OF MASS.
    EXEC. OFF. OF PUB. SAFETY & SEC. (June 2024),
    https://perma.cc/K62K-BD3M ........................................................ 7

*How Glock became America's gun*, CBS NEWS (Sep. 15, 2013),
    https://perma.cc/J5E8-42UA ......................................................... 39

SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE
    (4th ed. 1773) ................................................................... 18

PETER ALAN KASLER, GLOCK: THE NEW WAVE IN COMBAT HANDGUNS
    (1992) .......................................................................... 39

*P320-M17*, SIG SAUER, https://perma.cc/S6RH-ARA6 ........................... 49

Peter A. Patterson, *Common Use Is Not A Plain-Text Question*,
    14 HARV. J.L. & PUB. POL'Y: PER CURIAM (2025),
    https://perma.cc/P5UQ-GPBN ...................................................... 31

Guy J. Sagi, *Glock G19: A Top-Selling Pistol in 2020*, AM. RIFLEMAN
    (Jan. 21, 2021), https://perma.cc/HJ2Q-JLGC ............................... 38

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, 41 HARV. J.L. & PUB. POL'Y: PER CURIAM (2023), https://perma.cc/6WVZ-RBZZ ........................................................ 32

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ............................................................................... 18

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The Court should hear oral argument in this case because it involves a Second Amendment challenge to a complex regulatory scheme by which Massachusetts restricts which firearms, lawfully possessed across the country, are available to its residents. The case implicates the fundamental rights of Plaintiffs and all residents of the Commonwealth, and it raises complex and important questions of constitutional law.

## INTRODUCTION

The Supreme Court has repeatedly explained that handguns are "arms" that "are indisputably in 'common use' for self-defense today [and] … are, in fact, 'the quintessential self-defense weapon.' " *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). As such, ordinary semiautomatic handguns and revolvers are categorically protected and cannot be banned. In violation of this precedent, the district court below upheld a Massachusetts law that closes the Commonwealth's borders to large portions of the modern handgun market, banning as "unsafe" many of the firearms that are most trusted by the American people for their self-defense, substituting the legislature's judgment of what is safe and useful for the people's.

The Constitution forbids this type of law, and the Supreme Court has forbidden the district court's mode of reasoning. As *Heller* stated plainly, it is the choices of "the American people" that matter in deciding what is "in common use" and therefore per se protected by the Second Amendment. The district court's decision distinguished *Heller* on the ground that while the District of Columbia law at issue in that case

banned *all* handguns, Massachusetts has contented itself with only banning some of the most popular models. And it concluded, from that difference, that not only did the Massachusetts law not implicate precisely the same historical limitations as were at issue in *Heller*, it did not need to reach the historical questions at all because the limits placed on the right in this case were insufficiently severe to trigger *any* constitutional scrutiny.

That reasoning is anathema to *Bruen*. The Supreme Court's opinion was emphatic: There is no room in Second Amendment analysis for independent judicial judgment that a given law is constitutional because the burden it places on the right is sufficiently "minor" or it leaves other avenues for self-defense open. And there is no relevant constitutional difference between a "total" ban and a partial one: "The Amendment does not parse between types, makes and models of arms," *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1061 (S.D. Cal. 2023), *appeal pending*, No. 23-55367 (9th Cir. Apr. 20, 2023), so it is "[i]t is no answer to say … that it is permissible to ban the possession of [some firearms] so long as the possession of other firearms" is allowed, *Heller*, 554 U.S. at 629. (After all, the *Heller* ban was "partial" itself in that it only targeted handguns.)

The district court should have, therefore, found this case triggered the *Bruen* analysis. And it should further have found the same historical analysis laid out in *Heller* established the unconstitutionality of the Handgun Ban in this case. Instead, and in the alternative to its primary holding that the Second Amendment's text was not even implicated, it accepted every single source of historical support that Massachusetts proffered, holding the Handgun Ban was justified by historical laws running the gamut from restrictions on setting guns to fire when a trap is triggered to laws preventing sales of firearms to minors. This too, violated *Bruen*, as in purporting to apply a relaxed version of the historical analogical inquiry, the district court admitted analogies to laws that bear no relationship, in either purpose or effect, to the Handgun Ban. The judgment of the district court should be reversed.

## JURISDICTIONAL STATEMENT

This case challenges the constitutionality under the Second and Fourteenth Amendments of Massachusetts' regulatory scheme for handguns. The district court had jurisdiction under 28 U.S.C. § 1331, 1343, 2201 and 2202, as well as 42 U.S.C. § 1983, and entered summary judgment in favor of the Commonwealth on August 29, 2025. The district

court's summary judgment order is a final order disposing of all of Plaintiffs' claims. Plaintiffs timely filed a notice of appeal on September 24, 2025. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether Massachusetts' ban on sale of many of the most popular handguns in the country violates the "right to keep and bear arms" protected by the Second and Fourteenth Amendments to the United States Constitution.

## STATEMENT OF THE CASE

### I. Massachusetts' Ban on Ordinary Handguns.

In Massachusetts, the sale, transfer, rental, and lease of all "firearms" is strictly regulated. "Firearms" encompass, as relevant to this case, all handguns. MASS. GEN. LAWS ch. 140, § 121. Subject to narrow exceptions, it is unlawful for any individual to purchase or possess a handgun without first applying for and being granted a license to carry, *see id.* § 131; *id.* ch. 269, § 10(a), and it is also generally unlawful for anyone to sell, rent, lease, or otherwise transfer a handgun to any person who does not possess such a license. *Id.* ch. 140, § 128.

But even when an individual is appropriately licensed, there are many handguns that still cannot legally be acquired through ordinary commercial channels in Massachusetts.

Massachusetts's Attorney General regulates "transfers" of handguns by "handgun purveyors." A "transfer" includes any sale, rental, or lease, and a "handgun purveyor" includes anyone who sells five or more handguns per year to customers located in Massachusetts. 940 MASS. CODE REGS. § 16.01. The Attorney General's regulations make it an unfair or deceptive practice for any handgun purveyor to transfer a handgun if, among other things, it:

- lacks a tamper-resistant serial number, *id.* § 16.03;

- is made of a metal that does not meet certain melting point, tensile strength, or density requirements, *id.* § 16.04(1);

- lacks a safety device that prevents unauthorized use of the firearm, *id.* § 16.05(1);

- lacks a mechanism to preclude an average five-year-old child from operating the handgun, including but not limited to a trigger resistance of at least a ten pound pull, an altered firing mechanism that would make it impossible for a five-year-old child's hand to

operate the handgun, or a requirement of a series of multiple motions to fire the handgun, *id.* § 16.05(2); and

- lacks a load indicator or magazine safety disconnect, *id.* § 16.05(3).

Separately, the Massachusetts legislature has imposed its own requirements on handgun sales by licensed dealers. These include requirements regarding the melting point, tensile strength, and density of metal firearm parts, whether the firearm has met certain testing requirements, and its barrel length. MASS. GEN. LAWS ch. 140, § 123(o). The Commonwealth has established a "firearm control advisory board" that approves specific models of handguns for inclusion on the "Approved Firearms Roster" ("Handgun Roster") "using the parameters set forth in Section 123." *Id.* § 131 ¾; *see also* 501 MASS. CODE REGS. §§ 7.02–7.07; *Approved Firearms Rosters*, COMMONWEALTH OF MASS., https://perma.cc/EHP9-8MPX. Only firearms lawfully owned or possessed under a license issued before October 21, 1998, are exempt from complying with the requirements for inclusion on the Handgun Roster. MASS. GEN. LAWS ch. 140, § 123(p).

Because of these two distinct sets of regulations, even a firearm's inclusion on the Roster does not necessarily mean it is permitted for sale. As the disclaimer on the Roster itself declares:

> Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq. Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations.

*Formal Target Shooting Firearms Roster* at 1, COMMONWEALTH OF MASS. EXEC. OFF. OF PUB. SAFETY & SEC. (June 2024), https://perma.cc/K62K-BD3M. Enforcement Notice #3, from February 2002, featured on the Attorney General's website, further warns that "[i]f a handgun does not satisfy [its] three additional requirements," of including child-safety features, tamper-resistant serial numbers, and (for semiautomatic handguns) a chamber load indicator, "then it is a violation of the regulations for a handgun purveyor to transfer that handgun even if the handgun is listed on the Approved Firearms Roster." *Enforcement Notice: Attorney General's Handgun Safety Regulations* at 6, THE COMMONWEALTH OF MASS. OFF. OF ATT'Y GEN., https://perma.cc/MW37-DSTC (emphasis omitted). This means that some popular firearms that are included on the Roster, like many models manufactured by Glock, are

still illegal to sell in Massachusetts because they lack a chamber load indicator. *See id.* at 8 ("[T]he 'extractor indicator' device which [Glock] recently added to its handguns is not an effective load indicator and, therefore, does not comply with the handgun regulations.").

These provisions, collectively the "Handgun Ban," absolutely preclude a licensed seller from transferring any handgun *not* included on the Handgun Roster *and* any other handgun Defendants decide to prohibit from being transferred to typical law-abiding individuals. To acquire such a handgun in Massachusetts, ordinary law-abiding citizens are relegated to a secondary market of non-licensed transferors. Nor can Massachusetts residents go elsewhere to purchase or acquire any of the banned handguns because federal law requires the use of an in-state licensed dealer to facilitate any purchase or delivery of a handgun from an out-of-state seller. 18 U.S.C. § 922(a)(3), (a)(5), (b)(3). And, of course, that in-state dealer would have to fully comply with the Handgun Ban.

## II. The Effect of the Handgun Ban on Plaintiffs.

The handguns available for commercial sale to ordinary law-abiding citizens in the Commonwealth are only a portion of the total number of models of commercially available handguns available in the

United States that are in common use for self-defense and other lawful purposes. The Ban includes some of the most popular models, including handguns manufactured by Glock, Beretta, and Sig Sauer. *See* App. 57–59 (listing firearms Plaintiffs wish to acquire but cannot do so through the ordinary commercial market in Massachusetts). Indeed, the whole point of Defendants' maintenance of the Handgun Roster and requiring one or more "features" for inclusion on the Roster (*e.g.*, chamber load indicators or "childproofing protection" features) is to keep out of the market the many handguns lacking those features that are nevertheless commonly available through the rest of the country. Consider, for instance, the "childproofing protection" requirement. One such "childproofing" feature is a minimum ten-pound trigger pull, 940 MASS. CODE REGS. § 16.05(2), but many handguns in common use are not manufactured with such a heavy trigger pull, because it can cause "functional and operational problems," thus making a handgun more difficult to operate effectively. *See Firearms Examiner Training*, NAT'L INST. OF JUST. (July 11, 2023), https://perma.cc/J96K-2VD8. What is ordinarily a choice between different functional alternatives for an American to make is one that Massachusetts has arrogated to itself.

Plaintiffs Stefano Granata and Cameron Prosperi both hold licenses to carry firearms, App. 57, 59, which allow them to lawfully purchase, own, and publicly carry firearms, including handguns. They both wish to acquire, and but for the Handgun Ban would acquire and keep for self-defense, several makes and models of handguns widely sold and commonly owned across the country but which are banned from commercial sale in Massachusetts. App. 57–59.

Plaintiff Gunrunner, LLC is a licensed firearms dealer in Massachusetts which sells handguns that are permitted for sale under the Handgun Ban. But for the Handgun Ban, Gunrunner would make available for sale and sell to law-abiding citizens, like the individual Plaintiffs in this case, several dozen specific makes and models of handguns that are widely sold and commonly owned throughout the country yet forbidden for sale or transfer by licensed dealers in Massachusetts. App. 384, 392–93. Plaintiff Gunrunner would do so based on its knowledge of the handguns otherwise popular and widely available to the public and which their customers wish to purchase notwithstanding the Ban. App. 398–99. Plaintiffs Granata, Prosperi, and Gunrunner are all members of Plaintiff Firearms Policy Coalition, Inc.

("FPC"), a nonprofit membership organization which works to promote and defend the People's rights, especially those rights protected by the Second Amendment. App. 57–62.

## III. Procedural History

Plaintiffs filed this case on June 8, 2021, challenging the Handgun Ban and seeking to enjoin Defendants' enforcement of those laws and regulations. *See* Compl., Doc. 1 (June 8, 2021). On May 19, 2022, the district court granted Defendants' motion to dismiss for failure to state a claim under then-prevailing First Circuit precedent. *See* Order, Doc. 25 (May 19, 2022). Plaintiffs timely appealed and, while the appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *Bruen* rejected the "means-end scrutiny" approach that this Court had previously employed in adjudicating Second Amendment cases as inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See Bruen*, 597 U.S. at 19 n.4 (abrogating, for example, *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019)).

On April 7, 2023, this Court vacated the dismissal and remanded the matter for further proceedings in light of *Bruen. See Granata v. Campbell*, No. 22-1478, 2023 WL 4145911 (1st Cir. Apr. 7, 2023). On

remand, Plaintiffs filed an amended complaint, *see* App. 10, and after a period of discovery the parties filed cross-motions for summary judgment.

On August 29, 2025, the district court granted the State's motion in full and denied Plaintiffs' motion. In doing so, it concluded that the plain text of the Second Amendment was not implicated by the Handgun Ban, importing a Ninth Circuit standard for assessing "ancillary rights" like purchasing (as opposed to the rights of keeping and bearing), and asking, as a prerequisite to constitutional scrutiny, whether the Handgun Ban has "meaningfully constrained" Plaintiffs' rights. Add. 13. Because it concluded that, notwithstanding the Ban, both individual plaintiffs "own various handguns suitable to keep and carry in the event of a confrontation," the fact that Massachusetts has closed the commercial market to wide swaths of the common handguns available in the rest of the country did not even implicate the constitution's protections. *Id*.

In the alternative, the district court concluded that if the plain text of the Second Amendment did cover Plaintiffs' proposed course of conduct, Plaintiffs' claim would still fail because "there are historical analogues for" these regulations. Add. 18 (cleaned up). It credited the Commonwealth's citation of "four different categories of historical

tradition" as providing historical cover for the Handgun Ban. Add. 19. First, it held that historical laws regarding the "proving" of firearms and gunpowder were relevantly similar to the Handgun Ban because the Ban "places requirements on commercial sellers to sell firearms that comply with safety requirements in various forms to protect the customer or user from inadvertent accidents." Add. 22. Second, it found historical laws regarding the storage of gunpowder also qualified as supporting historical analogues because "under the 'nuanced approach' to historical analysis, it is appropriate to conclude that the historic laws' 'why' of protecting users from unintended accidents and fire-related explosions is 'relevantly similar' to the regulations' purpose of restricting" handguns based on safety concerns. Add. 23. Third, the district court credited historical laws prohibiting trap guns because they addressed a "common safety concern" to the Handgun Ban: "[A]n unattended firearm, either with rigged features or lacking safety features such as a load indicator or childproof mechanism, would present a danger to an unsuspecting person that handled the firearm." Add. 24–25. Finally, the district court held that even historical laws restricting minors from purchasing firearms could support that Handgun Ban because it concluded that those laws

and the "child safety features" required by Massachusetts both aimed to "prevent children from accidentally discharging a firearm given their ability to handle and operate the firearm." Add. 26.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's conclusions both as to the textual scope of the Second Amendment and the question of whether the Handgun Ban is historically justified were incorrect. This Court should reverse and remand with instruction that judgment be entered in Plaintiffs' favor.

I. Beginning with the text, under Supreme Court precedent, any law restricting the acquisition of certain types of firearms at least *implicates* the Second Amendment. In this case, a law that bans the ordinary commercial sale in Massachusetts of ordinary handguns, including many of the most popular individual firearms in the Country, simply must trigger scrutiny under the Second Amendment if the Second Amendment is to mean anything at all.

The district court, however, held the Handgun Ban evaded all scrutiny because it was instead a "condition [or] qualification on the commercial sale of arms" that did not "meaningfully restrict" the exercise

of the right. Both of these justifications fail. As for the first, nothing in the Supreme Court's body of Second Amendment caselaw supports the proposition that if a law can be characterized as a "condition" on sale as opposed to a limitation on possession, then it does not implicate the Second Amendment. And the "meaningful restriction" standard, as employed by the district court below, flatly contravenes *Bruen*'s doctrinal holding that the Second Amendment right cannot be justified by any means except a comparison to history.

II. The district court's alternative historical holding fares no better. Properly analyzed, this law is a restriction on the types of ordinary handguns that are available in Massachusetts. *Heller* has already held that such arms are categorically protected, and the Commonwealth's law banning some of them is therefore historically unjustifiable.

Even aside from *Heller*, however, the Commonwealth's proffered historical analogues are inadequate to the task of supporting the Handgun Ban. The district court compared the Ban to historical "proving laws" that required manufacturers to test gun barrels before selling them. But those laws simply mirrored the protection offered today by product liability law, ensuring that firearms worked properly before sale.

The district court also found support in historical laws regulating the storage of gunpowder to prevent fires. But those laws had no effect whatsoever on the types of firearms that people could own. Similarly unavailing are the district court's comparisons to anti-trap gun laws. Those laws prohibited an extremely dangerous misuse of a weapon, not the acquisition of any type of weapon. Finally, laws regulating firearm acquisition by minors likewise did not prohibit normal, adult Americans from possessing ordinary firearms for any lawful purpose the way the Handgun Ban does.

## ARGUMENT

### I. The Plain Text of the Second Amendment Covers Acquiring Handguns.

#### A. A Straightforward Reading of the Second Amendment Includes Purchasing Handguns.

Applying *Bruen*'s textual analysis should not have detained the district court for long. The Supreme Court has already explained that the "arms" protected by the Second Amendment include "all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. Indeed, given that *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen* all dealt with restrictions on handguns, it is inarguable that the handguns

Plaintiffs wish to acquire are "arms" within the meaning of the Constitution's "plain text."

To be sure, this case involves the predicate step of acquiring a firearm, not merely its possession. But that is a distinction without a difference. The Supreme Court has now definitively established that the Second Amendment right to "keep and bear" arms protects both *owning* and *carrying* firearms, and it is obvious that in order to own a firearm, the "right must also include the right to *acquire* a firearm." *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (emphasis in original); *see also Teixeira v. City of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (noting that the "right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Kole v. Village of Norridge*, No. 1:11-cv-03871, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017) (this right "necessarily includes the right to acquire a firearm"). Indeed, *Heller* explained that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. And the same dictionaries on which *Heller* relied make clear that "hav[ing] weapons" includes acquiring them.

Samuel Johnson defined "have" as, most relevantly, "[t]o obtain; to enjoy; to possess" and "[t]o take; to receive." *Have*, SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated). And Webster defined it as "[t]o gain; to procure; to receive; to obtain; to purchase." *Have*, NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). "The right to keep arms," therefore, "necessarily involves the right to purchase them." *Andrews v. Tennessee*, 50 Tenn. (3 Heisk.) 165, 178 (1871) (cited approvingly, *Heller*, 554 U.S. at 608, 614, 629). *Heller* thus establishes that the Second Amendment's plain text covers Plaintiffs' right to "have" the "weapons" being banned, and acquisition is inherent in "having" something.

If it were otherwise—if arms could be banned from sale without implicating the Second Amendment—then *Heller*'s holding that the government cannot ban possession of some arms would be a dead letter. Obviously, if the District of Columbia could have forbidden the *purchase* of handguns it would have, eventually, rendered the possession of them functionally impossible as well. And if bans on buying and selling should be treated as equivalent to bans on possessing, then this case falls within the plain text even though (1) the Handgun Ban does not apply to all

handguns and (2) it does not apply to the secondary market. As to the first point, *Heller* made clear it does not matter that, in banning possession of weapons, the government has declined to ban *all* weapons, so the same must be true for bans on sales. *See* 554 U.S. at 629. And as to the second, a ban on activity occurring in the primary commercial market is no less a "ban" implicating the Amendment's protections because it does not also close the secondary market. If that were the case, then an outright ban on the sale of all firearms in the commercial market would not even incur Second Amendment scrutiny. Just as possession is downstream of purchasing, the secondary market is downstream of the primary market, and restrictions on the primary market at the very least constrict the secondary market and at worst, remove it as an option entirely. Such a law necessarily implicates the right to keep and bear arms. Furthermore, the ordinary commercial market is the way most law-abiding people acquire firearms. Courts in other contexts have had no problem concluding that restrictions limited to the commercial market alone nevertheless implicate the Second Amendment's protections. *See McCoy v. BATFE*, 140 F.4th 568, 575 (4th Cir. 2025) (holding federal law barring 18-year-olds from the commercial market for handguns

constitutional, but noting that "the parties do not dispute that … purchasing a handgun for lawful purposes [] is part of the 'conduct' protected by the Amendment"); *Reese v. BATFE*, 127 F.4th 583, 600 (5th Cir. 2025) (finding the same law unconstitutional under the Second Amendment).

Interpreting the Second Amendment to cover acquisition of firearms accords with the Supreme Court's treatment of other fundamental constitutional rights. It "has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980); *see, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 586–90 (1983) (First Amendment prohibited a tax on the use of ink and paper used by newspapers); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687–88 (1977) (a total prohibition against sale of contraceptives would not only "intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use," but also "might have an even more devastating effect upon the freedom to choose contraception"). The Second Amendment also protects activities that are "concomitant" to the right's exercise, *see N.Y. State Rifle & Pistol Ass'n v.*

*City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting), because "without protection for these closely related rights, the Second Amendment would be toothless," *Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring). And the most necessary concomitant right is the simple right to acquire a firearm.

The Handgun Ban, by limiting sales to approved models of handguns, therefore impacts activity falling within the "plain text" of the Second Amendment, or at the very least, within the necessary implication of the "plain text."

## B. The District Court Wrongly Imported a "Meaningful Constraint" Prerequisite to Second Amendment Scrutiny.

The analysis above is consistent with the analysis the Supreme Court has conducted in each of the Second Amendment cases it has reviewed. The district court deviated from this mode of review, however, and asked instead whether the Ban "meaningfully constrains the core individual possessory right" enshrined in the Second Amendment's plain text. Add. 12 (cleaned up). And it concluded that Plaintiffs' injuries in not being able to acquire through the ordinary commercial market the models they desire and which Massachusetts has banned did not even

raise a constitutional question, because both Granata and Prosperi have other handguns and Massachusetts presented evidence that some handguns are in fact sold in Massachusetts.

The district court offered two related justifications for imposing this requirement. First, reasoning that the right to acquire firearms is merely "ancillary" to the right to possess them, it held that courts should ask in assessing any restrictions targeted at acquisition rather than possession whether the law functionally prevents individuals from possessing any firearms at all for their defense. Add. 13 ("The undisputed record here indicates that Granata and Prosperi have not been prevented from possessing handguns in Massachusetts."). Second, the court suggested that this standard flowed from the fact that the laws at issue here are merely "conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27; *see also* Add. 14–15, and therefore subject to lesser scrutiny.

Neither of these rationales support its analysis. Taking these in reverse order, when *Heller* said that it viewed laws imposing "conditions and qualifications on the commercial sale of arms" as presumptively constitutional, it did not mean that any restriction, however severe, that

could be phrased as a commercial sale "condition" was presumptively lawful. Nor did it exempt anything from Second Amendment scrutiny entirely—*Bruen* notably does not suggest that such cases are an exception to its otherwise universal form of Second Amendment analysis. A "condition or qualification" is "a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records," while a law that actually *bans* certain firearm transactions could not amount to a mere "condition or qualification," *Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (emphasis in original). In other words, a holding that "there would be no constitutional defect in prohibiting the commercial sale of firearms" is "untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated by Bruen*. The Handgun Ban does precisely that.

As for the first basis for the district court's decision, the claim that an "ancillary" right to *acquire* a firearm is entitled to lesser protection, or a different analysis that permits courts to weigh in on what is, or is not "necessary" for the exercise of the Second Amendment right, is contrary to both *Bruen* and *Heller*. Those cases are clear that *all* laws restricting

the exercise of the right must be justified, if at all, by reference to history and nothing else, *see Bruen*, 597 U.S. at 26, and that it is not for courts to decide what is "necessary" for a citizen seeking to exercise his right to possess firearms, *see Heller*, 554 U.S. at 628–29. The district court's contrary conclusion, that the *Bruen* standard only be applied in cases where the law in question directly limits either possession ("keep[ing]") or carrying ("bear[ing]"), while laws that are just one step removed from those acts be given a pass unless they are so restrictive that they entirely "prevent[] [individuals] from possessing handguns in Massachusetts" or similarly amount to de facto prohibitions on the exercise of the right altogether, effectively eviscerates the Second Amendment's protections. *See* Add. 13. Indeed, it brings back, in even weaker form, the very interest balancing that *Bruen* so explicitly prohibited.

This type of treatment for so-called "ancillary" rights is generally contrary to fundamental principles of constitutional interpretation that apply in all areas of the law. Going back to *McCulloch v. Maryland*, the Supreme Court has consistently instructed that courts "must never forget that it is a *constitution* we are expounding" because a constitution, in order to be comprehended by the people, must not "partake of the

prolixity of a legal code" but rather it should be assumed that "only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." 17 U.S. 316, 407 (1819). That the Framers, in stating that the Second Amendment protects "keeping" arms did not separately mention "acquiring" them is, therefore, unsurprising, and the district court erred in drawing a distinction between the two that accorded a lesser degree of protection for such a "closely related right[]." *Luis*, 578 U.S. at 27 (Thomas, J., concurring).

Nevertheless, the district court argued that its approach had been adopted by the Ninth Circuit and similar standards applied in the Second, Fifth, and Tenth Circuits as well. Add. 12. But there are two further problems with relying on these courts to justify the standard the district court imposed.

*First*, these decisions obviously cannot trump the Supreme Court, and the imposition of the "meaningful[] constrain[t]" standard on the right to keep and bear arms based on their reading of the Second Amendment as "not speak[ing] to all restrictions that impact firearms in any way," *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117–18 & n.17 (9th

Cir. 2024), is contrary to Supreme Court precedent. Indeed, in *United States v. Rahimi*, the Court made clear that the Second Amendment is implicated whenever "the Government regulates arms-bearing conduct." 602 U.S. 680, 691 (2024). And regulating which arms a person can acquire directly impacts what arms-bearing conduct the person can engage in. In the passage from *Bruen* that *B&L* relied upon to support this rule, Justice Kavanaugh in a concurrence reiterated that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose[.]" *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). But that was a statement about the Second Amendment's *ultimate* protection of certain weapons and activities, not about its *presumptive* textual scope. In other words, all that Justice Kavanaugh's statement means is that, after both the textual *and* historical analyses are done, not all weapons, and not all uses of them, will be protected. It does not at all suggest that some laws regulating firearms do not trigger scrutiny in the first place.

To the contrary, *Bruen*'s central doctrinal holding was that the only way that *any* "firearm regulation" could be constitutional under the

Second Amendment was if it "is consistent with this Nation's historical tradition." 597 U.S. at 17. The ways in which a law "constrains" the right to keep and bear arms are part of that analysis, but they must be judged against historical restrictions, not whether they seem "meaningful" to a judge. *See id.* at 29 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." (citation omitted) (emphasis in original)).

*Second*, even if this Court were to adopt the Ninth Circuit's "meaningful constraints" test, it should have proven to be no barrier to conducting a fulsome *Bruen* review in a case like this one. *B&L* did not hold that any law that regulates acquisition, as opposed to directly restricting possession, passes *Bruen*'s threshold textual inquiry only if it can be demonstrated to be a "meaningful constraint" on the exercise of the right. Rather, as with *Heller*'s "conditions and qualifications" language, *B&L* was effectively aimed at hurdles sellers needed to jump through, not restrictions that would apply to purchasers. In *B&L*, the law at issue was a regulation on where sellers could operate, but it did not restrict *what* sellers could sell to customers. The Handgun Ban is

different, as it bars certain firearms from the regulated commercial market entirely. Subsequent Ninth Circuit panels applying this standard have similarly been inapposite comparisons to this one. In *Yukutake v. Lopez*, the court drew a line between "*general* regulation[s] of firearms purchasing" and those that "merely restrict one particular *means* of acquiring a firearm," holding that it was the *latter* which might escape scrutiny, but not the former. 130 F.4th 1077, 1091 (9th Cir. 2025), *reh'g en banc granted, op. vacated*, 144 F.4th 1119 (9th Cir. 2025) (mem.) (emphases in original). Although *Yukutake* was vacated, the same distinction was applied in the Ninth Circuit's unvacated decision in *United States v. Vlha*, 142 F.4th 1194 (9th Cir. 2025). *Vlha* dealt with a federal law requiring anyone "engaged in the business" of manufacturing firearms to be licensed by ATF. *See id.* at 1197, 1199–1200. In explaining why the "meaningful constraints" test applied in the case, *Vlha* explained that the test applies "[w]here the challenger is an individual whose direct possessory right to 'keep and bear Arms' is not implicated," as are those who would like to manufacture firearms for business. *Id.* at 1198. But here Plaintiffs include individuals who would like to acquire firearms that Massachusetts bars from the ordinary commercial market and hence

cannot do so (or cannot do so without buying used and paying a premium). Under the Ninth Circuit's own caselaw, that is enough to subject the Handgun Ban to scrutiny.

The district court cited *Gazzola v. Hochul*, as another circuit court decision that has adopted the "meaningful constraint" standard, but that case too abides by the distinction between laws regulating *who* can sell firearms or *where* (which are only scrutinized if they "meaningfully constrain" firearm acquisition) and laws like the Handgun Ban that directly limit what arms are available or who can purchase them, which must be justified historically. *See* 88 F.4th 186, 197 (2d Cir. 2023) (finding there was no evidence that "New York citizens will be meaningfully constrained—or, for that matter, constrained at all—in acquiring firearms and ammunition" by a law requiring licensed dealers to lock up inventory outside of business hours). As the Fifth Circuit explained in *Reese*, it is difficult "to see how a purchase ban unknown at the time of the founding can evade *Bruen* analysis," and to the extent that is what these circuits did, they should not be followed. 127 F.4th at 590 n.2. It is what the district court did, and it should be reversed.

## II. There Is No Historical Justification for the Handgun Ban.

For the foregoing reasons, Handgun Ban regulates conduct falling within the "plain text" of the Second Amendment or, at the very least, within the necessary implication of the "plain text." The Commonwealth therefore bears the burden of proving that history discloses limitations on the right to keep and bear arms that are respected by the Ban. The district court, in the alternative to its textual-level holding, concluded that it had done so, based on four strands of historical evidence, but that was error.

### A. The Supreme Court Has Already Done the Historical Work Necessary to Resolve this Case in Plaintiffs' Favor.

Ordinarily, assessing this issue would require reviewing the " 'historical tradition of firearm regulation' to help delineate the contours of the right," and determining, based on that history, "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691–92 (quoting *Bruen*, 597 U.S. at 17). This would, again, ordinarily, require analogizing the Handgun Ban to historical regulations, with particular attention paid to both "how" and "why" those historical regulations burdened the Second

Amendment right, as a means of deducing an applicable historical principle. "Ordinarily," because in this case, the historical work has already been done, and binding Supreme Court precedent requires invalidating the Handgun Ban.

"Drawing from" America's "historical tradition," *Heller*, which just like this case, dealt with a ban on handguns, held that "the Second Amendment protects" arms that are "in common use at the time." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). Some courts have mistakenly treated "common use" as an element of the Second Amendment's text, but that is wrong. *See* Peter A. Patterson, *Common Use Is Not A Plain-Text Question*, 14 HARV. J.L. & PUB. POL'Y: PER CURIAM 1, 1–3 (2025), https://perma.cc/P5UQ-GPBN. *Heller*'s lengthy discussion of the textual meaning of the word "arms," never once mentioned "common use" or suggested that it is a prerequisite to an item being an "arm" in the literal sense. Rather, *Heller* noted that even the most restrictive Founding-era definition of the term it could find still encompassed "all firearms." 554 U.S. at 581. *Heller*'s discussion of the rule came in its analysis of *history* where it explained that support for the rule was found in two *historical* traditions. First, in the Founding era,

"when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time*." *Id*. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets omitted) (emphasis added). And simultaneously, *Heller* recognized that there had long been a recognized "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148–49 (1769)). Of course, arms that are "in common use" are necessarily not "dangerous and unusual." Therefore, "the pertinent Second Amendment inquiry is whether [the arms at issue] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (emphasis omitted); *see also* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases— Again*, 41 HARV. J.L. & PUB. POL'Y: PER CURIAM (2023), https://perma.cc/6WVZ-RBZZ.

The Handgun Ban is straightforwardly unconstitutional under this principle. It is a *de facto* ban on the acquisition and possession of handguns that lack certain required features but which are, nevertheless

and undeniably, in common use throughout the country. It is, therefore, in all relevant respects, the same type of restriction that was at issue in *Heller*. Residents of Massachusetts can only possibly acquire such handguns through unlicensed sellers, which effectively limits the market to secondhand firearms which may not have a manufacturer's warranty and lack safety guarantees that licensed dealers can offer. The secondary market also has an inherently limited selection of such firearms, and the possibility that a specific desired firearm is actually available for purchase through an unlicensed seller is slim at best. And the scarcity of supply necessarily increases the purchase costs for any prohibited handguns that *might* be available on the secondary market.

And these banned handguns are not "dangerous and unusual arms" which could be banned consistent with history. As the Supreme Court has now twice explained, "handguns . . . are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.' " *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629). Just like *Heller*, *McDonald* similarly resulted in the invalidation of a handgun ban. Indeed, *Heller* and *McDonald* held "the handgun bans at issue in those cases … categorically unconstitutional." *Ezell*, 651 F.3d at 703.

Justice Alito's concurrence in *Caetano* confirms this categorial approach to a ban on arms in common use. Concurring in the Court's *per curiam* opinion summarily reversing and remanding an opinion of the Massachusetts Supreme Judicial Court that upheld a ban on stun guns, Justice Alito reasoned simply that "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Caetano*, 577 U.S. at 420 (Alito, J., concurring).

The district court rejected this reasoning (though it treated it, erroneously, as part of the "plain text" analysis and not in its discussion of history), on the ground that unlike the ban in *Heller*, the Handgun Ban targets specific handguns, not all of them as a class. *See* Add. 16. In support it pointed to dicta[1] in this Court's decision in *Capen v. Campbell*, in which it rejected—on an appeal from a preliminary injunction—the

---

[1] The statement was dicta because, as this Court went on to explain, it had already determined that the facial challenge to the law failed because appellants had not demonstrated a likelihood of success on the merits with respect to the limitations on AR-15 rifles. *Capen v. Campbell*, 134 F.4th 660, 674 (1st Cir. 2025). The constitutionality of the handgun restrictions in the law were therefore beside the point, *id.* and *Capen*'s discussion of this issue is therefore not binding on this Court. *See United States v. Fish*, 758 F.3d 1, 12–13 (1st. Cir. 2014).

notion "that a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class." 134 F.4th at 674. But that is inconsistent with how the Supreme Court has considered these issues and, in any event, it is not necessary to declare the Handgun Ban equivalent to D.C.'s ban to conclude that the *principle* from *Heller* should still be applicable here.

The Supreme Court has always assessed these arguments in categorical terms. For example, the *Heller* Court paid no special attention to the specific type of revolver that Dick Heller sought to possess in challenging the District of Columbia's handgun ban and instead focused on the commonality of handguns *in general*. In explaining that the law the "common use" test was consistent with the historical tradition of members of the militia "bearing arms supplied by themselves *and of the kind* in common use at the time." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179) (emphasis added). In other words, while the individual weapons used by militiamen were protected, that protection stemmed from the fact that they were a common *kind* or *type* of weapon. *Heller* went on to state that "*the sorts* of weapons protected were those 'in common use at the time,'" *id.* at 627 (quoting *Miller*, 307 U.S. at 179)

(emphasis added), indicating again, that under this rule, *categories* of firearms are "protected," with an individual weapon's protected status hinging on whether it is part of a protected *category*. Similarly, in *McDonald*, the Court noted only that the plaintiffs "are Chicago residents who would like to keep handguns," without focusing on the *specific types* of handguns they may have sought. 561 U.S. at 750. And in *Bruen*, the Court cared only that the plaintiffs wanted to carry handguns, and that no "party dispute[s] that handguns are weapons 'in common use' today for self-defense." 597 U.S. at 32; *see also Renna*, 667 F. Supp. 3d at 1061 ("the arms at issue (semiautomatic pistols) are handguns, and handguns are 'indisputably in common use' today" (quoting *Bruen*, 597 U.S. at 47)); *accord Boland v. Bonta*, 662 F. Supp. 3d 1077, 1084 (S.D. Cal. 2023), *appeal pending*, No. 23-55276 (9th Cir. 2023).

"The Amendment does not parse between types, makes and models of arms," *Renna*, 667 F. Supp. 3d at 1061, and neither should this Court. What mattered in *Heller* was not that the law in question banned an entire class of arms in common use, but that the arms targeted by the District of Columbia's law *belonged* to such a category. The district court's contrary reading of the Supreme Court's caselaw as allowing anything

shy of a complete ban has no limiting principle. Under the district court's logic, Massachusetts could restrict the sale of almost all firearms provided it leaves its residents certain State approved options. *See* Add. 17–18 (emphasizing that, notwithstanding the Handgun Ban, dealers sold firearms, including handguns, that were not restricted by Massachusetts). *Heller* emphatically rejected that reasoning when the District of Columbia suggested that its residents could still defend themselves with long guns, *see Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (noting that district "residents still have access to hundreds more" firearms that were not banned (quotation marks omitted)), because "the right to bear other weapons is 'no answer' to a ban on the possession of protected arms," *Caetano*, 577 U.S. at 421 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 629). California made this same argument in defending its similar roster-inclusion "safety" requirements, and the district court in that case correctly rejected it. *Renna*, 667 F. Supp. 3d at 1061–62 & n.8 (rejecting the State's argument that its roster "is not a categorical ban on *all* handguns like that in *Heller*, as Plaintiffs have available for purchase on the retail market hundreds of handguns

on the roster," because that "runs headlong into *Heller's* admonition" (emphasis in original)).

Because Massachusetts cannot prevail simply by the fact that it bans something less than all handguns, to prevail the Commonwealth must show that the *particular* handguns it bans are dangerous and unusual weapons rather than arms in common use. *Heller*, for example, suggested that automatic weapons (and therefore automatic handguns) are dangerous and unusual weapons that can be banned. *See* 554 U.S. at 627. But the handguns that Massachusetts bans are not dangerous and unusual weapons that are "highly unusual in society at large." *id.* To the contrary, they are "widely legal and bought by many ordinary consumers" across the Nation. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). Indeed, the specific handguns Massachusetts bans are among the most popular in the country. Take, for example, Glock handguns, the most prominent example of the types of firearms banned by the Commonwealth. Glocks are among the most popular firearms of any type in the country and are legal almost everywhere; they are therefore "in common use" and in fact have been for some time. *See* Guy J. Sagi, *Glock G19: A Top-Selling Pistol in 2020*, Aм.

RIFLEMAN (Jan. 21, 2021), https://perma.cc/HJ2Q-JLGC ("In 2020 the Glock G19 was the top-selling semi-auto pistol sold by FFLs using the services of GunBroker.com."); *see also Renna*, 667 F. Supp. 3d at 1063 (finding similar arms banned by California to be, as a group, in common use); *How Glock became America's gun*, CBS NEWS (Sep. 15, 2013), https://perma.cc/J5E8-42UA; PETER ALAN KASLER, GLOCK: THE NEW WAVE IN COMBAT HANDGUNS 12 (1992) ("By the end of 1990 there were more than 300,000 Glock pistols in use throughout North America."). Because they are the firearm of choice for much of "the American people," they are categorically protected—Massachusetts cannot veto that decision. *See Heller*, 554 U.S. at 629.

To be sure, this Court in *Ocean State Tactical, LLC v. Rhode Island*, held that history likely permits the banning of so-called "large capacity" magazines even though they are in common use, because it concluded, "magazine capacity directly corresponds to lethality," and "banning them imposes no meaningful burden on the ability of Rhode Island's residents to defend themselves." 95 F.4th 38, 45, 47 (1st Cir. 2024). But that reasoning—which like *Capen* was in the posture of a preliminary assessment of the legal merits of that case and not a final decision—has

no applicability here. The Supreme Court has already concluded that handguns are the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, and Massachusetts' ban reaches some of the most popular modern handguns. What is more, Massachusetts has not established that handguns lacking the required features are more susceptible to criminal misuse than other handguns.

### B. The Historical Analogues the District Court Cited Are Inadequate to Support the Ban.

Even if this Court is not inclined to end its review at the commonality of the restricted firearms, the fact remains that the handguns impacted by Handgun Ban are "arms" within the Second Amendment's plain text. Therefore, wholly apart from their commonality, they are at least presumptively protected absent a showing of some valid historical justification for restricting them. The district court found that justification—or those justifications—in four discrete types of historical laws, but none are adequate to support the Ban. Before analyzing each of those historical threads specifically, two overarching principles of historical analysis under *Bruen* bear mention: first, in defining the historical scope of the right, the touchstone should be the understanding of the right in 1791 when the Second Amendment was

adopted. And second, regardless of whether this court purports to apply a "nuanced approach" or not, *Bruen* still requires a specific and not overly general comparison of a modern restriction to its alleged historical precursors.

Beginning with the timing issue, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' " *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*). The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37; *see also Gamble v. United States*, 587 U.S. 678, 702 (2019) (The relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment," not 1868 when the Fourteenth Amendment was ratified.); *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024), *cert. granted*, 145 S. Ct. 369 (2024) (mem.) ("[T]o maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in

1791."); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."). Consistent with this precedent, this Court has held that " 'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation" in Second Amendment cases and that later evidence, especially " 'late-19th-century evidence' . . . may have probative value if it does not 'contradict[] earlier evidence.' " *Ocean State Tactical*, 95 F.4th at 51 (quoting *Bruen*, 597 U.S. at 27, 66 n.28).

Second, the district court below artificially lessened the burden on the Commonwealth to show that historical laws truly were consistent with the same legitimate underlying principles by suggesting that because handguns today are technologically more advanced than the arms that existed at the Founding, it should employ a "more nuanced approach" in its historical analysis. Add. 19–20 (quoting *Bruen*, 597 U.S. at 27). But by that reasoning, the "nuanced approach" would apply in every Second Amendment case, since all arms in use today are more technologically advanced than those that were in use 250 years ago. Indeed, the district court's approach is flatly foreclosed by *Heller* and *Bruen*, both of which applied a "straightforward historical inquiry"

despite modern developments in handgun technology. *See Bruen*, 597 U.S. at 27.

In any event, properly applied the "nuanced approach" is not a more relaxed version of the *Bruen* analysis, but simply is the *Bruen* analysis applied to novel circumstances. *See Duncan v. Bonta*, 133 F.4th 852, 910 (9th Cir. 2025) (Bumatay, J., dissenting) ("[T]he Supreme Court has never endorsed a 'more nuanced' versus a 'straightforward,' unnuanced approach."). *Bruen* did not suggest that the Government's burden is lessened in a case "implicating unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27. "[I]n the same sentence discussing 'unprecedented societal concerns or dramatic technological changes,' *Bruen* characterizes itself and *Heller* as engaged in an analysis of 'historical analogies,' which strongly suggests that *all* [historical analysis]—even the 'relatively simple' ones like *Heller* and *Bruen*— involve analogical reasoning." J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 32 n.144 (2025). All *Bruen* did was recognize the obvious reality that, in a situation where an aspect of the modern world was significantly different the Founding era, the apparent analogy "will necessarily be looser than an analogy between modern regulations and

predecessors that addressed similar technology or social problems." *Id.*; *see also Duncan*, 133 F.4th at 910 (Bumatay, J., dissenting) ("The Court's note about the occasional need for a 'more nuanced approach' was an unremarkable observation that making comparisons to proper historical analogies might be challenging at times.").

Even under a "nuanced approach," the burden remains on the Commonwealth to establish a historical principle delimiting the scope of the right to keep and bear arms, and, contrary to the district court's rationale below, that principle is not easier to derive or more loosely defined merely because the Government claims a case involves an "unprecedented" modern development. It only means that the same principle's *application* may look different today than it did in 1791, else the Second Amendment's "historically fixed meaning" would in fact be subject to degradation as we get further from the world of the Founding. *Bruen*, 597 U.S. at 28; *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold.").

### 1. Proving Laws Cannot Justify the Handgun Ban.

The district court first concluded the Handgun Ban was relevantly similar to historical "proving" laws for the inspection of firearms and

gunpowder prior to sale. *See* Add. 21–22. It reasoned that the Handgun Ban and these historical restrictions are " 'relevantly similar' in that they include requirements for firearms prior to sale to ensure safe usage by firearm owners and to minimize harm due to malfunction to both the user and the public." *Id.* at 22. It conceded that unlike the proving laws the Handgun Ban "imposes an addition to firearms via a load indicator or magazine safety," but decided "the effect is nonetheless the same—the prohibition on the sale of unfit firearms or condemned gunpowder—while reflecting the use of modern technology that addresses the same core safety concern." *Id.*

**A.** This description of the laws, at such a high level of generality, greatly overstates their similarity. Take, for instance, the most important early American proving law cited by the district court, an 1804 Massachusetts enactment requiring that all firearms manufactured in the state be inspected and certified by a state-appointed "prover" of firearms. App. 103–05; *see* Add. 21. The "prover" would test the soundness of musket or pistol barrels by firing them twice, with different quantities of gunpowder, and if the "barrels shall stand the proof … and shall in no respect fail," then the prover would stamp the barrels to certify

that they had passed and been approved for sale and use. App. 103–04.

Maine passed a very similar, though not as specific, law in 1821. *See* App.

115. As a result of these protections, firearm purchasers in Maine and

Massachusetts could be given a modicum of assurance that the firearms

they were buying would be well-made and in good working order when

they acquired them.

These laws do not establish a generic principle that any regulation

that "ensure[s] safe usage by firearm owners" or "minimize[s] harm due

to malfunction" is constitutional, Add. 22, nor are they "relevantly

similar" to Massachusetts' Handgun Ban. "Proving laws" were aimed at

finding *defective* firearms, which might be dangerous to the user if their

barrels failed. They did not ban any types of or models of firearms, nor

did they mandate that the firearm manufacturers alter how they

constructed their firearms or insist upon the addition of other "safety

features" required by the Commonwealth. The Handgun Ban, however,

does not care if a specific handgun passes a firing test and is in perfect

working condition before it is sold, it is concerned with features the State

requires manufacturers to include; a handgun could pass 100 firing tests

and be in perfect working order; but it would still be banned if, for

instance, it was a model that lacked a "[l]oad indicator" or "[m]agazine safety disconnect." 940 Mass. Code Regs. § 16.01.

There are other problems with analogizing to these proving laws. The historical restrictions applied only to manufacturers in their respective states, and did not prevent, for instance, someone from Massachusetts from purchasing any firearm he wished, untested by a prover, if it was made in New Hampshire. *See* App. 104. Furthermore, while Massachusetts was home to a very important firearm manufacturer, the federal Springfield Armory, the proving law did not apply to arms made by Springfield Armory at all. *See* App. 217. The State's expert below opined that this was because such restrictions were unnecessary on Springfield Armory firearms, because the Springfield Armory imposed its own quality control regime on the firearms it produced. *See* App. 216–17. But that only proves how *unlike* these proving laws the Handgun Ban is; it is functionally their opposite. Just like Springfield Armory, firearm manufacturers today have exacting quality control processes to ensure that their firearms are reliable out of the box. *See Advanced manufacturing*, Glock, https://perma.cc/N3PM-MW63. But the Handgun Ban perversely prevents purchasers of the

banned firearms from having any such assurances. While purchasing a new Glock pistol from a licensed dealer carries with it the guarantee that the firearm has never been used, modified, stolen, or tampered with, and is accompanied by a manufacturer's warranty—significantly more robust protection than was offered even the proving laws on which the district court relied—a purchase on the secondary market lacks all of those things and leaves the purchaser in the same position as a resident in Massachusetts in 1806 who decided to purchase an untested New Hampshire barrel for his firearm.

**B.** Even if the proving laws were relevantly similar to the Handgun Ban—and to be clear, they are not—two laws do not amount to a "well-established and representative" tradition of historical regulation. *Bruen*, 597 U.S. at 30; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 480 (2020) (requiring a traditional limitation on the First Amendment to be "historic and substantial"). The district court, however, attempted to bolster the case for them by lumping them together with gunpowder proving laws, as well as the practice during the Revolutionary War and after of the colonies (and then the federal military) requiring the

"proving" of militia weapons. Add. 21–22. But these do not advance the Commonwealth's case.

As for the prescription of standards by governmental bodies for the weapons used by the military, they are totally irrelevant. Manufacturers do not have a Second Amendment right to have the military buy their firearms, and the government is of course free today as it was in the 1790s to set standards or specifications for firearms it wants to buy or use in the military. In doing so, it does not interfere in any way with the ability of individuals to make different decisions for themselves and does not restrict the sale of any firearms to civilian purchasers. The two things therefore are not at all comparable in "how" they burden the right. For example, the Sig Sauer P320 pistol is the civilian version of the military's standard issue sidearm, the M17/M18. *See P320-M17*, SIG SAUER, https://perma.cc/S6RH-ARA6. The M17 is constructed to military specifications, but the fact that the military has those specifications for the firearms it buys has no effect at all on the handguns available to civilian Americans, who can choose a Sig Sauer or can choose other options not built to military specifications.

As for the laws regarding the proving of gunpowder, though these were similar to the proving laws for firearm barrels passed in Massachusetts and Maine, they do not support the Handgun Ban. Like the Massachusetts barrel proving law, the gunpowder laws aimed to protect consumers "against 'inferior' gunpowder with defects not readily discoverable otherwise." Add. 21–22. They did not, in any way, meaningfully restrict the availability of firearms on the market, or even limit the availability of effectively fungible gunpowder—they were a shield against latent defects caused by shoddy manufacturing. Again, the Handgun Ban perversely *increases* the likelihood that an individual who wishes to acquire one of the restricted weapons will acquire a defective one by denying the ability to purchase new firearms at retail. Instead of weeding out defective products, the Handgun Ban does not merely eliminate those guns that are "unfit for use," Add. 21 (quoting App. 104). Rather, it seeks to restrict firearms Massachusetts wishes people would not choose. But as the Supreme Court has made clear, in this area it is the choices of the American people, not their state governments, that matters. *Heller*, 554 U.S. at 629.

## 2. Fire Safety Rules Are Also Irrelevant.

The district court also held that "laws regarding the storage of gunpowder and weapons from the colonial period through the 19th century" served as valid historical analogues for the Handgun Ban. Add. 23. In doing so, it emphasized that it was applying the " 'nuanced approach' to historical analysis" as a means of drawing looser historical analogies and, in that mode, concluded that "the historic laws' 'why' of protecting users from unintended accidents and fire-related explosions is 'relevantly similar' to the regulations' purpose of restricting the commercial sale to the public of handguns that are 'prone to repeated firing based on a single pull of the trigger,' explosion or accidental discharge." *Id.* (discussing 940 MASS. CODE REGS. § 16.04(2) and MASS. GEN. LAWS ch. 140, § 123(o)).

There are several problems with this analogy. First and foremost, it is too narrow to justify the Handgun Ban in toto, which is how it was used by the district court. Though the district court claimed that "there is sufficient uncontroverted evidence in the record to conclude the firearm and gunpowder storage laws are a historical analogue for the Massachusetts handgun regulations," Add. 24, its actual analysis was

much narrower than that and focused only on the firearms that are excluded from the Roster because they have not passed a "drop test" that is aimed at proving it is not "prone to accidental discharge." 940 MASS. CODE REGS. § 16.01, 16.04(2). Even if these laws could be analogues for the drop test component of the Handgun Ban, the Ban restricts even arms that *have* met requirements like the drop test (or only have not because they are otherwise banned and have not been submitted for futile testing). *Bruen* requires comparing both "how" and "why" modern and historical restrictions burdened the right to keep and bear arms and it cautioned against "endorsing outliers that our ancestors would never have accepted." 597 U.S. at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). Accepting a regime that greatly restricts the types of handguns that are commercially available in Massachusetts because just *one* limitation in that regime can be analogized (at a high level of generality) to historical gunpowder storage laws, violates those principles.

But even that *one* limitation is not remotely similar to these gunpowder storage laws. The historical restrictions were, as *Heller* has already explained, not firearm laws at all but rather fire-safety measures

that are irrelevant to the scope of the Second Amendment's protection. *See Heller*, 554 U.S. at 632. Just as Heller's conclusion that the government could not bar handguns did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents," neither do laws regulating the storage of gunpowder remotely suggest the validity of *any* provision that restricts the type of firearms that are commercially available in the commonwealth. The historical laws burdened the right to self-defense only incidentally, if at all, and not in the way the Handgun Ban does, since they did not prohibit the owner from keeping and bearing whatever type of firearm he wanted (and also permitted the storage of plenty of gunpowder to make that firearm useful).

While it is true that this Court, in *Ocean State*, relied in part on these laws to support restrictions on ammunition magazine capacity, that case's reasoning has no applicability here. The "why" identified in *Ocean State Tactical* for these historical laws was that the aggregation of gunpowder posed risks of explosion and fire "which could kill many people at once if ignited," which the Court found similar to magazines that provide additional firepower to weapons. 95 F.4th at 49. But that is utterly dissimilar to the risk of misfire that is the aim of the one

component of the Handgun Ban for which the district court found this provided support.

### 3. Trap Gun Laws Restricted Unlawful Uses of Weapons, Not Types of Common Arms.

The district court also credited "trap gun" laws as analogous to the Handgun Ban, holding that they shared a "common safety concern … that an unattended firearm, either with rigged features or lacking safety features such as a load indicator or childproof mechanism, would present a danger to an unsuspecting person that handled the firearm." Add. 24–25. But that seriously misunderstands the nature of these historical restrictions. They were unlike the Handgun Ban both in "how" and "why" they operated. As for "how," "trap guns" are not a discrete *type* of firearm that has historically been banned, but an illegal *use* of firearms, whereby they are rigged to fire if a "trap" (for example, a trip wire) is sprung. *See, e.g.*, App. 77–83 (laws of this type from Plymouth in 1670 and New Jersey in 1771). Such a restriction is fundamentally different from a law that prohibits even possessing a firearm that lacks, for example, a "chamber load indicator." And as for "why," the concern was not with accidents happening with a firearm, but with an individual committing a crime by intentionally rigging a firearm to go off without human input and killing

54

someone when lethal force was not justified. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1218 (7th Cir. 2023) (Brennan, J., dissenting) ("They fire indiscriminately, and the 'why' of banning them—the imbalance of using lethal force to protect property versus human life—is different than the 'why' " for a modern ban on a type of arms.).

### 4. Laws Restricting Firearm Access By Minors Have Nothing to Do with the Handgun Ban's Restrictions on Adults.

Finally, the district court credited even "laws protecting minors from harm caused by firearms" as historical analogues for the Ban." Add. 25. The district court found laws either banning minors from acquiring firearms or, in a few cases, the sale of certain "toy guns" that despite being miniature, were in fact capable of causing lethal injuries like real pistols were relevantly similar to the Handgun Ban's requirement that handguns have some feature that make it impossible for a 5-year-old to use the weapon. Add. 26. As with the comparison between historical fire safety laws and the Handgun Ban's "drop test" requirement, the first problem with this analogy is that it compares historical restrictions to just *one* facet of the Handgun Ban—at most, they could support that one facet of the ban, not the whole Handgun Ban. But furthermore, they

should not even be able to do that. The district court found the laws were similar in "how" they restricted the right, reasoning that "the Massachusetts handgun regulations draw from the historical analogues presented while addressing the advancements in technology to prevent firearm accidents involving children." *Id.* But that says *nothing* about "how" they actually restricted the right and in fact there is no similarity. Massachusetts already has laws banning children from acquiring firearms and handguns, exactly like these historical laws did. *See* MASS. GEN. LAWS ch. 140, §§ 129B(a), 131 (requiring a license to carry or firearm identification card to possess any firearms, and requiring an individual to be at least 15 years of age to acquire the lesser of these licenses). The historical laws which banned minors from acquiring firearms or banned "toy" firearms that were used by minors had no impact on the ability of ordinary adult Americans to acquire ordinary arms that were in common use at the time. Because the Handgun Ban *does* have that effect, there can be no comparison between the two.

# CONCLUSION

The judgment of the district court should be reversed and the case should be remanded with instruction to grant judgment in Plaintiffs' favor.

Dated: January 21, 2026

Respectfully submitted,

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 11,395 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: January 21, 2026 /s/David H. Thompson
David H. Thomspon
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 21, 2026

/s/David H. Thompson
David H. Thomspon
*Counsel for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY
COALITION, INC.; CAMERON PROSPERI,

*Plaintiffs-Appellants*,

JUDSON THOMAS; COLBY CANNIZZARO,

*Plaintiffs*,

v.

ANDREA J. CAMPBELL, in the official capacity as Attorney
General of the Commonwealth of Massachusetts; TERRENCE M. REIDY, in the
official capacity as Secretary of the Executive Office of Public Safety and Security
of the Commonwealth of Massachusetts,

*Defendants-Appellees*.

**On Appeal from United States District Court
for the District of Massachusetts**
Civil Case No. 1:21-cv-10960-DJC
The Honorable Denise Jefferson Casper, Judge

## PLAINTIFFS-APPELLANTS' OPENING BRIEF ADDENDUM

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

Opinion & Order, Doc. 103 (Aug. 29, 2025).....................................................Add. 1

Judgment, Doc. 104 (Aug. 29, 2025)...........................................................Add. 27

U.S. Const. amend. II..............................................................................Add. 28

Mass. Gen. Laws ch. 140, § 123(o)............................................................Add. 29

940 Mass. Code Regs.
    § 16.00 ..........................................................................................Add. 32
    § 16.01 ..........................................................................................Add. 33
    § 16.02 ..........................................................................................Add. 38
    § 16.03 ..........................................................................................Add. 40
    § 16.04 ..........................................................................................Add. 41
    § 16.05 ..........................................................................................Add. 43

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA, et al., | ) |
| **Plaintiffs** | ) |
| v. | ) Case No. 21-cv-10960-DJC |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts, et al., | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**CASPER, C.J.**                                                **August 29, 2025**

## I.    Introduction

Plaintiffs Stefano Granata ("Granata") and Cameron Prosperi ("Prosperi") ("Individual Plaintiffs"), The Gunrunner, LLC (" The Gunrunner"), and Firearms Policy Coalition, Inc. ("FPC") (collectively, the "Granata Plaintiffs")[1] have filed this lawsuit against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts ("AG Campbell"), and Terrence M. Reidy, in his official capacity as Secretary of the Executive Office of Public Safety and Security ("EOPSS") of the Commonwealth of Massachusetts ("Secretary Reidy") (collectively, "Defendants"), seeking permanent injunctive relief and a declaratory judgment that the challenged Massachusetts handgun laws and regulations violate the

---

[1] Two other individual Plaintiffs were voluntarily dismissed from this case by joint stipulation of the parties.  D. 52.

Second and Fourteenth Amendments to the U.S. Constitution facially and as applied.  D. 34.  Both parties have now moved for summary judgment, D. 61; D. 79.  For the reasons stated below, the Court DENIES Plaintiffs' motion for summary judgment, D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

## II.    Standard of Review

To succeed on a facial constitutional challenge to state law, the moving party must demonstrate "that the statute lacks any 'plainly legitimate sweep.'"  Hightower v. City of Boston, 693 F.3d 61, 77-78 (1st Cir. 2012) (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)).  To succeed on an as-applied challenge, the moving party must show that the challenged statute is unconstitutional as applied to the particular circumstances in his case.  See id. at 71-72.

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  "When deciding cross-motions for summary

judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## III.     The Challenged Handgun Regulatory Scheme

The Massachusetts legislature has codified certain handgun safety requirements at Mass. Gen. L. c. 140, § 123(o).  The statutory requirements do not apply to private sellers, and instead apply only to licensed firearm dealers/retailers.  Id. (referring to the prohibitions of selling any such firearm to a firearm retailer or consumer by any "licensee"); see 501 C.M.R. § 7.02 (defining "licensee" as "a firearm dealer licensed in Massachusetts under [Mass. Gen. L.] c. 140, § 122"); see also 940 C.M.R. § 16.01 (defining "handgun purveyor" to exclude, among other categories, a "person or entity [that] transfers less than five handguns per year").

Accordingly, the regulatory scheme (between the statute and the applicable regulations) require that handguns lawfully sold by licensees within the Commonwealth, must, among other things:  (1) meet specified minimum melting points, tensile strength, and density; or pass a make and model performance test (940 C.M.R. §§ 16.01, 16.04(1) and (3); Mass. Gen. L. c. 140 § 123(o)); (2) not be prone to either repeated firing from a single trigger pull or explosion upon firing with standard ammunition (940 C.M.R. § 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (3) not be prone to accidental discharge (940 C.M.R. §§ 16.01, 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (4) have a "safety device" that prevents unauthorized use of the firearm (940 C.M.R. § 16.05(1)); (5) have a tamper-resistant serial number (940 C.M.R. § 16.03); (6) have a mechanism that "effectively precludes an average five-year-old child from operating the handgun when it is ready to fire" (i.e., a form a childproofing), "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions

in order to fire the handgun" (940 C.M.R. § 16.05(2)); and (7) for semi-automatic handguns, have either "a load indicator or a magazine safety disconnect" (940 C.M.R. § 16.05(3) and (4)).

The legislature also directed the Secretary of the EOPSS to "compile and publish a roster" of handguns that meet the § 123 requirements, known as the "Approved Firearms Roster." Mass. Gen. L. c. 140, § 131 ¾ (a); 501 C.M.R. § 7.01 *et seq.*[2] To be listed on the Approved Firearms Roster, the Secretary must receive a final test report from an approved testing laboratory certifying that the handgun satisfies the Mass. Gen. L. c. 140, § 123(o) requirements. 501 C.M.R. § 7.03(1). The Approved Firearms Roster lists firearms that have meet the § 123(o) requirements, but because the Attorney General's regulations regarding childproofing, load indicators or magazine disconnect mechanisms, and tamper-resistant serial numbers have not been codified by the Legislature they are not tested for inclusion on the Approved Firearms Roster. See Enforcement Notice #3: Attorney General's Handgun Safety Regulations. It is unlawful for a licensed dealer/retailer to sell a firearm that is not so listed. 501 C.M.R. § 7.05.

## IV.    Factual Background

The Court draws the following undisputed facts from the parties' statement of undisputed facts and accompanying exhibits. D. 65; D. 81-1; D. 93-1; D. 97; D. 98.

### A.    <u>Parties</u>

AG Campbell is responsible for promulgating and enforcing regulations found at 940 C.M.R. §§ 16.01-16.09. D. 65 ¶ 1; D. 81-1 ¶ 1. Secretary Reidy has promulgated the regulations found at 501 C.M.R. §§ 17.01-17.16. Id. AG Campbell and Secretary Reidy have the authority to cease enforcement of the handgun regulations challenged by Plaintiffs. D. 65 ¶ 2; D. 81-1 ¶ 2.

---

[2] See Enforcement Notice #3: Attorney General's Handgun Safety Regulations (940 C.M.R. 16.00), February 2002, https://perma.cc/XA22-QCJX.

Granata and Prosperi each hold a License to Carry Firearms ("LTCF").  D. 65 ¶ 7; D. 81-1 ¶ 7.  Granata and Prosperi also both wish to acquire several makes and models of firearms not on the Approved Firearms Roster or that do not satisfy the Attorney General's handgun sales regulations.  D. 65 ¶ 8; D. 81-1 ¶ 8.  Granata currently owns fourteen guns, including nine different handgun models.  D. 81-1 ¶ 9; D. 93-1 ¶ 9.  But for the Massachusetts handgun regulations, Granata would commercially purchase a Glock 19 Gen 5, two Sig Sauer handgun models, possibly other Sig Sauer, CZ and Smith & Wesson models, a Heckler & Koch handgun model and a Walther handgun model.  D. 81-1 ¶ 14; D. 93-1 ¶ 14.  Although the Glock would be Granata's preferred carry weapon and he would buy a fifth generation Glock, he is not aware of anyone who has one in Massachusetts and he has not yet tried to purchase one on the private market.  D. 81-1 ¶ 15; D. 93-1 ¶ 15.  Granata wishes to purchase the Sig Sauer models as collector's items; he does not intend to carry or shoot either gun.  D. 81-1 ¶ 16; D. 93-1 ¶ 16.

As of August 22, 2024, Prosperi owned fourteen firearms and nine different handgun models, all of which he purchased in Massachusetts.  D. 81-1 ¶ 10; D. 93-1 ¶ 10.  Prosperi possesses six different Glock handgun models that he has purchased in Massachusetts both in the private market and from retailers. D. 81-1 ¶ 19; D. 93-1 ¶ 19.  One of the Glock handgun models Prosperi possesses is the same Glock model that Granata wishes to purchase commercially.  D. 81-1 ¶ 20; D. 93-1 ¶ 20.  But for the Massachusetts handgun regulations, Prosperi has identified one or more of at least eight additional handgun models from CZ, Beretta and Atlas Gunworks, that he would purchase from retailers in Massachusetts if he could.  D. 81-1 ¶ 25; D. 93-1 ¶ 25.

The Gunrunner keeps about 300 handguns in stock at any given time, representing about thirty to thirty-five different models of handguns, from fifteen to twenty brands.  D. 81-1 ¶ 27; D. 93-1 ¶ 27.  The Gunrunner would like to make available for sale makes and models of handguns,

a subset of which do not appear on the Approved Firearms Roster and do not satisfy the Massachusetts sales regulations. D. 65 ¶ 9; D. 81-1 ¶ 9. "More often than not," customers who wish to purchase handgun models that cannot be sold by retailers instead purchase another handgun model that is authorized for commercial sale. D. 81-1 ¶ 28; D. 93-1 ¶ 28.

FPC is a nonprofit organization incorporated under the laws of Delaware, whose essential purposes include defending and promoting people's rights under Second Amendment rights. D. 65 ¶ 11; D. 81-1 ¶ 11. FPC has members in Massachusetts, including Granata, Prosperi and the Gunrunner. D. 65 ¶ 13; D. 81-1 ¶ 13. FPC is suing on behalf of its members who wish to acquire one or more handguns from a licensed retailer, like the Gunrunner, that are not on the Approved Firearms Roster or do not satisfy the Massachusetts sale regulations. D. 65 ¶ 14; D. 81-1 ¶ 14.

### B.    Firearms Market in Massachusetts

In Massachusetts, licensed retailers are prohibited from transferring handguns that do not appear on either the Approved Firearms Roster or the Formal Target Shooting Roster and that do not comply with the Massachusetts sales regulations. D. 65 at 2; D. 81-1 at 2. Handguns that are not on the Approved Firearms Roster or Formal Target Shooting Roster and that do not satisfy the Massachusetts sales regulations still may be sold or purchased in private sales. See D. 65 ¶ 15; D. 81-1 ¶ 15.

Between 2019 and 2024, approximately 113 firearms have been added to the Approved Firearms Roster. D. 81-1 ¶ 1; D. 93-1 ¶ 1. Of the semiautomatic handgun models on the Approved Firearms Roster, over 500 handguns also comply with the Attorney General's regulations. D. 81-1 ¶ 2; D. 93-1 ¶ 2. Of 1,160 models on the Approved Firearms Roster as of June 2024, at least 1,029 handgun models also comply with the Attorney General's regulations. D. 97 ¶ 31; D. 98 ¶ 31.

Add. 6

In 2022, Massachusetts licensed dealers/retailers reported 72,502 handgun sales and 20,813 private sales of handguns were reported.  D. 81-1 ¶¶ 5, 8; D. 93-1 ¶¶ 5, 8.  In 2023, Massachusetts licensed dealers/retailers reported 67,652 handgun sales and 24,213 private sales of handguns were reported.  D. 81-1 ¶¶ 4, 7; D. 93-1 ¶¶ 4, 7.  In 2024, Massachusetts licensed dealers/retailers reported 76,409 handgun sales and 16,051 private sales of handguns were reported.  D. 81-1 ¶¶ 3, 6; D. 93-1 ¶¶ 3,6.  In 2024, Massachusetts licensed dealers/retailers reported 4,028 Glocks sold and 3,156 Glocks were reported as sold in private sales.  D. 81-1 ¶ 30; D. 93-1 ¶ 30.

## V.    Procedural History

Plaintiffs instituted this action against the former Massachusetts Attorney General and former EOPSS Secretary on June 8, 2021 before a different session of this Court (Zobel, J.).[3] D. 1.  On May 19, 2022, the Court granted Defendants' motion to dismiss, D. 24; D. 25, and shortly thereafter the Granata Plaintiffs appealed, D. 26.  The First Circuit later vacated the district court's judgment and remanded the matter for further proceedings on April 7, 2023 in light of the Supreme Court's decision in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).  D. 32; D. 33.  The Granata Plaintiffs then filed an amended complaint on September 21, 2023, D. 34, and Defendants filed an answer on November 20, 2023, D. 38.  On December 7, 2023, this matter was reassigned to this session.  D. 41.  The Granata Plaintiffs have now moved for summary judgment, D. 61, and Defendants have cross moved for summary judgment, D. 79.  The Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") and the Brady Center to Prevent Gun Violence ("Brady Center") filed an amicus brief.  D. 88.  The Court heard the parties on the pending motions

---

[3] AG Campbell and EOPSS Secretary Reidy were substituted pursuant to Fed. R. Civ. P. 25(d).

and took these matters under advisement.  D. 99.

## VI.    Discussion

### A.    <u>The Supreme Court's Second Amendment Jurisprudence</u>

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court held in <u>Heller</u> that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense," and held in <u>McDonald</u> that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in <u>Heller</u>."  <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742, 749, 791 (2010) (citing <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)).  In <u>McDonald</u>, the Supreme Court reiterated that it "made it clear in <u>Heller</u> that [its] holding did not cast doubt on such longstanding regulatory measures as . . . 'laws imposing conditions and qualifications on the commercial sale of arms.'"  <u>Id.</u> at 786 (quoting <u>Heller</u>, 554 U.S. at 626-27); <u>see United States v. Rahimi</u>, 602 U.S. 680, 699 (2024) (noting that "<u>Heller</u> never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home" and that "[the <u>Heller</u>] opinion stated that many such prohibitions [given as examples in <u>Heller</u>], are 'presumptively lawful'") (quoting <u>Heller</u>, 554 U.S. at 627 n.26); <u>see also</u> <u>Bruen</u>, 597 U.S. at 81 (Kavanaugh, J., concurring) (noting that the Supreme Court "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive") (quoting <u>Heller</u>, 554 U.S. at 627 n.26).

In <u>Bruen</u>, the Supreme Court held that <u>Heller</u> and <u>McDonald</u> "do not support applying means-end scrutiny in the Second Amendment context" and ruled that "[i]nstead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  <u>Bruen</u>, 597 U.S. at 17, 19; <u>see United States v. Turner</u>, 124 F.4th 69, 75 (1st Cir. 2024) (recognizing that in <u>Bruen</u> "the Court explained that, to

overcome a properly preserved Second Amendment challenge to a restriction on firearm possession, the government bears the burden of demonstrating that the restriction at issue is 'consistent with the Nation's historical tradition of firearm regulation'") (quoting Bruen, 597 U.S. at 24). Bruen thus provided "the standard that courts must use to evaluate the constitutionality of regulations that burden an individual's Second Amendment right to bear arms: [i]f the regulation at issue burdens conduct that falls within the plain text of the Second Amendment, then it is unconstitutional unless the government can prove that its regulation is 'consistent with the Nation's historical tradition of firearm regulation.'" United States v. Crater, 93 F.4th 581, 588 (1st Cir. 2024) (quoting Bruen, 597 U.S. at 24).

As to the first step of Bruen, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Bruen, 597 U.S. at 17. The relevant inquiry for courts is "not simply whether the regulation [at issue] affects firearms in some way, but whether the regulation infringes the right to own and bear arms in the case of confrontation." Oakland Tactical Supply, LLC v. Howell Township, Michigan, 103 F.4th 1186, 1196 (6th Cir. 2024). "[I]n defining a plaintiff's proposed conduct, courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do." Id.; see Doe v. Bonta, 101 F.4th 633, 639 (9th Cir. 2024) (noting that the relevant proposed conduct is "what the plaintiffs wanted to do and what the challenged law prevented them from doing"); B&L Prods., Inc. v. Newsom, 104 F.4th 108, 117 & n.17 (9th Cir. 2024) (same).

With respect to the second step of Bruen, courts must ask whether "[t]he government [can] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Bruen 597 U.S. at 24. Cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to historical analysis,

including "analogical reasoning" to determine whether historical analogues are "relevantly similar." Bruen, 597 U.S. at 27-30; see Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 44 (1st Cir. 2024), cert. denied, No. 24-131, 2025 WL 1549866 (U.S. June 2, 2025). In evaluating whether the historical analogues are "relevantly similar," courts must compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29. "Analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.* So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Bruen, 597 U.S. at 30 (emphasis in original); see Rahimi, 602 U.S. at 692 (explaining that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations . . . [t]he law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin"). In Rahimi, the Supreme Court clarified the approach set forth in Bruen by noting that the appropriate analysis involves whether the challenged regulation is "'consistent with the principles that underpin our regulatory tradition,'" such that it is 'relevantly similar' to laws that our tradition is understood to permit." Rahimi, 602 U.S. at 692, 698 (concluding that a federal statute, which bars individuals determined by a court to be credible threats to another's physical safety from possessing a firearm, was "relevantly similar" to surety and going armed laws, two founding era regimes, because the statute, like the two regimes, "applies to individuals found to threaten the physical safety of another," "restricts gun use to mitigate demonstrated threats of physical violence, just as the [two regimes] do" and "does not broadly restrict arms use by the public generally") (quoting Bruen, 597 U.S. at 24, 29).

**B.     The Massachusetts Handgun Regulatory Scheme Is Not Covered by the Plain Text of the Second Amendment**

"[Bruen] first asks whether the proposed conduct affected by the challenged law is protected by 'the Second Amendment's plain text'" because "[a]s carefully detailed in Heller, the right covered by the Second Amendment's plain text is the right to possess and carry arms in case of confrontation." Oakland Tactical, 103 F.4th at 1195  (noting that in Bruen, "[r]ather than defining the proposed conduct at the high level of generality urged by Plaintiffs—i.e., 'carrying handguns'—the Court's definition incorporated the purpose and location of the plaintiffs' desired action") (quoting Bruen, 597 U.S. at 32).

The Defendants argue that the Granata Plaintiffs' proposed conduct does not fall within the plain text of the Second Amendment because the Massachusetts handgun regulations do not infringe the Granata Plaintiffs' individual right to possess handguns in case of confrontation and because they are "presumptively lawful 'conditions and qualifications on the sale of arms' that do not meaningfully impair the [Granata Plaintiffs'] ability to access firearms.  D. 80-2 at 16 (quoting Heller, 554 U.S. at 626-27 & n.26).  As noted above, the Supreme Court has recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are part of a non-exhaustive list of "presumptively lawful regulatory measures."  Heller, 554 U.S. at 626-27 & n.26; see McDonald, 561 U.S. at 786; Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring); Rahimi, 602 U.S. at 735 (Kavanaugh, J., concurring).  In picking up this tenet, some Circuits have adopted an "ancillary-rights" doctrine and employed a "meaningful-constraint on the right to acquire firearms" test "to determine whether the conduct at issue is presumptively protected by the Second Amendment" under the first step of the Bruen analysis.  B&L Prods., 104 F.4th at 118; see United States v. Vlha, 142 F.4th 1194, 1198 (9th Cir. 2025).

The ancillary-rights doctrine is "based on the text of the Second Amendment, which [the Ninth Circuit has] interpreted as prohibiting 'meaningful constraints' on the right to possess firearms." Vlha, 142 F.4th at 1198 (citing B&L Prods., 104 F.4th at 118). Pursuant to the ancillary-rights doctrine, the Second Amendment protects some activities ancillary to the core possessory right, including the ability to acquire weapons . . . [b]ut [it] is limited in this context [and] it protects ancillary activities only if the regulation of such activities 'meaningfully constrain[s]' the core individual possessory right." Id.; see B&L Prods., 104 F.4th at 118 n.18. The Second, Fifth and Tenth Circuits also have adopted the Ninth Circuit's "meaningful-constraint test or something like it." Vlha, 142 F.4th at 1198; see Gazzola v. Hochul, 88 F.4th 186, 196-97 (2d Cir. 2023) (recognizing the Ninth Circuit's "meaningful constraint" test and concluding that "there [was] no evidence that [New York law] will impose such burdensome requirements on firearms dealers that they restrict protections conferred by the Second Amendment"); McRorey v. Garland, 99 F.4th 831, 839 (5th Cir. 2024) (affirming denial of challenge to expanded background checks for 18-to-20-year-old prospective firearms purchasers noting that "[t]he right to 'keep and bear' can implicate the right to purchase . . . [which] is why the [Supreme] Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping" but noting that "such an implication is not the same thing as being covered by the plain text of the amendment"); see also Rocky Mountain Gun Owners, 121 F.4th at 120 (agreeing with the Ninth Circuit that "[t]he most reasonable interpretation of th[e] passage [from Heller carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the Bruen test").

The relevant proposed conduct here is "what the [Granata Plaintiffs] want[] to do and what the challenged [Massachusetts handgun regulations] prevent[] them from doing." See Doe, 101

F.4th at 640. The Granata Plaintiffs assert that the proposed conduct is "possessing common handguns that Massachusetts has barred from sale." D. 62 at 13. The Massachusetts regulatory scheme at issue here, however, does not ban the possession of handguns by eligible individuals wishing to "keep and bear" these "[a]rms" in the Commonwealth. See U.S. Const. amend. II. Rather, the Massachusetts handgun regulations apply to licensed dealers/retailers and require them to only sell handgun models from the Approved Firearms Roster that have met certain manufacturing standards and safety features to comply with the Attorney General's regulations. See Mass. Gen. L. c. 140 §§ 123(o), 131 ¾; 940 C.M.R. §§ 16.00 et seq. Given that "[t]here is a longstanding distinction between the right to keep and bear arms and commercial regulation of firearms," Morehouse Enters., LLC v. BATFE, No. 22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022) (citing Heller, 554 U.S. at 626-27), and that the proposed conduct here involves the commercial sale by licensed dealers/retailers of certain handguns that do not comply with the Commonwealth's laws and regulations, the Court considers whether the Commonwealth's handgun regulatory scheme "meaningfully constrains the would-be purchasers from possessing firearms." Vlha, 142 F.4th at 1200.

The undisputed record here indicates that Granata and Prosperi have not been prevented from possessing handguns in Massachusetts and the Massachusetts handgun laws have not "meaningfully constrain[ed] [their] core possessory right," Vlha, 142 F.4th at 1198, as they both own various handguns suitable to keep and carry in the event of a confrontation. D. 93-1 ¶¶ 9-10; see Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015), aff'd on other grounds, 827 F.3d 1 (1st Cir. 2016) (concluding the Second Amendment did not apply to requirement that firearms for sale possess a "load indicator" because it "in no way prevents citizens from obtaining a wide array of firearms"). Specifically, Granata owns fourteen firearms, including nine different handgun

models, D. 93-1 ¶ 9; D. 82-14 at 48-49, and he rotates two of his handguns for concealed carry while the rest are for target shooting or kept as collector's items, D. 93-1 at 3; D. 82-14 at 24, 28, 33, 35-37, 41, 43, 46.  Although Granata wishes to purchase a fifth generation Glock to use as his preferred carry weapon and he is unaware of anyone in Massachusetts that has one, he has not tried to purchase the Glock in the private market.  See D. 93-1 ¶ 15; D. 82-14 at 60-61; see also D. 83-2 ¶ 14 (attesting that in 2024, 3,156 Glocks were reported as sold in private sales in Massachusetts).  Granata has also stated that he does not intend to carry or shoot the Sig Sauer handgun models he wishes to purchase, which are not available for commercial sale, because he intends to have them as collector's items.  See D. 93-1 ¶ 16; D. 82-14 at 63-64.  Similarly, as of August 22, 2024, Prosperi owned fourteen firearms, including nine different models of handguns, all bought in Massachusetts.  D. 93-1 ¶ 10; D. 82-13 at 16, 19-20, 28-33, 57-58; see D. 82-2 at 12 n.13.  Prosperi possesses six different Glock handguns, purchased in Massachusetts from licensed dealers/retailers or the private market, and he carries seven of his handguns for self-defense, varying between them based on the weather and his ability to conceal the handgun with his clothing.  See D. 93-1 ¶¶ 19; D. 82-13 at 14-15, 18-22, 27-30.

Plaintiffs contend that the Massachusetts handgun regulations are not presumptively lawful as "conditions [or] qualifications on the sale of arms" because they are "a *de facto* ban on the acquisition and possession of handguns that lack required features," D. 62 at 16, like the ban in Heller, and, even assuming the regulations are conditions or qualifications, they "[still] must be analyzed to determine whether [the] specific condition or qualification is ultimately constitutional under the Bruen test," D. 92 at 10.  Unlike what amounted to a prohibition against an entire class of arms in Heller, 554 U.S. at 628 (concluding that the law "totally bans handgun possession in the home"), the Massachusetts handgun regulations at issue here impose safety standards and

conditions on the commercial sale of handguns by licensed dealers/retailers, which in turn render a subset of handguns eligible for private sales only, but not unpossessable. See Mass. Gen. L. c. § 123(o); 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1), 16.05(2), 16.05(3). Ultimately, the handguns that do not appear on the Approved Firearms Roster or that do appear but do not also meet the Attorney General's regulations can still be purchased from a person that is not a licensed dealer/retailer. Mass. Gen. L. c. § 123(o); 501 C.M.R. § 7.02; 940 C.M.R. § 16.01.

Neither Reese v. BATFE, 127 F.4th 583, 590 (5th Cir. 2025) nor Hirschfeld v. BAFTE, 5 F.4th 407, 416, vacated as moot, 14 F.4th 322 (4th Cir. 2021), cited by the Granata Plaintiffs, D. 92 at 10-11, compel a different conclusion. In Reese, the Court broadly defined the relevant proposed conduct as "commercial purchases" and concluded that statutory provisions prohibiting Federal Firearms Licensees ("FFLs") from selling handguns to eighteen-to-twenty-year-olds were covered by the text of the Second Amendment and were inconsistent with the Nation's historical tradition of firearm regulation. Reese, 127 F.4th at 590, 595-600. Unlike the challenged Massachusetts handgun regulatory scheme, the statutory provisions in Reese functioned as an "outright ban" on purchasing a handgun from the FFLs because they prohibited all individuals within the specified age range from making a purchase irrespective of any conditions or qualifications on the sale. Id. at 590 & n.2. In Hirschfeld, a case also involving laws prohibiting FFLs from selling handguns to eighteen-to-twenty-year-olds, the Court determined the laws were not presumptively lawful. Hirschfeld, 5 F.4th at 416-18, 441. There, the Court noted "the restrictions operat[ed] as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms" because "[t]here was nothing a law-abiding 18-to-20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21." Id. at 416 (emphasis in original). Such is not the case here, where, the Granata Plaintiffs can buy

choose to buy one of the hundreds of handguns that are on the Approved Firearms Roster and comply with the Attorney General's regulations. The Granata Plaintiffs also argue that the relevant inquiry for the Court is whether the restricted handguns are "in common use." D. 62 at 16. Specifically, the Granata Plaintiffs argue that the analysis of historical analogues to determine whether the Massachusetts handgun regulations are consistent with the historical tradition of firearm regulations (the second step of the Bruen analysis) is unnecessary because the handguns at issue are in common use and "a complete prohibition of their use is invalid." Id. at 15-19. Relying upon Heller and Bruen, the Granata Plaintiffs assert that "'the Second Amendment protects' arms that are 'in common use at the time' which are in turn "necessarily not 'dangerous and unusual.'" Id. at 15-16 (quoting Bruen, 597 U.S. at 47). Defendants, on the other hand, contend that the "common use" test is deficient and dispute the necessity of the inquiry "where a regulation does not prohibit, either explicitly or in practice, the possession or use of 'an entire class of arms.'" D. 80-2 at 19-20 (quoting Heller, 554 U.S. at 628); see Bianchi v. Brown, 111 F.4th 438, 460 (4th Cir. 2024) (noting that "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms"), cert. denied sub nom. Snope v. Brown, 605 U.S. __, 145 S. Ct. 1534 (2025).

In Capen v. Campbell, the First Circuit recently held that, unlike the "complete prohibition" in Heller, the Massachusetts law prohibiting the sale, transfer or possession of "an assault weapon or large capacity feeding device," Mass. Gen. L. c. 140 § 131M, "restricts only semiautomatic handguns that are either specifically enumerated or exhibit a combination of certain features." Capen v. Campbell, 134 F.4th 660, 674 (1st Cir. 2025). The Court rejected appellants' argument that "a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class," noting that Heller does not support the

16

"sweeping proposition that any ban whose scope includes any handguns at all is unconstitutional."

Id.

Here, the Granata Plaintiffs have not shown that the Massachusetts handgun regulations ban all handguns as a class. As of September 2024, the Approved Firearms Roster contained over 1,000 handgun models compliant with the requirements enumerated in Mass. Gen. L. c. 140 § 123 and included over thirty-five manufacturers. See D. 83-1 at 2-31. While not all the handguns on the Approved Firearms Roster comply with the Attorney General's regulations, thereby enabling them to be commercially sold by licensed dealers/retailers, over 500 of the semiautomatic handgun models on the Approved Firearms Roster do. See D. 93-1 ¶ 2; D. 84 ¶ 4 (attesting that of the 694 semiautomatic handguns on the Approved Firearms Roster, 562 satisfy the Attorney General's regulations). Between 2019 and 2024, approximately 113 firearms were added to the Approved Firearms Roster. D. 93-1 ¶ 1; D. 83-2 ¶ 7. Further, the undisputed evidence indicates licensed dealers/retailers reported 72,502 handgun sales in 2022, 67,652 handgun sales in 2023, and 76,409 handgun sales in 2024. D. 93-1 ¶¶ 3-5; D. 83-2 ¶¶ 8-10. With respect to private sales, 20,813 were reported in 2022, 24,213 in 2023 and 16,051 in 2024 respectively. D. 93-1 ¶¶ 6-8; D. 83-2 ¶¶ 11-13. It is also undisputed that both Granata and Prosperi have been able to purchase firearms in Massachusetts. D. 93-1 ¶ 9-10; D. 82-12 at 6-7; D. 82-11 at 5-7. Finally, it is uncontroverted that "[m]ore often than not," customers who wish to purchase handgun models that cannot be sold by licensed dealers/retailers, purchase another handgun model authorized for commercial sale. D. 93-1 ¶ 28; D. 82-10 at 41-42. The record shows that in 2023, for instance, the Gunrunner sold approximately 700 handguns, which were manufactured by approximately fifteen to thirty brands and which consisted of multiple models across each brand. D. 93-1 ¶ 23. Given this record, the Granata Plaintiffs have not shown that the Massachusetts handgun regulatory scheme regarding

the commercial sale of handguns by licensed dealers/retailers has "meaningfully constrained" their ability to possess handguns in Massachusetts and "restrict[ed] protections conferred by the Second Amendment." Gazzola, 88 F.4th at 197 (concluding that "on the record . . . there is no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms"); see B&L Prods., 104 F.4th at 119 (noting that "the record suggests that no individual's access to firearms would be limited").

For these reasons, the Court concludes that the Granata Plaintiffs' proposed conduct of purchasing certain handguns that do not comply with the Massachusetts handgun regulatory scheme from licensed dealers/retailers is not covered by the plain text of the Second Amendment under the first step of Bruen.

### C.    There are Historical Analogues for the Massachusetts Handgun Regulatory Scheme Consistent with the Nation's Historical Tradition of Firearm Regulation

Even assuming *arguendo* that the regulatory scheme challenged here was covered by the plain text of the Second Amendment, Plaintiffs' claims would still fail under the second step of Bruen since there are historic analogues for these regulations. At this step of the Bruen analysis, the government bears the burden of demonstrating that the challenged handgun regulations are "consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24. When reviewing the government's historical sources, it is not this Court's job "to resolve historical questions in the abstract" but to "resolve *legal* questions" and to do so according to "the principle of party presentation." Id. at 30 n.6 (emphasis in original).

While the Supreme Court has indicated that "'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation[,]" the Supreme Court "has also relied upon 'how the Second Amendment was interpreted immediately after its

ratification through the end of the 19th century[,]'" and "likewise left open the possibility that 'late-19th-century evidence' and '20th-century historical evidence' may have probative value if it does not 'contradict[] earlier evidence.'" Ocean State Tactical, 95 F.4th at 51 (quoting Bruen, 597 U.S. at 27 and Heller, 554 U.S. at 605); see Antonyuk v. James, 120 F.4th 941, 972-74 (2d Cir. 2024) (noting that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis").  In Bruen, the Supreme Court did not weigh in on the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1869 when defining its scope," and it considered regulations from various periods both before and after the founding era since it concluded that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." Bruen, 597 U.S. at 37-38; see D. 88 at 16 (discussing regulations from various time periods considered in Bruen); see also Ocean State Tactical, 95 F.4th at 52 (noting that 19th-century and 20th-century historical evidence can "provide insight as apt historical precursors").  Based on the pre-and-post founding era evidence that courts have considered when assessing historical analogues, which has been in compliance with Bruen's historical analysis, the Court considers the evidence of historical traditions presented by Defendants from the founding era and thereafter.

Here, the Defendants have presented four different categories of historical traditions to demonstrate that the Massachusetts handgun regulations are consistent with the historical tradition of regulating firearms for public safety.  These categories include: (1) firearm and gunpowder "proving" laws and practices; (2) firearm and gunpowder storage laws; (3) "trap gun" restrictions; and (4) laws to protect minors from firearms.  D. 80-2 at 23-34.  As indicated below, this case implicates "dramatic technological changes" in handguns that have significantly increased the risk

of accidents related to their use, which "may require a more nuanced approach." <u>Bruen</u>, 597 U.S. at 27. "The metric [the Court] employ[s] in this comparability analysis is 'how and why these regulations burden a law-abiding citizen's right to armed self-defense.'" <u>Capen</u>, 134 F.4th at 669. As the First Circuit has directed, "'[f]irst, we consider the "how," comparing the "burden on the right of armed self-defense" imposed "by the new regulation to the burden imposed by historical regulations." Second, we turn to the "why," comparing the justification for the modern regulation to the justification for historical regulations.'" <u>Id.</u> (quoting <u>Ocean State Tactical</u>, 95 F.4th at 44-45).

### 1.    *Firearm and Gunpowder "Proving" Laws*

Defendants submit that in the same way that the Massachusetts handgun regulations are aimed at ensuring the safe use of firearms sold commercially by imposing requirements on the commercial sale of firearms, so too were 19th century "proving" and inspection laws that required firearms and gunpowder to be "proved" prior to sale to prevent "collateral dangers of firearms," or accidental discharges, malfunctions, explosions and related safety risks. <u>See</u> D. 80-2 at 24; <u>see</u> D. 88 at 18. The "proving" process for a firearm entailed testing a weapon by firing it using "different levels of charges" to confirm that it would "withstand the pressure and wear of use" and then stamping the weapon with a "proof mark" to demonstrate it had passed the test. D. 88 at 19. Proving and the subsequent proving marks "ensur[ed] that firearms met certain safety standards before being sold and create[ed] a chain of custody to track how and when they were inspected." <u>Id.</u> at 20.

Defendants point to 1804 Mass. Acts 111 c. 81 § 35, a Massachusetts law enacted in 1805 that required an inspection of all firearms manufactured in the state before they could be sold.  See D. 80-1 at 41-43; D. 88 at 23-24.  The purpose of the law, or the "why" was to "ensure that the guns sold to the public were safe and suitable for use," D. 82-3 ¶ 20, and to prevent "the lives of the Citizens [from being] exposed" to unsafe firearms.  D. 80-1 at 41.  With respect to "how," the law indicated the process by which the appointed "provers" needed to "prove all Musket Barrels and Pistol barrels," the frequency, and the specific charge before marking the firearms with a stamp if they passed inspection.  Id.  Firearms that "burst or shall in any manner fail in the proving . . . [were deemed] unfit for use." Id. at 42.  Massachusetts amended its proving laws to include additional requirements in 1814, 1837 and 1859.  See D. 80-1 at 47-49; D. 82-3 ¶ 20 n.25; D. 88 at 25.  Similarly, Maine enacted a proving law in 1821.  D. 80-1 at 53; D. 88 at 25; see 1821 Me. L. 546, c. 162.  The evidence in the record indicates that concern with the quality of firearms brought by militia members, see D. 82-4 ¶ 18, spurred state laws and federal laws that continued the "Revolutionary tradition of colonial governing bodies requiring the 'proving' of militia weapons." See D. 80-2 at 24; D. 88 at 25-29; see also D. 82-1 ¶¶ 17-18, 20; D. 88 at 22-23.

A "dramatic technological change[]," Bruen, 597 U.S. at 27, since the colonial era is the "widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century." See D. 82-4 ¶ 10.  Prior to that, firearms at the time were not "kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly." Id.  State laws were, therefore, enacted that required the proving and inspection of gunpowder.  See 1776 R.I. Pub. L. 25; 1776-77 N.J. L. 6-7 c. 6; 1820 N.H. L. 274 c. 25; 1794 P.A. L. 764 c. 337; D. 80-1 at 30-40, 50-52.  The purpose of these gunpowder laws, specifically the Pennsylvania law which required a specific device to prove the gunpowder, was to protect "the purchaser and consumer"

against "inferior" gunpowder with defects not readily discoverable otherwise.  See D. 80-1 at 35. Similar to the Massachusetts proving law, a law regarding gunpowder proving dictated requirements pertaining to the quality and composition of the gunpowder and restricted the sale of uninspected or damaged gunpowder.  See 1808 Mass. Acts c. 52; D. 80-1 at 44-46.

The Massachusetts handgun regulatory scheme at issue in this case places requirements on commercial sellers to sell firearms that comply with safety requirements in various forms to protect the customer or user from inadvertent accidents (e.g., firing tests, density and melting point, drop tests).  See 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1)-(2); Mass. Gen. L. c. 140, § 123(o); D. 80-1 at 42, 46.  Thus, when comparing the "why" of the Massachusetts handgun regulatory regime to the "why" of the historical "proving" laws, they are "relevantly similar" in that they include requirements for firearms prior to sale to ensure safe usage by firearm owners and to minimize harm due to malfunction to both the user and the public.  Bruen, 597 U.S. at 29.  Although the Massachusetts handgun regulations imposes an addition to firearms via a load indicator or magazine safety, see 940 C.M.R. § 16.05(3), as contended by the Granta Plaintiffs, the effect is nonetheless the same–the prohibition on the sale of unfit firearms or condemned gunpower–while reflecting the use of modern technology that addresses the same core safety concern present during the founding and colonial era.  See Rahimi, 602 U.S. at 692.  Any "burden" here is similar to that imposed by the firearm and gunpowder proving laws that similarly barred the sale of firearms and gunpowder deemed "unfit."

Based on the uncontroverted evidence in the record, the Massachusetts handgun regulations are "consistent with the principles that underpin our regulatory tradition" as demonstrated by the firearm and gunpowder "proving" laws.  Rahimi, 602 U.S. at 681; see United States v. Sharkey, 693 F. Supp. 3d 1004, 1007-09 (S.D. Iowa 2023) (analyzing proving laws of

Massachusetts and other states as a historical analogue and rejecting Second Amendment challenge).

### 2.    Firearm and Gunpowder Storage Laws

Defendants also rely upon laws regarding the storage of gunpowder and weapons from the colonial period through the 19th century as historical analogues to the Massachusetts handgun regulations. See D. 80-2 at 30; D. 82-2 ¶¶15-16; D. 82-3 ¶ 17 & n.17. These city storage statutes and regulations were aimed at reducing the individual limits of gunpowder possession to minimize associated fire risks, including the accidental discharge of weapons, explosions and "accidental injury or death." D. 82-2 ¶ 56. The record here indicates that gunpowder regulations "stretched across the country." D. 82-2 at 9. In Ocean State Tactical, the First Circuit referenced the gunpowder storage laws, see 1771-72 Mass. Province Laws 167, c. 9.; D. 80-1 at 22-24, and noted they were enacted to address "risks posed" resulting from the ignition of gunpowder. Ocean State Tactical, 95 F.4th at 49, n.16. The Granata Plaintiffs assert that these regulations are not historical analogues to the Massachusetts handgun regulations because in Heller, the Supreme Court analyzed a Massachusetts colonial law requiring the storage of excess gunpowder in a "special container or on the top floor of the home," and determined these laws "did not clearly prohibit loaded weapons" and that those "fire-safety laws" did not burden the right of self-defense as much as a ban on handguns. D. 92 at 22-23; See Heller, 554 U.S. at 632. As noted, the Massachusetts handgun regulations do not constitute a ban on handguns and under the "nuanced approach" to historical analysis, it is appropriate to conclude that the historic laws' "why" of protecting users from unintended accidents and fire-related explosions is "relevantly similar" to the regulations' purpose of restricting the commercial sale to the public of handguns that are "prone to repeated firing based on a single pull of the trigger," explosion or accidental discharge, see, e.g., id. § 16.04(2); Mass. Gen. L. c. § 123(o). See Bruen, 597 U.S. at 27, 29. The Court concludes that

there is sufficient uncontroverted evidence in the record to conclude the firearm and gunpowder storage laws are a historical analogue for the Massachusetts handgun regulations.

### 3.    *"Trap Gun" Restrictions*

Defendants next point to restrictions on "trap gun," "spring gun" or "infernal machines" as another type of analogous historical tradition to the Massachusetts handgun regulations.  D. 80-2 at 31.  These types of firearms were "configured in a way to fire remotely, typically by rigging the firearm to be fired by a string or wire when tripped."  Id.; D. 82-2 ¶ 23.  In the late 17th century and early 18th century, colonial Plymouth and New Jersey enacted colonial laws that made the setting of trap guns unlawful, with other jurisdictions following suit over time by banning the activity or imposing criminal liability.  See D. 82-2 ¶¶ 24-27; D. 80-1 at 14-21.  Defendants argue that the "how" of these restrictions on trap guns and the Massachusetts handgun regulations are "relevantly similar" in that neither regulation banned an entire class of firearms and instead focused on regulating firearms that had been configured "in a certain way that rendered them unusually dangerous" while other firearms, like rifles or muskets, remained available to citizens.  D. 80-2 at 31.  With respect to the "why,"  the trap gun law restrictions served to protect "innocent people who might unsuspectingly trip the device," D. 82-2 ¶ 25, in the same way that the Massachusetts handgun regulations protect unsuspecting individuals who may drop a loaded handgun that discharges without the pull of the trigger.  The Granata Plaintiffs assert that "there is a world of a difference between a law prohibiting intentionally rigging a firearm to go off in a reckless manner" and one prohibiting the commercial sale of firearms that need to comply with manufacturing requirements.  See D. 92 at 24.  The common safety concern, however, addressed by both the Massachusetts safety regulations and the trap laws is that an unattended firearm, either with rigged features or lacking safety features such as a load indicator or childproof mechanism, would present

a danger to an unsuspecting person that handled the firearm.  See, e.g., 940 C.M.R. §§ 16.05(2), 16.05(3); see Rahimi, 602 U.S. at 692.  The uncontroverted record here shows that courts in the 19th and 20th century recognized that using trap guns to protect property, for example, was "using means dangerous to life" and that "[t]he preservation of human life and of limb and member from grievous harm, is of more importance to society than the protection of property."  D. 82-2 at ¶ 26. Even when the trap guns were employed for the specific purpose of harming a potential burglar, the historic evidence suggests "the gun-setter could be held civilly or criminally liable."  Id. ¶ 27. Thus, trap gun restrictions are a type of historic analogue "relevantly similar" to the Massachusetts handgun regulations.  Bruen, 597 U.S. at 29.

### 4.    Laws to Protect Minors from Firearms

Lastly, Defendants argue that laws protecting minors from harm caused by firearms are historical laws analogous to the Massachusetts handgun regulations.  D. 80-2 at 32-34.  The uncontroverted evidence in the record also suggests the same based on various laws aimed at banning the sale or furnishing of firearms to children under fifteen, see D. 80-1 at 54; State v. Callicut, 69 Tenn. 714, 716-17 (1878); Coleman v. State, 32 Ala. 581, 582-83 (1858).  Defendants rely upon these laws, D. 80-2 at 32, and also point to the historical regulation of toy pistols, id.; D. 82-2 ¶¶ 20-21.  The evidence in the record shows that toy pistols were heavily regulated in the 19th century because they were "miniaturized guns" capable of shooting blank rounds "though live rounds could easily be substituted."  D. 82-2 ¶ 20.  Given that the toy pistol functionally operated as a deadly weapon, see id. ¶ 21, toy pistol sales were restricted to prevent children from suffering fatal infections and injuries from projectiles, id. ¶ 22.  The evidence in the record supports the argument that "dramatic technological changes" have led to an increase of accidents involving children based on modern smaller and lighter designs, that are kept loaded.  See D. 82-3 ¶ 68; D.

82-4 ¶ 10; D. 82-5 ¶¶ 25-26.  The Massachusetts handgun regulatory scheme at issue here require

that handguns sold by retailers have a "mechanism which effectively precludes an average five

year old child from operating the handgun when it is ready to fire."

See 940 C.M.R. § 16.05(2).  The purpose for the regulations is "relatively similar" to that of the

historical evidence, which was to prevent children from accidently discharging a firearm given

their ability to handle and operate the firearm.  As to the "how," the Massachusetts handgun

regulations draw from the historical analogues presented while addressing the advancements in

technology to prevent firearm accidents involving children.

Given this record and for the reasons discussed above, the Court concludes that the

Defendants have sufficiently established that the Massachusetts handgun regulatory scheme is

"consistent with the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.

## VII.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment,

D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**STEFANO GRANATA, ET AL**
                             Plaintiff(s)

                    v.                            CIVIL ACTION NO. **21-10960-DJC**

**ANDREA JOY CAMPBELL,**
**in her official capacity as Attorney General**
**of the Commonwealth of Massachusetts, ET AL**
                             Defendant(s)

### JUDGMENT IN A CIVIL CASE

CASPER, D.J.

☐    **Jury Verdict.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

X    **Decision by the Court**. In accordance with the Memorandum and Order dated August 29, 2025, D. 103,

    **IT IS ORDERED AND ADJUDGED**

    Judgment for the defendants.

                                          Robert M. Farrell, Clerk

Dated:  August 29, 2025                  /s/ Lisa M. Hourihan
                                           ( By )  Deputy Clerk

United States Code Annotated
    Constitution of the United States
        Annotated
           Amendment II. Keeping and Bearing Arms

U.S.C.A. Const. Amend. II

Amendment II. Keeping and Bearing Arms

Currentness

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S.C.A. Const. Amend. II, USCA CONST Amend. II
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** <span style="float:right">© 2026 Thomson Reuters. No claim to original U.S. Government Works.</span>

Add. 28

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 123

§ 123. Conditions of licenses

Effective: October 2, 2024
Currentness

* * *

(o) No licensee under section 122 shall sell, rent, lease or otherwise transfer any firearm described in this subsection except to a business entity that is primarily a firearm wholesaler, and such transfer shall, by its terms, prohibit the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth. This subsection shall apply to:

Add. 29

(i) a firearm that has a frame, barrel, cylinder, slide or breechblock that is composed of: (A) any metal having a melting point of less than 900 degrees Fahrenheit; (B) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (C) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of a firearm for which a sample of 3 firearms in new condition all pass the following test: each of the 3 samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for 10 minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard of ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than 6 malfunctions and completes the test without any crack or breakage of an operating part of the firearm that does not increase the danger of injury to the user. For purposes of this clause "malfunction" shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism;

(ii) a firearm that is prone to accidental discharge, which, for purposes of this clause, shall mean any make and model of firearm for which a sample of 5 firearms in new condition all undergo, and none discharge during, the following test: each of the 5 sample firearms shall be: (A) test loaded; (B) set so that the firearm is in a condition such that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the firearm; and (C) dropped onto a solid slab of concrete from a height of 1 meter from each of the following positions: (1) normal firing position; (2) upside down; (3) on grip; (4) on the muzzle; (5) on either side; and (6) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings;

Add. 30

(iii) a firearm that is prone to: (A) firing more than once per pull of trigger; or (B) explosion during firing; and

(iv) a firearm that has a barrel less than 3 inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at 7 yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purpose of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire 5 rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in the test target shall be measured and recorded. This procedure shall be repeated 2 more times on the firearm. The arithmetic mean of each of the 3 recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual, if none is recommended, any standard ammunition of the correct caliber in new condition.

**Credits**
Amended by St.1957, c. 688, § 7; St.1959, c. 296, § 4; St.1968, c. 737, § 3; St.1969, c. 799, § 3; St.1981, c. 541; St.1987, c. 249; St.1996, c. 151, §§ 309 to 311; St.1998, c. 180, §§ 14 to 22; St.1998, c. 358, § 3; St.2006, c. 177, eff. Oct. 24, 2006; St.2010, c. 256, § 88, eff. Nov. 4, 2010; St.2014, c. 284, §§ 23, 24, eff. Jan. 1, 2021; St.2014, c. 284, § 25, eff. Jan. 1, 2015; St.2014, c. 284, § 26, eff. Aug. 13, 2014; St.2018, c. 123, § 8, eff. July 3, 2018; St.2024, c.135, § 37, eff. Oct. 2, 2024.

M.G.L.A. 140 § 123, MA ST 140 § 123
Current through Chapter 65 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations
    Title 940: Office of the Attorney General
        Chapter 16.00: Handgun Sales

CMR T. 940, Ch. 16.00, Refs & Annos
Currentness

**Editors' Notes**

**GENERAL NOTES**

The Attorney General of the Commonwealth of Massachusetts promulgates 940 CMR 16.00 pursuant to authority granted to him under M.G.L. c. 93A, § 2(c). 940 CMR 16.00 defines certain unfair acts or practices but is not intended to describe all types of practices prohibited by M.G.L. c. 93A, § 2. 940 CMR 16.00 does not legitimize acts that are not specifically prohibited by 940 CMR 16.00, and does not alter or amend common law rights and remedies available to consumers. 940 CMR 16.00 is designed to supplement existing statutes and regulations. References to statutes and other regulations shall include amendments thereto from time to time.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Add. 32

Code of Massachusetts Regulations
 Title 940: Office of the Attorney General
  Chapter 16.00: Handgun Sales (Refs & Annos)

940 CMR 16.01

16.01: Definitions

Currentness

For purposes of 940 CMR 16.00, the following terms shall have the following meanings:

Average group diameter test result: shall mean the arithmetic mean of three separate group diameter test results taken from a set distance.

Combination handle lock: shall mean a device which precludes the use of the handgun unless the combination tumblers are properly aligned. This device may, for example, have the numbers for the combination tumblers protrude from the handle of the handgun.

Educational collector: shall mean an individual who is properly licensed as a bonafide collector pursuant to 520 CMR 7.00, and whose collection is maintained for purposes of display, research, lecturing, demonstration, or historical significance, as opposed to being maintained for personal enjoyment and/or possible future profit.

Group diameter test result: shall mean the largest spread in inches between the centers of any of the holes made in a test target after firing five rounds from the handgun in question at the target from a set distance. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition.

Hammer deactivation device: shall mean a built-in device (or an extension of the hammer) which allows a user manually to lower the handgun's hammer into a deactivated position, and which must be manually re-toggled in order to re-cock the hammer before the handgun can be fired.

Handgun: shall mean a weapon, designed to be fired by the use of a single hand, from which may be fired or ejected one or more solid projectiles propelled via a chemical ignition, and which has:

Add. 33

(a) a smooth bore with a barrel less than 18 inches long;

(b) a smooth bore and an overall weapon length of less than 26 inches; or

(c) a rifled bore with a barrel less than 16 inches.

Handgun Drop Test: shall mean a test in which the handgun in question shall be:

(a) test loaded;

(b) set such that the handgun is ready to fire; and

(c) dropped onto a solid slab of concrete from a height of one meter from each of the following positions:

    1. normal firing position,

    2. upside down,

    3. on grip,

    4. on the muzzle,

    5. on either side, and

    6. on the exposed hammer or striker (or if there is no exposed hammer or striker, then the rearmost part of the firearm).

In addition, if the handgun is designed so that its hammer or striker may be set in other positions, the handgun in question shall be tested with the hammer or striker in each

Add. 34

such position (but otherwise ready to fire). Alternatively, the tester may use different handguns of the same make and model, in similar condition, for the test of each of these hammer/striker settings.

Handgun Performance Test: shall mean a test in which the handgun in question shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun (if required by the cleaning schedule in the user manual), and as needed to refill the empty magazine or cylinder to capacity before continuing. For any handgun that loads other than via a detachable magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition. A handgun shall pass this test if it:

(a) fires the first 20 rounds without a malfunction, and

(b) fires the full 600 rounds with no more than six malfunctions and without any crack or breakage of an operating part of the handgun which increases the danger of injury to the user.

Handgun-purveyor: shall mean any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts. However, handgun-purveyor shall not include any of the aforementioned if:

(a) the person or entity transfers less than five handguns per year,

(b) the transfer in question is for the purpose of, and does, directly or indirectly, supply law enforcement officials or United States military personnel with handguns for their official duties,

(c) the transfer in question is for the purpose of, and does, directly or indirectly, supply museums or educational collectors with the handguns in question,

(d) the transfer in question is undertaken to, and does, result in the surrender of handguns to military or law enforcement personnel,

Add. 35

(e) the transfer in question is of handguns that qualify as antique firearms as defined in 18 U.S.C. § 921, or

(f) the transfer in question is of handguns that are solely designed and sold specifically for formal target shooting competition.

Key activated trigger lock: shall mean a device that when locked in place by means of a key, prevents a potential user from pulling the trigger of the handgun without first removing the trigger lock by use of the trigger lock's key.

Load indicator: shall mean a device which plainly indicates that a cartridge is in the firing chamber within the handgun.

Magazine safety disconnect: shall mean a device that prevents the firing of the handgun when the magazine is detached from the handgun.

Make and model: shall mean any group of handguns, all of which are made by a manufacturer by the same method and according to the same design pattern and specifications.

Make and Model Performance Requirements: shall mean a test in which three handguns in new condition of the make and model being tested shall each pass the Handgun Performance Test.

Make and Model's Average Group Diameter Test Result: shall mean the arithmetic mean of the results of three Average Group Diameter Tests, each performed on a different handgun in new condition of the make and model being tested.

Malfunction: shall mean any failure to feed, chamber, fire, extract, or eject a round, or any failure to accept or eject a magazine, or any other failure which prevents the handgun, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the handgun is capable of firing the new round properly. Malfunction shall not include a misfire caused by a faulty cartridge whose primer fails to detonate when properly hit by the handgun's firing mechanism.

Passive use-limitation device: shall mean a device that automatically resets itself so that an unauthorized user cannot fire the handgun. As an example, a key activated trigger lock is not a passive use-limitation device because it needs to be re-locked manually

Add. 36

after its key is used to unlock it; thus the next user can fire the handgun without having to unlock the handgun.

Prone to accidental discharge: shall mean unable to pass the following test: five handguns in new condition of the make and model in question shall each be subjected to, and none shall discharge during, the Handgun Drop Test.

Ready to fire: shall mean loaded, and in a condition such that pulling the trigger (and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure) will fire the handgun.

Serial number: shall mean the number stamped, inscribed, or placed upon a handgun by a handgun-purveyor pursuant to M.G.L. c. 269, § 11E.

Solenoid use-limitation device: shall mean a device which precludes, by use of a magnetically activated relay, the firing of the handgun unless a magnet of the appropriate strength is placed in proximity to the handle of the handgun. Such magnet may be imbedded in a ring which can be worn on the user's gun hand.

Test loaded: shall mean loading each chamber of the handgun in question with an empty case with a primer installed.

Transfer: shall mean sell, rent, or lease. Transfer shall not include a sale to a business entity that is primarily a firearm wholesaler, so long as the sale, by its terms, prohibits the purchaser from reselling the handgun to a handgun retailer or consumer in the Commonwealth.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 940, § 16.01, 940 MA ADC 16.01

---

**End of Document**                                                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 37

> Code of Massachusetts Regulations
>     Title 940: Office of the Attorney General
>         Chapter 16.00: Handgun Sales (Refs & Annos)

940 CMR 16.02

16.02: Unfair or Deceptive Practices: General

Currentness

(1) It shall be an unfair or deceptive practice for any handgun-purveyor, in conjunction with the transfer (or offer to transfer) of a handgun to a consumer in the Commonwealth, to fail to comply with M.G.L. c. 93A, 940 CMR 16.00 *et seq*., or any other existing local, state, or federal statute, rule or regulation whose implementation serves to protect consumers from unfair and deceptive practices by means including, but not limited to, regulating conditions of sale, precluding the sale of products when such sale will place purchasers in violation of the law, demanding the disclosure of information, and ensuring the satisfactory condition and non-contraband status of goods proffered for sale. Examples of the above include laws, regulations, and rules that:

(a) forbid the sale of handguns to juveniles, addicts, or mentally incompetent individuals,

(b) forbid the sale of silencers, armor penetrating bullets, or machine-gun pistols (when possession by purchasers will be unlawful),

(c) forbid participation in any way in the obliteration of serial numbers from handguns prior to sale,

(d) forbid the sale of handguns whose serial numbers have been defaced,

(e) require sellers to keep records of handgun sales,

(f) forbid sellers from delivering or transporting handguns loaded, or

Add. 38

(g) forbid the delivery of handguns to the custody of a minor.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or make false certifications regarding any handgun offered for transfer.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 940, § 16.02, 940 MA ADC 16.02

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 39

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations
    Title 940: Office of the Attorney General
        Chapter 16.00: Handgun Sales (Refs & Annos)

940 CMR 16.03

16.03: Tamper-Resistant Serial Numbers

Currentness

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun on which the serial number has been placed solely in a location on the handgun that results in the number's susceptibility to eradication. A serial number shall be deemed not susceptible to eradication for purposes of 940 CMR 16.00 if:

(1) it is placed on the interior of the handgun, and the handgun-purveyor provides information regarding the location of the interior serial number to the Office of the Attorney General and other law enforcement officials upon request; or

(2) it is placed on the exterior of the handgun in a way that is not visible to the unaided eye, but is visible with the aid of an infrared detector or other device, and the handgun-purveyor provides information regarding the location of the nonvisible serial number or any method by which this number can be made viewable to the Office of the Attorney General and other law enforcement officials upon request.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 940, § 16.03, 940 MA ADC 16.03

                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 40

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.                    1

> Code of Massachusetts Regulations
> Title 940: Office of the Attorney General
> Chapter 16.00: Handgun Sales (Refs & Annos)

940 CMR 16.04

16.04: Sale of Handguns Made From Inferior Materials

Currentness

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any make and model of handgun that:

(1) has a frame, barrel, cylinder, slide or breechblock:

(a) composed of any metal having a melting point of less than 900°F,

(b) composed of any material having an ultimate tensile strength of less than 55,000 pounds per square inch, or

(c) composed of any powdered metal having a density of less than 7.5 grams per cubic centimeter; or

(2) is prone to repeated firing based on a single pull of the trigger, prone to the explosion of the handgun during firing with standard ammunition, or prone to accidental discharge.

(3) 940 CMR 16.04(1) shall not apply to any make and model of handgun which satisfies the Make and Model Performance Requirements. The Attorney General may require that the handgun-purveyor, or the entity testing the make and model in question on behalf of the handgun-purveyor, provide a sworn certification verifying that the make and model met the performance requirements. At the Attorney General's discretion, he may, upon 60 days notice, require that any such test be performed again by an independent testing entity chosen by the Attorney General, upon three test guns of the make and model

Add. 41

purchased at retail. In such a case, the prior certification shall be prospectively invalid at the conclusion of the notice period and the make and model in question may henceforth only meet the Make and Model Performance Requirements by obtaining a certification from the independent tester. A handgun-purveyor may resubmit a make and model to the independent tester for testing an unlimited number of times.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 940, § 16.04, 940 MA ADC 16.04

---

**End of Document**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Massachusetts Regulations
    Title 940: Office of the Attorney General
        Chapter 16.00: Handgun Sales (Refs & Annos)

940 CMR 16.05

16.05: Sale of Handguns Without Childproofing or Safety Devices

Currentness

(1) It shall be an unfair or deceptive practice to sell a handgun without a safety device in violation of M.G.L. c. 140, § 131K.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire; such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun.

(3) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect.

(4) 940 CMR 16.05(2) shall not apply to handguns which have a hammer deactivation device. 940 CMR 16.05(3) applies only to handguns that have a mechanism to load cartridges via a magazine.

The Massachusetts Administrative Code titles are current through Register No. 1562, dated December 5, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 940, § 16.05, 940 MA ADC 16.05

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.                                    1