# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY
COALITION, INC.; CAMERON PROSPERI,

*Plaintiffs-Appellants*,

JUDSON THOMAS; COLBY CANNIZZARO,

*Plaintiffs*,

v.

ANDREA J. CAMPBELL, in the official capacity as Attorney
General of the Commonwealth of Massachusetts; TERRENCE M. REIDY, in the
official capacity as Secretary of the Executive Office of Public Safety and Security
of the Commonwealth of Massachusetts,

*Defendants-Appellees*.

**On Appeal from United States District Court
for the District of Massachusetts**
Civil Case No. 1:21-cv-10960-DJC
The Honorable Denise Jefferson Casper, Judge

## JOINT APPENDIX

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

District Court Docket ...........................................................................App. 1

First Amended Complaint, Doc. 34 (Sep. 21, 2023) ......................................App. 10

Answer to First Amended Complaint, Doc. 38 (Nov. 20, 2023) ....................App. 32

Granata Declaration, Doc. 63 (Jan. 6, 2025) ...................................................App. 57

Prosperi Declaration, Doc. 64 (Jan. 6, 2025).................................................App. 59

Combs Declaration, Doc. 66 (Jan. 6, 2025)....................................................App. 61

Addendum of Laws to Defendants' Brief, Doc. 80-1 (Feb. 5, 2025) .............App. 63

Regele Report, Doc. 82-1 (Feb. 5, 2025).......................................................App. 117

Rivas Report, Doc. 82-2 (Feb. 5, 2025).........................................................App. 153

Cornell Report, Doc. 82-3 (Feb. 5, 2025)......................................................App. 207

DeLay Report, Doc. 82-4 (Feb. 5, 2025) .......................................................App. 262

Hargarten Report, Doc. 82-5 (Feb. 5, 2025)..................................................App. 300

Costa Deposition Transcript, Doc. 82-10 (Feb. 5, 2025)..............................App. 360

First Lucier Declaration, Doc. 84 (Feb. 5, 2025)..........................................App. 420

Second Lucier Declaration, Doc. 97-1 (Mar. 13, 2025) ...............................App. 423

Notice of Appeal, Doc. 105 (Sep. 24, 2025).................................................App. 426

Hearing Transcript, Doc. 109 (Nov. 10, 2025) .............................................App. 429

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:21-cv-10960-DJC**

Granata et al v. Healey et al
Assigned to: Chief District Judge Denise J. Casper
Case in other court: USCA - First Circuit, 22-01478
          USCA - First Circuit, 25-01918
Cause: 42:1983 Civil Rights Act

Date Filed: 06/08/2021
Date Terminated: 08/29/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Stefano Granata**
                              represented by  **David H. Thompson**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Email: dthompson@cooperkirk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter A. Patterson**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
202-220-9600
Fax: 202-220-9601
Email: ppatterson@cooperkirk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Mark DiGuiseppe**
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street
Suite A
Southport, NC 28461
910-713-8804
Fax: 910-672-7705
Email: law.rmd@gmail.com
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
Chambers Law Office
Suite 404
220 Broadway
Lynnfield, MA 01940
781-581-2031
Fax: 781-581-8449
Email: richard@chamberslawoffice.com
*ATTORNEY TO BE NOTICED*

**William V. Bergstrom**
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
202-220-9622
Fax: 202-220-9601
Email: wbergstrom@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**William Sack**
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 596-3492
Email: wsack@fpclaw.org
*TERMINATED: 10/10/2023*

App. 1

**Plaintiff**
**Judson Thomas**
*TERMINATED: 09/03/2024*

represented by **Raymond Mark DiGuiseppe**
(See above for address)
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Sack**
(See above for address)
*TERMINATED: 10/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Colby Cannizzaro**
*TERMINATED: 09/03/2024*

represented by **Raymond Mark DiGuiseppe**
(See above for address)
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Sack**
(See above for address)
*TERMINATED: 10/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Cameron Prosperi**

represented by **David H. Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter A. Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Mark DiGuiseppe**
(See above for address)
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William V. Bergstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Sack**
(See above for address)
*TERMINATED: 10/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**The Gunrunner, LLC**

represented by **David H. Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

App. 2

**Peter A. Patterson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Mark DiGuiseppe**
(See above for address)
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William V. Bergstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Sack**
(See above for address)
*TERMINATED: 10/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**FIREARMS POLICY COALITION, INC.**                represented by   **David H. Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Raymond Mark DiGuiseppe**
(See above for address)
*TERMINATED: 03/11/2025*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Cullin Chambers , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William V. Bergstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Sack**
(See above for address)
*TERMINATED: 10/10/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**Maura Healey**                                    represented by   **Phoebe Fischer-Groban**
*In her official capacity as Attorney General of the*             Massachusetts Attorney General's Office
*Commonwealth of Massachusetts*                                   McCormack Building
*TERMINATED: 09/21/2023*                                          One Ashburton Place
Boston, MA 02108
617-963-2589
Email: phoebe.fischer-groban@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grace Gohlke**
Massachusetts Attorney General's Office
McCormack Building
One Ashburton Place
Boston, MA 02108
617-963-2527
Email: grace.gohlke@mass.gov
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Thomas Turco**
*In his official capacity as Secretary of Executive Office of Public Safety and Security of the Commonwealth of Massachusetts*
*TERMINATED: 09/21/2023*

represented by **Phoebe Fischer-Groban**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grace Gohlke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andrea Joy Campbell**
*in her Official capacity as Attorney General of the Commonwealth of Massachusetts*

represented by **Grace Gohlke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Phoebe Fischer-Groban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Terrence M Reidy**
*in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts*

represented by **Grace Gohlke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Phoebe Fischer-Groban**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Giffords Law Center to Prevent Gun Violence**

represented by **Jean-Paul Jaillet**
Choate, Hall & Stewart
Two International Place
100-150 Oliver Street
Boston, MA 02110
617-248-5259
Fax: 617-248-5254
Email: jjaillet@choate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/08/2021 | 1 | COMPLAINT against All Plaintiffs Filing fee: $ 402, receipt number 0101-8810702 (Fee Status: Filing Fee paid), filed by Stefano Granata. (Attachments: # 1 Civil Cover Sheet, # 2 Supplement Civil Action Cover Form)(Chambers, Richard) (Entered: 06/08/2021) |
| 06/08/2021 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Rya W. Zobel assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Danieli, Chris) (Entered: 06/08/2021) |
| 06/08/2021 | 3 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Vieira, Leonardo) (Entered: 06/08/2021) |
| 06/30/2021 | 4 | NOTICE of Appearance by Phoebe Fischer-Groban on behalf of Maura Healey, Thomas Turco (Fischer-Groban, Phoebe) (Entered: 06/30/2021) |
| 06/30/2021 | 5 | Assented to MOTION for Extension of Time to August 20, 2021 to File Answer re 1 Complaint, by Maura Healey, Thomas Turco. (Fischer-Groban, Phoebe) (Entered: 06/30/2021) |
| 07/01/2021 | 6 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 5 Motion for Extension of Time to Answer re 1 Complaint, Maura Healey answer due 8/2/2021; Thomas Turco answer due 8/2/2021. (Urso, Lisa) (Entered: 07/01/2021) |
| 07/01/2021 | 7 | Set/Reset Deadlines: Maura Healey 8/20/2021; Thomas Turco 8/20/2021. (Urso, Lisa) (Entered: 07/01/2021) |
| 07/13/2021 | 8 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Raymond DiGuiseppe Filing fee: $ 100, receipt number 0101-8856990 by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. (Attachments: # 1 Affidavit Affidavit of counsel, # 2 Certification)(Chambers, Richard) (Attachment 1 replaced on 7/13/2021 - Document filed with wrong affidavit and replaced with correct one provided by counsel) (Currie, Haley). (Entered: 07/13/2021) |
| 07/13/2021 | 9 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of William Sack Filing fee: $ 100, receipt number 0101-8857073 by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. (Attachments: # 1 Affidavit Affidavit of counsel, # 2 Certification)(Chambers, Richard) (Entered: 07/13/2021) |
| 07/13/2021 | 10 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 8 Motion for Leave to Appear Pro Hac Vice Added Richard DiGuiseppe; granting 9 Motion for Leave to Appear Pro Hac Vice Added William Sack. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Currie, Haley). (Entered: 07/13/2021) |
| 08/03/2021 | 11 | SUMMONS Returned Executed Maura Healey served on 6/17/2021, answer due 8/20/2021. (Chambers, Richard) (Entered: 08/03/2021) |

| | | |
|---|---|---|
| 08/03/2021 | 12 | SUMMONS Returned Executed Thomas Turco served on 7/1/2021, answer due 8/20/2021. (Chambers, Richard) (Entered: 08/03/2021) |
| 08/19/2021 | 13 | NOTICE of Appearance by Grace Gohlke on behalf of Maura Healey, Thomas Turco (Gohlke, Grace) (Entered: 08/19/2021) |
| 08/20/2021 | 14 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Maura Healey, Thomas Turco.(Fischer-Groban, Phoebe) (Entered: 08/20/2021) |
| 08/20/2021 | 15 | MEMORANDUM in Support re 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Maura Healey, Thomas Turco. (Fischer-Groban, Phoebe) (Entered: 08/20/2021) |
| 08/31/2021 | 16 | Assented to MOTION for Extension of Time to September 17, 2021 to File Response/Reply *to Defendants' Motion to Dismiss* by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. (Chambers, Richard) (Entered: 08/31/2021) |
| 09/08/2021 | 17 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 16 Motion for Extension of Time to File Response/Reply re 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM - Responses due by 9/17/2021. (Currie, Haley) (Entered: 09/08/2021) |
| 09/17/2021 | 18 | Opposition re 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. (Currie, Haley) (Entered: 09/18/2021) |
| 10/08/2021 | 19 | MOTION for Leave to File *Reply Memorandum* by Maura Healey, Thomas Turco. (Attachments: # 1 Exhibit A - Defendants' Reply in Support of Motion to Dismiss)(Fischer-Groban, Phoebe) (Entered: 10/08/2021) |
| 10/28/2021 | 20 | ELECTRONIC NOTICE Setting Hearing on Motion 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 11/18/2021 02:00 PM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 10/28/2021) |
| 10/28/2021 | 21 | Judge Rya W. Zobel: ENDORSED ORDER entered granting 19 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Urso, Lisa) (Entered: 11/02/2021) |
| 11/03/2021 | 22 | REPLY to Response to 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Maura Healey, Thomas Turco. (Fischer-Groban, Phoebe) (Entered: 11/03/2021) |
| 11/18/2021 | 23 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Motion Hearing held on 11/18/2021 re 14 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Thomas Turco, Maura Healey. Judge hears counsel and takes the matter under advisement; (Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Chambers, DiGuiseppe, Groben & Gohlke) (Urso, Lisa) (Entered: 11/18/2021) |
| 05/19/2022 | 24 | Judge Rya W. Zobel: MEMORANDUM AND ORDER entered. Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket No. 14 ) is **ALLOWED.** (Warnock, Douglas) (Entered: 05/19/2022) |
| 05/19/2022 | 25 | Judge Rya W. Zobel: ORDER entered. ORDER DISMISSING CASE (Warnock, Douglas) (Entered: 05/19/2022) |
| 06/15/2022 | 26 | NOTICE OF APPEAL as to 24 MEMORANDUM AND ORDER, 25 ORDER OF DISMISSAL by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas Filing fee: $ 505, receipt number AMADC-9370591 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 7/5/2022. **(Attachments: # 1 Memorandum & Order, # 2 Order of Dismissal)(Chambers, Richard)**<br><br>**Modified on 6/15/2022 to Correct Docket Text and Add CM/ECF Document Links to Orders Being Appealed as Counsel Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal. (Paine, Matthew).**<br><br>**(Entered: 06/15/2022)** |
| 06/15/2022 | 27 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 26 Notice of Appeal. (Paine, Matthew) (Entered: 06/15/2022) |
| 06/16/2022 | 28 | USCA Case Number 22-1478 for 26 Notice of Appeal, filed by Judson Thomas, Stefano Granata, Cameron Prosperi, FIREARMS POLICY COALITION, INC., The Gunrunner, LLC, Colby Cannizzaro. (Paine, Matthew) (Entered: 06/16/2022) |
| 07/01/2022 | 29 | TRANSCRIPT ORDER FORM by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas for proceedings held on 111822 Judge Judge Rya W. Zobel.. (Chambers, Richard) (Entered: 07/01/2022) |
| 07/25/2022 | 30 | Transcript of Motion Hearing held on November 18, 2021, before Judge Rya W. Zobel. COA Case No. 22-1478. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com. Redaction Request 8/15/2022. Redacted Transcript Deadline set for 8/25/2022. Release of Transcript Restriction set for 10/24/2022. (Coppola, Katelyn) (Entered: 08/02/2022) |
| 07/25/2022 | 31 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 08/02/2022) |
| 04/07/2023 | 32 | USCA Judgment as to 26 Notice of Appeal, filed by Judson Thomas, Stefano Granata, Cameron Prosperi, FIREARMS POLICY COALITION, INC., The Gunrunner, LLC, Colby Cannizzaro (Paine, Matthew) (Entered: 04/07/2023) |
| 05/01/2023 | 33 | MANDATE of USCA as to 26 Notice of Appeal, filed by Judson Thomas, Stefano Granata, Cameron Prosperi, FIREARMS POLICY COALITION, INC., The Gunrunner, LLC, Colby Cannizzaro. Appeal 26 Terminated (Paine, Matthew) (Entered: 05/02/2023) |
| 09/21/2023 | 34 | AMENDED COMPLAINT *First Amended Complaint* against Andrea Joy Campbell, Terrence M Reidy, filed by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. (Attachments: # 1 Exhibit A)(Chambers, Richard) (Entered: 09/21/2023) |

| 10/05/2023 | 35 | MOTION for Extension of Time to November 20, 2023 to File Answer re 34 Amended Complaint, by Andrea Joy Campbell, Terrence M Reidy.(Fischer-Groban, Phoebe) (Entered: 10/05/2023) |
|---|---|---|
| 10/10/2023 | 36 | Notice of Withdrawal as to Attorney *William Sack, Esq.* by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas.(Chambers, Richard)<br><br>Modified on 10/10/2023: Terminated document as motion, motion event filed in error. Corrected docket text. (de Oliveira, Flaviana). (Entered: 10/10/2023) |
| 10/11/2023 | 37 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 35 Motion for Extension of Time to Answer re 35 MOTION for Extension of Time to November 20, 2023 to File Answer re 34 Amended Complaint, , 34 Amended Complaint, Andrea Joy Campbell answer due 11/20/2023; Terrence M Reidy answer due 11/20/2023. (Urso, Lisa) (Entered: 10/11/2023) |
| 11/20/2023 | 38 | ANSWER to 34 Amended Complaint, by Andrea Joy Campbell, Terrence M Reidy.(Fischer-Groban, Phoebe) (Entered: 11/20/2023) |
| 12/04/2023 | 39 | Case Reopened Mandate USCA 33 and Amended Complaint Filed 34 . (Deslauriers, Timothy) (Entered: 12/04/2023) |
| 12/04/2023 | 40 | Joint MOTION for Local Rule 16.1 Scheduling Conference by Andrea Joy Campbell, Terrence M Reidy.(Fischer-Groban, Phoebe) (Entered: 12/04/2023) |
| 12/07/2023 | 41 | ELECTRONIC NOTICE of Reassignment. Judge Denise J. Casper added. Judge Rya W. Zobel no longer assigned to case. (McDonagh, Christina) (Entered: 12/07/2023) |
| 12/07/2023 | 42 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 40 Motion for Local Rule 16.1 Scheduling Conference by Andrea Joy Campbell, Terrence M Reidy (Hourihan, Lisa) (Entered: 12/07/2023) |
| 12/07/2023 | 43 | NOTICE of Scheduling Conference. Scheduling Conference set for 1/16/2024 03:00 PM in Courtroom 11 (Remote only) before Judge Denise J. Casper.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Hourihan, Lisa) (Entered: 12/07/2023) |
| 12/07/2023 | 44 | Judge Denise J. Casper: ORDER entered. Standing Order Re: Courtroom Opportunities for Relatively Inexperienced Attorneys(Hourihan, Lisa) (Entered: 12/07/2023) |
| 12/07/2023 | 45 | Judge Denise J. Casper: Standing Order Regarding Appearance of Counsel Via Telephone or Video Conference(Hourihan, Lisa) (Entered: 12/07/2023) |
| 01/05/2024 | 46 | JOINT STATEMENT re scheduling conference . (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fischer-Groban, Phoebe) (Entered: 01/05/2024) |
| 01/16/2024 | 47 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Scheduling Conference held on 1/16/2024 by video conference. Initial disclosures suspended. Amendment to the pleadings by 3/1/24. Court hears from counsel. Remainder of schedule taken under advisement. (Court Reporter: Debra Joyce at joycedebra@gmail.com.)(Attorneys present: Richard Cullin and Raymond DiGuiseppe for the plaintiff. Phoebe Fischer-Groban and Grace Gohlke for the defendants.) (Hourihan, Lisa) (Entered: 01/17/2024) |
| 01/19/2024 | 48 | Judge Denise J. Casper: ELECTRONIC ORDER entered. D. 46: Having given further consideration to the parties joint statement, D. 46, and the discussion with counsel about their various proposals for the discovery and dispositive motion schedule at the initial scheduling conference, D. 47, the Court ORDERS the following schedule (following the amendment to the pleadings deadline of 3/1/24 previously adopted, D. 47): Fact Discovery to be completed by 8/30/24. Opening expert disclosures by 9/16/24. Rebuttal expert disclosures by 10/15/24. Expert discovery to be completed by 11/15/24. Plaintiffs' motion for summary judgment to be filed by 12/16/24. Defendants' opposition and cross motion for summary judgment to be filed by 1/15/25. Plaintiff's reply and opposition to cross motion for summary judgment to be filed by 2/17/25. In light of the adoption of this particular schedule, the Court does not anticipate extension of these deadlines. Status Conference set for 9/16/2024 02:00 PM in Courtroom 11 (Remote only) before Judge Denise J. Casper<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the sessions courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: www.public.mad.uscourts.gov/seating-signup.<br><br>For questions regarding access to hearings, you may refer to the Courts general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Hourihan, Lisa) (Entered: 01/19/2024) |
| 07/29/2024 | 49 | Joint MOTION for Extension of Time to 9/6/24 to Complete Discovery *and to Further Extend as to One Plaintiff* by Andrea Joy Campbell, Terrence M Reidy.(Gohlke, Grace) (Entered: 07/29/2024) |
| 08/26/2024 | 50 | Judge Denise J. Casper: ELECTRONIC ORDER entered re: 49 Motion for Extension of Time to Complete Discovery. Given the reasons articulated in the parties' joint motion, the Court ALLOWS a one-week extension of the fact discovery deadline to September 6, 2024. As to only fact discovery as to Plaintiff Mr. Cannizzaro, the Court extends fact discovery as to him to December 2, 2024 given his present deployment. All other deadlines previously set by the Court in D. 46 shall remain in place. (Hourihan, Lisa) (Entered: 08/26/2024) |

| 08/28/2024 | 51 | Proposed Document(s) submitted by Andrea Joy Campbell, Terrence M Reidy. Document received: Stipulated Protective Order. (Gohlke, Grace) (Entered: 08/28/2024) |
|---|---|---|
| 09/03/2024 | 52 | STIPULATION of Dismissal *Joint Stipulation of Dismissal as to Plaintiffs Cannizzaro and Thomas* by Colby Cannizzaro, Judson Thomas. (Chambers, Richard) (Entered: 09/03/2024) |
| 09/16/2024 | 53 | Judge Denise J. Casper: ORDER entered. STIPULATED PROTECTIVE ORDER. (Cook, Savannah) (Entered: 09/16/2024) |
| 09/16/2024 | 54 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Status Conference held on 9/16/2024 by video conference. Court approves the stipulation of dismissal filed. Counsel inform the Court that they anticipate filing summary judgment motions. Hearing set for 2/26/25 at 2:00PM. If no summary judgment motions are filed, hearing will be converted to an initial pretrial conference. The parties shall confer regarding the topics identified under Local Rule 16.5(d) and shall prepare and submit a joint pretrial memorandum in accordance with Local Rule 16.5(d) no later than five (5) business days prior to the pretrial conference. The pretrial memorandum shall also propose deadlines for the filing of motions in limine, proposed jury instructions, proposed voir dire and a proposed trial date. (Court Reporter: Debra Kane at debrakane0711@gmail.com.)(Attorneys present: Raymond DiGuiseppe for the plaintiff. Phoebe Fischer-Groban and Grace Gohlke for the defendants.) (Hourihan, Lisa) (Entered: 09/17/2024) |
| 09/16/2024 | 56 | Judge Denise J. Casper: ELECTRONIC ORDER entered re 52 Stipulation of Dismissal filed by Judson Thomas, Colby Cannizzaro. APPROVED.(Hourihan, Lisa) (Entered: 09/17/2024) |
| 09/17/2024 | 55 | ELECTRONIC NOTICE Setting Hearing on Motions for Summary Judgment. Motion Hearing set for 2/26/2025 02:00 PM in Courtroom 11 (In person only) before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 09/17/2024) |
| 12/08/2024 | 57 | Joint MOTION for Extension of Time to File Summary Judgment Briefing by Andrea Joy Campbell, Terrence M Reidy.(Fischer-Groban, Phoebe) (Entered: 12/08/2024) |
| 12/17/2024 | 58 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 57 Motion for Extension of Time for Filing of Summary Judgment. Plaintiffs' motion for summary judgment to be filed by 1/6/25. Defendants' opposition and cross motion for summary judgment to be filed by 2/5/26. Plaintiffs' reply and opposition to cross motion to be filed by 3/7/25. Hearing on cross motions for summary judgment set for 4/9/25 at 3:00PM. If no summary judgment motions are filed, hearing will be converted to an initial pretrial conference. The parties shall confer regarding the topics identified under Local Rule 16.5(d) and shall prepare and submit a joint pretrial memorandum in accordance with Local Rule 16.5(d) no later than five (5) business days prior to the pretrial conference. The pretrial memorandum shall also propose deadlines for the filing of motions in limine, proposed jury instructions, proposed voir dire and a proposed trial date. (Hourihan, Lisa) (Entered: 12/17/2024) |
| 12/17/2024 | 59 | ELECTRONIC NOTICE Resetting Hearing on Cross Motions for Summary Judgment. Motion Hearing set for 4/9/2025 03:00 PM in Courtroom 11 (In person only) before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 12/17/2024) |
| 12/17/2024 | 60 | ELECTRONIC NOTICE Resetting Hearing on Cross Motions for Summary Judgment. Motion Hearing set for 3/26/2025 02:00 PM in Courtroom 11 (In person only) before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 12/17/2024) |
| 01/06/2025 | 61 | MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment* by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC..(Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 62 | MEMORANDUM in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Plaintiff's Proposed Judgment* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Attachments: # 1 Text of Proposed Order)(Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 63 | AFFIDAVIT in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Costa Deposition* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Attachments: # 1 Supplement Costa Deposition)(Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 64 | AFFIDAVIT in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Prosperi Declaration* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 65 | Statement of Material Facts L.R. 56.1 re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 66 | AFFIDAVIT in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Combs Declaration* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 67 | AFFIDAVIT in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Plaintiff Stefano's Declaration* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Chambers, Richard) (Entered: 01/06/2025) |
| 01/06/2025 | 68 | AFFIDAVIT in Support re 61 MOTION for Summary Judgment *Plaintiffs' Notice of Motion for Summary Judgment Plaintiff Prosperi's Declaration* filed by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Chambers, Richard) (Entered: 01/06/2025) |
| 01/08/2025 | 69 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of William V. Bergstrom Filing fee: $ 125, receipt number AMADC-10779778 by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC..(Chambers, Richard) (Entered: 01/08/2025) |
| 01/08/2025 | 70 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 69 Motion for Leave to Appear Pro Hac Vice Added William V. Bergstrom. <br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

App. 7

| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 01/08/2025) |
|---|---|---|
| 01/09/2025 | 71 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of David H. Thompson Filing fee: $ 125, receipt number AMADC-10781212 by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC..(Chambers, Richard) (Entered: 01/09/2025) |
| 01/10/2025 | 72 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 71 Motion for Leave to Appear Pro Hac Vice Added David H. Thompson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(SEC) (Entered: 01/10/2025) |
| 01/10/2025 | 73 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Peter A Paterson Filing fee: $ 125, receipt number AMADC-10782929 by Stefano Granata, Colby Cannizzaro, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC..(Chambers, Richard) (Entered: 01/10/2025) |
| 01/10/2025 | 74 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 73 Motion for Leave to Appear Pro Hac Vice Added Peter A. Patterson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(SEC) (Entered: 01/10/2025) |
| 01/31/2025 | 75 | Assented to MOTION to Seal *Unredacted Documents to Be Filed February 5, 2025* by Andrea Joy Campbell, Terrence M Reidy.(Gohlke, Grace) (Entered: 01/31/2025) |
| 02/03/2025 | 76 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 75 Motion to Seal Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, Defendant's Statement of Fact and Exhibits. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) (Entered: 02/03/2025) |
| 02/04/2025 | 77 | Assented to MOTION for Leave to File Excess Pages *for Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment* by Andrea Joy Campbell, Terrence M Reidy. (Gohlke, Grace) (Entered: 02/04/2025) |
| 02/05/2025 | 78 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 77 Motion for Leave to File Excess Pages for Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment by Andrea Joy Campbell, Terrence M Reidy. Brief not to exceed 28 pages in length. (LMH) (Entered: 02/05/2025) |
| 02/05/2025 | 79 | Cross MOTION for Summary Judgment by Andrea Joy Campbell, Terrence M Reidy.(Gohlke, Grace) (Entered: 02/05/2025) |
| 02/05/2025 | 80 | MEMORANDUM in Support re 79 Cross MOTION for Summary Judgment *and in Opposition to Plaintiffs' Summary Judgment Motion* filed by Andrea Joy Campbell, Terrence M Reidy. (Attachments: # 1 Appendix)(Gohlke, Grace) (Additional attachment(s) added on 2/7/2025: # 2 *SEALED* Unredacted Memorandum) (SEC). (Entered: 02/05/2025) |
| 02/05/2025 | 81 | Statement of Material Facts L.R. 56.1 re 79 Cross MOTION for Summary Judgment *and Responses to Plaintiffs' Statement of Facts* filed by Andrea Joy Campbell, Terrence M Reidy. (Gohlke, Grace) (Additional attachment(s) added on 2/7/2025: # 1 *SEALED* Unredacted Statement) (SEC). (Entered: 02/05/2025) |
| 02/05/2025 | 82 | AFFIDAVIT in Support re 79 Cross MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by Andrea Joy Campbell, Terrence M Reidy. (Attachments: # 1 Exhibit A - Expert Report (Regele), # 2 Exhibit B - Expert Report (Rivas), # 3 Exhibit C - Expert Report (Cornell), # 4 Exhibit D - Expert Report (DeLay), # 5 Exhibit E - Expert Report (Hargarten), # 6 Exhibit F - Prosperi Interrogatory Responses, # 7 Exhibit G - Granata Interrogatory Responses, # 8 Exhibit H - Prosperi Deposition, # 9 Exhibit I - Granata Deposition, # 10 Exhibit J - Costa (Gunrunner) Deposition)(Gohlke, Grace) (Additional attachment(s) added on 2/7/2025: # 11 *SEALED* Exhibit F, # 12 *SEALED* Exhibit G, # 13 *Sealed Exhibit H, # 14 *SEALED* Exhibit I) (SEC). (Entered: 02/05/2025) |
| 02/05/2025 | 83 | AFFIDAVIT in Support re 79 Cross MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by Andrea Joy Campbell, Terrence M Reidy. (Attachments: # 1 Exhibit A - Approved Firearms Roster)(Gohlke, Grace) (Additional attachment(s) added on 2/7/2025: # 2 *SEALED* Unredacted Affidavit) (SEC). (Entered: 02/05/2025) |
| 02/05/2025 | 84 | AFFIDAVIT in Support re 79 Cross MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment (Lucier Declaration)* filed by Andrea Joy Campbell, Terrence M Reidy. (Gohlke, Grace) (Entered: 02/05/2025) |
| 02/12/2025 | 85 | NOTICE of Appearance by Jean-Paul Jaillet on behalf of Giffords Law Center to Prevent Gun Violence (Jaillet, Jean-Paul) (Entered: 02/12/2025) |
| 02/12/2025 | 86 | Assented to MOTION for Leave to File *Amicus Brief* by Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Proposed Amicus Brief)(Jaillet, Jean-Paul) (Entered: 02/12/2025) |
| 02/20/2025 | 87 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 86 Motion for Leave to File Amicus Brief by Giffords Law Center to Prevent Gun Violence; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) (Entered: 02/20/2025) |

| | | |
|---|---|---|
| 02/20/2025 | 88 | AMICUS BRIEF filed by Giffords Law Center to Prevent Gun Violence . (Attachments: # 1 Exhibit 1 - Statutory Addendum)(Jaillet, Jean-Paul) (Entered: 02/20/2025) |
| 02/26/2025 | 89 | NOTICE of Appearance by William V. Bergstrom on behalf of Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC. (Bergstrom, William) (Entered: 02/26/2025) |
| 03/06/2025 | 90 | Assented to MOTION to Seal *Unredacted Documents to Be Filed March 7, 2025* by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC..(Bergstrom, William) (Entered: 03/06/2025) |
| 03/07/2025 | 91 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 90 Motion to Seal Plaintiffs' Responses to Defendants' Statement of Undisputed Facts. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) (Entered: 03/07/2025) |
| 03/07/2025 | 92 | MEMORANDUM in Opposition re 79 Cross MOTION for Summary Judgment filed by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC.. (Thompson, David) (Entered: 03/07/2025) |
| 03/07/2025 | 93 | Response by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC. to 81 Statement of Material Facts L.R. 56.1, . (Thompson, David) (Additional attachment(s) added on 3/7/2025: # 1 *SEALED* Response) (SEC). (Entered: 03/07/2025) |
| 03/10/2025 | 94 | NOTICE of Withdrawal of Appearance by Raymond Mark DiGuiseppe *as Counsel for the Plaintiffs* (DiGuiseppe, Raymond) (Entered: 03/10/2025) |
| 03/12/2025 | 95 | Assented to MOTION for Leave to File *Supplemental Statement of Material Undisputed Fact* by Andrea Joy Campbell, Terrence M Reidy. (Attachments: # 1 Exhibit A - Proposed Supplemental Statement of Facts, # 2 Exhibit B - Second Declaration of Peter Lucier)(Gohlke, Grace) (Entered: 03/12/2025) |
| 03/13/2025 | 96 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 95 Motion for Leave to File Supplemental Statement of Material Undisputed Fact by Andrea Joy Campbell, Terrence M Reidy; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (LMH) (Entered: 03/13/2025) |
| 03/13/2025 | 97 | STATEMENT of facts re 79 Cross MOTION for Summary Judgment . (Attachments: # 1 Affidavit Peter Lucier)(Fischer-Groban, Phoebe) (Entered: 03/13/2025) |
| 03/13/2025 | 98 | Response by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC. to 97 Statement of facts . (Thompson, David) (Entered: 03/13/2025) |
| 03/26/2025 | 99 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Motion Hearing held on 3/26/2025 re 79 Cross MOTION for Summary Judgment filed by Terrence M Reidy, Andrea Joy Campbell. Arguments. Court takes under advisement 79 Cross MOTION for Summary Judgment. (Court Reporter: Debra Kane at debrakane0711@gmail.com.)(Attorneys present: Phoebe Fischer-Groban and Grace Gohlke for the Defendants. Richard Cullin Chambers and William V. Bergstrom for Plaintiffs.) (SEC) (Entered: 03/26/2025) |
| 04/02/2025 | 100 | BRIEF by Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, FIREARMS POLICY COALITION, INC. *Regarding Bondi v. VanDerStok*. (Thompson, David) (Entered: 04/02/2025) |
| 04/02/2025 | 101 | Response by Andrea Joy Campbell, Terrence M Reidy to 100 Brief *Regarding Bondi v. VanDerStok*. (Gohlke, Grace) (Entered: 04/02/2025) |
| 04/18/2025 | 102 | Notice of Supplemental Authorities re 79 Cross MOTION for Summary Judgment filed by Andrea Joy Campbell, Terrence M Reidy. (Gohlke, Grace) (Entered: 04/18/2025) |
| 08/29/2025 | 103 | Chief District Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER - The Court DENIES Plaintiffs' motion for summary judgment, D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.(LMH) (Entered: 08/29/2025) |
| 08/29/2025 | 104 | Chief District Judge Denise J. Casper: ORDER entered. JUDGMENT (LMH) (Entered: 08/29/2025) |
| 09/24/2025 | 105 | NOTICE OF APPEAL as to 103 Memorandum & ORDER, 104 Judgment by Colby Cannizzaro, FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC, Judson Thomas. Filing fee: $ 605, receipt number AMADC-11259159 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 10/14/2025.** (Thompson, David) (Entered: 09/24/2025) |
| 09/26/2025 | 106 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 105 Notice of Appeal. (MAP) (Entered: 09/26/2025) |
| 09/26/2025 | 107 | USCA Case Number 25-1918 for 105 Notice of Appeal, filed by Judson Thomas, Stefano Granata, Cameron Prosperi, FIREARMS POLICY COALITION, INC., The Gunrunner, LLC, Colby Cannizzaro. (MAP) (Entered: 09/26/2025) |
| 10/07/2025 | 108 | TRANSCRIPT ORDER FORM by FIREARMS POLICY COALITION, INC., Stefano Granata, Cameron Prosperi, The Gunrunner, LLC for proceedings held on March 26, 2025 Judge Chief Judge Denise J. Casper.. (Thompson, David) (Entered: 10/07/2025) |
| 11/10/2025 | 109 | Transcript of Motion Hearing held on March 26, 2025, before Chief Judge Denise J. Casper. COA Case No. 25-1918. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Debra Kane at debrakane0711@gmail.com. Redaction Request due 12/1/2025. Redacted Transcript Deadline set for 12/11/2025. Release of Transcript Restriction set for 2/9/2026. (DRK) (Entered: 11/10/2025) |
| 11/10/2025 | 110 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 11/10/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **STEFANO GRANATA;** | : | |
| **JUDSON THOMAS;** | : | **FIRST AMENDED** |
| **COLBY CANNIZZARO;** | : | **COMPLAINT** |
| **CAMERON PROSPERI;** | : | 42 U.S.C. § 1983 |
| **THE GUN RUNNER, LLC;** and | : | |
| **FIREARMS POLICY** | : | |
| **COALITION, INC.,** | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs | : | 1:21-CV-10960-RWZ |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREA JOY CAMPBELL,** in her | : | |
| Official capacity as Attorney General of the | : | |
| Commonwealth of Massachusetts; and | : | |
| **TERRENCE M. REIDY,** in his official | : | |
| capacity as Secretary of the Executive | : | |
| Office of Public Safety and Security of the | : | |
| Commonwealth of Massachusetts, | : | |
| | : | |
| Defendants.[1] | : | |
| | : | |

Come now Plaintiffs Stefano Granata, Judson Thomas, Colby Cannizzaro, and Cameron Prosperi ("Individual Plaintiffs"), The Gunrunner, LLC ("Retailer Plaintiff"), and Firearms Policy Coalition, Inc., ("Institutional Plaintiff") (collectively "Plaintiffs"), and allege against the Defendants named herein as follows:[2]

---

[1]    Pursuant to Fed. R. Civ. P. 25(d), Andrea Joy Campbell is hereby substituted for Maura Healey, former Attorney General, and Terrence M. Reidy is hereby substituted for Thomas Turco, former Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts.

[2]    The Attorney General, as counsel for the Defendants, has consented in writing to the filing of this First Amended Complaint, and therefore it is authorized under Fed. R. Civ. P. 15(a)(2) as being filed "with the opposing party's written consent."

**INTRODUCTION**

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. The Second Amendment is incorporated against the Commonwealth of Massachusetts and is fully applicable to the States through the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

2.      The Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. And "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common' use for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629 (cleaned up)).

3.      "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2143 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*), concerning stun guns). Moreover, "[s]emiautomatic weapons," such as those proscribed under Massachusetts' Handgun Ban (as defined herein), [3] "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994).

---

[3]      The Commonwealth's laws and regulations underlying the challenged regulatory scheme consist of the following, collectively referred to as the "Handgun Ban": (i) sections 123, clauses 18 to 21, 128, 13lK, 131¾ of chapter 140 of the Massachusetts General Laws ("M.G.L."); (ii) sections 7.01, 7.02, 7.03, 7.04, 7.05, 7.06, 7.07, and 7.16 of Title 501 of the Code of Massachusetts Regulations ("CMR"); (iii)

4.     But under the Handgun Ban, the Commonwealth of Massachusetts unconstitutionally bans the commercial sale and transfer of a broad swath of handguns in common use for lawful purposes protected under the Second and Fourteenth Amendments to the United States Constitution.

5.     As the Supreme Court clarified in June 2022, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Ultimately, "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Id.*

6.     Here, the plain text of the Second Amendment covers the conduct that Plaintiffs wish to engage in (i.e., "keep and bear arms"), just as it covers the arms they wish to keep and bear. *Id.* at 2132 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). Indeed, "Plaintiffs' desire to commercially purchase newer models of semiautomatic handguns in common use is covered by the Second Amendment and presumptively protected." *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937, at *2 (S.D. Cal. Apr. 3, 2023) (addressing a challenge to a similar regulatory scheme in California).

7.     *Heller* has already established the relevant contours of the historical tradition: bearable arms presumptively protected by the Second Amendment cannot be banned unless they are both dangerous *and* unusual. *Heller*, 554 at 627. The arms that Plaintiffs wish to acquire are in common use for lawful purposes today and thus cannot be dangerous *and* unusual. No history, analogous or otherwise, supports the

---

sections 16.01, 16.02, 16.03, 16.04, 16.05, 16.06, 16.07, 16.08, and 16.09 of Title 501 of the CMR; and (iv) the related Enforcement Notices and other policies, practices, and customs.

Commonwealth's ban. Thus, Massachusetts cannot possibly meet its burden here.

8.    Under the Supreme Court's analysis, Defendants' Handgun Ban violates the Second and Fourteenth Amendments to the United States Constitution. The analysis is straightforward: (a) Plaintiffs are not prohibited from exercising their right to keep and bear arms; (b) because Plaintiffs' proposed conduct is covered by the Second Amendment's plain text, the government must justify the Handgun Ban as being consistent with this Nation's tradition of firearm regulation; and (c), as *Heller* and *Bruen* establish, there is no historical basis for banning arms in common use for lawful purposes. Therefore, the Handgun Ban must be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

10.    This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the Commonwealth of Massachusetts, of the rights, privileges, or immunities secured by the United States Constitution.

11.    Venue lies in this Court under 28 U.S.C. § 1391, as the events giving rise to Plaintiffs' causes of action arose or exist in the District where the action is being brought.

12.    The Eastern Division of this Court is appropriate pursuant to Local Rule 40.l(d)(l)(C) because all parties residing in the District reside in the Eastern Division.

## PARTIES

### *Plaintiff Granata*

13.    Plaintiff Stefano Granata is a natural person residing in North Reading, Middlesex County, Massachusetts.

14.    Plaintiff Granata currently holds a valid License to Carry ("LTC") in the Commonwealth.

15.     Plaintiff Granata is not prohibited from purchasing or possessing firearms under state and federal law.

16.     Plaintiff Granata desires to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

17.     But for the Handgun Ban and Defendants' enforcement thereof, Plaintiff Granata would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a fifth-generation Glock 19, a Sig Sauer Model 1911 "We the People" edition, and/or a Sig Sauer Model 1911 "TacOps" edition.

18.     Semiautomatic handguns such as those that Plaintiff Granata would otherwise purchase are in common use for self-defense and other lawful purposes, are widely sold and possessed outside of Massachusetts, and are thus constitutionally protected arms under the Second Amendment that cannot be banned.

19.     Plaintiff Granata is a member of Institutional Plaintiff Firearms Policy Coalition.

***Plaintiff Thomas***

20.     Plaintiff Judson Thomas is a natural person residing in Nantucket, Nantucket County, Massachusetts.

21.     Plaintiff Thomas holds a valid LTC in the Commonwealth.

22.     Plaintiff Thomas is not prohibited from purchasing or possessing firearms under state and federal law.

23.     Plaintiff Thomas desires to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

24.     But for the Handgun Ban and Defendants' enforcement thereof, Plaintiff Thomas would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a fifth generation Glock 19

and/or 17, CZ-USA DW Kodiak 10mm, CZ- USA 75 Compact 9mm, CZ-USA P-10 9mm, Magnum Research Desert Eagle XIX .50AE, Kimber Ultra carry II .45, Kimber KHX custom .45, Kimber Desert Warrior .45, and/or a Nighthawk Custom Heinie Signature Recon.

25.    Semiautomatic handguns such as those that Plaintiff Thomas would otherwise purchase are in common use for self-defense and other lawful purposes, are widely sold and possessed outside of Massachusetts, and are thus constitutionally protected arms under the Second Amendment that cannot be banned.

26.    Plaintiff Thomas is a member of Institutional Plaintiff Firearms Policy Coalition.

### *Plaintiff Cannizzaro*

27.    Plaintiff Colby Cannizzaro is a natural person residing in Granville, Hampden County, Massachusetts.

28.    Plaintiff Cannizzaro holds a valid LTC in the Commonwealth.

29.    Plaintiff Cannizzaro is not prohibited from purchasing or possessing firearms under state and federal law.

30.    Plaintiff Cannizzaro has honorably served six years in the Air Force reserves, he has served as a law enforcement officer for four years, and he has completed numerous hours of law enforcement firearms training.

31.    Plaintiff Cannizzaro desires to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

32.    But for the Handgun Ban and Defendants' enforcement thereof, Plaintiff Cannizzaro would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a Kimber Ultra Carry 2 1911, CZ P-09, and/or a Sig Sauer P365XL.

33.    Semiautomatic handguns such as those that Plaintiff Cannizzaro would otherwise purchase are in common use for self-defense and other lawful purposes, are

widely sold and possessed outside of Massachusetts, and are thus constitutionally protected arms under the Second Amendment that cannot be banned.

34.    Plaintiff Cannizzaro is a member of Institutional Plaintiff Firearms Policy Coalition.

***Plaintiff Prosperi***

35.    Plaintiff Cameron Prosperi is a natural person residing in Three Rivers, Hampden County, Massachusetts.

36.    Plaintiff Prosperi holds a valid LTC in the Commonwealth.

37.    Plaintiff Prosperi is not prohibited from purchasing or possessing firearms under state and federal law.

38.    Plaintiff Prosperi desires to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

39.    But for the Handgun Ban and Defendants' enforcement thereof, Plaintiff Prosperi would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a CZ Tactical Sport, CZ Tactical Sport Orange, Beretta 92X Performance, and/or a CZ P-1 OF.

40.    Semiautomatic handguns such as those that Plaintiff Prosperi would otherwise purchase are in common use for self-defense and other lawful purposes, are widely sold and possessed outside of Massachusetts, and are thus constitutionally protected arms under the Second Amendment that cannot be banned.

41.    Plaintiff Prosperi is a member of Institutional Plaintiff Firearms Policy Coalition.

***Plaintiff The Gunrunner***

42.    Plaintiff The Gunrunner, LLC ("The Gunrunner") is a limited liability company organized under Massachusetts law with its office in Middleborough, Plymouth County, Massachusetts.

43.    Plaintiff The Gunrunner is a firearms retailer licensed to sell and transfer firearms under federal law and the law of the Commonwealth.

44.    Plaintiff The Gunrunner is licensed to and does sell new handguns to law-abiding members of the public.

45.    But for the Handgun Ban and Defendants' enforcement thereof, Plaintiff The Gunrunner would make available for sale to all of its law-abiding customers all the commercially available handguns in common use for self-defense and other lawful purposes and sell and transfer them to law-abiding customers, including, but not limited to, those handguns sought by Individual Plaintiffs.

46.    Plaintiff The Gunrunner brings this action on behalf of its customers and would-be customers of handguns not available for sale under the Handgun Ban, including the Individual Plaintiffs. *See, e.g., Craig v. Boren*, 429 U.S. 190, 192–97 (1976).

47.    Plaintiff The Gunrunner is a member of Institutional Plaintiff Firearms Policy Coalition.

***Plaintiff Firearms Policy Coalition***

48.    Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada.

49.    The nature of the purposes of FPC is to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms.

50.    Plaintiff FPC specifically seeks to: protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms; protect, defend, and advance the means and methods by which individuals may exercise their rights, including but not limited to the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms; foster and promote the shooting sports and all lawful uses of arms; and foster and promote awareness of, and public engagement in, all of the above.

51.    FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

App. 17

52.    Plaintiff FPC has members in the Commonwealth of Massachusetts, including Plaintiffs Granata, Thomas, Cannizzaro, Prosperi, and The Gunrunner.

53.    FPC brings this action on behalf its members, including the named Plaintiffs herein.

54.    FPC's members have been adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

55.    Plaintiff FPC's members would otherwise have standing to sue in their own right, as established herein.

56.    The interests that Plaintiff FPC seeks to protect are germane to the organization's purpose.

57.    Neither the claims that Plaintiff FPC asserts nor the relief it requests requires the participation of individual members in the lawsuit. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U. S. ____ (2023), slip op. 7–9.

### *Defendant Andrea Joy Campbell*

58.    Defendant Andrea Joy Campbell ("Defendant Campbell") is sued in her official capacity as Attorney General of the Commonwealth of Massachusetts.

59.    Defendant Campbell is an independent constitutional officer responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms.

60.    Defendant Campbell is therefore responsible for regulating, implementing, and enforcing the Commonwealth's laws and regulations which collectively comprise the Handgun Ban of which Plaintiffs complain herein.

61.    Defendant Campbell has enforced, is presently enforcing, and is threatening to enforce the Handgun Ban.

62.    Defendant Campbell has authority to cease such enforcement of the Handgun Ban consistent with the relief Plaintiffs seek through this action. *See* M.G.L. c. 12 § 1 and § 3.

*Defendant Terrence M. Reidy*

63.    Defendant Terrence M. Reidy ("Defendant Reidy") is sued in his official capacity as Secretary of the Commonwealth's Executive Office of Public Safety and Security (EOPSS), *see* https://bit.ly/3ppS94N.

64.    Defendant Reidy is an independent constitutional office within the Executive branch, *see* https://bit.ly/3NXjtR1; https://bit.ly/44tCfF7.

65.    Defendant Reidy is responsible for overseeing the Firearms Records Bureau (FRB) through his Department of Criminal Justice Information Services (DCJIS).

66.    Defendant Reidy is thus responsible for regulating and enforcing the Commonwealth's laws and regulations related to the sales, transfer, possession, and ownership of firearms which collectively comprise the Handgun Ban of which Plaintiffs complain herein.

67.    Defendant Reidy has enforced, is presently enforcing, and is threatening to continue to enforce the Handgun Ban.

68.    Defendant Reidy has authority to cease such enforcement of the Handgun Ban consistent with the relief Plaintiffs seek through this action. *See* M.G.L. c. 6A § 2 and § 3.

## THE REGULATORY SCHEME AND HANDGUN BAN

69.    In Massachusetts, the sale, transfer, rental, and lease of all "firearms" is strictly regulated. A "firearm" includes any pistol, revolver, or "other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches," i.e., all handguns. M.G.L. c. 140, § 121.

70.    It is generally unlawful for anyone except "licensed dealers" to "own or possess" a firearm without first applying for and being granted a Firearms Identification card ("FID") or an LTC. *See* M.G.L. c. 140, §§ 128, 129B-129C; *id.* c. 269, § 10(a). And it is generally unlawful for anyone to sell, rent, lease, or otherwise transfer any handgun without first applying for and obtaining a license to engage in the commercial transaction of firearms under the provisions of M.G.L. c. 140, § 122.

71.    Even with such a license, the ability to actually engage in firearms transactions is strictly limited, as licensees are prohibited on pain of criminal and civil penalties from delivering, selling, renting, leasing, or otherwise transferring any firearm to anyone who does not have both a valid permit to purchase a firearm issued pursuant to M.G.L. c. 140, § 131A, and an FID, unless the transferee happens to hold a LTC or meet one of the narrow set of special exemptions to these restrictions generally unavailable to ordinary law-abiding citizens. M.G.L. c. 140, §§ 123, cl. 7-8, 131E(b).

72.    On top of that, it is generally illegal for a licensee (and any other person or entity involved in the chain of commercial supply or distribution of firearms) to sell, rent, lease, transfer, or deliver any firearm that does not meet the specifications established from time to time by the Commonwealth's "gun control advisory board" as being necessary for inclusion on the Massachusetts "Approved Firearms Roster" ("Handgun Roster"). M.G.L. c. 140, §§ 123, cl. 18-21, 131 ¾; 501 CMR 7.02 - 7.07.[4] *See* https://bit.ly/43blrla (last visited September 21, 2023).

73.    Only firearms lawfully owned or possessed under a license issued before October 21, 1998, are exempt from complying with the requirements for inclusion on the Handgun Roster. M.G.L. c. 140, § 123.

74.    Licensees are further constrained in their ability to engage in the sale and transfer of firearms by the "Attorney General's Handgun Sales Regulations," i.e., 940 CMR 16.00, et seq., and the "Enforcement Notices" based on the same.

75.    As the disclaimer on the Handgun Roster itself declares:

> Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq. Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney

---

[4]    The statutory provisions and regulations underlying the Handgun Roster fall within the statutory provisions and regulations being challenged in this action and thus fall within the "Handgun Ban" as defined herein. *See infra*, n. 3 (defining "Handgun Ban"). Accordingly, references to the Handgun Ban generally include the Handgun Roster unless the context specifically indicates otherwise.

General's Handgun Sales Regulations. Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us).

76.    Enforcement Notice #3, from February 2002, still featured on the Attorney General's website, further declares that the legality of a licensee's transfer of a firearm is contingent on the firearm's having the child safety features and tamper resistant serial numbers specified in 940 CMR 16.03 and 16.05, and, when it is a semiautomatic handgun, the load indicators and magazine safety disconnects specified in 940 CMR 16.05. The notice warns that "[i]f a handgun does not satisfy these three additional requirements, then it is a violation of the regulations for a handgun purveyor to transfer that handgun even if the handgun is listed on the Approved Firearms Roster." *See* https://bit.ly/46KlfN0 (last visited September 21, 2023).

77.    A copy of the Attorney General Enforcement Notices, as well as a copy of the July 16, 2004, Consumer Advisory on Glock Handguns, are attached to this First Amended Complaint as **Exhibit A**.

78.    A licensee's violation of the restrictions imposed by this regulatory scheme is not only a crime, M.G.L. c. 140, § 128, but also constitutes an unfair and deceptive trade practice subjecting the violator to significant civil penalties, 940 CMR 16.01–16.06.

79.    The sale, rental, lease, or other transfer of firearms by or to non-licensed individuals is subject to even greater restrictions. The general prohibition against the sale, rental, lease, or other transfer of firearms continues to apply, subjecting the transferor to the criminal penalties established under M.G.L. c. 140, § 128, unless the transaction fits within one of the following narrow exceptions for lawful transfers:

a.    The transfer is to a dealer licensed under state or federal law;

b.    The transfer is to a historical society, museum, or institutional collection open to the public; or

App. 21

       c.    The transfer is to someone other than a licensed dealer, a historical society, museum, or institutional collection open to the public, and all of the following are true:

         i.    The transferor has a valid FID or LTC or is exempt from such requirements under M.G.L. c. 140, § 129C(4)(n), (o), (r), or (s) (which apply to transfers involving legatees, military or law enforcement officers, chartered veteran's organizations, or historical societies, museums, or institutional collections open to the public);

         ii.    The transferee has (i) a purchase permit *and* an FID, (ii) a purchase permit and is exempt from the FID requirement, or (iii) an LTC;

         iii.    The transferor makes no more than four such transfers of firearms, including rifles and shotguns, in any one calendar year; and

         iv.    The transferee reports the transfer to the Commonwealth department of justice within seven days of the firearm's receipt, which report must specifically identify both the transferor and the firearm.

M.G.L. c. 140, §§ 128A, 128B, 131E.

80.    Consequently, licensed retailers are absolutely precluded from transferring any handgun *not* included on the Handgun Roster *and* any handgun prohibited from transfer to typical law-abiding individuals by the Defendants.

81.    All unlicensed individuals are precluded from transferring any handguns to any ordinary, law-abiding citizens who lack the necessary purchase permits, FID, or special exemptions, and even then, they are limited to four transfers in any one year.

82.    Obtaining a purchase permit, FID, or LTC for purposes of acquiring a handgun requires meeting specific statutory criteria based on the applicant's age, personal background, and satisfaction of mandated firearms training, and, even then, the granting of these statutory creatures is discretionary.

83.    Purchase permits are subject to the licensing official's subjective determination that the purchase, rental, or lease of the firearms "is for a proper purpose," and the official "may revoke such permit at will." M.G.L. c. 140, § 131A.

84.    Licensing officials may deny FIDs or LTCs based on their subjective determination that the applicant "could potentially create a risk to public safety" and is therefore "unsuitable." M.G.L. c. 140, §§ 129B, 129B(1½), 13lA, 13l(d)(i)–(x).

85.    Indeed, because licensed retailers are prohibited from transferring any off-Roster or otherwise unapproved or prohibited handguns, all ordinary law-abiding citizens—even those with purchase permits, FIDs, and LTCs—are relegated to a secondary market of non-licensed transferors who may transfer no more than four firearms, including shotguns and rifles, in an entire year, and thus who necessarily deal in limited supplies.

86.    The handguns approved for commercial sale to ordinary law-abiding citizens in the Commonwealth represent a fraction of the total number makes and models of commercially available constitutionally protected handguns available in the United States that are in common use for self-defense and other lawful purposes.

87.    Ordinary law-abiding Massachusetts residents cannot simply look outside the Commonwealth borders to purchase or acquire any of the banned handguns because federal law requires the use of an in-state licensed dealer to facilitate any purchase or delivery of a handgun from an out-of-state seller, 18 U.S.C. §§ 922(a)(3), 922(a)(5). And, of course, the in-state dealer must fully comply with Massachusetts law which precludes transferring handguns proscribed under the Handgun Ban.

88.    By banning the commercial sale of constitutionally protected handguns, Defendants' Handgun Ban is a bar to the exercise of the natural, inalienable, and fundamental right to keep and bear such protected arms.

89.    Defendants' Handgun Ban represents a policy choice that "the enshrinement of constitutional rights" has taken "off the table." *Heller,* 554 U.S. at 636.

90.    In fact, the "features" that the Commonwealth mandates for inclusion on its Handgun Roster are not present on many of the handguns otherwise in common use and widely available around the country for lawful purposes.

91.    The features that the Commonwealth mandates for inclusion on its Handgun Roster but which are not present on many of the handguns otherwise in common use around the country for lawful purposes include, for example, loaded chamber indicators, "childproofing protection" features, and/or magazine safety disconnect mechanisms.[5]

92.    Additionally, on information and belief, handguns that have not passed the Commonwealth's "Handgun Drop Test" are in common use and widely available around the country for lawful purposes.

93.    Therefore, the Handgun Ban excludes and outlaws the commercial sale of many firearms that are constitutionally protected.

94.    The Commonwealth's blanket prohibitions against this class of protected arms are categorically unconstitutional, which has been clear since the time of *Heller*; that was the essence of the ban the Supreme Court struck down as categorically unconstitutional in *Heller* itself. *Heller,* 554 U.S. at 628 (striking down a handgun ban where it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for self-defense purposes).

95.    *Bruen* seals the fate of the Handgun Ban by reaffirming *Heller* that "demands a test rooted in the Second Amendment's text, as informed by history," 142 S. Ct. at 2127, a test that Massachusetts cannot satisfy since it cannot show the Ban "is consistent with this Nation's tradition of firearm regulation," *id.* at 2126.

---

[5]    Some of Massachusetts' "safety" requirements, like the mandated 10-lb. trigger pull (nearly double the weight of many widely used law enforcement-issued duty handguns, *see*, *e.g.*, https://bit.ly/44vORfc) actually make handguns *more* difficult to operate effectively—and thus more difficult to operate safely.

**COUNT I**
**DEPRIVATION OF CIVIL RIGHTS**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS. II AND XIV**
**42 U.S.C. § 1983**

96.    Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

97.    There is an actual and present controversy between the parties.

98.    The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II.

99.    Individual Plaintiffs, Institutional Plaintiff FPC's similarly situated members, and Retail Plaintiff The Gunrunners' customers and would-be customers—all legally eligible to exercise their Second Amendment protected rights—wish to keep and bear constitutionally protected arms for self-defense and other lawful purposes.

100.    Because of Defendants' enforcement of the Handgun Ban, however, these individuals cannot purchase, and Plaintiff The Gunrunner is prohibited from selling to them, new constitutionally protected arms without suffering various penalties, including but not limited to criminal liability.

101.    Defendant Campbell has enforced, is presently enforcing, and is threatening to continue to enforce the Handgun Ban, and in doing so is actively subjecting and will continue to subject Individual Plaintiffs, the similarly situated customers and would-be customers of Retailer Plaintiff The Gunrunner, and the similarly situated Massachusetts-resident members of Institutional Plaintiff FPC to the threat of criminal sanction for any act or attempted act in violation of the Handgun Ban.

102.    Defendant Reidy has enforced, is presently enforcing, and is threatening to enforce the Handgun Ban, and in doing so is actively subjecting and will continue to subject Individual Plaintiffs, the similarly situated customers and would-be customers of Retailer Plaintiff The Gunrunner, and the similarly situated Massachusetts-resident members of Institutional Plaintiff FPC to the threat of criminal sanction for any act or attempted act in violation of the Handgun Ban.

App. 25

103.   The laws and regulations underlying the Handgun Ban, and the policies, practices, and customs designed to enforce the same, prevent the Individual Plaintiffs, the FPC's similarly situated members, and The Gunrunners' customers and would-be customers from purchasing, acquiring, receiving, and ultimately possessing "instruments that constitute bearable arms."

104.   Individuals in Massachusetts have a right to keep and bear arms, including but not limited to, buying, selling, transferring, self-manufacturing or assembling, transporting, carrying, and practicing safety and proficiency with, firearms, ammunition, magazines, and appurtenances, under the Second and Fourteenth Amendments to the United States Constitution.

105.   This inalienable, fundamental, individual right to keep and bear firearms includes the right to acquire modern handguns in common use for lawful purposes—indeed, arms that are lawfully sold and possessed throughout the United States—such as those the Handgun Ban and Handgun Roster prevent common law-abiding citizens from purchasing at a licensed retailer.

106.   The text of the Second Amendment, which guarantees "the right of the people to keep and bear Arms," implicitly includes the right to acquire firearms. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("[The] right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms."); *accord Teixeira v. County of Alameda*, 873 F.3d 670, 678 (2017).

107.   Without constitutional protections for the acquisition of firearms, the "right of the people to keep and bear Arms" would be in jeopardy. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (clarifying that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective"); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014) (holding that "the right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to acquire a firearm . . .").

17

App. 26

108.    Contrary to the regulations like those underlying the Handgun Ban and related Handgun Roster, no Founding Era precedent exists for prohibiting the commercial sale of firearms otherwise widely available to, and in common use for lawful purposes among, ordinary law-abiding citizens in the vast majority of States.

109.    Purchase prohibitions like those imposed by the Commonwealth only exist in a handful of jurisdictions and all of them are of recent origin—on information and belief, the *earliest* was Maryland's, enacted in 1988. Md. Code Ann., Pub. Safety § 5-405.

110.    The Handgun Ban prevents law-abiding citizens from acquiring and thus possessing for lawful purposes "instruments that constitute bearable arms" protected under the Second Amendment.

111.    The Handgun Ban is plainly inconsistent with the "Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Accordingly, these restrictions on the purchase and acquisition of firearms fall directly within—and are proscribed by—the Second Amendment's "unqualified command." *Id.* at 2130 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50, n.10 (1961)).

112.    The Commonwealth's prohibition on the purchase of constitutionally protected arms under the Handgun Ban and its maintenance of the Handgun Roster for purposes of enforcing this proscription in the absence of the necessary historical precedent fails constitutional scrutiny under *Bruen*, rendering them unconstitutional both facially and as applied in this case.

113.    "The very enumeration of the [Second Amendment] right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original).

114.    The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. 742, 780, and it cannot "be singled out for special—and especially unfavorable—treatment." *Id.* at 778–79.

115.  *Bruen* made this clear by expressly rejecting all interest balancing and the First Circuit's prior "two-step" approach in the context of Second Amendment claims. 142 S. Ct. at 2127.

116.  "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Again, "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

117.  *Bruen* makes clear that the First Circuit's former two-step approach and interest-balancing applied in *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), are inapplicable and improper in Second Amendment cases, and thus the analysis and conclusions of *Worman* are abrogated.

118.  "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. And "*Heller*'s methodology centered on constitutional text and history." *Id*. at 2128-29.

119.  The plain text of the Second Amendment covers the conduct the Plaintiffs wish to engage in ("keep and bear arms") and the arms they wish to keep and bear (handguns).

120.  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U. S. at 582).

121.  Since the conduct is covered by the Second Amendment's plain text, "the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

122.  As *Heller* already established, bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are both dangerous *and* unusual, and "[w]hatever the likelihood that handguns were considered dangerous and unusual during the colonial period, they are indisputably

in common use for self-defense. They are, in fact, the quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U. S. at 629) (cleaned up).

123.   The general definition of "arms" under the Second Amendment "covers modern instruments that facilitate armed self-defense. *Cf. Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*) (stun guns)." *Id*.

124.   Millions of handguns prohibited for sale to the Commonwealth's law-abiding citizens under the Handgun Ban and Defendants' enforcement thereof are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states.

125.   In the approximately 400-year history of the colonies and later the United States, no regulations at all like the Handgun Ban appeared until recently and then in only a few states. That is hardly a historical tradition of such regulations.

126.   Defendants' enforcement of the Handgun Ban has prevented and continues to prevent Individual Plaintiffs, Retailer Plaintiff's customers and would-be customers, and similarly situated members of Institutional Plaintiff FPC from purchasing new, constitutionally protected handguns from licensed firearm dealers, in violation of their rights protected under the Second and Fourteenth Amendments to the United States Constitution.

127.   Plaintiffs reasonably fear that Defendants will enforce the Handgun Ban against them should they act or attempt to act in violation of the same.

128.   Defendants' active enforcement of the Handgun Ban is evidenced by the prosecution of Massachusetts resident Michael A. Wheelock, who faced criminal charges stemming from the alleged sale of firearms not approved for sale in Massachusetts. MetroWest Daily News, April 4, 2013, *Northborough resident and former gun shop owner charged with selling illegal guns*, online at https://bit.ly/3JJIa10 (last visited September 21, 2023).

129.   In short, the Handgun Ban and Defendants' enforcement thereof prohibits the acquisition and possession of arms in common use for self-defense and other lawful purposes (and thus arms that are not both dangerous *and* unusual), nothing in the "Nation's historical tradition of firearm regulation" supports the

Handgun Ban, *Bruen*, 142 S. Ct. at 2130, and thus the Handgun Ban and Defendants' enforcement thereof violates the right to keep and bear arms protected under the Second and Fourteenth Amendments.

130.    Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the Commonwealth of Massachusetts not disqualified from exercising their fundamental, individual right to keep and bear arms, including Plaintiffs, through Defendants' enforcement and implementation of the prohibitions under the Handgun Ban, which has and will continue to infringe upon and prevent, by criminal sanction, the exercise of the fundamental right to keep and bear arms unless and until redressed through the relief Plaintiffs seek herein. *See* 42 U.S.C. § 1983.

131.    Because Defendants' enforcement of the purchase prohibitions under the Handgun Ban violates Plaintiffs' rights under the Second and Fourteenth Amendments, Plaintiffs are entitled to declaratory and injunctive relief.

132.    Defendants' Handgun Ban is thus causing injury and damage that is actionable under 42 U.S.C. § 1983.

133.    For all these reasons, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER

WHEREFORE, Plaintiffs pray for the following relief:

1.    A declaratory judgment that the Handgun Ban, as defined herein, violates the Second and Fourteenth Amendments to the United States Constitution;

2.    A permanent injunction restraining Defendants, their successors and assignees, and their officers, agents, servants, employees, and all persons in concert or participation with them, and all who have notice of the injunction, from enforcing the Handgun Ban and preventing otherwise qualified individuals from purchasing and possessing new handguns that are proscribed from sale under the Handgun Ban;

3.    Attorney's fees and costs (including incidental costs such as expert witness fees) pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

4.      Such other and further legal and equitable relief as may be necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

DATED: September 21, 2023

Respectfully submitted, the Plaintiffs,

/s/ *Richard C. Chambers. Jr.*, Esq.
Richard C. Chambers, Jr., Esq. (BBO# 651251)
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Richard@chamberslawoffice.com

Jason A. Guida (BBO# 667252)
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01906
Office: (617) 383-4652
jason@lawguida.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe, Suite A
Southport, NC 28461
Office: (910) 713-8804
law.rmd@gmail.com
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 21, 2023.

/s/ *Richard C. Chambers. Jr.*
Attorney for Plaintiffs

22

App. 31

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA; JUDSON THOMAS;
COLBY CANNIZZARO; CAMERON PROSPERI;
THE GUN RUNNER, LLC; and FIREARMS
POLICY COALITION, INC.,

                           Plaintiffs,

            v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts; and TERRENCE M. REIDY, in
his official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                           Defendants.

CIVIL ACTION
NO. 1:21-cv-10960-RWZ

## **DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

Defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts and Terrence M. Reidy, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, hereby answer the Plaintiffs' First Amended Complaint as follows.

1.      The first sentence of Paragraph 1 purports to quote and characterize the Second Amendment to the United States Constitution, to which no response is required. The second sentence of Paragraph 1 purports to state a legal conclusion concerning the Fourteenth Amendment, to which no response is required.

2.      The allegations of Paragraph 2 purport to quote and characterize *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which speaks for itself and no response is required.

App. 32

3.      The allegations of Paragraph 3 purport to quote and characterize *Bruen*, and *Staples v. United States*, 511 U.S. 600 (1994), which speak for themselves and no response is required.[1] Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

4.      The allegations of Paragraph 4 purport to state legal conclusions, to which no response is required; but, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second Amendment or the Fourteenth Amendment to the United States Constitution. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban." To the extent the allegations of Paragraph 4 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4.

5.      The allegations of Paragraph 5 purport to quote and characterize *Bruen*, which speaks for itself and no response is required.

6.      The allegations of Paragraph 6 purport to state legal conclusions, to which no response is required. To the extent the allegations of the first sentence of Paragraph 6 purport to assert facts, Defendants deny those allegations. To the extent the allegations of the second sentence of Paragraph 6 purport to characterize and quote an out-of-circuit decision, *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937 (S.D. Cal. Apr. 3, 2023), that decision speaks for itself and no response is required.

---

[1] The allegations in footnote 3 purport to describe the legal claims asserted in the First Amended Complaint, to which no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

App. 33

7.     The allegations of Paragraph 7 purport to quote and characterize *District of Columbia v. Heller*, 554 U.S. 570 (2008), which speaks for itself and no response is required; to the extent the allegations of Paragraph 7 purport to state legal conclusions, no response is required. To the extent the allegations of the second sentence of Paragraph 7 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of those facts. To the extent the allegations of the third and fourth sentences of Paragraph 7 purport to assert facts, those facts are denied.

8.     The allegations of Paragraph 8 purport to state legal conclusions, to which no response is required, and Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban." To the extent the second sentence of Paragraph 8 purports to characterize *Heller* or *Bruen*, these cases speak for themselves and no response is required. The allegations of the final sentence of Paragraph 8 purport to characterize the relief Plaintiffs request in this case, and no response is required.

9.     The allegations of Paragraph 9 purport to state legal conclusions, to which no response is required.

10.     The allegations of Paragraph 10 purport to state legal conclusions, to which no response is required.

11.     The allegations of Paragraph 11 purport to state legal conclusions, to which no response is required.

12.     The allegations of Paragraph 12 purport to state legal conclusions, to which no response is required.

App. 34

13.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

14.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14.

15.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15.

16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17, except that Defendants deny the speculative and conclusory allegations regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

18.    The allegations of Paragraph 18 purport to state a legal conclusion to which no response is required; to the extent the allegations of Paragraph 18 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18.

19.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19.

20.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20.

App. 35

21.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21.

22.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23, except that Defendants deny the speculative and conclusory allegations regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

24.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

25.    The allegations of Paragraph 25 purport to state a legal conclusion to which no response is required; to the extent the allegations of Paragraph 25 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution.

26.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26.

27.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27.

28.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28.

29.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29.

30.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30.

31.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31, except that Defendants deny the speculative and conclusory allegations regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

32.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

33.     The allegations of Paragraph 33 purport to state a legal conclusion to which no response is required; to the extent the allegations of Paragraph 33 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 33. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution.

34.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34.

35.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35.

36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36.

37.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37.

38.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

39.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

40.     The allegations of Paragraph 40 purport to state a legal conclusion to which no response is required; to the extent the allegations of Paragraph 40 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution.

41.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41.

App. 38

42.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42.

43.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 43.

44.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44.

45.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45, except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

46.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46; to the extent Paragraph 46 purports to state a legal conclusion, no response is required. Defendants further state that the case cited in Paragraph 46, *Craig v. Boren*, 429 U.S. 190 (1976), speaks for itself, and no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

47.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47.

48.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

49.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49.

App. 39

50.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 50.

51.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 51.

52.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 52.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 53; to the extent Paragraph 53 purports to state a legal conclusion, no response is required.

54.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54; to the extent Paragraph 54 purports to state a legal conclusion, no response is required. Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts.

55.     The allegations of Paragraph 55 purport to state a legal conclusion, to which no response is required.

56.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 56; to the extent Paragraph 56 purports to state a legal conclusion, no response is required.

57.     The allegations of Paragraph 57 purport to state a legal conclusion, to which no response is required. Defendants further state that the cases cited in Paragraph 57 speak for themselves.

58.     Admitted that Andrea Joy Campbell is the Attorney General of the Commonwealth of Massachusetts. The remaining allegations of Paragraph 58 purport to describe the legal claims asserted in the First Amended Complaint, to which no response is required.

App. 40

59.    Admitted that Defendant Campbell is a constitutional officer. The remaining allegations of Paragraph 59 purport to state legal conclusions, to which no response is required. To the extent a response is required, Defendant Campbell admits that her office is responsible for promulgating and enforcing the regulations found at 940 C.M.R. §§ 16.01-16.09.

60.    The allegations of Paragraph 60 purport to state legal conclusions, to which no response is required. To the extent a response is required, Defendant Campbell admits that her office is responsible for promulgating and enforcing the regulations found at 940 C.M.R. §§ 16.01-16.09. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

61.    The allegations of Paragraph 61 purport to state a legal conclusion, to which no response is required. To the extent a response is required, Defendant Campbell admits that her office is responsible for promulgating and enforcing the regulations found at 940 C.M.R. §§ 16.01-16.09, and that she has enforced these regulations in the past. Defendant Campbell denies the speculative and conclusory allegations regarding her current and hypothetical future enforcement efforts. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

62.    The allegations of Paragraph 62 purport to state a legal conclusion, to which no response is required. Defendants further state that the statutes cited in Paragraph 62 speak for themselves. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

63.    Admitted that Defendant Terrence M. Reidy is the Secretary of the Commonwealth's Executive Office of Public Safety and Security (EOPSS). The remaining allegations of Paragraph 63 purport to describe the legal claims asserted in the First Amended Complaint, to which no response is required.

App. 41

64.     Denied.

65.     Denied.

66.     The allegations of Paragraph 66 purport to state a legal conclusion, to which no response is required. To the extent a response is required, Defendant Reidy admits that he promulgated the regulations found at 501 C.M.R. §§ 17.01-17.16, and denies the remaining allegations of Paragraph 66.

67.     The allegations of Paragraph 67 purport to state a legal conclusion, to which no response is required. To the extent a response is required, Defendant Reidy denies the allegations of Paragraph 67.

68.     The allegations of Paragraph 68 purport to state a legal conclusion, to which no response is required. Defendants further state that the statutes cited in Paragraph 68 speak for themselves. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

69.     The allegations of Paragraph 69 purport to characterize Mass. Gen. Laws c. 140, § 12, which speaks for itself and no response is required.

70.     The allegations of Paragraph 70 purport to characterize Mass. Gen. Laws c. 140, §§ 122, 128, 129B-129C, and Mass. Gen. Laws c. 269, § 10(a), which speak for themselves and no response is required.

71.     The allegations of Paragraph 71 purport to characterize Mass. Gen. Laws c. 140, §§ 123, cl. 7-8, 131E(b), and 131A, which speak for themselves and no response is required.

App. 42

72.    The allegations of Paragraph 72 purport to characterize Mass. Gen. Laws c. 140, §§ 123, cl. 18-21, 131 ¾, and 501 Code Mass. Regs. §§ 7.02-7.07, which speak for themselves and no response is required.[2]

73.    The allegations of Paragraph 73 purport to characterize Mass. Gen. Laws c. 140, § 123, which speaks for itself and no response is required.

74.    The allegations of Paragraph 74 purport to characterize 940 Code Mass. Regs § 16.00 *et seq.*, and the Attorney General's "Enforcement Notices," which speak for themselves and no response is required.

75.    The allegations of Paragraph 75 purport to quote from the Approved Firearms Roster, which speaks for itself and no response is required.

76.    The allegations of Paragraph 76 purport to characterize and quote from the Attorney General's February 2002 Enforcement Notice #3, which speaks for itself and no response is required.

77.    Admitted that Exhibit A to the First Amended Complaint contains the Attorney General's enforcement notices and a copy of her July 16, 2004, Consumer Advisory on Glock Handguns, which speak for themselves.

78.    The allegations of Paragraph 78 purport to characterize Mass. Gen. Laws c. 140, § 128, and 940 Code Mass. Regs. §§ 16.01-16.06, which speak for themselves and no response is required.

_____

[2] The allegations in footnote 4 purport to describe the legal claims asserted in the First Amended Complaint, to which no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

App. 43

79.     The allegations of Paragraph 79, including all subparts, purport to characterize Mass. Gen. Laws c. 140 §§ 128A, 128B, 131E, which speak for themselves and no response is required.

80.     The allegations of Paragraph 80 purport to characterize and paraphrase the statutes cited in Paragraphs 69-79, which speak for themselves and no response is required.

81.     The allegations of Paragraph 81 purport to characterize and paraphrase the statutes cited in Paragraph 79, which speak for themselves and no response is required.

82.     The allegations of Paragraph 82 purport to characterize and paraphrase Massachusetts law, and state legal conclusions, and therefore no response is required.

83.     The allegations of Paragraph 83 purport to characterize and quote from Mass. Gen. Laws c. 140, § 131A, which speaks for itself and therefore no response is required.

84.     The allegations of Paragraph 84 purport to characterize and quote from Mass. Gen. Laws c. 140, §§ 129B, 129B(1½), 131A, and 131(d)(i)-(x), which speak for themselves and no response is required.

85.     The allegations of Paragraph 85 purport to characterize and paraphrase Massachusetts law, which speaks for itself, and no response is required; to the extent they purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 85.

86.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 86; to the extent the allegations of Paragraph 86 purport to state a legal conclusion, no response is required.

87.     The allegations of the first sentence of Paragraph 87 purport to characterize federal statutes 18 U.S.C. §§ 922(a)(3), and 922(a)(5), which speak for themselves and no response is required. The allegations of the second sentence of Paragraph 87 purports to characterize and

App. 44

paraphrase Massachusetts law, which speaks for itself and to which no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

88.    To the extent the allegations of Paragraph 88 purport to state legal conclusions, no response is required; to the extent the allegations of Paragraph 88 purport to assert facts, Defendants deny the allegations of Paragraph 88. Further answering, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution. Defendants also deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

89.    The allegations of Paragraph 89 purport to state a legal conclusion to which no response is required; they also purport to quote and characterize *District of Columbia v. Heller*, 554 U.S. 580 (2008), which speaks for itself, and no response is required. To the extent a response is required, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

90.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 90.

91.    The allegations of Paragraph 91 purport to state legal conclusions, to which no response is required; to the extent a response is required, these allegations are denied. To the extent

the allegations of Paragraph 91 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 91.[3]

92.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 92.

93.    The allegations of Paragraph 93 purport to state legal conclusions, to which no response is required; to the extent the allegations of Paragraph 93 purport to state facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 93. Furthering answering, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution. Defendants also deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

94.    The allegations of Paragraph 94 purport to state a legal conclusion, to which no response is required. They also purport to quote and characterize *Heller* which speaks for itself and to which no response is required; but, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments.

95.    The allegations of Paragraph 95 purport to state a legal conclusion, to which no response is required. They also purport to quote and characterize *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142, S. Ct. 2111 (2022), which speaks for itself and to which no response is required; but, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or

---

[3] The allegations of footnote 5 are denied.

App. 46

Fourteenth Amendments. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

96.    Defendants repeat and reallege their answers to the allegations of the foregoing paragraphs and incorporate them herein by reference.

97.    The allegations of Paragraph 97 purport to state a legal conclusion to which no response is required.

98.    The allegations of Paragraph 98 purport to characterize and quote the Second Amendment to the United States Conclusion, to which no response is required.

99.    The allegations of Paragraph 99 purport to state a legal conclusion to which no response is required. To the extent the allegations of Paragraph 99 purport to state facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 99.

100.    The allegations of Paragraph 100 purport to state a legal conclusion to which no response is required. To the extent the allegations of Paragraph 100 purport to state facts, they are denied. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

101.    The allegations of Paragraph 101 purport to state a legal conclusion, to which no response is required. Defendant Campbell states that her office is responsible for enforcing the regulations found at 940 C.M.R. §§ 16.01-16.09 and admits that she has enforced these regulations in the past. Defendant Campbell denies the speculative and conclusory allegations regarding her current or hypothetical future enforcement efforts. Defendant Campbell further denies that she is subjecting the Individual Plaintiffs, or similarly situated persons, to the "threat of criminal sanction" for hypothetical and speculative violations of the regulations found at 940 C.M.R. §§

16

16.01-16.09. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

102.    The allegations of Paragraph 102 purport to state a legal conclusion, to which no response is required. To the extent a response is required, Defendant Reidy denies the allegations of Paragraph 102.

103.    The allegations of Paragraph 103 purport to state a legal conclusion, to which no response is required. To the extent the allegations of Paragraph 103 purport to state facts, they are denied. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

104.    The allegations of Paragraph 104 purport to state legal conclusions, to which no response is required.

105.    The allegations of Paragraph 105 purport to state legal conclusions, to which no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

106.    The allegations of Paragraph 106 purport to state legal conclusions, to which no response is required. The out-of-circuit cases cited in Paragraph 106 speak for themselves and no response is required.

107.    The allegations of Paragraph 107 purport to state legal conclusions, to which no response is required. The out-of-circuit cases cited in Paragraph 107 speak for themselves and no response is required.

108.    The allegations of Paragraph 108 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 108 purport to state facts, they are denied. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

App. 48

109.    The allegations of Paragraph 109 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 109 purport to state facts, they are denied. The cited statute speaks for itself and no response is required.

110.    The allegations of Paragraph 110 purport to state legal conclusions, to which no response is required. To the extent the allegations of Paragraph 110 purport to assert facts, they are denied, and Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

111.    The allegations of Paragraph 111 purport to state legal conclusions, to which no response is required. The allegations of Paragraph 111 purport to quote and characterize *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142, S. Ct. 2111 (2022), which speaks for itself and no response is required. To the extent the allegations of Paragraph 111 purport to state facts, they are denied. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

112.    The allegations of Paragraph 112 purport to state legal conclusions, to which no response is required. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban." Further answering, the allegations of Paragraph 112 purport to characterize *Bruen*, which speaks for itself and no response is required.

113.    The allegations of Paragraph 113 purport to quote and characterize *Heller*, which speaks for itself and no response is required.

18

App. 49

114.    The allegations of Paragraph 114 purport to quote and characterize *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), which speaks for itself and no response is required.

115.    The allegations of Paragraph 115 purport to quote and characterize *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142, S. Ct. 2111 (2022), which speaks for itself and no response is required.

116.    The allegations of Paragraph 116 purport to quote and characterize *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142, S. Ct. 2111 (2022), which speaks for itself and no response is required.

117.    The allegations of Paragraph 117 purport to state a legal conclusion, to which no response is required. The allegations of Paragraph 117 further purport to quote and characterize *Bruen*, which speaks for itself and no response is required.

118.    The allegations of Paragraph 118 purport to quote and characterize *Bruen*, which speaks for itself and no response is required.

119.    The allegations of Paragraph 119 purport to state legal conclusions, to which no response is required. Furthering answering, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments to the United States Constitution.

120.    The allegations of Paragraph 120 purports to quote *Bruen*, which speaks for itself and no response is required.

121.    The allegations of Paragraph 121 purport to state legal conclusions, to which no response is required. The allegations of Paragraph 121 further purport to quote and characterize *Bruen*, which speaks for itself and no response is required.

122.    The allegations of Paragraph 122 purport to state legal conclusions, to which no response is required. The allegations of Paragraph 122 further purport to quote and characterize *Heller* and *Bruen*, which speak for themselves and no response is required.

123.    The allegations of Paragraph 123 purport to state legal conclusions, to which no response is required. The allegations of Paragraph 123 purport to characterize *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which speaks for itself and no response is required.

124.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 124; except that Defendants deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

125.    The allegations of Paragraph 125 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 125 purport to state facts, they are denied. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

126.    The allegations of Paragraph 126 purport to state legal conclusions, to which no response is required. To the extent the allegations of Paragraph 126 purport to assert facts, Defendants deny the allegations of Paragraph 126. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

127.    The allegations of Paragraph 127 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 127 purport to state facts,

Defendants deny the allegations of Paragraph 127, and Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

128.    The allegations of Paragraph 128 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 128 purport to characterize an article purportedly discussing charges brought against an individual by the Worcester County District Attorney's Office, that article speaks for itself and no response is required. To the extent the allegations of Paragraph 128 purport to assert facts and a further response is required, the allegations of Paragraph 128 are denied. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

129.    The allegations of Paragraph 129 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 129 purport to assert facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of those facts and further deny the speculative and conclusory allegation regarding any current or hypothetical future enforcement efforts. To the extent the allegations of Paragraph 129 purport to quote and characterize *Bruen*, it speaks for itself and no response is required. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

130.    The allegations of Paragraph 130 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 130 purport to assert facts, Defendants deny the speculative and conclusory allegations regarding any current or hypothetical

21

App. 52

future enforcement efforts. Further answering, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

131.    The allegations of Paragraph 131 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 131 purport to assert facts, Defendants deny the speculative and conclusory allegations regarding any current or hypothetical future enforcement efforts. Further answering, Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

132.    The allegations of Paragraph 132 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 132 purport to assert facts, Defendants deny the allegations of Paragraph 132. Defendants further deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action constitute a "handgun ban."

133.    The allegations of Paragraph 133 purport to state legal conclusions to which no response is required. To the extent the allegations of Paragraph 133 purport to state facts, Defendants lack knowledge or information sufficient to form a belief as to the truth of those facts. Defendants deny that the laws, regulations, and any related enforcement notices, policies, practices, or customs allegedly at issue in this action violate the Second or Fourteenth Amendments, and deny that Plaintiffs are entitled to any form of relief.

Paragraphs 1-4 assert Plaintiffs' Prayer for Relief, which are not allegations to which a response is required.

## First Affirmative Defense

Defendants' sovereign immunity and Eleventh Amendment immunity bar Plaintiffs from seeking or obtaining relief against them.

## Second Affirmative Defense

The First Amended Complaint fails to state a claim for violation of Plaintiffs' rights under the Second and Fourteenth Amendments to the United States Constitution.

## Third Affirmative Defense

Plaintiffs have not alleged injury-in-fact and lack standing to prosecute this case. This Court therefore lacks jurisdiction over the subject matter of this action under Article III.

## Fourth Affirmative Defense

Plaintiffs' claims are not ripe and this Court therefore lacks jurisdiction over the subject matter of this action.

## Additional Defenses

Defendants reserve the right to raise any and all defenses that may become apparent or available during the course of the proceedings in this case.

WHEREFORE, Defendants respectfully request that this Court: (1) dismiss the First Amended Complaint, deny Plaintiffs' Prayers for Relief with prejudice and enter judgment for Defendants; and (2) order such other relief as is just and proper.

App. 54

Dated: November 20, 2023

Respectfully submitted,

ANDREA JOY CAMPBELL, ATTORNEY
GENERAL, and SECRETARY TERRENCE M.
REIDY,

By their attorneys,

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban, BBO No. 687068
Grace Gohlke, BBO No. 704218
Assistant Attorneys General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2589
Phoebe.Fischer-Groban@mass.gov
Grace.Gohlke@mass.gov

App. 55

**<u>CERTIFICATE OF SERVICE</u>**

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 20, 2023.

<div align="right">

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban
Assistant Attorney General

</div>

App. 56

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA; CAMERON PROSPERI; THE GUN RUNNER, LLC; and FIREARMS POLICY COALITION, INC., | |
| Plaintiffs, | CIVIL ACTION NO. 1:21-cv-10960-DJC |
| v. | |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and TERRENCE M. REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, | |
| Defendants. | |

**Declaration of Stefano Granata in Support of Plaintiffs' Motion for Summary Judgment**

I, Stefano Granata, am competent to state and declare the following based on my personal knowledge:

1. I am a resident of North Reading, Middlesex County, Massachusetts, an adult over the age of 21, a citizen of the United States, and I am not disqualified to possess and acquire firearms under federal and state law.

2. I am a member of Plaintiff FPC.

3. I currently hold a valid License to Carry in the Commonwealth.

4. I desire to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

1

App. 57

5.     But for the Handgun Ban and Defendants' enforcement thereof, I would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a fifth generation Glock 19, Sig Arms Model 1911 "We the People" edition, and/or Sig Arms Model 1911 "TacOps" edition, H&K VP9SK and a Walther PDP Compact.

I declare under penalty of perjury that the foregoing is true and correct. Executed January **3**, 2025.

Stefano Granata

2

App. 58

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA; CAMERON PROSPERI; THE GUN RUNNER, LLC; and FIREARMS POLICY COALITION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and TERRENCE M. REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,<br><br>Defendants. | CIVIL ACTION NO. 1:21-cv-10960-DJC |

**<u>Declaration of Cameron Prosperi in Support of Plaintiffs' Motion for Summary Judgment</u>**

I, Cameron Prosperi, am competent to state and declare the following based on my personal knowledge:

1.    I am a resident of Three Rivers, Hampden County, Massachusetts, an adult over the age of 21, a citizen of the United States, and I am not disqualified to possess and acquire firearms under federal and state law.

2.    I am a member of Plaintiff FPC.

3.    I currently hold a valid License to Carry in the Commonwealth.

4.    I desire to purchase one or more handguns that are unlawful for sale and transfer to him under the Handgun Ban being enforced by Defendants.

5.    But for the Handgun Ban and Defendants' enforcement thereof, I would purchase new from a licensed retailer, for self-defense and other lawful purposes, one or more of the handguns which are prohibited from commercial sale by the Handgun Ban, including but not limited to: a CZ Tactical Sport, CZ Shadow 2, CZ Tactical Sport Orange, Beretta 92X Performance, and/or a CZ Pl0F, P10C, P10S, Atlas Gunworks 2011 (multiple models).

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 3, 2025.

*Cameron Prosperi*
Cameron Prosperi

2

App. 59

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA; CAMERON PROSPERI;
THE GUN RUNNER, LLC; and FIREARMS
POLICY COALITION, INC.,

                            Plaintiffs,                    CIVIL ACTION
                                                           NO. 1:21-cv-10960-DJC
            v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts; and TERRENCE M. REIDY, in
his official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                            Defendants.


**Declaration of Brandon Combs in Support of Plaintiffs' Motion for Summary Judgment**

I, Brandon Combs, am competent to state and declare the following based on my personal knowledge:

1.      I am the President of Firearms Policy Coalition, Inc. ("FPC"). In that capacity, I have knowledge of the matters set out below and I am authorized to attest to the same as a representative of FPC concerning such matters.

2.      Plaintiff FPC is a nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada.

3.      Plaintiff FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms.

1

4.      Plaintiff FPC specifically seeks to: protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms; protect, defend, and advance the means and methods by which individuals may exercise their rights, including but not limited to the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms; foster and promote the shooting sports and all lawful uses of arms; and foster and promote awareness of, and public engagement in, all of the above.

5.      Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

6.      Its members reside within and outside the Commonwealth of Massachusetts, and include the other Plaintiffs in this action.

7.      Plaintiff FPC is suing on behalf of its members, like the Individual Plaintiffs, who wish to acquire one or more of the banned handguns from a licensed retailer, like Plaintiff Gun Runner.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 3, 2025.

Brandon Combs

2

App. 62

## **Addendum**

Mass. Gen. Laws ch. 140, § 123 (as amended Oct. 2, 2024).....................................Add.2

Mass. Gen. Laws ch. 140, § 131¾ (as amended Oct. 2, 2024)..............................Add.10

Mass. Gen. Laws ch. 140, § 131K (as amended Oct. 2, 2024).............................Add.12

Records of the Colony of New Plymouth: Laws 1623-1682 .................................Add.14

1763-1775 N.J. Laws 346, ch. 540, § 10 ...........................................................Add.17

1771-72 Mass. Province Laws 167, ch. 9 ...........................................................Add.22

Resolution of the Maryland Council of Safety (Aug. 29, 1775)............................Add.25

Resolutions of the Pennsylvania Committee on Safety (Oct. 27, 1775)...............Add.27

1776 R.I. Pub. Laws 25 (Oct. Sess.) ..................................................................Add.30

1776-77 N.J. Laws 6-7, ch. 6 ............................................................................Add.32

1794 Pa. Laws 764, ch. 337 ..............................................................................Add.35

1804 Mass. Acts. 111, ch. 81 ............................................................................Add.41

1808 Mass. Acts. 444, ch. 52 ............................................................................Add.44

1814 Mass. Acts. 464, ch. 192 ..........................................................................Add.47

1820 N.H. Laws 274, ch. 25 ..............................................................................Add.50

1821 Me. Laws 546, ch. 162 ..............................................................................Add.53

1884 Mass. Acts. 57, ch. 76 ..............................................................................Add.54

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 123

§ 123. Conditions of licenses

Currentness

<[ Text of section effective until October 2, 2024. For text effective October 2, 2024, see below.]>

A license granted under section one hundred and twenty-two shall be expressed to be and shall be subject to the following conditions:-- First, That the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be strictly adhered to. Second, That every licensee shall, before delivery of a firearm, rifle or shotgun, make or cause to be made a true, legible entry in a sales record book to be furnished by the commissioner of the department of criminal justice information services and to be kept for that purpose, specifying the complete description of the firearm, rifle or shotgun, including the make, serial number, if any, type of firearm, rifle or shotgun, and designation as a large capacity weapon, if applicable, whether sold, rented or leased, the date of each sale, rental or lease, the license to carry firearms number or permit to purchase number and the identification card number in the case of a firearm or the identification card number or the license to carry firearms number in the case of a rifle or shotgun, the sex, residence and occupation of the purchaser, renter or lessee, and shall before delivery, as aforesaid, require the purchaser, renter or lessee personally to write in said sales record book his full name. Said book shall be open at all times to the inspection of the police. Third, That the license or a copy thereof, certified by the official issuing the same, shall be displayed on the premises in a position where it can easily be read. Fourth, That no firearm, rifle or shotgun, or machine gun shall be displayed in any outer window of said premises or in any other place where it can readily be seen from the outside. Fifth, That the licensee shall submit a record of all sales, rentals and leases forthwith at the time of such sale, rental or lease via electronic communication link to the commissioner of the department of criminal justice information services. Sixth, That every firearm, rifle or shotgun shall be unloaded when delivered. Seventh, That no delivery of a firearm shall be made to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one nor shall any delivery of a rifle or shotgun or ammunition be made to any minor nor to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one or a firearm identification card issued under the provisions of section one hundred and twenty-nine B nor shall any large capacity firearm or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under section 131 nor shall any large capacity rifle or shotgun or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under said section 131; provided, however, that delivery of a firearm by a licensee to a person possessing a valid permit to purchase said firearm issued under the provisions of section one hundred and thirty-one A and a valid firearm identification card issued under section one hundred and twenty-nine B may be made by the licensee to the purchaser's residence or place of business, subject to the restrictions imposed upon such permits as provided under section 131A. Eighth, That no firearm shall be sold, rented or leased to a minor or a person who has not a permit then in force to purchase, rent or lease the same issued under section one hundred and thirty-one A, and a firearm identification card issued under the provisions of section one hundred and twenty-nine B, or unless such person has a license to carry firearms issued under the provisions of section one hundred and thirty-one; nor shall any rifle or shotgun be sold, rented or leased to a person who has not a valid firearm identification card as provided for in section one hundred and twenty-nine B, or has a license to carry firearms as provided in section one hundred and thirty-one; that no large capacity firearm nor large capacity feeding device therefor shall be sold, rented, leased or transferred to any person not having (i) a license to carry firearms issued under section 131 or (ii) a proper permit issued under section 131A and a firearm identification card issued under section 129B; that no large capacity rifle or shotgun nor large capacity feeding

device therefor shall be sold to any person not having a license to carry firearms issued under said section 131; and that no machine gun shall be sold, rented or leased to any person who has not a license to possess the same issued under section one hundred and thirty-one. Ninth, That upon the sale, rental or lease of a firearm, subject to a permit to purchase issued under the provisions of section one hundred and thirty-one A, the licensee under section one hundred and twenty-two shall take up such permit to purchase and shall endorse upon it the date and place of said sale, rental or lease, and shall transmit the same to the executive director of the criminal history systems board; and that upon the sale, rental or lease of a machine gun shall endorse upon the license to possess the same the date and place of said sale, rental or lease, and shall within seven days transmit a notice thereof to said executive director. In case of a sale under the provisions of section one hundred and thirty-one E the licensee under section one hundred and twenty-two shall write in the sales record book the number of the license to carry firearms issued the purchaser under the provisions of section one hundred and thirty-one, or the number of the firearm identification card issued the purchaser under the provisions of section one hundred and twenty-nine B, whichever is applicable under the provisions of condition Eighth of this section. Tenth, That this license shall be subject to forfeiture as provided in section one hundred and twenty-five for breach of any of its conditions, and that, if the licensee hereunder is convicted of a violation of any such conditions, this license shall thereupon become void. Eleventh, That the second, fifth, eighth and ninth conditions shall not apply to a gunsmith with regard to repair or remodeling or servicing of firearms, rifles or shotguns unless said gunsmith has manufactured a firearm, rifle or shotgun for the purchaser, but said gunsmith shall keep records of the work done by him together with the names and addresses of his customers. Such records shall be kept open for inspection by the police at all times. Twelfth, That any licensee shall keep records of each sale, rental or lease of a rifle or shotgun, specifying the description of said rifle or shotgun, together with the name and address of the purchaser, renter or lessee, and the date of such transaction. Thirteenth, That the current validity of any firearm identification card, license to carry firearms or permit to purchase, rent or lease firearms presented, and that the person presenting said card, license or permit is the lawful holder thereof, shall be verified by the licensee prior to any sale, rental or lease of a rifle, shotgun, firearm or large capacity feeding device; and, upon being presented with such card or license that is expired, suspended or revoked, the licensee shall notify the licensing authority of the presentment of such expired, suspended or revoked card, license or permit; and further, the licensee may take possession of such card or license provided that, in such case, such licensee shall: (i) issue a receipt, in a form provided by the commissioner of the department of criminal justice information services, to the holder thereof which shall state that the holder's card or license is expired, suspended or revoked, was taken by such licensee and forwarded to the licensing authority by whom it was issued and such receipt shall be valid for the date of issuance for the purpose of providing immunity from prosecution under section 10 of chapter 269 for unlawfully possessing a firearm, rifle or shotgun or large capacity weapon; (ii) notify the cardholder or licensee of his requirement to renew said card or license; and (iii) forward such expired card or license to the licensing authority forthwith; provided, however, that such licensee shall be immune from civil and criminal liability for good faith compliance with the provisions herein. Fourteenth, That the licensee shall conspicuously post at each purchase counter the following warning in bold type not less than one inch in height: "IT IS UNLAWFUL TO STORE OR KEEP A FIREARM, RIFLE, SHOTGUN OR MACHINE GUN IN ANY PLACE UNLESS THAT WEAPON IS EQUIPPED WITH A TAMPER-RESISTANT SAFETY DEVICE OR IS STORED OR KEPT IN A SECURELY LOCKED CONTAINER.", and that such licensee shall provide said warning, in writing, to the purchaser or transferee of any firearm, rifle, shotgun or machine gun in bold type not less than one-quarter inch in height, and further that the licensee shall conspicuously post and distribute at each purchase counter a notice providing information on suicide prevention developed and provided by the division on violence and injury prevention within the department of public health. The department of public health shall develop and make available on its website for download a sign providing the information on suicide prevention. Fifteenth, That all licensees shall maintain a permanent place of business that is not a residence or dwelling wherein all transactions described in this section shall be conducted and wherein all records required to be kept under this section shall be so kept. Sixteenth, That no licensee shall sell, lease, rent, transfer or deliver or offer for sale, lease, rent, transfer or delivery to any person any assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Seventeenth, That any licensee from whom a rifle, shotgun, firearm or machine gun is lost or stolen shall report such loss or theft to the licensing authority and the executive director of the criminal history systems board forthwith. Such report shall include a complete description of the weapon, including the make, model, serial number and caliber and whether such weapon is a large capacity weapon. Eighteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, rent, transfer or delivery any firearm, to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from

reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a frame, barrel, cylinder, slide or breechblock that is composed of: (i) any metal having a melting point of less than 900 degrees Fahrenheit; (ii) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (iii) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of firearm for which a sample of three firearms in new condition all pass the following test: Each of the three samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than six malfunctions and completes the test without any crack or breakage of an operating part of the firearm. The term "crack" or "breakage" shall not include a crack or breakage that does not increase the danger of injury to the user. For purposes of evaluating the results of this test, malfunction shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism. Nineteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearms wholesaler, and the sale, by its terms, prohibits such purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to accidental discharge which, for purposes of this clause, shall mean any make and model of firearm for which a sample of five firearms in new condition all undergo, and none discharge during, the following test: Each of the five sample firearms shall be: (a) test loaded; (b) set so that the firearm is in a condition such that pulling the trigger and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the handgun; and (c) dropped onto a solid slab of concrete from a height of one meter from each of the following positions: (i) normal firing position; (ii) upside down; (iii) on grip; (iv) on the muzzle; (v) on either side; and (vi) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger, and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings. Twentieth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery, any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler, and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to: (i) firing more than once per pull of the trigger; or (ii) explosion during firing. Twenty-first, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a barrel less than three inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee, deliveree or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purposes of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire five rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in a test target shall be measured and recorded. This procedure shall be repeated two more times on the firearm. The arithmetic mean of each of the three recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. No licensee shall sell any rifle or shotgun, contrary to the provisions of section one hundred and thirty or section 131E.

Add.004

App. 66

Clauses Eighteenth to Twenty-first, inclusive, of the first paragraph shall not apply to: (i) a firearm lawfully owned or possessed under a license issued under this chapter on or before October 21, 1998; (ii) a firearm designated by the secretary of public safety, with the advice of the gun control advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm solely designed and sold for formal target shooting competition; (iii) a stun gun, as defined in section 121; or (iv) a firearm designated by the secretary of public safety, with the advice of the gun control advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm or pistol solely designed and sold for Olympic shooting competition. The secretary of public safety shall compile lists, on a bi-annual basis, of firearms designated as "formal target shooting firearms" and "Olympic competition firearms" in accordance with this paragraph. Such lists shall be made available for distribution by the executive office of public safety and security.

No person licensed under the provisions of section 122 or section 122B shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device contrary to the provisions of section 130 or section 131E; and no such licensee shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device to any person who does not have in his possession the required firearm identification card or proof of exemption therefrom, license to carry firearms or permit to purchase, rent or lease firearms and who does not present such card, proof, license or permit to the licensee in person at the time of purchase, rental or lease. No person licensed under the provisions of section 122 or section 122B shall fill an order for such weapon, ammunition or ammunition feeding device that was received by mail, facsimile, telephone or other telecommunication unless such transaction or transfer includes the in-person presentation of the required card, proof, license or permit as required herein prior to any sale, delivery or any form of transfer of possession of the subject weapon, ammunition or ammunition feeding device. Transactions between persons licensed under section 122 or between federally licensed dealers shall be exempt from the provisions of this paragraph.

The licensing authority shall enter, one time per calendar year, during regular business hours, the commercial premises owned or leased by any licensee, wherein such records required to be maintained under this section are stored or maintained, and inspect, in a reasonable manner, such records and inventory for the purpose of enforcing the provisions of this section. If such records and inventory contain evidence of violations of this section, the inspecting officer shall produce and take possession of copies of such records and, in the event that the licensee subject to inspection does not possess copying equipment, the inspecting officer shall arrange to have copied, in a reasonable time and manner, such records that contain evidence of such violations and the costs for such copying shall be assessed against the owner of such records. Licensees found to be in violation of this section shall be subject to the suspension or permanent revocation of such license issued under section 122 and to the provisions of section 128. Nothing herein shall prohibit the licensing authority or the department of state police from conducting such inspections pursuant to a valid search warrant issued by a court of competent jurisdiction.

Notwithstanding the provisions of this section, a person licensed under the provisions of section one hundred and twenty-two, or section one hundred and twenty-two B, may sell or transfer firearms, rifles, shotguns, machine guns or ammunition at any regular meeting of an incorporated collectors club or at a gun show open to the general public; provided, however, that all other provisions of this section are complied with and that such sale or transfer is in conformity with federal law or regulations applicable to the transfer or sale of firearms, rifles, shotguns, machine guns or ammunition, including the restrictions imposed upon firearm identification cards issued under section 129B, licenses to carry firearms issued under section 131 and permits to purchase, lease or rent firearms issued under section 131A.

### § 123. Conditions of licenses

<[ Text of section as amended by 2024, 135, Sec. 37 effective October
2, 2024. For text effective until October 2, 2024, see above.]>

(a) As used in this section "licensee" shall mean a person with a license to sell under section 122.

(b) Licensees shall maintain a business premise that is not a residential dwelling wherein all transactions shall be conducted and wherein all records shall be kept.

(c) Licensees shall display their license to sell or a copy thereof, certified by the licensing authority, in a position where it can be easily read; provided, however, that no firearm shall be displayed in any outer window of the business premises or in any other place where it can be readily seen from outside the business premises.

(d) Licensees shall conspicuously post and distribute at each purchase counter a notice providing information on: (i) safe transportation and storage of firearms developed and provided by the department of criminal justice information services, which shall develop and maintain on its website for download a sign providing such information; and (ii) suicide prevention information pursuant to subsection (e).

(e) The executive office of public safety and security, in collaboration with the department of public health, shall develop a notice providing information on suicide prevention, which shall be posted on the executive office's website and posted and distributed in accordance with subsection (d). Such notice shall include, but not be limited to: (i) information on signs and symptoms of depression; (ii) state and federal suicide prevention hotlines; and (iii) resources for individuals at risk of suicide.

(f) Prior to any transfer, a licensee shall verify the status of any license, card, permit or exemption documentation including a verification that the person presenting the license, card, permit or documentation is the lawful holder thereof. No transfer of any firearm or ammunition shall be made to any person not in possession of the required license, card, permit or exemption documentation at the time of the transaction.

(g) Upon being presented with an expired, suspended or revoked license, card or permit a licensee shall: (i) immediately report the attempted transaction to the department of criminal justice information services using its electronic firearms registration system, including, but not limited to, all information recorded pursuant to subsection (h); (ii) take possession of such card, permit or license and immediately forward the same to the licensing authority for the city or town where the licensee conducts business; (iii) issue the license, card or permit holder a receipt, in a form provided by the commissioner of the department of criminal justice information services, which shall state that the holder's license, card or permit is expired, suspended or revoked, was taken by the licensee, and forwarded to the licensing authority, and which shall be valid for 90 days for the purpose of providing immunity from prosecution under section 10 of chapter 269; and (iv) notify the license, card or permit holder of their duty to surrender their firearms forthwith to their local licensing authority under section 129D. The licensee shall be immune from civil and criminal liability for good faith compliance with the provisions herein.

(h) The licensee shall make and keep an on-site or electronic record of all firearm transactions and said record shall be open at all times to the inspection of the police. Before transfer or delivery of any sold, rented, leased or otherwise transferred firearm or ammunition, a legible entry in the on-site or electronic record shall be made and kept specifying: (i) the complete description of the firearm and ammunition transferred, including the make, serial number, type of firearm and designation as a large capacity firearm, if applicable; (ii) whether the firearm or ammunition has been sold, rented or leased and the date of such transaction; (iii) the license, permit or card identification number of the person acquiring the firearm, or ammunition along with their sex, residence address and occupation; and (iv) the purchaser, renter or lessee's name as personally written by said person in the sales record book and as confirmed by valid state or federal identification. This subsection shall not apply to a gunsmith with regard to repair or remodeling or servicing of firearms unless said gunsmith has manufactured a firearm for the purchaser but said gunsmith shall keep records of their work together with the names and addresses of their customers.

§ 123. Conditions of licenses, MA ST 140 § 123

(i) Licensees shall, immediately upon notice of any loss or theft of a firearm or ammunition from the licensee or licensee's business premises immediately report such loss or theft to the department of criminal justice information services via the electronic firearms registration system created pursuant to section 121B.

(j) A licensee may sell or transfer firearms and ammunition at any regular meeting of an incorporated collectors club or at a gun show open to the general public; provided, however, that a licensee shall comply with all other provisions of this section and that such sale or transfer is in conformity with both federal and state law and regulations.

(k) No licensee shall fill an order for any firearm or ammunition received by mail, facsimile, telephone, internet or other telecommunication unless such transaction includes the in-person presentation of the required license, card, permit or documentation as required herein prior to any sale, delivery or any form of transfer or possession. Transactions between federally licensed dealers shall be exempt from this subsection.

(l) Licensees shall ensure that all firearms and ammunition shall be unloaded when delivered and that delivery shall be only made to a person with the proper license card or permit or exemption to possess the firearms or ammunition included in the delivery.

(m) Any licensee, or any employee or agent of such a licensee, who violates this section shall be punished by a fine of not less than $1,000 nor more than $10,000, by imprisonment for not less than 1 year nor more than 10 years, or by both such fine and imprisonment.

(n) The local licensing authority shall enter the business premises of any licensee at least once per calendar year during regular business hours and shall make inquiries and inspect the licensee's records, inventory, policies and procedures for the purpose of enforcing this section. Licensees found to be in violation of this section shall be subject to the suspension or revocation of their license to sell. The department of state police may assume licensing responsibilities of a local licensing authority for the calendar year if a written request is provided at least 6 months in advance of any required inspection. Upon the failure of a local licensing authority to inspect licensees in accordance with this subsection the department of state police may become the inspecting authority. The executive office of public safety and security shall promulgate rules and regulations to effectuate the purposes of this subsection, which shall include, but not be limited to: (i) inspection timing, procedure, standards and reporting requirements; (ii) procedures and penalties for licensee violations and re-inspections; and (iii) processes and standards for a local licensing authority requesting or removing inspection responsibilities to the department of state police or failing to inspect as mandated by this subsection. Nothing herein shall prohibit any other law enforcement agency from conducting such inspections pursuant to a valid search warrant issued by a court of competent jurisdiction.

(o) No licensee under section 122 shall sell, rent, lease or otherwise transfer any firearm described in this subsection except to a business entity that is primarily a firearm wholesaler, and such transfer shall, by its terms, prohibit the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth. This subsection shall apply to:

(i) a firearm that has a frame, barrel, cylinder, slide or breechblock that is composed of: (A) any metal having a melting point of less than 900 degrees Fahrenheit; (B) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (C) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of a firearm for which a sample of 3 firearms in new condition all pass the following test: each of the 3 samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For

any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for 10 minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard of ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than 6 malfunctions and completes the test without any crack or breakage of an operating part of the firearm that does not increase the danger of injury to the user. For purposes of this clause "malfunction" shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism;

(ii) a firearm that is prone to accidental discharge, which, for purposes of this clause, shall mean any make and model of firearm for which a sample of 5 firearms in new condition all undergo, and none discharge during, the following test: each of the 5 sample firearms shall be: (A) test loaded; (B) set so that the firearm is in a condition such that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the firearm; and (C) dropped onto a solid slab of concrete from a height of 1 meter from each of the following positions: (1) normal firing position; (2) upside down; (3) on grip; (4) on the muzzle; (5) on either side; and (6) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings;

(iii) a firearm that is prone to: (A) firing more than once per pull of trigger; or (B) explosion during firing; and

(iv) a firearm that has a barrel less than 3 inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at 7 yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purpose of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire 5 rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in the test target shall be measured and recorded. This procedure shall be repeated 2 more times on the firearm. The arithmetic mean of each of the 3 recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual, if none is recommended, any standard ammunition of the correct caliber in new condition.

(p) Subsection (o) shall not apply to: (i) a firearm lawfully owned or possessed under a license issued under this chapter on or before October 21, 1998; (ii) a stun gun; or (iii) a firearm designated by the secretary of public safety, with the advice of the firearm control advisory board, established pursuant to section 1311/2, as a firearm solely designed and sold for formal target shooting competition or for Olympic shooting competition and listed on the rosters pursuant to section 131 ¼.

**Credits**
Amended by St.1957, c. 688, § 7; St.1959, c. 296, § 4; St.1968, c. 737, § 3; St.1969, c. 799, § 3; St.1981, c. 541; St.1987, c. 249; St.1996, c. 151, §§ 309 to 311; St.1998, c. 180, §§ 14 to 22; St.1998, c. 358, § 3; St.1998, c. 177, eff. Oct. 24, 2006; St.2010, c. 256, § 88, eff. Nov. 4, 2010; St.2014, c. 284, §§ 23, 24, eff. Jan. 1, 2021; St.2014, c. 284, § 25, eff. Jan. 1, 2015; St.2014, c. 284, § 26, eff. Aug. 13, 2014; St.2018, c. 123, § 8, eff. July 3, 2018; St.2024, c.135, § 37, eff. Oct. 2, 2024.

Notes of Decisions (12)

M.G.L.A. 140 § 123, MA ST 140 § 123
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

> Massachusetts General Laws Annotated
>     Part I. Administration of the Government (Ch. 1-182)
>         Title XX. Public Safety and Good Order (Ch. 133-148a)
>             Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131 3/4

§ 131 ¾ . Roster of large capacity rifles, shotguns, firearms, and feeding devices

Currentness

<[ Text of section effective until October 2, 2024. For text effective October 2, 2024, see below.]>

The secretary of public safety shall, with the advice of the gun control advisory board established pursuant to the provisions of section 131 ½, compile and publish a roster of large capacity rifles, shotguns, firearms and feeding devices, all as defined in section 121, and such weapons referred to in clauses Eighteenth to Twenty-first, inclusive, of section 123.

The secretary shall, not less than three times annually, publish the roster in newspapers of general circulation throughout the commonwealth, and shall send a copy thereof to all dealers licensed in the commonwealth under the provisions of said section 122 of said chapter 140; and further, the licensing authority shall furnish said roster to all cardholders and licensees upon initial issuance and upon every renewal of the same.

The secretary may amend the roster upon his own initiative or with the advice of said board. A person may petition the secretary to place a weapon on, or remove a weapon from, the roster, subject to the provisions of this section. A person who so petitions shall give the reasons why the roster should be so amended.

A petition to amend the roster shall be submitted in writing to the secretary and shall be in the form and manner prescribed by the secretary. Upon receipt of the petition to place a weapon on the roster, the secretary shall, within 45 days of receipt of the petition, either notify the petitioner by certified mail that the petition is denied, or it shall modify the roster. An addition to the roster shall be effective on the date it is included in the next publication in newspapers of general circulation as provided under this section.

The secretary may promulgate rules and regulations relative to the appeal of a decision on a petition to modify the roster and any other regulations consistent with the provisions of this section and section 2SS of chapter 29, sections 11 and 14 of chapter 131, sections 121, 122, 122B, 123, 128, 128A, 128B, 129B, 129C, 129D, 130, 131, 131A, 131E, 131F and 131K of chapter 140 to effectuate the purposes of each said section.

**§ 131 ¾. Roster of assault-style firearms; shooting competitions; roster amendments**

<[ Text of section as amended by 2024, 135, Sec. 51 effective October
2, 2024. For text effective until October 2, 2024, see above.]>

(a) The secretary of public safety and security shall, with the advice of the firearm control advisory board established in section 131 ½ compile and publish a roster of assault-style firearms banned under section 131M and a roster of firearms approved for sale and use in the commonwealth using the parameters set forth in section 123. The secretary shall, not less than 3 times annually, review, update, and publish the rosters online, and send a copy to all persons licensed in the commonwealth pursuant

to section 122. Licensing authorities shall provide information on these rosters to all permit and card holders and licensees upon initial issuance and every renewal.

(b) The secretary, with the advice of the firearm control advisory board, shall also compile and publish a roster of firearms solely designed and sold for formal target shooting competitions or Olympic shooting competitions. The board shall, not less than biannually, review, update and publish these rosters and make them available for distribution.

(c) The secretary may amend any roster upon their own initiative. A person may petition the secretary to place a firearm on, or remove a firearm from, the roster, subject to the provisions of this section. A petition to amend a roster shall be submitted in writing to the secretary, in the form and manner prescribed by the secretary, and include reasons why the roster should be amended. Upon receipt of a petition to amend a roster, the secretary shall, within 45 days, either notify the petitioner that the petition is denied or modify the roster. An addition to the roster shall be effective on the date it is published online by the board.

**Credits**
Added by St.1998, c. 180, § 41. Amended by St.1998, c. 463, § 107; St.2024, c.135, § 51, eff. Oct. 2, 2024.

M.G.L.A. 140 § 131 3/4, MA ST 140 § 131 3/4
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131K

§ 131K. Firearms or large capacity weapons without safety devices; liability

Currentness

<[ First paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

Any firearm or large capacity weapon, both as defined in section 121, sold within the commonwealth without a safety device designed to prevent the discharge of such weapon by unauthorized users and approved by the colonel of state police including, but not limited to, mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or authorized user, by solenoid use-limitation devices, key activated or combination trigger or handle locks, radio frequency tags, automated fingerprint identification systems or voice recognition, provided, that such device is commercially available, shall be defective and the sale of such a weapon shall constitute a breach of warranty under section 2-314 of chapter 106 and an unfair or deceptive trade act or practice under section 2 of chapter 93A. Any entity responsible for the manufacture, importation or sale as an inventory item or consumer good, both as defined in section 9-102 of chapter 106, of such a weapon that does not include or incorporate such a device shall be individually and jointly liable to any person who sustains personal injury or property damage resulting from the failure to include or incorporate such a device. If death results from such personal injury, such entities shall be liable in an amount including, but not limited to, that provided under chapter 229. Contributory or comparative negligence shall not be valid defenses to an action brought under this section in conjunction with section 2 of chapter 93A or section 2-314 of chapter 106 or both; provided, however, that nothing herein shall prohibit such liable parties from maintaining an action for indemnification or contribution against each other or against the lawful owner or other authorized user of said weapon. Any disclaimer, limit or waiver of the liability provided under this section shall be void.

<[ First paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

Any firearm or large capacity firearm, both as defined in section 121, sold within the commonwealth without a safety device designed to prevent the discharge of such firearm by unauthorized users and approved by the colonel of state police including, but not limited to, mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or authorized user, by solenoid use-limitation devices, key activated or combination trigger or handle locks, radio frequency tags, automated fingerprint identification systems or voice recognition, provided, that such device is commercially available, shall be defective and the sale of such a firearm shall constitute a breach of warranty under section 2-314 of chapter 106 and an unfair or deceptive trade act or practice under section 2 of chapter 93A. Any entity responsible for the manufacture, importation or sale as an inventory item or consumer good, both as defined in section 9-102 of chapter 106, of such a firearm that does not include or incorporate such a device shall be individually and jointly liable to any person who sustains personal injury or property damage resulting from the failure to include or incorporate such a device. If death results from such personal injury, such entities shall be liable in an amount including, but not limited to, that provided under chapter 229. Contributory or comparative negligence shall not be valid defenses to an action brought under this section in conjunction with section 2 of chapter 93A or section 2-314 of chapter 106 or both; provided, however, that nothing herein shall prohibit such liable parties from maintaining an action for indemnification or contribution against each other or against the lawful owner or other authorized user of said firearm. Any disclaimer, limit or waiver of the liability provided under this section shall be void.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

<[ Second paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

No entity responsible for the manufacture, importation or sale of such a weapon shall be liable to any person for injuries caused by the discharge of such weapon that does not include or incorporate a safety device as required under this section if such injuries were: (i) self-inflicted, either intentionally or unintentionally, unless such injuries were self-inflicted by a person less than 18 years of age; (ii) inflicted by the lawful owner or other authorized user of said weapon; (iii) inflicted by any person in the lawful exercise of self-defense; or (iv) inflicted upon a co-conspirator in the commission of a crime.

<[ Second paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

No entity responsible for the manufacture, importation or sale of such a firearm shall be liable to any person for injuries caused by the discharge of such firearm that does not include or incorporate a safety device as required under this section if such injuries were: (i) self-inflicted, either intentionally or unintentionally, unless such injuries were self-inflicted by a person less than 18 years of age; (ii) inflicted by the lawful owner or other authorized user of said firearm; (iii) inflicted by any person in the lawful exercise of self-defense; or (iv) inflicted upon a co-conspirator in the commission of a crime.

<[ Third paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

This section shall not apply to any weapon distributed to an officer of any law enforcement agency or any member of the armed forces of the United States or the organized militia of the commonwealth; provided, however, that such person is authorized to acquire, possess or carry such a weapon for the lawful performance of his official duties; and provided further, that any such weapon so distributed is distributed solely for use in connection with such duties. This section shall not apply to any firearm manufactured in or prior to the year 1899, or to any replica of such a firearm if such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition.

<[ Third paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

This section shall not apply to any firearm distributed to an officer of any law enforcement agency or any member of the armed forces of the United States or the organized militia of the commonwealth; provided, however, that such person is authorized to acquire, possess or carry such a firearm for the lawful performance of his official duties; and provided further, that any such firearm so distributed is distributed solely for use in connection with such duties. This section shall not apply to any firearm manufactured in or prior to the year 1899, or to any replica of such a firearm if such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition.

**Credits**

Added by St.1998, c. 180, § 47. Amended by St.1999, c. 1, § 3; St.2001, c. 26, § 40; St.2024, c. 135, § 66, eff. Oct. 2, 2024.

M.G.L.A. 140 § 131K, MA ST 140 § 131K
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    2

# RECORDS

OF

# PLYMOUTH COLONY.

## LAWS.

### 1623—1682.

# RECORDS

OF THE

# COLONY

OF

# NEW PLYMOUTH

IN

## NEW ENGLAND.

PRINTED BY ORDER OF THE LEGISLATURE OF THE
COMMONWEALTH OF MASSACHUSETTS.

EDITED BY

### DAVID PULSIFER,

CLERK IN THE OFFICE OF THE SECRETARY OF THE COMMONWEALTH,

MEMBER OF THE NEW ENGLAND HISTORIC-GENEALOGICAL SOCIETY, FELLOW OF THE AMERICAN STATISTICAL ASSOCIATION,
CORRESPONDING MEMBER OF THE ESSEX INSTITUTE, AND OF THE RHODE ISLAND, NEW YORK,
CONNECTICUT, WISCONSIN AND IOWA HISTORICAL SOCIETIES.

## LAWS.

### 1623–1682.



BOSTON:

FROM THE PRESS OF WILLIAM WHITE,

PRINTER TO THE COMMONWEALTH.

1861.

[PART III.]    It was att this Court voated and generally agreed on by the Court; that our Confeaderation with two Collonies: viz: Massachusetts and Conecticott shall stand and remaine as It did formerly with three;

It is enacted by the Court and the authoritie therof that a Comittee be chosen to puse all our lawes; and to gather vp from them or any other healpes they can gett and compose therfrom a body of Lawes; and prsent the same to the next election Court for a further settlement therof and the charge therof to be bourne and defrayed by the Treasurer

The Comitttee appointed by the court were   the Gour   } and Mr Walley healp
                                            The Major    } to be requested
                                            and Mr Hinckley
and if any of the deputies or others shall propose any thinge to this Comittee for theire consideration when they meet together it shalbe well accepted;

Wheras seuerall psons haue bine greatly Indangered by seting of Guns It is enacted by the Court and the authoritie therof that none shall sett any Guns except in Inclosures and that the gun be sufficiently enclosed soe as it be Cecure from hurting man or beast and that hee that seteth the gun doe giue warning or notice therof to all the Naighbours on the penaltie of paying a fine of fiue pounds to the vse of the Collonie for euery default;

Repealed June    It is enacted by the Court that if there be any psons that will buy all
9th 1671.    the Tarr that shalbe made within this Collonie and will pay eight shillings a barrell for itt in mony; and for euery halfe hogshed twelue shillings for it in mony; they shall haue it soe; for the tearme of two yeares from the date heerof; and to receiue it att a place appointed in euery Township and it is further enacted by the Court that if any others except those that soe engage to buy all the Tarr shall carry or cause any to be carryed out of the Collonie within the aforsaid tearme of two yeares they shall forfeite either the Tarr or the vallue therof; the one halfe to the Collonie and the other halfe to those that are engaged to buy all the said Tarr.

*120    *fforasmuch as seuerall Townes in this Collonie are alreddy much Straightened for building timber and through Gods prouidence some other townes are well accomodated to afford them a supply that townes soe straightened be not nessessitated to fech theire supplyes from another Jurisdiction; whilst wee haue of our owne;

June 1672.

Be it Inacted by this Court and the Authoritie therof That noe timber of any sort may or shall within the tearme of seauen yeares next after the first of Nouember next ensueing; be att any time transported or carryed away by land or water out of any Township in this Jurisdiction into any other

Add.016                                                    App. 78

WILLIAM FRANKLIN, Efquire, GOVERNOR.    343

# At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the Twenty-firſt Day of December 1771, in the Twelfth Year of the Reign of King George the Third, the following Laws were paſſed.

## SESSION THE FOURTH.

### CHAP. DXXXIX.

*An ACT to continue and amend an Act, entitled, An Act for better ſettling and regulating the Militia of this Colo-ny of New-Jerſey; for the repelling Invaſions, and ſuppreſ-ſing Inſurrections and Rebellions.** 

Paſſed Dec. 21, 1771.

WHEREAS the Act paſſed in the Nineteenth Year of the Reign of our late Sovereign Lord King *George* the Second, entitled, *An* Act *for better ſettling and regulating the Militia of this Colony of* New-Jerſey; *for the repelling Invaſions, and ſuppreſſing Inſurrections and Rebellions*, will expire at the End of this Seſſion of Aſſembly; *Preamble.*

*Sect.* 1. BE IT ENACTED by the Governor, Council and General Aſſem-bly, and it is hereby Enacted by the Authority of the ſame, That the ſaid Act, entitled, *An* Act *for better ſettling and regulating the Militia of this Colony of* New-Jerſey; *for the repelling Invaſions, and ſuppreſſing In-ſurrections and Rebellions,** ſhall be, and hereby is continued, and every Article and Clauſe therein contained ſhall be and remain in full Force, from the Publication hereof, to the firſt Day of *May* which will be in the Year of our Lord One Thouſand Seven Hundred and Seventy-ſeven, and from thence to the End of the next Seſſion of the General Aſſembly of this Colony, and no longer. *Limitation.*

2. AND WHEREAS it has been a Cuſtom of late, in ſome of the Counties of this Colony, to chooſe the Militia Officers Conſtables; for preventing the ſame for the Future, BE IT ENACTED *by the Autho-rity aforeſaid,* That, during the Continuance of this Act, it ſhall not be lawful for any Court of General Quarter-Seſſions of the Peace, or for any of the Inhabitants of this Colony, at their annual Town-meetings, to appoint or chooſe any commiſſioned Officer, while in Commiſſion, to be a Conſtable; any Law, Uſage or Cuſtom to the contrary not-withſtanding. *Commiſſion-ed Officers not to be cho-ſen Conſta-bles.*

### · CHAP. DXL.

*An ACT for the Preſervation of Deer and other Game, and to prevent treſpaſſing with Guns.*

Paſſed Dec. 21, 1771.

WHEREAS the Laws heretofore paſſed in this Colony for the Preſervation of Deer and other Game, and to prevent treſpaſſ- *Preamble.*

* Chap. CC.    ing

Digitized from Best Copy Available

ing with Guns, Traps and Dogs, have, by Experience, been found in-
sufficient to answer the salutary Purposes thereby intended ; Therefore,

No Person to
carry a Gun
on Lands not
his own, ex-
cept, &c.

    *Sect.* 1. BE IT ENACTED *by the Governor, Council and General As-
sembly of this Colony of* New-Jersey, *and it is hereby Enacted by the Au-
thority of the same*, That if any Person or Persons shall presume, at
any Time after the Publication hereof, to carry any Gun on any
Lands not his own, and for which the Owner pays Taxes, or is in his
lawful Possession, unless he hath Licence or Permission in Writing from
the Owner or Owners or legal Possessor, every such Person so offending,
and convicted thereof, either upon the View of any Justice of the Peace
within this Colony, or by the Oath or Affirmation of one or more Wit-
nesses, before any Justice of the Peace of either of the Counties, Cities or
Towns-corporate of this Colony, in which the Offender or Offenders
may be taken or reside, he, she or they, shall, for every such Offence, for-
feit and pay to the Owner of the Soil, or his Tenant in Possession, the

Penalty.

Sum of *Forty Shillings*, with Costs of Suit ; which Forfeiture shall
and may be sued for and recovered by the Owner of the Soil, or Te-
nant in Possession, before any Justice of the Peace in this Colony, for
the Use of such Owner or Tenant in Possession.

No Person to
drive Deer or
other Game,
except, &c.

    2. AND BE IT ENACTED *by the Authority aforesaid*, That if any
Person shall presume, at any Time after the Publication of this Act,
to hunt or watch for Deer with a Gun, or set in any Dog or Dogs to
drive Deer, or any other Game, on any Lands not his own, and for
which the Owner or Possessor pays Taxes, or is in his lawful Possession,
unless he hath Licence or Permission in Writing from such Owner or
Owners or legal Possessor ; every such Person so offending, and being
convicted thereof in Manner aforesaid, shall, for every such Offence,
forfeit and pay to the Owner of the Soil, or Tenant in Possession, the

Penalty.

Sum of *Forty Shillings*, with Costs of Suit ; provided, that nothing
herein contained shall be construed to extend to prevent any Person
carrying a Gun upon the King's Highway in this Colony.

Penalty on
Non-Resi-
dents.

    3. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That
if the Person or Persons offending against this Act be Non-Residents
of this Colony, he or they shall forfeit and pay for every such Offence
*Five Pounds*, and shall forfeit his or their Gun or Guns to any Person
or Persons who shall inform and prosecute the same to Effect, before
any Justice of the Peace in any County of this Colony, wherein the
Offender or Offenders may be taken or apprehended.

Penalty for
killing, &c.
Deer out of
Season.

    4. AND BE IT ENACTED *by the Authority aforesaid*, That if any
Person or Persons shall kill, destroy, hunt or take any Doe, Buck,
Fawn, or any Sort of Deer whatsoever, at any other Time or Season,
except only between the first Day of *September* and the first Day of
*January* yearly and every Year, he, she or they so offending, shall for-
feit and pay the Sum of *Forty Shillings* for each and every Offence ;
to be sued for, recovered and applied as hereafter is directed.

What shall
be Evidence
of such Kill-
ing, &c.

    5. AND, for the better and more effectual convicting of Offenders
against this Act, BE IT ENACTED *by the Authority aforesaid*, That any
and every Person or Persons in whose Custody shall be found, or who
                                        shall

Digitized from Best Copy Available

shall expose to Sale, any green Deerskins, or fresh Venison killed at any Time after the first Day of *January*, and before the first Day of *September* aforesaid, and shall be thereof convicted by the Oath or Affirmation of one or more credible Witnesses, shall be deemed guilty of offending against this Act, and be subjected to the Penalties of killing Deer out of Season.

6. AND WHEREAS great Numbers of idle and disorderly Persons make a Practice of hunting on the waste and unimproved Lands in this Colony, whereby their Families are neglected, and the Publick is prejudiced by the Loss of their Labour, BE IT THEREFORE ENACTED *by the Authority aforesaid*, That, from and after the first Day of *January* next, no Person or Persons whatsoever (except such Persons as are by the Laws of this Colony qualified to vote for Representatives in General Assembly, in Right of their Freeholds, and their Sons being of the Age of eighteen Years or upwards, and living with their Parent or Parents, or being Freeholders) shall, on any Pretence whatever, hunt on the waste and unimproved Lands in this Colony ; and if any Person or Persons, not qualified as aforesaid, shall presume to hunt as aforesaid, he or they so offending shall forfeit and pay, for every such Offence, the Sum of *Twenty Shillings* ; to be recovered by Action of Debt, with Costs, by any Person who shall sue for the same ; to be applied one Half to the Prosecutor, and the other Half to the Use of the Poor of the Township or Precinct where the Fact was committed.

*(margin: Who may hunt on unimproved Lands. Penalty on Offenders.)*

7. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall set any Trap or other Device whatsoever, larger than what is usually and commonly set for Foxes and Muskrats, such Person, setting such Trap or other Device, shall pay the Sum of *Five Pounds*, and forfeit the Trap or other Device, shall suffer three Months Imprisonment, and shall also be liable to make good all Damages any Person shall sustain by setting such Trap or other Device, and the Owner of such Trap or other Device, or Person to whom it was lent, shall be esteemed the Setter thereof, unless it shall be proved, on Oath or Affirmation, what other Person set the same, or that such Trap or other Device was lost by said Owner or Person to whom it was lent, and absolutely out of his Power ; and if the Setter of the Trap or other Device be a Slave, and it be his own voluntary Act, he shall (unless the Master or Mistress shall pay the Fine) in Lieu of such Fine, be publickly whipped with thirty Lashes, and committed till the Costs are paid ; and that the said Trap or other Device shall be broken and destroyed in the View and Presence of the Justice of the Peace before whom they are brought: And if any Person or Persons shall have Possession of, or there shall be found in his or their House, any Trap or Traps, Device or Devices whatsoever, for taking of Deer, such Person or Persons shall be subjected to the same Penalty as if he or they were convicted of setting such Trap or Traps, or other Device.

*(margin: Penalty on setting Traps, &c. Penalty on a Slave setting such Trap, &c. Penalty on keeping such Trap, &c.)*

8. AND, for encouraging the Destruction of such Traps and Devices, BE IT ENACTED *by the Authority aforesaid*, That if any Person shall seize any Trap or other Device for the taking Deer, and shall carry such Trap or other Device to any Magistrate of the County where such Trap or Device was seized, such Person shall be entitled to

*(margin: Reward for seizing a Trap, &c.)*

4 Q                                              an

an Order from the said Magistrate to the Collector of such County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raised for the Use of the County ; which Sums shall be allowed to such Collector on the Settlement of his Accounts.

**Penalty on a Smith making or mending such Trap, &c.**

9. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That every Smith or other Artificer, who shall hereafter make or mend any such Trap or other Device aforesaid, he shall forfeit and pay the Sum of *Forty Shillings ;* and the Person carrying such Trap or other Device to the Artificer aforesaid, shall forfeit and pay the Sum of *Twenty Shillings.* And every Person who shall bring into this Colony any

**Penalty on bringing such Trap, &c. into the Colony.**

such Trap or Device as aforesaid shall forfeit and pay the Sum of *Forty Shillings.* And if the Person who shall carry the same to the Smith or Artificer shall be so poor as that he shall not be able to pay the Forfeiture aforesaid, he shall be committed to the common Gaol, until he shall prove who is Owner of such Trap or Device, or who delivered the same to him ; and in such Case the Forfeiture aforesaid shall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of such Trap or Device, or the Person who delivered the same to the Pauper, and the Trap or Device shall be forfeited and destroyed.

**Penalty for setting loaded Guns.**

10. AND WHEREAS a most dangerous Method of setting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of *Six Pounds ;* and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.

**Application of Penalties.**

11. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That the Fines and Forfeitures in this Act expressed, and not particularly appropriated, shall be paid, one Half to the Prosecutor, and the other Half to and for the Use of the Poor of the Town, Precinct or District, where the Offence is committed ; and that the Execution of this Act,

**Jurisdiction given to one Magistrate.**

and every Part thereof, shall be within the Cognizance and Jurisdiction of any one Magistrate or Justice of the Peace, without any Reference to the Act for Trial of small Causes in this Colony.

**This Act not to affect Parks.**

12. AND BE IT ENACTED, That nothing in this Law shall be construed to extend to restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

**Penalty on Magistrate neglecting his Duty.**

13. AND BE IT ALSO ENACTED *by the Authority aforesaid*, That if any Justice of the Peace or other Magistrate, within this Province, shall have Information of any Persons offending against this Act, in killing Deer out of Season, setting and making Traps, Non-Residents killing Deer, and Persons setting of Guns, and shall not prosecute the same to Effect within two Months after such Information, he shall forfeit and pay the Sum or Sums to which the Offender against this Act would have been liable.

14. AND

Digitized from Best Copy Available

14. AND BE IT ENACTED *by the Authority aforesaid,* That the Jus- *This Act to be published and executed.* tices at every Quarter-Seffions of the Peace shall cause this Act to be publickly read; and give in Charge to the Grand-Jury to particularly inquire and present all Persons for killing Deer out of Season, setting or making Traps, and all Non-Residents killing, destroying, hunting and taking any Sort of Deer, and all Persons setting of Guns; and, upon Conviction for either of the said Offences, the said Justices shall set and impose the Fines and Penalties herein before-mentioned, with Costs of Suit.

15. AND BE IT ENACTED *by the Authority aforesaid,* That if any *Appeal given to next Seffions.* Person or Persons whatsoever, whether the Accused or Accuser, Plaintiff or Defendant, shall think themselves aggrieved by any of the Judg-ments given by the said Justices or other Magistrates, for any Suit commenced by Virtue of this Act; then it shall and may be lawful for such Person or Persons to appeal, on giving sufficient Security for the Forfeitures and Costs, to the next Court of General Quarter-Seffions, held for such County where such Judgment shall be given; which Court is hereby empowered to hear and determine all and every such Appeal or Appeals.

16. AND BE IT ENACTED *by the Authority aforesaid,* That if any *Penalty for watching in the Night near a Road.* Person or Persons, within this Colony, shall, after the Publication of this Act, watch with a Gun, on any uninclosed Land within two Hun-dred Yards of any Road or Path, in the Night Time, whether the said Road is laid out by Law or not, or shall stand or station him or them-selves upon or within two Hundred Yards of any Road as aforesaid, for shooting at Deer driven by Dogs, he or they so offending, shall, on Conviction, forfeit and pay the Sum of *Five Pounds* for every such Of-fence; to be recovered by Action of Debt, or Presentment of the Grand-Jury as aforesaid, and pay all Damages.

17. PROVIDED ALWAYS, That the sixth Section of this Act shall *Not to affect Indians, nor Essex, Bergen, Morris or Suffex.* not be construed to affect any Native *Indian;* and that nothing in this Act shall be construed to prevent the Inhabitants of *Essex, Bergen, Mor-ris* and *Suffex,* from making, having in their Houses, or setting Traps of five Pounds Weight or more for Bears, Wolves, Foxes, or any other wild Beasts, Deer only excepted.

18. AND BE IT FURTHER ENACTED *by the Authority aforesaid,* That *Repeal of Former Laws.* all former Laws made in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, and regulating the Size of Traps, shall be, and they are hereby repealed.

CHAP. DXLI.

*An* ACT *declaring the River* Delaware *a common* Highway, *and for improving the* Navigation *in the said River.*

Passed Dec. 21, 1771.

WHEREAS the improving the Navigation in Rivers is of great *Preamble.* Importance to Trade and Commerce; AND WHEREAS the River *Delaware*

Digitized from Best Copy Available

itants, in order to chuse such officers as, by law, towns are [e][i]powered to chuse in the month of March, annually ; at which said first meeting all the then present inhabitants shall be admitted to vote. [*Passed July 4\* ; published July 5.*]

## CHAPTER 8.

AN ACT FOR REVIVING AND CONTINUING AN ACT MADE TO PREVENT DAMAGE BEING DONE ON THE LANDS CALLED NOBSCUSSET, IN THE TOWNSHIP OF YARMOUTH.

WHEREAS the act made and passed in the thirtieth year of his late majesty, King George the Second, intitled "An Act to prevent damage being done on the lands lying in the township of Yarmouth, called Nobscusset," which act has been found useful and beneficial, is expired, — *Preamble.* *:757–58, chap. 6.*

*Be it therefore enacted by the Governor, Council and House of Representatives,*

[SECT. 1.] That the aforesaid act, and every clause, matter and thing therein contained, be and the same is, hereby, revived and shall continue in force until the first day in July, which will be in the year of our Lord one thousand seven hundred and eighty-one, and to the end of the then next session of the general court, and no longer. *Act of 30th George II., revived.*

*And be it further enacted,*

[SECT. 2.] That such person or persons as may have been chosen at the anniversary meeting of the inhabitants of the town of Yarmouth, in March last, to see to the observance of said act and to prosecute the breakers thereof, or that may, at any time during the continuance of the said hereby-revived act, be chosen or appointed by said town for that purpose, are hereby as fully impowered (being first sworn to the faithful discharge of such trust) to take effectual care that said act be duly observed, and the transgressors thereof duly prosecuted, as if said act had not expired ; and upon his or their refusing to accept of and be sworn to such office or trust, shall be subject to the same forfeiture, to be applied to the same use, as is therein mentioned ; and upon such refusal the inhabitants of said town may, and they are hereby, authorized to appoint another person or persons to that trust, and so, *toties quoties,* during the continuance of said act.    [*Passed July 4\* ; published July 5.*] *Persons chosen rt Yarmouth, empowered.*

## CHAPTER 9.

AN ACT FOR ERECTING TWO PUBLICK MAGAZINES FOR THE SAFE KEEPING OF POWDER ; THE ONE IN THE TOWN OF BOSTON, AND THE OTHER IN THE TOWN OF WATERTOWN.

WHEREAS it is with good reason apprehended that the present situation of the magazine or powder-house on the common or training-field in Boston is unsafe for lodging and keeping the great quantities of gun- *Preamble.*

* Signed July 5, according to the record.

powder which are commonly placed therein, and that it is also expedient to have another public magazine out of the town of Boston, in addition to that in Charlestown, —

*Be it therefore enacted by the Governor, Council and House of Representatives,*

Two powder-houses to be built; one in Boston, one in Watertown.

[SECT. 1.] That two public[k] magazines, or powder-houses, be built of stone or brick, and suitably finished, as soon as may be, at the publick expence, fit for stor[e]ing and safe keeping of gunpowder; the one in the town of Boston, behind, or at the north-western end of, the hills on the northern side of the common, or training-field, there; and the other, within the town of Watertown, in the county of Middlesex, in such place in said town as may be agreed upon by a committee that may be appointed by the general assembly to build said magazine; and that from and after the finishing such new magazines, all the gunpowder in the present magazine[s] shall, without delay, at the

Powder to be removed as the commander-in-chief shall direct.

expence of the respective owners thereof, be removed from thence into one of the new magazines, or into both of them, or into the magazine at Charlestown, in such proportions as the commander-in-chief shall order; and that all the gunpowder which shall be imported and landed, in the port of Boston aforesaid, after finishing such new magazines, or either of them, shall be carried into and placed in one

Forfeiture, in case.

or both of them, or in the magazine at Charlestown, according to such order as aforesaid, and not el[e]s[e]where, on pain of forfeiting all such gunpowder as shall be lodged or kept in any other place; one moiety thereof to and for the use of this province, and the rest, to the informer; to be recovered by bill, plaint or information in any court of record in this province. And the owner or owners of such gunpowder shall also forfeit the sum of ten pounds for every half-barrel of such gunpowder, and after that rate for every greater quantity, lodged in any other place; to be recovered by action of debt, in any court proper for the trial thereof, by him that shall sue for the same:

Town stocks to be under the direction of the selectmen.

*saving, nevertheless,* that the ordinary town stocks of gunpowder, of each and every town or district within this province, may be placed and kept in any other suitable place or places, as the selectmen thereof, respectively, shall appoint; and that a quantity of gunpowder, not

Quantity that may be kept in private shops.

exceeding five-and-twenty pounds, may be kept in any shop for sale (provided it be kept in brass or tin tunnels): *saving,* likewise, all needful stocks and gunpowder for any fort, fortress or garrison within this province; which may, nevertheless, be lodged and kept in such fortress: *saving, also,* all such public[k], or provincial, stocks of gunpowder as by the commander-in-chief, for the time being, shall be ordered to be lodged in any other place or places.

*And be it further enacted,*

Keeper to be appointed by the commander-in-chief;

[SECT. 2.] That a keeper shall, from time to time, be appointed by the commander-in-chief, [by] for each of the said magazines, who shall duly attend, each one, his respective magazine, at such hours and times as shall be directed and ordered by the commander-in-chief, for taking in and delivering out, all such gunpowder as shall, from time to time, be wanted by the respective owners thereof; and whose duty

— his duty;

it shall be, in all respects, to take due care of all the gunpowder therein, for the preservation thereof, and not to neglect turning the same, once [in] every month, at least, as long as it shall remain therein: and that no powder be taken in or delivered out, but between the hours of sun-rising and sun-s[i][e]tting.

*And be it further enacted,*

— his allow-ance.

[SECT. 3.] That for all gunpowder which shall be put into the said magazines, or either of them, *saving* such as belong to the public

stock, there shall be paid into the hands of the respective keepers thereof, for the use of the province, one shilling for each barrel, upon receipt thereof; and sixpence for each barrel, by the month, for three months after the first month from the receipt thereof; and fourpence for each barrel, for every month afterwards; as long as it shall remain therein: which monies, to be received by the several keepers of the said magazines, respectively, they shall each of them account for, upon oath, to the commander-in-chief and the council; and the same shall be applied towards defr[e]aying the charges of keeping and attending the said magazines, managing and taking due care of the gunpowder therein; and if there shall, at any time, be a deficiency for those purposes, it shall be made up and paid out of the province treasury; and if, at any time, there should be a surplusage, it shall be paid into the province treasury. [*Passed and published July 5.*]

# JOURNAL AND CORRESPONDENCE

OF

# THE COUNCIL OF SAFETY

OF

# MARYLAND.

1775—1776.

*of the Council of Safety*, 1775–76.    75

The few who realy know my Sentiments, my Principles, & Feelings, will not doubt of my Fidelity to the Interests of my Country; and that, as an Individual, in such sort as is within the reach of my talents, every power will be exerted to that end.

<div align="right">

I have the Honor to be
With great regard & request,
Gentlemen
Your obed' humble Serv'
Beale Bordley.

</div>

August 29th 1775.

The Council [met according to ad]journment.    C. S. J.

The Honble Daniel of S<sup>t</sup> Thomas Jenifer was chosen President.

Resolved, That M<sup>r</sup> Charles Beatty of Frederick Town be empowered to contract for the making and Delivery of 650 good substantial proved Musquets, 3½ Feet in the Barrel, and of three Quarters of an Inch in the Bore, with good double Bridle Locks, black walnut or Maple Stocks and plain strong brass mounting, Bayonets with Steel Blades 17 Inches long, steel Ramrods, double Screws, priming Wires, and Brushes fitted thereto, with a pair of brass Molds for every Eighty Musquets to cast 12 Bullets on one Side, and on the other side, to cast Shot of such Size, as the Musquet will chamber three of them, for a Sum not exceeding Ten Dollars and two Thirds of a Dollar in Bills of Credit issued by the Resolve of the last Convention for every such Firelock with the above Accoutrements, delivered at George Town or Elk Ridge Landing if required: and may contract to advance one half of the purchase money, on good Security for the Delivery of the Musquets, one third thereof before the first Day of January next, one third thereof before the first Day of March next, and the Residue before the first Day of May next, and on the last Delivery, the Residue of the purchase money to be paid.

Ordered, That the Treasurer [of the Western Shore] pay unto M<sup>r</sup> Charles Beatty, or his Order [out of the Bills] of Credit in his Hands, three thousand four hundred and sixty six Dollars and two Thirds of a Dollar, to enable him to advance as aforesaid.

Resolved, That Robert Alexander Esq<sup>r</sup> of Baltimore Town be empowered to contract for the making and Delivery of 500 good substantial proved Musquets with the same Accoutrements and like Dimensions with those for which M<sup>r</sup> Beatty is empowered to contract, and for the same price, and may contract to advance in the same Manner.

# MINUTES

OF THE

# PROVINCIAL COUNCIL

OF

# PENNSYLVANIA,

## FROM THE ORGANIZATION TO THE TERMINATION OF THE PROPRIETARY GOVERNMENT.

PUBLISHED BY THE STATE.

## VOL. X.

CONTAINING THE PROCEEDINGS OF COUNCIL FROM OCTOBER 18TH, 1771, TO 27TH OF SEPTEMBER, 1775, BOTH DAYS INCLUDED; TOGETHER WITH MINUTES OF THE COUNCIL OF SAFETY FROM JUNE 30TH, 1775, TO NOVEMBER 12TH, 1776, BOTH DAYS INCLUDED.

HARRISBURG:
PRINTED BY THEO. FENN & CO.
1852.

Generated on 2025-01-23 18:31 GMT / https://hdl.handle.net/2027/pst.000027878873
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PENN STATE

•    MINUTES OF THE

October 26th.—At a Meeting of the Committee of Safety.

PRESENT:

| | |
|---|---|
| Robert Morris, | Bernard Dougherty, |
| Michael Swoope, | Samuel Miles, |
| John Nixon, | Anthony Wayne, |
| James Mease, | Owen Biddle, |
| Andrew Allen, | James Biddle, |
| John Montgomery, | George Clymer, |
| Francis Johnson, | Alexander Wilcocks, |
| Thomas Wharton, jun'r, | George Gray. |
| John Cadwalader, | |

By Direction of this Board,

An order was this day drawn on Michael Hillegas, Esq'r., Treasurer to this Board, for one thousand pounds, in favour of Thomas Wharton, jun'r, John Nixon, & James Mease, Committee of Accounts.

Robert Towers, Commissary, Reports his having receiv'd the following Articles into Store, vizt :

5 Barrels of Powder, w't 500 lbs., receiv'd from George Lush, being the damag'd Powder Sent him to be made good ; ¼ Barrel of Ditto, 25 lbs., receiv'd from George Havener ; 6 Ream of paper for Canon Cartridges, receiv'd from Tho's Phillips.

| | | | Tun. | lb. | qr. | cwt. | |
|---|---|---|---|---|---|---|---|
| 6 32 pound Cannon Ball, | | | | | | | |
| 130 24 | lb. | do. | W't 11 | 2 | 2 | 18, | Rec'd from |
| 1207 18 | lb. | do. | | | | | Geo. Taylor, Esq'r. |
| 16 32 | lb. | do. | | | | | |
| 119 18 | lb. | do. | W't 1 | 5 | 0 | 0, | Rec'd Wm. |
| 20 9 | lb. | do. | | | | | Allen, Esq'r. |
| 11 6 | lb. | do. | | | | | |

October 27th.—At a Meeting of the Committee of Safety.

PRESENT:

| | |
|---|---|
| Robert Morris, | Samuel Miles, |
| Samuel Howell, | Alexander Wilcocks, |
| John Nixon, | Bernard Dougherty, |
| Thomas Wharton, jun'r, | Anthony Wayne, |
| John Cadwalader, | Francis Johnson, |
| James Mease, | Samuel Morris, jun'r, |
| Nicholas Fairlamb, | John Montgomery, |
| James Biddle, | Owen Biddle. |

Upon application of Mr. Thomas Proctor to be appointed Captain of the Company of Artillery to be raised and employed at Fort Island

Digitized by Google

Original from
PENN STATE

for the defence of this Province, This Board considering Mr. Proctor's Application,

*Resolved,* That the said Thomas Proctor be appointed Captain of the said Company.

*Resolved,* That Mr. David Rittenhouse be appointed Engineer to this Board.

*Resolved,* That Mr. Towers be directed to prove all the Muskets made in this City for the Provincial Service, and to Stamp such of them as are proof, with the letters P; and that a Copy of this Minute be handed to the County Commissioners, who are to notify the Smiths they contract with for said Muskets, of this Resolve, and that none of their Guns will be receiv'd or paid for by this Board, but such as have been so proved and Stampt as aforesaid.

*Resolved,* That Mr. Towers, Commissary, deliver and Send down to Fort Island a Gin, Handspikes, Pulleys, Ropes, and what other articles that may be thought necessary for carrying on the Public Works at that Island.

Upon application of James Jones, Mate; John Orkney, Second Mate; & John Clerk, Charles Heys, George Simpson, & George Stewart, Mariners belonging to the Rebeccah, & Francis Transport, Geor. Hastings, Mr., lately Stranded on Brig't Beach, on the Jersey Shores, a certificate was given them that they had been examined by this Committee, Discharged, and permitted to go at large.

*Resolved,* That Isaac Rotch be apointed Second Lieutenant to one of the armed Boats.

The Board taking into Consideration the application from Capt. William Davis and others, offering their Service to act as Volunteers in the Battery to be erected at Fort Island, are of opinion that the thanks of this Board are due to those Gentlemen for their Generous offer to serve the Public without reward, which Mr. Nixon is desired by the Board to present to them. It is recommended to the said Gentlemen to qualify themselves in such Exercise of Great Guns, as will be useful in the department in which they offer to serve; And this Board do Resolve to Call upon them to act as Volunteers, under the officers apointed by this Board, Whenever the Public Service shall require.

Digitized by Google          Original from PENN STATE

# October, 1776.
i

**A**T the GENERAL ASSEM-BLY of the GOVERNOR and COMPANY of the STATE of *Rhode-Iſland*, and *Providence Plantations*, begun and holden at *South-Kingſtown*, within and for the State aforeſaid, on the laſt Monday of *October*, in the Year of our LORD, One Thouſand, Seven Hundred and Seventy-ſix.

PRESENT,

The Honorable

*William Bradford*, Eſq; Deputy-Governor.

*JOHN COLLINS*, Eſq;
*SIMEON POTTER*, Eſq;
*JOHN JEPSON*, Eſq;
*JAMES ARNOLD*, jun. Eſq;  } Aſſiſtants.
*PETER PHILLIPS*, Eſq;
*WILLIAM POTTER*, Eſq;
*THOMAS CHURCH*, Eſq;

ROWSE J. HELME, Eſq; Deputy-Secretary.

*October,* 1776.                                              29

ed by this Affembly, *It is Voted and Refolved,* That
the Sum aforefaid be paid to the faid *Gromet Child,*
out of the General Treafury.

× × × × × × ×

AN ACT for the Infpection of G U N P O W D E R,
manufactured within this State.

B E *it Enacted by this General Affembly, and, by the*      Act regulat-
*Authority thereof, it is Enacted,* That if any Per-         ing the In-
fon or Perfons, within this State, fhall vend or ex-         fpection of
pofe to Sale any Gunpowder, manufactured within             Gunpowder:
the fame, unlefs faid Gunpowder be packed in a
good dry Cafk, marked with the two firft Letters of
the Manufacturer's Name, and hath been examined
and approved by the Infpector of Gunpowder, for
faid State, and by him marked with the Letters
*U. S. A.* and fuch other Marks as are neceffary to
diftinguifh the feveral Sorts of Gunpowder ; the
Perfon or Perfons fo offending, fhall forfeit and pay
fix Pounds, lawful Money, for every Cafk fo expofed
to Sale, to be recovered by Bill, Plaint or Informa-
tion, upon Conviction before any Court of Record
within this State; which Forfeiture fhall one Moie-
ty thereof be given to the Informer, and the other
be paid into the General Treafury of this State :
*And be it further Enacted by the Authority aforefaid,*
That the faid Infpector be paid, out of the General
Treafury, nine Pence, lawful Money, for every
Cafk fo marked and infpected by him.

× × × × × × ×

AN A C T for punifhing Perfons counterfeiting the
Bills or Notes of either of the Continental Loan-
Offices, within the *United States of America.*

B E *it Enacted by this General Affembly, and, by the*     Perfons coun-
*Authority thereof, it is Enacted,* That if any Per-        terfeiting the
fon or Perfons, within this State, fhall counterfeit        Bills or Notes
the Bills or Notes of either of the Continental Loan-       of either of
Offices, within the *United States of America,* or utter    the Conti-
or pafs the fame, Knowing them to be fuch, and be          nental Loan-
thereof duly convicted, fhall fuffer the Pains of Death.    Offices, to be
                                                            punifhed with
                                                            Death.

                                                            IT



# A C T S

OF THE

# GENERAL ASSEMBLY

OF THE

## STATE OF NEW-JERSEY,

At a SESSION begun at PRINCETON on the 27th Day of *August* 1776, and continued by Adjournments.

TO WHICH IS PREFIXED,

THE

# CONSTITUTION

OF THE

# S T A T E.

BURLINGTON:
Printed by ISAAC COLLINS, M.DCC.LXXVII.

6                 STATE of *NEW-JERSEY,* 1776.

Justices to tender the Oaths of Abjuration and Allegiance to suspected Persons.

4. AND BE IT ENACTED *by the Authority aforesaid,* That any two Justices of the Peace shall, and they hereby are empowered and directed to convene by Summons or Warrant any Person whatsoever, whom they shall suspect to be dangerous or disaffected to the present Government, and to tender and administer to him the Oaths of Abjuration and Allegiance, set forth in an Act, entitled, *An Act for the Security of the Government of* New-Jersey, passed the nineteenth of *September* One Thousand Seven Hundred and Seventy-six. And if any Person, to whom the said Oath shall be tendered, shall neglect or refuse to take the same, the said Justices shall bind him over with sufficient Sureties, to appear at the next Court of General Quarter-Sessions of the Peace, and to be in the mean-while of good Behaviour; and in Default of sufficient Sureties, or on Refusal to be bound, the said Justices are hereby empowered and directed to commit such Offender to close Gaol, and certify the same, with the Cause of Commitment, under their Hands and Seals, to the next Court of General Quarter-Sessions of the Peace, where, if such Offender refuse to take the said Oaths, he shall continue bound to his good Behaviour, or be fined, or imprisoned, as the said Court shall deem necessary.

*Passed at* Princeton, October 4, 1776.

C H A P.    VI.

*An* A C T *for the Inspection of Gun-Powder.*

Preamble.

WHEREAS the vending of damaged or bad Gun-Powder within this State, especially in the Time of War, may be of the most dangerous Consequence;

No Gun-Powder to be sold without Inspection, &c.

*Sect.* 1. BE IT THEREFORE ENACTED *by the Council and General Assembly of this State, and it is hereby Enacted by the Authority of the same,* That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the Sum of *Five Shillings* a Pound for every Pound weight

Penalty.

so offered for Sale, and so in Proportion for greater or lesser Quantity; to be recovered in any Court where the same may be cognizable, and applied the one Half to the Person who shall prosecute therefor, and the other Half to be paid to the Treasurer for the Use of the State.

Inspectors;

2. That *Jacob Zabriskie* of Bergen County, *Jonathan Sears* of *Essex,* *Samuel H. Sullivan* of *Middlesex, Kenneth Henkinson* and *Jacob Cook* of *Monmouth, Abraham Staats* of *Somerset, Samuel Day* and *Daniel Lindsly* of *Morris, William Perine* of *Sussex, David Cowell* of *Hunterdon, Josiah Foster* and *John Leek* of *Burlington, Joseph Hugg, John Somers* and *Thomas Clark* of *Gloucester, Curtis Trenchard* of *Salem, Enos Seeley* of *Cumberland,* and *Joseph Ludley* and *Abraham Bennet* of *Cape-May,* be, and

their Duty,

they hereby are appointed Inspectors of Gun-Powder; who are directed to pass or mark no Gun-Powder but such as is good as to its Quickness in Firing, Strength, Dryness, and other Qualities; and who, before

they

## WILLIAM LIVINGSTON, Esquire, Governor.    7

they do any Thing in the Execution of their Office, shall severally take, before any Justice of the Peace for the County in which they reside, the following Oath or Affirmation, *I A B will and truly execute the Office of Inspector of Gun-Powder for this State, according to the best of my Skill and Understanding, and agreeable to the Directions of an Act, entitled,* An Act for the Inspection of Gun-Powder.    and Qualification.

3. That every Inspector shall mark each Cask of Gun-Powder, by him approved, with the Letters S N I, and such other Marks as are necessary to distinguish the several Sorts of Gun-Powder.    Inspector to mark.

4. That every Maker of Gun-Powder shall pack his Powder in dry well-seasoned Casks, and mark every Cask in which he shall pack the same with the initial Letters of his Name.    Maker to pack, &c.

5. That every Inspector who shall neglect or refuse to do any of the Duties enjoined by this Act, shall forfeit for each Offence the Sum of *Five Pounds,* to be recovered and applied in like Manner and Form as the Fines and Penalties herein before-mentioned.    Penalty.

6. That every Inspector shall be allowed the one Eighth Part of a Dollar for every Hundred Weight of Gun-Powder he shall examine, to be paid by the Owner of said Powder; provided, that no Inspector shall be obliged to ride more than ten Miles to inspect any Quantity of Gun-Powder less than one Thousand Weight, without being allowed by the Owner thereof the Sum of *Three-pence* a Mile for going, and *Three-pence* a Mile for returning, over and above the Fees of Inspection allowed by this Act. PROVIDED ALSO, That Powder inspected by Order of the Continental Congress, or by any Person legally authorised for that Purpose, in any of the neighbouring States, shall be subject to Inspection by Virtue of this Act, any Thing herein to the contrary notwithstanding.    Inspector's Wages.

7. That in case of the Death, Removal, Disability or Resignation of any Inspector, the Court of General Quarter-Sessions of the County where the same shall happen, are hereby authorised to appoint an Inspector to supply such Vacancy, who shall take the Oath or Affirmation, perform the Duty, and be subject to the Forfeitures in and by this Act prescribed.    Inspector dying, &c. who to appoint another.

*Passed at* Princeton, October 4, 1776.

### C H A P.    VII.

*An* A C T *for establishing a Court of Admiralty and Custom-Houses within the State of* New-Jersey.

*Sect.* 1. **B**E IT ENACTED *by the Council and General Assembly of this State, and it is hereby Enacted by the Authority of the same,* That it shall and may be lawful for the Governor or Commander in Chief for the Time being, with the Consent of the Council, any

E                                three

[ 764 ]

be paid by the Treasurer on the warrants of the Governor ; and the accounts of all disbursements, services and expences, made and incurred in pursuance of this act, shall be exhibited and settled agreeably to the laws for settling other public accounts.

<div style="float:left">Repeal of two former acts respecting the town at Presqu' Isle.</div>

SECT. XVI. *And be it further enacted by the authority aforesaid,* That the act, entitled " An Act for laying out a town at Presqu'- " Isle," passed the eighth day of April, one thousand seven hundred and ninety-three, and the supplement thereto, passed the eighteenth day of April, one thousand seven hundred and ninety-four, shall be, and the same are hereby, repealed. *(s)*

GEORGE LATIMER, *Speaker*
*of the House of Representatives.*

ROBERT HARE, *Speaker*
*of the Senate.*

*Approved, April the eighteenth,* 1795.

THOMAS MIFFLIN, *Governor*
*of the commonwealth of Pennsylvania.*

---

CHAPTER CCCXXXVII.

*An* ACT *providing for the Inspection of Gun-powder.*

WHEREAS gun-powder imported from abroad, and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use : And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable : And whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition :

<div style="float:left">Gun-powder manufactured in this state, how to be packed in casks.</div>

SECTION I. *Be it therefore enacted by the* SENATE *and* HOUSE *of* REPRESENTATIVES *of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same,* That, from and after the first day of October next, all gun-powder manufactured within this state, with in-
tent

*(s)* For the acts referred to in this section, see *ant.* page 346, 518 ; and for another act relating to the town at Presqu'-Isle, see *ant.* page 639.

[ 765 ]

tent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks, and having the tare weight of each cask marked thereon, and that all such gun-powder, and all other gun-powder, wheresoever manufactured, imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing in by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same. *(t)*

All gun-powder manufactured, or imported, to be deposited in the magazine.

SECT. II. *And be it further enacted by the authority aforesaid,* That David Rittenhouse, Francis Gurney and Thomas Procter be, and they are hereby, appointed Commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad, and manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities by weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder, which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder, which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being so fixed and ascertained, the said Commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the commonwealth; one other part shall be returned to the Master of the Rolls, to be recorded in his office, and filed among the laws of the state ; and the other part,

Commissioners appointed to procure pendulum powder proofs

Standard proofs of gun-powder

The Commissioners to report, and return accurate drafts of the two pendulum powder proofs; where the same shall be deposited.

*(t)* See *ant.* pages 87, 171.

9 H

together

[ 766 ]

together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their successors, as often as another officer shall be appointed.

How the pendulum in the keeping of the Inspector may be repaired, or a new one made.

SECT. III, *And be it further enacted by the authority aforesaid,* That so often as the said pendulum powder proofs in the possession of the Inspector shall, by natural wear, or by accident, be rendered unfit for use, or its accuracy doubted, the same shall be compared with the other remaining in the Secretary's office, and, if found necessary, a new one constructed, and made conformably thereto in measure and weight, for the use of the Inspector, at his own costs and charges.

A suitable building to be erected, for the use of the Inspector.

SECT. IV. *And be it further enacted by the authority aforesaid,* That the said Commissioners shall prepare and report a plan for the necessary buildings, and an estimate of the expence thereof, and the same being laid before and approved by the Governor, he shall cause to be erected and built, on the most proper part of the lot belonging to the public magazine aforesaid, a brick building, for the use of the Inspector, with two apartments, one for the purpose of keeping his engine apparatus and for making proofs, and the other for the purpose of keeping the samples of powder in safety, the expence of which building shall be paid and defrayed by warrants to be drawn by the Governor on the State Treasurer, which shall be allowed him, on settlement of his accounts, out of the fund for the support of government :

Limitation of the expence.

*Provided,* That the whole amount of the expence thereof do not exceed the sum of five hundred dollars.

An Inspector of gun-powder to be appointed.

SECT. V. *And be it further enacted by the authority aforesaid,* That it shall and may be lawful for the Governor of this commonwealth, and he is hereby required, as soon as conveniently may be after the passing of this act, and as often afterwards as the office shall become vacant by death, resignation or otherwise, to appoint one suitable and skilful person to be Inspector of gunpowder in and for the city, port and county of Philadelphia,

His qualification.

who, before he enters on the duties of his office, shall take and subscribe the oath or affirmation required by law for the support of the constitutions of the United States and of this state ; and moreover shall take and subscribe, before the Governor, an oath or affirmation, that he will well and faithfully perform all and singular the duties required by this act, according to the best of his knowledge, skill and ability, and without prejudice or partiality.

Duties of the Inspector.

SECT. VI. *And be it further enacted by the authority aforesaid,* That it shall be the duty of the Inspector of gun-powder so to be appointed, for the time being, to attend at the said public magazine, and his office so to be built, as often as shall be necessary,

[ 767 ]

ceffary, to infpect and examine all gun-powder there to be de-
pofited, to draw famples from each cafk of powder which fhall
be fo as aforefaid bored, and to open or otherwife get famples
of cafks of powder not bored as aforefaid, and removing fuch
famples to his office, there to prove the fame by the pendulum
proof aforefaid, and note the ftandard quality of each cafk, **to
provide himfelf with cedar plugs ftamped on the outer end with
the letters S. P. and the figures number one, number two, and
number three, to defignate the firft, fecond and third proofs of
ftandard gun-powder of the ftate of Pennfylvania, and another
ftamped with the letters S. P. to defignate condemned gun-pow-
der**, and therewith carefully to plug up the holes opened or made
for the purpofe with fuch marked plugs, as the proof quality of
the powder in each cafk refpectively contained, and occafionally
to weigh the faid cafks ; and if upon weighing the fame fufpicion
fhould arife that the cafks are falfe tared, or do not contain the
quantity herein above mentioned for each cafk, to empty the
fame, and weigh the cafk and powder feparately, to afcertain
the deficiency, if any, in the neat weight, and to fill the fame
to its due weight out of any other cafk belonging to the fame
perfon, marking the weight taken on the ullage cafks, and keep-
ing an exact account in his books thereof, and of the names of
the owners, and the perfons bringing and depofiting the fame.

*To infpect, exa-
mine and prove
the gun-pow-
der;*

*to mark the
ftandard quali-
ty;*

*to mark con-
demned gun-
powder;*

*to weigh the
gun-powder oc-
cafionally;*

*and to fupply
any deficiency
from other
cafks.*

SECT. VII. *And be it further enacted by the authority aforefaid,*
That every cafk of gun-powder infpected as aforefaid fhall be
plugged up with a plug marked with the number next below the
ftandard number of degrees to which the pendulum fhall not be
elevated in the proof, and that every cafk of gun-powder in-
fpected as aforefaid, which fhall not elevate the pendulum to the
ftandard of the firft or loweft proof, fhall be condemned, and one
pint of clean water for every twenty-five pounds of powder
therein contained fhall be poured thereinto, and the hole plugged
up with the plug marked S. P. before the fame fhall be delivered
over to the owner to be refined and re-manufactured ; and to
prevent a failure in the infpection by the temporary indifpofition
of the Infpector, it fhall and may be lawful for him to execute
all the duties hereby required by a Deputy, to be appointed by
him, and approved by the Governor, the Deputy firft taking
and fubfcribing the like oaths or affirmations hereby required
from the principal.

*Rule for mark-
ing or con-
demning gun-
powder.*

*The Infpector,
may appoint a
Deputy.*

SECT. VIII. *And be it further enacted by the authority afor f.id,*
That the Keeper of the faid magazine fhall at all feafonable times
in every juridical day in the year admit the faid Infpector, and
his Deputy and Affiftants, into the faid magazine, to do and per-
form the feveral duties hereby required of him and them, and
fhall not deliver any powder from the faid magazine until the
fame fhall be infpected as aforefaid.                         SECT.

*The Infpector
&c. to be ad-
mitted into the
magazine.*

*Powder not to
be delivered, till
infpected.*

[ 768 ]

SECT. IX. *And be it further enacted by the authority aforesaid,* That no person appointed to the office of Inspector, or his Deputy, shall, during the time of holding or exercising the said office, be concerned directly or indirectly in manufacturing, buying or selling gun-powder in gross, or by retail, under penalty of forfeiting the sum of five hundred dollars for every such offence, to be recovered by any person who will sue for the same in any court having competent jurisdiction, one moiety for the use of this commonwealth, and the other to the use of him or them who shall sue for the same; and upon conviction thereof shall be removed from the said office, and wholly disqualified to take or hold any office of trust or profit under this commonwealth.

*Penalty, if the Inspector or his Deputy are concerned in manufacturing or selling gunpowder.*

SECT. X. *And be it further enacted by the authority aforesaid,* That if any person, from and after the said first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder, every person so offending shall forfeit all such gun-powder as aforesaid.

*Penalty on not depositing gunpowder in the magazine, or selling the same without inspection.*

SECT. XI. *And be it further enacted by the authority aforesaid,* That the Inspector shall be entitled to demand and receive of and from the owner and possessor of all gun-powder deposited in the said magazine, and by him or his Deputy examined, proved and plugged, as aforesaid, the following sums or rates, whether the same be approved or condemned, paid or secured, before the same shall be removed from the magazine, if the Inspector shall so require; for every cask of powder, manufactured in this state, or any of the United States, bored, and stopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cask containing fifty pounds, eight cents; for every like cask containing one hundred pounds, nine cents; and for every cask of foreign powder, or powder manufactured in the United States, not bored and stopped with corks as aforesaid, double the said price or rates; and for every cask which he shall find deficient one per cent. in weight, and shall fill up, fifty cents.

*Fees of the Inspector.*

SECT. XII. *And be it further enacted by the authority aforesaid,* That if any dispute should arise between the owner, possessor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or of the goodness of the materials and manner in which the casks are made, upon application by the owner, possessor or consignee of such powder to one of the

*How disputes between the owner of gunpowder and the Inspector shall be decided.*

[ 769 ]

the Magiſtrates of the city or county of Philadelphia, where the diſpute ſhall ariſe, the ſaid Magiſtrate ſhall iſſue his warrant to three indifferent judicious perſons to be triers thereof, one of them to be named by the ſaid owner, poſſeſſor or conſignee, one by the ſaid Inſpector, and the third by the ſaid Magiſtrate, directing the ſaid triers to view and examine the ſaid powder, and make report to him forthwith touching the condition thereof, and that if they ſhall find the ſaid powder not merchantable, that they certify to him the cauſe thereof, and the ſaid Magiſtrate ſhall thereupon give his judgment agreeably to the report of the ſaid triers, or any two of them ; and in caſe the ſaid Magiſtrate ſhall on ſuch report adjudge the powder not to be merchantable, he ſhall award the owner, poſſeſſor or conſignee thereof, to pay all coſts ; but in caſe the ſaid powder ſhall be found merchantable, the Inſpector ſhall be adjudged to pay all coſts which may have accrued, and ſhall thereupon cauſe the powder to be marked as of the ſtandard to be directed by the ſaid triers.

GEORGE LATIMER, *Speaker of the Houſe of Repreſentatives.*

ROBERT HARE, *Speaker of the Senate.*

*Approved, April the eighteenth,* 1795.
THOMAS MIFFLIN, *Governor of the commonwealth of Pennſylvania.*

---

## CHAPTER CCCXXXVIII.

*An ACT ſupplementary to the ſeveral Acts of Aſſembly for eſtabliſhing the Judicial Courts of this commonwealth, in conformity to the alterations and amendments in the conſtitution. (u)*

WHEREAS the times directed for holding the Supreme Court of this commonwealth are inconvenient : Therefore,

SECTION I. *Be it enacted by the* SENATE *and* HOUSE OF REPRESENTATIVES *of the commonwealth of Pennſylvania, in General Aſſembly met, and it is hereby enacted by the authority of the* 9 I                                                                     *ſame,*

*(u)* For the ſeveral acts reſpecting the Judicial Department, ſee *ant.* pages 92, 402, 409 ; and the Index to the ſeveral Volumes of the preſent edition.

other Towns within this Commonwealth are required by
law to choose in the Months of March or April annually;
And the Officers so chosen shall be qualified as other
Town Officers are.                    *Approved March 8, 1805.*

---

## 1804. — Chapter 81.

[January Session, ch. 35.]

AN ACT TO PROVIDE FOR THE PROOF OF FIRE ARMS MANU-
FACTURED WITHIN THIS COMMONWEALTH.

*Whereas no provision hath been made by law for the* Preamble.
*proof of Fire Arms manufactured in this Commonwealth*
*by which it is apprehended that many may be introduced*
*into use which are unsafe and thereby the lives of the Cit-*
*izens be exposed, to prevent which*

SECT. 1ST. *Be it enacted by the Senate and House of*
*Representatives in General Court assembled, and by the*
*authority of the same* That the Governor by and with Provers of fire-arms to be ap-
the advice and consent of the Council be and he hereby pointed.
is empowered to appoint in any part of this Common-
wealth where the Manufacture of fire Arms is carried on,
suitable persons to be provers of fire arms not exceeding
two in any County who shall be sworn to the faithful dis-
charge of their trust, whose duty it shall be to prove all
Musket Barrels and Pistol barrels which being sufficiently
ground bored and breeched shall be offered to him to be
proved — who shall prove the Musket barrels twice in
manner following vizt. first with a charge consisting of Method of
one eighteenth part of a pound of Powder, one ounce of proving.
which in a five & an half inch Howitz at an elevation
of forty five degrees will carry a twenty four pound shot,
eighty Yards — with a ball suited to the bore of the bar-
rel — the second proof to be with a charge consisting of
one twenty second part of the same powder with a ball
suited to the bore of the barrel, and shall prove the pistol
barrels once with a charge consisting of one twenty sec-
ond part of a pound of Powder, one ounc of which in a
five and half inch Howitz at an elevation of forty five
degrees, will carry a twenty four pound shot seventy
Yards, with a ball suited to the bore of the barrel —
which said powder and ball it shall be the duty of the
prover to provide — And if the said musket and pistol Proof marks
barrels shall stand the proof aforesaid and shall in no re-
spect fail, then it shall be the duty of the said prover to

112                    ACTS, 1804. — CHAPTER 81.

stamp the same on the upper side and within one and an half inches of the breech of said barrels with a stamp consisting of the initial letters of the provers name & over those letters the letter P. also in the line of the said initial letters and further up said barrel the figures designating the Year of our Lord in which the proof is made and over the said figures the letter M. which said letters and figures shall be so deeply impressed on said barrel as that the same cannot be erased or disfigured and shall

be in the form following AB 1805 and when any barrels shall burst or shall in any manner fail in the proving as aforesaid so that in the opinion of the prover they are unfit for use they shall not be stamped but the said prover shall suffer the owner to take them away — & any prover so proving musket or pistol barrels as aforesaid shall be entitled to recieve from the owner for each musket barrel thirty three Cents, and for each pistol barrel twenty five Cents, whether the same stand proof and are Stamped or not.

**Fees.**

**Penalty for not having arms proved.**

SEC. 2D.  *And be it further enacted*, that if any person after the first day of June next shall manufacture within this Commonwealth any musket or pistol without having the barrels proved and stamped as aforesaid, except such as are or may be Manufactured in the Armory of the United States, or in fulfilment of some contract made and entered into or that may hereafter be made and entered into for the Manufacturing of fire arms for the United States, shall forfiet and pay for every such Musket or pistol the sum of ten dollars to be recovered in an action of Debt before any Court proper to try the same by any person who shall sue for and recover the same to his own use.

**Penalty for selling or buying arms not proved.**

SEC. 3D.  *And be it further enacted* that if any person after the said first day of June next, shall sell and deliver or shall knowingly purchase any Musket or Pistol which shall have been manufactured within this Commonwealth after the said first day of June next, which shall not have the marks of proof above required the person so selling and the person so purchasing, shall each forfiet the sum of Ten Dollars, to be recovered by action of debt before any Court proper to try the same to the use of any person who shall sue for and recover the same.

**Penalty for forging stamp.**

SEC. 4TH.  *And be it further enacted*, that if any person, shall falsely forge or alter the stamp of any prover

of Fire arms, so appointed as aforesaid impressed on any
musket or Pistol Barrel pursuant to this Act, and be
convicted thereof before the Supreme Judicial Court he
shall be punished by fine not exceeding Fifty Dollars nor
less than twenty dollars, according to the nature and ag-
ravation of the offence.    *Approved March 8, 1805.*

### 1804.—Chapter 82.

[January Session, ch. 26.]

AN ACT TO INCORPORATE A NUMBER OF THE INHABITANTS
IN THE TOWN OF LIMINGTON, IN THE COUNTY OF YORK,
INTO A SEPERATE RELIGIOUS SOCIETY, BY THE NAME OF
THE FIRST BAPTIST SOCIETY IN LIMINGTON.

SEC. 1.    *Be it enacted by the Senate and House of Rep-
resentatives in General Court assembled, and by the au-
thority of the same,* That Ebenezer Clarke, James Marrs, Persons incor-
Solomon Stone, William Chick, Barzillai Small, Nathan- porated.
iel Clark, Paul Gray, James Sawyer, John Gray, Eben-
ezer Sawyer, Jeremiah Small, Lemuel Sawyer, Peter
Chick, James Small, Daniel Rounds, Amos Chase, Rob-
ert Hooper, David Nason, Jonathan Nason, Daniel Small,
Frethe Spencer, John Lord, John Sutton, Stephen Web-
ber, George Stone, James Lord, John Andrews, John
Finnix, Enoch Nason, Nathaniel Adams, Benjamin Nor-
ton, Edward Norton, John Greenlaw, Amos Thompson,
Joseph Sawyer, William Sawyer, Ebenezer Walker, Wil-
liam Wentworth, Hurd Hubbard, James Heard, Joshua
Durgon, Levi Cole, William Manning, George Finnix,
Isaac Small, Ezekiel Small, Jacob Small, Josiah Chase,
Thomas Spencer, Abraham Parker, Amos Chase Junior,
Nathan Chick, and Jonathan Nason Junior, members of
said Religious Society, with their polls and estates, be,
and they are hereby incorporated by the name of the Corporate
First Baptist Society in Limington, with all the privi- name.
ledges and immunities which parishes or Religious So-
cieties in this Commonwealth are by Law intitled to,
*provided however,* that all such persons, shall be holden
to pay their proportion of all Monies assessed in said
town of Limington for Parochial purposes, previous to
the passing of this Act.

SEC. 2D.    *And be it further enacted,* that any person Method of join-
in said town of Limington who may at any time within ing the society.
one year from the passing of this Act, actually become a
Member of, and unite in religious worship with the said

tors, then the said proprietors, for the purpose of paying such delinquent's assessment, are hereby authorized and

*Land of delin-
to be sold for
taxes.*

fully empowered, to direct their Collector, Clerk, or Treasurer from time to time, at publick vendue to sell and convey so much of such delinquent's land as near as may be to said causeway, as will be sufficient to defray the sum assessed on him, and all reasonable charges attending such sale ; notice of such sale, and of the time and place being given, by publishing an advertisement thereof, in two of the newspapers printed in Boston, five weeks successively before the time of sale.   And the proprietors may, by their Clerk, execute a deed of conveyance of the land thus sold, unto the purchaser ; wherein shall be conveyed all the right and title which said delinquent proprietor formerly had in said land thus sold and conveyed.   *Provided never-theless*, that the person whose land shall be sold, shall have liberty to redeem the same, at any time within one year after such sale, by paying the sum his land was sold for, and charges, together with twelve per centum on the sum produced by such sale.

*Proviso.*

Sect. 4. *Be it further enacted*, that the proprietors of said causeway, and of the land thereto adjacent, are hereby empowered to order and manage all affairs relative to the making and maintaining the said causeway, in such way and manner, as shall be concluded and agreed on, by the major part of those who are therein interested, present at any legal meeting ; the votes to be collected and accounted according to the number of acres owned by the proprietors of said causeway.

[This act passed *Feb.* 27, 1809.]

## CHAP. LII.

An act providing for the appointment of Inspectors, and regulating the manufactory of Gun-Powder.

Sect. 1. BE *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same*, That his Excellency the Governour, by and with the advice of Council, be, and he is hereby authorized to appoint an Inspector of gun-powder for every publick powder magazine, and at every manufactory of gun-powder in this Commonwealth, and at such other places, as may by him be thought necessary ; and his Ex-cellency the Governour, by and with the advice of Council,

*Governour to
appoint inspec-
tors.*

is

GUN-POWDER.                    *March* 1, An. 1809.              445

is hereby further authorized and empowered to remove said
Inspectors, or any of them at pleasure, and may by new
appointments from time to time fill any vacancy, or va-
cancies which may happen.

SECT. 2. *Be it further enacted*, That from and after the
first day of July next, all gun powder which shall be manu-   Materials.
factured within this Commonwealth shall be composed of
the following proportions, and quality of materials, that is,
every one hundred parts of gun powder, shall be composed
of fourteen parts of fresh burnt coal, made from wood
which forms the least ashes, and which has been carefully
and well prepared, and made into coal, after being stripped
of its bark, ten parts of pure sulphur, and seventy six parts
of purified nitre.

SECT. 3. *Be it further enacted*, That it shall be the duty
of each of said Inspectors, to inspect, examine and prove   Duty of inspec-
all gun-powder, which after the first day of July next, shall   tors.
be deposited at any publick powder magazine, or manufac-
tured in this Commonwealth, before the same shall be
removed from the manufactory, or received into such pub-
lick powder magazine, and if upon such inspection and ex-
amination it shall appear to the Inspector, that such gun-
powder is well manufactured, and composed of pure ma-
terials, and of the proper proportions of materals, and such
gun-powder shall be of the proof herein after mentioned
the Inspector shall mark each cask, containing gun-powder
by him inspected, examined and proved as aforesaid, with
the words Massachusetts Inspected Proof ; and with his
christian and sur-name, and shall also mark in figures upon
each cask the quantity of powder contained therein, and
the year in which the inspection is made.

SECT. 4. *Be it further enacted*, That no gun-powder
within this Commonwealth, shall be considered to be of
proof unless one ounce thereof placed in the chamber of a   Powder to be
four and an half inch howitzer, with the howitzer elevated   proved.
so as to form an angle of forty five degrees with the horizon,
will, upon being fired, throw a twelve pound shot, seventy
five yards at the least.

SECT. 5. *Be it further enacted*, That whenever any of
said Inspectors, shall discover any gun-powder, deposited
at any publick powder magazine, or any other place within
this Commonwealth, which is not well manufactured, or
which is composed of impure materials, or of an improper
proportion of materials, and which shall not be of the proof
herein before mentioned, the inspector in such case shall   Casks of bad
mark each cask containing such impure ill manufactured or   powder to be
marked.
             deficient

deficient gun-powder, with the word " Condemned" on both heads of the cask, and with the same words on the side thereof, with the christian and sur-name of the inspector on one head of the cask.

Sect. 6. *Be it further enacted,* That if any person shall knowingly sell any condemned gun powder as, and for, good gun-powder, or shall fraudulently alter, or deface any mark, or marks, placed by any Inspector upon any cask or casks containing gun-powder, or shall fraudulently put any gun-powder, which shall not have been inspected, or which has been condemned, into any cask or casks, which shall have been marked by any Inspector, agreeably to the provisions contained in the third section of this act, every such person so offending shall forfeit and pay not less than two hundred, nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt in any Court of competent jurisdiction ; one half to the use of the Commonwealth, the other half to the use of him or them, who shall sue, and prosecute for the same.

<div style="margin-left:2em">Fines.</div>

Sect. 7. *Be it further enacted,* That each Inspector who may be appointed by virtue of this act, shall before he acts as Inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gun-powder by him examined, inspected, and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gun-powder.

<div style="margin-left:2em">Inspector to be sworn.</div>

Sect. 8. *Be it further enacted,* That if any manufacturer of gun-powder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export, or cause to be exported without the limits of this Commonwealth, any powder of his manufacture, before the same has been inspected, and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

Sect. 9. *Be it further enacted,* That if any person within this Commonwealth, after the first day of July next shall knowingly sell, expose, or offer for sale within this Commonwealth any gun-powder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars, nor more than fifty dollars ; for each and every offence, to be recovered in the manner provided in the sixth section of this act.

<div style="margin-left:2em">Fines.</div>

[This act passed *March* 1, 1809.]    CHAP.

# LAWS

OF THE

## Commonwealth of Massachusetts,

### PASSED BY THE GENERAL COURT,

AT THEIR SESSION, WHICH COMMENCED ON WEDNESDAY THE 12th
DAY OF JANUARY, AND WHICH ENDED ON MONDAY
THE 28th DAY OF FEBRUARY, 1814.

Published agreeably to a Resolve of 16th January, 1812.



BOSTON:

PRINTED BY RUSSELL, CUTLER, AND Co.

1814.

464    COMMONWEALTH FIRE ARMS. *Feb.* 28, 1814.

**Town incor-porated.** county of Essex, by the name of Lynnfield," be, and the same hereby is incorporated into a town, by the name of Lynnfield, with all the powers, privileges, and immunities, and liable to all the duties and requisitions of other towns in this Commonwealth.

[Approved by the Governor, February 28, 1814.]

## CHAP. CXCII.

An Act in addition to an act, entitled "An act to provide for the proof of Fire Arms, manufactured within this Commonwealth."

SEC. 1. BE *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That from and after the passing of this act, all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act, entitled "An act to provide for the proof of Fire Arms, manufactured within this Commonwealth," to which this **Manner of proving.** is an addition, in manner following, viz : with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved ; and the powder used in such proof one ounce thereof in a howitzer of four and a half inch caliber, at an elevation of forty-five degrees, shall be of sufficient power to carry a twelve pound shot one hundred and thirty yards ; or one ounce thereof in a howitzer of five and a half inch caliber, at an elevation of forty-five degrees, shall be sufficient to carry a twenty-four pound shot eighty yards, and the ball used in such proof shall be suited to the bore of the barrel to be proved as aforesaid.

SEC. 2. *Be it further enacted,* That if any person or persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pis-**Restrictions.** tol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition ; or if

any person or persons shall sell, stock or finish, or shall
knowingly purchase any musket barrel or pistol barrel
manufactured within this Commonwealth, which shall not
have been first proved, marked and stamped according to
the provisions aforesaid, the person or persons who shall
so manufacture, sell and deliver, or knowingly purchase
any musket or pistol without causing the same to be first
proved, marked and stamped as aforesaid, and the person
or persons who shall sell, stock or finish, or shall know-
ingly purchase any musket barrel or pistol barrel, which
shall not have been proved, marked and stamped as afore- Forfeitures.
said, shall severally forfeit the sum of ten dollars, to be
recovered by an action of debt before any court proper to
try the same, by any person who shall sue for and recover
the same, to his own use : *Provided however,* That the Proviso.
foregoing provisions and penalties shall not extend to any
muskets or pistols, or musket or pistol barrels, manufac-
tured in any armoury of the United States, for their use,
or in execution of any contract made or to be made with
the United States, for the manufacture of fire arms.

Sec. 3. *Be it further enacted,* That the second and
third sections of the act to which this is in addition, and Sections re-
also so much of the first section thereof as prescribes the pealed.
mode of proving musket barrels and pistol barrels, and the
power of the powder to be used in such proof, be, and
the same are hereby repealed.

[Approved by the Governor, February 28, 1814.]

## CHAP. CXCIII.

An Act to incorporate The President, Directors and Com-
pany of the Lynn Mechanicks Bank.

Sec. 1. Be *it enacted by the Senate and House of
Representatives, in General Court assembled, and by the
authority of the same,* That Daniel Silsbe, Joseph Fuller
the third, John D. Atwell, Thomas Rich, Samuel Brimble- Persons in-
cum, Micajah Burrill, Parker Mudge, Oliver Fuller, Jon- corporated.
athan Conner, John Alley, jr. Stephen Oliver, John
Mudge, and Jonathan Bachellor, their associates, succes-
sors, and assigns shall be, and hereby are created a Cor-

*Inspectors of Gunpowder.*

A. D. 1820.

### CHAP. XXV.

Passed June
21, 1820.

AN ACT to provide for the appointment of Inspectors and
regulating the manufactory of Gunpowder.

*Inspectors of
gunpowder to
be appointed.*

SEC. 1. **B**E *it enacted by the senate and house of representa-
tives in general court convened,* That his excellency the gov-
ernor by and with the advice of council, be, and he is hereby
authorized to appoint an inspector of gunpowder for every
public powder magazine, and at every manufactory of gun-
powder in this state, and at such other places as may by him
be thought necessary; and his excellency the governor by
and with the advice of council is hereby further authorized
and empowered to remove said inspectors or any of them at
pleasure, and may by new appointments from time to time
fill any vacancy or vacancies which may happen.

*Proportion &
quality of ma-
terials for the
manufacture
of gunpowder.*

SEC. 2. *And be it further enacted,* That from and after the
first day of July next, all gunpowder which shall be manufac-
tured within this state, shall be composed of the following
proportions and quality of materials, that is, every one hun-
dred parts of gunpowder shall be composed of fourteen parts
of fresh burnt coal, made from wood which forms the least
ashes, and which has been carefully and well prepared and
made into coal, after being stripped of its bark; ten parts of
pure sulphur, and seventy-six parts of purified nitre.

*Duty of in-
spectors.*

SEC. 3. *And be it further enacted,* That it shall be the duty
of each of said inspectors to inspect, examine and prove all
gun powder which after the first day of July next shall be
deposited at any publick powder magazine, or manufactory
in this state, before the same shall be removed from the
manufactory or received into such public powder magazine,
and if upon inspection and examination it shall appear to the
inspector that such gunpowder is well manufactured and com-
posed of pure materials, and such gunpowder shall be of the
proof hereinafter mentioned, the inspector shall mark each
cask containing gunpowder by him inspected, examined, and
proved as aforesaid, with the words " *New-Hampshire inspec-
ted proof,*" and with his christian and surname, and shall also
in figures mark upon each cask the quantity of powder con-
tained therein, and the year in which the inspection is made.

SEC. 4. *And be it further enacted,* That no gunpowder within

Digitized from Best Copy Available

Add.050

App. 112

this state shall be considered to be of proof unless one ounce <span>A. D.1820.</span>
thereof, placed in the chamber of a four and an half inch <span>Proof of quality of gunpowder.</span>
howitzer, with the howitzer elevated so as to form an angle
of forty-five degrees with the horizon, will, upon being fired,
throw a twelve pound shot seventy-five yards at the least.

Sec. 5. *And be it further enacted,* That whenever any of <span>Inspectors to mark bad powder.</span>
said inspectors shall discover any gunpowder, deposited at
any public powder magazine, or any other place within this
state, which is not well manufactured, or which is composed
of impure materials, or of any improper proportion of mate-
rials, and which shall not be of the proof herein before men-
tioned, the inspector in such case, shall mark each cask con-
taining such impure, ill manufactured, or deficient gunpow-
der, with the word " *Condemned,*" on both heads of the cask,
and with the same words on the side thereof, with the chris-
tian and surname of the inspector on one head of the cask.

Sec. 6. *And be it further enacted,* That if any person shall <span>Penalty for selling condemned powder.</span>
knowingly sell any condemned gunpowder, or shall fraudu-
lently alter or deface any mark or marks, placed by any in-
spector upon any cask or casks containing gunpowder, or
shall fraudulently put any gunpowder, which shall not have
been inspected, or which has been condemned, into any cask
or casks, which shall have been marked by any inspector
agreeably to the provisions contained in the third section of
this act, every such person, so offending, shall forfeit and
pay not less than two hundred nor more than five hundred
dollars, for each and every offence, to be recovered in an
action of debt, in any court of competent jurisdiction, one
half thereof to the use of the state, the other to the use of
him or them who shall sue and prosecute for the same.

Sec. 7. *And be it further enacted,* That each inspector who <span>Inspector's fees and oath of office.</span>
may be appointed by virtue of this act, shall, before he acts
as inspector, be sworn to the faithful and impartial discharge
of the duties of his office, and each inspector shall be allowed
one cent for each pound of gunpowder, by him examined,
inspected and proved, whether the same be by him approved
or condemned, to be paid by the owner or owners of the
gunpowder.

Sec. 8. *And be it further enacted,* That if any manufacturer <span>Penalty for selling unin-spected powder.</span>
of gunpowder shall sell or dispose of, or shall cause or per-

Digitized from Best Copy Available

276                      *Artillery.*

A. D. 1820.   mit to be sold or disposed of, or shall export or cause to be
              exported without the limits of this state, any powder of his
              manufacture, before the same has been inspected and mark-
              ed agreeably to the provisions of this act, he shall forfeit and
              pay the sum of fifty cents for every pound of powder so sold,
              disposed of, or exported, to be recovered in the manner pro-
              vided in the sixth section of this act.

Penalty for        Sec. 9. *And be it further enacted,* That if any person within
selling powder
made of im-    this state, after the first day of January next, shall knowingly
pure materials
              sell, expose, or offer for sale, within this state, any gunpow-
              der which is not well manufactured, or which is composed
              of impure materials, and which shall not be of the proof
              herein before required, shall forfeit and pay not less than
              five dollars nor more than fifty dollars for each and every of-
              fence, to be recovered in the manner provided in the sixth
              section of this act.

                            Approved June 21, 1820.

## CHAP. XXVI.

Passed June   **R**ESOLVED, That the sum of four hundred dollars be and
22, 1820.
              the same hereby is appropriated for the purpose of furnish-
              ing each artillery company in this state, organized according
              to law, with powder and port-fire, and for the ordinary re-
              pairs of field pieces, agreeably to the sixth section of a law
              of this state passed July 1, 1820.*  And his excellency the
              governor is hereby authorized to draw on the treasury in fa-
              vour of the adjutant general for the above sum, and the ad-
              jutant general is hereby directed to pay to the captain or
              commanding officer of the different companies of artillery or
              their orders, the sum of twelve dollars each.

                            Approved June 22, 1820.

## CHAP. XXVII.

Passed June   **R**ESOLVED, That the Selectmen, or a major part of them
22, 1820.
              at the charge of the town, parish or place, to which they be-
              long, shall transmit and return an Inventory of the polls and

                    * This act passed July 1, 1819.

Digitized from Best Copy Available

546                               FIRE ARMS.—PAPER.

## CHAPTER CLXII.

### An Act to provide for the proof of Fire Arms.

*Governor to appoint provers of gun barrels.*    SEC. 1. BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of the barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and num-

*Barrels to be marked and certificate given.*    ber every barrel by him so proved, and make, and deliver to the person applying to have the same proved, a certificate for each barrel proved, and found good in the form following:

I certify that on this     day of     A. D. 18     I proved for     , a musket, pistol, or rifle barrel, (as the case may be,) and which is numbered and marked as in the margin, and that the same is good and strong.

                 A. B. Prover of fire arms.

*Prover's fees.*    SEC. 2. *Be it further enacted,* That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty-five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not.

*Penalty for selling guns or pistols, not proved and marked.*    SEC. 3. *Be it further enacted,* That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act, he shall forfeit for each barrel so sold, the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who

*How recovered.*    shall sue for and recover the same, or by indictment to the use of the State.

*Penalty for altering marks or certificates.*    SEC. 4. *Be it further enacted,* That if any person shall falsely alter the stamp or mark or the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars, according to the nature and aggravation of the offence, for the use of the State.

[Approved March 10, 1821.]

——:o:——

## CHAPTER CLXIII.

### An Act regulating the packing and selling of Paper within this State.

*Paper made or offered for sale*    SEC. 1. BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That all paper, excepting

structures thereon and otherwise improve the same as may
be deemed expedient.

SECTION 5.   The power conferred by this act shall not *Power confined to furtherance of purposes for which organized.*
be exercised except in furtherance of the objects and purposes for which said corporation is organized.

SECTION 6.   This act shall take effect upon its passage.
*Approved March 12, 1884.*

---

AN ACT TO PROHIBIT THE SALE OF FIREARMS AND OTHER DANGEROUS WEAPONS TO MINORS. *Chap.* 76

*Be it enacted, etc., as follows:*

SECTION 1.   No person shall sell or furnish to a minor *Dangerous weapons not to be furnished to minors under fifteen.*
under the age of fifteen years, any firearms or other dangerous weapon : *provided*, that instructors and teachers
may furnish military weapons to pupils for instruction and
drill.

SECTION 2.   Whoever violates the provisions of this *Penalty.*
act shall for each offence be punished by fine not less than
ten nor more than fifty dollars.

SECTION 3.   All acts and parts of acts inconsistent *Repeal.*
herewith are hereby repealed ; but such repeal shall not
affect any prosecutions or suits now begun, nor prevent
the institution of any suit, prosecution or proceedings to
enforce penalties and liabilities already incurred under existing laws.                    *Approved March 12, 1884.*

---

AN ACT TO AUTHORIZE THE BOSTON YOUNG WOMEN'S CHRISTIAN *Chap.* 77
ASSOCIATION TO HOLD ADDITIONAL REAL AND PERSONAL ESTATE.

*Be it enacted, etc., as follows:*

SECTION 1.   The Boston Young Women's Christian *May hold additional real and personal estate.*
Association is hereby authorized to hold real and personal
estate, for the purposes set forth in its charter, to an
amount not exceeding four hundred thousand dollars
in value.

SECTION 2.   This act shall take effect upon its passage.
*Approved March 12, 1884.*

---

AN ACT TO PROVIDE FOR THE APPOINTMENT OF TRUSTEES BY *Chap.* 78
CHURCHES OR RELIGIOUS SOCIETIES IN CERTAIN CASES.

*Be it enacted, etc., as follows:*

SECTION 1.   Churches or religious societies may appoint trustees, not exceeding five in number, who shall *Trustees may be appointed by churches and religious societies.*
with their successors be a body corporate, for the purposes

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, JUDSON THOMAS,
COLBY CANNIZZARO, CAMERON PROSPERI,
THE GUNRUNNER, LLC, and FIREARMS
POLICY COALITION, INC.,

                             Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
Of Massachusetts, TERRENCE REIDY, in his
official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                             Defendants.

CIVIL ACTION
NO. 1:21-CV-10960-DJC

## EXPERT REPORT OF LINDSAY SCHAKENBACH REGELE

1.      I have been asked by the Office of the Attorney General of the State of

Massachusetts to prepare an expert report on safety standards and regulations of firearms before

the Civil War. This supplemental expert report and declaration ("Report") is based on my own

personal knowledge and experience, and, if I am called as a witness, I could and would testify

competently to the truth of the matters discussed in this Report.

2.      I have been retained by Office of the Attorney General for the Commonwealth of

Massachusetts to render expert opinions in this case. I am being compensated at a rate of $350

per hour.

3.      I am an associate professor of history at Miami University. I received my B.A.

from Connecticut College in 2006, my M.A. in history from Tufts University, and my Ph.D. in

history from Brown University in 2015. After receiving my Ph.D., I joined the faculty at Miami

University in Oxford, Ohio (I also took a postdoctoral fellowship after my first semester at Miami). I have taught history at Miami ever since. I have not provided written testimony as an expert witness on any previous cases.

      4.     My curriculum vitae is attached hereto as Exhibit A.

### Basis for Opinion and Materials Considered

5.     The opinion I provide in this report is based on my review of the First Circuit brief of *Granata, et al. v. Healey, et al.* and the amended complaint filed in this lawsuit; my review of the Approved Firearms Roster and the Attorney General's regulations, which require additional safety features; my research in the history of American firearms manufacturing and regulation. Additionally, my conclusions draw on a detailed review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report. For this report, I relied on firsthand knowledge I have gained over the past 15 years researching and writing three books (two published, one in progress) that all have to do with the production, sale, and use of firearms in the late eighteenth and first half of the nineteenth century. The first involved years of readings letters, business records, congressional debates and laws, at multiple branches of the National Archives (including all of the correspondence exchanged between the Springfield Armory and private gun contractors from the 1810s through the 1830s) and state and local historical societies.

6.     These documents, along with published historical scholarship on weapon manufacturing, warfare, and political economy have enabled me to recognize historical analogues in the case at hand. I cannot, however, be exhaustive in the primary sources I cite, because there is no single repository for information on gun manufacturing, regulations, and sales. Information is scattered throughout dozens of different archives, government publications, media, etc. New documentation and details regularly come to light, providing more accurate perspectives on historical gun access and production.

App. 120

## Introduction

7.    The following report first summarizes my opinion that the testing and standards required by Massachusetts law to appear on the Firearms Roster and the Attorney General's regulations have precedent in the regulatory standards and testing required by the federal government for firearms used by the U.S. military and state militia. It then gives a brief history of gun ownership, manufacture, and sales, followed by a description of the types of testing and their regularity. It concludes with a section that explains how, because of quality standards, the United States produced a robust surplus of guns and was considered the international leader in firearms production by the middle of the nineteenth century.

## Summary of Opinion

8.    The plaintiffs argue that the Firearms Roster and the Attorney General's regulations violate their Second Amendment rights; yet, the sorts of testing these regulations require are in many ways similar to the testing that the Ordnance Department, a branch of the War Department established in 1812 to acquire and produce weapons for the military, required of all weapons that were produced at the national armories and the armories of private contractors in the decades after the Second Amendment was ratified.[1] There is no historical precedent for the claim that safety regulations should not prevent weapons from reaching the hands of consumers. The majority of firearms in the early national United States were produced at the federal armories set up by the government in Springfield, Massachusetts and Harpers Ferry, Virginia, and the factories of government contractors, and all underwent regular inspection. This included proofing, a stress test that involves firing a deliberately over-

---

[1] "An Act for the better regulation of the Ordnance Department", February 8, 1815, 13th Cong., 3rd Sess., Ch.38, in Richard Peters, *United States Statutes at Large, Vol. 3* (U.S. Government Printing Office, 1846), 203-4.

4

pressurized round through a firearm to ensure it is not defective and will not cause harm by exploding. The process is similar to the handgun drop test and handgun performance test required by Massachusetts law. Armory superintendents received notices from the federal government announcing that the ordnance officers would "regulate the proof they shall undergo…either in person or by substitute visit to check regulations."[2]

9.    Rather than an unconstitutional hindrance to gun use, compliance with government regulations was considered normal, as evidenced by hundreds of letters exchanged between manufacturers and government employees. In some instances, the passage of inspections was specifically seen as a marker of quality. (For example, during the Latin American independence wars in the 1810s, purchasing agents for patriot forces noted a preference for, and paid more for, guns that bore the Springfield stamp, which indicated that it had been proved by an inspector appointed by the Ordnance Department.[3]) Inspections led to improvements in safety and quality which ultimately helped American gun manufacturers innovate and become the international leader in firearms production by the middle of the nineteenth century.

### A brief history of gun ownership and production in the early United States

10.    Originally, gun use for common defense in the United States owed more to Article 1, Section 8 of the Constitution--which gave Congress the power to support armies and

---

[2]"The Duties of the Officers of the Ordnance Department in relations to the national armories," Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[3] John Morton, Ordnance Department, to Roswell Lee, July 24, 1816, Box 1, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

provide arms for the militia--than it did to the Second Amendment. [4]  In accordance with its constitutional obligation, the federal government subsidized and improved arms manufacturing and expanded the market for guns. The Militia Act of 1792 required militia members to provide themselves with a musket, but many struggled to arm themselves in the face of post-war shortages.  To redress the shortages, Congress constructed two federal armories, and began to invest in private gun factories to supplement the armories' output.

11.      An Act of Congress in 1792 gave the president power to select two sites for the nation's federal armories. George Washington chose Springfield, Massachusetts and Harpers Ferry, Virginia. Production began at Springfield in 1795. Workers, under the oversight of a superintendent and two master armorers, repaired old arms and manufactured the nation's first public musket, known as the Model 1795 musket.[5] This .69 caliber flintlock was modeled after

---

[4] Most court cases regarding gun rights today focus on the Second Amendment, even though "the right to bear arms" was rarely invoked in the century after its passage. Not until 1846 did a court overturn a gun regulation based on the Second Amendment, Nunn v. State, 1 Ga. (1 Kel.) 243 (1846), and not until 1857 did the Amendment undergo debate in the Supreme Court, when the Court observed that if black men were citizens they would have the constitutional right to bear arms. Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857). Jurisdictional and scholarly contentiousness around the Second Amendment did not emerge until the 1960s, when an increase in gun violence, compounded by the assassinations of President John F. Kennedy, Martin Luther King, Jr., and Robert Kennedy, provided impetus for the passage of the Gun Control Act of 1968.  Following the original proposal of this legislation in 1963, the National Rifle Association lobbied for its defeat and the *American Bar Association Journal* published an essay on "The Lost Amendment," which advocated an expanded interpretation of the Second Amendment as an individual right. Since then, legal scholars, historians, and political commentators have debated whether the Amendment confers an individual, collective or civic right. Bliss v. Commonwealth of Kentucky 12 Littell 90 Ky. 1822. For most of the Amendment's history, however, the right to bear arms was considered as a collective militia right, rather than an individual one. STUART R. HAYS, "The Right to Bear Arms, A Study in Judicial Misinterpretation," 2 WILLIAM & MARY LAW REVIEW, 1959, at 381-406. ROBERT A. SPRECHER, *The Lost Amendment,* AMERICAN BAR ASSOCIATION JOURNAL, 1965, at 665-69. This essay won the 1964 Samuel Pool Weaver Constitutional Law Essay Competition. For an overview of the Second Amendment and constitutional law, see Carl T. Bogus, *Symposium on the Second Amendment: Fresh Looks,* 76 CHICAGO-KENT LAW REVIEW, 3-6 (2000), 3-6. Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship,* 55 THE WILLIAM AND MARY QUARTERLY, Jan. 1998, at 40. See also, SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2008), and MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY (2015).

[5] "ASP, Military Force, Arsenal, and Stores," December 15, 1795, Military Affairs, Vol. 1, no. 25: 108; JAMES B. WHISKER, THE UNITED STATES ARMORY AT SPRINGFIELD, 1795-1865 19 (1997).

the French Charleville, which became the standard U.S. musket until the War of 1812. Federal official realized it was important to establish some degree of standardization for weapons used by the military, and because many American soldiers were already familiar with the Charleville, and US officials considered it superior to other European guns, it seemed logical to make it the standard for newly manufactured arms.

12. Because production was slow at first—fewer than one thousand annually in the 1790s—the federal government subsidized production in private armories to supplement the federal armories in Massachusetts and Virginia.[6] But first, it had to develop an arms industry beyond its then-current existence as a small-scale craft industry. According to military histories, at the start of the American Revolution, the majority of guns in use were Brown Bess muskets from the British. The colonies produced some gunpowder and muskets, but had to rely on imports for the majority of their ordnance and ordnance stores. Congress preferred the musket to the rifle because few men were skilled in using or manufacturing the rifle, and the musket could fire more quickly and accommodate a bayonet. As the war progressed, the Continental Army had to rely on imported arms, especially the French Charleville Musket. [7]

13. Following the war, many weapons were in disrepair, and private producers had little incentive to increase output for a limited civilian market. Guns were not yet a collectible commodity; rather, households might own one gun for hunting and protection. Gun ownership was more common in rural areas among men with the means to purchase them (guns were

---

[6] ASP, "Armory at Springfield," Communicated to the Senate January 7, 1800, Military Affairs, Vol. 1, No. 37:130.

[7] Erna Risch, *Supplying Washington's Army* (Washington, D.C.: Center of Military History, 1981), 25, 347

Ronald, Hoffman and Albert, Peter J., eds. *Arms and Independence: The Military Character of the American Revolution* (Charlottesville: University of Virginia Press, 1984).

expensive items). The very fact that the Militia Acts of 1792 mandated that men in the militia be armed as part of their civic duty indicates that it was not a given that all able-bodied men owned guns.

14.     At that time, guns were generally handcrafted by skilled gunsmiths in small shops. While throughout the eighteenth and early nineteenth centuries the most established of these gunsmiths worked in Pennsylvania, some of today's biggest gun companies—Colt's Manufacturing Company LLC (Hartford, CT), Smith and Wesson (Springfield, MA), and Sturm, Ruger & Co., Inc., (Southport, CT)—have their roots in private armories in the Connecticut River Valley in New England where the government played an essential role in shaping arms development because of its proximity to the federal armory at Springfield, Massachusetts.

15.     Beginning in the 1790s, the government contracted with new manufacturers seeking to enter the industry. Eli Whitney, for example, had failed to profit from his cotton gin patent, but convinced several acquaintances in the executive branch that he could successfully manufacture arms and received a contract for 10,000 muskets, which included a cash advance, and funding for several storehouses on his property in New Haven, CT.[8] As Purveyor of Public Supplies Tench Coxe recognized, only advance-sum contracts could "excite and promote the small arms manufacturing and bring the business to settled form."[9] Money for these contracts became standardized under the Militia Act of 1808, which mandated thatCongress appropriate

---

[8] Henry Dearborn to Eli Whitney, February 25, 1803, Order Book, Letters Sent Regarding Procurements, Records of the Office of the Secretary of War, RG107, National Archives, Washington, D.C. Oliver Wolcott to Daniel Gilbert, September 8, 1798, National Archives and Record Administration: Post-Revolutionary War Papers, Record Group 45.

[9] [Tench Coxe?] Rough Draft of Letter to Secretary of War, November 5, 1807, Coxe Irvine Papers - Philadelphia Supply Agencies: Correspondence, Reports, Returns, Bill Accounts, Receipts, Vouchers and Contracts 1794-1842, Box 136, Records of the Office of the Quartermaster General, Record Group 92, Entry 2118, National Archives Building, Washington, D.C.

App. 125

$200,000 annually "for the purpose of providing arms and military equipments for the whole body of the militia of the United States, either by purchase or manufacture, by and on account of the United States".

16.    It is clear that government officials worried seriously about the nation producing enough weapons for the military. The Militia Act of 1808 repealed a prior regulation that restricted the number of workers at the armories to one hundred men. The same fears about a strong national military apparatus that motivated the Second Amendment's protection of militia rights motivated the federal government to earmark federal monies to arm state militia to ramp up production capacity of the national armies for the same purpose.

17.    For the three decades following the War of 1812, the War Department issued five-year renewable contracts that came with 10-20 percent cash advances, as well as a slate of requirements. All gun parts had to conform to federal standards and pass regular inspections. When the Ordnance Department became an independent bureau within the War Department during the War of 1812, its civilian purveyors were replaced with military officers who worked to standardize and improve weapon production.[10] An 1815 congressional act expanded the size and powers of the Ordnance Department. The armories maintained their civilian superintendent but were subordinate to the orders of the ordnance chief,  who had autonomy in establishing military depots, appointing master armors, coordinating supply, and overseeing the inspection of

---

[10] American State Papers, "Extension of the Ordnance Department," June 19, 1813, Military Affairs, 13th Congress, 1st Session, Vol. 1, No. 121: 336. Jerry Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law* (New Haven: Yale University Press, 2012). Raphael P. Thian, *Legislative History of the General Staff of the Army of the United States from 1775 to 1901* (Washington, D.C.: Government Printing Office, 1901), 579-81. Merritt Roe Smith, "Army Ordnance and the "American System" of Manufacturing, 1815-1861" in Merritt Roe Smith, ed., *Military Enterprise and Technological Change: Perspectives on the American Experience* (London: MIT Press, 1985).

all arms provided for the army and militia.[11] The system for distributing weapons to the militia varied by states, and most weapons became state property.[12] Ordnance officers took seriously their regulation and distribution of weapons for the military. In 1821, when "An Act to reduce and fix the military peace establishment of the United States" became law, and the Ordnance Department was merged into the Artillery Department, Ordnance officers protested that "the Controul [sic] exercised over the Army by this Department… is essentially necessary."[13] The congressional attempts to reduce personnel and administrative officers did little to diminish the autonomy with which the now-subordinate lieutenant colonel of ordnance carried out ordnance duties (the Ordnance Department was reestablished as a separate department in 1832).

18.     Following the War of 1812, ordnance officials instructed the superintendent of the Springfield Armory to figure out the "best means to be devised and adopted for bringing the manufacture of arms to a uniform standard and pattern in all of their parts." They requested that, "muskets given out as patterns from the armories be strictly alike…in order that the conditions of the contracts now entered into by this department be made conformably thereto."[14] The Ordnance Department mandated that all contract arms be examined by a government proof-

---

[11] "An Act for the better regulation of the Ordnance Department", February 8, 1815, 13th Cong., 3rd Sess., Ch.38, in Richard Peters, *United States Statutes at Large, Vol. 3* (U.S. Government Printing Office, 1846), 203-4.

[12] In accordance with the Militia Act of 1808: "all the arms procured in virtue of this act, shall be transmitted to the several states composing this Union, and territories thereof, to each state and territory respectively, in proportion to the number of the effective militia in each state and territory, and by each state and territory to be distributed, to the militia in such state and territory, under such rules and regulations as shall be by law prescribed by the legislature of each state and territory."

[13] Decius Wadsworth, "critique of Senate bill to combine Ordnance and Artillery departments," ca. 1821

[14] John Morton to Roswell Lee, November 14, 1817, Box 1, Target #2, Letters Received from Officials and Officers of the War and Treasury Departments, Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA (hereafter SA-LRO); John Morton to Roswell Lee, July 24, 1816, Box 1, Folder 7, SA-LRM.

master, who would verify that all "contractors' arms be equal to those produced at the national armories."[15]

## Historical Examples of Safety Regulations

19.    The first head of the Ordnance Department, Decius Wadsworth, established a coordinated set of standards for the federal armories and its arms contractors. He designed a timeline for achieving weapon uniformity, requiring the national armories to produce pattern muskets by 1815 and begin full-scale production of the "Model 1816" the following year.[16] Eventually, all armories machine-produced identical gun parts, a manufacturing characteristic known as "interchangeability."[17] Historians of technology have demonstrated that a factory needed to produce at least 1,000 guns per year to make interchangeable parts production worthwhile.[18] In the early nineteenth century, only the federal government was willing and able to devote the resources to this. Private makers frequently modified the models they made, which

---

[15] John Morton to Roswell Lee, March 4, 1818, Box 1, Target #2; George Bomford to Roswell Lee, June 1, 1823, Box 2, SA-LRO.

[16] The Springfield Armory complied successfully with this order; Harper's Ferry did not. Merritt Roe Smith, *Army Ordnance and the 'American System' of Manufacturing, 1815-1861*, in Merritt Roe Smith, ed. MILITARY ENTERPRISE AND TECHNOLOGICAL CHANGE: PERSPECTIVES ON THE AMERICAN EXPERIENCE  53 (1985).

[17] Older studies of small arms manufacturing offer exhaustive details about private and public gun production in early America.  In addition to MERRITT ROE SMITH, HARPER'S FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE (1977). See FELICIA JOHNSON DEYRUP, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 (1948); JAMES B. WHISKER, THE UNITED STATES ARMORY AT SPRINGFIELD, 1795-1865 (1997); JAMES B. WHISKER AND KEVIN SPIKER, THE ARMS MAKERS OF MASSACHUSETTS, 1610-1900 (2012).

[18] Joshua L. Rosenbloom, *Anglo-American Technological Differences in Small Arms Manufacturing*, 23 THE JOURNAL OF INTERDISCIPLINARY HISTORY 691 (1993). Also, U.S. troops used rifles and muskets, which were less precise and so could more easily be made by interchangeable manufacture. Robert A. Howard, *Interchangeable Parts Reexamined: The Private Sector of the American Arms Industry on the Eve of the Civil War*, 19 TECHNOLOGY AND CULTURE 649 (1978).

11

made interchangeability impractical.[19] Their civilian consumers had little desire for
interchangeable guns because they were unlikely to have multiple identical guns from which to
scavenge parts. Soldiers, on the other hand, needed to be able to change and repair defective
parts quickly in the field.[20]  Members of Congress recognized their obligation to contribute to
this objective. In his argument for the reestablishment of the Ordnance Department as an
independent bureau, for example, Representative Wiley Thompson of Georgia noted that,
"unparalleled gallantry would become an easy prey to a well equipped and well disciplined foe,"
if using weapons of "a variety of calibres."[21] Thompson's statement suggests that firearms
management was a cooperative, rather than oppositional, undertaking between government
officials and private producers, such as Whitney's armory, in the nineteenth century.

      20.     The federal government not only subsidized and standardized the construction of
firearms, it also regulated their safety. The frequency with which "inspection" and "proofing"
appear in the correspondence that the superintendent of the Springfield Armory received from
manufacturers speaks to the normality of these regulations. For example, from 1815 to 1830, the
subject of inspection comes up over 400 times in 135 pages of transcribed documents. It was
most frequently brought up in response to a manufacturer being ready for their arms to be
inspected and proved. For just one example, on August 30, 1816, Eli Whitney (of cotton gin
fame) wrote to the superintendent of the Springfield Armory, Roswell Lee, "I am instructed …to
let you know when I have 500 muskets ready for inspection – that you would send a person

---

[19] Howard, Interchangeable Parts Reexamined, 645.

[20] Robert A. Howard argues that private arms makers were more responsible for innovation in
interchangeable production than the federal armories. Howard, *Interchangeable Parts Reexamined*, 634, 646-648.

[21] UNITED STATES CONGRESS, Reports of Committees of the House of Representatives, 125-126
(1973).

immediately for this."[22] A letter from weapons inspector James Carrington in 1827 suggests that there were multiple rounds of inspections: he asked the superintendent if "condemned barrels" were "unfit to prove or have they proven defective in the course of inspection?"[23] Condemned barrels were considered unsafe and unreliable for military personnel to use and were discarded. Because the armories wanted to recoup losses, the discarded weapons might be sold for parts at auction, along with fully functioning firearms.

21.     Some of the guns that failed to meet military standards, but were still functional, were sold to individual merchants along with surplus inventory and often times these weapons and weapon parts were exported. In the early 1800s, the Napoleonic Wars created a shortage in international supply because the majority of the world's guns were still made in Western Europe. By 1810, the United States manufactured the vast majority of its own arms and was able to take advantage of this shortage. When Latin American colonies began declaring independence during the 1810s, imperialists and colonists alike turned to the United States, which now produced a surplus of gun parts every year, for weapon supply.[24] For example, soon after Venezuelan patriots established an independent junta in 1810, the Spanish Captaincy General of Venezuela gave a New York vessel the exclusive privilege of loading and shipping her cargo, which

[22] Eli Whitney to Roswell Lee, August 30, 1816, Folder 7, Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[23] James Carrington to J. Weatherhead, January 30, 1827, Folder 1, Box 13, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[24] Brian DeLay, "How Not to Arm a State: American Guns and the Crisis of Governance in Mexico, Nineteenth and Twenty-First Centuries," *Southern California Quarterly*, Vol. 95, No.1 (Spring 2013): 8-9. For surplus stock see John Morton, Ordnance Department, to Roswell Lee, Superintendent, Springfield Armory, July14, 1817. Box 2, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

13

App. 130

included weapons for the royal army.[25] The independent junta in the viceroyalty Rio de la Plata (present-day Argentina, Bolivia, Uruguay and Paraguay) was particularly solicitous in its arms requests and expressed a preference for government-inspected guns.[26] In general, Americans preferred to contribute to the independent movements, so as not to support imperial rule. But although no international law prevented the United States from providing guns to rebel governments, the U.S. government could not directly sell weapons to "rebels" because the official military provisioning of Spain's colonies would hinder diplomacy with Spain.[27] Civilian merchants offered a way around this challenge, a solution Thomas Jefferson had anticipated in 1793 when he declared that private persons be permitted to export arms to belligerents.[28] Jefferson's pronouncement became U.S. policy for most of the nineteenth century, and New England arms that were manufactured and inspected under government patronage, either by the federal armories or by private contractors, made their way to Mexico and South America. Nathan Starr, the owner of the nation's oldest private arms manufactory in Middletown,

---

[25] Robert K. Lowry to Robert Smith. 1 October 1810, *Despatches from U.S. Consuls in La Guaira*, *1810-1836*, RG59, National Archives. Washington: 1949. Microfilm, no. 84, roll 1.

[26] U.S. consul to Buenos Aires William Miller wrote to Secretary of State James Monroe in March of 1812 that the government in Buenos Aires wanted to ship a large amount of copper to Boston in exchange for arms. One year later, U.S. Consul Thomas Lloyd Halsey informed the Secretary of State of this government's desire to purchase 10,000 stands of arms Isaac Foster Coffin Journal 1820, Appleton Family Papers, Massachusetts Historical Society, Boston. William G. Miller to James Monroe, March 15, 1812, and Thomas Lloyd Halsey to James Monroe, May 3, 1813, U.S. Department of State, *Despatches from U.S. Consuls in Montevideo*, *1811-1837*, RG59, National Archives. Washington: 1944. Microfilm, no.M71, roll 1. John Morton, Ordnance Department, to Roswell Lee, July 24, 1816, Box 1, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[27] Elton Atwater describes the law of neutrality as a working set of agreements between nations regarding behavior toward belligerents, in *American Regulation of Arms Exports* (Washington, D.C.: Carnegie Endowment for International Peace, 1941), p.7, f.n.2. John Missall and Mary Lou Missall, *The Seminole Wars: America's Longest Indian Conflict* (Gainesville, FL: University Press, 2004), 52.

[28] In a note to British Minister at Washington George Hammond on May 15, 1793, Jefferson announced that the government would not prohibit the private sale of arms or contraband to belligerents. Atwater, *American Regulation of Arms Exports*, 8.

Connecticut, and contractor to Springfield Armory, for example, exported arms to Colombia following the War of 1812 to supplement his income.[29]

22.    One of the Springfield Armory's principal agents in Philadelphia was William Cramond, a merchant who had experience with South American commerce and ties to merchants in Buenos Aires and took advantage of the fact that surplus arms "were of little use to the United States" and that a "low price for them might induce a sale of the whole."[30] He was connected with Baltimore shipping firm D'Arcy and Didier, which dealt government arms both in Argentina and Mexico in 1815 and 1816.[31] In July 1815, Cramond received authorization from Captain John Morton of the Ordnance Department to negotiate a sale of arms with Lee. Cramond sent his agent George Hockley to purchase arms with a letter from the acting Secretary of War Alexander Dallas, who had approved the mode of payment so that "no delay in shipping

---

[29] Deyrup, *Arms Makers of the Connecticut Valley,* 46. Nathan Starr, Middletown, CT, to Roswell Lee, Superintendent, Springfield Armory, Washington, January 30, 1826. Box 12, Folder 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry 1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[30] Receipts, January 31, 1815 and August 16, 1814 William Cramond, *William Cramond receipt book 1814-1815*, Historical Society of Pennsylvania, Philadelphia, PA. D'Arcy and Didier did business with David Curtis De Forest who had established the first American commercial house in Buenos Aires in 1815. DeForest provided political cover and served as agent for privateering activities. Jeffrey Orenstein," Joseph Almeida: Portrait of a Privateer, Pirate & Plaintiff, Part II," *Green Bag 2d* 12 (2008): 36. William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, July 17, 1815. Box 1, Folder 9, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[31] "Memorial on Behalf of the Owners of the Schooner Highflier, Having a Claim on the Mexican Government Addressed to the Board of Commissioners under the Convention of the 11th of April, 1839 between the United States of America and the Mexican Republic," Case Number 24, Thomas Tenant, Case Files for Cases Heard, 08/25/1850-51, Record Group 76: Records of Boundary and Claims Commissions and Arbitrations, 1716-1994, National Archives, College Park, MD. Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

15

the arms may take place."[32] In a series of visits, Hockley negotiated with Lee for a fair price so that business could be done.[33]

23.     From his agents, Lee received information about Latin American markets that would enable him to make the best possible decisions about arms exports to improve armory sales. He knew, for example, that the sale of additional arms to Argentina would be advantageous. Cramond informed Lee that one agent in Buenos Aires had received favorable reports from purchasers of old Springfield arms in 1816.[34] Lee also knew that shorter barreled muskets "were in very high demand in South America" and were in fact favored over long-barreled ones. But in order to sell these weapons at a profit, the selling agent needed from Lee specific guarantees that they had been properly inspected by the Armory's inspectors and were found to be of good quality, "though probably not of the first quality," and that they were being sold only on account of the size of the barrel. He sent one letter for example that "certified that the 6696 stands of arms with barrels of 33 in long purchased of the US by William Cramond of Philadelphia were in all respects good new arms having been inspected, proved, and approved at the armory."[35]

---

[32] William Cramond, Philadelphia, to Roswell Lee, Superintendent, Springfield Armory, July 15, 1815. Box 1, Folder 4, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[33] See for examples, William Cramond to Roswell Lee, Superintendent, July 17, September 2, September 25, September 28, 1815 Superintendent, Springfield Armory, April 11, 1817. Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[34] William Cramond, Philadelphia, to Roswell Lee, Superintendent, Springfield Armory, November 6, 1816. Box 1, Folder 9, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[35] Roswell Lee, "Subscriber, the Superintendent of the Springfield Armory hereby certifies…" November, 1816, Folder 9, Box 1, Letters Received Miscellaneous. Records of the

App. 133

24.     Lee also had to inform the agent of the price difference between the two types, as short barrel muskets were not usually made for U.S. service.[36] This type of communication enabled Lee and his merchant to profitably dispose of muskets that had been made by accident by the armory's employees at the government's expense and could not be used domestically. Because selling agents alerted Lee to quality issues and preferences, and solicited production information for marketing purposes, government-inspected arms were received in Buenos Aires in "preference to others and at the highest price in the market."[37]

### Long-term impact of safety standards and regulations

25.     New kinds of inspections began in the 1830s. In response to weapon innovation and the emergence of new patent manufacturers, like Samuel Colt, Congress reevaluated the balance between private and public production for the military. Lawmakers asked military officers to conduct a series of experiments to compare the safety and effectiveness of firearms

---

Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[36] William Cramond, Philadelphia, to Roswell Lee Superintendent, Springfield Armory, June 12, 1817. Box 2, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[37] William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, November 6, 1816. Box 1, Folder 9, Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, and William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, April 11, 1817. Box 2, Folder 6, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA; For quality issues, see Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

App. 134

manufactured at both the federal armories and those of private contractors. The government would not agree to purchase weapons from new armsmakers without testing them first. Samuel Colt, for example, solicited government patronage in the 1830s, after patenting his first revolvers in 1836, and had to undergo tests in 1837 relating to celerity of fire, simplicity in construction, and extent of recoil, among others. The officers deemed the revolver "as wholly unsuited to the wants and exigencies of the service in the field. The board is of the unanimous opinion, that from its complicated character, its liability to accidents (one having occurred in practice on the 21st June) in the hands of soldiers, and other reasons which may be found in this report, that this arm is entirely unsuited to the general purposes of the service."[38]   In regards to the repeating guns made by John Webster Cochran (who had recently patented a turet revolver, a type of percussion handgun designed to get around Colt's patent [39]), they ruled that,

> "the slightest defect in the metal of the receiver would render it highly dangerous both to the bearer and to others in contiguous positions; and that such defects would frequently exist will not be doubted by mechanics whose experience every day convinces them of the many circumstances that serve to prevent a perfect union of parts in similar constructions; and even admitting original perfection in this important limb, it is nevertheless liable, from the effects of constant and severe service, to receive fractures or other injuries sufficient to destroy its character for safety, and render it more dangerous to the ranks it is intended to support and defend than to those of the enemy."[40]

---

[38] United States Congress, Report from the Secretary of War, transmitting the report of a board of officers appointed to examine the improvements in fire-arms, made by Hall, Cochran, Colt, and the Baron Hackett; in compliance with a resolution of the Senate of the 27th January, 1837. Read, and ordered to be printed (Washington, D.C.: publisher not identified, 1837), 10.

[39] David B. Kopel and Joseph G.S. Greenlee, "THE HISTORY OF BANS ON TYPES OF ARMS BEFORE 1900," *Journal of Legislation*, Vol. 50, no. 2 (May 2024), 272

[40] United States Congress, Report from the Secretary of War, transmitting the report of a board of officers appointed to examine the improvements in fire-arms, made by Hall, Cochran, Colt, and the Baron Hackett; in compliance with a resolution of the Senate of the 27th January, 1837. Read, and ordered to be printed (Washington, D.C.: publisher not identified, 1837), 9.

Safety was valued over novelty of design and the officers determined that they preferred the standard U.S. musket; they decided that there was "risk to the national safety by adopting new inventions without being convinced of their superiority."[41]

26.      Several years later, in 1840, a board of dragoon[42] officers met at the Carlisle barracks in Pennsylvania specifically to test Colt's improved repeating carbines and waterproof ammunition. They compared them to government contractor John H. Hall's carbines, for which he had secured a patent several years prior. The board conducted 10 experiments, an example of which involved the carbines [short rifles] "slung to a man mounted, who galloped rapidly for a mile, the piece swinging against the side of the horse." Colt's carbines held up well to rough use by the experimenters and were faster than Hall's—firing 18 rounds in 2 minutes, 45 seconds, to Hall's 8 minutes. They were less accurate, however, because although smoothbore barrels increased speed, their loads did not fit as tightly, which could decrease accuracy beyond short distances. Hall's carbines hit the target 87 times, to Colt's 69. Although the officers were impressed with the guns, they expressed concern that they were impractical for field use and that several features of the new revolvers caused safety risks, namely "the possibility of two or more chambers going off at the same time" and the "deafening sharpness…which must injure the hearing of those who use them."[43] In response to government feedback, Colt improved the safety and practicality of his firearms. For example, he implemented a loading lever so that the hammer

---

[41] ASP, "Report of the President of a Board of Officers on Improvements in Fire-Arms by Hall, Colt, Cochran, Leavitt, and Baron Hackett, as Compared with the United States Musket," October 3, 1837, 25th Congress, 1st Session, no. 743, 525-529.

[42] Dragoons were soldiers who were trained to fight as both cavalry and infantry.

[43] ASP, "Report from the Secretary of War, transmitting the report of a board of dragoon officers appointed to witness an exhibition of the repeating fire-arms and water-proof ammunition invented by Samuel Colt," 16 December 1840, 26th Congress, 2nd Session, no.14, 3.

rested on a safety pin situated between two caps, rather than on the cap itself, to prevent the weapon from firing unintentionally. He also made changes to guns with ramrods, which many men dropped in the loading process (the time lost often led to fatality), and attached the rammers to the body of the weapon.[44] Colt received a government contract for his improved carbines in 1841 and, when military need ramped up in 1846 due to the Mexican-American War, Colt sold additional weapons to the United States.[45]

27.    In 1851, Colt showcased his guns on an international stage when London hosted the Great Exhibition of the Works of Industry of All Nations in 1851 (aka the Crystal Palace Exhibition). While the United States' 534 exhibitors won a greater share of prizes than any other nations', Colt received especially high praise from Britain's Board of Ordnance for his revolving pistols. He was invited to give a talk on machine production of guns to the Institute of Civil Engineers, and soon after opened his London Armory, the first American factory in England (and visited by Prince Albert).[46]

28.    Colt testified before Parliament's Select Committee on Small Arms and noted how much stricter US inspection was. He said, "our American inspectors are more strict than what I have yet seen in England; give one hundred arms to an American inspector, made at any place you choose by contract in England, and more would be condemned out of them, even if

---

[44] Henry Barnard, *Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial* (New York: Alvord, 1860)*,* 166-68. For soldiers' difficulties reloading their guns in Florida, see "Scraps Preserved by N.M. for H.W.M.," April 3, 1840, HM4020, Merrill Collection, Huntington Library, San Marino, CA, and Jacob Neff, *The Army and Navy of America: From the Period of the French and Indians Wars to the Close of the Florida War* (Philadelphia, 1845), 610.

[45] Herbert C. Houze, "The Paterson Era," Elizabeth Mankin Kornhauser, ed., *Samuel Colt: Arms, Art, and Invention* (New Haven: Yale University Press, 2006), 56.

[46] Doron Ben-Atar, Trade Secrets: Intellectual Piracy and the Origins of American Industrial Power (New Haven: Yale University Press, 2004), 210-21; Henry Barnard, Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial (New York: Alvord, 1860),310, 352.

made expressly, than if you took the arms made by machinery.[47] Although it is common today to equate regulation with manufacturer opposition, Colt was not necessarily opposed to strict government standards.

29.    After all, the improvements he had made during the Second Seminole War (war dates 1835-1842), when mounted regiments used his revolving cylinder percussion-ignition rifles, appealed to the Texas Rangers, who purchased them during the 1840s, as well as to the Ordnance Department, which purchased 2,000 during the Mexican American War after Ranger captain Samuel Walker heartily endorsed them.[48] The revolvers received glowing reports from the battlefront, which Colt used in gun advertisements in the 1850s.[49] And the United States' system of regulated standardization appealed to people in England, facilitating the popularity of his guns and other American manufactures overseas. Britain's Board of Ordnance even decided to model its new national armory on the Springfield Armory and to stock it with American-made machinery.[50]

**Long-term Consequences of Quality and Safety Standards**

---

[47] Henry Barnard, Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial (New York: Alvord, 1860), 367

[48] M.L. Brown, "Notes on U.S. Arsenals, Depots, and Martial Firearms of the Second Seminole War," *Florida Historical Quarterly,* Vol. 61, No. 4 (April, 1983), 447. ASP, "Petition of Samuel Colt," December 12, 1848, 30th Congress, 2nd Session, No. 3: 1-3.

[49] For example, D.E. Twiggs, Florida war veteran and commander under both General Zachary Taylor and General Winfield Scott, endorsed them to Congress. David E. Twiggs to Thomas Jefferson Rusk, 21 April 1848, Connecticut Historical Society, *Samuel Colt's Own Record of Transactions with Captain Walker and Eli Whitney, Jr., in 1847* (Hartford, 1949), 84-5. Richard A. Dillio, "Samuel Colt's Peacemaker: The Advertising that Scared the West," *History of Media Technology,* 9 Dec. 2017.

[50] Hounshell, From the American System to Mass Production, 16-25.

30.    By 1840, U.S. output rivaled that of Great Britain and France and by 1865, the Springfield Armory was the largest arsenal in the world.[51] Once the federal armories could fill both immediate and reserve needs, and the Ordnance Department had met its goals of standardization, the regular letting of large advance-sum government contracts to private arms manufacturers ceased because the government no longer needed to nurture the industry.[52] The technological advancements the original contractors made manifested in the guns made by the patent arms firms that replaced them (like Remington and Colt), even as the manufacturers that had risen to prominence under federal patronage and spearheaded innovation struggled to adapt to new business models. [53] These private manufacturers were individuals who, but for government patronage, would not make guns. According to arms contractor Asa Waters, "if the patronage of the government is not continued, our factories will be worth but little."[54] They either ceased operations or downsized production and sold their guns to consumers elsewhere.[55]

---

[51] Paul A. C. Koistinen, Beating Plowshares into Swords: The Political Economy of American Warfare, 1606–1865 (Lawrence: University Press of Kansas, 1996), 76.

[52] Arms produced by the federal government were declared superior to solicitations from private firms. "Report of the President of a Board of Officers on Improvements in Fire-Arms by Hall, Colt, Cochran, Leavitt, and Baron Hackett, as Compared with the United States Musket," Communicated to the Senate October 3, 1837, 25th Congress, 1st Session, *American State Papers,* Military Affairs, Vol. 7, No. 743: 525.

[53] See for examples, Samuel Colt Contract for Furnishing Rifles, February 4, 1850 and E. Remington and Sons Contract for Rifles, November 21, 1851, Contracts for Ordnance and Ordnance Supplies, Volume 3, Records of the Chief of the Ordnance Department, Record Group 156, Entry 78, National Archives, Washington, D.C. For frustration with the cessation of contract payments, see Asa H. Waters to Eli Whitney, Jr., December 8, 1845, Octavo Volume 7, Letterbook 1837-65, Waters Family Papers, American Antiquarian Society.

[54] Memorial of Private Contractors to U.S. Congress, 1835?, Waters Family, Papers, 1749-1873, BoxW1, Folder 4 1835, AAS.

[55] Waters sold arms to Mexico in the 1840s. Asa H. Waters and Co. to Richard M. Jones, October 13, 1842, Octavo Volume 7, Letterbook 1837-65, Waters Family Papers, American Antiquarian Society.

22

App. 139

31.     During the Civil War the U.S. military purchased weapons from gun companies that had benefited from the technological improvements that came out of the Ordnance Department's system of rigorous testing. Of the 8 firearms companies that the military purchased most of its weapons from, all except one were located within 100 miles of the Springfield Armory (Remington was located in Ilion, NY, 250 miles away), a reflection of the technological hub that had emerged from the inspection system, as manufacturers and inspectors moved around the region.

32.     Although the financial relationship between manufacturers and the federal government changed by the middle of the nineteenth century, the system of testing and inspection that the Ordnance Department had standardized in the 1810s continued during and after the Civil War. Inspectors were stationed at manufacturing plants and armories and firearms were subjected to proof testing. Guns that passed these safety and quality tests were given an inspector's mark, as proof that they could be used safely and reliably by soldiers and citizens.

33.     In sum,  the sorts of testing required by the Firearms Roster and the Attorney General's regulations are in many ways similar to the testing that the majority of firearms produced in the United States underwent during the nineteenth century. Rather than violate second amendment rights, the regulations come from the same logic: a desire for citizen-soldiers to have safe, effective, and plentiful guns. The firearms industry owes its existence to government oversight, and this oversight was compatible with the Second Amendment. The federal government established two federal armories, which drove firearms production; it also provided advance sum contracts to manufacturers to enable them to devote time and resources to producing firearms for the army and militia. These contracts came with expectations to meet quality and safety standards. Additionally, even iconic American armsmakers like Samuel Colt,

App. 140

had their weapons subjected to safety tests, which ultimately influenced the type of arms produced and available for consumers.

September _____16, 2024

Lindsay S. Regele

_____
Lindsay Schakenbach Regele

# EXHIBIT A

**LINDSAY SCHAKENBACH REGELE**
Miami University, History Department, Room 254, Upham Hall, 100 Bishop Circle, Oxford, OH
45056
(508-733-2377)
regelels@miamioh.edu

**EMPLOYMENT**
Associate Professor of History, Miami University, 2021-; Director of Graduate Studies 2023-
Robert H. and Nancy J. Blayney Assistant Professor of History, Miami University, 2019-2022
Assistant Professor of History, Miami University, 2015-2021
      Affiliate of Global and Intercultural Studies (American Studies)

**EDUCATION**
Ph.D. Brown University**,** May 2015
      Dissertation: "Manufacturing Advantage: War, the State, and the Origins of American
      Industrialization, 1790-1840"
      Committee: Seth Rockman (Chair), Michael Vorenberg, Harold Cook, Mark R. Wilson
      (UNC Charlotte)
      Fields: Early America (Seth Rockman), Colonial Latin America (Robert Douglas Cope),
Early   Modern Information Networks (Harold Cook)
M.A., Tufts University, United States History, May 2009
      Thesis: **"**Foreign Policy by Whom? United States Citizens, the Press, and the Leander
      Expedition (1805-1810)"
      Committee: Reed Ueda (Chair), Peter Winn, Steven P. Marrone
B.A., Connecticut College, May 2006, History, *summa cum laude*, Phi Beta Kappa, Brown-
Brooks      Award (Female Scholar-Athlete), History Department Prize for Excellence in
      Latin American History

**PRIZES**
Finalist, Herman E. Krooss Prize for Best Dissertation in Business History, 2015
Walter Muir Whitehill Prize in Early American History, Colonial Society, for "From
Discontented  Bostonians to Patriotic Industrialists: The Boston Associates and the
Transcontinental Treaty,     1790-1825," 2011

**BOOKS**
*Flowers, Guns, and Money: Joel Roberts Poinsett and the Paradoxes of American Patriotism*
(The   University of Chicago Press, 2023).
*Manufacturing Advantage: War, the State, and the Origins of American Industry, 1776-1848*
(Johns Hopkins University Press, 2019).

**BOOK CHAPTERS**
"National Economies," invited chapter in *The Cambridge History of the American Revolution*,
eds.   Marjoleine Kars, Michael McDonnell, and Andrew M. Shocket (forthcoming with
Cambridge    University Press).

"United States Expansion and the Development of a National Firearms Industry," invited chapter in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law*, eds.    Darrell Miller, Jacob Charles, Joseph Blocher (Oxford University Press, 2023).

**JOURNAL ARTICLES**

"A Brief History of the History of Capitalism, and a New American Variety," and "A Response to the   Comments on Martial Capitalism," *Enterprise & Society*, Volume 25, No. 1 (March 2024): 2-26;   54-59.

Co-authored with Robert C. Ford, "When government is the solution: creating the arms industry in the   Connecticut River Valley in the 1800s," *Journal of Management History*, Vol. ahead-of-print No.       ahead-of-print (March 2024): 20pp. https://doi.org/10.1108/JMH-11-2023-0122

"Joel Roberts Poinsett and the Political Economy of the Nullification Crisis," *Journal of Southern        History*,        Vol. 89, No. 3 (August 2023): 453-482.

" 'Confidence': Private Correspondence in Daniel Parker's War Department, 1811-1846," *Journal of the  Early Republic* 41 (Spring 2021): 39-68.

"The Rise, Fall, and Rise of Exceptionalism: 250 Years of Bostonian Political Economy and Culture,"        *The New England Quarterly,* vol. 93, no. 2 (Jun. 2020): 238-245

"Guns for the Government: Ordnance, the Military 'Peacetime Establishment,' and Executive        Governance in the Early Republic," *Studies in American Political Development,* Vol. 34, no. 1    (April 2020): 132-147.

*A New Constitutionality for Gun Regulation,* 46 Hastings Constitutional Law Quarterly 523, 530 (2019).

"Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion," *Business        History Review* 92.1 (Spring 2018): 57–83.

"The World's Best Carpets: Erastus Bigelow and the Financing of Antebellum Innovation,"        *Technology & Culture* 59, no. 1 (January 2018): 126-151.

"Manufacturing Advantage: War, the State, and the Origins of American Industry, 1790-1840,"        *Enterprise & Society*, Vol. 17, Issue 4 (December 2016): 721-733.

"Schemers, Dreamers, and a Revolutionary Foreign Policy: New York City in the Era of Second        Independence, 1805-1815," *New York History* 94/3-4 (Summer/Fall 2013): 267-282.

"From Discontented Bostonians to Patriotic Industrialists: The Boston Associates and the        Transcontinental Treaty, 1790-1825," *New England Quarterly* 84 (September 2011): 377-401.

**BOOK REVIEWS**

Andrew C. McKevitt, *Gun Country: Gun Capitalism, Culture, and Control in Cold War America* (Chapel        Hill: University of North Carolina Press, 2023), *Business History Review* (forthcoming).

Michael A. Blaakman et al, eds., *The Early Imperial Republic: From the American Revolution to the U. S.        -Mexican War*. (Philadelphia: University of Pennsylvania Press, 2023), *Journal of American        History* (forthcoming).

Sharon Ann Murphy, *Banking on Slavery: Financing Southern Expansion in the Antebellum United States* (Chicago and London: University of Chicago Press, 2023), *Journal of Southern History*,        Vol. XC, no. 3 (August 2024): 613-614.

App. 144

Manuel Covo, *Entrepôt of Revolutions*: *Saint-Domingue, Commercial Sovereignty, and the French American Alliance* (New York: Oxford University Press, 2023), *The Americas* 80, no. 4 (Oct.  2023):636-638.

Edward P. Pompeian, *Sustaining Empire: Venezuela's Trade with the United States during the Age of Revolutions, 1797–1828* (Baltimore: Johns Hopkins University Press, 2022), *Business History   Review* (Winter 2023).

José Galindo, *Ethnic Entrepreneurs, Crony Capitalism, and the Making of the Franco-Mexican Elite*  (Tuscaloosa: University of Alabama Press, 2021) in *The Americas* Vol. 78, no. 4 (Dec. 2021): 18-  20.

Scott R. Huffard, *Engines of Redemption: Railroads and the Reconstruction of Capitalism in the New   South* (Chapel Hill: University of North Carolina Press, 2019), in *Business History Review* vol.    95, issue 3 (Mar. 2021): 582-584.

Priya Satia, *Empire of Guns: The British State, the Industrial Revolution, and the Conscience of a Quaker   Gun-Manufacturer* (New York: Penguin Random House, 2018), in *Business History Review*,     Vol. 94, no. 2 (2020): 436-439.

Emma Hart, *Trading Spaces: The Colonial Marketplace and the Foundations of American Capitalism*    (Chicago: University of Chicago Press, 2019) in *Enterprise & Society,* Vol. 22, no. 1 (March 2021):     285-288.

Manu Karuka, *Empire's Tracks: Indigenous Nations, Chinese Workers, and the Transcontinental    Railroad*     (Berkeley: University of California Press), in *Journal of Cultural Economy*, Vol. 13, no. 2  (2020):250-252.

Tyson Reeder, *Smugglers, Pirates, and Patriots: Free Trade in the Age of Revolution* (Philadelphia: University of Pennsylvania Press, 2019), in *H-Net Reviews* (Jan. 2020).

Naomi R. Lamoureaux and John Joseph Wallis, *Organizations, Civil Society, and the Roots of Development*   (Chicago, University of Chicago Press, 2017), in *Journal of the Early Republic* 39, no. 4 (Winter  2019): 788-791.

Johan Mathew, *Margins of the Market: Trafficking and Capitalism Across the Arabian Sea* (Berkeley:     University of California Press, 2016), in *Enterprise & Society* 19.4 (Oct. 2018): 1-3.

Joanna Cohen, *Luxurious Citizens: The Politics of Consumption in Nineteenth-Century America*     (Philadelphia: University of Pennsylvania Press, 2017), in *Business History Review* 91.2 (2017):414-416.

Rowena Olegario, *The Engine of Enterprise: Credit in America* (Cambridge: Harvard University Press), in *History: Reviews of New Books, 45.3* (2017): 61–62.

James Traub, *John Quincy Adams: Militant Spirit* (New York: Basic Books, 2016) in *H-FedHist, H-Net  Reviews* (July 2017).

Katherine C. Epstein. *Torpedo: Inventing the Military-Industrial Complex in the United States and Great     Britain* (Cambridge, Ma: Harvard University Press, 2014) in *Enterprise & Society* 17.1 (March  2016): 227-229.

David F. Ericson, *Slavery in the American Republic: Developing the Federal Government, 1791-1861*   (Lawrence: University Press of Kansas, 2011) in *Journal of Interdisciplinary History* 43.3  (Winter 2013): 495-496.

Eliga H. Gould, *Among the Powers of the Earth: The American Revolution and the Making of a New    World Empire* (Cambridge: Harvard University Press, 2012) in *New England Quarterly* 85.4  (December 2012): 764-767.

**OTHER PUBLICATIONS**

"Joel Roberts Poinsett: Namesake of the poinsettia, enslaver, secret agent and perpetrator of the 'Trail of        Tears,'" *The Conversation* (19 December 2023).

"Poinsettia Day, the Monroe Doctrine, and U.S.-Mexican Relations," *Origins* (December 2023).

"Celebrate Constitution Day by reading the Constitution," *Cincinnati Enquirer* (17 September 2023).

"Entertaining and Revolting: Homosociality and Heterosexuality in War Department Correspondence,        1811–1846," *Panorama: Expansive Views from the Journal of the Early Republic* (8 March        2021).

"Top Ten Origins: Gun Regulation," *Origins* (8 February 2019).

"Print-your-own gun debate ignores how the US government long provided and regulated firearms," *The Conversation,* (1 August 2018) [reprinted in *The Chicago Tribune* and other newspapers]

"Regulations, Not Rights: The History of Government Gun Culture in the Early Republic," *The Panorama: Expansive Views from the Journal of the Early Republic* (16 July 2018).

"Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion," *Cambridge        Core Blog*, (3 July 2018).

"Early National Bro Culture in Daniel Parker's War Department." *Common-place: the journal of early        American life* 17, no. 2 (Winter 2017).

"Guest Post: Lowell and the Executive," *The Junto: A Group Blog on Early American History* (August 2014).

**INTERVIEWS**

"The Author's Corner with Lindsay Schakenbach Regele" *The Way of Improvement Leads Home: A blog devoted to American history, religion, politics, and academic life* (3 January 2024).

"The checkered history of the poinsettia's namesake and the flower's origins get new attention," *The        Associated Press,* (20 December 2023) [reprinted in *The Washington Post* and others].

"Five Questions with Lindsay Schakenbach Regele, author of "Flowers, Guns, and Money: Joel Roberts        Poinsett and the Paradoxes of American Patriotism" *The University of Chicago Press Blog* (19 December 2023).

"Spectrum News 1 Special: Exploring American gun culture," *Spectrum News 1* (13 December 2023).

"Washington, DC Reborn" (TV interview), *If We Built It Today: Season 2, Episode 1* Science Channel,        (24 January 24 2021).

"Episode 298: Lindsay Schakenbach Regele, Origins of American Manufacturing," *Ben Franklin's        World- A Podcast about Early American History* https://benfranklinsworld.com/ (March 30,        2021).

"Episode 105: Manufacturing Advantage," Podcast, *Historically Speaking*, https://historicallythinking.org/episode-105-manufacturing-advantage/ (3 April 2019).


**REFERENCE WORKS**

"Industrialization," "South America," "Mexico," "Singer Manufacturing Company," "Levi Strauss &        Co.," "Immigration Quotas," "Tariff," in *America in the World, 1776 to the Present: A        Supplement to the Dictionary of American History.* 2 vols., ed. Edward J. Blum (Farmington        Hills, MI: Charles Scribner's Sons, 2016).

App. 146

Contributing Author and Research Assistant, *America's Changing Neighborhoods: An Exploration of Diversity Through Places*, ed. Reed Ueda (Santa Barbara, Calif.: ABC-Clio, 2017).

**FELLOWSHIPS AND GRANTS**

George Washington Presidential Library at Mount Vernon Fellowship, 2023-2024
Committee on Faculty Research (CFR), Faculty Research Grant, Miami University, 2023-2024
Richard & Mary Jo Marsh Fellowship, William L. Clements Library, 2023-2024
Kluge Fellowship, John W. Kluge Center of the Library of Congress, 2018-19, $12,600
Beveridge Travel Grant, American Historical Association, March, 2019, $800
Huntington Library, Robert L. Middlekauff Fellowship, 2017-2018
John E. and Winifred E. Dolibois Fund, Farmer School of Business, Miami University, 2017-2018, $2,500; 2016-2017, $2,800; 2015-2016, $2,000
Program in Early American Economy and Society Post-Doctoral Fellowship, Philadelphia, PA, January      2016-May 2016, $20,000
Hazeltine Fellowship for Graduate Research in Entrepreneurship, The C.V. Starr Program in Business,      Entrepreneurship and Organizations, Brown University, $5,000, 2014-2015
Karen B. and Hall J. Peterson Fellowship, American Antiquarian Society, $1,850, 2014-2015
A. Molho Graduate Travel Fund, History Department, Brown University, $750, 2014
Alfred D. Chandler Travel Grant, Business History Conference, $500, 2014
International Affairs Travel Fund Award, Graduate School, Brown University, $500, 2014
Program on the Study of Capitalism Research Fellowship, Institute for Global Law and Policy, Harvard University, $2,000, May-December, 2013
Marc Friedlaender Fellowship, Massachusetts Historical Society, $1,500, 2013-2014
John E. Rovensky Fellowship in U.S. Business or Economic History, $10,000, 2012-2013
Peter Green Doctoral Scholar Fellowship, Brown University, $4,000, 2011-2012
Colonial Dames of America Research Grant, $5,000, 2011
International Affairs Travel Grant, Office of Global Engagement, Brown University, $750 (for participation in      Rothschild Archive Summer School: The American Project, London, UK, Sept. 12-16, 2011)
Graduate Student Research Prize, Tufts University, $700, 2008

**CONFERENCES AND OTHER PRESENTATIONS**

"An Inauspicious Start to Putting the Monroe Doctrine into Practice: Joel Roberts Poinsett in Mexico, 1825-1830," at the annual meeting of the Society for Historians of American Foreign      Relations, University of Toronto, June 14, 2024
Invited presentation. "U.S. Interest in Mexico, 1820-1825," Center for the Study of American Democracy      at Kenyon College Political Economy Colloquium, March 27, 2024
"The Business of 19th Century Firearms: Roundtable," at the annual meeting of the Business History      Conference, Providence, RI, March 16, 2024
"Guns and Westward Expansion," invited presentation at the Current Perspectives on the History of Guns      and Society Conference, Wesleyan University Center for the Study of Guns and Society, Oct. 14,      2023
Discussant. Tracy Barnett, "Armed Patrols: Northeastern Industry and its Links to Southern Violence," Southern Historical Association Junior Scholars Workshop, September 2023.

30

"The Springfield Armory's Role in Creating the Tool and Die Industry," with Robert C. Ford (University    of Central Florida), Springfield Museums Lecture Series, Sept. 14, 2023
"A Reassessment of the Nullification Crisis," presentation at the annual meeting of Society of Historians    of the Early American Republic, Philadelphia, July 16, 2023
Chair and comment. "Politics and the State," Local Stories, National Narratives: A Conference in Honor  of John L. Brooke, The Ohio State University, June 3, 2023
"Joel Roberts Poinsett and Military Expenditures during "Indian Removal,"" invited presentation at      "Crafting Narratives of Empire:      Contesting Roots of Revolution in the Long 19th Century,"      hybrid conference, The Institute for Thomas Paine Studies Iona University, September 24, 2022
 "Race and Empire in the Executive: The Case of Joel Roberts Poinsett, Ambassador to Mexico, Secretary      of War, Enslaver, Land Speculator," invited panel presentation at the annual meeting of Society     of Historians of the Early American Republic, New Orleans, July 22, 2022
"The Disruption of the Nullification Crisis: A Reassessment," presentation on panel "Responding to      Shocks in the Pre-industrial World," at the annual meeting of the Business History Conference,    Mexico City, April 7, 2022
"Capitalism and the Militarization of Indian Removal," presentation on panel "Capitalism, Class, Race,   and Gender in the Second Seminole War," annual meeting of the Society of Historians of the      Early American Republic, virtual, July 16, 2021
"Federal Force, States' Rights and the National Good: Nullification Crisis, 1832-3 and Today," Ohio    Archives Month Lecture (Zoom), Oct. 1, 2020
"United States Expansion and the Development of a National Firearms Industry," invited participation in      Duke Historical Gun Law Conference, Duke Center for Firearms Law, virtual, June 19, 2020
""The U.S. Arms Trade in the Age of Latin American Revolutions, 1815-1825," with Andrew Fagal  (Princeton University), for panel: Strategic Responses to Geopolitical Conflict" annual meeting of      Business History Conference, March 13, 2020, Charlotte, NC, March 13, 2020 (presented in   absentia)
"Official Diplomacy and U.S. "Interest" in Mexico, 1825-1830" for panel: "Knowledge, Diplomacy, and      Laying the Groundwork for U.S. Commercial Empire in Mexico, 1821-1846" at annual meeting      for SECOLA (Southeastern Conference for Latin American Studies, March 5, 2010 Austin TX   (presented in absentia)
 "United States Expansion and the Development of a National Firearms Industry," invited participation in      Firearms Law Works in Progress Workshop, Duke Center for Firearms Law, August 2, 2019
"Joel Roberts Poinsett and the Making of Martial Capitalism," Kluge Center, Library of Congress,      Washington, D.C., July 9, 2019
"Joel Roberts Poinsett and Martial Capitalism in the Early Republic United States," Society for Historians      of the Early American Republic Annual Meeting, Cambridge, MA, July 19, 2019.
"How the National Firearms Industry Helped Make an Early Republic Empire," at "Making a Republic      Imperial" Conference, Library Company of Philadelphia, March 28, 2019
 "State Department Business: Joel Roberts Poinsett and Latin American Independence, 1811–1829," Business History Conference annual meeting, Cartagena, Colombia, March 15, 2019
"The Historical Scope of the Second Amendment," invited panelist, *Heller at 10: A Symposium on the  Last-and Next-Decade of the Modern Second Amendment*, Giffords Law Center and UC Hastings      College of the Law, San Francisco, CA, January 18, 2019

31

App. 148

"A Surplus of Arms: The U.S. Ordnance Department and the South American Independence Wars," Society of Historians of American Foreign Relations Annual Meeting, Philadelphia, PA, June 21,        2018

Discussant. "Commodities and Finance" at the Business History Conference Annual Meeting, Baltimore,        MD, April 7, 2018

Business History Conference luncheon, American Historical Association Annual Meeting, invited presentation, Washington, D.C., January 6, 2018

  "Industrial Manifest Destiny?" Territorial Expansion and American Weapon Improvement," American        Historical Association Annual Meeting, Washington, D.C., January 5, 2018

"Industrial Manifest Destiny?" Territorial Expansion and American Weapon Improvement," Society for        Historians of Technology Annual Meeting, Philadelphia, PA, October 28, 2017

Discussant. "Everyday Economies," Omohundro Institute for Early American Culture and SocietyAnnual Meeting, Ann Arbor, MI, June 16, 2017

 "Industrial Manifest Destiny?: American Manufactures and Territorial Expansion, 1838-1850," Business        History Conference Annual Meeting, Denver, CO, March 31, 2017

"Secret Foreign Relations: The State, the People, and the Leander Expedition," Omohundro Institute for        Early American Culture and Society Annual Meeting, Worcester, MA, June 26, 2016

"Managing New Markets: A Reinterpretation of the Rise of American Industrial Capitalism," Business        History Conference Annual Meeting, Portland, OR, April 2, 2016

"A Readiness for Violence: War Preparations in the Early Republic United States," American Historical        Association Annual Meeting, Atlanta, GA, January 10, 2016

"Who Benefits from Innovation?: Winners and Losers in the Antebellum U.S. Patent System,"        Business History Conference Annual Meeting, Miami, FL, June 27, 2015

"Manufacturing Advantage: War, the State, and the Origins of American Industry 1790-1840," Histories        of American Capitalism Conference, Cornell University, Ithaca, NY, November 8, 2014

"Manufacturing Advantage: War, the State, and the Origins of American Industry 1790-1840," Fellows'        Talk, American Antiquarian Society, Worcester, Mass., August 5, 2014

"Anywhere where we have diplomatic powers we can affect regulation": Managing New Markets in an  Age of Latin American Revolutions, 1810-30," Society for Historians of the Early American        Republic Annual Meeting, Philadelphia, July 19, 2014

"The Origins of the Military-Industrial Complex?: The Federal Government, Diplomacy and        American Industry, 1790-1840," Business History Conference, Frankfurt am Main,        Germany, March 14, 2014

 "Manufacturing Advantage: Boston Merchant-Industrialists and the Federal Government, 1790-1840," Massachusetts Historical Society, September 18, 2013

"'Anywhere where we have diplomatic powers we can affect regulation': Managing New Markets        in an  Age of Latin American Revolutions, 1810-30," Yale Early American Historians Seminar, April17, 2013.

"The Business of Diplomacy: The Boston Associates and the Transcontinental Treaty, 1795-1825," *Capitalism in Action*, conference hosted by the Political Economy of Modern Capitalism        Workshop, Harvard University, March 3-5, 2011

**TEACHING**

32

App. 149

Association of College and University Educators, Fostering a Culture of Belonging, Micro-credential, Oct. 29, 2023
Howe Center for Writing Excellence Faculty Fellow, 2017
Center for Teaching Excellence, New Faculty Teaching Excellence Program certificate: Fall, 2015
Courses Taught: HST111 Survey of American History; HST290 America and Global Capitalism (developed; taught cross-listed with both AMS and ITS); HST359 (Junior Honors Colloquium); HST362 Era of the American Revolution; HST363 History of the Early American Republic; HST400 Capstone: Histories of American Capitalism; HST4007 Honors Capstone; HST480 Independent Study-thesis writing); HST 604 Graduate Research Seminar II; HST670 Graduate Colloquium: Capitalism; HST677 Independent Study: Summer Thesis Research; Early America, The Early American State; Early American Naval History; America in the Age of Revolutions; Antebellum United States; American Liberalism; American Abolitionism and Social Reform; HST700 Thesis writing hours

PhD committee member:
Justin Chandler (English), "Imagined States: the rise of American Speculative Fiction," 2022
M.A. Theses advised:
Rachel Patterson, "The Haitian Revolution in the United States," ongoing
Elijah Walter, "The Federal Government and Early Ohio Development," ongoing
Haley Knuth, "Who Controls the Narrative? Newspapers and Cincinnati's Anti-Black Riots of 1829, 1836, and 1841," 2021
Heather Sommer, "Of Crimes and Calamities: Marie Antoinette in American Political Discourse," 2018
Daniel Melega, "From Suasion to Coercion: Temperance Reform and Prohibition in Antebellum Maine," 2017
M.A. Thesis committee member:
Zachary Cherry, "Inheritors of Struggle: Orienting German Schoolchildren to the Unrealities of War from 1933 to 1939," defended July 16, 2024
Laura Janosik, The History behind the Flying Pig: A Narrative of Urban and Rural Land in Nineteenth-century Ohio," defended April 12, 2023
Will Elgin, "The Itinerary of Jan Huygen van Linschoten: Knowledge, Commerce, and the Creation of the Dutch and English Trade Empires," 2021
Alessandra A. McLoughlin: "Love and Dishonor: Miami University and Slavery in the Antebellum Era," 2021
Amanda Lawson, "Development in the "Rights" Timing: The Carter Administration, Non-Government Organizations, and the United States' Latin American Foreign Policy," 2019
Edward Strong, "The Jaws of Mars are Traditionally Wide … and His Appetite is Insatiable": Truman, His Secretaries, and Interpreting National Security," 2019
Courtney Misich, "Social and Spatial Mobility in the British Empire: Reading and Mapping Lower Class Travel Accounts of the 1790's," 2017
Senior Honors Thesis advised:
Hope Nickel, "Cry 'Havoc!' and Let Slip die Hunde of War: The Fervor and Fight of German-Americans in the American Civil War," ongoing
Madison McQueen: "The Children Sang Freedom: Mothering and Childhood in the Antebellum South," 2023

App. 150

Tim Bredemeier: "Foundations of Fortune: An Examination of the Many Trials and Tribulations of Procter & Gamble's Formative Years," 2023
Andrew Wettrich: "Seeing the Stars in the Stars and Stripes: The Role of Astronomy in Early Nineteenth Century American Identity, 2023"
Alexa Lawhorn: "My Call to Labor for Souls": The Rise and Fall of Jarena Lee's Ministry in the Antebellum United States," 2022
Cole Schroeder, "The Blurring of Domestic and Foreign Policy: The Effects of the French Revolution and Continental Liberalism on Great Britain in the Early Nineteenth Century," 2022
Karli Schivitz, "The Economics of Prostitution during the Early Republic," 2020
Katie Rogers, "Romanticism in the American Revolution and Late 18th Century Courtship," 2020
Samuel Lutz, "The American Predicament: Legitimizing Power over Native Americans in the Early American Republic Era," 2019
David McDevitt, "Captives of Revolution: Hessian Prisoners during the American War of Independence," 2016
Senior Honors Thesis reader: Lyndsey Case (April 2021): "Biopolitics of AIDs: Framing Disease & Challenging Homosexual Marielito's Relationship to the State through United States Immigration Law, 1980-1990;" Peyton Rayburn (April 2021): "The Interconnections of Native American Revitalization Efforts in the United States: Native American Policy, Red Power, and The Myaamia Center;" Gillian Davis (April 2021): "A Sexual Reward: The Gendered Experience of French Women in the Allied Media following the Nazi Occupation, 1944-1945" (April 2021); Alissa Johnson, "Nuances In Black Women's Welfare Reform: A Study Of Settlement House Developments in Cleveland and New York City, 1890-1930" May, 2018; Kaylie Schunk "Unification through Opposition: America and the Myaamiaki Following the Seven Years' War," May, 2018; Luke Noe, "Jefferson Davis was the President of the Confederate States of America during the Civil War," May, 2017; Hannah Blubaugh, "The History of Trade and Diplomacy Between the Creek Indians and the British, 1733-1770," May, 2016

**DEPARTMENT/UNIVERSITY SERVICE**
Graduate Studies (History) Director, 2023-
Graduate Studies Committee, 2015-2017, 2022-2023
History Department Chair Search Committee, Fall 2023-
Ohio Seminar in Early American History Co-organizer, 2023-
History Honors Program Mentor, 2022-2023
Societies, Politics, Economies Faculty Research Group Co-chair, 2017-
Advisory Committee (History Department), 2016-2017, 2018-2019, 2020, 2023
Undergraduate Studies Committee (History Department), 2019
Speakers, Outreach, and Alumni Relations Committee, 2018-
Shriver Chair Search Committee (History Department), 2016-2017
Curriculum Committee (College of Arts and Science), 2017-2019
Global Studies Committee (Miami University), 2015-2016

**PROFESSIONAL SERVICE**
Book Reviews Co-editor, *Journal of the Early Republic*, 2021-
Co-organizer, Ohio Seminar in Early American History and Culture, 2023

NEH-Hagley Fellowship Selection Committee, 2023
Springfield Armory National Historic Site Education Committee, 2021-
Kerr Prize Committee (Business History Conference), 2019-2021, Co-Chair 2020-2021
Manuscript Referee (*Journal of Management Studies, Journal of the Early Republic*


**LANGUAGE**
Reading and translation ability in Spanish

**PROFESSIONAL ORGANIZATIONS**
American Historical Association
Business History Conference
Organization of American Historians
Society for Historians of the Early American Republic

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA, JUDSON THOMAS, COLBY CANNIZZARO, CAMERON PROSPERI, THE GUNRUNNER, LLC, and FIREARMS POLICY COALITION, INC., | |
| Plaintiffs, | CIVIL ACTION NO. 1:21-CV-10960-DJC |
| v. | |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth Of Massachusetts, TERRENCE REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, | |
| Defendants. | |

## EXPERT REPORT OF BRENNAN RIVAS

### Background & Qualifications

1.      I am a historian and currently work as a Senior Postdoctoral Researcher at the

Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut.

During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The

Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of

Southwestern America within the Clements Center for Southwest Studies at Southern Methodist

University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian

University (TCU). My educational background includes a Ph.D. in History from TCU, where my

dissertation was on the development, evolution, and enforcement of gun and weapon policy in

Texas from the era of Mexican independence to the 1930s.

1

2.      My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the Southwestern Historical Quarterly, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the UC Davis Law Review. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

3.      I have provided expert witness declarations or reports in the following cases: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22 cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D.N.Y.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a Jones v. Bonta); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Md.); *Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield Cnty., Ohio); *Schoenthal v. Raoul*, No. 3:22-cv-50326

(N.D. Ill.); *May v. Bonta*, No. 8:23-cv-01696 CJC and No. 1:23-cv-01798 CJC (C.D. Cal.); *State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08 (Sup. Ct., Cowlitz Cty., Wash.); *California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D. Cal.); *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.); *Hartford v. Ferguson*, No. 3:23-cv-5364 (W.D. Wash.); *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. K23C-07-019 RLG (Sup. Ct., Del. St.); *Lane v. James*, No. 22 Civ. 10989 (KMK) (S.D.N.Y.); *City of Columbus v. State of Ohio*, No. 23-cv-3555 (Com. Pleas, Franklin County, OH); *O'Neil v. Neronha*, No. 1:23-cv-00070, D. R.I. I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.), and I have been deposed in *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.), and *O'Neil v. Neronha*, No. 1:23-cv-00070 (D. R.I.).

4.      I am being compensated by the Massachusetts Office of the Attorney General at a rate of $200/hour for document review and consultation, $250/hour for research, $300/hour for writing and editing materials, and $350/hour for deposition, testimony, and related activities.

5.      My curriculum vitae is attached hereto as Exhibit A.

**Methodology**

6.      This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous, peer-reviewed scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have supplemented that with additional research into the development of firearms, cartridges, and magazine technologies during the late nineteenth and early twentieth centuries. I

3

App. 156

have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

## Summary of Opinions

7.      This report is divided into three parts but its general purpose is to provide important historical information relative to a challenged Massachusetts statute that restricts the commercial sale of certain kinds of handguns in the name of public safety. There are relevant historical analogues from the nineteenth century where states exercised regulatory power over weapons in the name of public safety and public health. The significance and relevance of these analogues should be evaluated in accordance with the standard professional practice of historians—seeking to understand them on their own terms and as a part of an American past that is in many ways foreign to our present. A review of regulatory practices and philosophy of the nineteenth-century shows that public health was a crucial part of state and local governments' mission, and the analogous laws presented here should be interpreted with that fact in mind.

8.      The first part of this report introduces, explains, and contextualizes a series of historical weapon laws that are analogous to the challenged statute in some way. The closest analogue is the historical Massachusetts policy of state-mandated "proving" of firearm barrels. Other regulations in the United States placed restrictions upon the sale, possession, and/or manufacture of certain weapons or related substances (like gunpowder or fulminates) on the basis of their inherent danger. These include gunpowder regulations, restrictions upon the sale or manufacture of toy pistols, slung shots, bowie knives and pocket pistols. Some of these policies

4

took a form similar to portions of the challenged law by distinguishing between which firearms or handguns were legally salable and which were not. Taken together, this series of historical weapon restrictions demonstrates a longstanding tradition of regulating weapons and their accessories in the name of public safety. Most of these laws avoided constitutional challenge, and those that did were generally upheld by state appellate courts at the time. The historical analogues presented in this section illustrate the scope of the regulatory police power exercised by state and municipal governments to ensure public safety and provide for the common good; they rest comfortably within the American regulatory tradition.

9.      Moving on from historical analogues, the second part of this report focuses on historical process, methods, and ethics. The analogous historical laws called for by the *Bruen* framework are not readily available to researchers. Though many are contained within the Duke Repository of Historical Gun Laws, far more are locked behind the paywalls of keyword-searchable databases like Hein Online. Often scattered and buried within different kinds of legislation, weapon-related laws can be hard to find even for the researcher who knows exactly what she is looking for. To make matters more complicated, some pertinent regulations were enforced by private entities, municipal records are often not digitized, and countless pieces of evidence from the historical record remain undigitized or have not been preserved at all. These primary sources should be interpreted in accordance with the academic and ethical standards of the historical profession, which equips its practitioners to weigh evidence (or the absence of it) in a way that does justice to the past.

10.     The third and final part of this report discusses nineteenth-century notions of the police power, showing that strict regulations in the name of public health and public safety affected the use, sale, transportation, and manufacture of firearms and/or ammunition. Thus, the

historical record shows that—even though an identical law did not exist in the nineteenth

century—laws with similar policy contours did. Importantly, laws designed to protect the public

safety, promote public health, and protect marketplace consumers filled historical statute books,

and some of those applied to firearms.

### Historical Regulations of Weapons & Related Materials for Public Safety

11.    This first part of the report describes a series of historical laws that are similar in

one way or another to the challenged statute. The first subsection presents laws that regulated the

manufacture of firearms as well as the storage, sale, manufacture, and/or transport of gunpowder

on the basis that they were inherently dangerous by their very nature. The second presents four

types of weapons that were subject to restriction because they had features or functions that

made them especially dangerous or deadly: slung shots, toy pistols, bowie knives (and other

fighting knives), and trap guns (also known as spring guns). These are merely examples and do

not comprise an exhaustive list. Finally, a section about pistol sales restrictions demonstrates that

nineteenth-century lawmakers had the authority to distinguish between those handguns that were

safe and appropriate to be sold to the public versus those that were not.

*Inherent and Essential Danger*

12.    The following historical regulations targeted specific items or products on the

basis of their inherent danger to life and wellbeing. They include proof laws for firearm barrel

production, and laws surrounding the manufacture, storage, sale, and transportation of

gunpowder and explosive material.

<u>Proof of Firearms</u>

13.    The historical laws most closely analogous to the challenged statute are so-called

"proving" laws that set state-required standards upon the manufacture of firearm barrels. The

process is as old as the gun manufacturing trade itself, and in early modern England rules were in place for testing the strength of barrels before placing them in the hands of soldiers or militiamen.[1] The English were by no means the only power to put their firearms through a proof process. The French government did as well by proving barrels in addition to gunlocks.[2] Moreover, during the French Revolution gun inspectors' authority expanded to include not only privately made firearms destined for French military service, but gun barrels made for civilian markets as well (including the thousands of pistols produced there annually).[3]

14.     In Massachusetts, laws from 1805 and 1814 delineated a process for appointing barrel provers, charging them with responsibility for evaluating the safety of the barrels, and stamping them to signal whether they had passed proof.[4] Maine enacted a similar law in 1821.[5]

---

[1] Priya Satia, Empire of Guns: The Violent Making of the Industrial Revolution (New York: Penguin Press, 2018), 28-31, 38;  J. N. George, English Guns and Rifles: Being an Account of the Development, Design and Usage of English Sporting Rifles and Shotguns (Harrisburg: The Stackpole Company, 1947), 35-36, 66.

[2] A gunlock is "The firing mechanism on a small arm," consisting of such smaller parts as the tumbler, sear, and spring. It is fitted within a lockplate present on the side of a firearm. See *Firearms: An Illustrated History* (New York: DK Publishing, 2014), 310 (glossary, including terms "gunlock" and "lockplate.").

[3] On French traditions of gun inspection, barrel proofing, and lock testing, see Ken Alder, *Engineering the Revolution: Arms and Enlightenment in France, 1763-1815* (Princeton: Princeton University Press, 1997), 169-175 ("The central authorities justified state involvement in civilian gun production by pointing to the need to control the possession of an artifact so disruptive to the public safety and public order."). On the proof process in Europe and the United States generally, see Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 473-477.

[4] 1805 Mass. ch. 35, "An act to provide for the proof of fire arms manufactured within this Commonwealth"; 1814 Mass. ch. 192, "An Act in addition to an act, entitled 'An act to provide for the proof of Fire Arms, manufactured within this Commonwealth'."

[5] Maine, *Laws of the State of Maine* (Hallowell: Glazier, Master & Co., 1830), 546, ch. 462, "An Act to provide for the proof of Firearms," approved 1821.

Notably, these laws applied to firearms manufactured for civilian sale, and left those produced on behalf of the War Department to the appropriate oversight of military and ordnance authorities (who had their own standards and procedures for proofing).[6] In Massachusetts and elsewhere, firearm factories and powder mills were subject to police regulations that ultimately excluded them from residential areas to protect local populations against exposure to noxious odors, incessant noise, and potential fires or explosions.[7] In Burlington, Iowa, for instance, an ordinance gave local government the authority to designate where "shooting batteries" (likely test firing facilities or gun ranges) could be located within town limits, and reserved the right to erect them to authorized gunsmiths only.[8]

Gunpowder & Explosive Materials

15.    While these state-backed proving laws preponderated in New England, where advanced gunsmithing and barrel production had deep roots, gunpowder regulations stretched across the country.[9] In fact, so many laws and regulations applied themselves to gunpowder that

---

[6] On the exceptions within the Massachusetts proving laws for firearms made at Springfield Armory, or made as part of a government contract, see Billy Clark, "'Proven' Safety Regulations: Massachusetts 1805 Proving Law as Historical Analogue for Modern Gun Safety Laws," 108 Minn. L. Rev. Headnotes 327 at 342-345.

[7] See below section titled "Consumer Protection as Public Safety."

[8] Charles Ben Darwin, *Ordinances of the City of Burlington, with Head Notes and an Analytic Index* (1856), 149-150 (repeating an 1841 ordinance), available at the Duke Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/chas-ben-darwin-ordinances-of-the-city-of-burlington-with-head-notes-and-an-analytic-index-page-149-150-image-149-150-1856-available-at-the-making-of-modern-law-primary-sources, accessed August 14, 2024.

[9] On the significant distinctions between gunsmithing as the forging of original parts versus gunsmithing as the assembly of premade parts, versus gunsmithing as carrying out routine repairs and maintenance, see Brian DeLay, "The Myth of Continuity in American Gun Culture," 113 Cal. L. Rev. 101. Barrel-making was a rare skill in the early nineteenth century, but knowledge of the requisite process and access to the requisite materials preponderated in New England.

it is beyond the scope of this report to recount or cite them all.[10] Suffice it to say that gunpowder (and fulminating powders) were subject to regulation on multiple fronts. A 1794 Pennsylvania law laid out rules for storing and testing the strength of gunpowder—all to protect "the purchaser and consumer…against fraud and imposition" of "inferior" gunpowder.[11] Local sanitation and hygiene ordinances kept powder mills and stockpiles on the outskirts of settled areas, far from populated cities. New York City's 1872 health code provided that no "establishment or place of business…for carrying on any offensive or noisome trade or business, shall hereafter be opened, started, or established…without a permit… ."[12] Citing *Kent's Commentaries*, the document elsewhere provided as a "remedy for nuisances" that "Unwholesome trades…the deposit of powder…the building of combustible materials…may all be interdicted by law, in the midst of dense masses of population, on the general and rational principle, that every person ought so to use his property as not to injure his neighbors, and that private interests must be made subservient to the general interests of the community."[13] The notable absence of gunpowder in American cities even served as a rhetorical tool for Roger Taney in his argument before John

---

[10] Laws pertaining to gunpowder are some of the most common in historical statute books, session laws, and municipal codes. See the "Manufacturing, Inspection and Sale of Gunpowder and Firearms" category within the Duke Repository for Historical Gun Law, which identifies 140 relevant laws enacted by colonial, state, or municipal governments. https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, accessed August 15, 2024. On gunpowder regulation, see also Saul Cornell and Nathan DeNino, "A Well-Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73 (November 2004), 510-512.

[11] 1794 Pennsylvania ch. 337, "An Act providing for the Inspection of Gun-powder."

[12] New York City, Manual of the Board of Health, of the Health Department of the City of New York (New York: D. Appleton & Company, 1872), 61, § 74. Hereinafter referred to as New York Board of Health Manual.

[13] *New York Board of Health Manual*, 170-171 (citing 2 Kent's Com., 420).

Marshall in the case *Brown v. Maryland*. He posited that the overturning of a commercial regulation would pave the way for the indiscriminate and reckless sale of "large quantities of gunpowder in the heart of a city and thus endanger the lives of the citizens."[14] Marshall's opinion did overturn the challenged law, but in doing so defended states' exacting regulations on gunpowder, finding the enterprise well within the police powers that protected public safety.[15]

16.    In addition to restrictions upon the location of powder mills and storage facilities, the sale and transportation of gunpowder was also subject to strict regulation, at times spelled out in tremendous detail. The states who, as John Marshall explained, wielded the police power to "direct the removal of gunpowder" were also authorized to delegate the policing of gunpowder and explosive materials to municipal governments better situated to create and administer policies that worked for a particular community. For this reason, city charters often included recognition that city officials could regulate the sale, storage, and transportation of gunpowder— often by requiring licenses for dealers or manufacturers.[16]  Nebraska's legislature gave all cities of the first class (with class designations being predicated upon a population threshold) "power to license…all venders of gun powder…and in granting such license may exact and receive such

---

[14] *Brown v. Maryland* 25 U.S. 419 (1827); see also William J. Novak, *The People's Welfare: Law & Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1996), 53-54.

[15] Idem.

[16] For examples, see 1845 Iowa ch. 122, § 12 ("That the said city council…shall have power to regulate by ordinance the keeping and sale of gun-powder within the city."); 1847 Indiana ch. 55, § 8.4 ("The common council…shall have power for and within the city…To regulate and license…the keepers of gun powder and other explosive compounds, and in all these cases to charge and receive for such license such sum as the common council may ordain."); 1849 Ohio 406, § 4 ("That the said town council of Ripley shall have power to ordain and establish laws…to regulate the sale of gunpowder therein… ."). These are merely examples, they do not form an exhaustive list.

App. 163

sum or sums of money as the Council shall think fit and expedient."[17] America's largest cities, though, prescribed detailed rules and regulations for the storage, sale, and even transportation of gunpowder. Chicago's 1851 ordinance contained seven sections laying out the process of applying for a gunpowder permit, how and when such permits must be renewed, how gunpowder and gun cotton could be transported, and specifying penalties for violators. Importantly, the ordinance forbade not only the sale of such products "in any quantity," but also the possession of it and the giving of it to others.[18] New York City similarly levied special rules upon anyone who would "manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, nitro-glycerin, dualin, or any explosive oils or compounds…except…upon the conditions herein provided… ." Permitted dealers could keep on hand no more than fourteen pounds of gunpowder at any one time.[19] City officials further held the right to enter "all buildings, dwelling-houses, livery and other stables, hay-boats, or vessels, and places where any merchandise, gunpowder…or other combustible materials may be lodged… ."[20]

*Unusually Dangerous*

17.     The essential, inherent danger of firearms and gunpowder justified state and municipal regulation of their manufacture, sale, and storage. But firearms and gunpowder were

---

[17] 1869 Nebraska 53, § 47.

[18] "Regulating the Keeping and Conveying Gun Powder and Gun Cotton," *Ordinances of the City of Chicago*, available at Duke Repository of Historical Gun Laws. See esp § 1, "That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing… ."

[19] The ordinance did not specify how much could be had or kept by persons not engaged in the business of selling gunpowder. See Mark Ash, *The New York City Consolidation Act, as in Force in 1891* (Albany: Weed, Parsons and Company, 1891), 209-210.

[20] Ibid., 214.

App. 164

also recognized as necessary devices for communal defense, militia preparedness, hunting, and other purposes. There were, however, some devices and weapons deemed especially dangerous without providing the kinds of social benefits bestowed by firearms-access on the part of the public. These unusually dangerous weapons were, therefore, subject to the unmitigated policing of government in the name of public safety. In other words, they could be taxed at prohibitive rates and even banned altogether. This report addresses four such weapons: slung shots, toy pistols, bowie knives (along with other fighting knives), and trap guns (also known as spring guns). There are numerous other such weapons that became subject to strict regulation during the eighteenth and/or nineteenth centuries, such as metal knuckles, and sword canes.[21] This section of the report, therefore, is not exhaustive in its presentation of historical laws that regulated certain unusually dangerous weapons.

Slung Shots

18.    A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was a weapon in which a weighted ball could be swung from a cord or handle in a striking motion. The Oxford English Dictionary defines it as "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon," and attributes it to the United States.[22] The phrase could describe various kinds of homemade weapons and did not have a single, nationwide definition. A commenter from the South during the 1870s described a slung shot as being "made by putting stones in

---

[21] For an overview of some of these additional weapons and their regulation, including trap guns, see Robert Spitzer, "Understanding Gun Law History after *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51, no. 1 (2023), 57-115.

[22] "Slung-shot," Oxford English Dictionary.

App. 165

woolen stockings."[23] Around the same time, a Native American "war-club" was also referred to as a type of slung-shot with "the stone ball hanging loosely from the handle in a bag of buckskin."[24] Testimony in a Texas trial (1908) offered an explanation of the slung shot's use and deadliness. "The only slung shot I ever saw was by having a ball of shot or metal covered with leather, and a band of elastic or leather, attached to such a ball, and made so that the same could be attached to the wrist or arm of a person[.] . . . [A]nd, when a person using them would strike with his fist, the ball or weight would extend beyond his fist and strike a person, and, by being covered, would cause no sound."[25]

19.      Unlike firearms and knives, which required specialized knowledge and equipment to manufacture, a slung shot could be made by just about anyone. Slung shots and other club-like instruments also had no military function, unlike rifles and muskets conducive to militia service, or the large "horse pistols" used by cavalry. Beginning in the 1840s, laws prohibiting the carry, use, and manufacture of slung shots began to appear in numerous states. In 1849, Vermont's legislature passed a law saying, "Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of a misdemeanor."[26] The law went on to punish carrying, using, attempting to use, and

---

[23] Quoted in Richard Hopwood Thornton, An American Glossary: Being an Attempt to Illustrate Certain Americanisms Upon Historical Principles, 2 vols. (London: Francis & Company, 1912), II: 815.

[24] Otis T. Mason, "American Indian Weapons," *Nature* (June 10, 1875), 107-108, Fig. 2.

[25] *Geary v. State*, 53 Tex.Crim. 38 (1908).

[26] 1849 Vermont ch. 36, 26 § 1.

App. 166

being "found in the possession of" a slung shot as a felony.[27] Similar laws went into effect in

New York (1849), Massachusetts (1850), Florida (1868), Dakota Territory (1883), Minnesota

(1885), and Oklahoma Territory (1890) among others.[28]

<u>Toy Pistols</u>

20.     Another item which came under heavy regulation during the nineteenth century

was the toy pistol. Deceptively named, this device was exceptionally deadly even though it was

ostensibly designed for childhood amusement and play. The label "toy pistol" embraced a

number of different devices, some of which were essentially miniaturized guns. But the kind that

elicited the strongest public condemnation was made of cast iron, measuring about four inches in

length with a two-inch barrel. The breech-loading device could break open via a spring

mechanism, or it could feature a rotating barrel (like a revolver). In the post-Civil War period,

---

[27] 1849 Vermont ch. 36, 26 § 2.

[28] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list.

numerous patents for toy pistols were filed, and many thousands of them were produced and sold

within American communities over the ensuing decades.[29] An estimate from 1883 was that

50,000 toy pistols were sold to toy dealers over the preceding Fourth of July.[30] The style,

manufacture, and design of toy pistols were quite similar to real pistols, so their emergence in the

1860s and later may have been a way for gun-makers to turn a profit once the US Army and

Navy slowed their orders following the end of the Civil War.[31] Most toy pistols appear to have

been made as a 22-caliber firearm designed to shoot blank 22-caliber short rounds, though live

rounds could easily be substituted for the blanks.[32]

---

[29] The index for U.S. patents (1790-1873) lists dozens under headings like toy-gun, toy-pistol, toy cannon, toy breech-loading fire-arm. Most of these are dated to the 1860s and early 1870s, showing that they were new phenomena at that time. See *Subject-Matter Index of Patents for Inventions issued by the United States Patent Office from 1790 to 1873, Inclusive*, 3 vols. (Washington: Government Printing Office, 1874), III: 1559-1560. A report from 1883 states that "it is claimed that nearly 50,000 of these toy pistols were sold to toy dealers for the last Fourth of July."

[30] Arthur Hazlewood, "Remarks on Toy Pistols," Proceedings and Addresses at a Sanitary Convention Held at Pontiac, Michigan, April 26 and 27, 1883, Under the Direction of a Committee of the State Board of Health and a Committee of Citizens of Pontiac (Supplement to the Report of the Michigan State Board of Health for the Year 1883 No. 198 (Lansing: W. S. George & Co., 1883), 90.

[31] Catie Carberry, "The Origin of Toy Guns in America," *Second Thoughts Blog*, Duke Center for Firearms Law, Duke University (July 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/ (citing *CNN* and *Collector's Weekly* that "modern toy guns were produced in an effort by gun factories to stay in business after demand dropped at the conclusion of the Civil War," and that "the modern history begins with the cap gun, invented by shotgun manufacturers who retrofitted their factories in the settling smoke of the Civil War.").

[32] On the caliber of toy pistols, see Paul A. McIlhenny, "The Deadly Toy Pistol and Its Relationship to Tetanus," *Society Proceedings – Orleans Parish Medical Society, Meeting of April 11, 1903* reproduced in *New Orleans Medical and Surgical Journal, July 1902 to June 1903* (New Orleans: The L. Graham Co., Ltd., 1903), 744. A useful description of the toy pistol and its potential dangers can be found in "A Warning to Parents. The Toy Pistol," *Hartford Daily Courant* (Hartford, Connecticut) July 21, 1881, 1, reprinted from *New York Sun*.

21.    Toy pistols elicited a strong, condemnatory response from the general public for

two reasons. First, they were capable of shooting projectiles and thereby becoming a deadly

weapon as opposed to simply a toy.[33] And second, because they were likely to cause tetanus

infections and deaths as a result of lockjaw. When fired, the blank cartridges caused bits of

wadding, cartridge casing, and fulminating powder to penetrate the skin, carrying tetanus

bacillus deep enough to cause infection. Furthermore, the design of some (possibly most) toy

pistols called for a breech-loading process that encouraged users to hold the barrel in their left

hand against pressure from a spring. At times the opening snapped closed unexpectedly, causing

an inadvertent discharge of the blank cartridge on or next to the user's left hand. Doctors who

treated patients and studied the outbreak of toy-pistol-induced tetanus infections noted that most

injuries were to the hand. They often appeared so slight that children and their parents opted out

of seeking medical attention only to find out too late that lockjaw had set in and death was

imminent. This posed a serious threat to public health, and therefore public safety, which

justified state and local action at the time.[34]

22.    The response to toy pistols was widespread outrage along with sales restrictions.

The fact that these lethal devices afflicted primarily children with incurable, fatal illness was

(understandably) upsetting to people at the time.[35] One of the first jurisdictions to take action was

---

[33] See Pennsylvania's restriction against the sale of certain firearms and toy imitations of them, which described the prohibited toys as capable of "being exploded, fired off and discharged, and thereby become a dangerous and deadly weapon." Cap guns, by contrast, had an unbored barrel and were incapable of shooting projectiles. The wafer of fulminating powder and wadding therefore did not shoot at high velocity into objects such as hands, appendages, etc. 1881 Pennsylvania, 111, No. 124.

[34] Hazlewood, "Remarks on Toy Pistols," 92. See also C. H. Claudy and Clarence Maris, "The Deadly Toy Pistol," *The Technical World Magazine* XI, No. 1 (March 1909), 476-482.

[35] "Sweet Little Jessie," *Boston Daily Globe* (Boston, Massachusetts), September 21, 1886, 4 (an emotional recounting of the death of a young girl from a toy pistol shot to the face);

Baltimore, Maryland. An 1881 ordinance made it unlawful "to sell, give away, or dispose of in any manner, what is known as 'the toy cartridge pistol' within the limits of the city."[36] Pennsylvania restricted their sale that same year, followed by Maryland, Wisconsin, New Jersey, and Vermont in 1882.[37] Vermont's law, for example, penalized any person "who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges with intent to sell the same, or sells, or offers to sell or give away the same," and declared violators "liable for all damages resulting from such selling or giving away, to be recovered in an action on the case."[38]

---

"A Symposium of Murderous Rivals," *Puck* 40, no. 285 (New York, New York), August 23, 1885, 395 (a full page of poems and illustrations about common killers of children, with special emphasis on the toy pistol: "…If of these rivals, / Variously harmful, / I am not surely / Past peradventure / Leader and chieftain— / Deadliest and direst?"; illustrations especially condemn dealers in toy pistols, who sell them to boys with full knowledge of their fatal effects.). See also "The Murderous Toy Pistol," *Hartford Daily Courant* (Hartford, Connecticut), July 19, 1882, 3 (listing sixteen recent deaths by way of toy pistols, only one of which involved an adult; most decedents were aged 11-14).

[36] "An Ordinance to Prohibit the sale and use of the Toy Cartridge Pistol with the limits of the City of Baltimore," No. 120, *Ordinances of Baltimore* (1881), available at the Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/the-ordinances-and-resolutions-of-the-mayor-and-city-council-of-baltimore-passed-at-the-annual-session-of-1880-and-1881-page-162-image-162-vol-11-1881-available-at-the-making-of-modern-law-prim/.

[37] 1881 Penn. Ch. 124 (prohibiting sale of cannons, revolvers, pistols, or imitations or toys of such "constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls, and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon," as well as "any cartridge, gunpowder or other dangerous and explosive substance," to minors under age sixteen); 1882 Wisconsin Ch. 116 (prohibiting the sale, use, and having in one's possession "for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy firearm," and providing criminal penalty); 1882 N.J. Ch. 4 (prohibiting the sale, barter, exchange, or exhibition for such, and the hiring or loaning of any "gun, pistol, toy pistol, or other firearms in this state" to persons under fifteen years, and prohibiting persons under fifteen years from purchasing, bartering, exchanging, carrying, firing, or using "any gun, pistol, toy pistol or other firearms in this state," and assessing criminal penalties); 1882 Vermont ch. 82 (prohibiting the sale or possession with intent to sell of any toy pistol, and assessing criminal penalties and civil liability).

[38] 1882 Vermont ch. 82.

The statewide law in Maryland declared that "it shall be unlawful for any person or persons within the State of Maryland to manufacture or to sell, barter or give away the cartridge toy pistol to any one whomsoever."[39] Regulations limiting or prohibiting the sale of toy pistols, or prohibiting their manufacture, took effect in Ohio, Kansas, New Hampshire, Washington Territory, and Maine (1883), and in Iowa, Utah Territory, Michigan, and Mississippi (1884), and in Indiana (1885).[40] Yet more states enacted similar restrictions in later decades.[41]

---

[39] 1882 Maryland Ch. 424, § 1 (subsequent section prohibited "any person, be he or she licensed dealer or not" from the selling, bartering or giving away of "any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces and rifles" to minors under twenty-one years, and assessing criminal penalties).

[40] 1883 Ohio ch. 336, 222 (penalizing the sale of toy pistols to minors under fourteen, and assessing criminal penalties and civil liability); 1883 Kans. Ch. 105 (penalizing the sale or furnishing of deadly weapons, including toy pistols, to minors or persons of "notoriously unsound mind," and penalizing minors having deadly weapons, including toy pistols, in their possession); 1883 N.H. Ch. 10 (penalizing possession of toy pistols or other firearms with intent to sell the same, and assessing criminal penalties and civil liability); 1883 Wash. Terr. 67 (prohibiting the sale or offering for sale of toy pistols, as well as furnishing "any pistol, toy pistol or other pocket weapon, in which explosives may be used" to persons under sixteen years); 1883 Maine Ch. 216 (prohibiting having in one's possession "a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell the same," or selling, offering for sale, or giving away of such, and assessing criminal penalties and civil liability); 1884 Iowa Ch. 78 (prohibiting the sale, presentation, or gift of "any pistol, revolver or toy pistol to any minor" and assessing criminal penalties); 1884 Utah Terr. Ch. 1 (prohibiting the sale or gift of a toy pistol "to any person in this Territory" under criminal penalty); 1884 Michigan, Ch. 138, 144 (prohibiting selling, giving, or furnishing to children under thirteen years, "any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same," and providing criminal penalties); 1884 Mississippi Ch. 74 (prohibiting "any person company or corporation" from selling or offering for sale "any toy pistol, cartridges, caps or other contrivance by which said pistols are fired, within the limits of the State of Mississippi" and assessing criminal penalties); 1885 Ind. Ch. 74 (prohibiting the manufacture, sale, exposure for sale, giving away "as a prize or reward, any to pistol, or other device for the purpose of exploding caps or wafers, containing fulminates or other explosive compounds" and assessing criminal penalties).

[41] Louisiana (1893): John Q. Flynn, *Flynn's Digest of the City Ordinances...of the City of New Orleans* (1896), 545, quoted in Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/john-q-flynn-flynns-digest-of-the-city-ordinances-together-with-the-constitutional-provisions-acts-of-the-general-assembly-and-decisions-of-the-courts-relative-to-the-government-of-the-ci/ (prohibiting the sale, lease for giving of any "pistol, dirk, bowieknife, toy

Trap Guns or Spring Guns

23.    Another weapon subject to regulation during the nineteenth century was the trap gun or spring gun.[42] These deadly devices were essentially booby trapped guns loaded and ready to fire when an unsuspecting person tripped a wire that pulled the trigger.[43] They were different from "trap-guns" used in "trap-shooting," which was "The sport of shooting pigeons, glass balls, etc., released from a spring trap."[44] These booby trapped guns were also not to be confused with

---

pistol for which cartridges are used, or any other dangerous weapons which may be carried concealed" to persons under eighteen years, and providing criminal penalties); 1900 N.Y. Ch. 222 (prohibiting the selling or giving away of "any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used" to persons under sixteen years); 1902 Virginia Ch. 186 (prohibiting "any person, firm, corporation, or association" from selling, bartering, exchanging, furnishing, or disposing of by gift etc. "any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosives discharge blank or ball charges" to persons under twelve years, and prohibiting the purchase, acceptance, or acquisition "in any manner" of said articles on behalf of a person under twelve years, and assessing criminal penalties); 1903 S.C. Ch. 79, 123 (prohibiting "any person, firm or corporation, in this State," from selling, keeping or offering for sale, or giving away "any toy pistol, in which caps or cartridges are used, or any caps or cartridges for such toy pistol" and assessing criminal penalties); 1909 Arkansas 810 (prohibiting "any person, firm or corporation" from giving away, selling or offering for sale, "or to make or manufacture any toy pistol, firecracker—commonly known as cannon crackers—or gun that shoots a blank cartridge," and prohibiting the receiving, owning, carrying , or shooting of "any such toy pistol, gun or cannon cracker within this State" and assessing criminal penalties).

[42] On trap guns and their regulation in American history, see Robert J. Spitzer, "Understanding Gun Law History after *Bruen*: Moving forward by Looking Back," *Fordham Urban Law Journal*, 51, no. 1 (2023), 57-115 at 100-102 (Describing and explaining "historical restrictions on trap guns.").

[43] "Spring Gun," *Oxford English Dictionary* (Definition 1: "A booby trap consisting of a gun equipped with a triggering device, such as a trip wire, designed to cause it to fire when a person or animal passes through an area or interacts with a particular object, typically used to protect property or land.").

[44] "Trap-shooting," *Oxford English Dictionary*. See also "Trap-gun," *Oxford English Dictionary* ("a shotgun used in trap-shooting.").

19

spring guns in which a "missile is discharged by the release of a spring."[45] Though the term

"spring gun" appears to have come into use during the eighteenth century, the practice itself is

older. For instance, records from seventeenth-century Plymouth Colony restricted the "setting of

guns" as a result of "several persons [having] been greatly endangered" by it.[46] A century later,

colonial lawmakers in New Jersey similarly penalized the "a most dangerous Method of setting

Guns" in which "the [Gun] shall be intended to go off or discharge itself, or be discharged by

any String, Rope, or other Contrivance."[47]

24.     Restrictions upon the use of trap or spring guns often appeared in relation to

hunting regulations. In some cases, historical laws explicitly state that the purpose was to prevent

inappropriate hunting practices, like luring game into a trap.[48]

---

[45] "Spring Gun," *Oxford English Dictionary* (Definition 2: "A toy gun in which the missile is discharged by the release of a spring.").

[46] *Records of the Colony of New Plymouth in New England*, 12 vols. (Boston: William White, 1861), 11: 230. ("Whereas seuerall psons haue bine greatly Indangered by seting of Guns It is enacted by the Court and the authoritie thereof that none shall sett any Guns except in Inclosures and that the gun be sufficiently enclosed soe as it be Cecure from hurting man or beast and that hee that seteth the gun doe giue warning or notice thereof to all the Naighbours on the penaltie of paying a fine of fiue pounds to the vse of the Collonie for euery default;"). The law appears to have been passed in 1670. https://archive.org/details/recordscolonyne02courgoog/page/n249/mode/1up?view=theater All 12 vols available here: https://www.sec.state.ma.us/divisions/archives/collections/plymouth-records.htm

[47] 1771 New Jersey ch. 540, "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns," § 10 ("An whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it enacted by the authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun un such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.").

[48] For example, 1877 New York ch. 411, § 1 (excerpted from "An Act to further amend chapter seven hundred and twenty-one of the laws of eighteen hundred and seventy-one, entitled 'An act to amend and consolidate the several acts relating to the preservation of moose, wild deer, birds and fish'."); 1880 Wisconsin ch. 170, § 4 ("…or who shall kill, destroy or wound any

20

25.     But spring and trap gun laws were not *just* about humane hunting practices—they were also about public safety. As the colonial Plymouth and New Jersey laws showed, the setting of guns in a trap endangered innocent people who might unsuspectingly trip the device. In fact, trap guns shot people (as opposed to animals) often enough that states addressed it in their corpus of law for both homicide and trespass. In Minnesota, for instance, "the setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon" violated the law, and the penalty scaled upward depending upon whether a person was injured or killed as a result.[49] Law in Washington took a similar approach.[50] In Michigan, laws about trap guns and exploding devices prohibited "[leaving] or [permitting] the same to be left, except in the immediate presence of some competent person," and if death were to ensue, it would be manslaughter.[51]

---

wild duck, brant or goose, by the use of any pivot or swivel gun, or any fire-arm other than a gun habitually used at arm's length and fired or discharged from the shoulder, or when raised and held by the hand, or by any float, sneak boat, sail or steam boat, or floating box or similar device, or from any fixed or artificial blind or ambush located in open water outside or beyond the natural cover of reeds, canes, flag or wild rice, of any lake river, bay or inlet, or attempt so to do…"; 1915 Tennessee ch. 152, §§ 37, 45..

[49] 1869 Minnesota ch. 309, "An Act to prohibit the setting of traps or spring guns, rifle, or other deadly weapons." In the case of no injuries, penalties were a) county jail 6 months or longer; 2) fine up to $500; or c) both. In the case of a non-fatal injury, the penalty was prison no longer than five years. In the case of death, the penalty was prison 10-15 years.

[50] Frank Pierce, comp., *Pierce's Code, State of Washington, Cyclopedic Arrangement including Laws 1919* (Seattle: National Law Book Co., 1919), 2566, "Firearms and Weapons," § 8836, "Setting Spring Gun."

[51] Andrew Howell, comp., *General Statutes of the State of Michigan* (Chicago: Callaghan & Co., 1882-1890), 2212, § 9114, "Setting Spring Guns and Other Dangerous Devices," ("That if any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.").

21

26.    When property owners set up trap guns in the face of trespassers, they ran into

longstanding common law practices about whether lethal force could be employed to protect

property outside one's dwelling. In Iowa, for instance, a property owner set up a trap gun to

protect his vineyard from plunder by trespassers and ended up shooting a man. The shooting

victim survived but was wounded, and he won a suit against the property owner. The court stated

that a property owner "cannot prevent a trespass by using means dangerous to life."[52] A trap gun

set up near a well ended up killing an innocent woman, and the gun-setter—a man trying to ward

off thieves upon his property—was arrested in connection with the homicide.[53] An Alabama case

from 1877 asserted that the unlawfulness of setting spring guns to prevent trespass was a

nationwide consensus—and this in a state without a specific spring gun statute.[54] The court

summed up the problem with trap guns quite well by saying that their danger to the public

---

[52] *Hooker v. Miller*, 37 Iowa 613 (1873). The court went on to say: "The act of defendant, we conclude, upon the authority cited and upon principle, in preparing the means whereby plaintiff's life was endangered and from which he sustained great bodily injury, was unlawful. It follows, in the application of familiar doctrines, which do not demand the support of authority to secure their recognition, that he is liable for the injury inflicted upon plaintiff."

[53] "Killed by a Spring Gun," *Chicago Tribune* (Chicago, Illinois), April 29, 1884, 7 ("The owner of the well said he placed the gun there [near a well] to protect himself against thieves. He was lodged in jail."). The killing occurred in Texas.

[54] *Simpson v. State*, 59 Ala. 1 (1877). "The preservation of human life, and of limb and member from grievous harm, is of more importance to society than the protection of property. Compensation may be made for injuries to, or the destruction of property; but for the deprivation of life there is no recompense; and for grievous bodily harm, at most, but a poor equivalent. It is an inflexible principle of the criminal law of this State, and we believe of all the States, as it is of the common law, that for the prevention of a bare trespass upon property, not the dwelling-house, human life can not be taken, nor grievous bodily harm inflicted. If in the defence of property, not the dwelling-house, life is taken with a deadly weapon, it is murder, though the killing may be actually necessary to prevent the trespass." Also, counsel for appellant argued "There is no statute on the subject [of setting a spring-gun] in Alabama," and "not a case can be found in the reports of England or America, where any one has been prosecuted for shooting another with a spring-gun." The court disagreed with this argument notwithstanding the lack of a pertinent statute in Alabama.

outweighed a person's interest in protecting their property. "The preservation of human life, and of limb and member from grievous harm, is of more importance to society than the protection of property. Compensation may be made for injuries to, or the destruction of property; but for the deprivation of life there is no recompense; and for grievous bodily harm, at most, but a poor equivalent."[55]

27.     In some instances, the use of trap guns could only be tolerated as a mode of protecting a dwelling or place of business from burglary.[56] Some shop owners and home owners certainly resorted to trap guns or spring guns to defend their premises and succeeded in wounding or killing their would-be burglars.[57] But even then, if the trap gun harmed or killed an

---

[55] *Simpson v. State*, 59 Ala. 1 (1877).

[56] See *Scheuermann v. Scharfenberg*, 163 Ala. 337 (1909). Case applied the protections to dwelling to a man's place of business—a store with valuable goods protected at night by a spring gun. See also "The Burglar Trap Gun," *Cincinnati Daily Enquirer* (Cincinnati, Ohio), November 7, 1870 ("That the accused would have been justified in killing Tweedle under the circumstances of attempting burglary, had the former surprised him in such an attempt, no one can doubt, and at the best the deceased died from the misdirection of his own felonious act.").

[57] Many newspaper reports about trap guns described their effectiveness against burglars without validating or criticizing their use. For example, see "Post Office Robber Shot," *Washington Post* (Washington, D.C.), August 24, 1891, 1; "Burglar Shot," *Detroit Free Press* (Detroit, Michigan), February 17, 1870), 1; "Notorious Crook Killed," *St. Louis Post-Dispatch* (St. Louis, Missouri), October 23, 1897, 1; "Penny's Trap Gun at Work," *Atlanta Constitution* (Atlanta, Georgia), December 20, 1898, 7. It is unclear whether these shop and homeowners faced charges for their setting of trap guns.

innocent person, the gun-setter could be held civilly or criminally liable.[58] Sadly, trap guns also

had the unfortunate effect of wounding or killing the person who set them.[59]

Bowie Knives & Bladed Weapons

28.    An especially dangerous deadly weapon during the nineteenth century was the

bowie knife. Named for James Bowie, who used the blade to great effect in a duel-turned-melee

in 1827, the style became the most widely known, used, and discussed by Americans in the

nineteenth century. In justifying a sentence enhancement for homicides committed with bowie

knives, a Texas judge described them as inherently more dangerous than most other weapons:

29.    It is an exceedingly destructive weapon. It is difficult to defend against it, by any

degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when

discharged, its dangerous character is lost, or diminished at least. The sword may be parried.

With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not

necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The

bowie-knife differs from these in its device and design; it is the instrument of almost certain

death. He who carries such a weapon, for lawful defence, as he may, makes himself more

---

[58] See "Illinois: Suit to Recover Damages for Injuries Received from the Accidental Discharge of a Trap Gun," *Chicago Tribune* (Chicago, Illinois), December 22, 1870, 4 (In which the family of an innocent woman wounded by trap gun sue shop owner who set the same); "Killed His Wife's Mother," *San Francisco Chronicle* (San Francisco, California), September 20, 1895, 4 (In which a man whose trap gun at his cabin killed his mother-in-law pleaded guilty to manslaughter charge; "Did Burke Set a Trap Gun?" *New York Tribune* (New York, New York), August 21, 1894, 5 (In which the inquest into the shooting of a man by his father-in-law within the home investigated whether it was accomplished purposefully by way of a trap gun).

[59] "Set His Own Death-Trap," *St. Louis Post-Dispatch* (St. Louis, Missouri), October 21, 1897, 4; "His Trap Gun," *Cincinnati Enquirer* (Cincinnati, Ohio), December 25, 1896, 1.

dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon.[60]

30.    In his description of the bowie knife as a fearsome weapon, a commentator from the 1860s said, "Among the many means invented for man's destruction, this of Colonel Bowie is the most effectual in execution, the most fearful to the sight and imagination;… ."[61]

31.    Despite its entry into mainstream conversations during the nineteenth century, we cannot be sure what the original bowie knife actually looked like because it disappeared after Bowie's death at the Alamo in 1836.[62] What we do know, however, is that "bowie knife" as a term came to describe a large knife with clipped blade—one with a sharpened swedge[63] that made it more lethal. Bowie knives had long blades, often measuring 8 to 12 inches, and the point of the knife was generally aligned with the handle to make it a more effective weapon.[64]

---

[60] *Cockrum v. State*, 24 Tex. 394 (1859). This case is more frequently cited for the sentence preceding this passage, that "The right to carry a bowie-knife for lawful defence is secured, and must be admitted." That was the law in Texas at the time, but state policy changed in 1871 to prohibit the open or concealed carrying of deadly weapons (including bowie knives). That law's constitutionality was affirmed by a state supreme court of pro-Union appointees as well as a Redeemer-Era court of Democrats headed by none other than this judge himself, Oran M. Roberts. See 1871 Texas ch. 34; *English v. State* 35 Tex. 473 (1872); *State v. Duke* 42 Tex. 455 (1875).

[61] P. R., "Bowie Knife," *Army and Navy Journal* 4, no. 36 (April 27, 1867), 570.

[62] For more information on the mysterious origins of the bowie knife, see Harold Leslie Peterson, *American Knives: The First History and Collectors' Guide* (New York: Scribner, 1958), 26-27; Sid Latham, *Knives and Knifemakers* (New York: Winchester Press, 1973), 104-112.

[63] A swedge is a secondary edge on a knife blade, which—when sharpened—allows the knife to penetrate flesh more effectively. On swedges, see Norman Strung, *An Encyclopedia of Knives* (Philadelphia: J. B. Lippincott Company, 1976), 59-61.

[64] On bowie knives having tips aligned with their handles, see Strung, *An Encyclopedia of Knives*, 96. See also "Bowie Knife," (1867) (describing the bowie as having a twelve-inch blade with an edge "keen, smooth;" and "The point is curved and hollowed at the back, cutting both ways like a two-edged sword. It is two inches broad at the heel, and of proportional thickness. Its

25

Americans often discussed or made reference to bowie knives, but there were numerous styles of fighting knives in circulation during the nineteenth century. At times, the term "Arkansaw toothpick" also referred to a bowie knife, though it eventually referred to a knife that was generally similar to a bowie but double-edged and tapered.[65] In fact, there were so many styles and names of knives that Americans sometimes struggled to distinguish them from one another. To make matters even more complicated, labels and definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[66] A case arising in Tennessee during the 1840s revolved around what particular style of knife a defendant had carried (the jury settled on Mexican pirate knife) and whether he had been indicted for carrying a bowie knife, or a knife *resembling* a bowie knife. The abundance of knife names and styles inspired lawmakers to insert catchall language into weapon regulations such that they regulated not only the carrying of specifically enumerated bladed weapons, like a dirk, dagger, bowie knife, but also "any other knife of the like kind," or "any other deadly weapon."[67]

32.     After the death of Jim Bowie in 1836, criticism of bowie knives mounted.[68] A particularly gruesome incident occurred in Arkansas, when one member of the state legislature

---

weight alone is sufficient to give effect to a descending blow; and a child, thus armed, might well intimidate a man of strength and courage.").

[65] On the interchangeable use of "bowie knife" and "Arkansas toothpick" during the nineteenth century, see Peterson, *American Knives*, 59. For an explanation of these knife styles as understood by modern collectors, see Strung, *An Encyclopedia of Knives*, 95-97.

[66] Worthen, *Arkansas Made*, I:267–268.

[67] 1839 Alabama 67, § 1 ("That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon…"). This is just one example; with additional time I can provide more examples of this catchall language, which was quite common.

[68] For example, see "Murder with a Bowie Knife," *The New Yorker* (October 14, 1837).

murdered a fellow member on the floor of the House of Representatives with a bowie knife.[69]
Americans' response to this horror of bloodshed was regulation.

33.    As especially dangerous weapons, bowie knives and similar knives could be
regulated by state and local governments much more stringently than could militia weapons (like
muskets and rifles). Nineteenth-century laws generally included these knives in lists of so-called
"deadly weapons" or "concealed weapons" that were associated with interpersonal violence and
could easily be concealed on the person. Men carried bowie knives hidden inside the front of
their coats and at times down their backs (attached to a string).[70] Because bowie knives—like
other deadly weapons—had no customary militia purpose, public carry laws tended to restrict
their presence in public especially when concealed.[71]

---

[69] See "Another Awful Tragedy—Legislating with Bowie Knives," *The Sun* (Baltimore, Maryland), December 27, 1837.

[70] For a useful description of the many modes of concealing weapons, including bowie knives, see J.D. Brothwick, *Three Years in California, 1851-1854* (London: W. Blackwood and Sons, 1857), 78.

[71] The regulations referred to are public carry laws that restricted the carrying of deadly weapons, especially when concealed. Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

34.     Beyond public carry laws, some policies specifically targeted bowie knives for further restriction. In 1837, Alabama lawmakers taxed the sale or gift of bowie knives and the like at $100 per instance (equivalent to approximately $3,195.27 today).[72] That same year, a Georgia law prohibited the sale of bowie knives and other fighting knives.[73] An 1838 law from Tennessee prohibited "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[74] Meanwhile, in Florida Territory, an 1835 concealed-carry law proved so ineffectual that the territorial legislature followed it up with an 1838 enactment levying a tax of $200 upon anyone who chose "to vend dirks, pocket-pistols, sword-canes, or bowie-knives."[75] In 2023 dollars, the annual occupation tax would amount to approximately $6,300.[76] For a sparsely populated, rural environment like territorial Florida, this was clearly a prohibitively high tax designed to discourage trade in deadly weapons—including bowie knives.

---

[72] 1837 Ala. 11, § 2 ("That for every such weapon [knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw Tooth-pick], sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury[.]").

[73] 1837 Georgia 90. See below section "Handgun Sales Restrictions" for additional information.

[74] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

[75] 1838 Fla., ch. 24.

[76] The amount of the occupation tax is approximately $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

28

*Handgun Sales Restrictions*

35.　　A final form of relevant historical regulation is a body of nineteenth-century laws prohibiting the sale of certain kinds of handguns. Lawmakers at the time associated smaller, more readily concealable pistols with interpersonal violence as opposed to militia duty, and therefore restricted their sale.

36.　　An early sales restriction originated in Georgia in 1837 proscribed not only the carrying of certain deadly weapons, but their sale as well. The law held that "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere" certain weapons.[77] Those included "Bowie or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes spears, &c. … save such pistols as are known and used, as horseman's pistols, &c."[78] A well-known case, *State v. Nunn*, invalidated some of the rules pertaining to the carrying of deadly weapons, but it did not address the accompanying sales restriction.[79]

37.　　In 1856, Kentucky lawmakers prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung shot, or any imitation or substitute therefor."[80] At the time this law was passed, Colt revolvers were finally beginning to penetrate the American civilian market, which explains why lawmakers chose that word as opposed to the

---

[77] 1837 Georgia 90, § 1. The reference to "horseman's pistols" excluded from regulation those kinds of pistols customarily used in a military capacity by cavalry or mounted soldiers known as dragoons.

[78] Idem.

[79] *Nunn v. State*, 1 Ga. 243 (1846).

[80] Kentucky 1855 ch. 636, 96 § 1.

more general term "pistol." Lawmakers' decision there also suggests that the sale of other kinds of pistols, like single-shot derringers, remained legal, and that only the sale of Colt products violated the law. This leaves open the intriguing possibility that the Kentucky law would have prohibited the sale of Colt revolving rifles, understood at the time as having a serious and dangerous design flaw. The early models of Colt revolvers at times suffered from a "chain fire" problem, in which the ignition of one chamber within the cylinder could cause an unintentional chain reaction across the remaining un-fired chambers. This posed a serious danger to the user, and was more often associated with Colt's revolving rifles than with the pistols, but it remained a nettlesome problem among the antebellum models.[81]

38.     In the post-Civil War period, more states restricted the sale of certain kinds of handguns, and the distinction between legal versus illegal hinged upon whether the weapon could be understood as a militia arm. In Tennessee, a postbellum public carry law prohibited open as well as concealed carrying of deadly weapons, holding that "it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, or revolver."[82] A challenge on Second Amendment (and state analogue) grounds found a prohibition against all "revolvers" unconstitutional because the United States Army and Navy issued certain types of revolvers to some of its servicemen, making these "army/navy" models military—and therefore militia—arms protected by the state constitution. The following year

---

[81] On chain fire in Colt revolvers, see Rasenberger, *Revolver*, 130-131, 155; Flayderman, *Flayderman's Guide*, 567.

[82] *Andrews v. State*, 50 Tenn. 165 (1871). It is also worth noting that the Tennessee court in Andrews took "revolver" to also mean "repeater." The court limited itself to insisting that a repeating pistol was "a soldier's weapon—skill in the use of which will add to the efficiency of the soldier." But the wording itself could have been interpreted even more broadly to include revolving rifles and muskets as well as carbines typically referred to as "repeaters."

(1871), the legislature enacted a replacement statute which carved out a novel exception for "army pistol[s], or such as are commonly carried and used in the United States Army… ."[83] This schema passed constitutional muster when challenged in the state court system.[84] A few years later, Tennessee lawmakers added a new vector to their gun regulation program by making it a misdemeanor to "sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistols."[85] Army/Navy models were, in recognition of the high court's previous words about militia arms, exempted. Dealers had a limited window of time to divest themselves of their current stock, and any sales after the expiration risked prosecution.[86] An almost identical chain of events took place in Arkansas, with a sweeping public carry law being overturned, a replacement law featuring an army/navy exception, and a sales restriction put in place.[87]

39.    In both states, the sales restriction faced constitutional challenge, marking a sharp departure from previous decades when sales bans and prohibitive taxes had prompted no entries on the appellate record. But in both instances, the courts upheld the sales restrictions.[88] Arkansas and Tennessee provide insightful examples of nineteenth-century state governments

---

[83] 1871 Tenn. 90, pp.81-82. This law further held that even the exempted army pistols could only be carried "openly in his hands."

[84] *State v. Wilburn*, 66 Tenn. 57 (1872).

[85] 1879 Tenn. 96 pp.135-136.

[86] 1879 Tenn. 96 pp.135-136.

[87] 1875 Arkansas 156; *Wilson v. State*, 33 Ark. 557 (1878); 1881 Arkansas ch. 96 § 3.

[88] *State v. Burgoyne*, 75 Tenn. 173 (1881); *Dabbs v. State*, 39 Ark. 353 (1882).

distinguishing between handguns suitable for sale to the public versus those unsuitable. The metric they used was constitutional protection—allowing the sale (and limited carrying) of those pistols which served a military purpose; but their intent was to promote public safety by removing especially dangerous deadly weapons (like pocket pistols) from public spaces. Weapon sales restrictions did not disappear at the turn of the century, and continued to coexist with indirect forms of regulation like licensing laws and tax requirements. For example, a 1911 Michigan law prohibited the sale of "any dirk, dagger, stiletto, metallic-knuckles, sand-bag or skull cracker" and made specific exception for "the selling or keeping for sale of hunting and fishing knives."[89]

### Historical Process & Methods Applied to History & Tradition of Gun Regulation

40.     This second part of the report switches gears to address what is called "the historian's craft" of studying and analyzing the past. It begins with a description of how historians and Second Amendment scholars go about finding historical gun and weapon laws, emphasizing that we do not have a complete list or comprehensive database of such laws. Since the field of Second Amendment and gun regulatory jurisprudence is one that calls especially for historical analysis, practitioners should adhere to the standards of the historical profession— which requires its adherents to conform to ethical and methodological standards, and whose mission is to seek truth about the past.

*The Challenge of Identifying Historical Analogues*

41.     Identifying historical gun and weapon laws is a time-consuming process that takes special training as well as access to a number of paywall-protected research databases. This may

---

[89] 1911 Michigan ch. 274, § 2. This law also laid out terms and conditions for obtaining a license to carry pistols.

seem like an odd assertion in our digital age of AI and instantaneous online search results, but it is nevertheless true. Researchers do not have a comprehensive list or database of such laws, and it is unlikely that they ever will. Regulations were put in place not only at the state level, but also at the municipal level—meaning that potentially thousands of historical laws were recorded in local newspapers or council meeting minutes without being preserved in accessible archival collections. Moreover, the deep interdependency between public and private enterprise in the eighteenth and nineteenth century means that a host of private entities chartered for public purposes (especially transportation companies) established rules for customers that may not have been preserved or are challenging to locate and consult.[90]

42.    A first step in locating historical gun and weapon laws is the Duke Repository of Historical Gun Laws, maintained by the Center for Firearms Law at Duke University. This collection of historical laws is indexed and searchable by location, date, and regulatory type. It is a foundationally important resource for scholars working in this field. However, the Repository is far from a complete database of historical laws. It has collected a variety of state-level policies specifically pertaining to weapons (especially firearms), but it sometimes misses weapon-related policies that are part-and-parcel of other kinds of laws (like taxation of weapons within revenue bills, for instance).

---

[90] On the relationship between public and private enterprise, see William J. Novak, "Public-Private Governance: A Historical Introduction," *in Government by Contract: Outsourcing and American Democracy*, Jody Freeman and Martha Minnow, eds., (Cambridge: Harvard University Press, 2009), 23-40. This problem manifests itself in transit-related Second Amendment cases, where ridership rules for streetcar services and railway companies—challenging sources to find—can serve as historical analogues. See Josh Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133.

43.     Searching beyond the Duke Repository is most effectively accomplished (based on my experience) through the legal database Hein Online and its constituent collections of state session laws and historical state statutes. This is not the most user-friendly database. Beyond that, analogous laws can be found in other digitized materials accessible through sites like Google Books, The Internet Archive, and Hathi Trust. At times, historical municipal codes are accessible through these tools, but at others they are only available in hard copy at a law or research library. Municipal laws were sometimes printed in newspapers, which means that researchers can consult digitized newspaper databases like Chronicling America for historical analogues. But many newspaper collections are stored in paywall-protected databases, like America's Historical Newspapers, ProQuest Newspapers, and Newspapers.com. So, deep research into this subject is all but impossible without the kinds of resources that come with academic libraries, and even then different universities and law libraries provide uneven access to the sources. And of course, only a portion of historical documents (especially municipal records) have been digitized at all—so number-crunching based on hits found in digital repositories only takes into account a portion of the relevant sources.

44.     In addition to the challenges of finding historical gun and weapon laws, there is the problem of interpretation. Laws in and of themselves tell us something about the past, but the picture they paint is incomplete. Even though laws reflect the challenges and beliefs of the societies that enacted them, they are easily misinterpreted without their proper context. Legal historians have moved away from legal formalism to embrace a "law and society" approach that seeks to embed atomized laws within the societies, classes, and associations that produced, contested, enforced, and defied them rather than simply looking to the existence, or absence, or particular types of laws. Words in lawbook cannot shed light on that. Instead, historians turn to

34

App. 187

other primary sources, like newspapers, letters, pamphlets, material objects, etc., to better understand what the law meant to historical Americans and the context in which it was enacted and enforced. This is an especially important element of research when it comes to guns—devices imbued with deep meaning and tremendous cultural weight in the past as well as in the present. To undertake this additional level of *indispensable* historical research takes yet more time.

*Analyzing Analogues as a Historian*

45.    The many historical gun and weapon regulations that researchers have found (and will continue to uncover) should be interpreted in accordance with the standard practices of historical inquiry and scholarship. Professional historians operating within academe do not hold a monopoly on the study, writing, and exposition of history, but they are separated from amateurs by "their self-conscious identification with a community of historians who are collectively engaged in investigating and interpreting the past as a matter of disciplined learned practice."[91] This "disciplined learned practice" entails specialized training and charges *professional* historians to adhere purposefully and strictly to the ethical and methodological standards of their profession.

46.    Even though historians cannot *know* with certainty everything about the past, we are ultimately seekers of truth. The historian's present reality indelibly shapes the process of researching and analyzing historical events, but "even when interpretations grow too stale to use,

---

[91] American Historical Association, "Statement on Standards of Professional Conduct," revised January 2023, https://www.historians.org/resource/statement-on-standards-of-professional-conduct/, accessed August 14, 2024.

35

basic factual findings endure."[92] Thus, despite the mutability of history as a field of study, its practitioners recognize that some facts can be known and established with some certainty.[93] It is the interpretation and analysis of these facts that create the historian's craft, calling for methodological approaches and ethical practices that conform to professional standards. By adhering to professional standards, the ethical historian takes steps to avoid amateurish pitfalls. One of these is mythologizing the past, or replacing a nuanced and complex history with a convenient or useful myth.[94] Another is embracing mono-causation—which consists of "[identifying] a single factor and [seizing] on it as the *only* factor causing an event."[95] Historians are "people with special skills, who translate to others the meaning of the lives and struggles of their ancestors, so that they may see meaning in their own lives."[96] In this endeavor the professional historian seeks to do justice not only to the present audience, but also to the dead who can no longer speak for themselves.[97] Any scholarly endeavor that presents itself as rooted in the study of history must ultimately call for historical judgments—which should be determined on the basis of historians' professional standards.

---

[92] Zachary M. Schrag, *The Princeton Guide to Historical Research* (Princeton: Princeton University Press, 2021), 22.

[93] Idem.

[94] On truth versus myth in history, see Schrag, *Princeton Guide*, 33-35.

[95] Schrag, *Princeton Guide*, 223.

[96] Gerda Lerner, "The Necessity of History and the Professional Historian," *Journal of American History* 69, no. 1 (June 1982), 19.

[97] Jonathan Gorman, "Historians and Their Duties," *History and Theory* 43, no. 4 (December 2004), 103-117, at 111 ("This seems right: historians *as historians* owe historical truth to everyone who chooses to be part of their audience."). See also Idem at 115 ("Importantly, historians owe historical truth not only to the living but to the dead.").

47.    Historical gun and weapon regulations from the eighteenth and nineteenth centuries were products of political, social, and cultural environments unlike our own today. Accounting for and appreciating these differences is crucial to properly understanding the laws themselves, what they tell us about the communities that adopted them, and how they may be "analogous" to current laws. For the purposes of this case—in which a consumer safety law is being challenged—it may be useful to explore the history of consumer protection and ascertain whether pre-1900 governments took regulatory action on that front.

**Consumer Protection as Public Safety**

48.    This third part of the report provides some historical context for consumer protection in the United States. Drawing on scholarship about police power and modes of regulation during the nineteenth century, this part of the report demonstrates that consumer protection regulations (like the challenged statute) are part of a long, deep, and powerful tradition of protecting public health and safety in the United States.

49.    Consumer protection is generally associated with John F. Kennedy's 1962 speech about consumer rights, which resulted in the Consumer Bill of Rights as well as landmark federal legislation on the subject. The consumer protection movement was particularly effective in advancing automobile safety by pioneering scientific studies showing the efficacy of seatbelts, airbags, and other innovations that are now standard on American cars. Historians see the origins of the movement in an earlier period, though. In the traditional historical narrative, mass production of consumer goods in the early twentieth century, and a growing reliance upon domestic consumption of such goods, ultimately led to the redefinition of American civic

37

obligation in the New Deal Era to include patriotic consumption.[98] Even before that, advocacy organizations had formed, like Consumers Research, established in 1929 "to educate and protect consumers from harmful products."[99] As one might expect, though, the Progressives who never saw an American endeavor *not* in need of comprehensive reform were also concerned about the dangers posed by new consumer products.

50.    This view of the history of consumer protection legislation is not inaccurate, but some of its implicit assumptions hide the longer history of consumer protection regulation. First, this account couches its understanding of "consumer protection" within twentieth-century movement politics. Scholars seek out grassroots action, widespread public opinion among everyday Americans, and activity along the lines of other socio-political movements, like civil rights, women's rights, LGBTQ rights, etc.[100] Second, this view of consumer protection history is focused upon nationwide, federal regulation. Scholars working in the twentieth and twenty-first centuries have at times teleologically looked back to the past seeking the origins of the administrative, bureaucratic state and in finding them near the turn of the twentieth century, have inferred that the preceding era offered no viable regulatory heritage or was so weak in the face of emerging big business as to be "stateless."[101] In fact, though, consumer safety regulations made

---

[98] Alan Brinkly, The End of Reform: New Deal Liberalism in Recession and War (New York: Knopf, 1995), 72; Lizbeth Cohen, A Consumer's Republic: The Politics of Mass Consumption in Postwar America (New York: Knopf, 2003).

[99] Consumers Research, "History," https://consumersresearch.org/history/, accessed August 14, 2024.

[100] Narrative histories of economic regulation also tend to emphasize the "movement" origins of legislation like the Interstate Commerce Commission, Federal Trade Commission, federal antitrust laws, etc.

[101] Myth of American statelessness is predicated upon the idea that the United States is exceptional, and exceptionally individualistic at that. Though its roots reach deep into the American past, the concept solidified within historical writing during the 1950s and remained

their way onto American statute books long before the twentieth-century rights-based movements, and state and local governments exercised tremendous authority over the manufacture and sale of goods.

51.     Consumer protection is part and parcel of the unique form of governance prevalent across the United States during the nineteenth-century. Dubbed the "well-regulated society" by historian and law scholar William J. Novak, this governmental tradition was deeply rooted in the English common law and prioritized the polity's protection of public safety above all other concerns—above individual rights, above property rights, and before constitutional guarantees. In the century following the Founding, jurists adapted common-law precepts to a growing, thriving, modernizing United States, and sought to integrate new statutory laws and ordinances within a preexisting common-law framework. This system was necessarily local as opposed to national, and provides an all-important bridge between the premodern, patriarchal state of the colonial period and the modern, bureaucratized American state we experience today. Locally enforced rules stipulated how the commonly used goods of the society would be transported, stored, and at times even manufactured.[102]

52.     The "well-regulated society" and its practice of "localized law" has been overlooked by scholars of law and history not because it lies outside of American history and tradition (in fact it is foundational), but because inquiries into the history of "the state" have

---

unshakably attached to histories of American government and state-building even after the Cold War period. For a concise and insightful recounting of that process, see William J. Novak, "The Myth of the 'Weak' American State," *American Historical Review* 113, no. 3 (June 2008), 755-758.

[102] Novak, *The People's Welfare*, 19-50 (describing the "well-regulated society" and its origins in common law). The extent and intent of the police power was illustratively explained by Massachusetts judge Lemuel Shaw in the case *Commonwealth v. Alger*, 61 Mass. 53 (1851).

identified that concept with the national government and federal action rather than state or local governance. Changing conceptions of citizenship, constitutional law, and individual rights—all resulting from the passage and interpretation of the Reconstruction Amendments—slowly displaced this common-law-based system of regulatory governance.[103]

53.    Despite its being forgotten, though, the well-regulated society formed a critically important pillar of the American legal tradition. Its common law conception of public good (*salus populi*) placed tremendous power in the hands of governing officials (elected and appointed) to protect the public from harm. This power could reach as far as destroying personal property to prevent the spread of fire and disinterring bodies buried in urban cemeteries. The flip-side of this protection of the public was a mandate to promote the health and wealth of the community through necessary regulation of commercial activity and private property. All manner of regulations ensured fair exchange at marketplaces, segregated noisome and noxious trades away from residential neighborhoods, and implemented sanitation procedures for the community. In other words, the police power was exercised in the name of public safety first and foremost, with other attendant goals like the protection of public health and economy growing out of it.[104]

54.    The umbrella of nineteenth-century regulations is wide enough to provide an analogical cover for an unknown number of current laws pertaining to weapons. Some are particularly well-matched for consumer safety laws about firearms, like the challenged law in

---

[103] On the "well-regulated society," see Novak, The People's Welfare, 19-50; on "localized law," see Laura F. Edwards, The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South (Chapel Hill: University of North Carolina Press, 2009), 3-10.

[104] Novak, The People's Welfare, 19-50.

40

this case. Of those, several have already been addressed in this report: laws related to gunpowder, proof of firearms, and the manufacture and/or sale of especially dangerous weapons like bowie knives, slung shots, toy pistols, etc. We have also seen nineteenth-century state governments discriminate between firearms that are lawful to sell versus those that are not. In the cases of Arkansas and Tennessee, that distinction applied specifically to styles of handguns, allowing so-called "army/navy" pistols to be legally sold while prohibiting the same for pocket pistols. There are yet more historical regulatory policies that, while less directly analogous to the challenged law, demonstrate the presence of a broader public-health regulatory tradition that reached into the manufacture and use of firearms and related materials.

55.     A dynamic field of regulation in the eighteenth and nineteenth century involved sanitation, health, and hygiene. Maritime trade exposed residents of port cities to contagion transported on merchant vessels, and unsuitably prepared foodstuffs threatened to cause disease outbreaks. Cities like New York and Boston established health boards in the 1700s, and by the early 1800s the Massachusetts legislature had authorized all towns to form their own local boards of health.[105] These organizations were vested with state police power to create and enforce regulations that promoted the public health and prevented unnecessary threats to life and wellbeing. Rules and policies pertained to mandatory quarantines, environmental hazards like stagnant water or dumping of waste, the keeping of animals, and the carrying on of so-called

---

[105] Howard D. Kramer, "Early Municipal and State Boards of Health," *Bulletin of the History of Medicine* 24, no. 6 (1950), 503-529; for a Massachusetts example, see 1810 Mass. Laws ch. 62, "An Act to empower the inhabitants of the town of Plymouth to choose a Board of Health, and for removing and preventing nuisances in said town." Of note is § 7, apparently restating from a previous enactment, "That each town and district in this commonwealth may, at their meeting held in March or April annually…choose and appoint a Health Committee… ."

41

"noxious trades" that endangered people residing in the vicinity.[106] Health or sanitary rules were woven into state code books, as were the responsibilities and powers of health officers and inspectors.[107]

56.    In its pioneering study of the state's public health, the Massachusetts Sanitary Commission compiled a number of resources, including existing laws pertaining to public health, proposed new provisions on the subject, extracts from relevant medical publications, and even notes from international conferences on hygiene and sanitation.[108] The longstanding law prohibiting the discharge of firearms in cities was listed alongside quarantine policies as health-related legislation.[109] Members of the commission described numerous noxious trades and activities—from the use of "locomotive steam carriages, steamboats, or other vehicles," to allowing "horses, cattle, swine, or other animals" on the streets and "the manufacture, storage,

---

[106] Kramer, "Early Boards of Health," 505, 514-15; on the Massachusetts State Board of Health specifically, see 517-529; Novak, *The People's Welfare*, 191-233.

[107] For example, see Charles Allen, et al, eds., *The Public Statutes of the Commonwealth of Massachusetts* (Boston: Rand, Avery, & Company, 1882), in which public health regulations and duties of health officers (members of boards of health) are scattered across numerous parts, titles, and sections. In New York, sanitary officers had so many rules to enforce that the health board delegated its canine-related responsibilities to the ASPCA for many decades. See Jessica Wang, "Dogs and the Making of the American State: Voluntary Association, State Power, and the Politics of Animal Control in New York City, 1850-1920," *Journal of American History* 98, no. 4 (March 2012), 998-1024.

[108] Massachusetts Sanitary Commission, Report of a General Plan for the Promotion of Public and Personal Health, Devised, Prepared and Recommended by the Commissioners Appointed under a Resolve of the Legislature of Massachusetts, Relating to a Sanitary Survey of the State (Boston: Dutton & Wentworth, 1850). Hereinafter referred to as Massachusetts Sanitary Survey.

[109] *Massachusetts Sanitary Survey*, 339. In New York City, longstanding regulations about the "firing of any fire-arms, the firing or setting off any squibs, gunpowder, rockets, or fire-works" were also incorporated into the health code. See George W. Morton, comp., *Laws and Ordinances Relative to the Preservation of the Public Health in the City of New York* (New York: Edmund Jones & Co., 1860), 72, § 20. Originally passed in 1833.

and use of gunpowder and fireworks" in populated areas—the document's authors explained "These and all other nuisances of a sanitary character, which often occasion direct accidental injury or death, should be so regulated as not to become dangerous to health and life."[110] Gunpowder regulations certainly aimed at fire prevention, but they were even more fundamentally about protecting people's health and safety. In proposing why public health officers were needed in Massachusetts and what their duties would be, the commission quoted an expert who described their overarching purpose by saying: "It is the right of the people at large to enjoy the elementary conditions of a natural existence. The officer of health will be authorized to act, and be recognized as the public protector of that right."[111] The commission's vision of public health law was rooted in preventive regulation, and reached into commercial activity as well as personal property.

57.    In a similar vein, the city of New York published reports and codes pertinent to public health and safety concerns. Its 1872 manual included a section prohibiting the setting off of "any fireworks, fire-crackers, or other substance, whereby, or by reason of which, any human life may be put in danger."[112] Subsequent sections prohibited the encouragement of fights and

---

[110] *Massachusetts Sanitary Survey*, 183. See also p. 19, in reference to "Council of Health in Paris" mention of reports about "the condensation of the gas and vapors resulting from the refining of metals; the fabrication, preservation, and sale of fulminating and lucifer matches; the precautions to be taken in the construction of fulminating powder-mills, and the manipulation of the substances employed there."

[111] *Massachusetts Sanitary Survey*, 374; This passage is the Commission's extraction of an article published in *Journal of Public Health*. The author notes that "public bodies, especially public companies seeking after gain, are found quite as ready to sacrifice the public health for their private benefit, when such a course can be adopted in a quiet manner, as they are prompt to manifest regard for the public welfare in striking and readily observable works or operations which they expect to return large profits."

[112] New York Board of Health Manual, 88, § 157.

the firing of guns without authorization.[113] Finally, the sanitary code included a significant weapon restriction: "That no person shall sell, loan, or give to, or allow to be taken by any other person, any fire-arm, or other deadly or dangerous weapon, when there shall be any reason for such first-named person to think or believe that any danger to life may illegally result from the giving, loaning, selling for from the use of such arm or weapon."[114] On its face, this law prohibits the provision of weapons to irresponsible or dangerous people; but it can also be read to support the challenged law—that firearms which do not meet requisite safety standards should not be sold by licensed dealers to prevent "danger to life."

58.    Some may find public health law easy to discount as an appropriate analogue for current firearm restrictions, and indeed constitutional scholars have tended to downplay the power and significance of public health concerns in their analyses of constitutional history.[115] This tendency has erased from our current constitutional discourse our American heritage of promoting public safety and the common good by way of public health regulation; it has also "de-constitutionalized" public health efforts and therefore robbed the concept of its force.[116] But if we are to analogize current firearm laws to those of the pre-1900 or pre-1868 period, we

---

[113] New York Board of Health Manual, 88-89, §158-159.

[114] New York Board of Health Manual, 89, § 160.

[115] Wendy E. Parmet, "Health Care and the Constitution: Public Health and the Role of the State in the Framing Era," 20 Hastings Const. L.Q. 267 at 269 ("Despite the prevalence and prominence of health care issues in constitutional discourse, the unique role those issues have played is usually ignored by constitutional scholars. Health law scholars, meanwhile, often do not ask what light these cases shed on the nature of constitutional rights.").

[116] Wendy E. Parmet, "From *Slaughter-House* to *Lochner*: The Rise and Fall of the Constitutionalization of Public Health," *Journal of American Legal History* 40, no. 4 (October 1996), 477 ("I suggest that since the New Deal, public health has been both enlarged and enfeebled. Today the health of the public means everything and nothing at all.").

should bear in mind that public health was a necessary appendage of public safety at that time, and was supported by the full force of the police power as exercised by state and local authorities. Their primary concerns reflected the realities of their day—from epidemic diseases to toxic manufacturing waste, stray dogs, storage or sale of combustible products, and (as we saw in examples from Massachusetts and New York City above) the use or transferring of weapons.

59.     Recalling the prior force of public health as a vehicle for protecting life and promoting safety helps us better situate historical regulations that may be considered analogical to the challenged statute in approach or intent. We should also bear in mind the dramatic differences in "scientific context" between the present and the periods from which analogues are drawn. Equipped with a far greater knowledge of biomedical and behavioral sciences, as well as sophisticated data analytics, our modern sense of what counts as a "public health" concern and how to address it understandably differs from that of nineteenth-century and Founding-Era Americans. This reminds us that any assessment of historically analogous laws must take into consideration what was scientifically knowable or administratively feasible in 1791 or 1868.[117]

### Conclusion

60.     This report has presented historical gun and weapon policies that shed some light on an American tradition of regulating firearms. The proffered policies are salient to considerations of product safety, consumer protection, and public health.

61.     Laws from Massachusetts that required a proofing process for gun barrels, and laws that restricted the manufacture, sale, storage, and transportation of gunpowder (and other explosive materials) targeted the objects they did because they were by nature inherently

---

[117] Eric Ruben, "Scientific Context, Suicide Prevention, and the Second Amendment after *Bruen*," 108 Minn. L. Qu. 3121.

45

dangerous. Vested with the responsibility of protecting the public and empowered with the authority to accomplish that mission, state and local governments actively tried to minimize the risk of fires, injuries, and explosions caused by guns and gunpowder.

62.    Another series of laws placed special restrictions upon weapons and devices that were considered especially dangerous. Though this report is not exhaustive on the subject, it presents and explains the purpose behind laws that restricted the use, sale, or manufacture of slung shots, toy pistols, bowie knives, and trap guns. Again, public safety was a driving concern—protecting the public from the dangers posed by the circulation of unusually dangerous weapons. Toy pistols, as a result of their causing lockjaw and death in numerous children, present a particularly apt example of firearm-related regulation undertaken in the name of public health to address an unintentional and fatal consequence of poorly manufactured weapons.

63.    Nineteenth century Americans also understood their governments to possess the necessary power to prohibit the sale of certain kinds of problematic firearms. Antebellum appellate court records do not show laws restricting, taxing, or prohibiting the sale of deadly weapons being challenged on constitutional grounds. Those that were during the postbellum period were upheld by appellate courts in Arkansas and Tennessee, which prohibited the sale of pocket pistols while permitting the sale of revolvers conducive to militia service and similar to those issued to some classes of soldiers by the United States Army and Navy.

64.    The second part of this report pivots to historical processes and methods—the practices historians learn to *do* more so than to *explain*. That being said, the report provides a high-level explanation of how researchers in the field of gun and Second Amendment studies go about finding historical analogues, showing that the process is a time-consuming one reliant upon access to the institutional resources of academic and law libraries. Though any number of

interested researchers, amateurs, and students can embark on this path of study, the "disciplined learned practice" of history requires specialized training and adherence to historians' professional ethics. An endeavor seeking to understand the *history* of a thing should comport as much as possible with the standards of professional practice that historians exercise in their disciplinary field. In other words, the historical context of the laws and regulatory policies presented here is crucial to understanding the intentions behind them as well as why they took the form they did.

65.    This report ultimately demonstrates that the form of government in place within the United States during the nineteenth century championed regulations that would promote the common good and protect the public from harm. Historical regulations undertaken in the name of public health provided a powerful tool for state and local officials, enabling them to set rules for the marketplace, require quality standards for essential items, and dictate where certain trades or industries could be practiced. Importantly, examples from New York and Massachusetts show that weapon-related laws (like firing prohibitions and even a sale/transfer restriction) channeled state authority over firearms through the vehicle of public health. Understanding the force of the police power over public safety and public health in the nineteenth century shows us that American governments have a long tradition of enacting regulations in service of these fundamental goals.

September  16 , 2024

_Brennan Rivas_
Brennan Rivas

47

# EXHIBIT A

# Brennan Gardner Rivas
### Curriculum Vitae · May 2024

brennan.rivas.phd@gmail.com
*Professional Website*

## Employment
Senior Postdoctoral Researcher, Center for the Study of Guns and Society, Wesleyan University, 2024-present
Senior Title Agent, Norfleet Land Services, LLC, 2022-2024
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History, 2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (New York: Oxford University Press, 2023)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review* (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the Journal of the Early Republic*, October 17, 2023.

App. 202

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

2

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.

Status: Under contract, Yale University Press

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their deadly weapons, and why they generally did so concealed.

Status: In review

## University Teaching Experience
*Instructor of Record*

Lecturer in American History, Texas Christian University                2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

Panelist, "Regulating the Sale of Deadly Weapons in the United States," Roundtable on the Business of Firearms in American History, Business History Conference, Providence, Rhode Island, March 2024

Panelist, Race and the Disparate Impact of Gun Law Enforcement, Historically and Today, Aiming for Answers: Balancing Rights, Safety, and Justice in a Post-*Bruen* America, University of Minnesota Law School Symposium, Minneapolis, Minnesota, October 2023

Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed: Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms in the Early Republic, Society for Historians of the Early American Republic Annual Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy and Protection, Georgetown Law, Washington, D. C., June 2023

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*State of Ohio v. City of Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio
*Schoenthal v. Raoul*, No. 3:22-cv-50326, N.D. Ill.
*May v. Bonta*, No. 8:23-cv-01696 CJC and No. I:23-cv-01798 CJC, C.D. Cal.
*State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08, Sup. Ct., Cowlitz Cty, Wash.
*Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL, S.D. Cal.
*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB, W.D. Wash.
*California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D., Cal.
*Lane v. James*, No. 22 Civ. 10989 (KMK), S.D. N.Y.

## Professional Memberships
American Historical Association
Society for Historians of the Gilded Age and Progressive Era
Alliance for Texas History
Southern Historical Association

App. 206

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, JUDSON THOMAS,
COLBY CANNIZZARO, CAMERON PROSPERI,
THE GUNRUNNER, LLC, and FIREARMS
POLICY COALITION, INC.,

                              Plaintiffs,

          v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
Of Massachusetts, TERRENCE REIDY, in his
official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                              Defendants.

CIVIL ACTION
NO. 1:21-CV-10960-DJC

## **EXPERT DECLARATION OF SAUL CORNELL**

1.      I have been asked by the Office of the Attorney General for the State of

Massachusetts to provide an expert opinion on the history of firearms regulation in the Anglo-

American legal tradition, with a particular focus on how the Founding era understood the right to

bear arms, as well as the understanding of the right to bear arms held at the time of the

ratification of the Fourteenth Amendment to the United States Constitution.

2.      In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court

underscored that text, history, and tradition are the foundation of modern Second Amendment

jurisprudence. 597 U.S. 1 (2022). This approach was elaborated and clarified by the Court in its

recent decision in *United States v. Rahimi,* 144 S.Ct. 1889 (2024) where the Court recognized

that the scope of permissible regulation under the Second Amendment was not frozen in amber

but evolved in response to changing circumstances. *Rahimi* underscored that the proper historical

App. 208

inquiry should search for the animating principles guiding past regulations, not a series of isolated data points or "historical twins."

3.    *Bruen* and *Rahimi's* modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. My report explores these issues in some detail. Finally, I have been asked to evaluate the statutes at issue in this case, particularly regarding their connection to the traditions of firearms regulation in American legal history.

### Background and Qualifications

4.    I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

5.    My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] In

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit A.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

addition, my writings have been cited over a hundred times by federal and state courts over the

past five years. My scholarship on this topic has appeared in leading law reviews and top peer-

reviewed legal history journals. I now rank in the top one hundred legal scholars in America

according to the most recent Hein-On-Line Scholar Rankings. I authored the chapter on the right

to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in

*The Cambridge History of Law in America* on the Founding era and the Marshall Court, the

period that includes the adoption of the Constitution and the Second Amendment.[3] I have

authored two prize winning historical monographs and been nominated for a Pulitzer Prize twice.

Thus, my expertise not only includes the history of gun regulation and the right to keep and bear

arms, but also extends to American legal and constitutional history broadly defined. I have

provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v.

Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.);

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-00746-

JLS-JDE (C.D. Cal.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder

Cty.); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v.

Platkin*, Nos. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397 (D.N.J.); *Miller v. Bonta*, No. 3:19-

cv-01537-BEN-JLB (S.D. Cal.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v.

Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.);

*Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *B&L Productions, Inc. v. Newsom*, No. 21-cv-

1718-AJB-DDL (S.D. Cal.); *Capen v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Nat'l.

Assoc. for Gun Rights, et al. v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *Sullivan v. Ferguson*, No.

---

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

22-cv-05403 (W.D. Wash.); *Nat'l. Assoc. for Gun Rights v. Lopez*, No. 1:22-cv-404 (D. Haw.);

*Herrera v. Raoul*, No. 23-cv-00532 (N.D. Ill.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.).

### Retention and Compensation

6.      I am being compensated for services performed in the above-entitled case at an

hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports;

$1000 per hour for depositions and court appearances; and an additional $100 per hour for travel

time. My compensation is not contingent on the results of my analysis or the substance of any

testimony.

### Basis For Opinion And Materials Considered

7.      The opinion I provide in this report is based on my review of the operative

complaint filed in this lawsuit, the various briefs filed by relevant parties, and my review of the

state laws at issue in this lawsuit, my education, expertise, and research in the field of legal

history. The opinions contained herein are made pursuant to a reasonable degree of professional

certainty.

### Summary Of Opinions

8.      Understanding text, history, and tradition requires a sophisticated grasp of

historical context. One must canvass the relevant primary sources, secondary literature, and

jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with

the Second Amendment.[4] At the time *Heller* was decided there was relatively little scholarship

on the history of gun regulation, but in the decade following the case a burgeoning body of

scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American

---

[4] *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 144 S.Ct. 1889 (2024).

legal tradition.[5] Much of this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of searchable digital "archives" has transformed this sub-field and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law.[6] Hundreds of laws were enacted in the era of the Second Amendment to address the problems early American governments confronted.

9.      The scope of permissible regulation, as *Rahimi* makes clear, was not identical to this body of statutory law for several reasons. Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[7]

10.      No jurisdiction uses their ample police power authority to the fullest extent when legislating. Instead states and localities respond to specific problems as they emerge and draw on their reservoir of police power in formulating an appropriate legislative response.[8]

11.      Secondly, in the small close-knit communities of early America the task of law enforcement and regulation was largely accomplished through common law means not statutes. Thus, to obtain a full picture of early American gun regulation courts must grapple with the Americanization of English common law in the early republic. The American Revolution marked a break with some features of this tradition, but important aspects of the common law were

---

[5] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[6] Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019).

[7] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[8] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

absorbed into state law. Only those aspects of the common law consistent with America's new republican constitutions were thus incorporated.

12.    Understanding the relevant legal history to make sense of early American gun regulation also requires some understanding of other fields of American history, including social, cultural, economic, and military history. A history of gun regulation without an understanding of the evolving history of American gun cultures produces a distorted account of the past courts seek to reconstruct.

13.    In short, simply compiling a spread sheet of old laws and reading them with little regard for context offers an imperfect guide to understanding the history required by *Bruen* and *Rahimi*.[9]

14.    Finally, it is important to recognize that research is ongoing and continues to uncover new source materials relevant to the inquiries required by *Bruen* and *Rahimi*.

**The Arc of American Firearms Regulation: An Exercise of the Police Power**

15.    The ability to regulate firearms and gun powder is of ancient vintage and was central to the conception of ordered liberty that defined American law from its earliest days. At the very core of the early American understanding of the scope of liberty was the right of self-government and the right of the people themselves to regulate their internal police. Although modern law typically analyzes this concept in terms of the police power doctrine that emerged during the era of the Marshall Court, the Founding era understood this as a right, not a power.[10]

---

[9] Laura Edwards, *"The Peace," Domestic Violence, and Firearms in the New Republic*, 51 FORDHAM URB. L.J. 1 (2023); Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L.J. 25 (2023).

[10] John Phillip Reid, *The Authority of Rights at the American Founding*, in THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND 97 (Barry Alan Shain ed., 2007).

Thus, in keeping with *Heller's* observation that rights are entrenched with the scope they enjoyed at the Founding, it is vital that courts recognize the broad right of the people to regulate their own internal affairs and promote public safety.

16.     As this report discusses, regulation of arms and gun powder expanded after the adoption of the Second Amendment and various arms-bearing provisions in state constitutions. Both the number of states enacting laws and the type of laws enacted increased gradually over the course of the nineteenth century. As multiple scholars have demonstrated states and municipalities enacted hundreds of gun laws in the Founding era. [11] Gun regulation was a normal and unproblematic exercise of state police power. Apart from a few outlier cases in the slave South, most courts routinely upheld these regulations. [12]

### Early American Firearms Regulation: An Overview

17.     One can discern at least six broad categories of regulation in the Founding era that are key to evaluating the issues in this case. [13]

    i.     Manufacturing standards for arms and gun powder. [14]

    ii.    Regulation of the commercial sale of guns and gun powder. [15]

---

[11] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights* 80 LAW AND CONTEMP. PROBS 55 (2017) at 59–61 tbl. 1.

[12] On regional differences in the adjudication of gun regulations, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[13] For an alternative typology for this regulatory tradition, see Ambrose Graham, *Note, Gunmaking at the Founding,* 77 STAN. L. REV. (forthcoming 2025).

[14] *See, e.g.,* 1805 Mass. Acts 588, *infra,* note 25.

[15] *See, e.g.* 1794 Pa. Laws 764, ch. 337; An Act for the Inspection of Gunpowder, Manufactured within this State (1776) in Records of the State of Rhode Island And Providence Plantations In New England 18-19; An Act for the Inspection of Gunpowder, 1776-1777 N.J. Laws 6, ch. 6, § 1 ("That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the
(continued…)

      iii.     Restrictions on dangerous and non-law abiding persons acquiring arms and gun powder.[16]

      iv.     Time, place, and manner restrictions on arms and gun powder, including storage,[17] carry[18] and discharge. [19]

      v.     Bans on unusually dangerous weapons. [20]

      vi.     Gun censuses and militia muster rolls[21]

18.     Especially relevant here, is the recognition that the American firearms industry in its infancy was largely dependent on government contracts and subsidies. Thus, governments had

---

Sum of Five Shillings a Pound for every Pound weight so offered for Sale, and so in Proportion for greater or lesser quantity."); 1808 Mass. Acts 444, ch. 52; 1820 N.H. Laws 274, ch. 25.

[16] *See, e.g.,* Act of Feb. 16, ch. 6, 1787 Mass. Acts 555, 555-556.

[17] *See, e.g.,* 1771-72 Mass. Province Laws 167, ch. 9; 1782 Mass. Acts 119, ch. 46; 1882 Mass. Acts 212, ch. 269; 1772 N.Y. Laws 682, ch. 1549; 1821 Me. Laws 98, ch. 25; 1825 N.H. Laws 73, ch. 61; 1832 Conn. Acts 391, ch. 25.

[18] *See, e.g.,* Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218; Del. Const. of 1776, art. XXVIII ("To prevent any violence or force being used at the said elections, no persons shall come armed to any of them.")

[19] *See, e.g.,* An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified, Laws, and Acts of the General Assembly of His Majesties Province of Nova Caesarea or New-Jersey (1717) and *e.g.,* An Act To Prohibit Shooting Or Firing Off Guns Near The Road Or Highway On Boston Neck, chap. 6, § (1713) Acts and Resolves passed by the General Court; Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay; 1882 Ga. Laws 131, No. 378; 1878 Cal. Stat. 117, ch. 299; 1877 Ohio Laws 278, ch. 8, § 60.

[20] *See, e.g.,* Judge Edward Scott, 1 LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820, 710, 714 (1821); An Act for the Restraint of Idle and Disorderly Persons § 6. ("Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.")

[21] For a discussion of gun censuses and militia rolls, see Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America,* in A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

a vested interest in determining what types of weapons would be produced. Thus, it is not true that Founding era government simply let the market determine which firearms enjoyed heighted constitutional protections. Had the government adopted such an attitude America would have lost the American Revolution and there would be state constitutional tradition of protecting arms bearing and no federal constitution or Second Amendment to protect. History clearly shows that regulation was the necessary pre-condition for the preservation of the right to keep and bear arms: the exact opposite of the claim that market forces determined which guns were constitutionally protected. As discussed further below, most guns were regulated as private property, enjoying the protections all property were accorded in Anglo-American law and only a tiny subset of these guns were given the highest level of constitutional protection.[22]

19.    Government regulation of the firearms industry indisputably included the authority to inspect the manufacture of weapons and impose safety standards on the industry. As business historian Lindsay Schakenbach Regele notes, "By 1810, western Massachusetts produced more small arms than anywhere else in the Northeast."[23] Beginning in 1794 the federal armory in Springfield, Massachusetts served as a spur to technological innovation in the region. In the years following the War of 1812, the Armory served as an incubator for other local producers and gunsmiths, so much so that one Pittsfield gunsmith, Lemuel Pomeroy, praised the federal government for its actions which encouraged gunsmiths "to fabricate arms of the first quality."[24] The Springfield Armory's output accounted for most guns produced in the state.

---

[22] Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L.J. 25, 44-47 (2023).

[23] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[24] LINDSAY SCHAKENBACH REGELE, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 65-66.

20.    In 1805 Massachusetts enacted a law requiring all guns, before sale, to be inspected, marked, and stamped by an inspector. The state revised the proof statute two more times in the decades leading up to the Civil War. [25] These requirements ensured that the guns sold to the public were safe and suitable for use. Although the guns produced by the Springfield Armory were not subject to state law, because they were under federal control, they were nonetheless subjected to thorough testing and were stamped as well. Indeed, the fact that the arms produced by the Springfield Armory had undergone a rigorous testing and evaluation process became a major selling point that was advertised to increase their value and desirability as surplus military arms in the booming consumer market for guns that exploded in the decades after the War of 1812. [26]

21.    However, the starting point for any effort to properly contextualize early American gun regulation is the recognition that gun cultures and firearms technology were markedly different than the current situation America now faces. Understanding this basic fact is vital to constructing the type of historical analogies that *Bruen* and *Rahimi* requires.

22.    The specter of gun violence hovers over today's debate of the Second Amendment, but recent historical scholarship has demonstrated that this was not the case in the Founding era. Gun homicide, mass shootings, and suicide, the three forms of gun violence that dominate the modern gun debate, were simply not serious problems for those who enacted the

---

[25] 1805 Mass. Acts 588, An Act to Provide for the Proof of Fire Arms Manufactured Within This Commonwealth, Ch. 35. The law was revised in 1837 and later in 1859, see Chap 49, Sec. 27 (Firearms), General Statutes of the Commonwealth of Massachusetts: Revised by Commissioners Appointed under a Resolve of February 16, 1855, Amended by the Legislature, and Passed December 28, 1859 (1860). For a discussion of these regulations, see Graham, *supra* note 13.

[26] Lindsay Schakenbach Regele, *Guns for the Government: Ordnance, the Military 'Peacetime Establishment,' and Executive Governance in the Early Republic* 34 STUDIES IN AMERICAN POLITICAL DEVELOPMENT 132, 145 (2020).

App. 217

Second Amendment or its many state analogues.[27] Historian Randy Roth's work on homicide in this period demonstrates that guns were not the weapon of choice for those with evil intent in the Founding era. Black powder, muzzle-loading weapons, were too unreliable and took too long to load to make them effective tools of homicide and most crimes of passion. Given this fact it is easy to understand why Founding era legislators did not attempt to solve a problem that did not exist yet.[28] At this time, very few households possessed more than one gun. Consumer preferences and the market economy favored light hunting muskets and fowling pieces, guns that were of most use in a rural and predominantly agrarian society.[29] At the time of the Second Amendment Americans wanted guns useful to life in an agrarian society where most families were farmers. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men, as the tragic fate of Alexander Hamilton so vividly illustrates.[30]

23.      Today America confronts a firearms market that is awash with guns whose rate of fire and accuracy would have amazed eighteenth century Americans. The few multi-shot weapons that existed at the time of the Second Amendment were curiosities, oddities that were so rare they were only viewable at museums, not routinely purchased by citizens.[31]

24.      Recognizing that the black powder muzzle loading weapons that predominated in the era of the Second Amendment shared few features with today's guns is the first step to

---

[27] Sweeney, s*upra* note 21.

[28] Randolph Roth, *Whys Guns are and are not the Problem: The Relationship Between Guns and Homicide in American in History* in A RIGHT TO BEAR ARMS (Tucker, ed.).

[29] *Id.*

[30] *See* Sweeney, *supra* note 21, at 61.

[31] Brian DeLay, *The Myth of Continuity in American Gun Culture,* 113 CALIF. L. REV. (forthcoming 2025).

App. 218

reconstructing a historically accurate understanding of Founding era gun regulation.

25.    Although better armed than their British forebears, Americans in the Founding era also lived in an age of relative gun scarcity, particularly compared to the easy availability of guns today. Given these facts enacting laws limiting access to guns would have made little sense. The nature of the market meant that without vigorous government intervention to encourage manufacturing of arms the nation would never properly arm its militias. Put another way, public policy needed to encourage the production of arms and force Americans to purchase guns that reflected government preferences, not consumer preferences.[32]

26.    Although politicians, ministers, and other commentators praised the militia, the state faced a persistent problem of arming them sufficiently.[33] American reluctance to purchase the type of weapons needed to effectively arm their militias was a perennial problem in the Founding era.[34] Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by military tactics. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The lightweight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin but were not well suited to eighteenth-century ground wars. When the U.S. government surveyed the state of the militia's preparedness shortly after Thomas

---

[32] Sweeney, *supra* note 21.

[33] In the Virginia ratification convention, Patrick Henry praised the militia, but remined his fellow delegates of the persistent problems of arming them: "we have learned, by experience, that, necessary as it is to have arms, and though our Assembly has, by a succession of laws for many years, endeavored to have the militia completely armed, it is still far from being the case," 3 Founders Constitution, Article 1, Section 8, Clause 12, Document 27 http://press-pubs.uchicago.edu/founders/documents/a1_8_12s27.html.

[34] For further discussion, see SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia properly armed, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[35]

27.     Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities. Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms.[36] In short, laws created for a relatively sparsely populated rural society without much of a gun violence problem that were enacted at a time of relative gun scarcity, have limited value in illuminating the challenges Americans face today.

**A Well-Regulated Right: The Original Understanding of the Second Amendment within the Context of the Police Power**

28.     The language of rights is pervasive in modern American law and is familiar to both judges and lawyers.[37] Eighteenth-century rights talk drew on a range of intellectual traditions alien to most modern Americans, including most lawyers and jurists. Recovering the meaning of Founding era legal texts requires mastering a rich body of sources, including social contract theory (most notably Locke), common law, and Whig republicanism.[38] In modern law, liberty and power are typically cast as antithetical; accordingly, rights in contemporary law

---

[35] *Id.*

[36] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[37] For a notable exception to this general silence, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW AND CONTEMP. PROBS. 31 (2020).

[38] Victoria Kahn *Early Modern Rights Talk* 13 YALE J.L. & HUMAN. (2001).

13

App. 220

function as trumps, erecting strong barriers against government interference.[39] For many jurists

and lawyers in the Founding era, a properly structured legal system ensured that liberty and

power were complimentary concepts, not antagonistic ones.[40] Rather than limit rights, regulation

was the essential means of preserving rights.[41] In the legal traditions familiar to the Founding

generation, unrestrained liberty was a threat, not a guardian of liberty.[42] Members of the

Founding era described this dangerous form of liberty as licentiousness, a word that has virtually

disappeared from modern rights discourse.[43] The preservation of liberty—well-regulated

liberty—meant steering a course between arbitrary power and licentiousness.[44] In a speech to the

First Congress on North Carolina's adoption of the Constitution, President George Washington

reminded Congress that America's new experiment in republican government required its

citizens "to distinguish between oppression and the necessary exercise of lawful authority," and

"discriminate the spirit of liberty from that of licentiousness, cherishing the first, avoiding the

---

[39] Sanford Levinson, *United States: Assessing Heller*, 7 INT'L J. CONST. L. 316, 319 (2009).

[40] Jonathan Gienapp *Response: The Foreign Founding: Rights, Fixity, and the Original Constitution,* 97 TEXAS LAW REVIEW ONLINE 115 (2019).

[41] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights,* 3 CRITICAL ANALYSIS L. 221 (2016**)**.

[42] *Id.*

[43] On the difference between liberty and licentiousness in constitutional discourse in this period, see Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 YALE L. J. 907 (1993). Philodemus [Thomas Tudor Tucker], *Conciliatory Hints, Attempting, by a Fair State of Matters, to Remove Party Prejudice, Charleston, 1784* reprinted in 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA, 1760-1815, at 628 (Donald S. Lutz & Charles S. Hyneman eds., 1983).

[44] Although Justice Scalia rejected a "free standing" balancing test in *Heller,* he implicitly recognized that early American legislatures were free to engage in a variety of forms of balancing exercises when they crafted specific laws limiting aspects of this right. *District of Columbia v. Heller,* 554 U.S. 570. The focus on history and tradition therefore directs judges to canvass the past for precisely these sorts of insights into previous generations decisions about balancing. On the idea of well-regulated liberty and Founding era conceptions of rights, see John J. Zubly, THE LAW OF LIBERTY (Philadelphia 1775). The corresponding modern legal concept would be "ordered liberty," see *Palko v. Connecticut* 302 U.S. 319 (1937) and for a more recent elaboration of the concept, see James E. Fleming & Linda C. McClain, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES 1 (2013).

last."[45]

29.    Although some gun rights scholars have argued that First Amendment jurisprudence should be the model for interpreting the Second Amendment, this was not how early American legislatures and jurists approached these legal questions.[46] Indeed, both as a matter of text and as a matter of early regulation the First and Second Amendments diverge in several important ways.

30.    Textually, the First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits diminishing the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[47] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." The one clear reading of the text that does not make sense is to treat abridge as a synonym for infringe.

31.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by

---

[45] From George Washington to the United States Senate and House of Representatives, 8 January 1790," 4 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES, 543, 8 September 1789–15 January 1790, (ed. Dorothy Twohig, 1993).

[46] For a flawed effort to analogize the First and Second Amendment by a prominent gun rights activist, see David Kopel, *The First Amendment Guide to the Second Amendment,* 81 TENN. L. REV. 417 (2014). For critiques of this approach, see Gregory P. Magarian, *Speaking Truth to Firepower: How the First Amendment Destabilizes the Second,* 91 TEXAS L. REV. 49 (2012). Darrell A.H. Miller, *Analogies and Institutions in the First and Second Amendments: A Response to Professor Magarian,* TEXAS L. REV. 137-151 (2013).

[47] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

App. 222

the common law. Liberty, according to Burn, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[48]

32.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[49] And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[50] Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[51] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive."[52] And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[53] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The two terms were clearly understood to be distinctive in Founding era thinking about rights.

33.    In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions provided that such regulations did not destroy the

---

[48] *Liberty,* A NEW LAW DICTIONARY (1792). *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020).

[49] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[50] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[51] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[52] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[53] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

underlying *right*.

34.     Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[54] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[55] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[56]

35.     In further evidence that the First and Second Amendments were conceived in different ways, many individuals who enjoyed robust First Amendment rights in the Founding era were outside of the scope of the Second Amendment's protections. The same was true for state constitutional analogues of the Second Amendment. The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior

---

[54] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[55] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799) (text available in the Evans Early American Imprint Collection) (emphasis in original).

[56] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

17

restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[57]

36.    The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another. The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us, "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[58] Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[59]

37.    Without robust regulation of arms, ammunition, and accoutrements, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those

---

[57] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[58] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[59] Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic. This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing. On Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

weapons and fine individuals who failed to store them safely and keep them in good working order.[60]

38.    In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

39.    The legal concept of "police"—the power of the people, acting through their government, to enact and enforce laws to protect public health, safety, and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[61] The concept was elaborated by Sir William Blackstone in his influential *Commentaries on the Laws of England*. By the era of the American Revolution, the concept had become foundational to virtually every feature of Anglo-American law.[62] References to the right of the people to regulate their internal police were also included in many of the early state constitutions drafted after the American Revolution.[63] By the antebellum era, the concept of state police power had been further refined by leading jurists and legal theorists.

40.    The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his discussion of

---

[60] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[61] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744, 1744 (Leonard W. Levy et al. eds., 1986).

[62] Santiago Legarre, *The Historical Background of the Police Power* 9 U. PA. J. CONST. L. 745 (2007).

[63] MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. XVII; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

laws regulating gun powder in *Brown v. Maryland.*[64] The power to regulate firearms and

gunpowder is therefore at the very core of the police power and inheres in both states and local

municipalities. Nor was Marshall unique in highlighting the centrality of this idea to American

law. Massachusetts judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil

War era elaborated this point in his influential opinion in *Commonwealth v. Alger,* a decision that

became a foundational text for lawyers, judges, and legislators looking for guidance on the

meaning and scope of the police power. Shaw described the police power in the following

manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and
> establish all manner of wholesome and reasonable laws, statutes and ordinances,
> either with penalties or without, not repugnant to the constitution, as they shall
> judge to be for the good and welfare of the commonwealth, and of the subjects of
> the same. It is much easier to perceive and realize the existence and sources of this
> power, than to mark its boundaries, or prescribe limits to its exercise. There are
> many cases in which such a power is exercised by all well-ordered governments,
> and where its fitness is so obvious, that all well regulated minds will regard it as
> reasonable. Such are the laws to prohibit the use of warehouses for the storage of
> gunpowder.[65]

41.     Applying the emerging paradigm of police power jurisprudence, courts accepted

that limits on the right were constitutional if they promoted legitimate police power goals and did

not negate the right. Individual states enjoyed broad latitude to regulate arms as long as they

adhered to this framework. [66]

42.     Antebellum jurists understood how guns and gun powder were the quintessential

---

[64] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[65] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, see *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[66] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

App. 227

example of how police power regulation functioned. A clear consensus emerged that narrowing the right to promote public safety was permissible provided that the right was not nullified. This notion was central to virtually all antebellum police power jurisprudence.[67]

43.    The utility of the police power framework was that it prevented gun regulations from becoming the legal equivalent of a fly trapped in amber. When faced with changes in technology, consumer behavior, and faced with novel threats to public safety, states and municipalities enacted laws to address these problems. In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about abridgment: did the law negate the ability to act in self-defense.[68] In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition. When new technologies emerged or consumer preferences resulted in particularly dangerous weapons proliferating states acted to regulate them, as was the case with easily concealed weapons during the early nineteenth century.[69] Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

**Laws Regulating Unusually Dangerous Weapons and the Concept of "Common Use"**

---

[67] *State v. Jumel*, 13 La. Ann. 399 (1858). This antebellum consensus was underscored during Reconstruction in a variety of cases, e.g. *State v. Wilburn*, 66 Tenn. 57 (1872). The revisions of post-Civil War constitutional provisions on arms bearing expressly granted authority to regulate arms to state legislatures, a move designed to highlight the jurisprudential consensus articulated in antebellum case law, on this point see Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021). On the continuity between antebellum police power jurisprudence and Reconstruction era law, see NOVAK, THE PEOPLE'S WELFARE, *supra* note 8.

[68] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[69] *E.g.,* 1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, § 2.

44.    In *Bruen*, Justice Kavanaugh's concurrence reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh cited the "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[70]

45.    Blackstone text does not use the phrase "dangerous and unusual." The correct transcription of the text ought to read "dangerous or unusual weapons." The *Heller* quote was a scrivener's error.[71] In *Rahimi* the majority opinion *sub silentio* corrected this scrivener's error, but courts have not yet acknowledged this indisputable historical fact.[72]

46.    The phrase "dangerous and unusual" is an example of hendiadys, a classical rhetorical structure much beloved by Shakespeare. [73] Macbeth's soliloquy declares that life is: "a tale Told by an idiot, full of sound and fury, Signifying nothing." This statement is best interpreted as claiming that life was full of furious sound, not sound plus fury. Treating Blackstone's expression as an example of hendiadys also makes sense given that contemporaries treated the two formulation of the common law prohibition "dangerous and unusual" and "dangerous or unusual" as synonymous in all of the legal treatises and popular constitutional

---

[70] *District of Columbia v. Heller*, 554 U.S. 570, 626−27 & n.26 (2008). Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VA. L. REV. 687 (2016).

[71] On scrivener's errors, see ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 238 (2012); David Ryan Doerfler, *The Scrivener's Error* 110 NW. U. L. REV. 811 (2016); John David Ohlendorf, *Textualism And The Problem Of Scrivener's Error*, 64 ME. L. REV. 119, 155 (2011).

[72] *United States v. Rahimi*, 144 S.Ct. 1889.

[73] G.T. Wright, *Hendiadys and Hamlet* 96 PMLA 168 (1981); Samuel L. Bray, "*Necessary AND Proper" and "Cruel AND Unusual": Hendiadys in the Constitution* 102 VA. L. REV. 687 (2016).

guides of the period. This equivalence only makes sense of the phrase is read as an example of this type of rhetorical form. [74]

47.    Many courts have considered the flip side of "dangerous and unusual" weapons to be weapons in "common use." But that concept rests on a misunderstanding of the Founding era regulation of arms. Indeed, the regulation of arms that were not common, but dangerous makes little historical sense. Only when weapons reached sufficient saturation did they pose a sufficient public safety threat to require action. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[75]

48.    The source of *Heller's* common use test was not Founding law, but rather a poorly documented and erroneous historical claim in *United States v. Miller,* a case that Justice Scalia disparaged for its inadequate research.[76] The assertion that all weapons in common use were protected by the Second Amendment and its state analogues was historically false. Only weapons necessary to maintain a well-regulated militia were given the highest level of constitutional protection. All other weapons enjoyed the same level of protection that any form of private property enjoyed. It is important to note that that this fact did not make the Second Amendment and its state analogues a second-class right. The right of private property was among the most esteemed rights in early American law. Indeed, it formed part of the core of

---

[74] *Cf.* 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (1803) with 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716); Rees, Abraham, *The Cyclopaedia: Or, Universal Dictionary of Arts, Sciences, and Literature*, United Kingdom: S. F. Bradford, 1810 entry under "Peace." FRANCIS WHARTON, PRECEDENTS OF INDICTMENTS AND PLEAS, (1857) at 611; A COMPILATION OF THE PENAL CODE OF THE STATE OF GEORGIA (1850) at 23; HENRY POTTER, THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE (1816) at 39.

[75] Spitzer*, supra* note 11.

[76] *District of Columbia v. Heller*, 554 U.S. 570 (2008), citing *United States v. Miller*, 307 U.S. 174, 179 (1939).

inalienable rights that social contract theorists, most famously John Locke, described in his

trinity of life, liberty, and property.[77] The term inalienable itself derived from English property

law.[78] Inalienable rights were not exempt from regulation, but they could not be "alienated," i.e.

contracted away by individuals.[79] Thus, the claim that *Heller* requires that all weapons in

common use must enjoy the same level of legal protection has no foundation in Founding era

law.

      49.    Guns and gun powder were treated as a form of property subject to the full range

of police power authority.[80] Only a tiny percentage of guns in private hands were given

constitutional protections beyond those enjoyed by most forms of property.[81]

      50.    Specifically, in most states only militia weapons enjoyed the highest level of

constitutional protection. Privately owned guns unconnected to militia service were treated as

ordinary property, no different than other non-essential home furnishings or furniture. The table

below lists the legal treatment of various types of arms in debt proceedings and sales of goods

for tax arrears.

---

[77] Locke, John. *The Two Treatises of Civil Government (Hollis ed.)*. A. Millar et al., 1689. *Online Library of Liberty,* https://oll.libertyfund.org/titles/hollis-the-two-treatises-of-civil-government-hollis-ed.

[78] Nancy E. Johnson, *Political and Legal Thought*, in Frans De Bruyn, ed. THE CAMBRIDGE COMPANION TO EIGHTEENTH-CENTURY THOUGHT (2021).

[79] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).

[80] See Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L. J. 25, 38 (2023).

[81] *Id.*

**Enhanced Legal Protections for Militia Arms in the Founding Era**

| State | Militia Arms Exempt from Seizure[82] | Private Guns Exempt from Seizure[83] |
|---|---|---|
| Connecticut | Yes | Yes |
| South Carolina | Yes | No |
| Virginia | Yes | No |
| Massachusetts | Yes | No |
| Pennsylvania | Yes | No |
| Delaware | Yes | No |
| New Jersey | Yes | No |
| New York | Yes | No |
| Maryland | Yes | Yes |
| North Carolina | Yes | No |
| New Hampshire | Yes | No |
| Georgia | Yes | No |
| Rhode Island | Yes | No |

---

[82] For examples of militia laws exempting military arms, see ROBERT WATKINS & GEORGE WATKINS, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA: FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR 1798, INCLUSIVE AND THE PRINCIPLE ACTS OF 1799, App'x no. XLIX, 816-17 (1800) ("And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required, as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales for debt or for the payment of taxes"); *accord* Acts and Laws of the State of Connecticut, in America, 432 (1784); 2 LAWS OF THE STATE OF DELAWARE FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1137 (1797); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed, 587 (1793); 3 Laws of the State of New York Passed at the Sessions of the Legislature, ch. 166, 453 (1801); Henry Flanders & James Mitchell, The Statutes at Large of Pennsylvania from 1682 to 1801, app'x XXXIV, 458 (1793); Thomas Herty, A Digest of the Laws of Maryland, Laws of the District of Columbia, 173 (1804); Constitution and Laws of the State of New-Hampshire; Together with the Constitution of the United States, 258 (1805); WILLIAM PATERSON, LAWS OF THE STATE OF NEW-JERSEY 448 (1800); 2 FRANCOIS-XAVIER MARTIN, THE PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH-CAROLINA 1800 (1804); Public Laws of the State of Rhode-Island and Providence Plantations, 55 (1798-1813); JOHN FAUCHERARAUD GRIMKÉ, THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 234 (1790); A Collection of All Such Acts of the General Assembly of Virginia, 290 (1792).

[83] In 1821, Pennsylvania passed an act "[t]o encourage domestic industry, and promote the comfort of the poor." The act sought to identify items essential to family life that ought to be exempt from seizure in debt proceedings. To aid them in formulating such a list the legislature compiled an "abstract of the provisions made by the acts of assembly in several of the states." Although virtually every state singled out militia arms for special enhanced legal protection only two states extended the same protection to non-militia weapons, JOHN PURDON, A DIGEST OF THE LAWS OF PENNSYLVANIA 271 (1824); An Act for Directing and Regulating the Levying and Serving of Executions, 1 PUBLIC STATUTE LAWS OF CONNECTICUT 280 (1808); 1 THE LAWS OF MARYLAND: 1692-1785 105 (1811).

App. 232

51.     Indeed, the scope of government power to regulate, prohibit, and inspect gun powder has been among the most far reaching of any exercise of the police power throughout American history. [84] The many ordinances authorizing local government officials to search for gun powder illustrates the scope of this authority.[85] Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[86] New York city granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> [I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever. [87]

52.     The market revolution, roughly the period between 1820s and 1850s, transformed gun culture by making a variety of weapons, including handguns, more common. These new handguns were not only cheaper, but more accurate and more easily concealed.[88] In response to the rise in inter-personal violence caused by the proliferation of these weapons, states enacted

---

[84] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[85] *Id*.

[86] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218.

[87] N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York, (1793).

[88] On the more violent nature of southern society, see RANDOLPH ROTH, AMERICAN HOMICIDE 15, 300, 352 (2009). Slavery contributed the violence in the region but there is a rich historical debate on how to best characterize the roots of southern violence. I. M Leonard & C.C. Leonard, *The Historiography of American Violence* 7 HOMICIDE STUDIES 99 (2003); Pieter Spierenburg, *American Homicide. What Does the Evidence Mean for Theories of Violence and Society?* 115 CRIME, HISTOIRE & SOCIÉTÉS / CRIME, HISTORY & SOCIETIES, 123 (2011).

new limits on public carry, In some, but certainly not all jurisdictions, challenges to these new laws produced the first state court decisions on the meaning and scope of state constitutional arms bearing provisions.[89] In some parts of the Slave South, an expansive libertarian view of the scope of the right to keep and bear arms emerged to justify whites arming themselves because of the violent nature of life in this region of the United States. But outside of the slave South, a more restrictive model gained ascendency. [90]

53.     By mid-century a strong consensus in American law had emerged on the broad scope of the police power.[91] Francis Lieber, a leading commentator on American politics and law in the nineteenth century, confidently described its role in Anglo-American law in lucid terms. The police power, he observed, "in the common acceptation of the word, in the United States and England," was "applied to the municipal and officers provided for maintaining order."[92]

54.     No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.[93] Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.[94] This conception of law was familiar to most early American lawyers and judges who

---

[89] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020)

[90] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. F. 121 (2015)

[91] John L. Brooke, Patriarchal *Magistrates, Associated Improvers, and Monitoring Militias: Visions of Self--Government in the Early American Republic, 1760--1840,* in Peter Thompson and Peter S. Onuf, eds., STATE AND CITIZEN: BRITISH AMERICA AND THE EARLY UNITED STATES (2013).

[92] FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

[93] *United States v. Rahimi,* 144 S.Ct. 1889, 1925 (2024) *(*Barrett, J. concurring).

[94] In the extensive notes he added to James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power James Kent, 2 *Commentaries on American Law* 12 ed., Oliver Wendell Holmes, Jr., editor (Boston, 1873) at 340 note 2.

had been schooled in common law modes of thinking and analysis.[95] Throughout the long arc of

Anglo-American legal history, government applications of the police power were marked by

flexibility, allowing local communities to adapt to changing circumstances and craft appropriate

legislation to deal with the shifting challenges they faced.[96] This vision of the police power was

articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote

this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the
> changing exigencies of society. In the progress of population, of wealth, and of
> civilization, new and vicious indulgences spring up, which require restraints that
> can only be imposed by new legislative power. When this power shall be exerted,
> how far it shall be carried, and where it shall cease, must mainly depend upon the
> evil to be remedied.[97]

### State Police Power to Regulate Firearms During Reconstruction (1863-1877)

55.     Some courts and scholars have puzzled over the proper time frame for analyzing

the American tradition of regulation of firearms. Among the most important issues is the

relevance of laws enacted after the Founding era and how they ought to figure into *Bruen* and

*Rahimi*'s framework. But this confusion over the relative weight to assign post ratification

developments, including Reconstruction, evaporates when early American gun regulation is

placed within the police power framework universally adopted by American jurists across the

nineteenth century.[98] American jurists in the century after the adoption of the Second

---

[95] KUNAL M. PARKER, COMMON LAW, HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM (2013); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005).

[96] William J. Novak, *A State of Legislatures* 40 POLITY 340 (2008).

[97] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847). For a clear example of the application of this doctrine to gun regulation, see *State* v. *Reid,* 1 Ala. 612, 612 (1840).

[98] *See, e.g., Williams v. City Council of Augusta*, 4 Ga. 509, 512 (1848). *See, e.g.,* FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

Amendment approached issues of regulation within the police power framework, which was developed by the Marshall Court and elaborated by dozens of jurists in individual states.[99] Although the problems governments confronted changed over the course of the nineteenth century, the underlying police power framework proved extremely flexible and enduring over the entire course of the nineteenth century.[100]

56.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right, a Founding era formulation that was grounded in the idea of popular sovereignty. As a result, state constitutions after the Founding era no longer included positive affirmations of a police right. Secondly, as far as the right to bear arms was concerned the constitutional "mischief to be remedied" had changed as well.[101] Constitution writers in the era of the American Revolution feared powerful standing

---

[99] *Brown v. Maryland* 25 U.S. (12 Wheat.) 419, 442-43 (1827) 25 U.S.

[100] NOVAK, THE PEOPLE'S WELFARE, *supra* note 8.

[101] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, at *61. The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822). For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[102]

57.    The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the right codified in 1776, linking the right to bear arms inextricably with the states' broad police power to regulate conduct to promote health and public safety.[103] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[104] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[105] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus,

---

[102] *See McDonald*, 561 U.S. at 767–68 for an elaboration of the significance of the elimination of language focused on militias from state arms bearing provisions.

[103] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. 65 (2022).

[104] Tex. Const. of 1868, art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* Idaho Const. of 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); Utah Const of 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[105] Cornell, *supra* note 103, at 75–76.

millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority was at its apogee when regulating guns.[106]

58.    This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[107]

59.    Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a state's police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[108]

60.    Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.

---

[106] *Id.*

[107] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[108] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance,* 53 BUFFALO L. REV. 1215 (2005).

App. 238

The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[109] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good.[110]

61.    It would be difficult to understate the practical impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[111] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[112]

62.    These legal changes responded to the unprecedented challenges guns posed to public safety in post-Civil War America. Developments in firearms technology made guns more reliable, cheaper, and far more lethal.

63.    Post-Civil War America experienced a variety of other changes that also led to greater social unrest and crime. Urbanization, immigration, racial strife, and labor unrest contributed to these problems.[113] Together, all of these factors led to rising levels of gun violence

---

[109] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[110] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[111] *See* Spitzer, *supra* note 11, at 59–61 tbl. 1.

[112] *Id.*

[113] RICHARD WHITE, THE REPUBLIC FOR WHICH IT STANDS: THE UNITED STATES DURING RECONSTRUCTION AND THE GILDED AGE, 1865-1896 (2017)

and gun accidents in the post–Civil War era.

64.     Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[114]

65.     In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[115] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican-controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[116] Indeed, without such laws both Republicans and free persons would have been entirely at the mercy of terrorist violence by organizations such as the Ku Klux Klan. [117]

---

[114] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[115] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016).

[116] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted,* 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[117] Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

App. 240

66.    Reconstruction-era laws reflected both the growing problem of gun violence, not a major issue in the Founding era, and the greater urbanization and population density of the nation in the decades after the Civil War.

67.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

**Applying the Police Power to New Problems: Age Limits as Exemplar**

68.    One of the most dramatic expansions in regulation after the Civil War occurred in laws limiting minors from acquiring and using guns. Over ninety percent of the guns in circulation during the Founding era were long guns which were heavy and difficult to use. Given these facts it is not surprising that there were no laws to address a problem that did not yet exist, that is, accidents that could result from children's access to firearms.

69.    The increase in gun violence and accidents involving minors drew notice by jurists, journalists, and physicians.[118] Journalists, religious and educational leaders, public health experts, and law enforcement all weighed in on this novel problem and expressed support for legislating to protect American youth from this growing danger.[119] Indeed, there was a pronounced increase in discussion of these types of concerns in the press following the Civil War, as the following table demonstrates.

---

[118] Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868,* 108 MINN. L. REV. 3049 (2024).

[119] *Id.*

| Number of Articles Mentioning Accidental Shootings of Children in the New York Times | |
| --- | --- |
| Year | Number of Articles |
| 1860s | 9 |
| 1870s | 28 |
| 1880s | 32 |
| 1890s | 41 |
| Data Based on Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017). | |

*Puck* magazine published a satirical cartoon in December of 1881 with the revealing title "A Dangerous American Institution—The Free and Untrammeled Revolver."[120]



70.     Two of the five panels depicted in the cartoon addressed the problem posed by the easy access young people had to "pocket pistols," a small, easily concealed revolver. In the lower

---

[120] Frederick Burr Opper's "A Dangerous American Institution-The Free and Untrammeled Revolver," from December 14th, 1881. The Ohio State University Billy Ireland Cartoon Library & Museum, originally published in PUCK, December 14, 1881.

App. 242

left, a group of young men with pistols prominently protruding from their pants pockets stand about idly, smoking, and sporting their partially hidden guns. (Under American law, any gun partially concealed was treated as a concealed weapon.) In the upper right, a group of children clamor for pistols so they can emulate the exploits glorified in the sensationalist press and dime novels.

71.    To address the novel problems of the time, legislatures employed new regulatory strategies. The traditional common law tools of preserving the peace, most notably the use of sureties and recognizances, were eventually supplanted by new legal and administrative tools.

72.    The number of laws passed to deal with this problem increased dramatically over the course of the nineteenth century. After surveying hundreds of gun laws in the nineteenth century, political scientist Robert Spitzer concluded that "[n]umerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s." In fact, he found that, in the period between 1868 and 1899, restrictions on minors' access and use of arms were more common than limits on felons.[121]

73.    The regulation of firearms access for those under the legal age of majority was an area of the law in which the police power was at its greatest reach. The respected post-Civil War legal commentator Lewis Hochheimer, a leading authority on the status of minors, noted in his book *The Law Relating to the Custody of Infants* that "infants," a legal term of art that applied to all persons below the age of legal majority, were not entirely beyond the protection of the Bill of Rights. Nonetheless, Hochheimer was quick to point out that the need to protect those below the age of majority meant that some types of firearms regulations that were impermissible if applied to adults were perfectly legal when regulating infants. In this instance, the broad power to protect

---

[121]Spitzer, *supra* note 11.

36

the welfare of minors gave government extraordinary latitude in regulating their conduct. Hochheimer's comments echoed other commentators from the period who saw firearms regulation as the *locus classicus* of state police power authority.[122]

### Summary

74.     States and localities have regulated gunpowder and arms since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

75.     The metric used by courts to adjudicate questions about the scope of permissible regulation has remained constant over the long arc of American history. To constitute an infringement of the right the law must burden the right of self-defense to such a degree that it effectively negates it. As long as laws stay within this well-established  threshold, they have been held to be constitutional as a valid exercise of the state's police power.

---

[122] See Lewis Hochheimer, *The Police Power*, 44 CENT. L.J. 158, 158, 161 (1897). Hochheimer defined the police power as "the inherent and plenary power of a State or government to prescribe regulations to preserve and promote the public safety, health and morals, and to prohibit all things hurtful to the comfort and welfare of society." *Id.* at 158. He noted that "[t]he constitutionality of statutes as to the care and protection of minors has been universally upheld," and that States may utilize their police power in regard to minors for purposes of care and "moral training."

I declare under penalty of perjury that the foregoing is true and correct.

      Executed on 9/16/24 at Redding, CT.

*Saul Cornell*

_____

              Saul Cornell

# EXHIBIT A

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✶ Bronx, NY 10458 ✶ 203 826-6608 (c) ✶ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
| --- |

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Book Publications** |
| --- |

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u>  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u>  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of  American Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  <u>Albany Government Law  Review</u>  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u>  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u>  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u>  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u>  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

### Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse,"  <u>New York Daily News</u> Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"* *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

---

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations, Amicus Briefs and Symposia

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

App. 259

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).


**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]
Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]
Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
Amicus Brief, Young v. State of Hawaii  NO. 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, Flanagan vs. Becerra, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, Gill v. Whitford (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

App. 260

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### Law Review Symposia Organized

**Second Amendment:**

"The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev.* 487 (2004).

"Gun Control: Old Problems, New Paradigms" 17 *Stan. L. & Pol'y Rev.* 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA, JUDSON THOMAS, COLBY CANNIZZARO, CAMERON PROSPERI, THE GUNRUNNER, LLC, and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth Of Massachusetts, TERRENCE REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, <br><br> Defendants. | CIVIL ACTION NO. 1:21-CV-10960-DJC |

## EXPERT REPORT OF BRIAN DELAY

### Background and Qualifications

1.      I am Professor of History and the Preston Hotchkis Chair in the History of the

United States at the University of California, Berkeley.  I received my B.A. from the University

of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University.

My first book, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (Yale

University Press, 2008), won best book prizes from several scholarly organizations. Since 2010,

I have been working on three interrelated projects about the historic arms trade: a monograph

about the arms trade in the era of American Revolutions (under contract with W.W. Norton and

scheduled to be published in 2026); a second monograph about guns, freedom, and domination in

the Americas from 1800-1945 (also under contract with W.W. Norton); and a database tracking

the global trade in arms and ammunition between the end of the Napoleonic Wars and the start of

1

World War I. These projects are grounded in primary-source research in archives in the United States, England, Spain, and Mexico. "The Arms Trade and American Revolutions," a 20,000-word, peer-reviewed scholarly article previewing some of this research appeared in the September 2023 issue of the *American Historical Review*, the flagship journal of the history discipline. In 2024, that article won the Vandervort Prize for outstanding article in military history from the Society for Military History. In February 2025, the *California Law Review* will publish my 35,000-word article "The Myth of Continuity in American Gun Culture."

2.      I have delivered around three dozen presentations on firearms history at universities in the U.S. and abroad, including Harvard University, the University of Chicago, Stanford University, Oxford University, Cambridge University, the University of Melbourne, Doshisha University in Kyoto, Japan, the Zentrum für Interdisziplinäre Forschung (ZIF), in Bielefeld, Germany, and the Université de Poitiers, France.  My research on the history of firearms has been supported by grants from the American Philosophical Society, the British Academy, the American Council of Learned Societies, and the Stanford Humanities Center, among other organizations. In 2019, I was awarded a Guggenheim fellowship.

3.      I have been retained by the Office of the Attorney General of Massachusetts to provide expert testimony in litigation challenging various aspects of Massachusetts' requirements for the commercial sale of handguns. For my work on this matter, I am being compensated at a rate of $250/hour for research, writing, and consultation, and $400 for deposition, travel, and testimony.

4.      In addition to my work on this case, I've served as an expert witness in *Hartford, et al. v. Ferguson, et al.*, No. 3:23-cv-05364-RJB (W.D. Wash.); *Banta, et al. v. Ferguson and Batiste*, No. 2:23-cv-00112-MKD (E.D. Wash); *Guardian Arms, et al. v. State of Washington, et*

*al.*, No. 23-2-01761-34 (Wash., and County of Thurston); *Hanson v. District of Columbia*, 22-cv-02256 (D.D.C.); *Arnold v. Kotek, et al.*, No. 22CV41008 (Harney Cty. Cir. Ct.); *Oregon Firearms Federation, et al., v. Kotek, et. al.*, 22-cv-01815 (D. Ore.)[1]; *Wiese, et al. v. Bonta, et al.,* 2:17-cv-00903 (E.D. Cal); *Sullivan, et al. v. Ferguson, et al.*, 3:22-cv-05403 (W.D. Wash.); *Brumback, et al. v. Bob Ferguson, et al.*, 1:22-cv-03093-MKD (E.D. Wash.); *Rocky Mountain Gun Owners et al. v. The Town of Superior, et al.*, 22-cv-2680 (D. Col.); *Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Platkin, et al.*, 3:18-cv-10507 (D.N.J.); *Cheeseman, et al. v. Platkin, et al.*, 1:22-cv-04360 (D.N.J.); *Ellman, et al. v. Platkin, et al.*, 3:22-cv-04397 (D.N.J.); *Rigby et al. v. Jennings, et al.*, 1:21-cv-01523-MN (D. Del.); *National Association of Gun Rights, et al. v. Polis*, 24-cv-00001-GPG-STV (D. Colo); and *Palmer, et al. v. Sisolak, et al.*, 3:21-cv-00268-MMD-CSD (D. Nev.). The only cases in the last four years in which I testified are *Oregon Firearms Federation, supra, Arnold v. Kotek, supra*, and *National Association of Gun Rights v. Polis, supra*. A true and correct copy of my curriculum vitae is attached as Exhibit A to this report.

## SUMMARY OF OPINIONS

5.     I have been asked to provide opinions on the role of guns in society over time. Given *Bruen*'s[2] emphasis on history, text, and tradition, and *Rahimi*'s[3] injunction to prioritize "the principles that underpin our regulatory tradition" over a narrow text-by-text comparison of

---

1.     Oregon Firearms Federation, et al. v. Tina Kotek, et. al., has been consolidated with three other actions:  Fitz v. Rosenblum et al., 3:22-cv-01859 (D. Ore.), Eyre v. Rosenblum, et al., 3:22-cv-01862 (D. Ore.), and Azzopardi v. Rosenblum, et al., 3:22-cv-01869 (D. Ore.).

2.     *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

3.     *United States v. Rahimi*, 602 U.S. ---- (2024), 144 S. Ct. 1889 (2024).

contemporary and historic laws, it is important to inquire into the changing role of guns in society over time.

6.      Most notably for purposes of this declaration, whereas our present-day gun culture is consumerist, government-phobic, and individualist, gun culture in eighteenth century British North America and in the early United States was utilitarian, government-led, and collective. Further, out of early distinctions between civilian and military arms has grown a common practice of carving out exceptions for military and law enforcement purposes when regulating civilian firearms.

7.      These opinions should be understood in the context of the current state of historical research into firearm regulation. We have an incomplete understanding of the history of firearm regulation in the United States. Electronically searchable compendia of historic laws have only captured part of our legal tradition. They are particularly lacking when it comes to common law tradition and to local ordinances, where (as today) much regulation and enforcement originated,[4] as the Supreme Court acknowledged in *Rahimi* when it relied on common law "prohibitions on going armed and affrays" as part of the relevant historical "tradition."[5] Still, even the incomplete record reveals a rich regulatory tradition in pursuit of public safety – safety as authorities at the time defined it. Authorities in British North America and in the early United States passed hundreds of laws that directly or indirectly regulated firearms prior to 1791. Nearly all of them were motivated by concerns for public safety. Sometimes they anticipated laws in our own era. For example, colonies and states passed laws

---

4.      Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 158 (2023).

5.      *Rahimi,* 144 S. Ct. at 1901.

regulating the carrying[6] or brandishing[7] of particular weapons; forbidding discharge in sensitive times[8] and places;[9] and sentence enhancements for crimes committed with arms.[10] Regulations of all these types were enacted in the decade before the ratification of the Second Amendment, and they reflect public safety concerns familiar to twenty-first century Americans.

### Comparing Gun Cultures in the Founding Era and Today:
### Utilitarianism Versus Consumerism

8.    As relevant to the plaintiffs' challenge in this case, one conspicuous feature of our contemporary gun culture is the degree to which firearms are prized and heavily marketed consumer goods.[11] A landmark 2016 study from researchers at Harvard and Northeastern

---

6.    See, e.g., An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786), *available at* https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/ (last visited June 1, 2023).

7.    See, e.g., An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), *available at* https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/ (last visited June 1, 2023).

8.    See, e.g., An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, 1784–1785 N.Y. Laws 152 (1785), *available at* https://firearmslaw.duke.edu/laws/1784-1785-n-y-laws-152-an-act-to-prevent-firing-of-guns-and-other-firearms-within-this-state-on-certain-days-therein-mentioned-ch-81/ (last visited June 1, 2023).

9.    See, e.g., the 1788 Ohio Law 42, "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4, 1788–1801 Ohio Laws 42 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-42-an-act-for-suppressing-and-prohibiting-every-species-of-gaming-for-money-or-other-property-and-for-making-void-all-contracts-and-payments-made-in-furtherance-thereof-ch-13/ (last visited June 1, 2023).

10.    See, e.g., the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-20-a-law-respecting-crimes-and-punishments-ch-6/ (last visited June 1, 2023).

11.    For recent accounts of the business of marketing and selling firearms in the United States, *see* RYAN BUSSE, GUNFIGHT: MY BATTLE AGAINST THE INDUSTRY THAT RADICALIZED AMERICA (2021); and JENNIFER CARLSON, MERCHANTS OF THE RIGHT: GUN SELLERS AND THE

University found that today's so-called "super-owners," the 3% of Americans who—for reasons of collecting or prepping or both—own the most guns, possess roughly half of all privately held firearms in the country.[12]

9.      Contrast that with the colonial era. Large firearm collections were extremely rare in the eighteenth century. Only for a small minority of wealthy colonial buyers could finely-made arms be valued and pleasing material possessions.[13] Historian Kevin Sweeney's painstaking work in probate records from British North America has revealed that only 4.4% of male probate inventories contained more than three firearms, and that only 1.4% contained more than five.[14] Rather than aficionados or preppers, most of the tiny number of early American "super-owners" had entirely practical, utilitarian reasons to maintain private arsenals. More than two-thirds of those in Sweeney's sample who owned six or more guns were southern slaveholders.[15] All ten of the probate inventories in the sample containing ten guns or more belonged to South Carolinian planters who ran vast slave labor enterprises, averaging ninety-five enslaved laborers each.[16] Americans of the late eighteenth century would have found today's

---

CRISIS OF AMERICAN DEMOCRACY (2023).

12.      Lois Beckett, *The Gun Numbers: Just 3% of American Adults Own a Collective 133m Firearms*, THE GUARDIAN (Nov. 15, 2017), *available at* https://www.theguardian.com/us-news/2017/nov/15/the-gun-numbers-just-3-of-american-adults-own-a-collective-133m-firearms.

13.      Michael LENZ, "ARMS ARE NECESSARY": GUN CULTURE IN EIGHTEENTH-CENTURY AMERICAN POLITICS AND SOCIETY 138-40 (2010).

14.      Kevin M. Sweeney, *An Eighteenth-Century Gun Culture Shaped by Restraints*, Sept. 6, 2023, Duke Center for Firearms Law Second Thoughts Blog, https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints

15.      See Kevin M. Sweeney's declaration at 12 in *Nguyen et al., v. Bonta*, 3:20-cv-02470-WQH-BGS (S.D. Cal.).

16.      *Id.*

hyper-commercialized culture of consuming guns—in which individuals amass large collections of firearms for non-utilitarian purposes—deeply alien.

10.     Another salient difference between colonial gun culture and gun use today is that, prior to the widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century, firearms had to be muzzle-loaded with gunpowder and ball before every shot, either by pouring ammunition direct into the barrel or packing in a pre-made paper cartridge loaded with powder and ball.[17] Such guns were seldom kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly.[18]

11.     The relative scarcity of laws prohibiting the commercial sale of firearms in the Founding Era is unsurprising for several reasons. Most of them (vast differences in firearms technology, manufacturing, and markets; vast differences in the size, purpose, and regulatory capacity of the state) are outside the scope of this declaration. But one of the most important reasons is that the Founding generation was a war-time generation. Arming as many white men as possible for military service took precedence over other goals.

12.     For this reason, the most consequential early American firearm regulations concerned militias: the formal, compulsory, selective, state-sanctioned organizations through which colonists undertook most martial activities. Colonial authorities passed hundreds of militia laws before the Revolution, laws mandating how these armed bodies were to be constituted,

---

17.     Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 116–17 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019)

18.     *Id.* at 117.

mobilized, equipped, led, and disciplined.[19] This body of legislation fostered an uneven geography of gun ownership across British North America.

13.     Research in probate records makes it clear that colonial governments exerted a powerful influence on the geography of gun ownership in the British colonies, and that they did so primarily through the mechanism of militia laws. Gun ownership was highest in those colonies where governments energetically encouraged and supported militia service. These were places where slavery, conflicts with Native nations, and/or nearby imperial rivals provoked security concerns. In such places, colonial authorities mandated gun ownership and, in times of heightened anxiety, took steps to equip militiamen who lacked their own arms.[20]

14.     In mid-seventeenth-century New England, for example, with its violently expanding settler frontier and robust militia tradition, nearly 70% of male probate inventories included a firearm.[21] In contrast, mid-Atlantic colonies with weak or nonexistent militia traditions usually had far lower rates of gun ownership. Dutch and English New Yorkers, accustomed to relying on professional military and Native allies, owned fewer firearms than their counterparts north or south. There, firearms appear in just over half of late seventeenth-century

---

19.     Several hundred of these laws were anthologized by the Selective Service System in the mid-twentieth century. See MILITARY OBLIGATION: THE AMERICAN TRADITION; A COMPILATION OF THE ENACTMENTS OF COMPULSION FROM THE EARLIEST SETTLEMENTS OF THE ORIGINAL THIRTEEN COLONIES IN 1607 THROUGH THE ARTICLES OF CONFEDERATION 1789 (ARTHUR VOLLMER ED., 1947).

20.     The association between militia organization and changes in firearm possession over time and place is a dominant theme in Kevin Sweeney's work, cited above.

21.     See table 3.6 in Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 75 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019).

inventories, and in barely more than a third by the mid-eighteenth century.[22] In Pennsylvania, New Jersey, and Delaware, with few enslaved laborers, no nearby imperial rivals, and, until the mid-eighteenth century, relatively peaceful relations with Indigenous neighbors, pacifist Quaker proprietors repressed militias during most of the colonial era. As a result, here again only around a third of Pennsylvania's probate inventories contained firearms before independence.[23]

15.    Government played an enormous role in these shifting patterns of gun ownership, not only through militia regimes specific to individual colonies but through the primary fount of firepower, the imperial metropole. To a greater degree than in previous inter-imperial conflicts, the Seven Years' War came to turn on events in North America. British war planners needed to recruit tens of thousands of colonists but found that most of them were either unwilling or unable to muster into service with an appropriate firearm. Consequently, Britain shipped more than 66,000 guns to the colonies between 1756-1763.[24] That sudden infusion of firepower might have represented a fifty percent increase in the number of guns available in British North America. While thousands of these arms remained in colonial storehouses or crown arsenals after 1763, the majority apparently stayed with the colonists who mustered out of service.[25]

---

22.    *Id.*

23.    Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER 321-23 (Saul Cornell & Nathan Kozuskanich eds., 2013).

24.    De Witt Bailey, the main expert on the topic, found that the British Ordnance Department sent colonial authorities in British North America 10,000 muskets in 1756 and another 12,000 in 1758. During the war, merchants operating under government license shipped another 7610 firearms to colonial governments, and 36,592 "for the planters" – that is, for private buyers. Presumably most of these buyers were likewise motivated by the war. Bailey's figures exclude weapons shipped for the Indian trade. *See* DE WITT BAILEY, SMALL ARMS OF THE BRITISH FORCES IN AMERICA: 1664-1815, 119–24, 236–38 (2009).

25.    *Id.*

16.     Colonial British North America's gun culture, in summary, was very different from the one that prevails today in key ways. The vast majority of guns in circulation were muzzle-loading, single-shot, flintlock firearms. Encouraged and assisted by the metropole and by colonial assemblies, British North Americans armed themselves with these weapons for the purpose of responding to *shared* threats and opportunities. The result, evident in the shifting geography of firearms ownership, was a gun culture that was utilitarian, rather than consumerist; government-led, rather than government-phobic; and collective, rather than individualist.

### Distinguishing Civilian and Governmental Purposes: The History of Military and Law Enforcement Exceptions to Firearms Regulations

17.     Another feature of gun culture and regulation relevant to the laws challenged in this suit is a distinction between firearms suited to civilian use, and those suited to military or law enforcement use.

18.     Given their needs, civilians were far more likely to own less expensive, lighter long-arms than they were to own the heavier, large-caliber "muskets" used by European militaries. But colonial and early national leaders trying to organize forces against regular armies had different needs than civilians. They complained bitterly about the inferiority of most civilian arms for military service. During the Seven Years' War, for example, one despairing official reported that the arms "which belong to private persons are mostly poor and undersized and unfit for an expedition."[26] A little more than a decade later, when he was first trying to forge a revolutionary army out of New England's militiamen, General Washington complained that "of

---

26. Quote is from *Id.*, 331.

Arms those brought in by the Soldiers are So very indifferent that I Cannot place Confidence in them."[27]

19.    In sum, early Americans recognized a distinction between military and civilian arms. At that time, however, the line between the two was not rigid for two basic reasons. First, the weapons on either side of that line were similar: single-shot, muzzle-loading firearms that were time-consuming to reload. Second, early America was a wartime society. Slavery and the displacement of Native peoples, constant preoccupations throughout the colonial and early national periods, were both military projects usually executed by civilians serving temporarily in state-organized patrols or militias. Moreover, inter-imperial conflicts routinely drafted men into military service. In other words, authorities in early America had to rely on civilians for various forms of collective offense and defense. In such times, they frequently encouraged civilians to arm themselves with muskets, rather than (or in addition to) the lighter firearms most common in the colonies. Inevitably, then, some arms favored by civilians were put to military use in early America, and some arms favored by militaries were owned by civilians.

20.    During the antebellum nineteenth-century, legislators began inscribing more rigid distinctions into law. State and local authorities around the nation enacted numerous laws throughout the century aimed at addressing the mounting social problems caused by firearms and other deadly weapons. Sometimes state lawmakers included explicit language in these laws exempting officers of the state from their provisions. Georgia's 1837 "Act to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons,"[28]

---

27. Washington to Major General Richard Montgomery, Cambridge, January 12, 1776, https://founders.archives.gov/documents/Washington/03-03-02-0051

28. Georgia's Supreme Court declared certain parts of the 1837 law unconstitutional in

11

for example, outlawed the sale, keeping, or concealed carrying of bowie knives, pistols, dirks, sword canes, and other weapons. The act stipulated that its provisions "shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise."[29]

21.    Municipal authorities incorporated similar exemptions into law. In 1856, New Orleans forbade dangerous weapons (concealed or otherwise) in "any theatre, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement." Military personnel were explicitly exempt.[30]  In 1857, Washington D.C. prohibited the carry of various dangerous weapons, including pistols and Colt revolvers, but exempted "police officers, the members of the auxiliary guard, and the military" from its provisions.[31] Memphis passed a similar ordinance that same year but required police officers to obtain permission from a commanding officer to carry any of the prohibited weapons.[32] In 1859, the city of Georgetown (in what is now the District of Columbia) forbade concealed "deadly or dangerous weapons," but provided that "the police officers and military, when on duty, shall be exempt from such fines and forfeitures."[33] In 1861, authorities in Saint Louis, Missouri, passed a

---

1846, in *Nunn v. State,* 1 Ga. (1 Kel.) 243, though not because law enforcement were exempt.

29. State of Georgia. *Acts and Resolutions of the General Assembly of the State of Georgia, Passed in November and December, 1837* (Milledgeville: Boughton, Nisbet & Barnes), 90-91.

30. See *Jewell's Digest of the City Ordinances* (New Orleans, 1882), pp. 1-2.

31. Washington D.C. City Ordinance, approved Nov. 4, 1857, reprinted in *The American* (Washington, D.C.), Nov. 11, 1857.

32. See Smith P. Bankhead, *Digest of Charters and Ordinances of the City of Memphis* (Memphis, Tenn., 1860), 286.

33. See *Ordinances of the Corporation of Georgetown, from January 1859, to January 1860*, Washington, D.C., Thomas McGill, 1860, p. 22-23.

conceal-carry prohibition and stipulated that "[n]othing in this ordinance shall be so construed as to prohibit any United States, State, county or city officer from carrying and wearing such weapons as may be necessary in the proper discharge of his duties."[34]

22.    Explicit distinctions in law became even more common in state and territorial law after the Civil War massively increased the prevalence of firearms in American life. For instance, an 1870 Texas law made it a misdemeanor offence to go to any public assembly with "a bowie-knife, dirk, or butcher-knife, or fire-arms, whether known as six shooter, gun, or pistol of any kind," but stipulated that "nothing contained in this section shall apply to locations subject to Indian depredations: And provided further, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."[35] Three years later, Iowa's law prohibiting concealed weapons stipulated that it "shall not apply to police officers and other persons whose duty it is to execute process or warrants, or make arrests."[36] Washington State's conceal-carry prohibition from 1881 used nearly identical language.[37]

---

34. *The Revised Ordinances of the City of Saint Louis* (Saint Louis: 1861), 513.

35.    Available    at    the    Duke    Repository    of    Historical    Gun    Laws, https://firearmslaw.duke.edu/laws/george-washington-paschal-reporter-a-digest-of-the-laws-of-texas-containing-laws-in-force-and-the-repealed-laws-on-which-rights-rest-carefully-annotated-3rd-ed-vol-2-page-1322-image-292-washi, accessed Jan. 31, 2024.

36. See *The Code: Containing all the Statutes of the State of Iowa*, Vol. 2 (Des Moines, 1873), 603.

37. Wash. Code § 929 (1881): "If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days: Provided, that this section shall not apply to police officers and other persons whose duty it is to execute process or warrants, or make arrests."

13

23.    All told, between 1864 and 1892, at least eighteen states[38] and three territories[39] incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms.

24.    Municipalities continued to do the same. In 1869, for example, authorities in Memphis, Tennessee passed an ordinance punishing the carrying of concealed weapons with a fifty dollar fine, but exempted "sworn officers of the law."[40] Other examples known to me

---

38. In addition to the Texas, Iowa, and Washington laws above, these include New York, 1866 (see *Statutes at Large of the State of New York* (Albany: 1869), pp. 810-11); Nevada, 1867 (*Statutes of the State of Nevada Passed at the Third Session of the Legislature, 1867* (Carson City: 1867), p. 66); Georgia, 1870 (*The Code of Georgia* (Atlanta: 1882), p. 1181-82; Missouri, 1875 (*Laws of Missouri* (Jefferson City: 1875), pp. 50-51; Tennessee, 1870 (*A Compilation of the Statute Laws of the State of Tennessee* (St. Louis: 1872), pp.88-92; Texas, 1871 ("Brief of Thirty-Four Professional historians," pp. 27a-28a); North Carolina, 1877 (*Laws and Resolutions of the State of North Carolina, Passed by the General Assembly at its Session 1876-77* (Raleigh:1877), pp. 162-63); Kentucky, 1880 ("Brief of Thirty-Four Professional historians," pp. 12a-13a); South Carolina, 1880 (ibid., 21a); Mississippi, 1880 (*The Revised Code of the Statute Laws of the State of Mississippi* (Jackson: 1880), p. 776); Arkansas, 1881 ("Brief of Thirty-Four Professional historians," pp. 3a-4a); Colorado, 1883 (*The General Statutes of the State of Colorado, 1883* (Denver: 1883), p. 339; Illinois, 1887 (*The Revised Statutes of the State of Illinois, 1887*), p. 441-42); Minnesota, 1889 (*General Statutes of the State of Minnesota* (St. Paul: 1888), p. 1006-07; Michigan, 1890 (*Laws of the State of Michigan Relating to Public Health* (Lansing: 1889), p. 145); and Oregon, 1892 ("Brief of Thirty-Four Professional historians," p. 20a). The Georgia, Missouri, and Texas laws concerned sensitive places; all the other laws concerned concealed carry.

39. Idaho Territory, 1864 (*Laws of the Territory of Idaho* (Lewiston: 1864), p. 442; New Mexico Territory, 1869 (*Laws of the Territory of New Mexico* (Santa Fe, 1869), p. 72-76); Arizona, 1889 (*Acts, Resolutions, and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona* (Prescott, 1889), p. 11-12. Idaho's law concerned brandishing. New Mexico and Arizona's law regulated the carry of weapons (concealed or open).

40. See *The Public Ledger* (Memphis), Oct. 21, 1869.

include Jersey City (1868)[41];Washington, D.C. (1871)[42]; Omaha, Nebraska (1872)[43]; Fayetteville, Tennessee (1876)[44]; Mexico, Missouri (1877)[45]; Provo City, Utah (1877)[46]; Kansas City, Missouri (1880)[47]; Albany, New York (1887)[48]; and Milwaukee, Wisconsin (1888).[49] I am very confident that further research would unearth more nineteenth-century examples of firearms legislation making distinctions between civilians and the police or military.

25.     The tradition of inscribing that distinction into law became still more pronounced in the early twentieth century, when the dramatic technological change of automatic and semi-automatic weapons brought about unprecedented societal concerns. Dozens of states passed laws

---

41. *Revised Ordinances of Jersey City*, Jersey City: Howard C. Griffiths, 1899, p 121.

42. *Laws of the District of Columbia, 1871-1872*, Washington, D.C.: Chronicle Publishing Company, 1872, p33.

43. *The Revised Ordinances of the City of Omaha* (Omaha, 1872), pp.86-87.

44. Ordinance printed in the *Fayetteville Observer*, Aug. 31, 1876.

45. See "Ordinances of the City of Mexico," reprinted in the *Mexico Weekly Ledger*, Jan. 25, 1877.

46. *The Revised Ordinances of Provo City* (Salt Lake City: 1877), pp. 106-07.

47. See Gardiner Lathrop and James Gibson, compilers, *An Ordinance in Revision of the Ordinances Governing the City of Kansas* (Kansas City, 1880), pp. 264-65.

48. See *Charter and General Ordinances of the City of Albany* (Albany, 1887), 110.

49. See *The General Ordinances of the City of Milwaukee* (Milwaukee, 1888), 227-28.

App. 277

regulating automatic[50] or semi-automatic[51] firearms during the 1920s and 1930s. None of these laws applied to the U.S. military. Similarly, at the federal level, the National Firearms Act of 1934[52] and the Gun Control Act of 1968[53] both contained explicit exceptions for military and law enforcement.

---

50. To my knowledge this list includes twenty-five states, one territory, and Washington, D.C. The statutes fall into three groups:

1)      Total bans on possession (see 1927 Cal. Stat. 938, §§ 1–2; 1927 Ind. Acts 469, § 1; 1927 Iowa Acts 201, §§ 1–2; 1927 Mich. Pub. Acts 888–89 § 3; 1927 (January Session) R.I. Pub. Laws 256 §§ 1, 4–6; 1929 Mo. Laws 170, §§ 1–2; 1928–1929 Wis. Sess. Laws 157 § 1; 1931 Del. Laws. 813, § 1; 1931 Ill. Laws 452-53, §§ 1–2; 47 Stat. 650 §§ 1, 14 [D.C. 1932]; 1933 Haw. Sess. Laws 38, § 7; 1932 La. Acts 337–38, §§ 1–2; 1933 Kan. Sess. Laws 76, §§ 1–3; 1933 Minn. Laws 231–33, §§ 1–3; 1933 N.Y. Laws 1639, §§ 1, 3; 1933 Tex. Gen. Laws 219–20, 1st Called Sess., §§ 1–4, 6; 1933 Wash. Sess. Laws 335–36, §§ 1-5; 1931–1933 Wis. Sess. Laws 778, § 1);

2)      Bans on possession with an unlawful or aggressive purpose (see 1929 Neb. Laws 673; 1931 N.Y. Laws 1033, § 1; 1933 S.D. Sess. Laws 245–47, §§ 1–8); and

3)      Licensing regimes (see 1925 W. Va. Acts 30–31 (Extraordinary Sess.); 1927 Mass. Acts 413, §§ 1–2 (amending §§ 121, 123); 1927 N.J. Laws 180–81, §§ 1–2; 1931 N.D. Laws 305–06; 1933 Cal. Stat. 1169; 1933 Ohio Laws 189–90, § 1 (Reg. Sess.); 1933 Or. Laws 489, §§ 3–4).

All available at https://firearmslaw.duke.edu/repository-of-historical-gun-laws.

51. Period laws regulating semiautomatic firearms usually incorporated magazine limits. 1933 Minn. Laws 231-33, § 1 (no specific limit); 1933 Ohio Laws 189, § 12819-3 (eighteen-shot limit); 1927 Mich. Pub. Acts 887, § 3 (sixteen-shot limit); 1927 R.I. Pub. Laws 256 § 1 (twelve-shot limit); 1934 Va. Acts 137-39 § 1 (seven-shot limit); 1935 Mont. Laws 57, 57-60, Ch. 43, § 1 (six-shot limit); 1933 S.D. Sess. Laws 245-47 § 1 (five-shot limit); 1935 Ark. Laws 171, 171-75 § 1 (five-shot limit); 1935 Conn. Laws 389, 389-94, Ch. 152, § 1 (five-shot limit); 1927 Mass. Acts 413, §§ 1-2; 1934 S.C. Acts 1288, § 1 (eight-shot limit); 1932 La. Acts 337-38, §§ 1–2 (eight-shot limit); 1931 Ill. Laws 452-53, §§ 1-2 (eight-shot limit). Washington D.C. also regulated semi-automatic firearms in this period: 47 Stat. 650 (1932) ch. 465, §§ 1, 14 [D.C.], (twelve-shot limit). All except the Connecticut statute are available at https://firearmslaw.duke.edu/repository-of-historical-gun-laws.

52. See National Firearms Act of 1934, 48 Stat. 1236, Sec. 13

53. See National Firearms Act Amendments of 1968, Pub. L. No. 90-618, tit. I § 102 (amending 18 U.S.C. § 925(a); tit. II § 201 (amending § 5853(a) of the Internal Revenue Code of

16

September 13 , 2024

*Brian DeLay*
Brian DeLay

---

1954).

# EXHIBIT A

# Brian DeLay

University of California
3229 Dwinelle Hall
Berkeley, CA 94720-2550
https://history.berkeley.edu/brian-delay
delay@berkeley.edu

## ACADEMIC POSITIONS
- Preston Hotchkis Chair in the History of the United States, UC Berkeley:     2016-Present
- Professor of History, University of California, Berkeley           July 2023-Present
- Associate Professor of History, University of California, Berkeley:     July 2010 – June 2023
- Assistant Professor of History, University of California, Berkeley:     July 2009 – June 2010
- Assistant Professor of History, University of Colorado, Boulder:     July 2004 – June 2009
- Lecturer in History, Harvard University:                 Spring, 2004

## EDUCATION
 -Ph.D., Harvard University, Cambridge, MA:                 March, 2004
 -MA, Harvard University:                         June, 1998
 -B.A., University of Colorado, Boulder, *summa cum laude:*     December, 1994

## WORK IN PROGRESS:
- "Aim at Empire: American Revolutions through the Barrel of a Gun, 1750-1825," book project under contract with W.W. Norton.
- "Means of Destruction: Guns, Freedom, and Domination in the Americas before World War II," book manuscript under contract with W.W. Norton. Research nearly complete.
- "PATH: The Project on Arms Trade History." Since 2008, I have been working with student research assistants to quantify the global arms trade, from the Napoleonic Wars to WWI. We have been extracting detailed import and export data from manuscript sources and, especially, from annual customs reports published by the main arms-exporting states: The United Kingdom, the United States, Belgium, and France (Germany and Spain still underway). We are nearly finished locating sources and doing the laborious work of data entry. Our relational database now has nearly 112,000 entries capturing the global movement of all kinds of war material, from percussion caps to artillery, from 1815-1915. We will soon shift to data analysis and begin applying for external funding to turn the dataset into an online tool freely available to researchers around the world.

## PUBLICATIONS AND RESEARCH
### Refereed Publications
- "The Arms Trade & American Revolutions," *The American Historical Review* 128:3 (Sept. 2023), 1144-1181.
- "Foreign Relations between Indigenous Polities, 1820-1900," in Kristin Hoganson and Jay Sexton, eds., *The Cambridge History of America and the World*, Vol 2: 1812-1900 (Cambridge University Press, 2022), 387-411.
- "Indian Polities, Empire, and Nineteenth-Century American Foreign Relations" *Diplomatic History* 39:5 (December 2015), 927-42.

**Refereed Publications (cont.)**

- "Watson and the Shark," chapter in Brooke Blower and Mark Philip Bradley, eds., *The Familiar Made Strange: American Icons and Artifacts after the Transnational Turn* (Ithaca: Cornell University Press, 2015).
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," in Juliana Barr and Edward Countryman, eds., *Contested Spaces of Early America*, University of Pennsylvania Press, 2014, pp. 229-256.
- Editor, *North American Borderlands*. Routledge, 2012.
- *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War*. New Haven: Yale University Press, 2008 [paperback, 2009].
- "The Wider World of the Handsome Man: Southern Plains Indians Invade Mexico, 1830-1846," *Journal of the Early Republic* 27 (March, 2007), 83-113
- "Independent Indians and the U.S.-Mexican War," *American Historical Review* 112 (Feb., 2007), 35-68.

**Other Publications:**

- "The Myth of Continuity in American Gun Culture," 35k-word article forthcoming in the *California Law Review* 113:1 (Feb., 2025).
- "American Guns, Mexico's Trials," *Bulletin of the American Academy of Arts and Sciences*, Spring, 2020
- "A Misfire on the Second Amendment," extended review of Roxanne Dunbar-Ortiz, *Loaded: A Disarming History of the Second Amendment* for *Reviews in American History* 47:3, Sept. 2019
- Co-author with James West Davidson, William E. Gienapp, Christine Leigh Heyrman, Mark H. Lytle, and Michael B. Stoff, *Experience History: Interpreting America's Past* [Formerly *Nation of Nations: A Narrative History of the American Republic*], McGraw-Hill (9th ed., 2019).  *Concise version: *US/A History* (9th ed., 2022).
- "How the U.S. Government Created and Coddled the Arms Industry," *The Conversation*, October 2017
- "How Not to Arm a State: American Guns and the Crisis Of Governance In Mexico, Nineteenth and Twenty-First Centuries" [24th Annual W.P. Whitsett Lecture], *Southern California Quarterly* 95:1 (Spring 2013), pp. 5-23.
- "Oportunismo, ansiedad, idealismo: los impulsos Estadunidenses durante la intervención Francesa en México," in Jean Meyer, ed., *Memorias del Simposio Internacional 5 de Mayo*, El Colegio de Puebla, 2013, pp 269-288.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,'" in Charles Faulhaber, ed., *The Bancroft Library at 150: A Sesquicentennial Symposium*, Berkeley: University of California Press, 2011.
- "How Indians Shaped the Era of the U.S.-Mexican War," abbreviated version of Independent Indians and the U.S.-Mexican War," in Pekka Hämäläinen and Benjamin H. Johnson, eds., *Major Problems in the History of North American Borderlands*, Wadsworth, 2011.
- Response to Daniel Walker Howe, Andrés Reséndez, Ned Blackhawk, and Leonard Sadosky's essays in H-SHEAR roundtable on *War of a Thousand Deserts*, Nov. 2010.

DeLay CV    2

App. 282

**Other Publications (cont.)**

- Top Young Historian essay, Historians News Network, October 2010.
- "Forgotten Foes," *Berkeley Review of Latin American Studies* (Fall 2010), 14-19.
- "James Madison and the Scolds," Review of J. C. A. Stagg, *Borderlines in the Borderlands: James Madison and the Spanish American Frontier, 1776-1821*, *Passport* 40:3 (January 2010).
- "Why Mexico Fought," review of Timothy J. Henderson, *A Glorious Defeat: Mexico and its War with the United States*, *Diplomatic History* 33:1 (January 2010).
- "19th Century Lessons for Today's Drug War Policies," *The Chronicle Review*, Tuesday, July 28, 2009,
- "It's Time We Remembered the Role of Indians in the U.S.-Mexican War," *History News Network*, 3/9/2009
- "War of a Thousand Deserts," on *The Page 99 Test*,
- "Navajo," "Popé," and "Pueblo Indians," in Billy G. Smith, ed. *Colonization and Settlement (1585-1763)*, Volume 2 in the 10-volume *Facts on File Encyclopedia of American History* (2003)
- "Narrative Style and Indian Actors in the Seven Years' War," *Common-Place: The Interactive Journal of Early American History*, 1 (1), September 2000.

## PRIZES, HONORS, & AWARDS

- Vandervort Prize for Outstanding Article in Military History, Society for Military History, 2024
- Visiting Scholar, University of Melbourne, October 2017
- Fulbright Distinguished Lecturer, Doshisha American Studies Seminar (Kyoto), 2014
- Bryce Wood Book Award for the outstanding book on Latin America in the social sciences and humanities published in English, Latin American Studies Association, 2010
- HNN "Top Young Historian," November 2010
- W. Turrentine Jackson (biennial) Award for best first book on any aspect of the history of the American West, Western History Association, 2009
- Robert M. Utley Award for best book published on the military history of the frontier and western North America, Western History Association, 2009
- Southwest Book Award, sponsored by the Border Regional Library Association, 2009
- James Broussard Best 1st book prize, Society for Historians of the Early American Republic, 2008
- Norris and Carol Hundley Best Book Award, Pacific Coast Branch of the AHA, 2008
- The Sons of the Republic of Texas Summerfield G. Roberts Best Book Award, 2008
- Finalist, Francis Parkman Prize from the Society of American Historians, 2008
- Finalist for the Clements Prize for the Best Nonfiction Book on Southwestern Americana, 2008
- Honorable Mention, TSHA Kate Broocks Bates Award for Historical Research, 2008

## PRIZES, HONORS, & AWARDS (cont.)

- Finalist for the PROSE Award in the U.S. History and Biography/Autobiography category, sponsored by the Association of American Publishers, 2008
- Organization of American Historians Distinguished Lecturer, 2008-2011
- Bolton-Cutter Award for best borderlands article, Western History Association, 2008
- Robert F. Heizer Prize for the best article in the field of ethnohistory, 2008
- CLAH Article Prize, Conference on Latin American History, 2008
- Stuart Bernath Article Prize, Society for Historians of American Foreign Relations, 2008
- Phi Alpha Theta/Westerners International Prize for Best Dissertation, 2005
- Harold K. Gross Prize from Harvard University for the dissertation "demonstrating the greatest promise of a distinguished career in historical research," 2004
- University of Colorado Residence Life Academic Teaching Award, 2005
- Derek Bok Center Awards for Excellence in Teaching, Spring 1999 and Fall 1999

## GRANTS AND FELLOWSHIPS

- John Simon Guggenheim Foundation Fellowship, 2019-2020
- Marta Sutton Weeks Fellow, Stanford Humanities Center, 2019-2020
- Center for Advanced Studies in Behavioral Sciences Fellowship, 2019-2020 (declined)
- American Council of Learned Societies Fellowship, 2017-2018
- Harry Frank Guggenheim Foundation Fellowship, 2013-14'
- UC Humanities Research Fellowship Grant, 2013-14'
- UC Berkeley CORE Research Bridging Grant, 2012-14'
- Charles A. Ryskamp Research Fellowship, American Council of Learned Societies, 2010-2011
- Donald T. Harrington Fellowship, UT Austin, 2009-2010 (Declined).
- University of Colorado Graduate Committee on the Arts and Humanities Research Grant, 2008.
- American Philosophical Society / British Academy Fellowship, 2008.
- Junior Faculty Development Award, University of Colorado, 2007.
- Bill and Rita Clements Research Fellowship for the Study of Southwestern Americana, Full Year, Clements Center, Southern Methodist University, Dallas, TX, 2005-2006
- Postdoctoral Fellowship, Full Year, Huntington Library, San Marino, CA, 2005-2006 (Declined)
- Postdoctoral Fellowship, Full Year, Newberry Library, Chicago, IL, 2005-2006 (Declined)
- Packard Foundation Dissertation Finishing Grant, 2002-2003
- American Philosophical Society, Philips Fund Grant for Native American Research, 2001
- David Rockefeller Center for Latin American Studies Summer Grant 2001
- Department of Education Foreign Language Area Studies Grant, 2000-01
- Mellon Summer Field Research Travel Grants, 1999, 2000, 2001
- Harvard History Department Summer Travel Grant, 2000, 2001
- Graduate Society Term Time Research Fellowship, Spring 2000
- Harvard Graduate Student Council Summer Travel Grant, 1999

**GRANTS AND FELLOWSHIPS (cont.)**
- The Charles Warren Center Fellowships for Summer Research, 1998, 1999
- The Graduate Society's Summer Fellowship, Harvard University, 1998
- General Artemas Ward Fellowship, Harvard University, 1996-97, 1997-98

**BOOK REVIEWS**
- Review of Jonathan Grant, *Between Depression and Disarmament: The International Armaments Business, 1919-1939*, in the *American Historical Review* 25:3, June 2020
- Review of David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America*, in the *American Historical Review*, Oct. 2017
- Review of Rachel St. John, *Line in the Sand: A History of the Western U.S.-Mexico Border*, in the *Pacific Historical Review*, Aug. 2012.
- Review of *Bridging National Borders in North America: Transnational and Comparative Histories*, Edited by Benjamin H. Johnson and Andrew R. Graybill, *Hispanic American Historical Review*, Feb. 2012.
- Review of *Fiasco: George Clinton Gardner's Correspondence from the U.S.-Mexico Boundary Survey, 1849-1854*. Edited David J. Weber and Jane Lenz Elder, *New Mexico Historical Review* 86:3, Summer 2011, 526-28.
- Review of Juliana Barr's *Peace Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands*, for the *American Historical Review* 113 (June 2008), 878-79.
- Review of Samuel Truett's *Fugitive Landscapes: The Forgotten History of the U.S.-Mexican Borderlands*, for *Labor: Studies of Working-Class History of the Americas* 4:4 (2007), 130-32.
- Review of Gary Clayton Anderson's *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875*, for the *Journal of American History* 93:2 (2006), 530-31.
- Review of Samuel Truett and Elliott Young, eds., *Continental Crossroads: Remapping U.S.-Mexican Borderlands History*, for the *Hispanic American Historical Review* 86:4 (2006), 864-65.
- Review of Rosemary King's *Border Confluences: Borderland Narratives from the Mexican War to the Present*, for *New Mexico Historical Review*, Fall 2005.
- Review of Edward A. Goodall, *Sketches of Amerindian Tribes, 1841-1843,* for *Itinerario: The European Journal of Overseas History*, Fall 2004 (28:3).
- Combined review of Alex D. Krieger's *We Came Naked and Barefoot: The Journey of Cabeza de Vaca Across North America* and Rolena Adorno's and Patrick Charles Pautz's *The Narrative of Cabeza de Vaca* for the *Southwestern Historical Quarterly,* April 2004.
- Review of Richard Flint's *"Great Cruelties Have Been Reported:" The 1544 Investigation of the Coronado Expedition*, for the *Southwestern Historical Quarterly,* October 2003.
- Review of Allen G. Hatley's *The Indian Wars in Stephen F. Austin's Texas Colony, 1822-1835*, for the *Southwestern Historical Quarterly*, October 2001.

**PRESENTATIONS & INVITED TALKS**

- "The Myth of Continuity in American Gun Culture," invited presentation at "The Future of the Second Amendment" panel at the UC Berkeley Law School, April 2024.
- "The Myth of Continuity in American Gun Culture," invited presentation at "Why History Matters" panel at UCLA, April 2024.
- Roundtable participant in "Across the Oceans: Transnational Connections during the Long 19th Century," American Historical Association annual conference, San Francisco, Jan. 2024
- Roundtable chair, "Beyond the Second Amendment: Rethinking U.S. Gun History," American Historical Association Annual Conference, San Francisco, Jan. 2024
- In public conversation with Heather Cox Richardson about her book *Democracy Awakening*, Book Passage, Corte Madera, Nov. 2023.
- In public conversation with Dylan Penningroth about his book *Before the Movement*, Book Passage, San Francisco, Oct. 2023.
- "How and Why to Count Winchesters in 1868," invited presentation at the conference "Current Perspectives on the History of Guns and Society, Wesleyan University, Oct. 2023
- "What a Junk-Shop Musket has to say about the American Revolution," presentation at Approaching American Revolutions Symposium, USC, May 2023
- "War of a Thousand Deserts," (virtual) presentation for the Instituto de Investigaciones Históricas, Universidad Autónoma de Baja California, March 2023
- "The Myth of Continuity in American Gun Culture," BOCA-LONGA Conference, Stanford University, March 2023.
- "Why Dragging Canoe Sold Kentucky," paper presentation at the Western History Association Conference, San Antonio, TX Oct. 2022
- Roundtable participant for "After 1800: Rethinking Revolution and Counter-Revolution in the Atlantic World," USC/Écoles des Hautes Études en Sciences Sociales, June 2022
- Roundtable participant for "Empire and U.S. Foreign Relations," Society for Historians of American Foreign Relations, June 2022
- "Aim at Empire: Arms Trading & The Fates of American Revolutions," paper presentation at Kent State University, March 2022
- "Aim at Empire: Arms Trading & The Fates of American Revolutions," paper presentation at the Berkeley Economic History Seminar, Feb. 2022
- "Aim at Empire: Arms Trading & The Fates of American Revolutions," (virtual) paper presentation at El Colegío de México, Nov. 2021.
- "Tribe and Nation in North America," comment for roundtable on Sumit Guha's *Tribe and State in Asia through Twenty-Five Centuries*, Institute for Historical Studies, UT Austin, November 2021.
- "What is History Now," Roundtable participant at UC Berkeley History Colloquium, October 2021
- "Tsiyu Gansini's Predicament: Guns, Ammunition, & Cherokee Choices before the Revolution," Rocky Mountain Seminar in Early American History, Oct., 2021
- "Aim at Empire," talk at the UC Berkeley Institute for International Studies, Sept. 2021
- Roundtable participant in "the U.S.-Mexican Borderlands" for Janet Napolitano and Daniel Sargent's class "Intro to Security Policy," GSP, Berkeley, Sept. 2021

- "Arms Trading and American Revolutions," paper for roundtable on Transnational Revolutionary History, Society for Historians of the Early American Republic, July 2021
- Roundtable on Armed Conflict and Military History, Society for Historians of American Foreign Relations annual conference, June 2021.
- "Guns Across Borders," presentation at Revolutions Across Borders symposium, Newberry Library, June, 2021.
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" American Historical Association, Jan. 2021
- "Arms Trading and the Fates of American Revolutions," invited paper given in the Cambridge University American History Seminar, March 1, 2021
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" Conference on Latin American History, Jan. 2021
- "Aim at Empire," presentation at the Stanford Humanities Center, December 2019
- "America's Guns, Mexico's Trials," Morton Mandel Public Lecture given at the invitation of the American Academy of Arts and Sciences, Berkeley, CA, Nov. 20, 2019
- "Arms Trading & New World Decolonization," paper presented at University College, London, May 2019.
- "The Texas Gun Frontier & the Travails of Mexican History," keynote at the 1st Biennial Symposium on Borderlands & Borders, Texas A&M University, San Antonio, April 2019
- "Guns and Revolution: The Arms Trade and the First Global Wave of Decolonization," Boston College, September 2018
- "Migration and the History of Immigration Enforcement on the U.S.-Mexican Border," at conference on Borders, Borderlands, and Migration, Institute of Slavic, East European, and Eurasian Studies and the Central European University, UC Berkeley, Sept. 2018
- "Shoot the State," roundtable presentation at the Western History Association, Nov. 2017
- "The Texas Gun Frontier and the Travails of Mexican History," Gary L. Nall Lecture, West Texas A&M, October 2017
- "Guns and Revolution: The Arms Trade and the Making of American Revolutions, 1774-1825," University of Melbourne, October 2017
- "Dam-Breaking: How the Arms Trade Enabled the First Global Wave of Decolonization, 1775-1825," New York University, September 2017
- "The Most Dangerous Man You've Never Heard Of," invited presentation at symposium "Small Arms, Big Business: Trading Arms - Political, Cultural and Ethical Dimensions in Historical and Global Perspectives," Zentrum für Interdisziplinäre Forschung (ZIF), Bielefeld, Germany, June 2017.
- Organizer/chair and presenter for roundtable "Arsenal to the World: The Missing History of the American Arms Trade," OAH April 2017
- "The Ungovernable Rio Grande," Cal History Homecoming talk, February 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," CENFAD Colloquium, Temple University, January 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," University of Connecticut, October, 2016

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Harvard University, October 2016
- "How Transimperial Arms Bazaars Stabilized Instability in the Greater Caribbean," Rothermere Institute, Oxford University, May 2016
- "The International Arms Trade and the Brittle State in Mexico, 1810-1920," University of Chicago Latin American Seminar, December 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Northwestern University, December 2015
- "Guns and the Making of the Modern Americas," Stanford University, November 2015
- "The Texas Gun Frontier and the Travails of Mexican History," UT Austin, November 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," University of Cincinnati, September 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Society for Historians of American Foreign Relations, Conference Keynote, June 2015
- "War of a Thousand Deserts," San Jacinto Symposium, Houston, TX, April 2015
- "Dambreaking: Guns, Mercantilism, and the Demolition of Europe's America," the James P. Jones endowed lecture, Florida State University, March 2015
- "Dambreaking: Mercantilism, Armaments, and the Demolition of Europe's America," Indiana University, October 10, 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Doshisha University, Kyoto, Japan, July 25, 2014
- "How Borderland Indians Shaped the Era of the U.S.-Mexcan War," Keynote address for the 2014 Doshisha American Studies Seminar, Kyoto, July 26, 2014
- "War and Trade," Roundtable on new histories of trade, Society for Historians of American Foreign Relations, Lexington, June 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Cambridge University, November 25, 2013
- "A Protest of Arms: Guns and the Brittle State in Mexico, 1810-1920," Cambridge University Borderlands Workshop, November 11, 2013
- "Gotham's Gun Barons: New York City Arms the Americas," Oxford University, Oct 2013
- "Marcellus Hartley: The Most Dangerous Man You've Never Heard Of," OAH April 2013
- "A Good Story," invited presentation to admitted students at Cal Day, April 20, 2013
- "Beware the Metanarrative; or, How I Acquired My Resistance to Resistance," Kaplan Lecture, University of Pennsylvania, March 2013
- "Domestic Dependent Notions: American Indians and the First Few Pages of American Empire," American Studies Association meeting, San Juan, Nov. 2013
- "Indian History and the History of American Foreign Relations," Society for Historians of American Foreign Relations annual conference, June 2012
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Society for Historians of American Foreign Relations annual conference, June 2012

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Opportunism, Anxiety, and Idealism: U.S. Impulses during the French Intervention in Mexico," invited paper at el Simposio Internacional 5 de Mayo de Mexico, Biblioteca Palafoxiana, Puebla, Mexico, May 2012.
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Organization of American Historians annual conference, April 2012
- Chair, roundtable on the state of the field in U.S.-Mexico Borderlands History, Organization of American Historians annual conference, April 2012
- "So Far From God, So Close to the Gun Store: Borderlands Arms Trading and the Travails of Mexican History," 26th Annual W.P. Whitsett Lecture, CSU Northridge, March 2012
- "War of a Thousand Deserts," at the Tattered Cover Bookstore, Denver, CO, March 2012
- "Frontiers, Borderlands, and Transnational History," Huntington Library symposium on the Significance of the Frontier in an Age of Transnational History, Feb. 2012 [Audio in file#2]
- "Sailing Backwards on Mexico's 'Iron River of Guns': The Political Economy of the Arms Trade in the 19th and 21st Century's, Harvard Kennedy School, Feb. 2012
- "The Drug War and Borderlands History," Cal Alumni Day, Oct. 2011.
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited presentation at Stanford University's Comparative Wests Seminar, April 2011
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited talk for round two of Contested Spaces in Early America symposium, Clements Center for Southwest Studies, Southern Methodist University, Dallas, TX, April, 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk at UCLA's American Indian Studies Center, March 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk presentation the USC-Huntington Early Modern Studies Institute and the Autry Museum of Western Heritage, March 2011
- "People and Peoples in Borderland Relations: Blood Talk in New Mexico," invited talk for Contested Spaces in Early America symposium, McNeil Center for Early American Studies, University of Pennsylvania, Philadelphia, PA October 2010
- "How Indians Shaped the U.S.-Mexican War," invited talk for the Bay Area Latin America Forum, Berkeley, CA September 2010
- "Indians and the U.S.-Mexican War," invited talk at University of North Texas, Sept. 2010
- "Patterns of Violence in Navajo-New Mexican Relations," Pacific Coast Branch of the American Historical Association annual meeting, Santa Clara CA, August 2010
- "States and Stateless Peoples in George Herring's *From Colony to Superpower*," Society for Historians of American Foreign Relations annual meeting, Madison, WI, June 2010
- "Indians, Politics, and 19th-Century American Empire," UC Berkeley-Stanford-UC Davis faculty dinner, April 2010
- "War of a Thousand Deserts," invited Keynote Address to the James Rawley Conference in the Humanities, University of Nebraska, Lincoln, April 2010
- "19th Century Lessons for Today's Drug War Policies," History as a Resource for Decision Making, UC Berkeley, March 2010

DeLay CV    9

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Comanches in the Cast: Recovering Mexico's 'Eminently National War, 1830-1846,'" Bancroft Sesquicentennial Symposium, Berkeley, CA, March 2010.
- "Mexico, Native Polities, and the Continuous 19th Century American Empire," invited talk for the Harvard Symposium on 19th Century Empire, Cambridge, MA April 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented to the El Paso History Museum, February 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented at the Texas Community College Teachers Association Conference, Austin, Feb. 2009
- "Putting Indians into the U.S.-Mexican War," paper presented at the Organization of American Historians annual meeting, New York, March 2008.
- "Military History and Non-State Peoples," roundtable paper presented at the American Historical Association conference, Washington D.C., Jan. 2008.
- "The French and Indian War," public talk for the High Plains Chautauqua, Greeley, CO, Aug. 8, 2007
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the University of San Diego Trans-Border Institute, April. 2007.
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the George and Anne Richards Civil War Era Center, Penn State University, Jan. 2007.
- "Independent Indians, the U.S.-Mexican War, and the Reshaping of North America," paper presented at the American Historical Association conference, Atlanta, GA, Jan. 2007 (*Panel organizer*)
- **"**Opportunity Costs: Southern Comanches between Mexico and Texas, 1836-1846," paper presented at the Filson Institute's Comparative Borderlands Conference, Louisville, KT, Oct. 2006.
- "The War of a Thousand Deserts: Indians, the U.S.-Mexican War, and the Reshaping of North America," Clements Center Brown Bag series, Southern Methodist University, Feb. 2006.
- "Independent Indians and Borderlands Scholarship in the Americas" roundtable presentation at the Conference on Latin American History, Philadelphia, PN, Jan. 2006.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,' 1830-1846," paper at the Latin American Studies Association Conference, Los Vegas, NV Oct. 2004
- Invited comment on Marie Duggan's "Franciscan Missions as Institutions of Economic Development: The Case of California, 1769-1832," at the Boston Area Latin American Seminar, Dec. 2003
- Invited comment on David J. Weber's "Spaniards and their Savages in the Age of Enlightenment," at the Boston Area Latin American Seminar, Oct. 2002.
- "Mexicans, Indians, and Anglo-Americans: Ethnic Conflict and Territorial Expansion, 1776-1854," paper presented at the Harvard Ethnic Studies Conference, Cambridge, MA, Feb. 2002.

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at the American Historical Association conference, San Francisco, Jan. 2002.
- "The War of a Thousand Deserts: Indian Power & the Contest for Mexico, 1835-1854," paper presented at the Conference on Latin American History, San Francisco, Jan. 2002
- "Indian Power and the Fragmentation of Northern Mexico, 1835-1846," paper presented at the Western History Association Conference, San Diego, CA, Oct. 2001. (*Panel organizer*).
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at Global America: The New International History Conference, Harvard, April 2001.
- Commentator at roundtable discussion of Fred Anderson's *Crucible of War* at the Charles Warren Center for Studies in American History, Harvard University, Feb. 2000.

**CONSULTING**

- Washington D.C.
  - Submitted declaration for the Attorney General's Office of Washington D.C. in defense of district law limiting high-capacity gun magazines in Hanson et al., v. District of Columbia, Case No. 22-cv-02256 (D.D.C.), Nov. 2022.
- Oregon
  - Submitted declaration as expert witness for the Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in Joseph Arnold et al., v. Tina Kotek, et al., No. 22CV41008 (Harney Cnty. Cir. Ct.), Dec. 2022. Testified remotely in preliminary injunction trial, Dec. 2022. Testified in person at the case trial, Sept. 2023.
- Oregon, cont.
  - Submitted declaration for Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in *Oregon Firearms Federation et al. v. Tina Kotek et. al.*, 2:22-cv-01815-IM (D. Ore.) (lead case); Mark Fitz, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01859-IM (D. Ore.) (trailing case); Katerina B. Eyre, et al., v. Ellen F. Rosenblum et al., 3:22-cv-01862-IM (D. Ore.) (trailing case); and Daniel Azzopardi, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01869-IM (D. Ore.) (trailing case). Feb. 2023. Deposed March 14, 2023. Testified in Fed Dist. Court trial in Portland, June 2013.
- Illinois
  - Submitted declaration for Attorney General's Office of the State of Illinois in defense of its law limiting assault weapons and high-capacity magazines in Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); Herrera v. Raoul, 23-cv-532 (N.D. Ill.); and *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.). March, 2023.

DeLay CV  11

**CONSULTING (cont.)**

- California
  - o Submitted declaration for Attorney General's Office of the State of California in defense of its law limiting high-capacity magazines in William Wiese, et al., v. Rob Bonta, et al., 2:17-cv-00903-WBA-KJN (E.D. Cal.), May 2023.
- Washington (state)
  - o Submitted declaration for Attorney General's Office of the State of Washington in defense of its law limiting high-capacity magazines in Gabriella Sullivan, et al., v. Bob Ferguson, et al., (W.D. Wash.), 3:22-cv-05403, May 2023; and in *Brumback, et al., v. Bob Ferguson, et al.* (E.D. Wash.),1:22-cv-03093-MKD, Jan. 2024.
  - o Submitted report in defense of WA assault weapons law, for Intervenor-Defendant Alliance for Gun Responsibility in *Hartford et al. v. Ferguson, et al.* (W.D. Wash.), No. 3:23-cv-05364-RJB; *Banta, et al. v. Ferguson and Batiste* (E.D. Wash.), No. 2:23-cv-00112-MKD; and *Guardian Arms, et al., v. State of Washington, et al.* (Wash., and County of Thurston), No. 23-2-01761-34, Jan. 2024.
- Colorado
  - o Submitted expert report for the Town of Superior, Cities of Superior and Boulder, and Board of County Commissioners of Boulder County in defense of their laws limiting certain firearms and high-capacity magazines in Rocky Mountain Gun Owners et al., v. the Town of Superior et al., (D. Colo.), 22-cv-2680, May 2023.
  - o Submitted expert declaration for Attorney General's Office of the State of Colorado in defense of its law regulating ghost guns in National Association of Gun Rights et al., v. Jared S. Polis (D. Colo), 24-cv-00001-GPG-STV. Feb. 2024; testified March, 2024.
- New Jersey
  - o Submitted expert report for Attorney General's office of the State of New Jersey in defense of its laws regulating assault weapons and high-capacity magazines in Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al. (D.N.J.), 3:18-cv-10507; Cheeseman et al. v. Platkin et al. (D.N.J.), 1:22-cv-04360; Ellman et al. v. Platkin et al. (D.N.J.), 3:22-cv-04397, July 2023.
- Delaware
  - o Submitted declaration for Attorney General's office of the state of Delaware in defense of its law regulating ghost guns in John Rigby et al. v. Kathy Jennings et al. (D. Del), 1:21-cv-01523-MN, Sept. 2023.
- Nevada
  - o Submitted declaration for Attorney General's office of the state of Nevada in defense of its law regulating ghost guns in Roger Palmer et al., v. Stephen Sisokak et al. (D. Nev), 3:21-cv-00268, April 2024.
- Supreme Court
  - o Contributor and signatory to [Brief for Amici Curiae Professors of History and Law in Support of Petitioner](), United States of America v. Zackey Rahimi, 2023.

DeLay CV  12

## TEACHING
### Classes Offered at UC Berkeley
- HIST 7a: Lower-division lecture – *North America through Reconstruction,* 2011, 2012, 2015, 2018, 2020, 2021 (always in fall)
- HIST 100: Upper-Division Lecture - *American Encounters,* Fall 2009
- HIST 101: Undergraduate Research Seminar - *Senior Thesis Seminar* Spring 2010; Spring 2012, Spring 2013, Fall 2014, Spring 2022, Spring 2023
- HIST 102: Undergraduate Research Seminar, *Senior Thesis Seminar*, Spring 2024
- HIST 103: Undergraduate Reading Seminars:
  - *Borderlands in North America*, Fall 2009
  - *The U.S. and Latin America in the 19ᵗʰ C.*, Spring 2012
  - *The Border* (reading seminar), Fall 2016
  - *The Radicalism of American Revolutions*, Fall 2022
- HIST 104: Undergrad lecture/seminar- *The Craft of History*, Spring 2015, Spring 2017
- HIST 135B: Upper-division lecture - *Encounter and Conquest in Indigenous America*, Spring 2019, Spring 2022, Spring 2023, Fall 2023
- HIST 280: Graduate Reading Seminars:
  - *Borderlands in World History,* Fall 2011
  - *The Making of the Modern World, through the Age of Revolutions* (Sem.), Fall 2014 (co-taught with Daniel Sargent)
  - *The Making of the Modern World, since the Age of Revolutions* (Sem.) Spring 2015 (co-taught with Daniel Sargent)
  - *Borderlands in North America* (reading seminar), Spring 2015
  - *Native North American History* (reading seminar), Spring 2021
- HIST 285: Graduate Research Seminars:
  - *American History before 1900*, Spring 2013, Fall 2015
  - *Topics in American History*, Fall 2018, Spring 2024
- HIST 375: Graduate Sem: *Teaching History at the University* (pedagogy), Spring 2021

### Classes Offered at the University of Colorado
- HIST 1015*: Lower-Division lecture - *U.S. History to 1865*, Fall 07', Fall 08'
- HIST 1035*: Lower-Division lecture - *Honors: United States History to 1865*, Fall 04'
- HIST 2015: Lower-Division lecture - *Early America,* Fall 06'
- HIST 3050: Undergraduate seminar - *The Arms Trade in World History,* Spring 09'
- HIST 3317*: UG sem. - *Interethnic Borderlands in the American West*, Fall 04', Fall 07
- HIST 4115: Upper-Div. lec – *Natives & Newcomers in the Americas,* Fall 06', Spring 08'
- HIST 4327*: Upper-Division lecture - *Novelty, Conflict, and Adaptation in the American Southwest,* Spring 05', Spring 08'
- HIST 4617*: Upper-Division lecture - *Native North American History: Origins to 1815*, Spring 05', Spring 07', Spring 09'
- HIST 5106: Graduate Reading seminar - *Colloquium: U.S. History to 1865,* Fall 08'
- HIST 6030: Grad. Reading sem - *Frontiers and Borderlands in the Americas*, Spring 07'

DeLay CV  13

App. 293

**PhD Students** (1) = advisor/co-advisor; (2) 2nd reader
- **Current Students:**
  - Russ Weber
    - Dissertation: Emotions and the political history of the early republic.
  - Kyle Jackson (1)
    - Dissertation: New Orleans and Pan-Americanism before WWI
  - Noah Ramage (1)
    - Dissertation: The Cherokee Nation in the late 19th Century
  - Annabel LaBrecque (1)
    - "Deep Histories of Salt in North America"
  - Julia Frankenbach (1)
    - Livestock Production, Gender, and Power in the Greater Indigenous Bay Area
  - Lissett Bastidas (1)
    - Colonialism and Resistance in Mexican-Ear California
- **Former PhD Students:**
- Ariel Ron (2), Glenn M. Linden Associate Professor of the U.S. Civil War Era, Southern Methodist University
  - Dissertation: "Developing the Country: 'Scientific Agriculture' and the Roots of the Republican Party" (2012)
- Mattie Harper, Grantmaking Officer, Bush Foundation
  - Dissertation (Ethnic Studies): "French Africans in Ojibwe Country: Negotiating Marriage, Identity, and Race, 1780-1890" (2012)
- Melisa Galván (2), Associate Professor, California State University, Northridge
  - Dissertation: "From Contraband Capital to Border City: Matamoros, 1746-1848," (2013)
- Allie McLafferty, History Instructor, St. Stephens Episcopal School, Austin, TX
  - Dissertation: "'A Plumb Craving for the Other Color': White Men, Non-White Women, and the Sexual Crisis in Antebellum America," (2013)
- Jennifer Carlson, Associate Professor of Sociology and Government & Public Policy, University of Arizona
  - Dissertation (Sociology): "Clinging to their Guns?: The New Politics of Gun Carry in Everyday Life," 2013
- Delia Hagen (1), Founding Director Hagen Historical Consulting, Missoula, Montana
  - Diss: "Northern Plains Borders and the People In Between, 1860-1940" 2015
- Bathsheba Demuth (2), Dean's Associate Professor of History and Environment & Society, Brown University
  - Dissertation: "The Power of Place: Ideology and Ecology in the Bering Strait, 1848-1988" (2016)
- Alberto Garcia (2), Assistant Professor, San José State University
  - Dissertation: "The Politics of Bracero Migration" (2016)
- Robert Lee (2), University Lecturer, Cambridge University
  - Dissertation: "Louisiana Purchases: The U.S.-Indian Treaty System in the Missouri River Valley" (2017)

DeLay CV  14

App. 294

**Former PhD Students, cont.**
- Erica Lee (1), Analyst in Emergency Management and Disaster Recovery, Congressional Research Service, Washington, D.C.
    - o Dissertation: "Sanctuaries into Fortresses: Refugees and the Limits of Obligation in Progressive-Era America" (2017)
- Javier Cikota (2), Assistant Professor, Bowdoin College
    - o Dissertation: "Frontier Justice: State, Law, and Society in Patagonia, 1880-1940" (2017)
- David Tamayo (2), Assistant Professor, University of Michigan
    - o Dissertation: "Serving the Nation: Rotary and Lions Clubs, the Mexican Middle Classes, and the Post-Revolutionary State, 1920s-1960s" (2018)
- Julia Lewandowski (1), Assistant Professor, University of California, San Diego
    - o Dissertation: "Small Victories: Indigenous Proprietors Across Empires in North America" (2019)
- Franklin Sammons (1), Assistant Professor, Washington & Lee
    - o Dissertation: "Yazoo's Settlement: Finance, Law, and Dispossession in the Southeastern Borderlands, 1789-1820
- Sophie FitzMaurice (1) Postdoctoral Fellow, Joint Center for History and Economics, Magdalene College and King's College, University of Cambridge
    - o Dissertation: "The Material Telegraph: An Environmental History of the Technology that Wired America, c. 1848-1920."
- J.T. Jamieson (2)
    - o Dissertation: "'A Mere Change of Location': Migration and Reform in America, 1787-1861."

## <u>SERVICE</u>
**University of California, Berkeley History Department**
- Search Committees:
    - o Native North American History Search Committee, 2021-22'
    - o US West Search Committee, 2018-19'
    - o 20th Century Latin America Search Committee, 2014-15'
    - o U.S. History Search Committee (Chair), 2012-13'
    - o Latin America Search Committee, 2011-12'
- Endowed Chairs Committee, 2021-22'
- AC-5 Grad Admissions Committee, 2020-21', 2022-23', 2023-24' (chair)
- Governance Task Force Committee, 2014-15'
- Committee on the History Undergraduate Major,
    - o 2011-12' (chair, spring 2012); 2015-16';  2016-17' (chair)
- Honors Committee, 2009-10'
- Admissions Committee, US Field, 2009-10'
- Reentry and Disabled Student Advisor, 2009-10'
- Faculty co-sponsor, with Daniel Sargent, of the Berkeley International and Global History Conference (BIG-H), 2011-2017

**SERVICE (cont.)**
- Co-founder (with Daniel Sargent) and co-organizer (since 2021 with Rebecca Herman) of the Berkeley Global History Seminar, 2010-Present.

**University of California, Berkeley, Campus Service**
- Senate Liaison for external review of UC Berkeley Department of Ethnic Studies, 2021
- Letters & Sciences Executive Committee, 2020-2023
  - L&S Executive Committee Liaison for the external review of UC Berkeley Department of Slavic Languages & Literatures, 2022
- Berkeley Institute for International Studies (IIS)
  - IIS Directorship Search Committee, 2021
  - IIS Faculty Board, 2020-present
  - IIS Simpson Award Committee, 2012; 2013; 2015 (chair); 2016-2019.
- Bancroft Library
  - Friends of the Bancroft Library Council, 2021-present
  - Bancroft Library Prize Committee, 2015, 2016, 2017, 2019, 2020
- Academic Senate Committee on Committees, 2015 – 2017
- American Cultures Senate Subcommittee, 2011-12'

**University of Colorado History Department**
- Departmental Undergraduate Studies Committee, 2007-08'
- Departmental Executive Committee, 2006-07'
- Robert G. Athearn Lecture organizer, 2006
- Judge for Colorado History Day, Spring 2005
- History Department Graduate Studies Committee, 2004-05', 2008-09'
- Phi Alpha Theta/History Club Advisor, Fall 2004

**Professional Service, Memberships, K-12 and Public Outreach**
- Professional Service:
  - Series Editor with Steven Hahn and Amy Dru Stanley for University of Pennsylvania Press book series, "America in the Nineteenth Century", 2014-present. Within the series, I have had served as faculty editor for the following books, working closely with their authors throughout the process:
    - William Kiser, *Borderlands of Slavery: The Struggle Over Captivity and Peonage in the American Southwest* (2017)
    - Noelani Arista, *The Kingdom and the Republic: Sovereign Hawai'i and the Early United States* (2019)
    - Katherine Bjork, *Prairie Imperialists: The Indian Country Origins of American Empire* (2019)
    - Alaina Roberts, *I've been Here All the While: Black Freedom on Native Land* (2021)
    - Paul Conrad, *The Apache Diaspora: Four Centuries of Displacement and Survival* (2021)
    - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in*

DeLay CV  16

App. 296

*the U.S.-Mexico Borderlands* (2021)
- ▪ Sarah Keyes, *American Burial Ground: A New History of the Overland Trail* (2023)
- o Editorial Board Service:
  - ▪ *Reviews in American History*, 2019-2022
  - ▪ *Journal of the Early Republic*, 2020-2022
  - ▪ *Journal of the Civil War Era*, 2016-2018
  - ▪ *Pacific Historical Review*, 2012-2015
  - ▪ *Ethnohistory*, 2009-2012
- o Prize Committees:
  - ▪ Robert M. Utley Award Com., Western History Association, 2022-2025
  - ▪ Ray Allen Billington Prize Committee, Organization of American Historians, 2017-2019.
  - ▪ David J. Weber-Clements Center Prize Committee, Western History Association, 2016-2018.
  - ▪ Bernath Lecture Prize Committee, Society for Historians of American Foreign Relations, 2015-2018.
  - ▪ Louis Knott Koontz Memorial Award committee, Pacific Coast Branch of the American Historical Association, 2012-15
  - ▪ CLAH Article Prize Committee (Chair), Conference on Latin American History, 2012
  - ▪ John Ewers Book Prize Committee, Western History Association, 2012
  - ▪ Sons of the Republic of Texas, Summerfield G. Roberts Book Award Committee, 2010-2012
  - ▪ Western History Association's Huntington-WHA Ridge Prize Committee, 2009-2011.
- o Conference Committees:
  - ▪ Conference Planning Committee, Society for Historians of the Early American Republic, 2021, 2025
  - ▪ Society for Historians of American Foreign Relations, Conference Planning Committee, 2012 and 2013
  - ▪ Organization of American Historians, Conference Planning Com., 2012
  - ▪ Society for Historians of the Early Republic, Conference Planning Committee, 2012
  - ▪ Local Arrangements Committee, Western History Association Annual Conference, Denver, 2009
  - ▪ American Society for Ethnohistory, Conference Planning Com., 2005
- o Manuscript Reviewer for *American Historical Review*, *Ethnohistory, Western Historical Quarterly*, the *Journal of American History*, *Modern American History*, *Law and History Review*, *Economics and Human Biology*, *History: the Journal of the Historical Association*, *Journal of the Early Republic*; *Enterprise & Society*; *William & Mary Quarterly*; the *Southwestern Historical Quarterly*; Oxford University Press, Harvard University Press, Princeton University Press, University of Pennsylvania Press, University of California Press, University of Arizona Press, Basic Books, Yale University Press, University of Colorado Press,

DeLay CV  17

**SERVICE (Manuscript Reviews, cont)**
University of Kansas Press, Cornell University Press, Palgrave & Macmillan;
University of North Carolina Press, Duke University Press, University of Virginia
Press, University of Tennessee Press, Texas A&M University Press; University of
Nebraska Press, Blackwell Publishing, and Rourke Publishing.
  o  Other Professional Service:
     ▪  Co-Chair, Taskforce on Conference Conduct and Sexual Harassment,
        2019, Society for Historians of American Foreign Relations
     ▪  Nominating Committee, Western History Association, 2019-2021
     ▪  External Reviewer for UC Davis Undergraduate Program Review, 2017
     ▪  Secretary and then Chair, Borderlands & Frontiers Studies Committee,
        Conference on Latin American History, 2011-2012
     ▪  Grant/Fellowship reviews for: National Science Foundation; Comisión
        Nacional de Investigación científica y tecnológica (Chile)
     ▪  Evaluations and nominations for the MacArthur Fellowship Program
- Member: American Historical Association; Org. of American Historians; Conference on
  Latin American History; Society for Historians of American Foreign Relations; Society
  for Historians of the Early American Republic; Western History Association.
- K-12 and Public Outreach:
  o  Academic Advisor, Teaching American History Grant "American Democracy in
     Word and Deed," Mt. Diablo School District, CA, 2009-2013.
  o  Presenter at Teaching American History Grant workshops in Oakland, CA, Dec.
     2009, May 2010, and Oct. 2010.
  o  Lead Presenter at Teaching American History or Gilder-Lehrman workshops for
     primary-school teachers in:
     o  Hartford, Delaware, June 2012

**Professional Service – K-12 and Public Outreach, cont.**
     o  New Orleans / San Antonio, June 2012
     o  Chicago, IL (June 2011)
     o  Deer Valley, AZ (Feb., 2010)
     o  Crescent City, CA (Jan., 2009 and April, 2010);
     o  Eureka, CA (Jan., 2009);
     o  Huntsville, Alabama (June 2008 and June 2009)
- Media:
  o  Interviewed for Faculti.net on "The Myth of Continuity in American Gun
     Culture," April 2024
  o  Interviewed about the film There Will Be Blood for Historians at the
     Movies Podcast, Feb. 2024.
  o  Interviewed about "The Arms Trade & American Revolutions" for the
     American Historical Review's podcast History in Focus, October 2023.
  o  Interviewed for episodes 1 & 2 of The Gun Machine podcast, by WBUR
     and The Trace, October 2023.
  o  Hour-long interview with the History of California Podcast, Oct. 2020

DeLay CV  18

App. 298

- **Media (cont)**
  - On-air interview for BBC News World Service on gun law following the massacres in Gilroy, El Paso, and Dayton, August 10, 2019
  - On-air interview for extended program "The American Gun Industry: A Billion Dollar Business," Australian Broadcasting Corp., March, 2018
  - On-air Interview for BBC Newsday on Remington's bankruptcy, March 27, 2018
  - On-air interview for "City Visions," KALW San Francisco, on youth protests against gun violence, March 26, 2018
  - On-air interview, BBC Radio 5 on America's gun business, Feb. 26, 2018
  - On-air interview for "The Attitude," Pacifica Network, on America's gun business, February 20, 2018
  - "Gotham's Gun Baron," Spoken essay for BBC Radio Three program *The Essay*, January 2017
  - On-screen consultant for German documentary on the U.S. presidency, "Die US-Präsidenten und der Krieg," produced by Westdeutscher Rundfunk and aired nationally in Germany in November 2016.
  - "Guns, Capitalism, and Revolution in the Americas," 2015 SHAFR keynote address filmed and broadcast on CSPAN's American History TV, (first aired August 1, 2015).
  - Interview with Deborah Lawrence and Jon Lawrence for Contesting the Borderlands: Interviews on the Early Southwest (University of Oklahoma Press, 2016), 182-200.
  - Guest of NPR's Backstory, with the American History Guys, Jan 17, 2014
  - Invited essay for the *New York Times*' Room for Debate feature, July 2, 2013
  - Guest on NPR's "On Point with Tom Ashbrook," Nov. 7, 2012.
  - Guest on PRI's "The World," April 12, 2011
  - On-screen consultant for "The Mexican-American War," Oct. 29, 2006, History Channel
  - KERA "Think" radio interview on *War of a Thousand Deserts*, 2008.

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, JUDSON THOMAS,
COLBY CANNIZZARO, CAMERON PROSPERI,
THE GUNRUNNER, LLC, and FIREARMS
POLICY COALITION, INC.,

                Plaintiffs,

            v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
Of Massachusetts, TERRENCE REIDY, in his
official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                Defendants.

CIVIL ACTION
NO. 1:21-CV-10960-DJC

## **EXPERT REPORT OF DR. STEPHEN HARGARTEN**

1.      I have been asked to render an opinion on the public health consequences of firearms accidents.

2.      I have been retained by Office of the Attorney General for the Commonwealth of Massachusetts to render expert opinions in this case. I am being compensated at a rate of $250-$500 per hour.

3.      A copy of my curriculum vitae is attached as Exhibit A.

4.      My name is Stephen W. Hargarten, M.D., M.P.H. I am an emergency medicine specialist, having practiced emergency medicine for over 35 years. I have been board certified across four decades. My curriculum vitae, which is attached documents my educational and research experience in detail.

## Background And Qualifications

5.      I received my Medical Degree from the Medical College of Wisconsin in 1975, completed my internship at Gorgas Hospital, a U.S. Army hospital in Panama City, Panama in 1976, and received my Master's Degree in Public Health at the Bloomberg School of Public Health at The Johns Hopkins University in 1984.

6.      I was a practicing emergency medicine physician in the Milwaukee area for over 35 years, most recently serving as an Attending Physician at Froedtert Hospital until 2018. As an emergency medicine physician, I treated hundreds of patients who sustained gunshot wounds from many different firearms.

7.      In addition to practicing emergency medicine, I continue to serve as Professor of Emergency Medicine.  I served as Chairman of the Department of Emergency Medicine for twenty years and Associate Dean for Global Health for twelve years at the Medical College of Wisconsin. In 2001 I founded the Injury Research Center, which later was reorganized to become the Comprehensive Injury Center at the Medical College of Wisconsin, serving as Director for nearly 20 years.

8.      The Comprehensive Injury Center focuses on the sciences of injury prevention and control, including violence prevention, through a multidisciplinary health care/public health approach. This includes community engagement, research, education, and collaboration with multidisciplinary partners. The Center conducts research in a variety of areas.

9.      I currently serve as the Vice-Chair of the Community Preventive Services Task Force of the U.S. Department of Health and Human Services (CDC, 2018-present), and am a former member of the Executive Committee of the Transportation Research Board of the

National Academies of Science, Engineering, and Medicine, (2018-2023). I have been a member of the National Academy of Medicine since 2011.

10.     Over the course of my career, I've been awarded more than $20 million in research grants and awards, including awards by the State of Wisconsin Department of Health Services, Joyce Foundation, National Institute of Justice, and the Centers for Disease Control and Prevention. In addition, I've published more than 100 original papers in journals such as the *Academic Emergency Medicine*, *Annals of Emergency Medicine*, and the *New England Journal of Medicine*.

11.     My current position at the Medical College of Wisconsin is: Professor of Emergency Medicine and Senior Injury and Policy Advisor in the Comprehensive Injury Center at MCW.

12.     I have published regularly in the science field of Injury Prevention and Control since completing my Masters in Public Health at Johns Hopkins Bloomberg School of Public Health.  My CV contains my prior publications.

13.     I have treated hundreds of patients with gunshot wounds during my 35 years of clinical practice, often times not knowing what the circumstance were, given that the emergency department priority is to evaluate and initiate acute care for the patient's wounds.

14.     During these past four years, I have not been deposed nor testified as an expert witness in any federal cases.

**Opinions**

**The Public Health Importance of Quality Control and Safety Features in Consumer Goods**

15.     There is a long history of physicians advocating for product safety, going back 100 years to an ENT surgeon advocating for safter packaging of lye.[1] William Haddon, MD, who is considered the "father" of Injury Prevention and Control Science was another early advocate, calling for safer designs of cars.[2] He was the first director of the newly established NHTSA in 1968 which has authority over automobile safety regulations.[3] Pediatricians over decades had advocated for safer medicine containers, which resulted in a dramatic decrease in childhood poisonings from aspirin and acetaminophen.[4]

16.     The recent Surgeon General Advisory called for a national consideration for firearms to be considered consumer products.[5] The report noted that, because firearms are not federally regulated as consumer products, those firearms "may not undergo safety testing or include safety features like warning labels related to associated risk or authorized-use technology ('smart' firearm technology) for firearm access." Based on my own experience in injury

---

[1] *See* Eriksson, S.E., Jobe, B.A. & Ayazi, S. Chevalier Jackson: father of endoscopic surgery, and champion of women in medicine, social justice, and public health. Surg Endosc 37, 6660–6671 (2023). https://doi.org/10.1007/s00464-023-10256-x.

[2] For an introduction to Dr. Haddon's formulation of a scientific approach to reducing injuries from "accidents," see, for example, Baker, Susan P., and William Haddon. "Reducing Injuries and Their Results: The Scientific Approach." The Milbank Memorial Fund Quarterly. Health and Society, vol. 52, no. 4, 1974, pp. 377–89. JSTOR, https://doi.org/10.2307/3349509.

[3] "Past NHTSA Administrators," https://www.nhtsa.gov/about-nhtsa/past-nhtsa-administrators.

[4] World Health Organization, "World report on child injury prevention," Oct. 3, 2008, at 133 https://www.who.int/publications/i/item/9789241563574.

[5] Firearm Violence: A Public Health Crisis in American (U.S. Surgeon General's Advisory: 2024), https://www.hhs.gov/sites/default/files/firearm-violence-advisory.pdf.

prevention, it is my opinion that treating firearms as a consumer product subject to uniform safety standards would save lives.

17.     My injury prevention and control approach—informed by my training and experience across five decades—requires multiple public health interventions and can be divided into three categories:  the "host", user of a product, the product itself and its design, and the environment where the product resides (i.e. home with children).

18.     Product safety designs are key strategies to maximize safety and achieve injury prevention. Principles of injury prevention include the relative effectiveness of active and passive safety features. Looking at the example of automobile passenger safety, seat belts (active measure) require an active behavior of the occupant. Airbags (passive measure) provide their safety benefits automatically during a crash.

19.     When feasible, passive measures of safety are superior to active strategies since the latter requires a person's behavior to achieve safety.  A mechanism like a magazine safety disconnect is an excellent example of a passive strategy because it is a design feature that provides a safety benefit automatically, without active behavior by the firearm user.

20.     Over decades of product safety development, I have never found any research that suggests that by making the product safer, that users are further "stimulated" to act in an unsafe manner.

21.     In my own experience and study of injury prevention and control, comprehensive strategies are needed for preventing harm, not limited to education.  Multiple strategies are needed to comprehensively address the reduction of harm, which include product design. Examples of product design changes that successfully reduced child injury and death include

App. 305

child proof medication bottles, child proof caustic substance containers (such as for lye), as well as policies that require fencing around pools.

22.     Safety features have been designed into firearms and have been a part of firearm manufacturing since the 1800s.  The grip safety for a revolver was introduced in the 1880s to reduce child access.[6] This safety design approach is consistent with today's lighters that have "grip safeties" to prevent children from releasing thermal energy.  You can still find pistols manufactured today with grip safeties, providing evidence that firearm manufacturers have the capacity to integrate safety features.[7]

**The Public Health Threat Posed by Firearm Accidents, Including Unintentional Discharge and Misuse by Children**

23.     Firearms, and the bullets they carry have been linked with deaths and injuries for decades, both intentional and unintentional. Since 1990, over 100,000 children and young adults, ages 1-24, have died as a result of gunshot wounds.[8]

24.     In the most recent data about cause of death for young people, deaths attributable to firearms and the bullets they carry, now outnumber motor vehicle crash deaths for children aged 1-19.[9]

---

[6] *See* Associated Press, "Gun safety has evolved over time," May 1, 2016, https://www.columbian.com/news/2016/may/01/gun-safety-has-evolved-over-time/.

[7] For example, the Springfield Armory XD-M model of handgun has a grip safety. https://support.springfield-armory.com/manuals/xd-m-manual?section=5KYJs6ZopPgToouJIgCEkO&topic=49bvsojftyypSS3oxOuIOh.

[8] Matt McGough, Krutika Amin, Nirmita Panchal, and Cynthia Cox, "Child and Teen Firearm Mortality in the U.S. and Peer Countries," July 18, 2023, https://www.kff.org/mental-health/issue-brief/child-and-teen-firearm-mortality-in-the-u-s-and-peer-countries/.

[9] Jason E. Goldstick, Ph.D., Rebecca M. Cunningham, M.D., Patrick M. Carter, M.D., "Current Causes of Death in Children and Adolescents in the United States," N. Engl. J. Med. Vol. 386, No. 20 (Apr. 20, 2022) https://www.nejm.org/doi/full/10.1056/NEJMc2201761.

App. 306

25.    Concerning trends have been identified comparing the rise of children/adolescent deaths with the rise of 9mm production in the United States over the past 20 years.[10] That data shows that from 2001 to 2020, United States firearm production increased 1298% for 9mm pistols and that, in the same period, firearm deaths and injuries in U.S. youth increased 48% and 69%. The study found "strong relationships between pistol production, specifically 9 mm, and firearm deaths, both suicides and homicides, and nonfatal injuries in youth." The study posited that this strong association "may be due to the pervasiveness of this weapon type in the market" and that "pistols are smaller than other types of firearms allowing easier access and handling of these weapons in general and by children and young adults with smaller hands."

26.    Analyzing data from the National Violent Death Reporting System (NVDRS), researchers reviewed 1,262 fatal unintentional firearm injury cases among children aged 0–17 years from 2003–2021.[11] Of those cases, the most common precipitating circumstances were the shooter playing with or showing the firearm to another person (66.6%); unintentionally pulling the trigger (21.3%); thinking the firearm was unloaded, the safety was engaged, or the magazine was disengaged (20.5%); and mistaking the firearm for a toy (10.6%; most commonly among children aged 0–5 years [28.0%]). Among incidents with known storage information, firearms

---

[10] Tomas, C.W., Fumo, N., Kostelac, C.A., Flynn-O'Brien, K., Levas, M., deRoon-Cassini, T.A., Hargarten, S. (2023). Trends in firearm production and firearm deaths in children. *Preventive Medicine*. https://doi.org/10.1016/j.ypmed.2023.107684.

[11] Wilson RF, Mintz S, Blair JM, Betz CJ, Collier A, Fowler KA. Unintentional Firearm Injury Deaths Among Children and Adolescents Aged 0–17 Years — National Violent Death Reporting System, United States, 2003–2021. MMWR Morb Mortal Wkly Rep 2023;72:1338–1345. DOI: http://dx.doi.org/10.15585/mmwr.mm7250a1. For further analysis of data regarding unintentional gun injuries among children from 2015 to 2021, see Cannon AD, Reese K, Tetens P, Fingar KR. Preventable tragedies: findings from the #NotAnAccident index of unintentional shootings by children. Inj Epidemiol. 2023 Oct 23;10(Suppl 1):52. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10594669/#:~:text=Background,children%2017%20years%20and%20younger

used to inflict the fatal injury were stored loaded and unlocked in 73.8% and 76.2% of incidents, respectively. Among firearms that were stored unlocked and for which loaded status was known, 90.6% were stored loaded.

27.     Based on my experience, the NVDRS is likely under-representative of the actual number of unintentional firearm injury cases, whether among children or adults. This is because that system relies on reporting from state coroners and medical examiners, and those states have different reporting standards and capacities for collecting and reporting data about firearms injuries and deaths. The figure cited above is likely an undercount of actual cases of fatal unintentional firearm injury cases among children.

28.     A report published in 1991 by the United States General Accounting Office (now called the Government Accountability Office) found that if simple changes in firearm (handgun) designs were implemented, that a significant number of unintentional deaths would be prevented.[12]

29.     My co-authors and I published two studies in the late 1990s that similarly suggested that if simple changes would occur in firearm design, that there would be fewer deaths.[13] Specifically, we recommended that various design modifications can prevent

---

[12] GAO, Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate: *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented* (March 1991), https://www.gao.gov/assets/pemd-91-9.pdf

[13] Freed LH, Vernick JS, Hargarten SW: *Prevention of firearm-related injuries and deaths among youth—a product orientated approach.* Pediatric Clinics of North America 45(2):427-438, 1998; Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW: *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries.* Journal of Public Health Policy 20(4):427-440, 1999. For further discussion of handgun safety devices as they intersect with the work of physicians, see Milne J, Hargarten SW: Handgun safety features: A review for physicians. J Trauma: Injury, Infection and Critical Care 47(1):145-150, 1999.

unauthorized use, unintended use, or both. As to unintended use, we recommended that loaded chamber indicators, manual safeties, magazine safeties, and handguns designed to minimize the likelihood of discharge if dropped are all strategies to prevent injuries and deaths.

30.    In 2003, I co-authored and published another article again confirming that "[i]ncorporating safety devices into firearms is an important injury intervention, with the potential to save hundreds of lives each year."[14]

31.    Carrying firearms with basic safety design flaws has public health implications beyond the primary user.  Because the  national system for accounting for unintentional firearm related deaths and injuries has limitations, anecdotal cases are often times the only examples. My own experience, spanning decades of clinical care in the emergency department, and in public health has brought me to this important determination: product safety matters.

32.    I published a commentary in 2001 about a Sturm Ruger single action revolver involved in two events where the user dropped the loaded firearm, striking the hammer and killing and injuring multiple people.[15]

33.    As a treating physician, I have attended to hundreds of people with gunshot wounds, although I was not always aware of the circumstances that caused the wound because my primary role and goal in the emergency room was to resuscitate and stabilize the patient for the next phase of care (ICU or Operating room).  Based on my experience in injury treatment, I have treated cases where the patient most likely had shot themselves by accident based on the

---

[14] Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. *Unintentional and undetermined firearm related deaths: a preventable death analysis for three safety devices.* Inj Prev. 2003 Dec;9(4):307-11.

[15] Hargarten SW. *Three shots, two dead, five errors, one gun: A recipe for prevention?* Ann Emerg Med 2001; 37:340-341.

positioning of the wounds in the posterior lateral thigh, suggesting they were withdrawing their firearm from their pocket or holster and unintentionally pulled the trigger, releasing a bullet. As a treating physician, I can confirm that unintentional gunshot wounds can be just as serious as ones linked with assaults.

September 15, 2024

_____

Dr. Stephen Hargarten

10

# EXHIBIT A

**Dr. Stephen Hargarten**
**CURRICULUM VITAE**
Professor of Emergency Medicine

Home Address:                         2411 E. Menlo Boulevard
                                      Shorewood, WI  53211

Office Address:                       The Hub for Collaborative Medicine
                                      8701 W Watertown Plank Rd.
                                      Milwaukee, WI  53226
                                      Email: hargart@mcw.edu

Birth date:                           January 5, 1949

Marital Status:                       Married, 1987 - Janis
                                      Children:  Beth, Jordan, Leah

Education:

    1984                           MPH, Johns Hopkins School of Public Health and Hygiene

    1975                           MD, Medical College of Wisconsin

    1971                           BA, University of Wisconsin, Milwaukee

Postgraduate Training:

    1975-1976                      Rotating Internship, Gorgas Hospital, Canal Zone, Panama

Faculty Appointments:

    2020-present                   Senior Injury and Policy Advisor, Comprehensive Injury Center at the Medical
                                      College of Wisconsin

    2017-2019                      Co-Director, Global Health Pathway, Medical College of Wisconsin

    2014-2016                      Faculty Representative, Board of Trustees, Medical College of Wisconsin

    2013-2017                      Director, Global Health Pathway, Medical College of Wisconsin

    2013-2017                      Adjunct Faculty, Joseph J. Zilber School of Public Health, University of
                                      Wisconsin

    2012-present                   Graduate Faculty, Graduate School of Biomedical Sciences, Medical College of
                                      Wisconsin

    2010-2021                      Associate Dean, Global Health, Medical College of Wisconsin

    2010-2014                      Institute for Health and Society, Medical College of Wisconsin

- 2 -
Stephen W. Hargarten, MD, MPH

| | |
|---|---|
| 2008–present | Adjunct Professor, Department of Population Health Sciences University of Wisconsin School of Medicine and Public Health |
| 2001-2020 | Director, Comprehensive Injury Center at the Medical College of Wisconsin |
| 1998-present | Professor, Department of Emergency Medicine, Medical College of Wisconsin |
| 1998-2018 | Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1998-2001 | Director, Wisconsin Injury Research Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1997-2002 | Director, Firearm Injury Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1997 | Associate Professor, Interim Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1996 | Instructional Academic Staff Preceptor, Physician Assistant Program, Department of Family Medicine & Practice, University of Wisconsin Medical School - Madison, WI |
| 1994-2004 | Health Policy Institute, Medical College of Wisconsin |
| 1989-1994 | Assistant Professor of Emergency Medicine, Medical College of Wisconsin |
| 1985-1988 | Assistant Clinical Professor, Department of Trauma and Emergency Medicine, Medical College of Wisconsin |

Hospital and Administrative Appointments:

| | |
|---|---|
| 1995-2018 | Attending Staff, Froedtert Hospital |
| 1992-1997 | Associate Attending Staff, Children's Hospital of Wisconsin |

Hospital Appointments: (past)

| | |
|---|---|
| 1989-1995 | Associate Attending Staff, John L. Doyne Hospital, Milwaukee, WI |
| 1985-1988 | Staff Physician, Emergency Department, St. Luke's Hospital |
| 1984-1985 | Staff Physician, Emergency Department, St. Joseph's Hospital |
| 1977-1983 | Staff Physician, Emergency Department, St. Mary's Hospital |
| 1976-1977 | Staff Physician, Emergency Department, St. Joseph's Hospital |

Other Appointments:

- 3 -
Stephen W. Hargarten, MD, MPH

2014-2020          President and CEO, Milwaukee Global Health Consortium, Milwaukee, WI

Specialty Certification:

2000          Board Re-certified, American Board of Emergency Medicine

1991          Board Re-certified, American Board of Emergency Medicine

1987-2010          Examiner, American Board of Emergency Medicine

1987-2003          Instructor, Advanced Trauma Life Support

1983-2005          Fellow, American College of Emergency Physicians

1982          Board Certified, American Board of Emergency Medicine

Licensure:
National Board of Medical Examiners - July 1976 - #154341
State of Wisconsin - July 1976 - #20218

Awards/Honors
2019          Distinguished Service Award, Medical College of Wisconsin

2018          Appointment to the Community Preventive Services Task Force (CPSTF)
              of the U.S. Department of Health and Human Services

2017          International Institute of Wisconsin's Dorothy Von Briesen World Citizen
              Award in recognition of dedication to the promotion of international
              cooperation and understanding between diverse cultural communities

2016          The Leonard Tow 2016 Humanism in Medicine Award in recognition of
              exemplary compassion, competence and respect in the delivery of care
              (presented by The Arnold P. Gold Foundation)

2015          Distinguished Achievement Award, Milwaukee Academy of Medicine

2012          Outstanding Pathways Advisor for the 2012 Academic Year
              Medical College of Wisconsin

2012          Outstanding Medical Student Teacher for the 2011-2012 Academic Year
              Medical College of Wisconsin

2011          Election to the National Academy of Medicine, (Formally the Institute of Medicine) of
              The National Academy of Sciences

2011          Selected to be a Johns Hopkins Scholar

2008          Outstanding Medical Student Teacher for the 2007-2008 Academic Year
              Medical College of Wisconsin

2000          Prevention Achievement Award – presented by the Brain Injury

App. 314

- 4 -
Stephen W. Hargarten, MD, MPH

Association of Wisconsin

| | |
|---|---|
| 2000 | President's Award, Milwaukee Academy of Medicine |
| 1996 | Contributions to the 1996 Healthy People 2000 Progress Review, and in recognition of leadership in the area of Violence Prevention, on behalf of the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Washington, DC, November |
| 1995 | Public Citizen of the Year, National Association of Social Workers - Wisconsin Chapter |
| 1994 | Physician of the Year State Medical Society – Wisconsin |
| 1990 | Rookie of the Year Award (presented by the Emergency Medicine Residents, Medical College of Wisconsin-MCWAH) |

Memberships in Professional and Honorary Societies:

Society for Research Excellence
Community Preventive Services Task Force (US Dept of Health & Human Services)
The National Academy of Medicine (fka Institute of Medicine)
Johns Hopkins Society of Scholars
Society for Academic Emergency Medicine
American Public Health Association
Advocates for Highway and Auto Safety
Wisconsin Public Health Association
International Travel Medicine Society
Society for Advancement of Violence and Injury Research

Consultant:

Florida Department of Health
Colorado Department of Health

Journal Reviewer:

Academic Emergency Medicine
Annals of Emergency Medicine
Accident Analysis and Prevention
American Journal of Emergency Medicine
Journal of Global Health
Journal of the American Medical Association
Journal of Injury Prevention
Chinese Journal of Emergency Medicine, Editorial Board

Peer Grant Reviewer

NCIPC - Elimination of Health Disparities through Translation Research (R18), 2008

App. 315

- 5 -
Stephen W. Hargarten, MD, MPH

National Advisory Committees/Boards:

Chair, Network to Prevent Gun Violence in the Americas, 2020-present

Member, Global Violence Prevention Forum of the National Academies of Sciences, Engineering and Medicine, 2019-present

Member, Community Preventive Services Task Force of the U.S. Department of Health and Human Services, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies of Sciences, Engineering and Medicine, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies, 2018-present

Member, Scientific Committee, Consortium of Universities for Global Health, 2013

Special Government Employee, Board of Scientific Counselors, National Center for Injury Prevention and Control, 2013-2017

Member, Institute of Medicine, Global Health Board, 2012-2018

Member, Scientific Advisory Committee, University of Michigan Injury Center, 2011-present

Board Member, Community Advocates, Urban Strategies, 2010-present

Board Member, Great Lakes Transportation Enterprise Institute, 2010-2013

Founding President, Society for Advancement of Violence and Injury Research, 2005-2007

President, Association of Academic Chairs of Emergency Medicine, 2004-2005

President, National Association of Injury Control Research Centers, 2004-2005

Member, Advisory Committee, National Center of Injury Prevention and Control, Acute Care Research Committee, 2004-2005

Board Member, St. Charles Youth and Family Services, 2001-present

Participant, Injury Research Grant Review Committee, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, June 7-8, 1998

Member, Senator Russ Feingold Health Care East Advisory Committee, 1999–2010

Co-Chair, Advocates for Highway & Auto Safety, 1998 – 2002

Public Health Task Force, Society for Academic Emergency Medicine 1998 - 2000

App. 316

- 6 -
Stephen W. Hargarten, MD, MPH

Member, Education Advisory Committee, Association for the Advancement of Automotive Medicine, 1996 – 1997

Board Member, Advocates for Highway & Auto Safety, 1994– present

Member, Public Health and Injury Prevention Committee - American College of Emergency Physicians, 1991-1995

Member, Program Committee, Society for Academic Emergency Medicine, 1993 - 1995

Board Member, Association for Advancement of Automotive Medicine, 1992 - 1995

Member, Public Health Committee - Society for Academic Emergency Medicine, 1990 - 1993

Member, Trauma Subcommittee American College of Emergency Physicians, 1990 – 1991

State/Local Advisory Committee/Boards:

Faculty Member, Board of Trustees, Medical College of Wisconsin, 2014-2016

Member, Committee on Inmate/Youth Death, Department of Corrections, 2005-2007

Member, Public Health Council, Department of Health and Family Services, 2004-2006

Task Force Member, Governors Task Force on Terrorism, 2001-2003

Chair, State Trauma Advisory Committee, 1999-2003

Chair, State Medical Society Council on Health of the Public, 1999-2000

Eastern Regional Health Care Advisory Committee of Senator Feingold, 1998-2000

Chair, Policies and Practice Work Group, Fighting Back, 1998

Board Member, Fighting Back, 1997-2000

Chair, State Medical Society Injury Control Commission, 1996 - 1999

Chair, Public Health and Education Committee, Milwaukee Academy of Medicine, 1993 – 1999

Tom Dooley Heritage - Board Member (Private, Voluntary Organization), 1981 - 1995

Chairman, Safe Transportation Commission Wisconsin State Medical Society, 1990 - 1994

Board Member, Wisconsin Division American Trauma Society, 1990 - 1993

President, Wisconsin Public Health Association, 1992 - 1993

Co-Chairman, Wisconsin Safety Belt Coalition, Madison, Wisconsin, 1986 - 1991

- 7 -
Stephen W. Hargarten, MD, MPH

Milwaukee County Medical Society Public Health Committee, 1989 - 1991

Commissioner, Milwaukee Safety Commission, 1987 - 1990

Medical Director, St. Luke's International Travel Clinic, 1985 - 1988

Board Member/President, Wisconsin Indochina Refugee Relief (WICRR) – Wisconsin, 1980 - 1982

Wisconsin Indochina Refugee Relief (WICRR) (Private, Voluntary non-profit organization), Volunteer Physicians - Tom Dooley Memorial Hospital Thailand, 1980

Co-Founder, Board Member West of the River Community Center, Milwaukee, Wisconsin, 1977 – 1979

Research Grants, Contracts, and Awards:

1. "Remembering the Lost: How Investigation of Military Suicides Can Improve Prevention Resources"
   AWARD FOR FISCAL YEARS 2020-22
   $316,576
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

2. "Using Hospital Records of Patients Presenting to Froedtert Hospital to Predict Risk of Opioid Use Disorder (OUD), Fatal and Non-fatal Opioid Overdose, and ED Readmission"
   AWARD FOR FISCAL YEARS 2020-2021
   $50,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Clinical and Translational Science Institute through Advancing a Healthier Wisconsin Endowment

3. "Project Zero"
   AWARD FOR FISCAL YEARS 2021-2023
   $316,760
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

4. "Project Aware"
   AWARD FOR FISCAL YEARS 2019-2024
   $300,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

5. "WVDRS and SUDORS Contract"
   AWARD FOR FISCAL YEARS 2019-2020
   $170,440
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

6. FY20 DOC Contract
   AWARD FOR FISCAL YEARS 2019-2020
   $99,874
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

- 8 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Wisconsin Department of Corrections

7. "Destination Zero: Zero Suicide in Fond du Lac County"
   AWARD FOR FISCAL YEARS 2018-2020
   $419,691
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Healthier Wisconsin Partnership Program

8. "MCW Blue Center Research Award"
   INITIAL AWARD FOR FISCAL YEARS: 2017-2020
   $600,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Medical College of Wisconsin, Office of Research

9. "Scudder Travel Scholarship"
   AWARD FOR FISCAL YEARS: 2017-2021
   $15,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Dr. James H. Taylor and Dr. Susan P. Taylor

10. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
    AWARD FOR FISCAL YEARS: 2017-2021
    TOTAL AWARD: $250,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: John Michael Kohler Family Foundation

11. "The Cardiff Model: Strengthening Community Capacity to Reduce Violence:
    AWARD FOR FISCAL YEARS 2016-2018
    $499,693
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: US Department of Justice

12. "Developing a Community-Based Approach to Reduce Drug Overdoses in Milwaukee County"
    AWARD FOR FISCAL YEAR 2016
    TOTAL AWARD $25,000
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Milwaukee County

13. "Addressing Racial Disparities in the Ascertainment and Identification of Depression,
    Suicidal Ideation, and Death by Suicide"
    AWARD FOR FISCAL YEARS 2016-2017
    TOTAL AWARD $37,347
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Charles E. Kubly Foundation

14. "Creating a Jackson County that Supports Mental Health"
    AWARD FOR FISCAL YEARS 2015-2017
    TOTAL AWARD: $374,504
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

- 9 -
Stephen W. Hargarten, MD, MPH

15. "Wisconsin Violent Death Reporting System" (WVDRS)
    AWARD FOR FISCAL YEAR 2015
    AWARD: $69,773
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: (Sub-Contract) State of Wisconsin, Department of Health Services

16. "Integrating Emergency Data with Law Enforcement, Emergency Medical Service and
     Community Data to Reduce Violence"
    AWARD FOR FISCAL YEAR 2015
    PRINCIPAL INVESTIGATORS: Stephen Hargarten, MD, MPH and Jennifer Hernandez-Meier, MSW
    FUNDING AGENCY: National Institute of Justice

17. "Criminal Background Characteristics of Homicide Perpetrators and Victim's and
     Suicide Decedents: A Model State Analysis"
    AWARD FOR FISCAL YEARS 2014-2016
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: New Venture Fund for a Safer Future

18. "Training Administration Support"
    AWARD FOR FISCAL YEARS 2012-present
    TOTAL AWARD: $6,200
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Varies

19. "M4 University of the Philippines College of Medicine Global Health Elective"
    AWARD FOR FISCAL YEARS: 2012-2013
    TOTAL AWARD: $1,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: David E. Engelhardt, MD

20. "Changing the Culture of Risky Drinking Behavior: Policy Change"
    AWARD FOR FISCAL YEARS: 2012-2017
    TOTAL AWARD: $748,267
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY:  Healthier Wisconsin Partnership Program

21. "Child Maltreatment and Partner Violence: Bridging the Medical/Social/Science Gap"
    AWARD FOR FISCAL YEAR 2011-2012
    TOTAL AWARD $7,142
    FUNDING AGENCY: NICHHD/Sub-contract from Washington University-St. Louis

22. "M4 Global Health Elective Travel Scholarship"
    AWARD FOR FISCAL YEARS: 2011-2017
    TOTAL AWARD: $70,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: St. Joseph's Hospital Professional Emergency Services, Inc. (PES) Fund Award

23. "M4 Global Health Elective Travel Scholarship"
    AWARD FOR FISCAL YEARS: 2011-2017
    TOTAL AWARD: $70,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

App. 320

- 10 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Ewens WIcare Fund

24. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
    AWARD FOR FISCAL YEARS: 2011-2016
    TOTAL AWARD: $255,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: John M. Kohler Foundation

25. "Violence Prevention Initiative Research and Evaluation Team"
    AWARD FOR FISCAL YEARS: 2010-2015
    TOTAL AWARD: $1,241,473
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

26. "Strengthening Emergency Care in Belize"
    AWARD FOR FISCAL YEARS: 2010-2012
    TOTAL AWARD: $21,360
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wagner Foundation

27. Changing the Culture of Risky Drinking Behavior"
    AWARD FOR FISCAL YEARS: 2009-2012
    TOTAL AWARD: $300,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

28. "Elaine Kohler Nicaragua Award"
    AWARD FOR FISCAL YEARS: 2008-2016
    TOTAL AWARD: $5,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Julilly Kohler WI Care

29. "Kenosha County Suicide Prevention Initiative"
    AWARD FOR FISCAL YEARS: 2008-2011
    TOTAL AWARD: $450,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

30. "Train the Trainer Alcohol Screening and Intervention"
    AWARD FOR PERIOD: June-September 2008
    TOTAL AWARD $20,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Transportation

31. "Comprehensive Injury Center at the Medical College of Wisconsin"
    AWARD FOR FISCAL YEARS: 2007-2012
    TOTAL AWARD: $4,424,025
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Centers for Disease Control and Prevention

32. "Public Health Injury Surveillance and Program Development"

App. 321

AWARD FOR FISCAL YEAR: 2007-2008
TOTAL AWARD: $106,034
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

33. "Changing the Culture of Risky Drinking Behavior"
AWARD FOR FISCAL YEARS: 2007-2008
TOTAL AWARD: $49,944
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

34. "Medical Student Training in Aging and Injury Research"
AWARD FPR FOSCA: UEARS: 2007-2012
TOTAL AWARD: $391,068
CO-PROGRAM DIRECTOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: National Institutes of Health/National Institute on Aging

35. "Public Health Injury Surveillance and Program Development"
AWARD FOR FISCAL YEAR: 2006-2007
TOTAL AWARD: $68,870
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

36. "Strengthening Public Health Policymaking for a Healthier Milwaukee"
AWARD FOR FISCAL YEARS: 2006-2008
TOTAL AWARD: $49,816
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Healthier Wisconsin Partnership Program

37. "Youth Suicide Prevention and Early Intervention"
AWARD FOR FISCAL YEARS: 2006-2009
TOTAL AWARD: $100,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Milwaukee Mental Health Association via Substance Abuse and Mental Health Services
Administration

38. "Public Health Injury Surveillance and Program Development"
AWARD FOR FISCAL YEAR: 2005-2006
TOTAL AWARD: $93,228
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

39. "Toward Regional Priorities for Injury Prevention"
AWARD FOR FISCAL YEAR: 2003
TOTAL AWARD: $22,727
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Health and Family Services

40. "Deaths to US Travelers Abroad"
AWARD FOR FISCAL YEAR: 2002
TOTAL AWARD: $50,000

- 12 -
Stephen W. Hargarten, MD, MPH

PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Center for Disease Control and Prevention

41. "Annie E. Casey Foundation"
AWARD FOR FISCAL YEAR: 2002
TOTAL AWARD: $68,181
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Annie E. Casey Foundation

42. "Comprehensive Injury Center at the Medical College of Wisconsin"
AWARD FOR FISCAL YEARS:  2001-2007
TOTAL AWARD: $5,180,275
PRIMARY INVESTIGATOR:  Stephen W. Hargarten MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

43. "Grants for Injury Control Research Centers – Small Project 4"
AWARD FOR FISCAL YEARS: 2001-2004
TOTAL AWARD: $ 66,672
CO-INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

44. "Grants for Injury Control Research Centers – Large Project 4"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD: $ 204,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

45. "Grants for Injury Control Research Centers – Large Project 3"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD: $100,000
CO-INVESTIGATOR (IN KIND): Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

46. "Grants for Injury Control Research Centers – Core A"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD:  $ 137,380
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

47. "2nd Annual Emerging Injury Conference: International Travel Related Injury"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD:  $ 50,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

48. "NVDRS – Intentional Injuries and Assaults"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD: $ 75,774
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Office of Justice Assistance

App. 323

- 13 -
Stephen W. Hargarten, MD, MPH

49. "Improving Patient Safety: Health Systems Reporting, Analysis, and Safety Improvement Research Demonstrations"
AWARD FOR FISCAL YEARS: 2001-2004
TOTAL AWARD: $1,418,594
CO-PI: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Agency for Healthcare Research and Quality

50. "International Injuries and Assaults"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD:  $ 68,196
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin

51. "Building a National Firearm Injury Reporting System"
AWARDED FOR FISCAL YEARS:  2000 - 2001
TOTAL AWARD:  $50,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Funder's Collaborative for Gun Violence Prevention by Harvard School of Public Health National Violent Injury Statistics System (NVISS)

52. "Preventing Firearm Suicides and Unintentional Deaths"
AWARD FOR FISCAL YEARS:  2000-2001
TOTAL AWARD: $60,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Funder's Collaborative for Gun Violence Prevention by Johns Hopkins Center for Gun Policy & Research

53. "A Comprehensive Model for Firearm Injury Reporting, Analysis and Information" – Joyce 5
AWARD FOR FISCAL YEARS: 1999-2002
TOTAL AWARD: $771,924
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

54. "Closing the Gap: Applying Injury Control Science to Patient Safety"
AWARD FOR FISCAL YEARS:  1999-2000
TOTAL AWARD:  $24,316 and $30,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Centers for Disease Control and Prevention

55. "In the Wake of a Gunshot"
AWARD FOR FISCAL YEARS:  1999-2000
TOTAL AWARD:  $10,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Wisconsin Humanities Council and the National Endowment for the Humanities

56. "Strategic Development of State Firearm Injury Reporting Systems"
AWARD FOR FISCAL YEARS: 1999-2000
TOTAL AWARD: $116,911
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Open Society Institute

57. "Wisconsin Firearm Injury Reporting Systems (FIRS) – Joyce 4
AWARD FOR FISCAL YEARS: 1998-1999
TOTAL AWARD: $95,912
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

58. "Wisconsin Drug Abuse Emergency Room Registry"
AWARD FOR FISCAL YEARS: 1998-1999
TOTAL AWARD: $1500
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin, Dept. of Health & Family Services

59. "National Firearm Information Center" – Joyce 3
AWARD FOR FISCAL YEARS: 1997-2000
TOTAL AWARD: $391,581
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

60. "Firearm Injury Reporting System" – Joyce II
AWARD FOR FISCAL YEARS: 1996-1998
TOTAL AWARD: $194,538
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

61. "Brief Strategies for Alcohol-Related Non-traffic Injuries"
AWARD FOR FISCAL YEAR: 1996
TOTAL AWARD: $10,904
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: University of Wisconsin – Madison

62. "Firearm Surveillance System - Wisconsin"
AWARD FOR FISCAL YEAR: 1994-1997
TOTAL AWARD:  $150,000
CO-DIRECTOR:   Stephen Hargarten, MD, MPH
FUNDING AGENCY: Division of Health, State of Wisconsin

63. "Firearm Injury Reporting System"
AWARD FOR FISCAL YEAR: 1994-95
TOTAL AWARD: $50,000
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Faye McBeath Foundation

64. "Firearm Injury Reporting System" – Joyce II
AWARD FOR FISCAL YEAR: 1994-95
TOTAL AWARD: $79,997
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

65. "Emergency Room Drug Abuse Data"
AWARD FOR FISCAL YEARS: 1992 - 2000

- 15 -
Stephen W. Hargarten, MD, MPH

TOTAL AWARD:  $5,000/yr.
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin

66. "Crash Outcome Data Evaluation (CODES) in Wisconsin"
AWARD FOR FISCAL YEAR: 1992-1993
TOTAL AWARD:  $15,000
CO-INVESTIGATOR:  Stephen Hargarten, MD, MPH
FUNDING AGENCY: National Highway Traffic Safety Administration

67. "Partnerships in Health/EMS Training for Poland"
AWARD FOR FISCAL YEARS: 1992-1994
TOTAL AWARD:  $2.4 million
ASSOCIATE DIRECTOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: United States Agency for International Development

68. "Emergency Medical Services Course for Physicians"
AWARD FOR FISCAL YEAR: 1992
TOTAL AWARD:  $29,789.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

69. "Motorboat Propeller Injuries in Wisconsin 1987-1989"
AWARD FOR FISCAL YEAR: 1991
TOTAL AWARD:  $2,000.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Institute for Injury Reduction

70. "Electronic Log System for Emergency Department"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $40,356.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

71. "Cost & Data Analysis of Motor Vehicle Trauma in Milwaukee County"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD: $3,417.00.
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

72. "Hunting Injuries and Illnesses in Montana 1990"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $2,500.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wilderness Medical Society

73. "Motor Vehicle Crashes - Emergency Physician Costs"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $6,000.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Safety Belt Coalition

- 16 -
Stephen W. Hargarten, MD, MPH

Invited Lectures/Testimony:

1. "Gun Violence as a Biopsychosocial Disease," Midwest Injury Prevention Alliance Virtual Summit, December 9, 2020.

2. "Global Health from Neighborhoods to Nations", Milwaukee Academy of Medicine, Virtual Webinar, November 17, 2020.

3. "Impact of COVID-19 on the University's Global Health Programming," 7th Annual Midwestern Universities for Global Health, Virtual Webinar, September 30.

4. "Gun Violence in the Americas: Local Solutions to a Hemispheric Challenge," Consortium of Universities for Global Health, Virtual Webinar, July 16, 2020.

5. "Assault Weapons Ban in the Americas," Newtown Action Alliance, Virtual Webinar, July 9, 2020.

6. "Gun Violence in Mexico and Central America," Consortium of Universities for Global Health, Virtual Webinar, April 21, 2020.

7. "The Milwaukee Global Health Landscape Study," Milwaukee Global Health Consortium, Virtual Webinar, April 13, 2020.

8. "Gun Violence in the Americas Focus: Mexico," Consortium of Universities for Global Health, Virtual Webinar, March 24, 2020.

9. "Physician Advocacy," Medical College of Wisconsin Health Policy and Advocacy Course, Milwaukee, WI, March 23, 2020.

10. "Understanding the Biopsychosocial Aspects of Violence Involving Firearms," American Hospital Association Webinar Series on Gun Violence, Virtual Presentation, February 19, 2020.

11. "Gun Violence: A Biopsychosocial Disease," 2020 Comprehensive Injury Center Lecture Series, Medical College of Wisconsin, Milwaukee, WI, January 23, 2020.

12. Assembly Health Committee Public Hearing (Military Civilian Partnership + Cancer Clinical Trials Legislation), Madison, WI, January 7, 2020.

13. "Global Burden of Gun Violence," University of Wisconsin Population Health Seminar Series, University of Wisconsin, Madison, WI, December 2, 2019.

14. "Gun Violence: A Biopsychosocial Disease," Department of Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, September 27, 2019.

15. "Suicide in Wisconsin: Considerations for Prevention," Wisconsin State Legislature's Suicide Prevention Task Force Testimony, Milwaukee, WI, September 9, 2019.

16. "Gun Violence: A Biopsychosocial Disease," Department Conference, Department of Emergency Medicine, Medical College of Wisconsin, Milwaukee, WI, August 8, 2019.

Stephen W. Hargarten, MD, MPH

17. "Road Traffic Injury Prevention and Violence Injury Prevention," International Congress on Emergency Medicine Meeting, Seoul, South Korea, June 12, 2019.

18. "Gun Violence Prevention: Dispelling Myths, Understanding Science, Strengthening Prevention, Programs, and Policies," Community Conversations, La Crosse, WI, April 24, 2019.

19. "Gun Violence: A Biopsychosocial Disease," Toward One Wisconsin Inclusivity Conference, Milwaukee, WI, April 11, 2019.

20. "Motor Vehicle Crash Deaths and Injury – Moving to Zero," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

21. "Gun Violence: A Biopsychosocial Disease," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

22. "Injury as a Biopsychosocial Disease," Wisconsin Violence and Injury Prevention Program Summit, Madison, WI, April 4, 2019.

23. "Gun Violence: A Biopsychosocial Disease," Society for the Advancement of Violence and Injury Research Conference, Cincinnati, OH, April 2, 2019.

24. "Gun Violence: A Complex Biopsychosocial Disease," Grand Rounds, University of Wisconsin School of Medicine and Public Health, Madison, WI, February 21, 2019.

25. "Why Do Health Systems Have A Role?" NASEM: Health Systems Interventions to Prevent Firearm Injuries & Death – A Workshop, Washington DC, October 17, 2018

26. "Vision Zero – Emphasis on Public Health" Transportation Research Board Transportation Safety Management Mid-Year Meeting, Washington DC, July 30, 2018

27. "Gun Violence: A Biopsychosocial Disease: Myths, Science & Prevention", 2018 Preventive Medicine Annual Meeting, American College of Preventive Medicine, Chicago, ILL, May 24, 2018

28. "International Challenges and Higher Education", 39th Annual National Conference on Law & Higher Education.  Stetson University College of Law, Clearwater, FL, February 3, 2018

29. "Faculty promotion for global health" 4th Annual Midwest Universities for Global Health Meeting: Capacity Building in Global Health at Washington University Medical School, December 1, 2017.

30. "Gun Violence: A Biopsychosocial Disease: Physician Roles and Responsibilities", Grand Rounds, University of Michigan Emergency Medicine Residency Conference, Ann Arbor, MI, November 8, 2017.

31. "International Partnerships: Global Wisdom, Global Citizens" American Association of Medical Colleges, Boston, MA, November 5, 2017.

32. "Legal Characteristics of Emergency Medicine" Belize Medical and Dental Association XXXVI Congress, Belize City, Belize, October 17, 2017.

33. "Global Health Challenges: The Burden of Injury" University of Norte Dame Eck Institute for Global Health, Norte Dame, IN September 28, 2017.

App. 328

- 18 -
Stephen W. Hargarten, MD, MPH

34. "Gun Violence: Myths, Science, Opportunities", Underground Science Society, The Sugar Maple,
    i.   Milwaukee, WI, September 11, 2017.

35. "Gun Violence as a Biopsychosocial Disease Burden: Our Roles and Responsibilities" for The Violence Epidemic:
    Justice, Public Health and Ethics, Center for Bioethics and Medical Humanities, Medical College of Wisconsin,
    Milwaukee, WI, June 13, 2017.

36. "Global Burden of Road Traffic Injury: Opportunities and Strategies for Prevention and Control: Roles of Civil
    Society" Consortium of Universities for Global Health, Washington DC, April 8, 2017.

37. "Gun Violence: A Biosocial Disease" Keynote for Wisconsin Chapter of American College of Emergency
    Physician's 2017 Spring Symposium, Madison, WI, March 28, 2017.

38. "Global Burden of Injury" Hainan Medical University, Hainan, China, March 15, 2017.

39. "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", MCW/Marquette Medical
    Alumni Association 51st Clinical Conference, Sonoma, CA, March 7, 2016.

40. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global
    Health: Ethical and Logistical Issues, Bronx, NY, December 5, 2016.

41. "Global Emergencies" Belize Medical and Dental Association XXXV Congress, Belize City, Belize,
    November 17, 2016

42. "Shoot to Kill: Shooting Trends Across the Nation" Panel at Marquette University, Milwaukee, WI,
    i.   October 14, 2016.

43. "Gun Violence: A Biosocial Disease", Sanford Trauma Symposium, South Dakota Department of Health, Sioux
    Falls, SD, October 11, 2016.

44. "Global Health from a Milwaukee Perspective" Marquette University Global Health Symposium, Milwaukee,
    September 30, 2016

45. "Study Abroad Student Safety", Wisconsin Association of Independent Colleges and Universities Student
    Safety Workshop, Milwaukee, September 28, 2016

46. "Global Health Challenges", Notre Dame University, Notre Dame, IN, September 1, 2016

47. "Beyond the Basics of Health, Safety, Security and Risk Management", Keynote Speaker for The Forum on
    Education Abroad Standards of Good Practice Institute, Northwestern University, Evanston, IL, June 23,
    2016.

48. "Global Burden of Injury" University College of Dublin, Dublin, Ireland, June 8, 2016

49. "Global Health: The Ultimate Sustainable Challenge", Sustainability Summit, Milwaukee, May 13, 2016

50. "Medical Student Perspectives on Global Health" MCW Today, Tomorrow, and Beyond Symposium Alumni
    Weekend, Milwaukee, April 30, 2016

51. "Gun Violence: A Biosocial Disease" for Medical College of Wisconsin Nursing Trauma Conference,
    Milwaukee, WI, April 23, 2016.

App. 329

Stephen W. Hargarten, MD, MPH

52. "Gun Violence: A Biosocial Disease", Keynote Speaker for Gun Violence: A Public Health Symposium, Washington University – Institute for Public Health, St. Louis, MO, April 5, 2016.

53. "How Violence Impacts Public Health", Panel Participant for University of Wisconsin-Zilber School of Public Health, Milwaukee, WI, February 25, 2016.

54. "Programs and Policy: Addressing a Global Need for Surgery and Emergency Care" and "Global Burden of Injury", Global Health Conference Midwest, Creighton University, Omaha, NE, February 6, 2016.

55. "Inequality and Freedom from Violence: Community violence has identifiable causes and implementable cures" University of Wisconsin-Milwaukee Fireside Forum, Milwaukee, WI, February 2, 2016

56. "Global Health: Managing Health & Safety", 2nd Annual Midwestern Universities for Global Health, Rush University, Chicago, IL, December 2, 2015

57. "Global Burden of Injury" Visiting Professor, Notre Dame, Notre Dame, IN, October 15, 2015

58. "Global Burden of Injury" Visiting Professor, University of Wisconsin, Madison, WI, October 12, 2015

59. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health" Visiting Professor, Universidad Católica de Guayaquil, Guayaquil, Ecuador, May 6, 2015

60. "Disaster Preparedness & Response: An All Hazard Approach" Consortium of Universities for Global Health Annual Meeting, Boston, MA, March 26, 2015

61. "Injury Science and Geriatrics: Coming of Age Together", Visiting Professor, Weill Cornell Medical College, Division of Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 12, 2015

62. "Emergency Medicine and Injury Prevention and Control: A Room with a View", Visiting Professor, Weill Cornell Medical College, Divisions of Emergency Medicine and Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 11, 201.5

63. "Firearm Injuries", Community Memorial Hospital Medical Staff Education Program, Menomonee Falls, WI, January 16, 2015.

64. "Firearm Injuries", Institute of Medicine Forum on Violence, Washington, DC, December 17, 2014

65. "Global Health Managing Traveler Safety" Midwest Universities for Global Health Inaugural Meeting, University of Illinois at Chicago Center for Global Health, December 3, 2014

66. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global Health: Education, Building, and Support, Albert Einstein College of Medicine, Bronx, New York, November 10, 2014

67. "Strengthening Emergency Care in Belize" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

68. "Triage Use and Implementation" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

- 20 -
Stephen W. Hargarten, MD, MPH

69. "The Science of Injury Prevention and Control" University of Zagreb School of Medicine, Zagreb, Croatia, September 9, 2014

70. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health", University of Rzeszow Jubilee of Medical Faculty, Rzeszow, Poland, September 5, 2014

71. "Burden of Global Violence/Injury" for the 2014 World Affairs Seminar, Carroll University, Waukesha, Wisconsin, June 23, 2014

72. "Practical advice for implementing useful global health curricula and effective academic programs" USAID The Future of Global Health: Building Better Professionals & Programs, Washington DC, May 9, 2014

73. "Global Health and Partnerships" Shanghai Minhang Central Hospital, Shanghai, China, April 25, 2014

74. "Organizing Injury prevention and control programs" 2014 China- US-Japan Summit Forum of Emergency Medicine, Xinhua Hospital, Shanghai, China, April 25, 2014

75. "Technical Consultation for United Nations Office for Disarmament Affairs", Research and Information Gathering Participant, UN Headquarters, New York, NY, November 19, 2013.

76. "Gun Violence as a Public Health Issue", Tuesday Speaker for Milwaukee Rotary Club, War Memorial, Milwaukee, WI, October 29, 2013

77. "Transportation Safety and Injury Prevention," Keynote Speaker for Midwest Conference of Institute of Transportation Engineers, Pfister Hotel, Milwaukee, WI, June 27, 2013.

78. "Patient Safety or Injury Control: Two Worlds or One?", Patient Safety Summit, Johns Hopkins, Baltimore, MD, June 21, 2013

79. "Gun-Related Violence", Guest Speaker for Milwaukee Forum, Haggerty Museum, Milwaukee, WI, January 17, 2013.

80. "Gun Policy Summit". Expert Panel Participant, Johns Hopkins University, Baltimore, MD, January 14-15, 2013.

81. "Emergency Medicine: Going Global", Guest Speaker for Klippel Lecture, Washington University School of Medicine, St. Louis, MO, December 4, 2012.

82. "Global Burden of Injury", Introduction to Public Health: Global Health, Carroll University, Waukesha, WI, November 30, 2012, April 20, 2012, November 11, 2011

83. "Gun Violence: The Strengths and Limits of the Disease Model", Guns in America: Conflicting Points of View, University of Wisconsin, Madison, WI, November 1, 2012.

84. "Increasing Utilization of NVDRS Data", National Violent Death Reporting System Reverse Site Visit, Atlanta, GA, September 13, 2011.

85. "Researching Car Crashes and Gun Shot Wounds: Products, Problems, Policies," and "Opportunities in Injury Research: Getting Started and Connecting the Dots", Visiting Lecturer for the University of Alberta, Canada, June, 2011.

- 21 -
Stephen W. Hargarten, MD, MPH

86. "Congressional Briefing".  Expert Testimony, Association for Safe International Road Travel and the U.S. Congressional Caucus on Global Road Safety, United Nations Decade of Action for Road Safety 2011-2020 United Nations, Washington, DC, May 11, 2011.

87. "The Team Approach to Caring for Acutely Injured Patients", Jao Tong University, Xinhua Hospital, Shanghai, China, November 9, 2010.

88. "Trauma Evaluation and Management, TEAM" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 20, 2010.

89. "The Emergency Department and Systems Approach to Emergency Medicine" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 19, 2010.

90. "The Public Health Approach to Violence Prevention in Health Care Settings" for International Association for Healthcare Security and Safety Conference, Baltimore, MD, June 22, 2009.

91. "Epidemiology of Travel-Related Injury & Death" for 11th Conference of the International Society of Travel Medicine, Budapest, Hungary, May 26, 2009.

92. "Reducing Firearm Injuries and Death: A Public Health Approach" for Trauma Conference, Kent State University, Canton, OH, November 7, 2008.

93. "Guns and Cars: A Tale of Product Design Flaws Linked with Death & Injury" for Trauma Conference Kent State University, Canton, OH, November 7, 2008.

94. "Gun Violence" for Grand Rounds, Mount Sinai Hospital, Milwaukee, WI, October 17, 2008.

95. "Town Hall Meeting – Status of Impaired Driving in Wisconsin" for MADD, NHTSA, DOT in Middleton, WI, August 14, 2008.

96. "Guns and Cars: Stories for preventing car and gun related deaths" for Grand Rounds, Columbia-St. Mary's, Milwaukee, WI, June 13, 2008.

97. "Panel on Urban Studies Programs" for 2nd Annual Henry W. Maier State of Milwaukee Summit, Milwaukee, WI, April 30, 2008.

98. "The Public Health Approach to Reduce Alcohol Related Injury and Death" Noon Conference for Gundersen Lutheran Trauma & Emergency Center, LaCrosse, WI, November 1, 2007

99. "From the Bedside to the Community and Beyond: The Physician's Role in Injury Prevention and Control", Grand Rounds, Philadelphia, PA, October 23, 2007.

100. "Public Health Approach to Reducing the Burden of Suicide" Grand Rounds for Psychiatry, St. Joseph's Outpatient Conference Center, Milwaukee, WI, June 20, 2007.

101. "Violence is a Disease", 2007 Global Health and Social Justice Conference, University of Wisconsin-Milwaukee College of Nursing, Milwaukee, WI, March 29, 2007.

102. "Burden of Injury in Wisconsin: Spelling It Out", Injury Summit, Holiday Inn, Neenah, WI, October 25, 2006.

103. "Injury Policy Forum", EMSC Policy Forum, Monona Terrace, Madison, WI, March 21, 2006.

App. 332

- 22 -
Stephen W. Hargarten, MD, MPH

104. "To Be or Not to Be: Case Studies in Injury Control and Advocacy", Seminar on Gun Violence, University of Wisconsin, Population Health Institute, Madison, WI, December, 2005.

105. "Emergency Medicine Leadership", Yale University, Section of Emergency Medicine, April 2005

106. "Emergency Medicine Leadership," Brown University, Department of Emergency Medicine, March 2005

107. "Emergency Medicine Leadership", University of Alabama-Birmingham, Department of Emergency Medicine, November 2002

108. "Medical Examiner and Coroner Data for Public Health: A Model Linked System", Institute of Medicine Workshop on the Medicolegal Death Investigation System, Washington, DC, March 23-25, 2003.

109. "The National Violent Death Reporting System: It's About Time We're Connecting-the-Dots for Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

110. "Emergency Medicine Leadership in the 21st Century: Guns and Cars, Acute Care, and Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

111. "Medical Injury", Grand Rounds at the University of Western Ontario, Ontario, Canada, January 24, 2003.

112. "Planning for a State Violent Death Reporting System", National Violent Death Reporting System Implementation Training, Atlanta, Georgia, January 16-17, 2003.

113. "Advocacy in Emergency Medicine", Grand Rounds at the University of Alabama Birmingham, Birmingham, A., November 20, 2002.

114. "Causes of Gun Crime", American Society of Criminology Conference, Chicago, IL, November 12, 2002.

115. "Nonfatal Gun Injuries – What We Know, Don't Know and Need to Know", The 7th HELP Network Conference, Chicago, IL, October 27, 2002.

116. "Youths and Guns", Gun Violence Workshop, The National Academies National Research Council Institute of Medicine, Washington, D.C., September 16, 2002.

117. "Injury Prevention: Creating an Agenda for Action", Springfield, Illinois, July 31, 2002.

118. "The Public Health Approach to reducing firearm related deaths", Coalition Against Gun Violence, Cleveland, Ohio, June 6, 2002.

119. "The Physician Scientist as Advocate", The Spivey Lecture, Society for Academic Emergency Medicine Annual Meeting, St. Louis, MO, May 16, 2002.

120. "Firearm suicides: A two-state comparison", 6th World Conference on Injury Prevention and Control, Montreal, Quebec, Canada, May 12-15, 2002.

121. "Travel related injury prevention for students", NAFSA Conference, University of Wisconsin Milwaukee, Milwaukee, WI, April 18, 2002.

- 23 -
Stephen W. Hargarten, MD, MPH

122. "Suicide among Wisconsin farmers", American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

123. "The relationship between health providers and law enforcement: Information sharing and lessons learned in the Firearm Injury Reporting System", 30th Annual Conference on Value Inquiry – Values in Health Care: Past, Present and Future, Milwaukee, WI, April 4-6, 2002.

124. "The Public Health Approach to Reducing Firearm Injuries", 13th Annual Trauma Symposium for Coastal Area Health Education Center, Wilmington, NC, February 9, 2002.

125. "Emergency Medicine and Advocacy", Department of Emergency Medicine Grand Rounds at Johns Hopkins School of Medicine, Baltimore, MD, January 31, 2002.

126. "Gun Violence and Gun Policy Conference", Brookings Institute, Washington, D.C., January 25, 2002.

127. "Emergency Medicine Advocacy: A Model Discussion", Northwestern University, Department of Emergency Medicine, December 2001.

128. "Emergency Medicine Advocacy", Northwestern University, Chicago, Illinois, December 19, 2001.

129. "Firearm suicide in Wisconsin 1999: Urban/rural and age-related patterns", Mobilizing for a Safe USA, Atlanta, GA, December 3-5, 2001.

130. "Improve Research Information and Data on Firearms", National Academy of Science Committee, 2nd Meeting, Irvine, CA, November 15, 2001.

131. "The Public Health Approach to Reducing Firearm Injuries", AMA Key Stakeholders Meeting, Oak Brook, IL, November, 2001.

132. "Linking the gun with homicides and suicides: A model analysis of the who, when, and where of the gun's first purchase", American Society of Criminology, Atlanta, GA, November 6-10, 2001.

133. "Firearm Injury Data Systems", AMA Science Reporters Conference, San Francisco, California, October 30, 2001.

134. "Firearm suicide: The Wisconsin experience, 1999", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

135. "Relationship of household gun ownership to firearm suicide rates in Wisconsin communities", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

136. "Firearm Homicide in Milwaukee and the Progress of the Firearm Injury Reporting System", The Milwaukee Fire and Police Commission, Milwaukee, Wisconsin, October 18, 2001.

137. "Identification and Classification of Homicide in Wisconsin 2000: A Comparison of Two Data Systems", Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

138. "Demonstrating the Linkage of Data Sets from the Firearm Injury Center and the City of Milwaukee Using Geographic Information System Analysis" Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

App. 334

- 24 -
Stephen W. Hargarten, MD, MPH

139. "The Public Health Challenge and the Model Firearm Injury Reporting System", Plenary Presentation, Aiming for Prevention: International Medical Conference on Small Arms, Helsinki, Finland, September 28-30, 2001.

140. "Highlights of the Firearm Injury Reporting System's first statewide report: Investigating regional differences", 13th Annual Milwaukee County Medical Examiners Office Forensic Science Seminar, Milwaukee, Wisconsin, September, 2001.

141. "What We Don't Know is Killing Us: The Need for Better Data about Firearm Injuries and Deaths", National Academy of Sciences Committee on Law and Justice, Washington, DC, August 30, 2001.

142. "Injury Control of Gun Shot Wounds", Advances in Trauma, American College of Surgeons, Kansas City, Missouri, December 8, 2000.

143. "Trauma Care in the State of Wisconsin", 2000 Annual Meeting of the Wisconsin Chapter of the American College of Surgeons, Waukesha, Wisconsin, December 2, 2000.

144. "Travel Health:  Clinical Issues for Occupational and Environmental Health Providers", American Occupational Health Conference, American College of Occupational and Environmental Medicine, Philadelphia, Pennsylvania, May 18, 2000.

145. "To Be or Not to Be a Physician Scientist Advocate:  That is the Question", Emergency Medicine Spring Research Forum, University of Michigan, Ann Arbor, May 2000.

146. "US Citizen Deaths Abroad:  What we know, don't know, and need to know to prevent them", Occupational Health Conference, Philadelphia, Pennsylvania, May 14, 2000.

147. "Firearms:  The Need for Better Information and Safer Guns", Commission for the Prevention of Youth Violence, American Medical Association, Houston Texas, May 9, 2000.

148. "Understanding State-of-the-Art Treatment & Prevention of Firearm Injuries", National Conference for Health Care Professionals, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, December 10-11, 1999.

149. "Better Data, Safer Guns Equals Fewer Injuries", Gun Violence Forum, Entertainment Industries Council, Los Angeles, California, November 3-4, 1999.

150. "Bridging the Gap between Information and Policy: A Public Health Approach to Reducing Firearm Injuries", Conference of Wisconsin Network for Health Policy Research, University of Wisconsin School of Medicine, Madison, WI, November 4-5, 1999.

151. "Counting Firearm-related Deaths: A case study for better surveillance and knowledge through data linkage," Emergency Medicine New England Conference, Newport, Rhode Island, August 11-13, 1999.

152. "Guns, Cars & Death: A View from a Room," Department of Emergency Medicine and Division of Traumatology and Surgical Critical Care Grand Rounds, University of Pennsylvania Medical Center, Philadelphia, PA, July 9, 1999.

153. "The Scientist as Policy Advocate: Clarifying the Issues and Framing the Data for Effective Policy Development and Debate," 1999 Society for Academic Emergency Medicine Annual Meeting, Boston, MA, May 23, 1999.

154. "Firearm Injury Surveillance", The 5th Annual Citizens' Conference to Stop Gun Violence, The Educational Fund to End Handgun Violence, Washington DC, November 13-14, 1998.

App. 335

155. "Public Health Strategies to Address Family Violence", National Advisory Council on Family Violence, Rosemont, IL, April 4, 1998.

156. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, April 4, 1998.

157. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, March 31, 1998.

158. "Taking Aim at Cars and Guns", Skills Fair 1998, Shared Governance Development Council, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, March 26, 1998.

159. "Preventing Firearm Injury: Protecting Our Children", Firearm Injury Prevention Training Conference, American Academy of Pediatrics, Chicago, IL, March 14-15, 1998.

160. "Scope and Nature of Firearm Injury Research: Issues and Challenges" Injury Prevention Research Center, The University of Iowa, Iowa City, IO, February 1998.

161. "Mechanism of Injury", Flight for Life's Trauma Nurse Specialist Course, Flight for Life, Milwaukee, WI, February 4, 1998.

162. "Scope and Nature of Firearm Injury Research: Issues and Challenges", University of Iowa Injury Prevention Research Center, Iowa City, IO, February 3, 1998.

163. "Adult Option of the Master's Program in Nursing" Medical College of Wisconsin, Fall Semester, Marquette University College of Nursing, Milwaukee, WI, August 24 - December 6, 1997.

164. National HELP Conference -Tracking the Firearm Epidemic National Conference, Washington DC, April 1997.

165. Lafollette Institute-Public Health Model for Reducing Firearm Injuries and Deaths, Madison, WI, April 1997.

166. "Futures in Emergency Medicine Research Conference, Macy Foundation, Washington D.C., March 1997 (invited as representing the Association of Academic Chairs in Emergency Medicine)

167. "Emergency/Trauma Medicine."  Sheboygan Memorial Medical Center, Knights of Columbus Center, Sheboygan, WI, February 18, 1997.

168. "Firearm Injury Prevention: A Model Strategy."  Medical College of Wisconsin, Winter Refresher Course for Family Physicians, Pfister Hotel, Milwaukee, WI, January 30, 1997.

169. The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD December 3-6, 1996.

170. "The Nature and Scope of Firearm Injury Research: Issues and Challenges."  Visiting Professor, The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD, December 3-6, 1996.

171. "The Milwaukee County Firearm Injury Reporting System."  Healthy People, National Health Promotion and Disease Prevention Objectives, Violent and Abusive Behavior - 1996 Progress Review, Washington, DC, November 26, 1996.

172. "Violence Prevention."  Tenth Annual Summer Trauma Symposium.  Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

173. "Teenage Violence."  Tenth Annual Summer Trauma Symposium.  Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

174. Injury Prevention and Control for Emergency Medicine, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

175. "Firearm Injury Surveillance System."  1996 Attorney General's Law Enforcement Conference, Stevens Point, WI, May 1996.

176. "The Milwaukee County Firearm Injury Reporting System."  Visiting Professor, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

177. "Tracking the Epidemic."  Third Annual HELP Network Conference: Promoting Public Policy for the Public's Health, guest lecturer, Washington, DC, November 1995.

178. "Injury and Violence Prevention: Confronting the Crisis."  69th National School Health Conference of the American School Health Association, Milwaukee, WI, October 1995.

179. "Guns and Violence: The Tragic Cost."  National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

180. "Monitoring Firearm Injuries."  National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

181. "Rural Trauma/Rural Violence."  Day of Country Medicine Conference, Howard Young Medical Center, Minocqua, WI, September 1995.

182. "Firearm Violence and Gun Control in America."  Panel participant at the Wisconsin Surgical Society meeting, Lake Geneva, WI, September 1995.

183. "Milwaukee County Firearm Injury Reporting System: A Model for Injury Prevention."  State of Wisconsin, Department of Health and Social Services, Milwaukee Managed Care Forum, Milwaukee, WI, August 1995.

184. "Firearm Injury Prevention for Primary Care Physicians."  Family Practice Grand Rounds, Waukesha Memorial Hospital, August 1995.

185. "Strategies to Reduce Firearm Deaths."  Wisconsin Council of Administrators of Special Services, Ltd., Madison, WI, May 1995.

186. "Violence Prevention."  State Medical Society of Wisconsin Alliance, 66th Annual Convention, Milwaukee, WI, April 1995.

187. "Emergency Medicine Research: A View from the Riverbank."  Faculty Development Seminar Series, University of Illinois at Chicago, Department of Emergency Medicine, Chicago, IL, March 1995.

188. "Committee on Transportation and Infrastructure Subcommittee on Surface Transportation."  Advocates for Highway and Auto Safety, Washington, DC, March 1995.

- 27 -
Stephen W. Hargarten, MD, MPH

189. "Firearm Injuries and Deaths."  Department of Psychiatry, University of Wisconsin - Madison Medical School, Milwaukee Campus, WI, March 1995.

190. "Firearms, Violence and Prevention."  Public Issues Committee, Family Service of Milwaukee, Milwaukee, WI, March 1995.

191. "Injury Control."  Grand rounds, Department of Emergency Medicine, William Beaumont Hospital, Department of Emergency Medicine, Royal Oak, MI, March 1995.

192. "Understanding How to Access Health Care Delivery Systems II Conference."  Milwaukee Regional Medical Complex, Milwaukee, WI, March 1995.

193. "Proposal to Establish a Reporting System for Firearm Injuries."  Public Issues Consortium, 12th Annual Legislative Breakfast, Milwaukee, WI, January 1995.

194. "Firearm Violence: A Public Health Issue."  Marquette University College of Nursing, Milwaukee, WI, January 1995.

195. "Handgun Violence as a Public Health Problem in our Community."  Social Development Commission, November 1994.

196. "Integrated Firearm Injury Reporting System: A Model for Communities."  Second Annual HELP Conference, Chicago, IL, October 1994.

197. "Violence and Firearms: Reshaping the Discussion and Restructuring the Prevention Strategies."  Forum on Youth Violence Conference, Wisconsin AODA Education Network, Stevens Point, WI, October 1994.

198. "Injury Control and Emergency Medicine."  American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

199. "Trauma Systems."  American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

200. "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee."  Wisconsin Coroners & Medical Examiners Association, Oshkosh, WI, June 1994.

201. "Firearm Injuries and Deaths: Reshaping the Discussion."  Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

202. "Injury Prevention and Control and Emergency Medicine."  Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

203. "The Science of Injury Prevention: A Framework for Violence Prevention."  The University of Wisconsin - Milwaukee, School of Nursing, Continuing Education and Outreach Program, Milwaukee, WI, March 1994.

204. "Firearm Injuries and Deaths: Reshaping the Discussion."  Columbia Hospital Grand Rounds, Milwaukee, WI, February 1994.

205. "Injury Patterns of Motor Vehicle Crashes."  Wisconsin EMT Association Annual Conference, Milwaukee, WI, January 1994.

App. 338

- 28 -
Stephen W. Hargarten, MD, MPH

206. "Firearm Injuries and Deaths: Reshaping the Discussion."  Milwaukee Forum, Milwaukee, WI, November 1993.

207. "Alcohol and Medicine: An Emergency Medicine Perspective."  Association of American Medical Colleges, Washington, DC, November 1993.

208. "Handguns:  Taking Aim at the Problem."  Emergency Nurses Association Annual Meeting, LaCrosse, WI, September 1993.

209. "Violence and the Elderly."  Wisconsin Chapter American College of Emergency Physicians Annual Conference, LaCrosse, WI, September 1993.

210. "Advocacy in Public Health Workshop."  Wisconsin Public Health Association Annual Conference, Appleton, WI, June 1993.

211. "State of the Art Session on Injury Control."  Society for Academic Emergency Medicine, San Francisco, CA, May 1993.

212. "Injury Prevention: A Crucial Aspect of Travel Medicine."  Third Biennial International Travel Medicine Society Meeting.  Paris, France, April 26, 1993.

213. "Firearms Deaths and Injuries."  Emergency Nurses Association - Milwaukee Chapter, Milwaukee, WI, January 1993.

214. "Facial Injuries: Epidemiology, Acute Care, and Prevention."  Wisconsin Emergency Medical Technician Association Annual Meeting, Milwaukee, WI, January 1993.

215. "Boating Injuries and Deaths: Challenges for Emergency Medical Services."  American Trauma Society - Wisconsin Division, Stevens Point, WI, December 1992.

216. "Firearm Injuries: Public Policy Issues, Data Sources for Firearms Injuries."  American Public Health Association, Washington, DC, November 1992.

217. "Data Sources for Firearms Injuries: Problems and Opportunities."  Milwaukee Academy of Medicine, Milwaukee, WI, November 1992.

218. "EMTs and Injury Prevention: It's in our job description."  American Trauma Society - Wisconsin Division, Milwaukee, WI, December 1991.

219. "Firearms and Children."  Wisconsin Nurse Practitioners Conference, Madison, WI, November 1991.

220. "Drownings:  Acute care and prevention."  American Red Cross - Milwaukee Chapter, Milwaukee, WI, January 1991.

221. "Fire-safe cigarettes."  Illinois Public Health Association, Chicago, IL, May 1990.

222. "Travel-related mortality."  Travel Medicine Update Conference, Seattle, WA, May 1990.

223. "Travel-related illness - Where have you been lately?"  Wisconsin Chapter, American College of Emergency Physicians, October 12, 1989.

224. "Travel-related mortality."  Travel Medicine Conference, Seattle, WA, May 1988.

App. 339

Stephen W. Hargarten, MD, MPH

225. "Motor Vehicle Crashes and Seat Belts."  Beloit Memorial Hospital, May 1987.


Exhibits:

    1.     Producer:  Photograph Exhibit - "Portraits of the Silent Epidemic" - Head Injury in Wisconsin, 1988.


Medical College Committees:

    Chair, Global Health Advisory Council, 2014-2019

    Chair, Milwaukee Regional Medical Center Strategic Planning for Global Health, 2014- 2015

    Chair, Global Health Department Liaisons, 2011- present

    Board Member, Medical College Physicians, 2000- 2017

    MCP Finance Committee, 2005-2007

    Froedtert Credential Committee, 2005-2007

    Chair, Global Health Program Advisory Council, 2010-2011

    Member Department of Medicine Search Committee, Medical College of Wisconsin, 2000

    Froedtert & Medical College Joint Management Cabinet, 1997-2000

    Faculty Career Development Advisory Committee, Medical College of Wisconsin, 1998 - 2003

    Chair, Ad Hoc Committee for M3/M4 Curriculum, 1998

    Intramural Review Committee, Department of Medicine, Medical College of Wisconsin, 1999

    Intramural Review Committee, Department of Family Medicine, Medical College of Wisconsin, 1997

    Clinical Practice Group Committee, Medical College of Wisconsin, 1995 - 2000

    Curriculum and Evaluation Committee, Medical College of Wisconsin, 1998 – 2000

    Executive Committee of the Faculty, Medical College of Wisconsin, 1994 – present

    Nominating Committee - Medical College of Wisconsin, 1992 – 1995


Medical College Teaching:

- 30 -
Stephen W. Hargarten, MD, MPH

1.      MCW Faculty's Efforts in Low- and Middle-Income Countries" PhD in Public and Community Health
        Seminar, January 10, 2018

2.      "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", Asthma/Allergy, and
        Clinical Immunology Grand Rounds, Children's Hospital of Wisconsin, September 22, 2017

3.      "Global Health Electives: What to Consider with International Travel Health and Wellness" Global Health
        Elective Preparation, September 12, 2017

4.      "MCW's Global Health Efforts and Opportunities for Pharmacy" School of Pharmacy, January 16, 2017

5.      "Global Health Impact" Department of Pediatrics Division of Adolescent Medicine, January 20, 2017

6.      "Local/Global Lens: Exploring the Impact of Medical Training Experiences in Low-Resource Settings" Pediatrics
        Grand Rounds, December 2, 2016

7.      "The State of MCW Global Health and Opportunities for Neurosurgery" Neurosurgery Grand Rounds,
        December 2, 2016

8.      "Global and Local Global Health" Neurology Grand Rounds, December 2, 2016

9.      "Developing a Medical Elective in Nicaragua" Orthopedic Grand Rounds, November 30, 2016

10.     "Global Health at MCW" Faculty Council Meeting, October 21, 2015

11.     "Supporting Faculty's Global Health Efforts" Administrators Monthly Meeting, September 3, 2015

12.     "Minimizing GME Global Health Rotation Risk" Graduate Medical Education Committee, April 20, 2015

13.     "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, February 18,
        2015

14.     "Insight and Direction Global Health Nursing", Froedtert Global Health Nursing Committee, November 26, 2014

15.     "Global Health Definitions, Implications", Physical Medicine and Rehabilitation Grand Rounds, December 5,
        2014

16.     "Establishing Partnerships to Promote Global Health" PhD in Public and Community Health
        Global Health Seminar, September 29, 2014

17.     "Promoting Diversity and Inclusion with Global Health Efforts" Diversity and Inclusion Committee, January 28,
        2014

18.      "Growing a campus-wide Global Health Effort" Froedtert Hospital Operations Committee, Milwaukee,
        Wisconsin, January 22, 2014

19.     "Growing a campus-wide Global Health Effort" Children's Hospital and Health System Leadership, Milwaukee,
        Wisconsin December 10, 2013

20.     "Global Health Program and Faculty Partnerships" Women's Faculty Council, November 25, 2013

App. 341

- 31 -
Stephen W. Hargarten, MD, MPH

21.    "Growing Global Health Opportunities" Neurology Faculty Meeting, October 10, 2013

22.    "M4 Global Health Electives for MCW Students" Global Health Pathway Core Curriculum, April 25, 2013

23.    "Move toward global health care, what new skills or knowledge will the physicians of the future need to master" Docere Panel, January 8, 2013

24.    "Partnering with Faculty to Grow Global Health" Department of Ophthalmology, November 25, 2012

25.    "Global Burden of Injury," The Clinical and Translational Science Institute Seminar, September 20, 2012

26.    "Ethical Considerations of Defining Global Health" Bioethics Summer Course Poverty, Justice and Global Health, June 6, 2012

27.    "MCW's Global Health Program: An Exciting New Development" Pediatric Surgery Grand Rounds, May 4, 2012

28.    "Grand Rounds in Injury for the Master Clinician Pathway" M1, M2 & M3 students, Medical College of Wisconsin, March 29, 2012.

29.    "What is the Definition of Global Health" PhD in Public and Community Health Seminar Series, February 14, 2012

30.    "Global Burden of Injury," Global Health Pathway Program, January 5, 2012

31.    "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, November 30, 2011

32.    "Growing MCW's Global Health Program and Opportunities to Engage" Medical College of Wisconsin Global Health Organization, Student Interest Group, November 28, 2011

33.    "Faculty's Global Health Efforts" Global Health Pathway Program, May 13, 2019. "Wound Ballistics", Emergency Medicine Grand Rounds, Medical College of Wisconsin and Froedtert Hospital, March 10, 2011.

34.    Health Policy and Physician Advocacy" M4 Selective, Family Medicine, Medical College of Wisconsin, February 8, 2011

35.    "Alcohol and and Youth: Big Problem with a Hospital Based Intervention", Pediatric Trauma Grand Rounds, Children's Hospital and Health System, May 12, 2010

36.    "Reducing the Public Health Burden of Suicide: A View from the Room" for Department of Psychiatry and Behavioral Medicine Grand Rounds, Wheaton Franciscan Healthcare, Wauwatosa, WI, March 18, 2009

37.    "Alcohol Related Illness in the ED", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, December, 2008

38.    "Department Administrator Update", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, October, 2008

- 32 -
Stephen W. Hargarten, MD, MPH

39. "Firearm Related Injury: Myths, Physiology & Epidemiology", Pediatric Trauma Grand Rounds, Children's Hospital of Wisconsin, December 4, 2007

40. "Gunshot Wounds: An Integrated Approach to a Biosocial Disease", Integrated Grand Rounds, Medical College of Wisconsin, November 2, 2007

41. "Wound Ballistics", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July, 2008

42. "Injury Prevention", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 5, 2007

43. "Emergency Medicine Update", Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 13, 2006

44. "Firearm suicide: The Wisconsin experience 2000", 10th Annual Emergency Medicine Research Forum, Medical College of Wisconsin, April 16, 2002

45. "Comprehensive Injury Center at MCW", EPI Seminar Series, Medical College of Wisconsin, October 18, 2001

46. "Advanced Trauma Life Support", Instructor, Medical College of Wisconsin and Froedtert Hospital, June 21, 2000

47. "Acute Trauma Care & Prevention", AIM Program, Medical College of Wisconsin, Milwaukee, WI, August, 1996, 1997, 1998, 1999

48. "Epidemiology of Unintentional and Intentional Injuries", Course Director, Medical Student Lecture, Medical College of Wisconsin Graduate School, Milwaukee, WI, February-April 1998

49. "Bags, Belts, and Bruises", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, February 13, 1997

50. "Mechanism of Injury", Trauma Nurse Specialist Course, Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, January 29, 1997

51. "Firearm Injuries and Deaths," Department of Epidemiology, medical student lecture, Medical College of Wisconsin, Milwaukee, WI, 1995, 1996, 1997, 1998, 1999

52. "Firearm Injury Epidemiology," Epidemiology seminar of the Health Policy Institute, Medical College of Wisconsin, Milwaukee, WI, September 1996

53. "Propeller Injuries," Flight for Life Lecture, Medical College of Wisconsin, Milwaukee, WI, March 1996

54. "Mechanisms of Injury", Trauma Nurse Specialist Course.  Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, February 1996

55. "Scope and Nature of the Firearm Injury and Death Problem", Fourth Annual Firearms Seminar, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, January 1996

App. 343

- 33 -
Stephen W. Hargarten, MD, MPH

56.     "Violence as a Public Health Issue," First Annual Forum - The Changing Urban Health Care Environment: Ethical Implications, Sponsored by the Center for Ethics Studies, Marquette University, and the Center for the Study of Bioethics at the Medical College of Wisconsin, November 1995

57.     "Issues & Challenges of Gunshot Wound Research",  J. (Deke) Farrington, MD, Trauma Visiting Professorship presented by the Section of Trauma & Emergency Surgery of the Medical College of Wisconsin, the American Trauma Society (Wisconsin Division), ACS Wisconsin Committee on Trauma, and Flight for Life, Milwaukee, WI, November 1995

58.     "Firearm Injuries and Deaths: Epidemiology and Prevention", Pathology lecture to medical students.  Medical College of Wisconsin, Milwaukee, WI, November 1995

59.     "Patterns of Injury and Opportunities for Prevention."  Milwaukee Regional Medical Complex, Flight for Life, Milwaukee, WI, March 1995

60.     "Trauma Systems: Where Does Emergency Medicine Fit In?", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, December 1994

61.     "Wound Management."  Medical Student Lecture/Workshop, Medical College of Wisconsin, Milwaukee, WI, December 1994, 1995, 1996, 1997, 1998, 1999

62.     "Trauma Systems: Who, What, Where?", Surgery Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, November 1994

63.     "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee," Medical College of Wisconsin (Firearms Seminar) January 1994

64.     "Injury Prevention."  Department of Pediatrics Research Seminar Series, Medical College of Wisconsin, Milwaukee, WI, January 1994

65.     POMP Students, 1992 – 1994

66.     Biostatistics & Epidemiology Course, First Year Medical Students at the Medical College of Wisconsin, March 1993

67.     Introduction to Clinical Medicine Lecture, Junior Medical Students, July 1993

68.     Advanced Trauma Life Support Instructor/Shock Lecture, Medical College of Wisconsin, June 1993

69.     Advanced Cardiac Life Support Instructor/Airway Management, Dysrhythmia Recognition, Medical College of Wisconsin, June 1993

70.     Biostatistics Course Lecturer, Freshman Students, March 1993

71.     "Alcohol and Health: Emergency Medicine View from the Bottom of the Bottle."  Medical College of Wisconsin Emergency Medicine Grand Rounds, Milwaukee, WI, December 7, 1993

72.     "The Epidemiology of Firearm Deaths and Injuries."  Surgery Grand Rounds, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, July 1993

- 34 -
Stephen W. Hargarten, MD, MPH

73.    "Firearm Deaths and Injuries: Lessons from the 1960s and the Corvair." Health Policy Institute Seminar, Medical College of Wisconsin Alumni Center, Milwaukee, WI, June 10, 1993

74.    "Mechanisms of Injury", Trauma Nurse Specialist Course: Flight for Life, Milwaukee, WI, March 1993

75.    "Firearms and Children", Children's Hospital of Wisconsin Grand Rounds, Milwaukee, WI, July 1992

76.    Introduction to Advanced Cardiac, Life Support, Junior Students, July 1992

77.    Wound Management Course, Junior Students, 1991 – present

78.    Basic Trauma Life Support Course Director, 1989 1990, 1991, 1991

BIBLIOGRAPHY

Original Papers:

1.    Dove, A. Kallies, KJ, Hargarten, S, Tomas, C. A Milwaukee Syndemic? Penetrative Injury and COVID-19 *WI Medical Journal* 2023 122 (5), 313-318

2.    Tomas, C.W., Fumo, N., Kostelac, C.A., Flynn-O'Brien, K., Levas, M., deRoon-Cassini, T.A., Hargarten, S. (2023). Trends in firearm production and firearm deaths in children. *Preventive Medicine*. Doi: 10.1016/j.ypmed.2023.107684

3.    Timmer-Murillo, S.C., Schroeder, M.E., Trevino, C., Geier, T., Schramm, A.T., Brandolino, A.M., Hargarten, S., Holena, D., deMoya, M., Milia, D., & deRoon-Cassini, T.A. (2023). Comprehensive Framework of Firearm Violence Survivor Care: A Review. *Jama Surgery*. doi:10.1001/jamasurg.2022.8149

4.    Schneider, R.J., Willman, J., & Hargarten, S. (2023) Linking Police and EMS Records: An Approach to Strengthen Bicyclist Injury Reporting. *Transportation Research Record*, 03611981221151073.

5.    Kohlbeck, S. A., Quinn, K., deRoon-Cassini, T., Hargarten, S., Nelson, D., & Cassidy, L. (2022, December 22). "I've Given Up": Biopsychosocial Factors Preceding Farmer Suicide in Wisconsin. American Journal of Orthopsychiatry. Advance online publication. https://dx.doi.org/10.1037/ort0000662

6.    Timmer-Murillo, S.C., Schroeder, M.E., Trevino, C., Geier, T., Schramm, A.T., Brandolino, A.M., Hargarten, S., Holena, D., deMoya, M., Milia, D., & deRoon-Cassini, T.A. (In Press). Comprehensive Framework of Firearm Violence Survivor Care: A Review. *JAMA Surg.*

7.    Girasek, D.C., Hargarten, S. (2022). Prevention of and Emergency Response to Drowning. *N Engl J Med* 2022;387:1303-8.

8.    Sakran, J.V., Hargarten. S., Rivara, F.P. (2022). Coordinating a National Approach to Violence Prevention. *JAMA*, Sept. 28, 2022 Volume 328, Number 12

9.    Ehrlich, P.F., Pulcini, C.D., De Souza, H.G. Hall, M., Andrews, A., Zima, B.T., Fein, J.A., Chaudhary, S., Hoffmann, J.A., Fleegler, E.W., Jeffires, K.N., Goyal, M.K., Hargarten, S., Alpern, E.R. (2022). Mental Healthcare Following Firearm and Motor Vehicle Related Injuries: Differences Impacting Our Treatment Strategies. *Ann Surg*. 2022 June 28. doi: 10.1097/SLA.0000000000005557. Online ahead of print.PMID: 35762587

- 35 -
Stephen W. Hargarten, MD, MPH

10.  Wyler, B.A., Young, H. M., Hargarten, S.W., Cahill, J.D. (2022) Risk of deaths due to injuries in travellers: A systematic review. *J Travel Med* 29.5 (2022): taac074.

11.  Kohlbeck, S., Schramm, A., deRoon-Cassini, T., Hargarten, S., Quinn, K. (2022). Farmer Suicide in Wisconsin: A Qualitative Analysis. *Journal of Rural Health*. Summer 2022. Volume 38, Issue 3: 546-553.

12.  Barron, A., Hargarten, S., & Webb, T. (2021). Gun violence education in medical school: a call to action. *Teaching and learning in medicine* 34.3 (2022): 295-300.

13.  Dunton, Z. R., Kohlbeck, S. A., Lasarev, M. R., Vear, C. R., & Hargarten, S. W. (2021). The association between repealing the 48-hour mandatory waiting period on handgun purchases and suicide rates in Wisconsin. *Archives of suicide research* 26.3 (2022): 1327-1335.

14.  Kohlbeck, S., Levas, M., Hernandez-Meier, J., & Hargarten, S. (2021). Implementing the Cardiff Model for violence prevention: using the diffusion of innovation theory to understand facilitators and barriers to implementation. *Injury Prevention* 28.1 (2022): 49-53.

15.  Dunton, Z., Hargarten, S., Kohlbeck, S., & Osman, F. (2021). Homicide: a leading cause of death for black non-hispanics in Wisconsin. *WMJ (Wisconsin medical journal)*, *120*(S1), S6-S9.

16.  Kohlbeck, S., deRoon-Cassini, T., Levas, M., Hargarten, S., Kostelac, C., Totoratis, M., ... & Smith, J. (2021). Multidisciplinary data-sharing for community violence prevention: shifting power to the community. *Injury prevention* 27.Suppl 3 (2021): A4-A4.

17.  Martin, I. B., & Hargarten, S. (2020). The antiracist, propatient pledge of emergency medicine. *Academic Emergency Medicine*, *27*(9), 932-933.

18.  McDougall, S., Annapureddy, P., Madiraju, P., Fumo, N., & Hargarten, S. (2020, December). Predicting Opioid Overdose Readmission and Opioid Use Disorder with Machine Learning. In *2020 IEEE International Conference on Big Data (Big Data)* (pp. 4892-4901). IEEE.

19.  Hargarten, S. W. (2020). The Bullets He Carried. *Western Journal of Emergency Medicine*, *21*(5), 1036.

20.  Kohlbeck, S, Hargarten, S, Cassidy, L. (2020). Age- and Sex-Specific Risk Factors for Youth Suicide: A Mixed Methods Review. *WMJ* 119.3 (2020): 165-170.

21.  Zosel, A., Kohlbeck, S., Davis, C. S., Meurer, L., & Hargarten, S. (2020). Medical student education for injury prevention: closing the gap. *Injury Prevention* 27.2 (2021): 201-205.

22.  Kohlbeck, S, Fumo, N, Hargarten, S. (2020). Systems Change for Suicide Prevention Among Adolescents: A Rural Wisconsin County Approach. *Injury Prevention* 27.2 (2021): 131-136.

23.  Bonk C, Weston B, Davis C, Barron A, McCarty O, Hargarten S. (2019). Saving Lives with Tourniquets: A Review of Penetrating Injury Medical Examiner Cases. *Prehospital Emergency Care:* DOI: 10.1080/10903127.2019.1676344

24.  Hernandez-Meier J, Akert B, Zheng C, Guse C, Layde P, Hargarten S. (2019). Status of Legal Firearm Possession and Violent Deaths: Methods and Protocol for a Retrospective Case-Control Study. *Injury Prevention* 25.Suppl 1 (2019): i49-i58.

- 36 -
Stephen W. Hargarten, MD, MPH

25.  <u>Hargarten SW</u>, Lerner EB, Gorelick M, Brasel K, deRoon-Cassini T, Kohlbeck S.  Gun Violence: A Biopsychosocial Disease. *Western Journal of Emergency Medicine: Integrating Emergency Care with Population Health*, 2018; 19(6), 1024-1027.

26.  Levas M, Hernandez-Meier J, Kohlbeck S, Piotrowski N, <u>Hargarten S</u>. Integrating Population Health Data on Violence into the Emergency Department: A Feasibility and Implementation Study.  *Journal of Trauma Nursing*: May/June 2018 – Vol 25 – Issue 3/149-158

27.  Rajan S, Branas CC, <u>Hargarten S</u>, Allegrante JP: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, Am J Public Health. 2018 Feb;108(2):194-195. doi: 10.2105/AJPH.2017.304235.  PMID: 29320291

28.  <u>Hargarten, S</u>: Firearm Injury in the United States: Effective Management Must Address Biophysical and Biopsychosocial Factors. *Ann Intern Med*. 2016 Dec 20;165(12):882-883. doi: 10.7326/M16-2244. Epub 2016 Oct 18. PMID: 27750331

29.  Bloemen EM, Rosen T, Schiroo JC, Clark S, Mulcare MR, Stern ME, Mysliwiec R, Flomenbaum NE, Lachs MS, <u>Hargarten S</u>. Photographing injuries in the acute care setting: Development and evaluation of a standardized protocol for research, forensics, and clinical Practice. *Acad Emerg Med* May 2016; 23(5):653-9. Doi:10.1111/acem.12955. Epub 2016 Apr 13.

30.  Rosen T, <u>Hargarten S</u>, Flomenbaum NE, Platts-Mills TF. Identifying elder abuse in the Emergency Department: Toward a multi-disciplinary team-based approach. *Ann Emerg Med*; 63(3):378-82; Sept 2016.

31.  Guse CE, <u>Hargarten S</u>. Limitations of travel data for rate computations.  Injury Prevention: Journal of the International Society for Child and Adolescent Injury Prevention. 2015; 21(e1):e153.

32.  Vu A, Duber HC, Sasser SM, Hansoti B, Lynch C, Khan A, Johnson T, Modi P, Clattenburg EJ, <u>Hargarten S</u>. Emergency Care Research Funding in the Global Health Context: Trends, Priorities, and Future Directions. *Academic Emergency Medicine* December 2013 20(12):1259-63.

33.  Myers SR, Salhi RA, Lerner EB**,** Gilson R, Mehrotra A, Kraus A, Kelly JJ, <u>Hargarten S</u>, Carr BG:  Pilot Study Describing Access to Emergency Care in 2 States Using a Model Emergency Care Categorization System.  *Academic Emergency Medicine* <u>Volume 20, Issue 9,</u> pages 894–903, September 2013.

34.  Hanlin ER, Delgado-Rendón A, Lerner EB**,** <u>Hargarten S</u>, Farías R: Fall Risk and Prevention Needs Assessment in an Older Adult Latino Population: A Model Community Global Health Partnership.  *Progress in Community Health Partnerships: Research, Education, and Action* 2013; 7(2):191-9.

35.  Kowalenko T, Gore R, Sachs CS, Barata IA, Gates D, <u>Hargarten SW</u>, Josephson EB, Kamat S, Kerr HD, McClain A, Cunningham RM.  Workplace Violence in Emergency Medicine: Current Knowledge and Future Directions, *Journal of Emergency Medicine* 43.3 (2012): 523-531.

36.  Galvin S, Robertson R, <u>Hargarten S</u>. Injuries Occurring in Medical Students during International Medical Rotations: A Strategy towards Maximizing Safety. *Family Medicine* 2012; Jun 44(6):404-7.

37.  Webb T, Winthrop A, Klingbeil F, Hein L, Czinner M, Christiansen A, <u>Hargarten S</u>, Simpson D. Using an Inter professional Approach to Teach about the Disease of Injury. *Wisconsin Medical Journal*, 2011.

38.  Schlotthauer AE, Guse CE, Brixey S, Corden TE, <u>Hargarten SW</u>, Layde PM. Motor Vehicle Crashes Associated with Alcohol: Child Passenger Injury and Restraint Use, *Am J Prev Med*, 2011 Mar 40(3): 320-3.

App. 347

39.  Villaveces A, Christiansen A, <u>Hargarten SW</u>. Developing a Global Research Agenda on Violence and Injury Prevention: A Modest Proposal, *Injury Prevention* 16.3 (2010): 190-193.

40.  Pribble JM, Fowler EF, Karmat SV, Wilkerson WM, Goldstein KM, <u>Hargarten SW</u>. Communicating Emerging Infectious Disease Outbreaks to the Public Through Local Television News: Public Health Officials as Potential Spokespeople, *Disaster Medicine and Public Health Preparedness*, 2010; (4) 220-5.

41.  Runyan CW, <u>Hargarten S</u>, Hemenway D, Peek-Asa C, Cunningham RM, Costich J, Gielen AC. An Urgent Call to Action in Support of Injury Control Research Centers, *Am J Prev Med*, 2010; 39(1)89-92.

42.  Houry D, Cunningham RM, Hankin A, James T, Bernstein E, <u>Hargarten, S</u>. Violence Prevention in the Emergency Department: Future Research Priorities, *Journal of Acad Emerg Med*, November 2009; 16(11),1089-95.

43.  Tonellato DJ, Guse CE, <u>Hargarten SW</u>. Injury Deaths of US Citizens Abroad: New Data Source, Old Travel Problem. *J Travel Med* 16.5 (2009): 304-310.

44.  Wanta BT, Schlotthauer AE, Guse CE, <u>Hargarten SW</u>. The Burden of Suicide in Wisconsin's Older Population.  *Wisconsin Medical Journal*  2009; 108(2), 87-93.

45.  Hanrahan R, Layde P, Zhu S, Guse C, <u>Hargarten S</u>.  The Association of Driver Age with Traffic Injury Severity in Wisconsin. *Traffic Injury Prevention*, 2009; 10(4), 361-367.

46.  Cunningham R, Knox L, Fein J, Harrison S, Frisch K, Walton M, Dicker R, Calhoun D, Becker M, <u>Hargarten SW</u>. Before and After the Trauma Bay: The Prevention of Violent Injury Among Youth. *Ann Emerg Med*. April 2009; 53(4) 490-500.

47.  Meisel ZF, <u>Hargarten S</u>, Vernick J. Addressing Prehospital Patient Safety Using the Science of Injury Prevention and Control. *Prehospital Emergency Care*. 2008; 12:4, 411-16.

48.  Layde PM, Meurer LN, Guse CE. Yang H, Laud P, Meurer JR, Grube J, Brasel KJ, <u>Hargarten S</u>. Confidential Performance Feedback and Organizational Capacity Building to Improve Hospital Patient Safety: Results of a Randomized Trial. In *Advances in Patient Safety: New Directions and Alternative Approaches*. AHRQ Publication No. 08-0034- 2. August 2008. Vol. 2. Culture and Redesign; pp. 1-12. Agency for Healthcare Research and Quality, Rockville, MD.

49.  Pribble JM, Trowbridge MJ, Kamat SV, Fowler EF, Goldstein KM, Hargarten SW: Injury Reporting on Local TV News: A Prime-Time Opportunity for Prevention, May 2008; 34(5), 420-23.

50.  Pan S, <u>Hargarten S</u>, Zhu S. School Bus and Traffic Safety. *Chinese Journal of Tramaology*. August 2007.

51.  Guse C, Cortés L, <u>Hargarten S,</u> Hennes H. Fatal injuries of US citizens abroad.  *J Travel Med*.  2007; 14 (5), 279–287.

52.  Phelan MB, Falimirski ME, Simpson, Czinner ML, <u>Hargarten SW</u>. Competency-based strategies for injury control and prevention curricula in undergraduate medical education. *Injury Prevention*. 2007; 13(1):6-9.

53.  Heng K, <u>Hargarten SW</u>, Craven A, Layde P, Zhu S.  Motor vehicle crashes and moderate alcohol intake – Conflict Between Health Advantage and At-Risk Use.  *Alcohol & Alcoholism*. 2006;41:451-54

- 38 -
Stephen W. Hargarten, MD, MPH

54. Cortes LM, Hargarten SW, Hennes HM.  Recommendations for water safety and drowning prevention for travelers.  *J Travel Med*. 2006; 13(1): 21-34.

55. Zhu S, Layde P, Guse C, Laud P, Pintar F, Nirula R, Hargarten S.  Obesity and risk for death due to motor vehicle crashes.  *American Journal of Public Health*, April 2006;94(4):#1-6.

56. Allen S, Zhu S, Sauter C, Layde P, Hargarten S.  A Comprehensive Statewide Analysis of Seatbelt Non-Use with Injury and Hospital Admissions: New Data, Old Problem. *Academic Emergency Medicine*. 2006;13:427-34.

57. Glysch RL, Hale, LJ, Nie C, Hargarten SW. Wisconsin's violent death reporting system: Monitoring and responding to Wisconsin's violent deaths.  *WMJ* 2005;104 (1);17-19.

58. Layde PM, Meurer LN, Guse CE, Meurer JR, Yang H, Laud P, Kuhn EM, Brasel KJ, Hargarten SW. Medical injury identification using hospital discharge data. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 0500021(1-4) February 2005. Vol 2; pp.119-132. Agency for Healthcare Research and Quality, Rockville, MD.

59. Meurer JR, Meurer LN, Grube J, Brasel KJ, McLaughlin C, Hargarten SW, Layde PM. Combining performance feedback and evidence-based educational resources: A model to promote medical injury prevention. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 050021 (1-4). February 2005. Vol 4; pp 237-252. Agency for Healthcare Research and Quality, Rockville, MD.

60. Pan S, Chen E, Zhu S, Layde P, Pirrallo R, Hargarten S.  Epidemiology Characteristics of Road Traffic Injury in China. Chin J Emerg Med. 2005;14(9):709-14.

61. Sauter C, Zhu S, Allen S, Hargarten S, Layde P: Increased Risk of Death or Disability in Unhelmeted Wisconsin Motorcyclists. *WMJ*.  2005; 104 (2): 39-44.

62. Shiffler T, Hargarten SW, Withers RL. The burden of suicide and homicide of Wisconsin's children and youth. *WMJ* 2005;104(1):62-67.

63. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. Unintentional and undetermined firearm-related deaths: a preventable death analysis for three safety devices. Injury Prevention 2003;9:307-311.

64. Milne JS, Hargarten SW, Kellerman AL, Wintemute GJ: Effect of current federal regulations on handgun safety features. *Ann Emerg Med* January 2003; 41(1):1-9.

65. Hargarten SW: *The Physician's Role in Preventing Small Arms Injury.* Medicine Conflict and Survival. 18(4): 389-393, Oct.-Dec. 2002.

66. Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, Hargarten SW.  *Missing the target: A comparison of buyback and fatality-related guns*.  Injury Prevention 8:143-146, 2002.

67. Layde P, Maas L, Teret S, Brasel K, Kuhn E, Mercy J, Hargarten SW. *Patient Safety Efforts Should Focus on Medical Injuries*. JAMA 287(15):1993-7, 2002.

68. Hargarten SW. *Docs and cops: A collaborating or colliding partnership?* Ann Emerg Med 2001; 38:438-440.

App. 349

- 39 -
Stephen W. Hargarten, MD, MPH

69. <u>Hargarten SW.</u> *Three shots, two dead, five errors, one gun: A recipe for prevention?* Ann Emerg Med 2001; 37:340-341.

70. Cortes L, <u>Hargarten SW</u>. *Preventive care in the emergency department: a systematic literature review on emergency department-based interventions that address smoke detectors in the home.* [Review] [21 refs] Academic Emergency Medicine. 8(9):925-9, 2001.

71. Nie C, <u>Hargarten SW</u>. *Wisconsin needs to support death investigation: Here's why.* Wis Med J 2001;100(2): 60-62.

72. Brasel K, Layde P, <u>Hargarten SW</u>. *Evaluation of Error Medicine: Application of a Public Health Model.* Academic Emergency Medicine November 2000; 7: 1298-1300.

73. <u>Hargarten SW</u>, Kuhn EM, Mercy JA, Withers RL, Nie CL, O'Brien ME. *Suicide guns: why collect the information?* Injury Prevention 2000;6:245-246.

*74.* Barber C, Hemenway D, <u>Hargarten SW</u>, Kellermann A, Azrael D, Wilt S. *"Call to arms" for a national reporting system on firearm injuries.* Am J Public Health. 2000;90:1191-93.

75. Hootman JM, Annest JL, Mercy JA, Ryan GW, <u>Hargarten SW</u>: *National estimates of non-fatal firearm related injuries other than gunshot wounds.* Jour Inj Prev 6(4):263-267, 2000.

76. Cisler RA, <u>Hargarten SW</u>: *Public health strategies to reduce and prevent alcohol-related illness, injury and death in Wisconsin and Milwaukee County.* WMJ, June 2000, 71-78.

77. Withers RL, Mercy JA, <u>Hargarten SW</u>: *Public health: A successful paradigm applied to firearm injuries.* WMJ 99(1):48-50, 2000.

78. Milne J, <u>Hargarten SW</u>: *Handgun safety features: A review for physicians.* J Trauma: Injury, Infection and Critical Care 47(1):145-150, 1999.

79. Vernick JS, Meisel ZF, Teret SP, Milne JS, <u>Hargarten SW</u>: *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries.* Journal of Public Health Policy 20(4):427-440, 1999.

80. Milne J, <u>Hargarten SW</u>: *The availability of extrinsic handgun locking devices in a defined metro area.* WMJ 98(7):25-28, 1999.

81. Wolff M, Pirrallo RG, <u>Hargarten SW</u>: *Strengthening emergency medicine in Poland: A training and partnership model.* Acad Emerg Med <u>5(12)</u>:1187-1192, 1998.

82. Freed LH, Vernick JS, <u>Hargarten SW</u>: *Prevention of firearm-related injuries and deaths among youth—a product orientated approach.* Pediatric Clinics of North America 45(2):427-438, 1998.

83. Fox J, Stahlsmith L, Remington P, Tymus T, <u>Hargarten S</u>: *The Wisconsin firearm-related injury surveillance system.* Am J Prev Med <u>15(3S)</u>:101-108, 1998.

84. Teret SP, Defrancesco S, <u>Hargarten SW</u>, Robinson KD: *Making Guns Safer.* <u>Issues in Science and Technology</u>, 14(4): 37-40, 1998.

85. Mannenbach M, Hargarten SW, Phelen MB:  *Alcohol use among injured patients aged 12 to 18 years*.  Acad Emerg Med 4(1): 40-44, 1997.

86. Yoganandan N, Pintar FA, Kumaresan S, Maiman DJ, Hargarten SW. *Dynamic Analysis of Penetrating Trauma*. Journal of Trauma-Injury Infection & Critical Care 42(2):266-72, 1997.

87. Hargarten SW, Haskins L, Stehlsmith L, Chatterjee B, Morgan J, Remington P, Nashold R, Peterson P, Karlson T:  *Firearm-related deaths and hospitalizations - Wisconsin, 1994.* CDC M&M Wkly Report, Sept 6, 1996: 45(35): 757-759.

88. Pollock G, Brady W, Hargarten S, DeSilvey D, Carner CT:  *Hypoglycemia manifested by sinus bradycardia:  A report of three cases*.  Acad Emerg Med  3(7): 700-707, 1996.

89. Tymus TA, O'Brien ME, Hargarten SW:  *Wisconsin firearm injury surveillance system development: A comparison of medical examiner/coroner data*.  WMJ 95(5):277-282, 1996.

90. Hargarten SW, Anderson A, Walker J, Barboriak JJ.: *Travel of U.S. citizens after coronary artery bypass surgery*.  J Travel Med 1996; 3(1): 7-10.

91. Hargarten SW, Karlson TA, O'Brien ME, Hancock J, Quebbeman E:  *Characteristics of firearms involved in fatalities*.  JAMA 275(1): 42-45, 1996.

92. Meldon S, Hargarten SW:  *Ligamentous injuries of the wrist*.  JEM 13(2): 217-225, 1995.

93. Wang-Cheng R, Dillig K, Buthie E, Gilson I, Greaves W, Hargarten S, Nannis P:  *Public health strategies: To reduce firearm injuries and deaths in Milwaukee county* - Executive Summary.  WI Med J 572-584,1995.

94. Pirrallo RG,  Wolff M, Simpson DE, Hargarten SW:  *Analysis of an international EMS train-the-trainer program*.  Ann Emerg Med 25(5): 656-659, 1995.

95. Hargarten SW, Karlson T:  *Motor vehicle crashes and seat belts: A study of emergency physicians' procedures, charges, and documentation*.  Ann Emerg Med  24(5): 857-860, 1994.

96. Kellermann A, Conway C, et al:  *Access of Medicaid recipients to outpatient care*.  New Eng J Med 1994; pp1426-1430.

97. Hargarten SW, O'Brien M: *Trends in motor vehicle and firearm deaths in Wisconsin:  An analysis for examining prevention strategies*.  WI Med J 93(10): 521-524, 1994.

98. Garrison HG, Runyan CW, Tintinalli JE, Barber CW, Bordley WC, Hargarten SW, Pollock DA, Weiss HB:  *Emergency department surveillance: An examination of issues and proposal for a national strategy*.  Ann Emerg Med  24(5): 849-856, 1994.

99. Aufderheide T, Apprahamian C, Mateer J, Rudnick E, Manchester EM, Lawrence SW, Olson SW, Hargarten SW: *Emergency airway management in hanging victims*.  Ann Emerg Med 24(5): 879-884, 1994.

100.Kefer MP, Hargarten SW, Jentzen J:  *Death after discharge from the emergency department*.  Ann Emerg Med  24(6): 1102-1107, 1994.

101. Hargarten SW, Karlson T, Vernick JS, Aprahamian C:  *Motorboat propeller injuries in Wisconsin: Enumeration and prevention.*  J Trauma 37(2): 187-190, 1994.

102. Hargarten SW:  *Injury prevention: A crucial aspect of travel medicine.*  J Trvl Med 1(1): 48-50, 1994.

103. Meldon S, Hargarten SW: *Airplane vacuum toilets: An uncommon travel hazard.*  J of Trvl Med 1(2):104-105, 1994.

104. Bernstein E, Goldfrank LR, Kellerman AL, Hargarten SW, Jui J, Fish SS, Herbvert BH, Flores C, Caravati ME, Krishel S, et al:  *A public health approach to emergency medicine in preparing for the twenty-first century.*  Acad Emerg Med 1(3): 277-286, 1994.

105. Weesner CL, Hargarten SW, Aprahamian C, Nelson DR:  *Fatal childhood injury patterns in an urban setting: The case for primary prevention.*  Ann Emerg Med 23(2): 231-236, 1994.

106. Hargarten SW: *Injury control.*  Acad Emerg Med 1(2): 168-171, 1994.

107. Hargarten SW, Bouc GT:  *Emergency air medical transport of United States citizen tourists: 1988-1990.*  Air Med J 12(10): 398-402, 1993.

108. Hargarten SW, Karlson T:  *Injury control: A crucial aspect of emergency medicine.*  Emerg Med Clin N Amer  11(1):255-262, 1993.

109. Lambrecht CJ, Hargarten SW:  *Hunting-related injuries and deaths in Montana: The scope of the problem and a framework for prevention.*  J of Wilderness Med 4: 175-182, 1993.

110. Walker B, Hargarten SW:  *Another drug-related death.*  J of Emerg Med 10(5): 649-650, 1992.

111. Hargarten SW, Roberts MJ, Anderson AJ: Cancer Presentation in the Emergency Department: A Failure of Primary Care. Am J Emerg Med, 10(4):290-293, 1992.

112. Hargarten SW: *Availability of safety devices in rental cars: An international survey.*  Trvl Med Interntl 1992; 10(3): 109-110.

113. Hargarten SW, Hanel DP:  *Volar metacarpal phalangeal joint dislocation: A rare and often missed injury.*  Ann Emerg Med  21(9): 1157-1159, 1992.

114. Baker T, Hargarten SW, Guptill KS:  *Uncounted dead:  Americans dying overseas.*  Public Health Reports  107(2): 155-159, 1992.

115. Grunert BK, Hargarten SW, Matloub HS, Sanger JR, Hanel DP, Yousif NJ:  *Predictive value of psychological screening in acute hand injuries.*  J Hand Surg –Am Vol 17(2): 196-199, 1992.

116. Hargarten SW:  *International travel and motor vehicle crash deaths: The problem, risks, and prevention.*  Trvl Med Interntl  9(3): 106-110, 1991.

117. Hargarten SW, McKinney WP:  *Malaria in Wisconsin 1981-1989:  A review of cases and update on chemoprophylaxis.*  WI Med J 90(5): 215-217, 1991.

118. Hargarten SW: *All terrain vehicle mortality in Wisconsin: A case study in injury control.*  Amer J Emerg Med  9(2): 149-152, 1991.

119. Hargarten SW, Baker TD, Guptill K:  *Overseas fatalities of United States citizen travelers, 1975 and 1984: An analysis of deaths related to international travel*.  Ann Emerg Med  20(6): 622-626, 1991.

120. Guptill KS, Hargarten SW, Baker TD:  *American travel deaths in Mexico: Causes and prevention strategies*.  West J Med 154:169-171, 1991.

121. Hargarten SW, Baker T, Baker TD: *Injury deaths and American travelers*.  Travel Medicine: Proceedings of the First Conference on International Travel Medicine 1-64, 1988.

122. Hargarten SW, Baker SP: *Fatalities in the Peace Corps: A retrospective study: 1962-1983*.  JAMA 254(10): 1326-1329, 1985.


BOOKS/CHAPTERS/MONOGRAPHS/NON PEER-REVIEWED ARTICLES:

1. Kohlbeck S., Pederson L., Hargarten S. (2020) Defining Gun Violence Using a Biopsychosocial Framework: A Public Health Approach. In: Geffner R., White J.W., Hamberger L.K., Rosenbaum A., Vaughan-Eden V., Vieth V.I. (eds) Handbook of Interpersonal Violence and Abuse Across the Lifespan. Springer, Cham. https://doi.org/10.1007/978-3-319-62122-7_308-1

2. Keystone, JS, Kozarsky, PE, Freedman, DO, Nothdruft, HD, and Connor, BA, Hargarten S. Chapter 47: "Injuries and Injury Prevention", Travel Medicine 3rd Edition, El Sevier.

3. Yonas MA, Frattaroli S, Liller KD, Christiansen A, Gielen AC, Hargarten S, Olsen LM. Moving Child and Adolescent Injury Prevention and Control Research into Practice: A Framework for Translation.  Injury Prevention for Children and Adolescents:  Research, Practice, and Advocacy (2nd edition). American Public Health Association, 2012 Print ISSN: 0090-0036 | Electronic ISSN: 1541-0048.

4. Hargarten SW, Lerner EB: Injury Prevention and Control. Rosen's Emergency Medicine 7th Edition 2009;37:286-294

5. Hargarten SW: Injuries and Injury Prevention. In Health Problems While Traveling  pp 485-491, 2008.

6. Runge J, Hargarten SW:  Injury Prevention and Control.  In Emergency Medicine: Concepts and Clinical Practice, Marx J, Hockberger S, Walls R., 6th ed, Mosby, Vol 1, pp 940-951, 2006.

7. Hargarten SW, Grenfell R: Travel-related Injuries: Epidemiology and Prevention.  In the Textbook of Travel Medicine and Health, HL DuPont, MD and R Steffen, MD, 2nd Edition, B.C. Decker Inc., 1999.

8. Freed LH, Vernick JS, Hargaten SW:  Prevention of Firearm-related Injuries and Deaths Among Youths:  A Product-Oriented Approach.  In Pediatric Clinics of North America, Saunders, 45(2): 427-438, 1998.

9. Runge J, Hargarten SW:  Injury Control.  In Emergency Medicine: Concepts and Clinical Practice, Rosen, Barkin, 4th ed, Mosby, Vol 1, pp 397-406, 1997.

10. Karlson T, Hargarten SW:  Reducing Injury and Death: A Public Health Sourcebook on Guns. Rutgers University Press, 1997

11. <u>Hargarten SW</u>, Gursu KG: The Travel Related Injuries, Epidemiology, and Prevention.  In <u>Textbook of Travel Medicine and Health</u>, H.L. DuPont, MD and R. Steffen, MD, ed, B.C. Decker Inc., 1997.

12. <u>Hargarten SW</u>, Williams JM:  Injury Prevention and the Role of the EMS Provider.  In <u>Basic Trauma Life Support for Paramedics and Advanced EMS Providers</u>, John Emory Campbell, MD, FACEP (Ed), American College of Emergency Physicians, Brady, Prentice Hall, New Jersey, 1995.

13. Swart GL, <u>Hargarten SW</u>:  Emergency Department Management of Intoxication with Drugs of Abuse.  In <u>Pharmacological Therapies in Drug and Alcohol Disorders</u>, N.S. Miller, ed.  Marcel-Dekker, Inc, New York, 1994.

14. Martinez R, Gardner J, et al.:  "Applying an Injury Control Model to the Treatment of Motor Vehicle-Related Injuries.  American College of Emergency Physicians, Dallas, Texas, 1994.

15. <u>Hargarten SW</u>:   The Epidemiology of Travel-Related Deaths.   In <u>Travel Medicine Advisor</u>.  E. Jong and J. Keystone, eds.  American Health Consultants, Atlanta, Georgia, 1990.

16. Sheridan DP, Winogrond IR, et al: <u>The Preventive Approach to Patient Care</u>.  Elsevier Science Publishing, 1987.


<u>COMMENTARY, EDITORIALS AND LETTERS TO THE EDITOR:</u>

1. Therese S. Richmond, PhD, RN; <u>Stephen W. Hargarten, MD, MPH</u>; Frederick P. Rivara, MD, MPH Strengthening the Role of the NIH in the Firearm Violence Epidemic: A Modest Proposal. *JAMA Internal Medicine* 2024; 10.1001/www.jamainternmed.2024.0337

2. Pulcini, C.D., Hoffman, J.A., Alpern, E.R., Chaudhary, S., Ehrlich, P.F., Fein, J.A., Fleegler, E.W., Goyal, M.K., Hall, M., Jeffries, K.N., Myers, R.M., Sheehan, K.M., Zamani, M., Zima, B.T., <u>Hargarten, S</u>.  A Holistic Approach to Childhood Firearm Injuries. *Pediatrics* 2023 e2023063322. https://doi.org/10.1542/peds.2023-063322

3. <u>Hargarten, Stephen W</u>. Lerner, E. Brooke Gorelick, Marc Brasel, Karen deRoon-Cassini, Terri Kohlbeck, Sara. Commentary - Gun Violence:  A Biopsychosocial Disease.  West J Emerg Med. Sept 10, 2018;19(6)

4. <u>Hargarten S., MCJATLANTA</u> Editorial: Dr. Stephen Hargarten: Gun Violence a 'Public Health Issue' Milwaukee Community Journal, March 5, 2018

5. <u>Hargarten SW</u>.Editorial: Firearm Injury in the US: Effective Management Must Address Biophysical and Biosocial Factors. *Annals of Internal Medicine,* 2016 Dec 21; 24(65).

6. <u>Hargarten S</u>. Reflections on a 37 Years of EM Clinical Practice. *Academic Emergency Medicine*, 2016.

7. <u>Hargarten S</u>. Reflections on a Mass Shooting. *Academic Emergency Medicine*, 2015.

8. <u>Hargarten S</u>. Opinion Editorial: The Global Burden of Gun Violence. Milwaukee Journal-Sentinel, January 30, 2016.

9. <u>Hargarten S</u>. Reflections on Leaving the Bedside. *Academic Emergency Medicine*, December 2015; 23(1):113.

10. Hargarten S, Halverson J. Opinion Editorial: Reducing Gun Violence in Milwaukee. *Milwaukee Journal-Sentinel*, May 9, 2015.

11. Guse C, Hargarten S. Correspondence: Limitations of Travel Data for Rate Computations. *Injury Prevention*, February 21, 2014.

12. Hargarten S, Martin IBK, Hauswald M, Hirshon JM. Executive Summary: Global Health and Emergency Care – What Do We Need to Know to Address the Burden of Illness and Injury? *Academic Emergency Medicine*, December 2013; 20(12):1213-15.

13. Hargarten S. Using Alcohol as an Excuse to Walk Away from the Patient. Milwaukee Journal-Sentinel, March 6, 2010.

14. Hargarten S, Reed J.  First Step in Preventing Violent Deaths: Data.  Milwaukee Journal-Sentinel, Jun 21, 2008.

15. Corden T, Hargarten S, Brixey S, Clementi B, Peterson N. Booster Seats: Inform Parents. Milwaukee Journal-Sentinel, Nov 15, 2007.

16. Hargarten SW. Docs and cops: A collaborating or colliding partnership? Ann Emerg Med October 2001;38:438-440.

17. Hargarten SW, Cortes LM. Landmines: Not Just Another Travel Risk. Journal of Travel Medicine. 8(5):229-231.

18. Hargarten SW. Three shots, two dead, five errors, one gun: a recipe for prevention? Ann Emerg Med March 2001;37:340-341.

19. Hargarten, SW, Kuhn EM, Mercy JA, Withers RL, Nie CL, Obrien ME:  Suicide guns:  Why collect this information?  Jour Inj Prev 6(4):245-246, 2000.

20. Barber C, Hemenway D, Hargarten S, Kellermann A, Azrael D, Wilt S:  "A Call to Arms" for a National Reporting System on Firearm Injuries.   Editorial.  American Journal of Public Health 90:8:1191-1193, 2000.

21. Withers RL, Mercy JA, Hargarten SW:  Public health: A successful paradigm applied to firearm injuries. WI Med Journal, Jan/Feb 2000.

22. Hargarten SW: Emporiatric Medicine—Growing into the 21st century:  From patient care to population care.  Editorial.  J Travel Med 6(2):59, 1999.

23. Hargarten SW:  Alcohol-related injuries:  Do we really need more proof?  Editorial; comment.  Ann Emerg Med 33(6):699-701,1999.

24. Hargarten SW: Injury control research and wilderness medicine: a babe dangling in the woods. Editorial.   Wilderness & Env Med 10(1):2, 1999.

25. Hargarten SW:  Alcohol-related research and advocacy:  Much to do, many places to do it! Editorial. Ann Emerg Med 31(5): 638-639, 1998

- 45 -
Stephen W. Hargarten, MD, MPH

26. Withers R, <u>Hargarten SW</u>.  Real data needed on firearms and firearm safety. Editorial. Wisconsin Lawyer 71(4), 1998.

27. <u>Hargarten SW</u>, Olson L, Sklar D: Emergency Medicine and injury control research:  Past, present, and future.  Editorial.  Acad Emerg Med <u>4(4)</u>: 243-244, 1997.

28. <u>Hargarten SW:</u> So, just do it...  Go upstream.  Acad Emerg Med <u>3(4)</u>: 293-294,1996.

29. Rubens AJ, <u>Hargarten SW</u>, Oleckno WA:  Comparison between emergency department and inpatient E-codes.  Letter.  Acad Emerg Med <u>3(4):</u> 385-3866,1996.

30. <u>Hargarten SW:</u>  Atlanto-occipital dislocation.  J Emerg Med <u>11(6):</u>760-761, 1993.

31. <u>Hargarten SW:</u> Travel related diseases:  Injury and infectious disease prevention.  J Wilderness Medicine <u>4(4):</u> 464-465,1993.

32. Quebbeman EJ, <u>Hargarten SW:</u> The black talon: A new risk for percutaneous injury.  Letter.  J Trauma <u>35(3):</u> 489, 1993.

33. Jameson SJ, <u>Hargarten SW:</u> Calcium pretreatment to prevent Verapamil induced hypotension in patients with SVT.  Editorial.  Ann Emerg Med <u>21(1):</u> 68,1992.

34. Schultz CH, <u>Hargarten SW</u>, Babbitt <u>J:</u> Inhalation of a coin and a capsule from metered-dose inhalers. Letter.  New Engl J Med <u>325(6):</u> 431-432,1991.

35. <u>Hargarten SW:</u>  Injuries in Wisconsin.  Letter.  WI Med J 89(4):158,1990.

36. <u>Hargarten SW:</u>  Injury prevention in emergency medicine.  J Emerg Med <u>6(3):</u>248, i. 1988

37. <u>Hargarten SW</u>, Sanders AB:  Injury prevention in medical school curriculums.  Ann Emerg Med <u>15(2):</u> 226, 1986.

<u>ABSTRACTS:</u>

1. Rajan S, Branas C, <u>Hargarten S</u>, Allegrante  J: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, January 10, 2018

2. Kopatich D, Hernandez-Meier J, <u>Hargarten S</u>: Geographic Fluctuations of Violent Deaths in Children and Youth over Time. 2015 Injury Prevention (21).

3. Meurer LN, Bernstein R, Brousseau DC, <u>Hargarten S</u>, Treat R: Primary care match is associated with scholarly concentrations focused on underserved local and global communities.  2015 AAMC Medical Education Meeting, Baltimore, MD, November 2015

4. Oswald J, Kostic M, Gummin D, Kopp B, <u>Hargarten S.</u> *Poison Center Consultation Decreases Hospital Length of Stay and Inpatient Charges*, North American Congress of Clinical Toxicology, Denver, CO, October, 2010

App. 356

5.  Woods LA, Kuhn EM, Nie CL, Hargarten SW. *Losing Wisconsin dairy farmers to suicide.* American Public Health Association 130th Annual Meeting and Exposition, Philadelphia, Pennsylvania, November 9-13, 2002.

6.  Woods LA, Kuhn EM, Nie CL, Jashinsky LA, Hargarten SW. *Suicide among Wisconsin farmers.* American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

7.  Kuhn EM, Mercy JA, Nie CL, O'Brien ME, Withers RL, Hargarten SW:  Firearm homicide in relation to location of public housing in the City of Milwaukee.  American Society of Criminology, San Francisco, CA, Nov 15-18, 2000.

8.  O'Brien M, Nie C, Kuhn E, Hargarten S, Withers R: Criminal history and firearm ownership of firearm homicide perpetrators.  American Society of Criminology, San Francisco, Nov 15-18, 2000.

9.  Hargarten SW, Kuhn EM, Nie C, O'Brien, Withers R:  Analysis of firearm type, caliber, and manufacturer associated with homicides and suicides in a defined geographic region. APHA, Boston, Nov 12-16, 2000.

10. Nie CL, Kuhn EM, Mercy JA, O'Brien ME, Hargarten SW: Characteristics of firearms involved in family and intimate partner homicides: Milwaukee County, 1991-1998.  National Conference on Health Care and Domestic Violence, San Francisco, Oct 13-14, 2000.

11. Milne JS, Nie CL, O'Brien M, et al: Homicide and Suicide Handguns: Two Unique Populations, Emergency Medicine Forum, Medical College of Wisconsin, Milwaukee, WI, April 18, 2000.

9.  Hargarten SW, Kuhn EM, Nie CL, Withers RL, Wintemute GJ:  Homicide Gun Characteristics Before and After the 1994 Crime Bill. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999

10. O'Brien ME, Hargarten SW, Nie CL, Withers RL, Kuhn EM. *Linking the gun with the death: the who, when, and where of the gun's first purchase.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

11. Milne JS, Nie CL, O'Brien ME, Hargarten SW. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

12. Withers RL, Reza A, Hargarten SW. *A Survey of State Reporting Statutes for Gunshot Wounds.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

13. Hargarten SW, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* American Society of Criminology Conference, Toronto, Ontario, Nov 17-20, 1999

14. Milne JS, Nie CL, O'Brien ME, Hargarten SW. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

App. 357

- 47 -
Stephen W. Hargarten, MD, MPH

15. O'Brien ME, <u>Hargarten SW</u>, Nie CL, Withers, RL, Kuhn EM. *Linking the gun with the death: The who, when, and where of the gun's first purchase.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

16. Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, <u>Hargarten SW</u>:  A comparison of buyback and fatality-related guns. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999 and American Society of Criminology Conference, Toronto, Ontario, Nov 17-20,1999.

17. Withers RL, Reza A, <u>Hargarten SW</u>. *A survey of state reporting statutes for gunshot wounds.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

18. <u>Hargarten SW</u>, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* Second Wisconsin Health Services Research Conference: Health Services Policy Practice and Research: Making Connections, Madison, WI, November 4-5, 1999.

19. Nie CL, Kuhn EM, O'Brien ME, Withers RL, <u>Hargarten SW</u>. *Firearm homicide-suicide events in Southeastern Wisconsin.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

20. Kuhn EM, Nie CL, O'Brien ME, Withers RL, <u>Hargarten SW</u>. *Firearms used in Southeastern Wisconsin suicides.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

21. Nie CL, <u>Hargarten SW</u>. *Reducing Firearm Injuries: Health Providers and Survivors Working Together.* The Fifth National HELP Network Conference, San Francisco, California, February 5-6, 1999.

22. <u>Hargarten SW</u>, O'Brien ME, Quebbeman EJ, Nie CL, Kuhn EM. *Integrated firearm injury reporting system.* Eastern Association for the Surgery of Trauma, 12th Annual Meeting, Orlando, FL, January 13-16, 1999.

23. Kuhn EM, Nie CL, O'Brien ME, <u>Hargarten SW</u>. *Firearm-related suicides in Southeastern Wisconsin.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

24. Nie CL, Kuhn EM, <u>Hargarten SW</u>. *Urban versus rural firearm homicides and suicides in youth.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

25. <u>Hargarten SW</u>, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Magazine capacity and number of wounds for Milwaukee County Homicides before and after the 1994 Crime Bill.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

26. O'Brien ME, <u>Hargarten SW</u>, Nie CL. *Linking the Gun with the Death: the Who, When, and Where of the Gun's First Purchase.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

- 48 -
Stephen W. Hargarten, MD, MPH

27.    Nie CL, Kuhn EM, O'Brien ME, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* American College of Emergency Physicians Research Forum, San Diego, California, October 11-12, 1998.

28.    Nie CL, Kuhn EM, O'brien ME, Withers RL, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* 12th Annual California Childhood Injury Control Conference, Sacramento, California, September 14-16, 1998.

29.    Kuhn EM, Nie CL, O'Brien ME, Withers RL, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Violence Data Exchange Team (VDET), First National Conference, Washington, DC, June 24-25, 1998.

30.    Kuhn EM, Nie CL, O'Brien ME, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Wisconsin Public Health Association, Waukesha, WI, June 4-5, 1998.

31.    Wolff M, Hargarten SW, Pirrallo RG: An Analysis of a US-based Project to Strengthen Prehospital Emergency Medical Services (EMS) in Poland.  Ann Emerg Med 23(4): 925, 1994.

32.    Shepherd D, Hargarten SW: Alcohol Screening in the Emergency Department: Blood Versus Saliva.  Ann Emerg Med 23(2): 612, 1994.

33.    Robertson ME, Hodel D, et al: Minimizing hypothermia: Comparison of the effluent temperature of blood using three delivery methods and cold and pre-warmed starts.  J Emerg Nursing 19(5):  468, 1993.

34.    Orsay EM, Muelleman RL, Peterson TD, et al: Motorcycle helmets and spinal injuries: Dispelling the myth.  Ann Emerg Med 21(5): 655, 1992.

35.    Weesner CL, Apprahamian C, Hargarten SW: Fatal childhood injury patterns in an urban setting: The case for primary prevention.  Ann Emerg Med 21(5): 608, 1992.

36.    Bergstein JM, Robertson ME, Hedell D, et al.: Rapid resuscitation may contribute to hypothermia despite blood warmer use.  Ann Emerg Med, 21(5): 597, 1992.

37.    Hargarten SW, Karlson T, Oldham G:  Alcohol and injuries in the ED: Patients, places, and problems.  Ann Emerg Med 20(4): 477, 1991.

App. 359

# EXHIBIT J

1

VOLUME:  I
PAGES:  1 - 46
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
***************************)
STEFANO GRANATA; JUDSON     )
THOMAS; COLBY CANNIZZARO;   )
CAMERON PROSPERI; THE GUN   )
RUNNER, LLC; and FIREARMS   )
POLICY COALITION, INC.,     )
               Plaintiffs, )
     VS.                    ) Civil Action No.
                            ) 1:21-cv-10960-DJC
ANDREA JOY CAMPBELL, in     )
her official capacity as    )
Attorney General of the     )
Commonwealth of             )
Massachusetts; and          )
TERRENCE M. REIDY, in his   )
official capacity as        )
Secretary of the Executive  )
Office of Public Safety     )
and Security of the         )
Commonwealth of             )
Massachusetts,              )
               Defendants. )
***************************
```

       **ZOOM CONFERENCE DEPOSITION OF FRANCES
COSTA**, a witness called on behalf of the
Defendants, taken pursuant to the provisions of
the Federal Rules of Civil Procedure, before
Kathleen M. McHugh, a Registered Professional/
Certified Shorthand Reporter (#120093) and
Notary Public in and for the Commonwealth of
Massachusetts, at the Office of the Attorney
General, One Ashburton Place, Boston,
Massachusetts, on Monday, August 19, 2024,
commencing at 9:36 a.m.

COPLEY COURT REPORTING
71 Commercial Street
Boston, Massachusetts 02109
(617) 423-5841

2

1    **APPEARANCES:**

2

3    **THE DIGUISEPPE LAW FIRM, P.C.**
     (By:  Raymond M. DiGuiseppe, Esquire)
     116 N Howe Street
4    Suite A
     Southport, North Carolina 28461
5    Counsel for the Plaintiffs

6

7    **OFFICE OF THE ATTORNEY GENERAL**
     **GOVERNMENT BUREAU**
     (By:  Grace Gohlke, Assistant Attorney General)
8    One Ashburton Place
     20th Floor
9    Boston, Massachusetts 02108
     Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                        **I N D E X**

2

3    <u>Witness</u>                <u>Direct</u> <u>Cross</u>   <u>Redirect</u> <u>Recross</u>

4    **FRANCES COSTA**

5    (By Ms. Gohlke)        4

6

7                        **E X H I B I T S**

8    <u>Exhibit No</u>.                                    <u>Page</u>

9    1            Notice of Deposition, dated      4
                 7/19/24, consisting of five
10               pages.

11   2            Response to Defendants' First    4
                 Interrogatories to Plaintiff
12               The Gunrunner, LLC, dated
                 6/21/24, consisting of 13
13               pages.

14   3            Printout of The Gunrunner, LLC,  4
                 website, consisting of 13
15               pages.

16   4            Approved Firearms Roster         4
                 06/2024.
17
     5            Formal Target Shooting Firearms  4
18               Roster, 06/2024.

19

20

21

22

23

24

4

1                    **PROCEEDINGS**

2                         (Group of documents was

3        premarked Exhibit Nos. 1 through 5 for

4        identification.)

5                    **FRANCES COSTA**, having been

6        satisfactorily identified and duly sworn by the

7        Notary Public, testified as follows in answer to

8        direct interrogatories by Ms. Gohlke:

9            Q.    Good morning.  My name is Grace

10       Gohlke, Assistant Attorney General.  I'm

11       representing the Attorney General and Secretary

12       Reidy in this 30(b)(6) deposition of The

13       Gunrunner, LLC, in the matter of Granata, et

14       al, v. Campbell, et al, Civil Action No.

15       1:21-cv-10960-DJC, pending in the District of

16       Massachusetts.

17                    MS. GOHLKE:  For the record counsel

18       have stipulated that all objections except as to

19       privilege are reserved until trial and we can --

20           Q.    If there are questions that elicit

21       responses that, Ms. Costa, you feel are

22       confidential in nature, that's something that

23       you'll be able to designate.  So please feel

24       that this is a space where you can answer

5

1    questions unless your attorney instructs you not

2    to and that any issues of confidentiality will

3    be resolved through a negotiated order of the

4    parties.

5              So, just to start out, Ms. Costa,

6    could you state and spell your name for the

7    record?

8         A.    Frances, F-r-a-n-c-e-s, middle

9    initial L, as in Louise, Costa, C-o-s-t-a.

10        Q.    Have you ever been deposed before?

11        A.    I have.

12        Q.    And when was that?

13        A.    Back in 1999 or 2000.

14        Q.    What was that in connection with?

15        A.    An auto accident case.

16        Q.    Could you state your business

17   address?

18        A.    395 Wareham Street, W-a-r-e-h-a-m, as

19   in Mike, in Middleborough, Massachusetts.

20        Q.    Okay.  So I'm just going to go

21   briefly over some sort of ground expectations.

22   I know you have been deposed before so some of

23   these might be familiar to you.

24              When I ask a question, please just

6

1    make sure to answer it orally so that the Court

2    Reporter can record your response.  So don't

3    gesture or nod because that can't be captured in

4    the transcript.  It's hard for the Court

5    Reporter to just transcribe two voices at once,

6    so, please, if I'm asking a question, just wait

7    until I've finished before answering and I'll do

8    the same for you.

9         There may be objections from your

10   attorney throughout this process.  Please wait

11   for that objection to be finished before

12   responding, but unless your attorney instructs

13   you not to answer, please do still answer the

14   question.

15        I'll generally assume you understand

16   my questions.  So, if at any point you don't

17   understand a question I've asked, please just

18   ask me to repeat it or rephrase it.  If you do

19   not know the answer to a question, don't guess,

20   but please do provide a complete response,

21   including an estimate, if that's the best way

22   you have to answer the question, and if you're

23   providing an estimate, please just make clear

24   that that's what you're doing.

7

1          If you recall something later that

2    provides a fuller or more accurate answer to a

3    prior question, please provide that fuller

4    answer.  Then we will take a few breaks

5    throughout.  If you need a break sooner than I'm

6    suggesting one, just let me know, but if there's

7    a pending question that I've asked, I will ask

8    you to finish answering that question before we

9    take the break.

10          Do you understand all of those

11    instructions?

12      A.    Yes.

13      Q.    So do you understand that you are

14    under oath today?

15      A.    I do.

16      Q.    And do you understand that that means

17    that you must answer all my questions truthfully

18    and accurately?

19      A.    I do.

20      Q.    Is there anything that would

21    interfere with your ability to testify

22    truthfully today?

23      A.    Nothing.

24      Q.    Are you under the influence of any

8

1    medication or any substances that would affect

2    your ability to answer truthfully?

3         A.    I am not.

4         Q.    Did you review the topics in the

5    Schedule A of the deposition notice for The

6    Gunrunner, LLC, that was sent to your counsel

7    earlier in this case?

8         A.    I do.

9         Q.    I'm going to just share -- see if I

10   can share appropriately as Exhibit 1.  Do you

11   recognize this document?

12        A.    I do.

13        Q.    What is this?

14        A.    The Notice of Deposition.

15        Q.    If I go to pages four and five of

16   this document, do you recognize those two pages?

17        A.    I do.

18        Q.    And what is that?

19        A.    Schedule A which are the definitions

20   and the topics.

21        Q.    And are you prepared to answer

22   questions related to these eight topics of

23   examination?

24        A.    I am.

9

1          Q.    And without reviewing any

2     communications you had with your attorney, what

3     did you do besides meet with your attorney to

4     prepare for the deposition today?

5          A.    Reviewed my answers to the

6     interrogatories.

7          Q.    Did you speak to anyone other than

8     your attorney to prepare for the deposition?

9          A.    I did not.

10         Q.    Okay.  I'm going to stop sharing.

11    Have you ever been named in a lawsuit?

12         A.    I have not.

13         Q.    Have you ever testified in court

14    before?

15         A.    I have not.

16         Q.    And just a few more background

17    questions, what is your highest level of

18    educational degree?

19         A.    I went to Andover Institute of

20    Business to become a secretary so no college

21    degree.

22         Q.    Where do you work?

23         A.    I work at The Gunrunner, LLC.

24         Q.    And if we both use the term Gunrunner

10

1    to mean The Gunrunner, LLC, will you understand

2    what I mean by that?

3         A.    Yes.

4         Q.    So how would you describe the nature

5    of The Gunrunner's business?

6         A.    Retail firearms sales and all related

7    accessories thereto.

8         Q.    And how long have you worked at The

9    Gunrunner?

10        A.    Since in a full-time capacity roughly

11   September of 2018.

12        Q.    And how did you get involved in that

13   work?

14        A.    I'm sorry.  I didn't hear part of

15   that.

16        Q.    Sure.  How did you get involved or

17   how did you start to work for The Gunrunner?

18        A.    I retired from being a full-time

19   secretary and joined my husband in the business

20   to help him with the business.

21        Q.    What role or what is your current

22   role with The Gunrunner?

23        A.    Pretty much everything, paperwork,

24   retail sales.

11

1        Q.    And so does your husband still work
2    for The Gunrunner as well?
3        A.    Yes.
4        Q.    Does anyone else work for The
5    Gunrunner besides the two of you?
6        A.    No.
7        Q.    So you said that you started working
8    with the business in September of 2018.  Was the
9    business already existing at that time?
10       A.    Yes.  We have been in the gun
11   business since 1986.
12       Q.    So from 1986 to 2018 was the business
13   run solely by your husband?
14       A.    Correct.  I would help with mostly
15   paperwork.
16       Q.    Has The Gunrunner been a party to any
17   other lawsuit besides this one either as a
18   plaintiff or as a defendant?
19       A.    No.
20       Q.    Is The Gunrunner a member of the
21   Firearms Policy Coalition?
22       A.    I don't believe we have a membership
23   in that particular organization.
24       Q.    Does The Gunrunner hold any licenses

12

1    issued by the Commonwealth of Massachusetts?

2        A.    Yes.

3        Q.    And what license?

4        A.    There is a separate license to sell

5    firearms, there is a separate license to sell

6    ammunition and there is a separate state license

7    to perform services as a gunsmith.

8        Q.    And The Gunrunner has all three of

9    those licenses; is that right?

10       A.    We do.

11       Q.    And the license to offer services as

12   a gunsmith, what does that entail?

13       A.    Primarily repairs to firearms.

14       Q.    Does The Gunrunner have more than one

15   location?

16       A.    No.

17       Q.    So the only location is at the

18   Middleborough address that you provided earlier?

19       A.    Correct.

20       Q.    And what would you say in your role

21   working with The Gunrunner, what does a typical

22   day look like for you?

23       A.    First thing set up the cash drawer;

24   open up the handgun cabinets that are locked up

13

1    every night; review e-mails that have come in

2    since the night before; receive product that is

3    delivered by FedEx, UPS, U.S. Postal Service.

4    If it's firearms they have to be logged into an

5    acquisition and disposition book, enter them

6    into the point of sale system, price them, put

7    price tags on them and then put them out for

8    display and then wait for customers to come in

9    and make purchases.

10        Q.    You mentioned that The Gunrunner has

11   licenses to sell both firearms and ammunition.

12   Within the category of firearms what does The

13   Gunrunner sell under that license?

14        A.    I'm not sure I understand what you're

15   looking for.

16        Q.    Sure.  Does The Gunrunner sell

17   multiple types of firearms?

18        A.    Oh, absolutely.

19        Q.    How would you describe those

20   different types?

21        A.    Handguns, consisting of pistols,

22   revolvers, Derringers, and long guns consisting

23   of rifles, shotguns.

24        Q.    And then in terms of the license to

14

1    sell ammunition, what falls under that category?

2        A.    Any bullet that can be shot out of a

3    pistol or revolver or rifle or a shotgun.

4        Q.    And you said you also sell, I believe

5    you said, related accessories; is that right?

6        A.    That is correct.

7        Q.    And what would fall under the

8    category of related accessories?

9        A.    Pretty much anything that doesn't

10   fall into rifle, shotgun, pistol, revolver,

11   Derringer, such as scopes, holsters, the

12   necessary products to mount a scope onto a

13   firearm which consists of what are called bases

14   and then rings that the scope goes through,

15   dehumidifier units that people put inside their

16   gun safes so that moisture doesn't collect and

17   then rust the barrels of the firearms, different

18   types of sights.  People like to change out the

19   sights that come from the manufacturer on a

20   firearm; cleaning kits so that people can clean

21   their firearms after they've shot them, various

22   solvents and greases to maintain their firearms

23   in good working order, reloading equipment.

24   Some people reload their own ammunition after

15

1     it's shot.  They take the empty casing and they

2     can actually create a new bullet from that and

3     over time that is less expensive than constantly

4     buying a new box of ammunition from me that came

5     direct a manufacturer.

6          Q.    Is that a complete -- as far as

7     you're able to recall at this moment --

8          A.    As far as I'm able to recall at this

9     moment, yes.

10          Q.    So do you remember that we asked you

11     some questions called interrogatories that you

12     provided written answers to those?

13          A.    Yes.

14          Q.    So I'm going to share now Exhibit

15     No. 2.  Do you recognize this document?  I can

16     try to make it a little bigger.

17          A.    I do.

18          Q.    And what is this document?

19          A.    Those are the Responses to

20     Defendants' First Set of Interrogatories to the

21     Plaintiff.

22          Q.    Excellent.  So I'm going to show you

23     Interrogatory No. 7.  I'll just scroll down and

24     this interrogatory says to please identify the

16

1    number of firearms that The Gunrunner, LLC, sold

2    in each year from January 1st, 2021, until the

3    present, and for each year the number of makes

4    and models represented with net total sales

5    number.

6            Do you recall answering this

7    question?

8        A.    I do.

9            MR. DIGUISEPPE:  Grace, can I just

10   interject quickly and just state that the

11   objections stated in that answer are reasserted

12   and preserved for the record.

13           MS. GOHLKE:  Noted.

14       Q.    So, looking at the answer provided,

15   I'll direct you to line 17 where it says, "In

16   calendar year 2023 Plaintiff, The Gunrunner,

17   sold 1074 firearms."  Do you recall providing

18   that answer?

19       A.    I do.

20       Q.    And within that answer where the word

21   firearms is used, could you explain what was

22   comprised within that term firearm as you

23   answered this question?

24       A.    It would be rifles, shotguns,

17

1    pistols, revolvers and Derringers.

2         Q.    And you said that the pistols,

3    revolvers and Derringers can be grouped together

4    under the term handguns; is that right?

5         A.    Correct.

6         Q.    All of this 1074 firearms sold within

7    calendar year 2023, do you know what percentage

8    of that number or -- either in number or

9    percentage was handguns?

10        A.    I do not.  I did not break it down.

11   I merely added up the total number for that

12   year.

13        Q.    Are you able to estimate about what

14   percentage of that total number would be

15   handguns and it can be a range, just your best

16   estimate based on your knowledge of your sales?

17        A.    The best estimate that I could give

18   would be to say approximately two-thirds of the

19   total firearms are most likely handguns.

20        Q.    Okay.  So is it fair to say that

21   handguns as opposed to long guns is the majority

22   of your sales of firearms?

23        A.    Yes.

24        Q.    And I'm going to stop sharing here on

18

1    this one.  Again, just as a best estimate,

2    knowing that you haven't done this exact

3    calculation, but within the, you know, let's say

4    700 or so firearms that represent handguns,

5    about how many models of handguns do you think

6    that represents?

7         A.    I would have to say it could be

8    anywhere from 15 to 30 different brands.

9         Q.    So 15 to 30 different brands and then

10   within each brand are there multiple models that

11   you --

12        A.    Absolutely.

13        Q.    Approximately how many -- well, let

14   me ask this way.  Do you keep a certain number

15   of handguns specifically in stock at any given

16   time?

17        A.    I think the best way that I could

18   answer that would be to say we do try to keep a

19   certain number in stock at all times without

20   going overboard because there are always new

21   models coming out and once a new model comes out

22   everybody wants the newer model.  So we try very

23   hard not to get stuck with something for a long

24   period of time and so we keep low numbers gun by

19

1    gun, and if they go swiftly and a new version

2    has not come out, we would then restock.

3         Q.    And currently, just taking now as an

4    example, about how many individual handguns do

5    you have in stock?

6         A.    I would say probably a good estimate

7    would be 300.

8         Q.    And within that 300 approximately how

9    many, I guess, starting with how many brands

10   does that represent by your best estimate?

11        A.    Probably 15 to 20.

12        Q.    And then -- and this might require

13   some explanation, but for each of those 15 to 20

14   brands how many particular models would be

15   represented or maybe a better way to ask that is

16   just of the total 300 handguns, about how many

17   particular models would you estimate are

18   represented?

19        A.    Maybe 30 to 35.

20        Q.    Would you say those numbers, 300 in

21   stock, representing approximately 15 to 20

22   manufacturers and representing approximately

23   30 to 35 different models -- does that reflect

24   your typical inventory for handguns?

20

1          A.      Our typical inventory?

2          Q.      Yes, for your particular store.

3          A.      Yes.

4          Q.      I'm going to share Exhibit No. 3.  Do

5     you recognize -- let me just click through it so

6     that you can see.  This is 13 pages.  Do you

7     recognize what this exhibit is?

8          A.      They appear to be screen shots off of

9     our website.

10         Q.      You can see perhaps -- it's

11    probably very small.  Sorry.  I made it

12    smaller rather than bigger.  Down here at the

13    bottom of the first sheet where it says

14    https://thegunrunnerllc.com/inventory --

15         A.      Yes.

16         Q.      -- does this appear to you to be a

17    screen shot of the inventory section of your

18    website, The Gunrunner's website?

19         A.      It does.

20         Q.      I'm going to click to the second page

21    where it says updated for Tuesday, August 13th,

22    2024.  Who updated this page?

23         A.      I maintain the web page so I did the

24    updating.

21

1      Q.     How often do you update this

2    inventory page of your website?

3      A.     I try to do it at least once a week.

4      Q.     And what does this website -- what

5    does it show?  What does it represent?

6      A.     It does not represent our entire

7    firearm inventory.  At one point I tried to go

8    back in all of our federal acquisition and

9    disposition books.  I have yet to make it all

10   the way back to book one in looking for firearms

11   that have not yet sold.

12     Q.     So is it fair to say this represents

13   some but not all of your in-stock inventory at

14   any given moment?

15     A.     Exactly.

16     Q.     Okay.  So looking at the section

17   titled Handguns and I see -- sorry, let me count

18   it -- about one, two, three and -- so just under

19   three pages of particular models of handgun that

20   are in stock; is that correct?

21     A.     Correct.

22     Q.     And as you testified there may, in

23   fact, be a few more models that aren't captured

24   on this list; is that right?

22

1          A.     Correct.

2          Q.     So, looking at the eighth line down

3     within handguns where it says Glock 21 .45ACP,

4     bracket, LEO only, could you explain what LEO

5     refers to?

6          A.     LEO is an acronym for Law Enforcement

7     Only.

8          Q.     And why is that particular model law

9     enforcement only?

10         A.     It is not a Gen 1 or a Gen 2 Glock

11    which I am allowed to sell to civilians.

12    Anything beyond Gen 2 -- and right now Glock

13    goes up to Gen 5s -- I am only allowed to sell

14    to law enforcement with full arrest powers and

15    it is supposed to be considered a duty weapon.

16         Q.     Okay.

17         A.     They are not, quote, unquote,

18    Massachusetts compliant for sale to civilians.

19         Q.     And what do you understand to be the

20    reason that you cannot -- and I should say I

21    don't mean the sort of philosophical reason.  I

22    mean what is the legal requirement that prevents

23    you from selling these weapons to civilians?

24         A.     As I understand it under the Attorney

23

1    General's handgun sales regulations, in order

2    for me to sell any handgun to a civilian, it has

3    to have been submitted to a testing facility of

4    the Attorney General's choosing and put through

5    a series of rigorous tests.  If it passes it is

6    then deemed, quote, unquote, Massachusetts

7    compliant and at that point I am allowed to sell

8    it to a civilian, and as I understand the

9    requirements for Mass. compliancy, beyond the

10   rigorous testing they have to have a ten-pound

11   trigger pull.  They have to have some sort of a

12   load indicator.  I believe they have to have a

13   hidden serial number imbedded within the firearm

14   such that you have to take the imbedded serial

15   number which will match the one that is visible

16   to the public so that I can log it into my box,

17   and Glock will not submit any of their handguns

18   for the required testing.  So they are on the

19   Approved Firearms Roster which from the initial

20   placement on that roster means I am allowed to

21   sell them to law enforcement, but unless they

22   are Massachusetts compliant I am not allowed to

23   sell them to civilians.

24        Q.    And for the models listed on this

24

1     website section under handguns if it does not

2     say LEO only, does that mean you are permitted

3     to sell to a civilian purchaser?

4          A.     Correct.

5          Q.     Who makes decisions about -- and I'm

6     going to stop sharing this.  Who makes decisions

7     about what models of handgun or any other

8     firearm -- let me ask that better.

9               Who makes the decisions about what

10    models of firearm the Gun Runner will stock?

11         A.     My husband and I.

12         Q.     And what factors go into that

13    decision?

14         A.     No. 1, Mass. compliancy, No. 2,

15    popularity, requests from customers, can you now

16    sell something that's just come out.

17         Q.     Anything else in particular that --

18         A.     Pricing.

19         Q.     And when, you know, when you say

20    popularity and that customers tend to want the

21    newest model, do you have a sense from the

22    customers about why they want the newest model?

23         A.     The only thing I can tell you is most

24    people want the latest and greatest because it

25

1    is supposedly improved over the prior model.

2         Q.    How much physical space does The

3    Gunrunner have to hold inventory?

4         A.    The square footage of the retail

5    store is roughly 850 square feet.

6         Q.    Do you have any other space like a

7    warehouse or a separate location at which you

8    store current inventory?

9         A.    No.

10        Q.    And in terms of the physical space

11   you have available for stock or inventory, do

12   you use all of that space?

13        A.    Yes.

14        Q.    So would you say you operate at

15   maximum capacity in terms of what you're able to

16   stock?

17        A.    We try to at all times, yes, to have

18   as much available as possible.

19        Q.    When a customer wants to make a

20   purchase from you, do they typically purchase

21   from the available inventory you have in stock?

22        A.    Typically.

23        Q.    If they weren't ordering that way,

24   through available inventory, what other

26

1    mechanisms would there be to -- or what other

2    ways might you sell them a firearm?

3        A.    We get a lot of requests, can you get

4    a particular firearm that we don't currently

5    have in stock.  I then have 15 to 20

6    distributors that I can check with and then if I

7    am able to get it I determine pricing; call the

8    customer back.  They give me a deposit.  I

9    special order it in for them.

10       Q.    And of your total sales, so, you

11   know, let's say for 2023 that you had a thousand

12   700 -- sorry, 1,070 -- I believe 74 or 79 total

13   sales, about what percentage of that do you

14   think represents special orders?

15       A.    I would say probably at the most five

16   to ten percent.

17       Q.    Okay.  I'm going to share Exhibit

18   No. 4.  Let me make this a little bigger.  Do

19   you recognize this document?

20       A.    I do.

21       Q.    And what is this?

22       A.    That is the most recent iteration of

23   the Approved Firearms Roster.

24       Q.    And are you familiar with the

App. 386

27

1    Approved Firearms Roster?

2         A.    Very much so.

3         Q.    What do you understand to be the

4    purpose of this document?

5         A.    As I understand these are the guns

6    that are tested by the Department of Public

7    Safety which is a free service, and if they pass

8    that testing, they go on this roster, unless

9    they are subsequently submitted for the Attorney

10   General's testing facilities tests and pass.

11   The guns on this list I'm allowed to sell to law

12   enforcement only until I determine it's Mass.

13   compliant.

14        Q.    And how do you determine if it is

15   Mass. compliant?

16        A.    At one point my only way to determine

17   that was to call the manufacturer, for example,

18   Ruger, and give them a specific make, model and

19   SKU or MPN number and ask has it been submitted,

20   did it pass, is it now deemed Mass. compliant,

21   and they would answer the question yes or no.

22             The various manufacturers have gotten

23   very savvy with their websites now and a lot of

24   the major manufacturers I can go on the website

28

1    and determine which SKUs or MPNs are

2    Massachusetts compliant.

3         Q.    And do you determine that based on

4    the website explicitly stating it was Mass.

5    compliant or by tracking if the required

6    features are there?

7         A.    I go primarily by the website stating

8    this is a Massachusetts compliant firearm.

9         Q.    I'm going to stop sharing this and

10   I'm going to go to Exhibit 5.  I'll go to the

11   top and make this bigger.  Do you recognize that

12   document?

13        A.    Yes.  That's the Formal Target

14   Shooting Firearms Roster.

15        Q.    Are you familiar with the Formal

16   Target Shooting Firearms Roster?

17        A.    I am.

18        Q.    What do you understand to be the

19   purpose of this document?

20        A.    It is pretty much the same as the

21   Approved Firearms Roster in that it has that

22   third paragraph that says that they'd have to

23   conform to the Attorney General's handgun sales

24   regulations.  I will note that that third

App. 388

29

1    paragraph at some point in the past was not on

2    that roster.

3        Q.    And this particular version of the

4    Formal Target Shooting Firearms Roster, do you

5    see the date there that it says?

6        A.    Yes.  It's the same as the prior

7    roster, June of 2024.

8        Q.    So do you understand this to be the

9    version or each of those two rosters to be the

10   version currently in effect?

11       A.    Correct.

12       Q.    Would you use this roster, the Formal

13   Target Shooting Firearms Roster, would you

14   follow the same process for a model on here that

15   you would for the Approved Firearms Roster?

16       A.    Yes.

17       Q.    So do you understand that provided

18   the model is Massachusetts compliant, any model

19   appearing on either of these two rosters may be

20   sold to a civilian?

21       A.    Yes, provided they are deemed

22   Massachusetts compliant, yes.

23       Q.    Okay.  And do you consult these

24   rosters -- I think you've already answered this,

30

1    but let me just kind of walk through the steps.

2              When you're deciding if you can sell

3    a particular model of handgun, do you consult

4    these two rosters?

5         A.   Constantly.

6         Q.   And then if you determine that the

7    model is on one of the two rosters, you

8    testified that what you then do is go to the --

9    typically you would go to the manufacturer's

10   website to determine if it also states it is

11   Mass. compliant; is that right?

12        A.   Correct.

13        Q.   Can you estimate how many models --

14   having gone through this process of checking the

15   roster and then checking for Mass. compliance,

16   are you able to estimate how many models you've

17   done that for and found that you can, indeed,

18   sell them to civilians?

19        A.   As a percentage out of the total that

20   appear on the rosters?

21        Q.   Or just as a number, whatever metric

22   is easiest for you to provide an estimate.

23        A.   I'd have to clarify and say on the

24   Approved Firearms Roster with the exception of

31

1    Glocks as a manufacturer, the majority of what

2    is on the roster winds up as also being

3    Massachusetts compliant.

4         Q.    Of the models that are on the

5    roster -- and, perhaps, this as a percentage

6    would be the best way to do it -- what

7    percentage have you checked to see if they are

8    Mass. compliant or if it's easier to just do it

9    as a number that --

10        A.    I don't think I'd be able to

11   actually -- I honestly don't feel that I could

12   answer that.  It would depend on what the

13   customer comes in and asks for.

14        Q.    Would you say it's more than 100

15   models?

16        A.    Yes.

17        Q.    Okay.  Do you have any kind of range

18   that you're able to provide of how many

19   approximately you think you have checked?

20        A.    That's very difficult to say.

21        Q.    Okay.

22        A.    Again it depends on when the customer

23   comes in and is asking about a specific firearm

24   that I don't currently have in stock.

32

1          Q.    Right.  So that was my next question.

2     So this process that you described of checking

3     the roster and checking for Mass. compliance, do

4     you do that for every model that you are holding

5     in inventory in stock?

6          A.    I would check before I would bring it

7     into inventory.

8          Q.    And then if there is a model that you

9     do not stock that someone is requesting as a

10    special request, I understand your testimony to

11    be that you would do that process on a

12    case-by-case basis; is that right?

13         A.    That is correct.

14         Q.    Are you aware of particular -- any

15    particular handgun models that you would stock

16    if not for these -- the requirements of the

17    roster and the Mass. compliance?

18         A.    No. 1 would be Glocks.  Heritage

19    Firearms makes revolvers, none of which are

20    Mass. compliant.  There are many Kimber

21    handguns, some of which are on the formal target

22    shooting roster but not all; Colt, some of which

23    are on the formal target shooting roster but not

24    all.  Those are the most popular that come to

33

1    mind that people ask for.

2        Q.    Based on your familiarity with your

3    own inventory and with firearms as someone who's

4    been in this business for many years, taking,

5    for example, Heritage revolvers, what -- how

6    would you describe the difference between a

7    Heritage revolver and a model that you do stock?

8        A.    None whatsoever, no difference.  They

9    just have not submitted them for the testing.

10       Q.    And the other manufacturers that you

11   mentioned, the Kimber handguns that are not on

12   the formal roster, the Colt handguns that are

13   not on the formal roster and the Glocks, would

14   you say that's -- are there particular

15   differences that you can identify between those

16   handguns and ones that you are able to sell?

17       A.    Nope.

18            MS. GOHLKE:  Let's take a short

19   break here.  Let's break -- it's 10:22.  Maybe

20   we'll break for eight minutes and come back at

21   10:30.  I think I have about one more major

22   category of questions so I think we'll go

23   probably at most another hour.

24       A.    Okay.

34

1           MS. GOHLKE:  I'm going to turn off

2     my video and mute and then turn that all back on

3     at 10:30.

4           THE WITNESS:  Okay.

5           MR. DIGUISEPPE:  Sounds good,

6     thanks.

7                     (Recessed at 10:22 a.m.)

8                     (Resumed at 10:31 a.m.)

9     Q.    Do your customers ever tell you the

10    purpose for which they're purchasing a handgun?

11    A.    Yes.

12    Q.    And what reasons do they give?

13    A.    Personal protection, hunting, target

14    shooting, formal competition shooting.

15    Q.    Are you able to estimate what

16    proportion of customers say they are purchasing

17    a handgun for personal protection?

18    A.    I would have to say pretty close to

19    90 percent.  One of the many reasons is personal

20    protection.

21    Q.    And do you have customers that buy

22    more than one firearm from you?

23    A.    Yes.

24    Q.    How often does that happen?

35

1        A.     Quite often.  We have quite a few

2    return customers.

3        Q.     So, when a customer comes to you and

4    says they are interested in purchasing a handgun

5    for personal protection, do those individuals

6    typically then purchase a handgun from you?

7        A.     Yes.

8        Q.     And are there particular models of

9    handgun that you recommend for someone who is

10   looking for a handgun for that purpose?

11       A.     There is after we ask them questions,

12   measure their hand.  You're not going to put a

13   large-gripped handgun in the hand of a very

14   petite, small hands woman, for example.

15       Q.     And you said you would ask them

16   questions.  What types of questions would you

17   ask?

18       A.     Are they looking for something

19   strictly for protection while at home, are they

20   looking to carry outside the home, typically at

21   night when out alone, unaccompanied by anyone

22   else, questions of that nature.

23       Q.     And how would the responses to those

24   questions change your recommendation?

36

1    A.    If it was for inside the home, you

2    would not necessarily have to be concerned about

3    concealability, whereas if they are looking to

4    protect themselves while out in the public, even

5    though Massachusetts is not technically a

6    concealed carry state, the majority of the

7    people don't like to see guns and get very

8    frightened when they do see guns and, therefore,

9    it is always recommended by police to carry

10   concealed.

11       Q.    You said you also would measure

12   someone's hand to see what size gun might be the

13   best fit; is that right?

14       A.    That is correct.

15       Q.    Is there any other questions or

16   anything else you would do to determine what

17   model or models of handgun would be best suited

18   to -- for someone to purchase for purposes of

19   self-protection?

20       A.    We would also typically ask if they

21   have any -- for lack of a better word --

22   disability with respect to hands.  As you get

23   older, you get arthritis or you might have some

24   kind of neuropathy which would make it more

37

1    difficult for one person as compared to someone

2    else to pull back the slide which allows you to

3    load the first bullet in the magazine into the

4    chamber for the firearm to be then ready to

5    shoot and there are certain models made by some

6    of the manufacturers that it is much easier to

7    perform that function of racking the slide as

8    it's called to load the first bullet into the

9    chamber.

10        Q.    And thinking about these various

11   considerations, from your perspective do you

12   have models to offer for sale that meet each of

13   these different qualifications?  So for someone

14   answering these questions differently do you

15   have different models you can offer them?

16        A.    Yes.

17        Q.    So do you have models that both are

18   models with that easier racking action?

19        A.    Yes.

20        Q.    And do you have models that have

21   larger grips and smaller grips, depending on the

22   individual's hand size?

23        A.    Yes.

24        Q.    And do you have models that are more

38

1    or less concealable, depending on whether the

2    individual expects to carry the firearm in

3    public versus at home?

4         A.    Yes.

5         Q.    And overall from your perspective do

6    you sell handguns that you consider suitable for

7    personal protection?

8         A.    Yes.

9         Q.    And do you have any estimate of how

10   many models of handgun you carry within your

11   inventory that would be suitable for personal

12   protection purposes?

13        A.    Technically I would have to say that

14   every one could be used for personal protection;

15   with respect to concealability, the smaller,

16   more lightweight ones.

17        Q.    And have you had any communications

18   with customers about either the Approved

19   Firearms Roster or the Mass. compliance

20   requirements?

21        A.    All the time, all the time.

22        Q.    And what types of communications are

23   those?

24        A.    Primarily a vast majority aren't even

39

1    aware of the roster; don't realize there are

2    certain firearms that I'm not allowed to sell or

3    transfer; don't understand why.

4        Q.    And have you had customers who have

5    come to you stating they would like to buy a

6    certain model of handgun and you inform them

7    you're not permitted to sell that based on

8    Massachusetts law?

9        A.    It happens all the time.

10       Q.    And do the customers -- in those

11   particular situations do the customers explain

12   to you why they want that particular model?

13       A.    They do.

14       Q.    And what are some of the reasons that

15   they give or what are all the reasons that you

16   can remember that they give?

17       A.    Some of the time they explain that

18   someone they know already has that gun in their

19   possession.  Some of the time they tell me that

20   they've seen it on display at another gun shop.

21       Q.    Anything else you can think of for

22   reasons they give you?

23       A.    No.

24       Q.    And in those cases where someone is

40

1    inquiring about a model of handgun that you're

2    not permitted to sell, how do you respond to

3    them?

4         A.    I usually take out the Approved

5    Firearms Roster and explain it to them.  I

6    explain that it's organized alphabetically by

7    manufacturer.  Within the manufacturer it is

8    then organized by caliber and I literally point

9    out to them that there are no Colts listed on

10    the Approved Firearms Roster or no Kimbers on

11    the Approved Firearms Roster, therefore, I am

12    not allowed to sell it if it's not on the

13    Approved Firearms Roster to literally anybody.

14    I can't even sell to a law enforcement officer

15    unless it's first on that Approved Firearms

16    Roster.

17         Q.    Do you recommend to the customer a

18    gun that you are able to sell that they might be

19    interested in?

20         A.    Absolutely.

21         Q.    And in most cases would you say

22    customers in that situation who have requested a

23    gun you cannot sell, do they typically then

24    still buy a gun you can sell from you?

41

1          A.     More often than not, yes.

2          Q.     Do you ever communicate with firearms

3     manufacturers?

4          A.     Yes.

5          Q.     What kinds of communications do you

6     have with firearms manufacturers?

7          A.     I communicate directly with firearms

8     manufacturers in the case of a repair of a

9     firearm, most likely under warranty, some

10    problem.  It was purchased brand-new.  It's not

11    functioning properly in some way and we

12    facilitate the return to the manufacturer to

13    check it out and see what's wrong and it is then

14    returned to us and then returned from us to the

15    customer.  I --

16         Q.     And what type -- sorry.

17         A.     I also communicate with them

18    sometimes if I'm unable to determine Mass.

19    compliancy through their website and I have to

20    talk directly to somebody at the manufacturer

21    directly to determine that.

22         Q.     So, going back to the first category

23    of communications about repairs, what types of

24    problems might come up that -- in which the

42

1   firearm is not functioning properly?

2        A.    I've had people complain that when

3   they rack the slide it's not loading the first

4   bullet into the chamber.  I've had people say

5   that on a subsequent pull of the trigger the

6   next bullet in line to be shot doesn't load

7   properly into the chamber.  There's a term

8   called stovepiping in which it -- it doesn't

9   attempt to load properly and so it gets jammed.

10            What else?  That's the primary

11   problem that I may have to send something back

12   to the manufacturer and say there's some little

13   something wrong somewhere, it needs to be

14   checked over and fixed.

15        Q.    In your communications related to

16   Mass. compliance, what is the nature of that

17   communication?

18        A.    When I'm trying to determine Mass.

19   compliancy and feel I have to call the

20   manufacturer directly?

21        Q.    Yes.

22        A.    Whoever answers the phone, I explain

23   that I need to speak to someone with definitive

24   knowledge as to whether or not a particular

43

1    firearm has been submitted for the testing

2    demanded by our Attorney General in order to

3    determine the safety of the firearm such that

4    I'm allowed to sell it to the general licensed

5    public and they transfer me to somebody who

6    knows what they're talking about, knows exactly

7    what I'm referring to, and they check their

8    records to see that they did, in fact, submit it

9    and that they submitted the testing results that

10   said it passed to the Attorney General's Office

11   and, yes, it is a Massachusetts compliant

12   firearm.

13        Q.    And are there any cases where you

14   call to make that inquiry and they say they have

15   not submitted it for the required testing?

16        A.    Yes.

17        Q.    And when you have those conversations

18   where a manufacturer says they have not

19   submitted it for required testing, do they

20   explain to you why they haven't done that?

21        A.    They do not.

22             MS. GOHLKE:  I think that's all of

23   the questions I have for you, so unless, Ray,

24   you had any questions you wanted to ask?

44

1                MR. DIGUISEPPE:  I don't.

2                MS. GOHLKE:  Then I think we are

3      completed for this deposition.

4                         (Whereupon the deposition was

5      adjourned at 10:46 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

**C E R T I F I C A T E**

  I, **FRANCES COSTA**, do hereby certify
that I have read the foregoing transcript of
my testimony given on August 19, 2024, and I
further certify that said transcript is a true
and accurate record of said (with the exception
of the following corrections listed):

Page        Line        Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Dated at                      , this        day

of               , 2024.

                    _____
                    **FRANCES COSTA**

Signed under the pains and penalties of perjury.

46

1                    **C E R T I F I C A T E**

2

3    COMMONWEALTH OF MASSACHUSETTS

4    SUFFOLK, SS.

5            I, Kathleen M. McHugh, a Notary Public

6    in and for the Commonwealth of Massachusetts,

7    do hereby certify:

8            That **FRANCES COSTA**, the witness whose

9    testimony is hereinbefore set forth, was duly

10   sworn by me and that such testimony is a true

11   and accurate record of my stenotype notes taken

12   in the foregoing matter, to the best of my

13   knowledge, skill and ability.

14           IN WITNESS WHEREOF, I have hereunto

15   set my hand and Notarial Seal this 20th day of

16   August, 2024.

17                            _____

18                            KATHLEEN M. MCHUGH
                              CRR/RPR/CSR #120093
19                            Notary Public

20
     My Commission Expires:  June 29, 2029
21

22

23   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
     BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
24   AND/OR DIRECTION OF THE CERTIFYING REPORTER.

1

## #

**#120093** [2] - 1:19, 46:18

## 0

**02108** [1] - 2:9
**02109** [1] - 1:23
**06/2024** [2] - 3:16, 3:18

## 1

**1** [7] - 1:1, 3:9, 4:3, 8:10, 22:10, 24:14, 32:18
**1,070** [1] - 26:12
**100** [1] - 31:14
**1074** [2] - 16:17, 17:6
**10:22** [2] - 33:19, 34:7
**10:30** [2] - 33:21, 34:3
**10:31** [1] - 34:8
**10:46** [1] - 44:5
**116** [1] - 2:3
**13** [3] - 3:12, 3:14, 20:6
**13th** [1] - 20:21
**15** [6] - 18:8, 18:9, 19:11, 19:13, 19:21, 26:5
**17** [1] - 16:15
**19** [2] - 1:21, 45:3
**1986** [2] - 11:11, 11:12
**1999** [1] - 5:13
**1:21-cv-10960-DJC** [2] - 1:8, 4:15
**1st** [1] - 16:2

## 2

**2** [5] - 3:11, 15:15, 22:10, 22:12, 24:14
**20** [4] - 19:11, 19:13, 19:21, 26:5
**2000** [1] - 5:13
**2018** [3] - 10:11, 11:8, 11:12
**2021** [1] - 16:2
**2023** [3] - 16:16, 17:7, 26:11
**2024** [6] - 1:21, 20:22, 29:7, 45:3, 45:18, 46:16
**2029** [1] - 46:20
**20th** [2] - 2:8, 46:15
**21** [1] - 22:3
**28461** [1] - 2:4
**29** [1] - 46:20

## 3

**3** [2] - 3:14, 20:4
**30** [4] - 18:8, 18:9, 19:19, 19:23
**30(b)(6** [1] - 4:12
**300** [4] - 19:7, 19:8, 19:16, 19:20
**35** [2] - 19:19, 19:23
**395** [1] - 5:18

## 4

**4** [8] - 3:5, 3:9, 3:11, 3:14, 3:16, 3:17, 26:18
**423-5841** [1] - 1:24
**45ACP** [1] - 22:3
**46** [1] - 1:1

## 5

**5** [3] - 3:17, 4:3, 28:10
**5s** [1] - 22:13

## 6

**6/21/24** [1] - 3:12
**617** [1] - 1:24

## 7

**7** [1] - 15:23
**7/19/24** [1] - 3:9
**700** [2] - 18:4, 26:12
**71** [1] - 1:23
**74** [1] - 26:12
**79** [1] - 26:12

## 8

**850** [1] - 25:5

## 9

**90** [1] - 34:19
**9:36** [1] - 1:21

## A

**a.m** [4] - 1:21, 34:7, 34:8, 44:5
**ability** [3] - 7:21, 8:2, 46:13
**able** [12] - 4:23, 15:7, 15:8, 17:13, 25:15, 26:7, 30:16, 31:10, 31:18, 33:16, 34:15, 40:18
**absolutely** [3] - 13:18,

18:12, 40:20
**accessories** [3] - 10:7, 14:5, 14:8
**accident** [1] - 5:15
**accurate** [3] - 7:2, 45:4, 46:11
**accurately** [1] - 7:18
**acquisition** [2] - 13:5, 21:8
**acronym** [1] - 22:6
**Action** [2] - 1:8, 4:14
**action** [1] - 37:18
**added** [1] - 17:11
**address** [2] - 5:17, 12:18
**adjourned** [1] - 44:5
**affect** [1] - 8:1
**al** [2] - 4:14
**allowed** [9] - 22:11, 22:13, 23:7, 23:20, 23:22, 27:11, 39:2, 40:12, 43:4
**allows** [1] - 37:2
**alone** [1] - 35:21
**alphabetically** [1] - 40:6
**ammunition** [5] - 12:6, 13:11, 14:1, 14:24, 15:4
**AND/OR** [1] - 46:24
**Andover** [1] - 9:19
**ANDREA** [1] - 1:9
**answer** [19] - 4:7, 4:24, 6:1, 6:13, 6:19, 6:22, 7:2, 7:4, 7:17, 8:2, 8:21, 16:11, 16:14, 16:18, 16:20, 18:18, 27:21, 31:12
**answered** [2] - 16:23, 29:24
**answering** [4] - 6:7, 7:8, 16:6, 37:14
**answers** [3] - 9:5, 15:12, 42:22
**ANY** [2] - 46:23, 46:23
**appear** [3] - 20:8, 20:16, 30:20
**APPEARANCES** [1] - 2:1
**appearing** [1] - 29:19
**APPLY** [1] - 46:23
**appropriately** [1] - 8:10
**Approved** [13] - 3:16, 23:19, 26:23, 27:1, 28:21, 29:15, 30:24, 38:18, 40:4, 40:10, 40:11, 40:13, 40:15
**arrest** [1] - 22:14
**arthritis** [1] - 36:23

**Ashburton** [2] - 1:20, 2:8
**Assistant** [2] - 2:7, 4:10
**assume** [1] - 6:15
**attempt** [1] - 42:9
**Attorney** [11] - 1:10, 1:20, 2:7, 4:10, 4:11, 22:24, 23:4, 27:9, 28:23, 43:2, 43:10
**attorney** [6] - 5:1, 6:10, 6:12, 9:2, 9:3, 9:8
**ATTORNEY** [1] - 2:6
**August** [4] - 1:21, 20:21, 45:3, 46:16
**auto** [1] - 5:15
**available** [4] - 25:11, 25:18, 25:21, 25:24
**aware** [2] - 32:14, 39:1

## B

**background** [1] - 9:16
**barrels** [1] - 14:17
**based** [4] - 17:16, 28:3, 33:2, 39:7
**bases** [1] - 14:13
**basis** [1] - 32:12
**become** [1] - 9:20
**behalf** [1] - 1:17
**best** [10] - 6:21, 17:15, 17:17, 18:1, 18:17, 19:10, 31:6, 36:13, 36:17, 46:12
**better** [3] - 19:15, 24:8, 36:21
**between** [2] - 33:6, 33:15
**beyond** [2] - 22:12, 23:9
**bigger** [4] - 15:16, 20:12, 26:18, 28:11
**book** [2] - 13:5, 21:10
**books** [1] - 21:9
**Boston** [3] - 1:20, 1:23, 2:9
**bottom** [1] - 20:13
**box** [2] - 15:4, 23:16
**bracket** [1] - 22:4
**brand** [2] - 18:10, 41:10
**brand-new** [1] - 41:10
**brands** [4] - 18:8, 18:9, 19:9, 19:14
**break** [6] - 7:5, 7:9, 17:10, 33:19, 33:20
**breaks** [1] - 7:4
**briefly** [1] - 5:21
**bring** [1] - 32:6

**bullet** [6] - 14:2, 15:2, 37:3, 37:8, 42:4, 42:6
**BUREAU** [1] - 2:7
**Business** [1] - 9:20
**business** [5] - 5:16, 10:5, 10:19, 10:20, 11:8, 11:9, 11:11, 11:12, 33:4
**buy** [3] - 34:21, 39:5, 40:24
**buying** [1] - 15:4
**BY** [1] - 46:23

## C

**C-o-s-t-a** [1] - 5:9
**cabinets** [1] - 12:24
**calculation** [1] - 18:3
**calendar** [2] - 16:16, 17:7
**caliber** [1] - 40:8
**CAMERON** [1] - 1:6
**Campbell** [1] - 4:14
**CAMPBELL** [1] - 1:9
**CANNIZZARO** [1] - 1:5
**cannot** [2] - 22:20, 40:23
**capacity** [4] - 1:9, 1:12, 10:10, 25:15
**captured** [2] - 6:3, 21:23
**Carolina** [1] - 2:4
**carry** [5] - 35:20, 36:6, 36:9, 38:2, 38:10
**case** [5] - 5:15, 8:7, 32:12, 41:8
**case-by-case** [1] - 32:12
**cases** [3] - 39:24, 40:21, 43:13
**cash** [1] - 12:23
**casing** [1] - 15:1
**category** [5] - 13:12, 14:1, 14:8, 33:22, 41:22
**certain** [5] - 18:14, 18:19, 37:5, 39:2, 39:6
**CERTIFICATION** [1] - 46:22
**Certified** [1] - 1:19
**certify** [3] - 45:2, 45:3, 46:7
**CERTIFYING** [1] - 46:24
**chamber** [4] - 37:4, 37:9, 42:4, 42:7
**change** [2] - 14:18,

35:24
**check** [4] - 26:6, 32:6, 41:13, 43:7
**checked** [3] - 31:7, 31:19, 42:14
**checking** [4] - 30:14, 30:15, 32:2, 32:3
**choosing** [1] - 23:4
**Civil** [3] - 1:8, 1:18, 4:14
**civilian** [4] - 23:2, 23:8, 24:3, 29:20
**civilians** [5] - 22:11, 22:18, 22:23, 23:23, 30:18
**clarify** [1] - 30:23
**clean** [1] - 14:20
**cleaning** [1] - 14:20
**clear** [1] - 6:23
**click** [2] - 20:5, 20:20
**close** [1] - 34:18
**COALITION** [1] - 1:7
**Coalition** [1] - 11:21
**COLBY** [1] - 1:5
**collect** [1] - 14:16
**college** [1] - 9:20
**Colt** [2] - 32:22, 33:12
**Colts** [1] - 40:9
**coming** [1] - 18:21
**commencing** [1] - 1:21
**Commercial** [1] - 1:23
**Commission** [1] - 46:20
**Commonwealth** [5] - 1:10, 1:14, 1:19, 12:1, 46:6
**COMMONWEALTH** [1] - 46:3
**communicate** [3] - 41:2, 41:7, 41:17
**communication** [1] - 42:17
**communications** [6] - 9:2, 38:17, 38:22, 41:5, 41:23, 42:15
**compared** [1] - 37:1
**competition** [1] - 34:14
**complain** [1] - 42:2
**complete** [2] - 6:20, 15:6
**completed** [1] - 44:3
**compliance** [5] - 30:15, 32:3, 32:17, 38:19, 42:16
**compliancy** [1] - 23:9, 24:14, 41:19, 42:19
**compliant** [16] - 22:18, 23:7, 23:22, 27:13,

27:15, 27:20, 28:2, 28:5, 28:8, 29:18, 29:22, 30:11, 31:3, 31:8, 32:20, 43:11
**comprised** [1] - 16:22
**concealability** [2] - 36:3, 38:15
**concealable** [1] - 38:1
**concealed** [2] - 36:6, 36:10
**concerned** [1] - 36:2
**CONFERENCE** [1] - 1:16
**confidential** [1] - 4:22
**confidentiality** [1] - 5:2
**conform** [1] - 28:23
**connection** [1] - 5:14
**consider** [1] - 38:6
**considerations** [1] - 37:11
**considered** [1] - 22:15
**consisting** [5] - 3:9, 3:12, 3:14, 13:21, 13:22
**consists** [1] - 14:13
**constantly** [1] - 15:3, 30:5
**consult** [2] - 29:23, 30:3
**CONTROL** [1] - 46:23
**conversations** [1] - 43:17
**COPLEY** [1] - 1:22
**correct** [12] - 11:14, 12:19, 14:6, 17:5, 21:20, 21:21, 22:1, 24:4, 29:11, 30:12, 32:13, 36:14
**Correction** [1] - 45:5
**corrections** [1] - 45:4
**COSTA** [6] - 1:17, 3:4, 4:5, 45:2, 45:19, 46:8
**Costa** [3] - 4:21, 5:5, 5:9
**counsel** [2] - 4:17, 8:6
**Counsel** [2] - 2:5, 2:9
**count** [1] - 21:17
**court** [1] - 9:13
**COURT** [2] - 1:3, 1:22
**Court** [2] - 6:1, 6:4
**create** [1] - 15:2
**Cross** [1] - 3:3
**CRR/RPR/CSR** [1] - 46:18
**current** [2] - 10:21, 25:8
**customer** [7] - 25:19, 26:8, 31:13, 31:22,

35:3, 40:17, 41:15
**customers** [13] - 13:8, 24:15, 24:20, 24:22, 34:9, 34:16, 34:21, 35:2, 38:18, 39:4, 39:10, 39:11, 40:22

## D

**date** [1] - 29:5
**dated** [2] - 3:9, 3:12
**Dated** [1] - 45:17
**deciding** [1] - 30:2
**decision** [1] - 24:13
**decisions** [3] - 24:5, 24:6, 24:9
**deemed** [3] - 23:6, 27:20, 29:21
**defendant** [1] - 11:18
**Defendants** [3] - 1:15, 1:17, 2:9
**Defendants'** [2] - 3:11, 15:20
**definitions** [1] - 8:19
**definitive** [1] - 42:23
**degree** [2] - 9:18, 9:21
**dehumidifier** [1] - 14:15
**delivered** [1] - 13:3
**demanded** [1] - 43:2
**Department** [1] - 27:6
**deposed** [2] - 5:10, 5:22
**deposit** [1] - 26:8
**Deposition** [2] - 3:9, 8:14
**DEPOSITION** [1] - 1:16
**deposition** [6] - 4:12, 8:5, 9:4, 9:8, 44:3, 44:4
**Derringer** [1] - 14:11
**Derringers** [3] - 13:22, 17:1, 17:3
**describe** [3] - 10:4, 13:19, 33:6
**described** [1] - 32:2
**designate** [1] - 4:23
**determine** [13] - 26:7, 27:12, 27:14, 27:16, 28:1, 28:3, 30:6, 30:10, 36:16, 41:18, 41:21, 42:18, 43:3
**difference** [2] - 33:6, 33:8
**differences** [1] - 33:15
**different** [7] - 13:20, 14:17, 18:8, 18:9, 19:23, 37:13, 37:15
**differently** [1] - 37:14

**difficult** [2] - 31:20, 37:1
**DIGUISEPPE** [4] - 2:2, 16:9, 34:5, 44:1
**DiGuiseppe** [1] - 2:3
**direct** [3] - 4:8, 15:5, 16:15
**Direct** [1] - 3:3
**DIRECT** [1] - 46:23
**DIRECTION** [1] - 46:24
**directly** [4] - 41:7, 41:20, 41:21, 42:20
**disability** [1] - 36:22
**display** [2] - 13:8, 39:20
**disposition** [2] - 13:5, 21:9
**distributors** [1] - 26:6
**District** [1] - 4:15
**DISTRICT** [2] - 1:3, 1:3
**document** [8] - 8:11, 8:16, 15:15, 15:18, 26:19, 27:4, 28:12, 28:19
**documents** [1] - 4:2
**DOES** [1] - 46:23
**done** [3] - 18:2, 30:17, 43:20
**down** [4] - 15:23, 17:10, 20:12, 22:2
**drawer** [1] - 12:23
**duly** [2] - 4:6, 46:9
**duty** [1] - 22:15

## E

**e-mails** [1] - 13:1
**easier** [3] - 31:8, 37:6, 37:18
**easiest** [1] - 30:22
**educational** [1] - 9:18
**effect** [1] - 29:10
**eight** [2] - 8:22, 33:20
**eighth** [1] - 22:2
**either** [4] - 11:17, 17:8, 29:19, 38:18
**elicit** [1] - 4:20
**empty** [1] - 15:1
**Enforcement** [1] - 22:6
**enforcement** [5] - 22:9, 22:14, 23:21, 27:12, 40:14
**entail** [1] - 12:12
**enter** [1] - 13:5
**entire** [1] - 21:6
**equipment** [1] - 14:23
**Esquire** [1] - 2:3
**estimate** [14] - 6:21,

6:23, 17:13, 17:16, 17:17, 18:1, 19:6, 19:10, 19:17, 30:13, 30:16, 30:22, 34:15, 38:9
**et** [2] - 4:13, 4:14
**exact** [1] - 18:2
**exactly** [2] - 21:15, 43:6
**examination** [1] - 8:23
**example** [4] - 19:4, 27:17, 33:5, 35:14
**excellent** [1] - 15:22
**except** [1] - 4:18
**exception** [2] - 30:24, 45:4
**Executive** [1] - 1:12
**Exhibit** [7] - 3:8, 4:3, 8:10, 15:14, 20:4, 26:17, 28:10
**exhibit** [1] - 20:7
**EXHIBITS** [1] - 1:2
**existing** [1] - 11:9
**expectations** [1] - 5:21
**expects** [1] - 38:2
**expensive** [1] - 15:3
**Expires** [1] - 46:20
**explain** [8] - 16:21, 22:4, 39:11, 39:17, 40:5, 40:6, 42:22, 43:20
**explanation** [1] - 19:13
**explicitly** [1] - 28:4

## F

**facilitate** [1] - 41:12
**facilities** [1] - 27:10
**facility** [1] - 23:3
**fact** [2] - 21:23, 43:8
**factors** [1] - 24:12
**fair** [2] - 17:20, 21:12
**fall** [2] - 14:7, 14:10
**falls** [1] - 14:1
**familiar** [5] - 5:23, 26:24, 28:15
**familiarity** [1] - 33:2
**far** [2] - 15:6, 15:8
**features** [1] - 28:6
**federal** [1] - 21:8
**Federal** [1] - 1:18
**FedEx** [1] - 13:3
**feet** [1] - 25:5
**few** [4] - 7:4, 9:16, 21:23, 35:1
**finish** [1] - 7:8
**finished** [2] - 6:7, 6:11
**firearm** [19] - 14:13,

3

14:20, 16:22, 21:7, 23:13, 24:8, 24:10, 26:2, 26:4, 28:8, 31:23, 34:22, 37:4, 38:2, 41:9, 42:1, 43:1, 43:3, 43:12
**FIREARMS** [1] - 1:6
**firearms** [23] - 10:6, 12:5, 12:13, 13:4, 13:11, 13:12, 13:17, 14:17, 14:21, 14:22, 16:1, 16:17, 16:21, 17:6, 17:19, 17:22, 18:4, 21:10, 33:3, 39:2, 41:2, 41:6, 41:7
**Firearms** [20] - 3:16, 3:17, 11:21, 23:19, 26:23, 27:1, 28:14, 28:16, 28:21, 29:4, 29:13, 29:15, 30:24, 32:19, 38:19, 40:5, 40:10, 40:11, 40:13, 40:15
**FIRM** [1] - 2:2
**first** [7] - 12:23, 20:13, 37:3, 37:8, 40:15, 41:22, 42:3
**First** [2] - 3:11, 15:20
**fit** [1] - 36:13
**five** [3] - 3:9, 8:15, 26:15
**fixed** [1] - 42:14
**Floor** [1] - 2:8
**follow** [1] - 29:14
**following** [1] - 45:4
**follows** [1] - 4:7
**footage** [1] - 42:12
**foregoing** [2] - 45:2, 46:12
**FOREGOING** [1] - 46:22
**formal** [5] - 32:21, 32:23, 33:12, 33:13, 34:14
**Formal** [5] - 3:17, 28:13, 28:15, 29:4, 29:12
**forth** [1] - 46:9
**four** [1] - 8:15
**FRANCES** [7] - 1:16, 3:4, 4:5, 5:8, 45:2, 45:19, 46:8
**Frances** [1] - 5:8
**free** [1] - 27:7
**frightened** [1] - 36:8
**full** [3] - 10:10, 10:18, 22:14
**full-time** [2] - 10:10, 10:18

**fuller** [2] - 7:2, 7:3
**function** [1] - 37:7
**functioning** [2] - 41:11, 42:1

## G

**Gen** [4] - 22:10, 22:12, 22:13
**GENERAL** [1] - 2:6
**General** [6] - 1:10, 1:20, 2:7, 4:10, 4:11, 43:2
**general** [1] - 43:4
**General's** [5] - 23:1, 23:4, 27:10, 28:23, 43:10
**generally** [1] - 6:15
**gesture** [1] - 6:3
**given** [3] - 18:15, 21:14, 45:3
**Glock** [4] - 22:3, 22:10, 22:12, 23:17
**Glocks** [3] - 31:1, 32:18, 33:13
**GOHLKE** [6] - 4:17, 16:13, 33:18, 34:1, 43:22, 44:2
**Gohlke** [4] - 2:7, 3:5, 4:8, 4:10
**GOVERNMENT** [1] - 2:7
**Grace** [3] - 2:7, 4:9, 16:9
**GRANATA** [1] - 1:5
**Granata** [1] - 4:13
**greases** [1] - 14:22
**greatest** [1] - 24:24
**gripped** [1] - 35:13
**grips** [1] - 37:21
**ground** [1] - 5:21
**group** [1] - 4:2
**grouped** [1] - 17:3
**guess** [2] - 6:19, 19:9
**GUN** [1] - 1:6
**gun** [10] - 11:10, 14:16, 18:24, 19:1, 36:12, 39:18, 39:20, 40:18, 40:23, 40:24
**Gun** [1] - 24:10
**Gunrunner** [24] - 3:12, 3:14, 4:13, 8:6, 9:23, 9:24, 10:1, 10:9, 10:17, 10:22, 11:2, 11:5, 11:16, 11:20, 11:24, 12:8, 12:14, 12:21, 13:10, 13:13, 13:16, 16:1, 16:16, 25:3
**Gunrunner's** [2] -

10:5, 20:18
**guns** [6] - 13:22, 17:21, 27:5, 27:11, 36:7, 36:8
**gunsmith** [2] - 12:7, 12:12

## H

**hand** [5] - 35:12, 35:13, 36:12, 37:22, 46:15
**handgun** [19] - 12:24, 21:19, 23:1, 23:2, 24:7, 28:23, 30:3, 32:15, 34:10, 34:17, 35:4, 35:6, 35:9, 35:10, 35:13, 36:17, 38:10, 39:6, 40:1
**Handguns** [1] - 21:17
**handguns** [20] - 13:21, 17:4, 17:9, 17:15, 17:19, 17:21, 18:4, 18:5, 18:15, 19:4, 19:16, 19:24, 22:3, 23:17, 24:1, 32:21, 33:11, 33:12, 33:16, 38:6
**hands** [2] - 35:14, 36:22
**hard** [2] - 6:4, 18:23
**hear** [1] - 10:14
**help** [2] - 10:20, 11:14
**hereby** [2] - 45:2, 46:7
**hereinbefore** [1] - 46:9
**hereunto** [1] - 46:14
**heritage** [1] - 32:18
**Heritage** [2] - 33:5, 33:7
**hidden** [1] - 23:13
**highest** [1] - 9:17
**hold** [2] - 11:24, 25:3
**holding** [1] - 32:4
**holsters** [1] - 14:11
**home** [4] - 35:19, 35:20, 36:1, 38:3
**honestly** [1] - 31:11
**hour** [1] - 33:23
**Howe** [1] - 2:3
**https://thegunrunnerllc.com/inventory** [1] - 20:14
**hunting** [1] - 34:13
**husband** [4] - 10:19, 11:1, 11:13, 24:11

## I

**identification** [1] - 4:4
**identified** [1] - 4:6
**identify** [2] - 15:24, 33:15
**imbedded** [2] - 23:13, 23:14
**improved** [1] - 25:1
**IN** [1] - 46:14
**in-stock** [1] - 21:13
**INC** [1] - 1:7
**including** [1] - 6:21
**indeed** [1] - 30:17
**Index** [1] - 1:2
**indicator** [1] - 23:12
**individual** [2] - 19:4, 38:2
**individual's** [1] - 37:22
**individuals** [1] - 35:5
**influence** [1] - 7:24
**inform** [1] - 39:6
**initial** [2] - 5:9, 23:19
**inquiring** [1] - 40:1
**inquiry** [1] - 43:14
**inside** [2] - 14:15, 36:1
**Institute** [1] - 9:19
**instructions** [1] - 7:11
**instructs** [2] - 5:1, 6:12
**interested** [2] - 35:4, 40:19
**interfere** [1] - 7:21
**interject** [1] - 16:10
**Interrogatories** [2] - 3:11, 15:20
**interrogatories** [3] - 4:8, 9:6, 15:11
**Interrogatory** [1] - 15:23
**interrogatory** [1] - 15:24
**inventory** [15] - 19:24, 20:1, 20:17, 21:2, 21:7, 21:13, 25:3, 25:8, 25:11, 25:21, 25:24, 32:5, 32:7, 33:3, 38:11
**involved** [2] - 10:12, 10:16
**issued** [1] - 12:1
**issues** [1] - 5:2
**iteration** [1] - 26:22

## J

**jammed** [1] - 42:9
**January** [1] - 16:2
**joined** [1] - 10:19

**JOY** [1] - 1:9
**JUDSON** [1] - 1:5
**June** [2] - 29:7, 46:20

## K

**Kathleen** [2] - 1:18, 46:5
**KATHLEEN** [1] - 46:18
**keep** [3] - 18:14, 18:18, 18:24
**Kimber** [2] - 32:20, 33:11
**Kimbers** [1] - 40:10
**kind** [3] - 30:1, 31:17, 36:24
**kinds** [1] - 41:5
**kits** [1] - 14:20
**knowing** [1] - 18:2
**knowledge** [3] - 17:16, 42:24, 46:13
**knows** [1] - 43:6

## L

**lack** [1] - 36:21
**large** [1] - 35:13
**large-gripped** [1] - 35:13
**larger** [1] - 37:21
**latest** [1] - 24:24
**LAW** [1] - 2:2
**Law** [1] - 22:6
**law** [6] - 22:8, 22:14, 23:21, 27:11, 39:8, 40:14
**lawsuit** [2] - 9:11, 11:17
**least** [1] - 21:3
**legal** [1] - 22:22
**LEO** [4] - 22:4, 22:6, 24:2
**less** [2] - 15:3, 38:1
**level** [1] - 9:17
**license** [7] - 12:3, 12:4, 12:5, 12:6, 12:11, 13:13, 13:24
**licensed** [1] - 43:4
**licenses** [3] - 11:24, 12:9, 13:11
**lightweight** [1] - 38:16
**likely** [2] - 17:19, 41:9
**Line** [1] - 45:5
**line** [3] - 16:15, 22:2, 42:6
**list** [2] - 21:24, 27:11
**listed** [3] - 23:24, 40:9, 45:4
**literally** [2] - 40:8, 40:13

App. 409

4

**LLC** [8] - 1:6, 3:12, 3:14, 4:13, 8:6, 9:23, 10:1, 16:1
**load** [5] - 23:12, 37:3, 37:8, 42:6, 42:9
**loading** [1] - 42:3
**location** [3] - 12:15, 12:17, 25:7
**locked** [1] - 12:24
**log** [1] - 23:16
**logged** [1] - 13:4
**look** [1] - 12:22
**looking** [9] - 13:15, 16:14, 21:10, 21:16, 22:2, 35:10, 35:18, 35:20, 36:3
**Louise** [1] - 5:9
**low** [1] - 18:24

### M

**magazine** [1] - 37:3
**mails** [1] - 13:1
**maintain** [2] - 14:22, 20:23
**major** [2] - 27:24, 33:21
**majority** [4] - 17:21, 31:1, 36:6, 38:24
**manufacturer** [11] - 14:19, 15:5, 27:17, 31:1, 40:7, 41:12, 41:20, 42:12, 42:20, 43:18
**manufacturer's** [1] - 30:9
**manufacturers** [8] - 19:22, 27:22, 27:24, 33:10, 37:6, 41:3, 41:6, 41:8
**Mass** [16] - 23:9, 24:14, 27:12, 27:15, 27:20, 28:4, 30:11, 30:15, 31:8, 32:3, 32:17, 32:20, 38:19, 41:18, 42:16, 42:18
**MASSACHUSETTS** [2] - 1:3, 46:3
**Massachusetts** [21] - 1:11, 1:14, 1:20, 1:21, 1:23, 2:9, 4:16, 5:19, 12:1, 22:18, 23:6, 23:22, 28:2, 28:8, 29:18, 29:22, 31:3, 36:5, 39:8, 43:11, 46:6
**match** [1] - 23:15
**matter** [2] - 4:13, 46:12
**maximum** [1] - 25:15

**McHugh** [2] - 1:18, 46:5
**MCHUGH** [1] - 46:18
**mean** [5] - 10:1, 10:2, 22:21, 22:22, 24:2
**MEANS** [1] - 46:23
**means** [2] - 7:16, 23:20
**measure** [2] - 35:12, 36:11
**mechanisms** [1] - 26:1
**medication** [1] - 8:1
**meet** [2] - 9:3, 37:12
**member** [1] - 11:20
**membership** [1] - 11:22
**mentioned** [2] - 13:10, 33:11
**merely** [1] - 17:11
**metric** [1] - 30:21
**middle** [1] - 5:8
**Middleborough** [2] - 5:19, 12:18
**might** [7] - 5:23, 19:12, 26:2, 36:12, 36:23, 40:18, 41:24
**Mike** [1] - 5:19
**mind** [1] - 33:1
**minutes** [1] - 33:20
**model** [19] - 18:21, 18:22, 22:8, 24:21, 24:22, 25:1, 27:18, 29:14, 29:18, 30:3, 30:7, 32:4, 32:8, 33:7, 36:17, 39:6, 39:12, 40:1
**models** [27] - 16:4, 18:5, 18:10, 18:21, 19:14, 19:17, 19:23, 21:19, 21:23, 23:24, 24:7, 24:10, 30:13, 30:16, 31:4, 31:15, 32:15, 35:8, 36:17, 37:5, 37:12, 37:15, 37:17, 37:18, 37:20, 37:24, 38:10
**moisture** [1] - 14:16
**moment** [3] - 15:7, 15:9, 21:14
**Monday** [1] - 1:21
**morning** [1] - 4:9
**most** [8] - 17:19, 24:23, 26:15, 26:22, 32:24, 33:23, 40:21, 41:9
**mostly** [1] - 11:14
**mount** [1] - 14:12
**MPN** [1] - 27:19
**MPNs** [1] - 28:1

**MR** [3] - 16:9, 34:5, 44:1
**MS** [6] - 4:17, 16:13, 33:18, 34:1, 43:22, 44:2
**multiple** [2] - 13:17, 18:10
**must** [1] - 7:17
**mute** [1] - 34:2

### N

**name** [2] - 4:9, 5:6
**named** [1] - 9:11
**nature** [4] - 4:22, 10:4, 35:22, 42:16
**necessarily** [1] - 36:2
**necessary** [1] - 14:12
**need** [2] - 7:5, 42:23
**needs** [1] - 42:13
**negotiated** [1] - 5:3
**net** [1] - 16:4
**neuropathy** [1] - 36:24
**new** [6] - 15:2, 15:4, 18:20, 18:21, 19:1, 41:10
**newer** [1] - 18:22
**newest** [2] - 24:21, 24:22
**next** [2] - 32:1, 42:6
**night** [3] - 13:1, 13:2, 35:21
**none** [2] - 32:19, 33:8
**North** [1] - 2:4
**Nos** [1] - 4:3
**NOT** [1] - 46:23
**Notarial** [1] - 46:15
**Notary** [4] - 1:19, 4:7, 46:5, 46:19
**note** [1] - 28:24
**noted** [1] - 16:13
**notes** [1] - 46:11
**nothing** [1] - 7:23
**Notice** [2] - 3:9, 8:14
**notice** [1] - 8:5
**number** [14] - 16:1, 16:3, 16:5, 17:8, 17:11, 17:14, 18:14, 18:19, 23:13, 23:15, 27:19, 30:21, 31:9
**numbers** [2] - 18:24, 19:20

### O

**oath** [1] - 7:14
**objection** [1] - 6:11
**objections** [3] - 4:18, 6:9, 16:11
**OF** [7] - 1:3, 1:16, 2:6,

46:3, 46:22, 46:23, 46:24
**offer** [3] - 12:11, 37:12, 37:15
**OFFICE** [1] - 2:6
**Office** [3] - 1:13, 1:20, 43:10
**officer** [1] - 40:14
**official** [2] - 1:9, 1:12
**often** [4] - 21:1, 34:24, 35:1, 41:1
**older** [1] - 36:23
**once** [3] - 6:5, 18:21, 21:3
**One** [2] - 1:20, 2:8
**one** [15] - 7:6, 11:17, 12:14, 18:1, 21:7, 21:10, 21:18, 23:15, 27:16, 30:7, 33:21, 34:19, 34:22, 37:1, 38:14
**ones** [2] - 33:16, 38:16
**open** [1] - 12:24
**operate** [1] - 25:14
**opposed** [1] - 17:21
**orally** [1] - 6:1
**order** [5] - 5:3, 14:23, 23:1, 26:9, 43:2
**ordering** [1] - 25:23
**orders** [1] - 26:14
**organization** [1] - 11:23
**organized** [2] - 40:6, 40:8
**outside** [1] - 35:20
**overall** [1] - 38:5
**overboard** [1] - 18:20
**own** [2] - 14:24, 33:3

### P

**P.C** [1] - 2:2
**page** [4] - 20:20, 20:22, 20:23, 21:2
**Page** [2] - 3:8, 45:5
**pages** [7] - 3:10, 3:13, 3:15, 8:15, 8:16, 20:6, 21:19
**PAGES** [1] - 1:1
**pains** [1] - 45:20
**paperwork** [2] - 10:23, 11:15
**paragraph** [2] - 28:22, 29:1
**part** [1] - 10:14
**particular** [17] - 11:23, 19:14, 19:17, 20:2, 21:19, 22:8, 24:17, 26:4, 29:3, 30:3, 32:14, 32:15, 33:14,

35:8, 39:11, 39:12, 42:24
**parties** [1] - 5:4
**party** [1] - 11:16
**pass** [3] - 27:7, 27:10, 27:20
**passed** [1] - 43:10
**passes** [1] - 23:5
**past** [1] - 29:1
**penalties** [1] - 45:20
**pending** [2] - 4:15, 7:7
**people** [9] - 14:15, 14:18, 14:20, 14:24, 24:24, 33:1, 36:7, 42:2, 42:4
**percent** [2] - 26:16, 34:19
**percentage** [7] - 17:7, 17:9, 17:14, 26:13, 30:19, 31:5, 31:7
**perform** [2] - 12:7, 37:7
**perhaps** [2] - 20:10, 31:5
**period** [1] - 18:24
**perjury** [1] - 45:20
**permitted** [3] - 24:2, 39:7, 40:2
**person** [1] - 37:1
**personal** [7] - 34:13, 34:17, 34:19, 35:5, 38:7, 38:11, 38:14
**perspective** [2] - 37:11, 38:5
**petite** [1] - 35:14
**philosophical** [1] - 22:21
**phone** [1] - 42:22
**physical** [2] - 25:2, 25:10
**pistol** [2] - 14:3, 14:10
**pistols** [3] - 13:21, 17:1, 17:2
**Place** [1] - 1:20, 2:8
**placement** [1] - 23:20
**Plaintiff** [3] - 3:11, 15:21, 16:16
**plaintiff** [1] - 11:18
**Plaintiffs** [2] - 1:7, 2:5
**point** [7] - 6:16, 13:6, 21:7, 23:7, 27:16, 29:1, 40:8
**police** [1] - 36:9
**Policy** [1] - 11:21
**POLICY** [1] - 1:7
**popular** [1] - 32:24
**popularity** [2] - 24:15, 24:20
**possession** [1] - 39:19

**possible** [1] - 25:18
**Postal** [1] - 13:3
**pound** [1] - 23:10
**powers** [1] - 22:14
**premarked** [1] - 4:3
**prepare** [2] - 9:4, 9:8
**prepared** [1] - 8:21
**present** [1] - 16:3
**preserved** [1] - 16:12
**pretty** [4] - 10:23, 14:9, 28:20, 34:18
**prevents** [1] - 22:22
**price** [2] - 13:6, 13:7
**pricing** [2] - 24:18, 26:7
**primarily** [3] - 12:13, 28:7, 38:24
**primary** [1] - 42:10
**Printout** [1] - 3:14
**privilege** [1] - 4:19
**problem** [2] - 41:10, 42:11
**problems** [1] - 41:24
**Procedure** [1] - 1:18
**PROCEEDINGS** [1] - 4:1
**process** [5] - 6:10, 29:14, 30:14, 32:2, 32:11
**product** [1] - 13:2
**products** [1] - 14:12
**Professional** [1] - 1:18
**properly** [4] - 41:11, 42:1, 42:7, 42:9
**proportion** [1] - 34:16
**PROSPERI** [1] - 1:6
**protect** [1] - 36:4
**protection** [9] - 34:13, 34:17, 34:20, 35:5, 35:19, 36:19, 38:7, 38:12, 38:14
**provide** [4] - 6:20, 7:3, 30:22, 31:18
**provided** [5] - 12:18, 15:12, 16:14, 29:17, 29:21
**provides** [1] - 7:2
**providing** [2] - 6:23, 16:17
**provisions** [1] - 1:17
**public** [4] - 23:16, 36:4, 38:3, 43:5
**Public** [6] - 1:13, 1:19, 4:7, 27:6, 46:5, 46:19
**pull** [3] - 23:11, 37:2, 42:5
**purchase** [4] - 25:20, 35:6, 36:18

**purchased** [1] - 41:10
**purchaser** [1] - 24:3
**purchases** [1] - 13:9
**purchasing** [3] - 34:10, 34:16, 35:4
**purpose** [4] - 27:4, 28:19, 34:10, 35:10
**purposes** [2] - 36:18, 38:12
**pursuant** [1] - 1:17
**put** [5] - 13:6, 13:7, 14:15, 23:4, 35:12

## Q

**qualifications** [1] - 37:13
**questions** [17] - 4:20, 5:1, 6:16, 7:17, 8:22, 9:17, 15:11, 33:22, 35:11, 35:16, 35:22, 35:24, 36:15, 37:14, 43:23, 43:24
**quickly** [1] - 16:10
**quite** [2] - 35:1
**quote** [2] - 22:17, 23:6

## R

**rack** [1] - 42:3
**racking** [2] - 37:7, 37:18
**range** [2] - 17:15, 31:17
**rather** [1] - 20:12
**Ray** [1] - 43:23
**Raymond** [1] - 2:3
**read** [1] - 45:2
**ready** [1] - 37:4
**realize** [1] - 39:1
**reason** [2] - 22:20, 22:21
**reasons** [5] - 34:12, 34:19, 39:14, 39:15, 39:22
**reasserted** [1] - 16:11
**receive** [1] - 13:2
**recent** [1] - 26:22
**Recessed** [1] - 34:7
**recognize** [7] - 8:11, 8:16, 15:15, 20:5, 20:7, 26:19, 28:11
**recommend** [2] - 35:9, 40:17
**recommendation** [1] - 35:24
**recommended** [1] - 36:9
**record** [6] - 4:17, 5:7, 6:2, 16:12, 45:4,

46:11
**records** [1] - 43:8
**Recross** [1] - 3:3
**Redirect** [1] - 3:3
**referring** [1] - 43:7
**refers** [1] - 22:5
**reflect** [1] - 19:23
**Registered** [1] - 1:18
**regulations** [2] - 23:1, 28:24
**REIDY** [1] - 1:11
**Reidy** [1] - 4:12
**related** [5] - 8:22, 10:6, 14:5, 14:8, 42:15
**reload** [1] - 14:24
**reloading** [1] - 14:23
**remember** [2] - 15:10, 39:16
**repair** [1] - 41:8
**repairs** [2] - 12:13, 41:23
**repeat** [1] - 6:18
**rephrase** [1] - 6:18
**REPORTER** [1] - 46:24
**Reporter** [3] - 1:19, 6:2, 6:5
**REPORTING** [1] - 1:22
**represent** [4] - 18:4, 19:10, 21:5, 21:6
**represented** [3] - 16:4, 19:15, 19:18
**representing** [3] - 4:11, 19:21, 19:22
**represents** [3] - 18:6, 21:12, 26:14
**REPRODUCTION** [1] - 46:23
**request** [1] - 32:10
**requested** [1] - 40:22
**requesting** [1] - 32:9
**requests** [2] - 24:15, 26:3
**require** [1] - 19:12
**required** [4] - 23:18, 28:5, 43:15, 43:19
**requirement** [1] - 22:22
**requirements** [3] - 23:9, 32:16, 38:20
**reserved** [1] - 4:19
**resolved** [1] - 5:3
**respect** [2] - 36:22, 38:15
**respond** [1] - 40:2
**responding** [1] - 6:12
**Response** [1] - 3:11
**response** [2] - 6:2,

6:20
**Responses** [1] - 15:19
**responses** [2] - 4:21, 35:23
**restock** [1] - 19:2
**results** [1] - 43:9
**Resumed** [1] - 34:8
**retail** [3] - 10:6, 10:24, 25:4
**retired** [1] - 10:18
**return** [2] - 35:2, 41:12
**returned** [1] - 41:14
**review** [2] - 8:4, 13:1
**reviewed** [1] - 9:5
**reviewing** [1] - 9:1
**revolver** [3] - 14:3, 14:10, 33:7
**revolvers** [5] - 13:22, 17:1, 17:3, 32:19, 33:5
**rifle** [2] - 14:3, 14:10
**rifles** [2] - 13:23, 16:24
**rigorous** [2] - 23:5, 23:10
**rings** [1] - 14:14
**role** [3] - 10:21, 10:22, 12:20
**roster** [15] - 23:20, 27:8, 29:2, 29:7, 29:12, 30:15, 31:2, 31:5, 32:3, 32:17, 32:22, 32:23, 33:12, 33:13, 39:1
**Roster** [18] - 3:16, 3:18, 23:19, 26:23, 27:1, 28:14, 28:16, 28:21, 29:4, 29:13, 29:15, 30:24, 38:19, 40:5, 40:10, 40:11, 40:13, 40:16
**rosters** [6] - 29:9, 29:19, 29:24, 30:4, 30:7, 30:20
**roughly** [2] - 10:10, 25:5
**Ruger** [1] - 27:18
**Rules** [1] - 1:18
**run** [1] - 11:13
**Runner** [1] - 24:10
**RUNNER** [1] - 1:6
**rust** [1] - 14:17

## S

**safes** [1] - 14:16
**safety** [1] - 43:3
**Safety** [2] - 1:13, 27:7
**sale** [3] - 13:6, 22:18, 37:12

**sales** [9] - 10:6, 10:24, 16:4, 17:16, 17:22, 23:1, 26:10, 26:13, 28:23
**SAME** [1] - 46:23
**satisfactorily** [1] - 4:6
**savvy** [1] - 27:23
**Schedule** [2] - 8:5, 8:16
**scope** [2] - 14:12, 14:14
**scopes** [1] - 14:11
**screen** [2] - 20:8, 20:17
**scroll** [1] - 15:23
**Seal** [1] - 46:15
**second** [1] - 20:20
**secretary** [2] - 9:20, 10:19
**Secretary** [2] - 1:12, 4:11
**section** [3] - 20:17, 21:16, 24:1
**Security** [1] - 1:13
**see** [11] - 8:9, 20:6, 20:10, 21:17, 29:5, 31:7, 36:7, 36:8, 36:12, 41:13, 43:8
**See** [1] - 1:2
**self** [1] - 36:19
**self-protection** [1] - 36:19
**sell** [30] - 12:4, 12:5, 13:11, 13:13, 13:16, 14:1, 14:4, 22:11, 22:13, 23:2, 23:7, 23:21, 23:23, 24:3, 24:16, 26:2, 27:11, 30:2, 30:18, 33:16, 38:6, 39:2, 39:7, 40:2, 40:12, 40:14, 40:18, 40:23, 40:24, 43:4
**selling** [1] - 22:23
**send** [1] - 42:11
**sense** [1] - 24:21
**sent** [1] - 8:6
**separate** [4] - 12:4, 12:5, 12:6, 25:7
**September** [2] - 10:11, 11:8
**serial** [2] - 23:13, 23:14
**series** [1] - 23:5
**service** [1] - 27:7
**Service** [1] - 13:3
**services** [2] - 12:7, 12:11
**Set** [1] - 15:20
**set** [3] - 12:23, 46:9,

6

46:15
**share** [5] - 8:9, 8:10, 15:14, 20:4, 26:17
**sharing** [4] - 9:10, 17:24, 24:6, 28:9
**sheet** [1] - 20:13
**shoot** [1] - 37:5
**Shooting** [5] - 3:17, 28:14, 28:16, 29:4, 29:13
**shooting** [4] - 32:22, 32:23, 34:14
**shop** [1] - 39:20
**short** [1] - 33:18
**Shorthand** [1] - 1:19
**shot** [5] - 14:2, 14:21, 15:1, 20:17, 42:6
**shotgun** [2] - 14:3, 14:10
**shotguns** [2] - 13:23, 16:24
**shots** [1] - 20:8
**show** [2] - 15:22, 21:5
**sights** [2] - 14:18, 14:19
**Signed** [1] - 45:20
**situation** [1] - 40:22
**situations** [1] - 39:11
**size** [2] - 36:12, 37:22
**skill** [1] - 46:13
**SKU** [1] - 27:19
**SKUs** [1] - 28:1
**slide** [3] - 37:2, 37:7, 42:3
**small** [2] - 20:11, 35:14
**smaller** [3] - 20:12, 37:21, 38:15
**sold** [5] - 16:1, 16:17, 17:6, 21:11, 29:20
**solely** [1] - 11:13
**solvents** [1] - 14:22
**someone** [9] - 32:9, 33:3, 35:9, 36:18, 37:1, 37:13, 39:18, 39:24, 42:23
**sometimes** [1] - 41:18
**somewhere** [1] - 42:13
**sooner** [1] - 7:5
**sorry** [5] - 10:14, 20:11, 21:17, 26:12, 41:16
**sort** [3] - 5:21, 22:21, 23:11
**sounds** [1] - 34:5
**Southport** [1] - 2:4
**space** [5] - 4:24, 25:2, 25:6, 25:10, 25:12
**special** [3] - 26:9,

26:14, 32:10
**specific** [2] - 27:18, 31:23
**specifically** [1] - 18:15
**spell** [1] - 5:6
**square** [2] - 25:4, 25:5
**SS** [1] - 46:4
**start** [2] - 5:5, 10:17
**started** [1] - 11:7
**starting** [1] - 19:9
**state** [5] - 5:6, 5:16, 12:6, 16:10, 36:6
**states** [1] - 30:10
**STATES** [1] - 1:3
**stating** [3] - 28:4, 28:7, 39:5
**STEFANO** [1] - 1:5
**stenotype** [1] - 46:11
**steps** [1] - 30:1
**still** [3] - 6:13, 11:1, 40:24
**stipulated** [1] - 4:18
**stock** [16] - 18:15, 18:19, 19:5, 19:21, 21:13, 21:20, 24:10, 25:11, 25:16, 25:21, 26:5, 31:24, 32:5, 32:9, 32:15, 33:7
**stop** [4] - 9:10, 17:24, 24:6, 28:9
**store** [3] - 20:2, 25:5, 25:8
**stovepiping** [1] - 42:8
**Street** [3] - 1:23, 2:3, 5:18
**strictly** [1] - 35:19
**stuck** [1] - 18:23
**submit** [2] - 23:17, 43:8
**submitted** [8] - 23:3, 27:9, 27:19, 33:9, 43:1, 43:9, 43:15, 43:19
**subsequent** [1] - 42:5
**subsequently** [1] - 27:9
**substances** [1] - 8:1
**SUFFOLK** [1] - 46:4
**suggesting** [1] - 7:6
**suitable** [2] - 38:6, 38:11
**Suite** [1] - 2:4
**suited** [1] - 36:17
**supposed** [2] - 22:15
**supposedly** [1] - 25:1
**swiftly** [1] - 19:1
**sworn** [2] - 4:6, 46:10
**system** [1] - 13:6

# T

**tags** [1] - 13:7
**Target** [5] - 3:17, 28:13, 28:16, 29:4, 29:13
**target** [3] - 32:21, 32:23, 34:13
**technically** [2] - 36:5, 38:13
**ten** [2] - 23:10, 26:16
**ten-pound** [1] - 23:10
**tend** [1] - 24:20
**term** [4] - 9:24, 16:22, 17:4, 42:7
**terms** [3] - 13:24, 25:10, 25:15
**TERRENCE** [1] - 1:11
**tested** [1] - 27:6
**testified** [4] - 4:7, 9:13, 21:22, 30:8
**testify** [1] - 7:21
**testimony** [4] - 32:10, 45:3, 46:9, 46:10
**testing** [10] - 23:3, 23:10, 23:18, 27:8, 27:10, 33:9, 43:1, 43:9, 43:15, 43:19
**tests** [2] - 23:5, 27:10
**THE** [8] - 1:6, 2:2, 2:6, 34:4, 46:22, 46:23, 46:23, 46:24
**themselves** [1] - 36:4
**therefore** [2] - 36:8, 40:11
**thereto** [1] - 10:7
**they've** [2] - 14:21, 39:20
**thinking** [1] - 37:10
**third** [2] - 28:22, 28:24
**thirds** [1] - 17:18
**THIS** [1] - 46:22
**THOMAS** [1] - 1:5
**thousand** [1] - 26:11
**three** [3] - 12:8, 21:18, 21:19
**throughout** [2] - 6:10, 7:5
**titled** [1] - 21:17
**TO** [1] - 46:23
**today** [3] - 7:14, 7:22, 9:4
**together** [1] - 17:3
**top** [1] - 28:11
**topics** [3] - 8:4, 8:20, 8:22
**total** [6] - 16:4, 17:11, 17:14, 17:19, 19:16, 26:10, 26:12, 30:19
**tracking** [1] - 28:5

**transcribe** [1] - 6:5
**TRANSCRIPT** [1] - 46:22
**transcript** [3] - 6:4, 45:2, 45:3
**transfer** [2] - 39:3, 43:5
**trial** [1] - 4:19
**tried** [1] - 21:7
**trigger** [2] - 23:11, 42:5
**true** [2] - 45:3, 46:10
**truthfully** [3] - 7:17, 7:22, 8:2
**try** [5] - 15:16, 18:18, 18:22, 21:3, 25:17
**trying** [1] - 42:18
**Tuesday** [1] - 20:21
**turn** [2] - 34:1, 34:2
**two** [9] - 6:5, 8:16, 11:5, 17:18, 21:18, 29:9, 29:19, 30:4, 30:7
**two-thirds** [1] - 17:18
**type** [1] - 41:16
**types** [6] - 13:17, 13:20, 14:18, 35:16, 38:22, 41:23
**typical** [3] - 12:21, 19:24, 20:1
**typically** [7] - 15:20, 25:22, 30:9, 35:6, 35:20, 36:20, 40:23

# U

**U.S** [1] - 13:3
**unable** [1] - 41:18
**unaccompanied** [1] - 35:21
**UNDER** [1] - 46:23
**under** [11] - 7:14, 7:24, 13:13, 14:1, 14:7, 17:4, 21:18, 22:24, 24:1, 41:9, 45:20
**UNITED** [1] - 1:3
**units** [1] - 14:15
**unless** [6] - 5:1, 6:12, 23:21, 27:8, 40:15, 43:23
**UNLESS** [1] - 46:23
**unquote** [2] - 22:17, 23:6
**up** [7] - 12:23, 12:24, 17:11, 22:13, 31:2, 41:24
**update** [1] - 21:1
**updated** [2] - 20:21, 20:22
**updating** [1] - 20:24

**UPS** [1] - 13:3

# V

**various** [3] - 14:21, 27:22, 37:10
**vast** [1] - 38:24
**version** [4] - 19:1, 29:3, 29:9, 29:10
**versus** [1] - 38:3
**video** [1] - 34:2
**visible** [1] - 23:15
**voices** [1] - 6:5
**VOLUME** [1] - 1:1
**VS** [1] - 1:8

# W

**wait** [3] - 6:6, 6:10, 13:8
**walk** [1] - 30:1
**wants** [2] - 18:22, 25:19
**Wareham** [1] - 5:18
**WAREHAM** [1] - 5:18
**warehouse** [1] - 25:7
**warranty** [1] - 41:9
**ways** [1] - 26:2
**weapon** [1] - 22:15
**weapons** [1] - 22:23
**web** [1] - 20:23
**website** [12] - 3:14, 20:9, 20:18, 21:2, 21:4, 24:1, 27:24, 28:4, 28:7, 30:10, 41:19
**websites** [1] - 27:23
**week** [1] - 21:3
**whatsoever** [1] - 33:8
**whereas** [1] - 36:3
**WHEREOF** [1] - 46:14
**winds** [1] - 31:2
**WITNESS** [2] - 34:4, 46:14
**Witness** [1] - 3:3
**witness** [2] - 1:17, 46:8
**woman** [1] - 35:14
**word** [2] - 16:20, 36:21
**written** [1] - 15:12

# Y

**year** [5] - 16:2, 16:3, 16:16, 17:7, 17:12
**years** [1] - 33:4

7

| **Z** |
| --- |
| **ZOOM** [1] - 1:16 |

45

## C E R T I F I C A T E

I, **FRANCES COSTA,** do hereby certify
that I have read the foregoing transcript of
my testimony given on August 19, 2024, and I
further certify that said transcript is a true
and accurate record of said (with the exception
of the following corrections listed):

Page        Line            Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

See Attached Addendum
_____

Dated at *Middleboro MA*      , this *20th* day
of *September* , 2024.

*Frances L. Costa*
**FRANCES COSTA**

Signed under the pains and penalties of perjury.

App. 414

## ADDENDUM TO CERTIFICATE AND SIGNATURE PAGE

## DEPONENT FRANCES COSTA

I, the undersigned, Frances Costa, do hereby certify that I have read the foregoing deposition transcript and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINES | CHANGE |
|------|-------|--------|
| 8 | 8 | *Correction at line 8*: "do" should be "did" |
| 9 | 12 | *Correction to answer at line 12 ("I have not.")*: I was a party to the auto accident lawsuit referenced on page 5, line 15. |
| 11 | 22-23 | *Correction to answer at lines 22-23 ("I don't believe we have a membership in that particular organization.")*: The Gunrunner is a member of Firearms Policy Coalition. |
| 15 | 5 | *Correction to answer at line 5 ("direct a manufacturer")*: direct *from* a manufacturer |
| 23 | 16 | *Correction to answer at line 16 ("to the public so that I can log it into my box")*: to the public so that I can log it into my *book* |
| 32-33 | 24-1 | *Supplement to answer at 32:24 – 33:1*: Additional firearms that the GunRunner would stock and sell but for the challenged laws and regulations include the following:<br><br>Adam Arms<br>Alex Pro Firearms<br>Alpha Foxtrot<br>Alexander Arms<br>Altor<br>American Classic<br>American Precision Firearms<br>Anderson Mfg.<br>Angstadt Arms<br>Arex |

| | | Armalite |
|---|---|---|
| | | Armscor/Rock Island Armory [RIA] |
| | | Arsenal |
| | | ATI |
| | | Auto Ordnance |
| | | B&T |
| | | Beretta |
| | | Bersa |
| | | Black Rain Ordnance |
| | | Blue Line Global |
| | | Bond Arms |
| | | Bravo Co. |
| | | Brigade Manufacturing |
| | | Browning |
| | | Century Arms (Canik) |
| | | Charles Daly |
| | | Charter Arms |
| | | Chiappa |
| | | Christensen |
| | | Cimarron |
| | | Citadel |
| | | CMMG |
| | | Colt |
| | | CZ-USA |
| | | Dan Wesson |
| | | Daniel Defense |
| | | Del-Ton |
| | | Desert Eagle |
| | | Diamondback |
| | | DPMS |
| | | EAA Corp. |
| | | EMF |
| | | ET Arms |
| | | Faxon Arms |
| | | FK Brno |
| | | FMK |
| | | FN |
| | | Fostech |
| | | Foxtrot Mike |
| | | Franklin Armory |

| | | Freedom Ordnance |
|---|---|---|
| | | Fusion Firearms |
| | | Gforce Arms |
| | | Girsan |
| | | Glock |
| | | Grand Power |
| | | Great Lakes Firearms |
| | | Grey Ghost |
| | | GSG |
| | | Hammerli |
| | | Heckler & Koch [H&K] |
| | | Henry |
| | | Heritage Firearms |
| | | Hi-Point |
| | | Hogue |
| | | Inland |
| | | Iver Johnson |
| | | IWI |
| | | Just Right Carbines |
| | | Kahr Arms |
| | | Keystone Sporting Arms |
| | | Kel-Tec |
| | | Kimber |
| | | Kriss |
| | | Les Baer |
| | | LSI |
| | | LWRCI |
| | | LW Seecamp |
| | | Magnum Research |
| | | Masterpiece Arms |
| | | Military Armament Corp. [MAC] |
| | | Mission First Tactical |
| | | MKS Supply |
| | | Mossberg |
| | | Night Hawk Custom |
| | | North American Arms [NAA] |
| | | POF |
| | | PTR |
| | | Radical Firearms |
| | | Remington [REMARMS] |

| | | |
|---|---|---|
| | | Rhineland Arms |
| | | Rock River Arms |
| | | Rossi |
| | | Rost Martin |
| | | Ruger |
| | | Savage |
| | | SAR |
| | | SCCY |
| | | SDS Imports |
| | | Shadow Systems |
| | | Shark Coast Tactical |
| | | Sig Sauer |
| | | Silver Shadow |
| | | Smith & Wesson |
| | | Springfield Armory |
| | | Standard Mfg. |
| | | Steyr |
| | | STI |
| | | Tanfoglio |
| | | Taurus |
| | | Taylor's & Company |
| | | Thompson Center |
| | | Tisas |
| | | Traditions |
| | | TR Imports |
| | | Tristar |
| | | Troy Industries |
| | | Tyler |
| | | VKTR |
| | | Volquartsen Firearms |
| | | Wilson Combat |
| | | Wraithworks |
| | | Zastava |
| | | Zenith |
| | | Zev Tech |
| 33 | 8-9 | *Substitution for answer at lines 8-9 ("None whatsoever, no difference. They just have not submitted them for the testing.")*: The ergonomic features of the firearm, including trigger-pull weight (not required to be a minimum of ten |

| | | pounds), size, configuration, shape, overall weight, and color, as those features relate to the suitability, utility, and desirability of a firearm for a particular person based on the individual's hand size, strength, shape, any physical disabilities or limitations, and design needs and preferences. |
|---|---|---|
| 33 | 17 | *Substitution for answer at line 17 ("Nope.")*: The ergonomic features of the firearm, including trigger-pull weight (not required to be a minimum of ten pounds), size, configuration, shape, overall weight, and color, as those features relate to the suitability, utility, and desirability of a firearm for a particular person based on the individual's hand size, strength, shape, any physical disabilities or limitations, and design needs and preferences. |
| 39 | 23 | *Substitution for answer at line 17 ("No.")*: The ergonomic features of the firearm, including trigger-pull weight (not required to be a minimum of ten pounds), size, configuration, shape, overall weight, and color, as those features relate to the suitability, utility, and desirability of a firearm for a particular person based on the individual's hand size, strength, shape, any physical disabilities or limitations, and design needs and preferences. |

Date: 09/20/2024

*Frances L. Costa*
Frances Costa

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, CAMERON PROSPERI,
THE GUN RUNNER, LLC, AND FIREARMS
POLICY COALITION, INC.,

                                   Plaintiffs,              CIVIL ACTION
                                                            NO. 1:21-cv-10960-DJC
                    v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
AND TERRENCE M. REIDY, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE
EXECUTIVE OFFICE OF PUBLIC SAFETY
AND SECURITY OF THE COMMONWEALTH
OF MASSACHUSETTS,

                                   Defendants.

**DECLARATION OF PETER LUCIER IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

Peter Lucier, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      The evidence set out in the foregoing declaration is based on my personal

knowledge.

2.      I am a veteran of the United States Marine Corps and a former Marine Corps

firearms instructor. I hold a Juris Doctor from Saint Louis University. My current and past work

involves using and teaching others about firearms as well as consulting about firearms. The

Massachusetts Attorney General's Office retained me as a consultant to review handguns on the

1

App. 420

Massachusetts Approved Firearms Roster[1] for compliance with the Attorney General's Handgun Sales Regulations.[2]

     3.    I am in the process of reviewing the semi-automatic handguns on the roster for compliance with the Attorney General's Handgun Sales Regulations by (1) reviewing materials including specifications, manuals, publicly-available test results, and other documentation as necessary and (2) physically reviewing handguns as needed to resolve any questions remaining after documentary review.

     4.    Thus far, I have reviewed all 694 of the semi-automatic handguns on the Approved Firearms Roster. Based on my review, with the current information available, 562 satisfy the Attorney General's Handgun Sales Regulations.

     5.    The 395 revolvers on the Approved Firearms Roster are still under review.

     I declare under penalty of perjury that the foregoing is true and correct. Executed on February 5, 2025.

                             */s/ Peter Lucier*
                             Peter Lucier

---

[1] Approved Firearms Roster 12/2023 Amended.

[2] 940 CMR: Handgun Sales, 02/19/1999.

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 5, 2025.

<div align="center">

*/s/ Grace Gohlke*
Grace Gohlke
Assistant Attorney General

</div>

App. 422

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, CAMERON PROSPERI,
THE GUN RUNNER, LLC, AND FIREARMS
POLICY COALITION, INC.,

Plaintiffs,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
AND TERRENCE M. REIDY, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE
EXECUTIVE OFFICE OF PUBLIC SAFETY
AND SECURITY OF THE COMMONWEALTH
OF MASSACHUSETTS,

Defendants.

CIVIL ACTION
NO. 1:21-cv-10960-DJC

**Leave to file allowed on March 13, 2025**

**SECOND DECLARATION OF PETER LUCIER IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Peter Lucier, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      The evidence set out in the foregoing declaration is based on my personal knowledge.

2.      I am a veteran of the United States Marine Corps and a former Marine Corps firearms instructor. I hold a Juris Doctor from Saint Louis University. My current and past work involves using and teaching others about firearms as well as consulting about firearms. The Massachusetts Attorney General's Office retained me as a consultant to review handguns on the

1

App. 423

Massachusetts Approved Firearms Roster[1] for compliance with the Attorney General's Handgun Sales Regulations.[2]

3.      I reviewed the handguns on the roster for compliance with the Attorney General's Handgun Sales Regulations by (1) reviewing materials including specifications, manuals, publicly-available test results, and other documentation as necessary and (2) physically reviewing handguns as needed to resolve any questions remaining after documentary review.

4.      Based on my review of 1,160 handgun models on the Approved Firearms Roster, with the current information available, and consistent with the Attorney General's July 16, 2004, Consumer Advisory on Glock Handguns,[3] at least 1,029 handgun models on the Approved Firearms Roster also comply with the Attorney General's Handgun Sales Regulations.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 12, 2025.

*/s/ Peter Lucier*
Peter Lucier

---

[1] I reviewed Approved Firearms Roster as of June 2024. Since June 2024, another 14 handgun models have been added to the Approved Firearms Roster.

[2] 940 Mass. Code Regs. §§ 16.00 *et seq*.

[3] Available at https://www.mass.gov/files/documents/2016/12/wg/ag-handgun-regulation-enforcement-notices.pdf

App. 424

## CERTIFICATE OF SERVICE

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 13, 2025.

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban
Assistant Attorney General

3

App. 425

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEFANO GRANATA; CAMERON PROSPERI; THE GUN RUNNER, LLC; and FIREARMS POLICY COALITION, INC.,<br><br>         Plaintiffs,<br><br>v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and TERRENCE M. REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,<br><br>         Defendants. | CIVIL ACTION<br>NO. 1:21-cv-10960-DJC |

## NOTICE OF APPEAL

Plaintiffs Stefano Granata, Cameron Prosperi, The Gun Runner, LLC, and Firearms Policy Coalition, Inc., hereby appeal to the United States Court of Appeals for the First Circuit from this Court's memorandum and order, Doc. 103, and judgment, Doc. 104, entered on August 29, 2025, in this case.

Dated: September 24, 2025

              Respectfully Submitted,

              /s/ David H. Thompson

Richard C. Chambers, Jr., Esq.    David H. Thompson
(BBO# 651251)         (*Admitted Pro Hac Vice*)
Chambers Law Office       Peter A. Patterson
              (*Admitted Pro Hac Vice*)
              William V. Bergstrom
              (*Admitted Pro Hac Vice*)
              COOPER & KIRK, PLLC
              1523 New Hampshire Ave., N.W.
              Washington, D.C. 20036
              (202) 220-9600
              (202) 220-9601 (fax)
              dthompson@cooperkirk.com

1

App. 426

*Admitted *pro hac vice*

*Attorneys for Plaintiffs- Appellants*

App. 427

**CERTIFICATE OF SERVICE**

I certify that on September 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel who have entered an appearance.

<div align="right">

*/s/ David H. Thompson*
David H. Thompson
*(Admitted Pro Hac Vice)*

*Attorney for Plaintiffs-Appellants*

</div>

App. 428

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

STEFANO GRANATA, et al.,

                Plaintiffs,      Civil Action
                                 No. 21-10960-DJC
V.

                                 March 26, 2025
MAURA HEALEY, et al.,           1:58 p.m.

                Defendants.
_____


TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. KANE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
debrakane0711@gmail.com

1   APPEARANCES:

2   FOR THE PLAINTIFFS:

3   RICHARD CULLIN CHAMBERS, JR., ESQ.
    Chambers Law Office
4   Suite 404
    220 Broadway
5   Lynnfield, MA 01940
    781-581-2031
6   richard@chamberslawoffice.com

7   WILLIAM V. BERGSTROM, ESQ.
    Cooper & Kirk, PLLC
8   1523 New Hampshire Ave., N.W.
    Washington, DC 20036
9   202-220-9622
    wbergstrom@cooperkirk.com

10
    FOR THE DEFENDANTS:
11
    PHOEBE FISCHER-GROBAN, ESQ.
12  GRACE GOHLKE, ESQ.
    Massachusetts Attorney General's Office
13  McCormack Building
    One Ashburton Place
14  Boston, MA 02108
    617-963-2589
15  phoebe.fischer-groban@mass.gov
    grace.gohlke@mass.gov

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

        (The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on March 26, 2025.)

        THE CLERK:  All rise.

        (The Court entered the courtroom.)

        THE CLERK:  Court is in session.  Please be seated.

        Civil action 21-10960, <u>Granata, et al. v. Healey, et al.</u>

        Would counsel please state your name for the record.

        MR. CHAMBERS:  Good afternoon, your Honor.  Richard Chambers, Jr. for the plaintiff.  With me is Will Bergstrom, *pro hac vice*, for Stefano.

        THE COURT:  Thank you.  Good afternoon to you both.

        MR. BERGSTROM:  Good afternoon.

        MS. FISCHER-GROBAN:  Good afternoon, your Honor.  Assistant Attorney General Phoebe Fischer-Groban on behalf of state defendants.

        THE COURT:  Good afternoon, counsel.

        MS. GOHLKE:  And Grace Gohlke also on behalf of state defendants.

        THE COURT:  Good afternoon.

        Counsel, I know we're here on cross-motions for

summary judgment.  I've had a chance to read the motion papers

on either side.  I'm prepared to hear argument.

Counsel, I would hear from plaintiffs first, since I

think you filed your motions first, then I'll let the defense

respond, and then, if you want some rebuttal time after that,

I'll let you have that.

Counsel.

MR. BERGSTROM:  Thank you, your Honor.  Will

Bergstrom.

02:00  THE COURT:  And you should rise.  Thank you.

And you should feel free to use the podium if that

would be easier.

MR. BERGSTROM:  If you don't mind, thank you.

THE COURT:  Thank you.

MR. BERGSTROM:  Thank you, your Honor.  May it please

the Court.  My name is Will Bergstrom, as Mr. Chambers

introduced me, and I represent the plaintiffs in this matter.

The state's argument in this case hinges on the Court

accepting either of two propositions that are at least in

02:00  significant tension with each other:  Either the Second

Amendment's plain text is not even implicated in this case,

because the burden that the handgun ban exacts on plaintiffs'

rights is so minimal that it never even intersects with the

plain text; or, in the alternative, if the text is implicated,

then the -- then the restrictions are so important that they're

 1  part of an important comprehensive network of state regulations

 2  aimed at reducing the dangers of firearms and ammunition and it

 3  fits into a tradition of laws they say that did something

 4  similar historically.  And in fact --

 5          THE COURT:  On behalf of Ms. Kane and myself, just

 6  slow down.  There are good arguments on both sides, counsel.  I

 7  want to make sure that I catch all of them.  So, thank you.

 8          MR. BERGSTROM:  Certainly, I'm sorry.

 9          I'll take the text first.

02:01 10         The Second Amendment is implicated in this case for

11  the straightforward reason that the law at issue bans the sale

12  of certain firearms.

13          Now the Second Amendment does not say "sale of arms"

14  or "commerce in arms," it says "keep and bear."  But we would

15  submit, your Honor, that there is no way to keep and bear arms

16  unless there is a way to acquire them.

17          The state says that because it is banning the

18  acquisition of arms and not directly the keeping of arms, that

19  that one step removed, to use their words, regulation

02:02 20  exonerates them.

21          THE COURT:  And so, counsel, isn't there some

22  suggestion and Supreme Court precedent in this area that there

23  is a distinction to be made in that regard, in regards to

24  keeping and bearing versus sale?

25          MR. BERGSTROM:  I don't think there's anything in the

1  Supreme Court precedent, your Honor, that suggests that that

2  distinction has validity --

3       THE COURT:  And to be more precise, my memory is that

4  Heller made some reference, right -- aren't there some

5  references in Heller and elsewhere in regards to not

6  questioning the right of the state to regulate for safety sake?

7       MR. BERGSTROM:  Well, so the language in Heller -- and

8  please correct me if I'm thinking of the wrong passage -- but I

9  believe the language in Heller, your Honor, I believe is

02:03 10  indicating is that the fact that Heller mentioned that certain

11  longstanding regulations it viewed as probably presumptively

12  lawful and included among those regulations that set conditions

13  or qualifications on the commercial sale of arms.

14       And I've got a couple of points in response to that.

15       THE COURT:  Sure.

16       MR. BERGSTROM:  The first would be that Heller did

17  not, when it said those laws were presumptively lawful, say

18  that they were outside the plain text of the Second Amendment.

19  In fact, had those laws been outside of the Second Amendment,

02:03 20  they wouldn't have been presumptively lawful.  They would have

21  been conclusively lawful since the plain text here, if we can't

22  cross that threshold, there's no more analysis to be done.

23       And I think we have to read that language in Heller in

24  light of what Bruen went on to say.  Because Bruen made very

25  clear that any time the law implicates the plain text of the

1    Second Amendment, you have to do this historical analysis.

2         So I think in light of Bruen, the best way to read

3    that language in Heller is the Supreme Court saying -- because

4    you have to remember, in Heller the Supreme Court was laying

5    down the law for the first time saying the Second Amendment

6    applies -- I'm sorry, I'll slow down.  I try to catch myself.

7         In Heller, the Supreme Court was saying that the

8    Second Amendment applies to an individual right to bear arms in

9    the first place.  And with this language it was trying to sound

02:04 10   a cautionary note to say not everything is going to be

11   unconstitutional because of this, and that it presumed that at

12   least some of the regulations that existed that put conditions

13   and qualifications on the commercial sale of arms would turn

14   out to be constitutional once the analysis was done.

15        Following Bruen, we know that that analysis involves

16   first looking at the plain text, and then analyzing historical

17   restrictions on the right.

18        And so the fact that it was presumptively lawful in

19   Heller I think suggests really that we do get past the plain

02:04 20   text here and we have to do the historical analysis.

21        I can turn to the historical analysis now, unless

22   there are further questions on the plain text.  But the

23   historical analysis here, your Honor, the state points to --

24        THE COURT:  And, counsel, is there -- is Bruen -- is

25   your position about Bruen -- or does Bruen require that either

1    it's covered by the plain text or it's not and then you go to

2    the -- and if it's covered you go to the historical analysis?

3    Is there a step in between those in regards to whether or not

4    it's infringed it or not, or is it just going from the plain

5    text to the historical analysis?

6           MR. BERGSTROM:  Your Honor, I think the plain text and

7    the historical analysis together is how this Court arrives at

8    the conclusion of whether or not a law infringes the right.  I

9    think whether the law infringes the right is the ultimate

02:05 10   question of the whole Bruen analysis.

11           So, in this case, because the regulation on acquiring

12   firearms implicates the right to keep and bear them, you go to

13   the historical analysis.  And you have to ask is the state's

14   regulation relevantly similar to historical regulations or

15   supported, to use the words in Rahimi, by the same historical

16   principle in those historical regulations.

17           And here the government has put forward several

18   analogs --

19           THE COURT:  And before you jump to that, because I do

02:06 20   want to hear both sides on the historical piece, I guess what I

21   was trying to get at with my last question is part of the

22   Attorney General's response is it's not covered by the plain

23   text because it's not impinging on the right to keep and bear

24   arms because, for one example, there are over a thousand

25   handguns that are available to not just the plaintiffs but just

citizens in the Commonwealth.  So what do you say to that?

MR. BERGSTROM:  What we say, your Honor, is that does not come in at the plain text stage.  Anything that restricts -- if there are a thousand handguns the plaintiffs can buy and the state only banned one, that would still implicate the plain text of the Second Amendment.  We would have to ask:  Is it historically justified?

The plain text is very broad and it doesn't make distinctions about how many firearms are available or the degree of the government's regulation.  In fact, I would say that the whole of the <u>Bruen</u> analysis is based on the idea that we should not be doing things like that at the outset.  Questioning whether or not a law is restrictive enough to be justified is exactly what courts were doing before <u>Bruen</u> came down.  And I think I would -- I believe it's the <u>Reese</u> opinion out of the Fifth Circuit that we quote in our brief emphasizes that this sort of analysis at the outset to narrow the right before we begin the <u>Bruen</u> analysis is exactly what <u>Bruen</u> was opposed to.

That may be relevant once we get to history, but it's not part of the text or anything that happens before --

THE COURT:  Even if the text says "keep and bear arms" not "purchase or sell arms"?

MR. BERGSTROM:  Yes, your Honor, because we think -- there's no way to purchase -- or there's no way to keep and

bear arms unless there's a way to acquire them.  Obviously most people are not making firearms.  Most people are going to the commercial marketplace and purchasing them.

So a law that intentionally restricts the ability to access the commercial marketplace for firearms necessarily implicates that plain text.  And from there, then, your Honor, we move onto history.

And as I mentioned, at history, the question is whether or not the historical analogs the state can point to were similarly justified to the modern law and burdened the right in a similar way.

And the state law leans most heavily on these proving laws, which I'd like to address first, because I understand there is a superficial similarity between them, but I think that they're actually quite different.

A proving law required -- to take the Massachusetts, I think, 1805 example first, it required that every firearm before it was sold be fired twice to test and make sure that it wasn't a defective product.  It was essentially a regulation to keep defective firearms from entering into commerce because defective firearms are dangerous; they could blow up in your hand, they could hurt somebody, and they had to be tested first.

But what that law did not do was restrict the type or the models of firearms available.  It only kept defective

1    examples of any firearm out of the market.

2          This law operates on an entirely different principle.

3    It keeps firearms out of the market -- first of all, it

4    presumes all firearms can't enter the market until approved by

5    Massachusetts; and then it keeps firearms out of the market not

6    based on their being defective or not being able to function as

7    firearms, because they lack certain features that Massachusetts

8    wishes manufacturers would include.  So that's different both

9    in how and why.

02:09 10          And I would add that, in reality, the effect of this

11    law, by forcing people who want to acquire a firearm that is

12    not approved for commercial sale, by forcing them to go to the

13    secondary market, it actually does something that's sort of the

14    opposite of what these proving laws would do.  Because when you

15    buy a new firearm from a dealer -- if I buy a Glock, for

16    example, from a federally licensed dealer --

17          THE COURT:  So a second market being resale as

18    opposed --

19          MR. BERGSTROM:  As opposed to people who are in the

02:10 20    business of selling firearms and sell more than five a year

21    can't sell firearms that Massachusetts doesn't approve for

22    sale.  Other sellers, people who sell less than four, five a

23    year, so usually people who are just selling a handgun they no

24    longer need, those people are not regulated by this law, and so

25    people could acquire a firearm through them.

1      But when you do that, you don't have a manufacturer's

2  warranty.  You don't have a guarantee that nobody else has used

3  this gun before, and you have no idea if the person who used it

4  before you, you know, abused it to the degree that it was no --

5  it may now be a defective firearm even if it was not sold as

6  one.

7      So the burden on the plaintiffs' rights is not the

8  same under these proving laws as under the handgun ban.

9      THE COURT:  And so -- but, counsel, is that -- you

02:11 10  know, I know there's some discussion in the caselaw I think

11  post-Bruen about this analysis being sort of historical

12  analogs, right, that they're sort of trying to figure out,

13  looking back at the founding colonial era for whether or not

14  these laws reflect those or an appropriate analog.

15      The fact that there are numerous provisions in the

16  statute and regs about safety, isn't that just a reflection of

17  the development in firearms and firearm safety?  Meaning, I

18  guess what I'm saying, how is it not -- how is it not an analog

19  in that regard, in terms of it being about safety?

02:11 20      MR. BERGSTROM:  Well, your Honor, I think that is

21  looking at it at too high a level of generality.  Because this

22  law purports to promote safety in two ways:  One is by

23  requiring manufacturers to send in handguns of a model that

24  they want to sell in the state for testing.  But the other way

25  is by saying that even if you do that, if your handgun doesn't

1    have certain features, if it doesn't have a 10-pound trigger

2    pull or if it doesn't have a chamber load indicator or a

3    magazine safety disconnect, if it lacks those things, even if

4    it's been sent in and tested, you still can't sell it in the

5    state.

6         And while there is nothing in the record, no

7    historical analog I'm aware of that says that the state can ban

8    sale of a firearm for lacking features that it wishes the

9    people would adopt.  And we mention in our brief, your Honor,

02:12 10   that when the Supreme Court held that handguns are protected in

11   Heller, it did so on the basis that they were in common use.

12   And it said that throughout history, the types of weapons

13   protected have been those that were typically possessed for

14   lawful purposes, is what it said about the firearms people

15   bring to malicious service or in common use for lawful

16   purposes.  And there is no tradition of the state banning

17   firearms that are in common use for lawful purposes because

18   they don't have safety features that the state would like them

19   to have.

02:13 20        And the reason that that makes sense, your Honor, is

21   because people, the American people who make the decisions of

22   what firearms to buy, they also care about their safety.  And

23   so if there is a change in firearms technology, as your Honor

24   suggested, that makes them safer to use and has no tradeoffs,

25   it's adopted.  But it's not something that the government has

1 ever forced top-down on the American people, and that's why

2 this law doesn't map onto the proving laws.

3          THE COURT:  Thank you.

4          MR. BERGSTROM:  If I can move on to the other analogs

5 the government suggests.

6          THE COURT:  Yes.

7          MR. BERGSTROM:  There's two types of gun powder

8 regulations, your Honor.  There is gunpowder proving laws, but

9 those are very like the handgun proving laws.  All those laws

02:14 10 existed to do was detect latent defects in gunpowder.  And so

11 that didn't burden the right in any meaningful way because it

12 didn't keep anybody from acquiring gunpowder.

13          The storage laws are a similar story.  It didn't keep

14 anybody from possessing gunpowder.  It limited where and how

15 much could be possessed at a time, but generally in large

16 enough quantities that it was not a restriction on the ability

17 to defend yourself or really on the ability to use your

18 firearm.  Again, those were justified on a completely different

19 basis.

02:14 20          In Ocean State Tactical, the 1st Circuit cited those

21 laws but it noted they were there to prevent mass casualty

22 events like city fires that could destroy blocks at a time if

23 gunpowder was inappropriately stored in wooden city buildings.

24          The final two sets of analogs the government relies

25 on, your Honor, are trap law guns and then laws restricting the

1  ability of minors to possess or acquire firearms.

2       As for the trap gun laws, those weren't restrictions

3  on possession of any type of firearm either.  Those were

4  restrictions on an unlawful thing to do with your firearm,

5  which was to set it up to go off in a trap, usually some sort

6  of string, was pulled.  And the reason that was prohibited, of

7  course, because there was no longer a person who was deciding

8  to pull the trigger in those instances.

9       The minor laws are similarly unrelated to the current

02:15 10  law.  Massachusetts today, your Honor, has laws that restrict

11  the ability of minors to acquire firearms.  So we have, I mean,

12  direct descendents of those laws that are not challenged in

13  this case and that serve those purposes.

14       So if there are further purposes about the history or

15  the text, I'm happy to answer them, otherwise I can reserve

16  some time and talk to you in rebuttal.

17       THE COURT:  Sure, I'll give you rebuttal time.  Thank

18  you.

19       MR. BERGSTROM:  Thank you, your Honor.

02:15 20       THE COURT:  Counsel, I'll hear from the defense.

21       MS. FISCHER-GROBAN:  Hi, your Honor.  Phoebe

22  Fischer-Groban on behalf of the defendants.  And I'll use the

23  podium, too, just because it is a little bit more comfortable

24  so I don't have to bend over.

25       So, your Honor, in this case, the handgun sales

regulations and laws that are at issue are basic and easily

attainable safety and performance standards for the commercial

sale of handguns.  They don't apply to the private sale of

handguns and they preserve broad access to handguns in

Massachusetts and they impose no restrictions on possession and

carrying of handguns in the state.

So the undisputed record here is that licensed

individuals in Massachusetts, like the plaintiffs in this case,

have access to a wide variety of modern handguns.  As your

Honor noted, there are over a thousand different models of

handguns that can be commercially purchased in Massachusetts at

licensed retailers; and furthermore, other handguns can be

purchased in private sales.  And the evidence in this case is

that there's also a robust private market outside of the

commercial market for handguns.

THE COURT:  So a few questions on that.

MS. FISCHER-GROBAN:  Yes.

THE COURT:  So am I to understand that if there's a

firearm that's not on the roster, it could still be subject to

private sale between a purchaser and a seller?

MS. FISCHER-GROBAN:  That's absolutely right.  The

roster requirement in the Attorney General's regulations only

apply to retailers who sell five or more firearms per year.  So

if you're selling fewer than that -- and the record shows

examples of that in the statements of fact and in the materials

 1   that we submitted -- there's actually a robust private market.

 2          I have a few numbers.  Last year alone, in 2024,

 3   commercial retailers reported 76,409 handgun sales in

 4   Massachusetts.  And that same year, there were an additional

 5   16,051 private sales of handguns reported in Massachusetts.

 6   And in the materials we submitted to your Honor, there's other

 7   details for the previous years indicating just kind of the

 8   breadth of the handgun market in Massachusetts.

 9          THE COURT:  And just to back up, what do you say to

02:18 10   your brother's argument sort of starting with the plain text,

11   that even though it's the right to keep and bear arms, it's

12   implicated -- the restrictions here on any type of sale,

13   whether it's just commercial or not, is covered by the plain

14   language for the purposes of the first step in the Bruen

15   analysis?

16          MS. FISCHER-GROBAN:  The plain text of the Second

17   Amendment says "keep and bear arms," and here, the statute and

18   regulations at issue here do not restrict the right to possess

19   or to bear arms.  Validly licensed individuals in Massachusetts

02:19 20   can still freely possess and bear arms.

21          So the plain text of the statute refers to those, and

22   that's what Heller is about and Bruen is about, is the

23   individual right to keep and bear arms, which are the terms

24   used in the plain text.

25          This is about the commercial sale of specific models

of handguns. And the courts that have looked at this question
look at what the course of conduct the plaintiffs in the case
seek to engage in. And here, the course of conduct is to
commercially purchase about 20 different models that they've
identified that do not appear on the firearms roster, or, if
they do, as in the case of Glocks, cannot be sold because they
do not have a load indicator, which is one of the requirements
for semiautomatic weapons that the Attorney General's
regulations impose.

02:20      So the courts have taken -- the courts that have
addressed this question have taken a somewhat similar approach.

When we're dealing with one of these kind of --
conduct that's ancillary to keeping and bearing, which, again,
the restrictions here do not restrict possession or bearing of
handguns, then we look to whether the -- somehow the impact of
these kind of ancillary, like the right to -- if this case is
about the right to commercially purchase weapons, we look to
whether -- the courts that have looked at this have concluded
that these type of ancillary conduct is protected to the extent
02:20 necessary to serve the textual right to keep and carry firearms
for self-defense. So, in other words, laws, state regulations
must meaningfully impair the right to keep and bear.

And here, the factual record shows that, in fact,
there is no meaningful impairment on the right to keep and bear
arms in Massachusetts because there are over a thousand

1    handguns that can be purchased.

2            THE COURT:  And when you cite to this language about

3    "meaningfully impair," is that to Supreme Court precedent or is

4    there -- are you citing that from caselaw?

5            MS. FISCHER-GROBAN:  So that language I'm citing to --

6    and these cases are cited in our papers -- I'm citing to the

7    9th Circuit in the B&L Productions case, which is a case where

8    that circuit took a close look at this question of whether the

9    plaintiffs' course of conduct falls within the plain text.

02:21 10   That was -- that case is about the sale and purchase of

11   firearms and ammunition on state property and whether a

12   prohibition on that type of conduct fell within the plain text

13   of the Second Amendment.

14           I'm also citing the 6th Circuit's decision in Oakland

15   Tactical Supply, that is also cited in our papers.  That case

16   was about engaging in firearms training.  And there, the court

17   concluded that while the ability to effectively use a weapon in

18   self-defense and being trained to do so is a part of the right

19   or is closely related to the right to keep and bear arms, in

02:22 20   that case, being able to engage in the kind of firearm training

21   that was prohibited, in this case in a town in Michigan, was

22   not -- and I'm quoting from the court, from the 6th Circuit

23   there -- was not necessary to effectuate those plaintiffs'

24   Second Amendment rights.

25           So these are not from Supreme Court precedent because

1    in the cases the Supreme Court has decided, the restrictions in

2    those cases, in <u>Rahimi</u> and <u>Bruen</u> and <u>Heller</u>, directly impacted

3    a person's ability to possess any weapon at all.

4         Here, this case is not about the ability to possess a

5    weapon.  And again, the factual record shows that -- the

6    ability that all properly licensed individuals in Massachusetts

7    have broad access to handguns in Massachusetts.

8         So then the question becomes do these safety

9    requirements for handguns in Massachusetts meaningfully impair

02:23 10   one's ability to keep and bear a weapon, and they do not.  And

11   thus, they fall outside the course of conduct that the

12   plaintiffs wish to engage in, and this case falls outside of

13   the plain text of the Second Amendment.

14        Additionally, there is this presumptively lawful

15   condition or qualification of the sale of arms.  That was

16   identified by the court in <u>Heller</u>.  And although the court has

17   not had opportunity to apply this category, it certainly hasn't

18   walked this back or concluded that this is not something that

19   applies.  And that's precisely what these laws are.  These are

02:23 20   conditions and qualification --

21        THE COURT:  And, counsel, this is probably not a fair

22   question because I have not digested the decision myself, but

23   is there anything about this new -- I think there's a new

24   decision on ghost guns by the Supreme Court.  Is there

25   anything -- and I'll ask your brother the same question, and,

again, it's probably not a fair question since I haven't
digested it -- but is there anything about that opinion that
you rely upon here?

      MS. FISCHER-GROBAN:  Not here.  But I will say, your
Honor, I personally have not had the opportunity to read that
decision, but my co-counsel may have.  But we would be happy
to, if there's anything in that decision we think would be
helpful to the Court's analysis, to submit a letter to the
Court after.  But standing here today, I am not relying on that
decision, and I, candidly, have not read it.

      THE COURT:  Well, if I give you that opportunity, I
will give the same obviously to the plaintiffs as well.

      MS. FISCHER-GROBAN:  Yes, of course.

      And I also want to talk about the -- just make a
couple of points about these restrictions here and respond to a
couple of things said by my brother.

      So these are safety and performance standards.  And
here, there are a series of kind of tests that firearm
manufacturers must make sure their handguns can satisfy before
they can be sold in Massachusetts, and I just want to make a
couple of other clarifying points to clarify some of those
requirements.

      The childproofing requirement, it's just some form of
childproofing that means that a child of five or under can't
operate the handgun.  It does not require a 10-pound trigger

pull.  That's simply an example provided of something that
might be child-proofing requirements.  And the safety or
magazine safety disconnect mechanism requirement is one of the
Attorney General's requirements, it's an alternative
requirement, so one or the other, and it only applies to
semiautomatic handguns.

      And so what about your brother's arguments that
these -- there's no historical analog for this type of
regulation of sales of firearms?

      MS. FISCHER-GROBAN:  I respectfully disagree, and let
me tell you why.

      We have built an incredibly robust record of the
analogs for these safety and performance requirements for arms.
And I want to emphasize something from the Supreme Court's
recent Rahimi decision.

      In Rahimi, the Supreme Court said that we are not
looking for historical twins, and that was what it faulted the
5th Circuit for in that decision, by being too persnickety
about how it was looking at the historical analogs.  In Rahimi,
the court said we are looking at principles, we are looking at
the principles that underpin our regulatory tradition of
firearm regulation and deciding whether those principles
support the regulation here.

      So we have identified two principals within our
tradition of firearm regulation, which is what Rahimi demands,

1  and it is all that <u>Rahimi</u> demands.

2          The first is quality control and safety of weapons and

3  gunpowder to address firearm accidents and injuries and make

4  sure that arms and gunpowder are fit for their intended

5  purpose.

6          And in the expert declarations that we submitted in

7  this case, there is a long history of both states and the

8  federal government, through the ordinance department and the

9  patronage systems for arms manufacturing, of exercising very

02:27 10  careful control over the safety and fitness of firearms

11  manufactured in the United States.

12          And the purpose -- this is extremely relevant on both

13  the why, which is to make sure that arms are safe and will

14  perform as intended, and also the how, which is through kind of

15  the performance testing that we require in Massachusetts.

16          I want to address one other point, which is the

17  requirement that semiautomatic handguns have either load

18  indicator or magazine safety disconnect.

19          THE COURT:  This is the Glock, counsel?

02:27 20          MS. FISCHER-GROBAN:  Well, Glock -- so, as our office

21  of consumer advisory said, so Glocks has something called I

22  think it's an extractor indicator.  It's like a load indicator,

23  but it doesn't clearly indicate whether the chamber is loaded.

24  So our office's position is that is not a load indicator, and

25  that's why Glocks don't satisfy our regulations.  But it does

have an indicator on it, it's just not -- it's not as clear
about whether there is a round in the chamber.

But the point I wish to make here is that at the time
of the founding when -- either 1791 or 1868, which are the
relevant periods of time -- most firearms were long guns, they
had to be muzzle loaded, so individually loaded.  They were not
stored loaded because gunpowder was incredibly corrosive.  And
so the nature of the technology of arms at that time was such
that arms were not going to accidently fire because they were
not kept loaded.

Here, the danger that the changes in firearm
technology have introduced is the danger that one can pick up a
loaded firearm and not know that it's loaded.  This is a danger
that was not -- that was not present.

And so Bruen tells us that when there are
technological changes, we can take a more nuanced approach.

THE COURT:  So, counsel, what do you say to your
brother's argument -- and obviously he disagrees with you about
the historical analogs, whether or not we're looking for twins
or following the Supreme Court's recent directive on not doing
so -- what do you say to your brother's argument, which I think
in part is if this were truly about safety, wouldn't it apply
both to personal sales and commercial sales?

MS. FISCHER-GROBAN:  So that's part of the means-end
scrutiny test that Bruen has made clear we can't apply.  In

other words, means-end scrutiny looked to whether -- it looked

to the state's interest and then it looks to whether the

regulation is kind of naturally tailored.  That's not the test

we're applying here.

Here, instead, we're looking for principles and we're

looking to see whether there are historical analogs and

principles underlying our history and tradition of firearm

regulation that are sufficiently analogous to the current state

regulations that we're looking at.  So that would be something

that the Court would apply in a means-end scrutiny test, but it

doesn't apply here, because <u>Bruen</u> rejected means-end scrutiny

and said that, instead, we use the text and then the historical

tradition test.

THE COURT:  Thank you.

MS. FISCHER-GROBAN:  I also want to make one

additional point about this tradition of federal patronage and

the history of the state proving laws and this oversight of the

safety and quality of arms in -- across the country.

Recently in <u>Ocean State Tactical</u>, the 1st Circuit

specifically rejected this argument that the constitutionality

of an arms requirement depends on ownership statistics in

that -- in that case if a lot of people owned large-capacity

magazines, then they must be constitutionally protected.  And

the 1st Circuit has rejected that argument, and the Court

should reject that same argument here.  Because, in

1 Massachusetts, the manufacturers are in control of whether

2 their arms can be sold here, and they shouldn't be in control,

3 and <u>Ocean State Tactical</u>, the court in <u>Ocean State Tactical</u>

4 specifically said that manufacturers can't be in control of the

5 Second Amendment analysis and what's protected.

6         Here, manufacturers can submit their handguns for

7 testing, and if they have to modify them in any way to satisfy

8 Massachusetts' requirement, it's easy for them to do so.

9         So the fact that arms are sold elsewhere doesn't mean

02:31 10 that it's not constitutional for us to subject them to

11 safety --

12         THE COURT:  For the purposes of what, this common-use

13 analysis?

14         MS. FISCHER-GROBAN:  Yes.  And the common-use

15 analysis -- as we argued in our memo of law, the common-use

16 analysis doesn't really apply here, because the common-use

17 analysis has been used to decide what is an arm under the

18 Second Amendment, and we don't dispute that these regulations

19 apply to handguns.  And then the common-use analysis is about

02:31 20 whether an arm under the Second Amendment can be banned, which

21 was the issue in <u>Heller</u>, the question of whether no one can

22 possess a handgun.

23         Here, that's not -- we don't dispute that this is

24 about handguns, but this is not a handgun ban.  And so common

25 use is simply not applicable here where, as I've mentioned,

there's over a thousand different models of handguns that can
be lawfully purchased from commercial retailers in
Massachusetts. And there's no restrictions on possession or
carrying of those handguns.

Another just smaller point I'll make on that, just
referring to recent Supreme Court caselaw, so in <u>Rahimi</u>, which
was a case about, again, a person being prohibited from
possessing a handgun, he made an argument that this is about a
handgun possession ban, I'm not allowed to possess a handgun
because I'm subject to a restraining order. And in <u>Rahimi</u>, the
Supreme Court said that <u>Heller</u> does not stand for a categorical
rule that handguns can't -- some people can't be prohibited
from possessing handguns. So <u>Rahimi</u> makes clear that <u>Heller</u> is
about whether you can prohibit everyone from possessing a
handgun which was at issue in that case.

Here, simply the fact that the state is imposing
quality standards and safety standards on handguns but still
preserving the ability to possess and carry a wide variety of
handgun models in the state does not bring this under <u>Heller</u>.

Your Honor, just a couple of other points on the
historical analogs, but, of course, I'm happy to answer
questions.

So the federal ordinance department and federal
patronage of firearm manufacturing in the state proving laws
for both firearms and gunpowder are remarkably similar to these

1   laws on both the two metrics that matter: how and why. They

2   impose safety and product standards, they preserve the right to

3   possess and carry a broad variety of handguns in the state.

4          Similarly, the firearm and gunpowder storage laws are

5   quite similar. At the time of the founding, the accident

6   danger of firearms was related to gunpowder and the fire and

7   explosion harms of gunpowder. Today we have different harms.

8   But the how and the why are the same. The how -- the why is

9   accidental injuries that are related to firearm possession but

02:34 10   that are incidental to the firing of the arm, accidents. And

11   the how is ensuring that firearms comply with safety standards

12   and have safety mechanisms on them, but, nonetheless,

13   preserving any robust market for firearms and the ability to

14   keep and carry firearms in the state.

15          Trap guns and our analogs related to trap guns, trap

16   guns are quite similar as well, because in that case, the issue

17   was that a person will come upon a firearm that is

18   unaccompanied. So a person would think -- an innocent

19   bystander thinks this gun poses no danger to me because there's

02:34 20   not somebody firing it, but the trap gun has been configured in

21   such a way that it can fire on that person. And that's quite

22   similar to what these -- the laws and regulations that are at

23   issue in this case do. They prevent firearms from firing

24   unexpectedly when a person doesn't expect that the firearm is

25   either loaded or is prone to accidental discharge if it is

dropped or if it is fired.

So there, the how is not prohibiting handguns, but prohibiting handguns that are configured in a certain way, which is similar to Massachusetts; and the why is the same, which is the risk of harm to kind of unsuspecting victims of trap guns.

Then, finally, on the fourth category of analogs, there is a robust tradition of protecting children from handgun possession. And here, it's important to note that technological changes. And specifically the ones that I've described, now arms can be kept loaded, they are not simply single-shot long guns that are difficult for a child to operate and that are generally not kept loaded. These dramatic technological changes have introduced significant harms to children from firearm accidents, and we've also included material about that in our papers.

And so this is another situation where, while we have very good analogs about protecting children from firearm accidents, specifically the toy pistols analogs that we've identified, as well as all of the kind of analogs prohibiting children from possessing firearms, here there's also a situation where perhaps a more nuanced approach is appropriate because the firearm -- the modern firearms are so much more dangerous to children than those were at the founding. So the principles, again, of protecting children and generally

1  protecting the public from firearm accidents is a robust

2  principle that also supports that requirement.

3           THE COURT:  Thank you.

4           MS. FISCHER-GROBAN:  Thank you, your Honor.

5           THE COURT:  Counsel, rebuttal.

6           MR. BERGSTROM:  Thank you, your Honor.

7           I have a couple of responses to my friend on the other

8  side's argument here.

9           The first would be that the state has repeatedly

02:37 10  mentioned in this argument that its ban is not a full ban, that

11  there is this private market that's available to acquire some

12  of these firearms secondhand.  As I noted in my initial

13  argument, there are plenty of reasons why that is not an

14  adequate replacement.  But the strangest part of that argument

15  is that that market exists only because other states have not

16  enacted the same law Massachusetts has here today.  And so

17  Massachusetts' justification for this law cannot be that it's

18  one of the few that's done this, because either this law is

19  okay under the Second Amendment, meaning everybody could do it,

02:37 20  or it's not okay because these firearms are in fact in common

21  use and of the sort that most people choose for themselves for

22  self-defense.

23           To the point about the plain text, your Honor, the

24  quote I was mentioning to you appears on page 4 of our reply

25  brief in this matter.  It's from Reese v. ATF, and I would

1   recommend that both <u>Reese</u> and <u>Hirschfeld</u>, which is a 4th

2   Circuit decision that's since been vacated as moot but I think

3   is still very persuasive, both addressed restrictions that are

4   very like this one, in that those involved the federal ban on

5   18- to 20-year-olds buying firearms or buying handguns

6   specifically from federally licensed dealers.  And just like

7   this began, 18-year-olds can possess a firearm and they can buy

8   one -- or a handgun and they can buy one on the secondary

9   market, but they're foreclosed from the regulated federally

02:38 10  licensed sort of channel of commerce here.  And both the 5th

11  Circuit and the 4th Circuit had no problem finding that that

12  was a meaningful restriction that got past the plain text of

13  the Second Amendment.

14         And Judge Jones in her decision in <u>Reese</u> said that the

15  baleful implications of limiting the right at the outset by

16  means of narrowing regulations not implied in the text are

17  obvious, step by step other limitations on sales could easily

18  displace the right.  I think that's the core of our point here.

19         The state has mentioned a 9th Circuit case in <u>B&L</u>

02:39 20  <u>Productions</u> and the 6th Circuit case in <u>Oakland Tactical</u>.  Only

21  <u>B&L</u> is about sales.  I would submit to your Honor that to the

22  extent <u>B&L</u> stands for the proposition that restrictions on

23  sales are acceptable as long as they leave some way to exercise

24  the right to defend yourself, I think that it's out of step

25  with the Supreme Court's decisions in <u>Bruen</u> and <u>Rahimi</u> and

1    <u>Heller</u> for the reasons we describe.  But even if this Court did

2    apply that, the restriction in <u>B&L</u> was about whether or not you

3    could hold a gun show on state grounds.  That is nowhere near

4    the same severity of a restriction as keeping people out of the

5    commercial market for handguns.  So even if you did apply that,

6    I think that we should still get past that threshold

7    restriction.

8           Another point I'd like to make, your Honor, moving

9    onto the historical analysis, the government tries to make its

02:40 10   how and why.  The relevantly similar metrics that <u>Bruen</u> gives

11   us are how and why the regulation burdens the right, and they

12   try and make this law similar to historical laws by emphasizing

13   how little, in the state's view, it burdens the right.  They

14   say people still have access to firearms and that was true

15   under the proving laws.

16          The problem with that argument, your Honor, is it's

17   exactly the same as a burden analysis under the old means-end

18   scrutiny analysis.  And <u>Bruen</u>, in Footnote 7 of <u>Bruen</u>, the

19   Supreme Court specifically warned against this type of

02:40 20   reasoning, saying that we should not be smuggling in the old

21   form of interest balancing under the guise of the analogical

22   inquiry.  And I'd submit to your Honor that's what's happening

23   there.

24          I did not mention patronage in my initial argument,

25   but the idea, your Honor, there is that the government has made

1  decisions about what firearms --

2        THE COURT:  I guess, counsel, just to go back for a

3  minute.

4        MR. BERGSTROM:  Yes.

5        THE COURT:  But still under the historical analysis,

6  the court, even under <u>Bruen</u>, has to think about whether or not

7  the restrictions have an analog, not necessarily a twin, but an

8  analog.  I mean, that's not dipping into means-ends analysis,

9  right?

02:41 10        MR. BERGSTROM:  No, your Honor.  But properly done,

11  the how of a regulation is in what way, not how much.  And what

12  I understand the government's argument here to be is how much

13  does it burden the right.  And that question is one that <u>Bruen</u>

14  forecloses this Court from asking.  It's not -- the Supreme

15  Court in <u>Heller</u> even, a similar argument was made there, where

16  the District of Columbia said you can own long guns in your

17  home so you don't need a handgun.  And the Supreme Court said

18  that that was no answer -- was the words it used -- that they

19  should be able to own other types of firearms, of the types

02:42 20  they want to choose for their self-defense.  They were not able

21  to access, that meant it was a burden on their right, and

22  because the arms that DC banned were in common use, they were

23  protected.

24        On that -- while we're on common use, your Honor, I

25  would just emphasize a couple of things.

1    The first is that even if this Court does not accept

2  that "common use" means that the handguns are categorically

3  protected, that does not mean the government lacks -- or the

4  government still needs to justify its regulation through the

5  historical analysis, so that wouldn't end the case.

6    However, I believe your Honor should accept the common

7  use means that these handguns are categorically protected.

8    When Heller discussed handguns as a class as

9  protected, it did not then mean the state could go and ban

02:42 10  specific examples of that class if it wanted to.  It's hard to

11  understand what "protected" would mean if it means the state

12  still gets to go and pick and choose which of the protected

13  arms people can lawfully buy or possess.

14    I believe that's -- addresses most of what I wanted --

15  oh, the patronage, excuse me, I wanted to address that.

16    I didn't mention this in my affirmative case, and the

17  reason is that the government's patronage of firearm

18  manufacturers by buying large orders of their firearms for

19  military use or by requiring certain specifications for

02:43 20  military arms to be met in order for the government to purchase

21  them is not like this law at all because it had no effect on

22  what law-abiding citizens could buy for themselves.  The

23  government still does this today.  It has military

24  specifications for the firearms it buys and it tests them.  And

25  that is one way that the state of Massachusetts still could

push development of firearms technology, is by insisting on
features in the firearms it itself purchases.  That's what --
if you look at the historical expert reports the state has put
in, they give the example of Samuel Colt, the inventor of the
Colt revolver and how the government -- the federal government
had initially refused to buy firearms from Colt because they
spotted problems with them.  He went back to the drawing board,
fixed it, they bought a bunch of them from him in the future.

The state still can exert that sort of pressure on the
marketplace if it is concerned with the safety of firearms
technology.  It can exert that sort of power, but it cannot --
because the government has specifications for the firearms it
buys and had specifications -- then use that as an excuse to
restrict the civilian marketplace today.

And unless your Honor has any further questions, I
thank you for your time.

THE COURT:  Thank you.

Thank you, counsel.

Counsel, I appreciate the arguments on either side.
As hopefully my questions to you reflected, your papers gave me
a lot to think about, as have your arguments today, and I want
to give it further consideration.

Again, on this ghost gun recent ruling by the Supreme
Court, counsel, if either side thinks there's anything from
that I should take from that ruling in considering your

1    arguments, I would give both sides leave.  Would a week's time

2    work, counsel?  Maybe no more than five pages either side, if

3    you think there's anything from that ruling that I should

4    consider here.

5           Other than that, I will take the matter under

6    advisement.

7           Thank you.

8           THE CLERK:  All rise.

9           (Court adjourned at 2:45 p.m.)

10                  - - - - - - - - - - - -

11                      CERTIFICATION

12           I certify that the foregoing is a correct transcript

13    of the record of proceedings in the above-entitled matter to

14    the best of my skill and ability.

15

16

17

18    /s/Debra M. Kane_____          November 10, 2025_____
      Debra M. Kane, RMR, CRR, FCRR     Date
19    Official Court Reporter

20

21

22

23

24

25