No. 25-1918

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

STEFANO GRANATA; THE GUN RUNNER, LLC; FIREARMS POLICY COALITION, INC.; CAMERON PROSPERI,

Plaintiffs-Appellants

JUDSON THOMAS; COLBY CANNIZZARO,

Plaintiffs

v.

ANDREA J. CAMPBELL, in the official capacity as Attorney General of the Commonwealth of Massachusetts; TERRENCE M. REIDY, in the official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING APPELLANTS AND URGING REVERSAL

_____

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General
ANDREW M. DARLINGTON
  Acting Chief, Second Amendment
  Section

ANDREW G. BRANIFF
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................. 1

INTEREST OF THE UNITED STATES ................................................................ 4

STATEMENT OF THE ISSUES ........................................................................... 5

STANDARD OF REVIEW ................................................................................... 5

ARGUMENT

    I.      The Second Amendment protects arms that are in common use for traditionally lawful purposes. ..................................................... 5

    II.     The Massachusetts scheme violates the Second Amendment by banning the purchase of weapons in common use. ........................ 12

           A.    Bans on the purchase of weapons are largely prohibited by the Second Amendment. ........................................................... 12

           B.    The Massachusetts scheme bans the sale of weapons in common use. ................................................................... 16

CONCLUSION .................................................................................................. 19

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

*Andrews v. State*, 50 Tenn. 165 (1871) ...................................................................7

*Aymette v. State*, 21 Tenn. 154 (1840) .................................................................7

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc),
    *cert. denied*, 145 S. Ct. 1534 (2025) ...................................................... 10-12

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) ............................1, 9

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... *passim*

*Fife v. State*, 31 Ark. 455 (1876) .........................................................................7

*Florida v. Jardines*, 569 U.S. 1 (2013) ...................................................................11

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir.),
    *cert. denied*, 577 U.S. 1039 (2015) ............................................................ 9-10

*Granata v. Campbell*, 798 F. Supp. 3d 46 (D. Mass. 2025)
    (*Granata II*) ...................................................................... 3, 13, 15, 17

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ...............................................................14

*Joyal v. Hasbro, Inc.*, 380 F.3d 14 (1st Cir. 2004) .....................................................5

*Miller v. California*, 413 U.S. 15 (1973) .................................................................11

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................. *passim*

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) ....................................................14

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025) .....................................................................................18

*Snope v. Brown*, 145 S. Ct. 1534 (2025) ........................................................ 10-12

**CASES (continued):**                                                          **PAGE**

*State v. Duke*, 42 Tex. 455 (1874) ................................................................7

*State v. Kerner*, 107 S.E. 222 (1921) ...........................................................7

*State v. Workman*, 14 S.E. 9 (W. Va. 1891) .................................................7

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) ...............14

*United States v. Miller*, 307 U.S. 174 (1939) ............................................8

*United States v. Petrillo*, 332 U.S. 1 (1947) ........................................ 11-12

*United States v. Rahimi*, 602 U.S. 680 (2024)...........................................10

*United States v. Vlha*, 142 F.4th 1194 (9th Cir.),
    *cert. denied*, No. 25-5867, 2025 WL 3198670 (U.S. Nov. 17, 2025)...........16

**CONSTITUTION:**

U.S. Const. Amend. II.................................................................. *passim*

U.S. Const. Art. I, § 8, Cl. 15...................................................................12

**STATUTES:**

Mass. Gen. Laws ch. 140 (2025)
    § 121 ...........................................................................................1
    § 123 ...........................................................................................3
    § 123(*o*).......................................................................................2
    § 123(p).......................................................................................2
    § 128 ...........................................................................................2
    § 131 ...........................................................................................1
    § 131 ¾ .......................................................................................2

Mass. Gen. Laws ch. 269, § 10(a) (2025)................................................1

Militia Act of 1792, ch. 33, 1 Stat. 271 ................................................6

**REGULATIONS:**                                                                        **PAGE**

501 Mass. Code Regs. § 7.02 (2025)...................................................................................3

501 Mass. Code Regs. §§ 7.02-7.07 (2025)........................................................................2

**RULES:**

Fed. R. App. P. 29(a)(2)..................................................................................................5

Fed. R. Civ. P. 56(c)........................................................................................................5

**MISCELLANEOUS:**

1 *William Blackstone*, *Commentaries on the Laws of England* (1807) ....................11

Bureau of Alcohol, Tobacco, Firearms & Explosives, Annual Firearms
    Manufacturing and Export Report (2023),
    https://www.atf.gov/resource-
    center/docs/report/afmer2023finalreport508cpdf/download.........................17

Bureau of Alcohol, Tobacco, Firearms & Explosives, Annual Firearms
    Manufacturing and Export Report (2022),
    https://www.atf.gov/resource-
    center/docs/report/afmer2022finalreport508cpdf/download.........................17

Bureau of Alcohol, Tobacco, Firearms & Explosives, Annual Firearms
    Manufacturing and Export Report (2021),
    https://www.atf.gov/resource-
    center/docs/report/afmer2021finalreport508cpdf/download.........................17

Bureau of Alcohol, Tobacco, Firearms & Explosives, Annual Firearms
    Manufacturing and Export Report (2020),
    https://www.atf.gov/resource-
    center/docs/report/afmer2020finalreport508cpdf/download.........................18

Commonwealth of Mass., *Approved firearms rosters*,
    https://www.mass.gov/lists/approved-firearms-rosters
    (last visited January 28, 2026)....................................................................2

- v -

**MISCELLANEOUS (continued):**                                                    **PAGE**

David B. Kopel & Joseph G.S. Greenlee,
*The History of Bans on Types of Arms Before 1900*,
50 J. Legis. 223 (2024) ...................................................................................6

**INTRODUCTION**

The Second Amendment guarantees law-abiding citizens the right to acquire, possess and carry arms that are in common use for lawful purposes by law-abiding citizens. That principle is not new. It is settled Supreme Court precedent. In *District of Columbia v. Heller*, the Court held that arms "in common use" by law-abiding citizens may not be prohibited. 554 U.S. 570, 627-629 (2008) (citation omitted). The Court has reaffirmed that rule repeatedly, explaining that the Second Amendment protects weapons that are commonly possessed for lawful purposes by law-abiding citizens and forbids governments from banning such arms. *See Caetano v. Massachusetts*, 577 U.S. 411, 416-417 (2016) (per curiam) (Alito, J., concurring in the judgment); *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022).

This case implicates that basic constitutional guarantee. In Massachusetts, the sale, transfer, rental, and lease of all "firearms" is strictly regulated. "Firearms" encompass, as relevant to this case, all handguns. Mass. Gen. Laws ch. 140, § 121 (2025). Subject to narrow exceptions, it is a felony with enhanced sentencing requirements for any individual to purchase and possess a handgun without first applying for and being granted a license to carry, *see id.* ch. 140, § 131; *id.* ch. 269, § 10(a) (2025), and it is also generally unlawful for anyone to sell, rent, lease, or

- 1 -

otherwise transfer a handgun to any person who does not possess such a license.  *Id.* ch. 140, § 128.    The Massachusetts legislature also has imposed multiple requirements on handgun sales by licensed dealers.  These include requirements regarding the melting point, tensile strength, and density of metal firearm parts, whether the firearm has met certain testing requirements, and its barrel length.  *Id.* ch. 140, § 123(*o*).  The Commonwealth has established a "firearm control advisory board" that approves specific models of handguns for inclusion on the "Approved Firearms Roster" (Handgun Roster) "using the parameters set forth in [S]ection 123."  *Id.* ch. 140, § 131 ¾; *see also* 501 Mass. Code Regs. §§ 7.02-7.07 (2025); Commonwealth of Mass., *Approved firearms rosters*, https://www.mass.gov/lists/approved-firearms-rosters (last visited January 28, 2026).*  Only firearms lawfully owned or possessed under a license issued before October 21, 1998, are exempt from complying with the requirements for inclusion on the Handgun Roster.  Mass. Gen. Laws ch. 140, § 123(p).  Massachusetts law effectively establishes a preclearance regime for the sale of handguns that excludes many handguns in common use, thereby prohibiting law-abiding Massachusetts

---

*  Amicus understands that, since the case below, Massachusetts has revised its approved roster of firearms and may now approve some of the firearms considered below, but that the roster continues to restrict lawful firearms that are the subject of this appeal.

citizens from purchasing those arms. *Id.* ch. 140, § 123; *see also* 501 Mass. Code Regs. § 7.02 (2025) (defining "Approved Firearm Roster").

Although the Commonwealth characterizes its regime as a set of safety regulations, the effect of the law is to bar ordinary citizens from acquiring widely owned and commonly used arms. Under Supreme Court precedent, a State may not accomplish indirectly what it is forbidden to do directly:  prohibit arms that fall within the Second Amendment's core protection. *See Bruen*, 597 U.S. at 70-71.

Despite this, the lower court upheld the law. *Granata v. Campbell*, 798 F. Supp. 3d 46 (D. Mass. 2025) (*Granata II*).  The trial court acknowledged that *Bruen* controls these regulations, *id.* at 54, but reasoned that the registry did not outright ban arms because it only set certain safety standards for them. *Id.* at 55-57.  The Court also held that the law did not truly preempt access to arms in common use because the plaintiffs could still purchase them outside the State. *Ibid.*  In so doing, the district court adopted precisely the approach the Supreme Court warned against in *Bruen*, subjecting a fundamental right to a preclearance regime that would fail comparable constitutional analysis. *See Bruen*, 597 U.S. at 70 (rejecting treatment of the Second Amendment as a "second-class right" and comparing it to the First and Sixth Amendments) (citation omitted).

- 3 -

The constitutional problem presented here does not require the Court to resolve every question surrounding firearm regulation, commercial licensing, or historical analogues. Nor does it require the Court to decide whether States may impose neutral conditions on the sale of firearms in general. This amicus brief addresses a narrower and more fundamental point. Whatever regulatory authority States possess, that authority does not extend to prohibiting the sale of arms that are in common use by law-abiding citizens for lawful purposes. When a law operates to forbid the sale of those arms, it crosses a constitutional line the Second Amendment does not permit.

Because Massachusetts law prohibits the sale of arms that are in common use, it conflicts with the Second Amendment's text as interpreted by the Supreme Court. The judgment below should therefore be reversed.

## INTEREST OF THE UNITED STATES

This case poses important questions about the scope of the Second Amendment's protections. U.S. Const. Amend. II. The United States has strong interests in ensuring that these important questions are correctly resolved; that the Second Amendment is not treated as a second-class right; and that law-abiding Americans in this Circuit are not deprived of the full opportunity to enjoy the exercise of their Second Amendment rights.

- 4 -

The United States is permitted to file this amicus brief without the consent of the parties or leave from the Court.  Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUES

In this brief, the United States addresses only the following issues:

1.  Whether the Second Amendment guarantees law-abiding citizens the right to possess and carry arms that are in common use for lawful purposes such as self-defense.

2.  Whether Massachusetts law violates that constitutional guarantee by prohibiting the commercial sale of arms that are in common use by law-abiding citizens for lawful purposes.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 16, 18 (1st Cir. 2004).  Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## ARGUMENT

**I.     The Second Amendment protects arms that are in common use for traditionally lawful purposes.**

In determining which arms the Second Amendment protects, courts must ask whether the arms are "in common use" among law-abiding citizens for lawful

- 5 -

purposes—not rely on their own intuitions about which types of arms are useful for traditionally lawful purposes. *See District of Columbia v. Heller*, 554 U.S. 570, 624 (2008) (citation omitted). Some courts have declined to apply this common-use test, but that approach is erroneous. The common-use test has deep roots in both English and American law, and the Supreme Court has repeatedly invoked it in its Second Amendment cases.

American legislatures have long distinguished between common weapons and unusual weapons. Under early federal, state, and colonial militia laws, the "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes." *Heller*, 554 U.S. at 624. For instance, the Militia Act of 1792, ch. 33, 1 Stat. 271, required every militia member to supply himself with a "a good musket or firelock" or "a good rifle." *Ibid.*

Many 19th-century American legislatures banned the possession, carrying, or sale of specific types of unusual weapons. One law-review article identified 221 19th-century state and territorial laws targeting unusual weapons such as spears, sword canes, slungshots, brass knuckles, and cannons. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 328-368 (2024).

State courts routinely upheld such laws on the ground that the right to keep and bear arms extended only to arms that are in common use for lawful purposes. The Supreme Court of Tennessee, for instance, explained that individuals have a right to possess commonplace weapons (such as "rifles" and "muskets") but that legislatures may prohibit weapons that are "dangerous" and "not usual" (such as "a spear concealed in a cane"). *Aymette v. State*, 21 Tenn. 154, 159, 161 (1840). The Supreme Court of North Carolina likewise explained that the right to keep and bear arms extends to arms "in common use," such as "the rifle, the musket, the shotgun, and the pistol," but not to "cannon[s]," "poisonous gases," and armed aircraft, nor to small concealable weapons such as "brass knuckles." *State v. Kerner*, 107 S.E. 222, 224-225 (1921). Other state-court decisions drew similar distinctions. *See, e.g.*, *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) (right extends to "guns, rifles, and muskets" but not to weapons that are "only habitually carried by bullies, blackguards, and desperadoes"); *Fife v. State*, 31 Ark. 455, 460 (1876) (right extends to "the usual arms of the citizen," such as "the shot gun" and "the musket"); *State v. Duke*, 42 Tex. 455, 458 (1874) (right extends to "such arms as are commonly kept, according to the customs of the people"); *Andrews v. State*, 50 Tenn. 165, 179 (1871) (right extends to "the usual arms of the citizen of the country").

- 7 -

1. The Supreme Court adopted the common-use test in *United States v. Miller*, 307 U.S. 174 (1939), a case concerning the constitutionality of a federal law restricting short-barreled shotguns. In upholding the statute, the Court reasoned that the Second Amendment protects arms "of the kind in common use at the time." *Id.* at 179. Because short-barreled shotguns did not satisfy that criterion, the Court concluded that the Second Amendment did not guarantee "the right to keep and bear such an instrument." *Id.* at 177-178.

The Supreme Court reaffirmed that holding in *Heller*. *Heller* read *Miller* to hold that "the sorts of weapons protected [a]re those 'in common use at the time'" and that legislatures may prohibit weapons that are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 627 (citation omitted). That interpretation, *Heller* stated, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citation omitted). That interpretation, *Heller* added, also fits with founding-era practice, under which the "militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes." *Id.* at 624. *Heller* also applied the "common use" test in holding that the Second Amendment protects the right to possess handguns. *See id.* at 628-635. Handguns, the Court emphasized, are "the most popular weapon chosen by Americans for self-defense in the home," "the most

preferred firearm in the nation to 'keep' and use for protection of one's home and family," and "overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-629 (citation omitted).

The Court then reiterated the common-use test in *Bruen*. It stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (citation omitted), and that handguns are protected because "handguns are weapons 'in common use' today," *id.* at 32. The Court also contrasted weapons that are "in common use at the time" with weapons that are "highly unusual in society at large," explaining that the Second Amendment allows legislatures to prohibit the latter (unusual) but not the former (common) class of weapons. *Id.* at 47 (citation omitted).

Individual Justices, too, repeatedly have invoked the "common use" test. Justice Thomas has explained that the Second Amendment protects "commonly used" arms. *Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting). Justice Alito has written that "the pertinent Second Amendment inquiry is whether [the weapons at issue] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (per curiam) (Alito, J., concurring in the judgment) (emphasis omitted). And Justice Kavanaugh has endorsed "the historically based 'common

- 9 -

use' test with respect to the possession of particular weapons." *Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (statement of Kavanaugh, J.); *see United States v. Rahimi*, 602 U.S. 680, 735 (2024) (Kavanaugh, J., concurring) ("[T]he Second Amendment attaches only to weapons 'in common use.'").

2.  Some courts of appeals have eschewed inquiring into the commonality of weapons. *See, e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025); *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). But those courts' reasons for rejecting that test are incorrect.

To begin, courts have erred in deriding the common-use standard as a "circular" inquiry, *Friedman*, 784 F.3d at 409, and as an "ill-conceived popularity test," *Bianchi*, 111 F.4th at 460. The point of the common-use test is that "the American people," rather than federal judges, get "to decide which weapons are useful" for lawful purposes. *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting). "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. Thus, instead of relying on their "own assessment of how useful an arm is for self-defense [or other lawful purposes] before deeming it protected," judges must defer to the practices of the American people. *Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting).

- 10 -

Such reliance on community practices is hardly unusual in Anglo-American law. For example, the First Amendment requires courts to determine whether material is obscene by applying "contemporary community standards." *Miller v. California*, 413 U.S. 15, 24 (1973) (citation omitted). Whether an intrusion constitutes an unreasonable search under the Fourth Amendment depends in part on whether the intrusion is consistent with "customary" practices and "the habits of the country." *Florida v. Jardines*, 569 U.S. 1, 8-9 (2013) (citation omitted). And the common law itself is built on community customs. 1 William Blackstone, *Commentaries on the Laws of England* 64 (1807).

Courts also have erred in suggesting that courts would face "difficulties" in judging "which weapons would pass" the common-use test. *Bianchi*, 111 F.4th at 460. Courts have been applying the test for centuries without apparent difficulty. A court should face no trouble in concluding, for instance, that rifles and handguns are in common use for lawful purposes, or that rocket launchers and ICBMs are not. Some types of weapons may, of course, raise harder questions. But under any legal test, "there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls." *United States v. Petrillo*, 332 U.S. 1, 7 (1947). This case does not present a marginal issue as the arms prohibited by the Massachusetts scheme are common-use under any test.

Finally, some courts have expressed concern that the common-use test would lead to "absurd consequences," such as allowing "nuclear warhead[s]" to "gain constitutional protection" if they become "popular." *Bianchi*, 111 F.4th at 460. But that concern is implausible. "Even if some nuclear warheads are small enough for an individual to carry, no reasonable person would think to use one to defend himself. Still less could nuclear warheads ever become a *common* means of self-defense." *Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting). Such weapons also are highly unusual even in military contexts and are wholly inappropriate for a citizen to use when "call[ed] forth . . . to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, Cl. 15.

## II.    The Massachusetts scheme violates the Second Amendment by banning the purchase of weapons in common use.

### A.    Bans on the purchase of weapons are largely prohibited by the Second Amendment.

Under the plain text of the Second Amendment, the right to "keep and bear arms" is implicated by a law that bans acquiring certain handguns through commercial sale. The Supreme Court has repeatedly explained that handguns are "arms" that "are indisputably in 'common use' for self-defense today [and] are, in fact, 'the quintessential self-defense weapon.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S.

- 12 -

570, 629 (2008)).   That the law does not apply to all "arms" or all methods of acquiring them is simply irrelevant to the threshold textual question *Bruen* requires this Court to answer.  As the Supreme Court has made clear, "[i]t is no answer to say . . . that it is permissible to ban the possession of [some firearms] so long as the possession of other firearms" is allowed.  *Heller*, 554 U.S. at 629.

The district court has two clear flaws in its 'textual' analysis of the Second Amendment.  First, that when an ancillary right—as Massachusetts characterizes the right to acquire a firearm to be—is involved, then there is no infringement unless the law prevents something that is necessary to serve self-defense purposes such as a ban on all handguns.  *Granata II*, 798 F. Supp. 3d 46, 56 (D. Mass. 2025).  And second, the district court absolves a regulation from being an infringement unless it is a complete and total ban on someone from exercising the right to keep and bear arms as opposed to a partial restriction.  *Ibid.*

As for the first issue, the argument that a so-called ancillary right to acquire a firearm is not included in the text of the Second Amendment is not supported by existing case law.  The Supreme Court has established that the Second Amendment right to "keep and bear" arms protects both *owning* and *carrying* firearms, and in order to do either of those things, the "right must also include the right to acquire a firearm." *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d

- 13 -

928, 930 (N.D. Ill. 2014) (emphasis omitted); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (noting that the "right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (citation and internal quotations marks omitted)).

The Ninth Circuit has confronted a similar law in *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025), which involved a facial challenge to a California law that prohibited most people from buying more than one firearm in a 30-day period. *Id.* at 1240. The Ninth Circuit held that this law meaningfully constrained the right to keep and bear arms. *Id.* at 1243. Although the United States disagrees with the Ninth Circuit's 'meaningful constraint' limitations on Second Amendment rights, the *Ngyuen* Court accurately explained that the plain text of the Second Amendment protects the right to possess multiple firearms and thus to purchase them. *Id.* at 1242. Here, the Ninth Circuit concluded that the government could not "temporally meter" this right by barring citizens from purchasing more than one firearm per month. *Id.* at 1243. The district court's contrary analysis, that the *Bruen* standard should be applied only in cases in which the law in question directly bears on "keeping" or "bearing" arms, while those that are just *one step removed* from those activities be given a pass unless they make exercising the right entirely impossible,

- 14 -

is fundamentally at odds with these holdings and a normal understanding of the Second Amendment.

Further, the narrow restriction of whether the law in question directly bears on "keeping" or "bearing" arms as what is protected under the Second Amendment has since provided federal appellate circuits the 'green light' to heighten the burden required for plaintiffs to demonstrate a Second Amendment violation.  Here, as in the Ninth Circuit and others, plaintiffs must also show that the regulation "meaningfully constrains" their other *core* Second Amendment rights.  *See Granata II*, 798 F. Supp. 3d at 56.  "The Second, Fifth and Tenth Circuits also have adopted the Ninth Circuit's 'meaningful-constraint test or something like it.'"  *Ibid.* (citation omitted).  The result is that district courts, including this one, have determined that plaintiffs failed to meet their burden because they could work around a law that facially violates the Second Amendment. Here, the district court found plaintiffs could purchase protected firearms elsewhere and thus the law did not implicate the Second Amendment.  *Granata II*, 798 F. Supp. 3d at 59.  Thus, although the district court here cites Ninth Circuit dicta stating that acquiring a firearm is protected under the Second Amendment, it still places a wedge between plaintiffs and their Second Amendment rights.  *Id.* at 56 ("Pursuant to the ancillary-rights doctrine, the Second Amendment protects some activities . . . including the ability to acquire weapons.")

- 15 -

(citing *United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir.), *cert. denied*, No. 25-5867, 2025 WL 3198670 (U.S. Nov. 17, 2025).

As to the district court's second argument, that a regulation is not an "infringement" even in an as-applied challenge unless it totally prevents someone from exercising the right to keep and bear arms, the district court has moved the cart before the horse. *Bruen* makes clear that whether a law "infringes" the right to bear arms is a legal conclusion, based on text and history. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) ("The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment."). Inquiring whether the litigants in a case had other means to acquire similar firearms, or other firearms at all, is simply not part of the Second Amendment equation. Furthermore, applying the amendment only to those situations where a person was completely prohibited from bearing an arm in the act of self-defense would eviscerate the Second Amendment's protections.

**B.    The Massachusetts scheme bans the sale of weapons in common use.**

The Massachusetts scheme bans guns in common use from commercial sale. In Massachusetts, licensed retailers are prohibited from transferring handguns that do not appear on either the "Approved Firearms Roster" or the "Formal Target

- 16 -

Shooting Roster" and that do not comply with the Massachusetts sales regulations. *Granata II*, 798 F. Supp. 3d at 53 (citation omitted). The Granata plaintiffs have identified numerous widely sold handgun models that are not available for purchase commercially in Massachusetts due to the Approved Firearms Roster scheme. These include a Glock. *Id.* at 52 (citing Doc. 81-1 ¶ 14; Doc. 93-1 ¶ 14).

Glocks themselves are among some of the most commonly manufactured weapons in America according to Bureau of Alcohol, Tobacco, Firearm and Explosives reports:

- 345,119 of the 3,939,517 pistols manufactured in the USA in 2023 or ~8.8% of all pistols manufactured were made by Glock, Inc. Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* 1, 16 (2023), https://www.atf.gov/resource-center/docs/report/afmer2023finalreport508cpdf/download.

- 465,117 of the 6,183,507 pistols manufactured in 2022 in the USA or ~7.5% of all pistols manufactured were made by Glock, Inc. Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* 1, 16 (2022), https://www.atf.gov/resource-center/docs/report/afmer2022finalreport508cpdf/download.

- 581,944 of the 6,751,919 pistols manufactured in 2021 in the USA or ~7.5% of all pistols manufactured were made by Glock, Inc. Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* 1, 13 (2021), https://www.atf.gov/resource-center/docs/report/afmer2021finalreport508cpdf/download.

- 445,442 of the 5,509,183 pistols manufactured in 2020 in the USA or ~7.5% of all pistols manufactured were made by Glock, Inc.  Bureau of Alcohol, Tobacco, Firearms & Explosives, *Annual Firearms Manufacturing and Export Report* 1, 13 (2020), https://www.atf.gov/resource-center/docs/report/afmer2020finalreport508cpdf/download.

It is thus undeniable that the weapons banned by the Massachusetts scheme are "widely legal and bought by many ordinary consumers" across the Nation.  *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025).  For this reason alone, the decision should be overturned.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
    Attorney General

ANDREW M. DARLINGTON
  Acting Chief, Second Amendment
  Section

s/ Andrew G. Braniff
ANDREW G. BRANIFF
  Attorney
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

## CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING APPELLANTS AND URGING REVERSAL:

(1) complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 3961 words.

(2) This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney


Dated:  January 28, 2026