No. 25-1918

# United States Court of Appeals
## for the First Circuit

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY COALITION, INC.; CAMERON PROSPERI,

*Plaintiff-Appellants*,

*v.*

ANDREA J. CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS; GINA KWON, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY OF THE COMMONWEALTH OF MASSACHUSETTS,

*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF OF DEFENDANTS-APPELLEES

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

Phoebe Fischer-Groban, 1st Cir. No. 1198575
Grace Gohlke, 1st Cir. No. 1204282
*Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2589
phoebe.fischer-groban@mass.gov
grace.gohlke@mass.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

QUESTIONS PRESENTED............................................................................ 2

STATEMENT OF THE CASE......................................................................... 3

    I.      Statutory and Regulatory Framework ................................................... 3

          A.     The Attorney General's Regulations ........................................... 3

          B.     Codification of Section 123 and the Approved Firearms
              Roster ....................................................................................... 5

    II.     Statement of Facts ............................................................................... 8

          A.     The Massachusetts Handgun Market........................................... 8

          B.     Appellants Stefano Granata, Cameron Prosperi, and The
              Gunrunner, LLC .................................................................... 8

    III.    Procedural History and Decision Below ............................................. 11

SUMMARY OF THE ARGUMENT ................................................................ 12

ARGUMENT ................................................................................................. 14

    I.      The Second Amendment Framework..................................................... 14

    II.     Appellants' Proposed Conduct Does Not Fall Within the Plain
         Text of the Second Amendment........................................................... 17

          A.     The Handgun Safety Regulations Do Not Meaningfully
              Constrain Appellants' Right to Keep and Bear Arms. ............. 18

          B.     The Handgun Safety Regulations Are Presumptively
               Lawful Conditions or Qualifications on the Sale of
               Firearms. ................................................................................ 21

III.     The "Common Use" Inquiry Has No Relevance To This Case Because the Handgun Safety Regulations Are Not a "Ban" on a "Class of Arms." ......................................................................23

IV.      The Handgun Safety Regulations Are Consistent with Historical Regulations of Firearms. ...................................................31

         A.       Laws and Governmental Practices Requiring the Inspection or "Proving" of Firearms and Ammunition Are Relevantly Similar to the Handgun Safety Regulations....................................................................................32

         B.       Firearms and Gunpowder Safe Storage Laws Further Support the Constitutionality of the Handgun Safety Regulations....................................................................................44

         C.       Trap Gun Restrictions Are Yet Another Example of a Relevantly Similar Historical Tradition...................................48

         D.       Law Protecting Minors From the Dangers of Firearms Have a Long Historical Pedigree. ..............................................49

CONCLUSION ........................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021)....................................................14

*American Shooting Sports Council, Inc. v. Attorney Gen.*, 429 Mass. 871,
   711 N.E.2d 899 (1999)......................................................................3

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ............................................. 31, 32

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) ................. 17n, 18, 21

*Berrios-Romero v. Estado Libre Asociado de Puerto Rico*,
   641 F.3d 24 (1st Cir. 2011)................................................................33n

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ............................................. 24, 29

*Boland v. Bonta*, 662 F. Supp. 3d 1077 (C.D. Cal. 2023) ....................................28n

*Brown v. Maryland*, 25 U.S. 419 (1827) ....................................................45

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)............................................27n

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025)........................................... *passim*

*Coleman v. State*, 32 Ala. 581 (1858)........................................................50

*Commonwealth v. Alger*, 61 Mass. 53 (1851).................................................45

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... *passim*

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)...........................................21

*Marcus v. American Cont. Bridge League*, 80 F.4th 33 (1st Cir. 2023) .................14

*McDonald v. City of Chicago*, 561 U.S 742 (2010) ............................. 14, 15, 21, 27

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) ...........................................23

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)......................................................46

*New York State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025)................22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .......... *passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186
  (6th Cir. 2024)................................................................................................ 18, 20

*Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38
  (1st Cir. 2024). ............................................................................................. *passim*

*Renna v. Bonta*, 667 F. Supp. 3d 1048 (S.D. Cal. 2023).......................................28n

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) ...................22

*State v. Callicut*, 69 Tenn. 714 (1878).....................................................................50

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................. 17n, 20, 21

*United States v. Miller*, 307 U.S. 174 (1939) .........................................................25

*United States v. Rahimi*, 602 U.S. 680 (2024)................................................ *passim*

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) ..................................... 50, 50n

*United States v. Salerno*, 481 U.S. 739 (1987).......................................................30

*United States v. Vlha*, 142 F.4th 1194 (9th Cir. 2025) .............................. 17, 18, 20

**Statutes**

M.G.L. c. 93A, § 2(c)......................................................................3, 22

M.G.L. c. 140, § 123 .......................................................................1, 5

M.G.L. c. 140, § 123(o) ............................................................. 3, 5, 12

M.G.L. c. 140, § 123(o)(i) ..................................................................39

M.G.L. c. 140, § 123(o)(ii) .................................................................39

M.G.L. c. 140, § 123(o)(iii) ...............................................................39

M.G.L. c. 140, § 128A .........................................................................7

M.G.L. c. 140, § 128B .........................................................................7

M.G.L. c. 140, § 131 ..........................................................................22

M.G.L. c. 140, § 131¾(a) .....................................................................6

M.G.L. c. 140, § 131K .................................................................4, 4n

**Regulations**

501 CMR §§ 7.01 *et seq.* ....................................................................6

501 CMR § 7.02................................................................................6n

501 CMR § 7.03(1) .......................................................................6, 6n

940 CMR §§ 16.01 *et seq.* ....................................................... 1, 3, 12

940 CMR § 16.01........................................................... 3n, 4, 5n

940 CMR § 16.03...............................................................................5

940 CMR § 16.04 ........................................................................................................7

940 CMR § 16.04(1) ...................................................................................................4

940 CMR § 16.04(2) ...................................................................................................4

940 CMR § 16.04(3) ...................................................................................................4

940 C.M.R. § 16.05 ..................................................................................................53

940 CMR § 16.05(1) ...................................................................................................4

940 CMR § 16.05(2) ...................................................................................................4

940 CMR § 16.05(3) ...................................................................................................5

940 CMR § 16.05(4) ...................................................................................................5

## **Constitutional Provisions**

U.S. Const. amend. II .................................................................................................14

## <u>INTRODUCTION</u>

Together, the requirements for the commercial sale of handguns codified in Mass. Gen. Laws ch. 140, § 123, and the Attorney General's handgun sales regulations, 940 Code Mass. Regs. §§ 16.01 *et seq.* (together, the "handgun safety regulations"), protect handgun users and their families from the sale of unsafe handguns that are prone to malfunction or accidental discharge during normal use or are not equipped with basic safety features. In this case, Appellants claim the handgun safety regulations infringe their Second Amendment rights because the regulations prevent them from commercially purchasing about a dozen particular handgun models, despite the extensive commercial and private handgun marketplace in Massachusetts. In effect, Appellants claim they have the right to commercially purchase "any weapon whatsoever," in contravention of *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

The District Court properly granted summary judgment, which this Court should affirm for any or all of three independent reasons. *First*, the handgun safety regulations fall outside the text of the Second Amendment, because they do not meaningfully constrain Appellants' right to keep and bear arms for lawful self-defense. *Second*, the challenged regulations are presumptively lawful conditions and qualifications on the commercial sale of arms. *Third*, the challenged

regulations are consistent with the Nation's historical tradition of firearms regulation, and thus do not violate the Second Amendment.

**<u>QUESTIONS PRESENTED</u>**

1.      Whether the District Court correctly concluded that the plain text of the Second Amendment does not cover the Appellants' proposed course of conduct—the ability to commercially purchase or sell a dozen handgun models sold elsewhere in the United States—where the handgun safety regulations do not meaningfully constrain their individual rights to keep and bear arms in case of confrontation?

2.      Whether the District Court correctly concluded that the handgun safety regulations are presumptively lawful conditions and qualifications on the commercial sale of arms where there is no evidence of a *de facto* ban on handguns in Massachusetts or that the handgun safety regulations have been put to abusive ends?

3.      Whether the District Court correctly concluded that the Commonwealth had met its burden to show that the handgun safety regulations are consistent with the Nation's historical tradition of firearms regulation, which includes regulations since the Founding requiring the testing weapons for quality and safety, among other analogous regulations?

<u>**STATEMENT OF THE CASE**</u>

**I.      Statutory and Regulatory Framework**

Two sets of requirements establish minimum safety standards for handguns sold by licensed retailers in the Commonwealth: (1) regulations promulgated by the Attorney General and codified at 940 Mass. Code Regs. §§ 16.01 *et seq.*; and (2) statutory requirements at Mass. Gen. Laws ch. 140, § 123(o), that form the basis for the Approved Firearms Roster.

**A.      The Attorney General's Regulations**

In 1997, pursuant to her authority under Mass. Gen. Laws ch. 93A, § 2(c), to "prevent the deceptive or unfair sale or transfer of defective products which do not perform as warranted," *American Shooting Sports Council, Inc. v. Attorney Gen.*, 429 Mass. 871, 875, 711 N.E.2d 899, 902 (1999), the Attorney General promulgated a set of regulations deeming it an unfair or deceptive trade practice for a "handgun-purveyor"[1] to "transfer"[2] a handgun within the Commonwealth that is defective or lacks certain safety features. 940 Mass. Code Regs. §§ 16.01 *et seq.* (the "Attorney General's regulations"). The Attorney General's regulations do not apply to sellers who transfer fewer than five handguns annually, nor do they apply

---

[1] This brief uses the terms "handgun-purveyor," "retailer," and "dealer" interchangeably.

[2] "Transfer" is defined as "sell, rent, or lease" and excludes sales to firearm wholesalers who do not intend to sell the handguns to Massachusetts retailers or consumers. 940 Mass. Code Regs. § 16.01.

to transfers to "supply law enforcement officials … with handguns for their official duties." *Id.* § 16.01.

First, handguns sold by retailers cannot be "made from inferior materials," meaning they either must be made of materials that meet specified standards or must pass a performance test to show the gun can be fired repeatedly with a limited number of malfunctions and without breaking. *Id.* §§ 16.01; 16.04(1), (3). Next, the handgun must not be "prone" to repeated firing upon a single trigger pull or to explosion. *Id.* § 16.04(2). The handgun must also pass a "drop test" to show it is not "prone to accidental discharge." *Id.* §§ 16.01; 16.04(2). Further, the retailer must sell the handgun with a "safety device" that when installed prevents the firing of the gun by an unauthorized user. *Id.* § 16.05(1) (citing Mass. Gen. Laws ch. 140, § 131K).[3] The handgun must also have a form of childproofing, defined as any mechanism that "effectively precludes an average five year old child from operating the handgun when it is ready to fire." *Id.* § 16.05(2). For semi-automatic handguns, the regulations further require either a load indicator or a magazine

---

[3] A list of safety devices approved by the Colonel of the Department of State Police as complying with § 131K is available at https://www.mass.gov/doc/approved-firearm-safetylocking-devices-11-14-2022/download. The seller is not required to install the device so long as the device is provided along with the firearm. Appellants make no legal argument related to the "safety device" requirement and therefore it is not at issue here.

safety disconnect. *Id.* §§ 16.05(3); 16.05(4).[4] Finally, handguns must have a

tamper resistant serial number. *Id.* § 16.03.[5, 6]

**B.       Codification of Section 123 and the Approved Firearms Roster**

In 1998, the Legislature codified several overlapping provisions at Mass.

Gen. Laws ch. 140, § 123, cl. 18-21, which were amended in 2024 and codified at

Mass. Gen. Laws ch. 140, § 123(o) ("Section 123"). Section 123 also prohibits

retailers from selling certain handguns based on: the handgun's material

composition or its ability to pass a firing test, *id.* § 123(o)(i); whether the handgun

is prone to accidental discharge, as shown through a drop test, *id.* § 123(o)(ii); and

whether the handgun is prone to repeated firing or explosion, *id.* § 123(o)(iii).

The Legislature directed the Secretary of the Executive Office of Public

Safety and Security ("Secretary") to "compile and publish a roster" of handguns

---

[4] A "load indicator" is a "device which plainly indicates that a cartridge is in the firing chamber within the handgun." 940 Mass. Code Regs. § 16.01. A "magazine safety disconnect" is a "device that prevents the firing of the handgun when the magazine is detached from the handgun." *Id.*

[5] Appellants make no legal argument related to tamper-resistant serial numbers and therefore it is not at issue. In any case, several federal circuits have held that firearms with obliterated serial numbers are not protected by the Second Amendment. *E.g.*, *United States v. Reyna*, 165 F.4th 1056, 1064 (7th Cir. 2026); *United States v. Gomez*, 159 F.4th 172, 177-78 (2d Cir. 2025); *United States v. Price*, 111 F.4th 392, 408 (4th Cir. 2024), *cert. denied* 145 S.Ct. 1891.

[6] In addition to these safety features, the regulations also require retailers to make certain disclosures at the time of sale. 940 Mass. Code Regs. § 16.06(1)-(3). Those disclosure provisions are not at issue in this case.

that meet Section 123's requirements. Mass. Gen. Laws ch. 140, § 131¾(a). This roster is known as the "Approved Firearms Roster."[7] 501 Mass. Code Regs. §§ 7.01 *et seq.* A handgun may be placed on the Approved Firearms Roster "only after the Secretary has received a final test report from an approved independent testing laboratory" certifying that the handgun make and model meets the statute's requirements. 501 Mass. Code Regs. § 7.03(1). [8] Thus, if a particular handgun is not on the roster, it could mean that it has failed the requisite testing, or that the requisite testing has never been performed or submitted to the Secretary.

As of its September 2024 update, the Approved Firearms Roster listed over 1,000 handgun models that meet Section 123's requirements. *See* Supp. App. 2-32 (Ex. A to Dunne Decl.) ("September 2024 Roster").[9] The September 2024 Roster

---

[7] The Approved Firearms Roster has recently been renamed the Approved Handgun Roster. *See* https://www.mass.gov/lists/approved-firearms-rosters#approved-handgun-roster

[8] Handgun models that are the "functional design equivalent" of handguns that have already satisfactorily completed the testing requirements do not need to separately satisfy those requirements. 501 Mass. Code Regs. §§ 7.02, 7.03(1). Functional design equivalents are firearms "whose dimensions and material, as well as linkage and functioning of the magazine well, cylinder, barrel, chamber or any components of the firing mechanism" are the same, including larger or smaller calibers of the same model. *Id.* § 7.02.

[9] Since September 2024, which was the most recent roster as of the summary judgment briefing, the roster has continued to be regularly updated, with 82 additional handgun models as of the March 2026 version, available here: https://www.mass.gov/doc/approved-handgun-roster-march-2026/download.

includes handguns from 35 manufacturers, often with multiple models for each. From 2019 to 2024, approximately 113 firearms were added to the Roster. Sealed App. 183 (Defendants' Statement of Undisputed Material Facts ("DSMF") 1).[10]

Like the Attorney General's regulations, Section 123 does not regulate private sellers that transfer up to four guns per year, which are governed separately by Mass. Gen. Laws ch. 140, §§ 128A and 128B. The Attorney General's regulations related to childproofing, load indicators or magazine disconnect mechanisms, and tamper-resistant serial numbers have not been codified at Section 123, and so are not tested for inclusion on the Approved Firearms Roster.[11] But, to be sold by a retailer in Massachusetts, a handgun that appears on the roster also must comply with the Attorney General's regulations. 940 Mass. Code Regs. § 16.04. Of the models on the Approved Firearms Roster, over 1,000 handgun models also comply with the Attorney General's regulations. App. 424.

---

[10] The Sealed Joint Appendix includes materials that were filed in redacted form on the public docket in the District Court but have been sealed in their entirety in this Court. The electronically-filed version of this brief redacts references to information from the Sealed Joint Appendix that was not publicly-filed in the District Court, but does not redact information that was filed on the public docket in the District Court.

[11] *See* Enforcement Notice #3: Attorney General's Handgun Sales Regulations (940 CMR 16.00), February 2002, available at https://www.mass.gov/files/documents/2016/12/wg/ag-handgun-regulation-enforcement-notices.pdf, at 5-7.

## II. Statement of Facts

### A. The Massachusetts Handgun Market

Massachusetts has a robust handgun market. In 2024, Massachusetts retailers reported 76,409 handgun sales. Sealed App. 183 (DSMF 3). In 2023, Massachusetts retailers reported 67,652 handgun sales. Sealed App. 184 (DSMF 4). In 2022, Massachusetts retailers reported 72,502 handgun sales. Sealed App. 184 (DSMF 5).

In addition to the commercial market, Massachusetts also has an active private market for handguns. In 2024, 16,051 private sales of handguns were reported in Massachusetts. Sealed App. 184 (DSMF 6). In 2023, 24,213 private sales of handguns were reported in Massachusetts. Sealed App.184 (DSMF 7). In 2022, 20,813 private sales of handguns were reported. Sealed App. 184 (DSMF 8).

### B. Appellants Stefano Granata, Cameron Prosperi, and The Gunrunner, LLC

The two individual Appellants in this case, Stefano Granata and Cameron Prosperi, ███████████████████████████████████████ ██████████████████████████████. Sealed App. 184-85 (DSMF 9-10). ██████████████████████████████████████████ ████████████████████████████████████████████. Sealed App. 184 (DSMF 9). ██████████████████████████████ ██████████████████████████████████████████

8

████████████████████████████████████████ Sealed App. 185 (DSMF 12). ████

████████████████████████████████████████████████████████████████

████████████████████████████████. Sealed App. 185 (DSMF 13). But for the

handgun safety regulations, Granata would commercially purchase a Glock 19

Gen 5, two Sig Sauer handgun models, possibly other Sig Sauer, CZ, and Smith &

Wesson models, a Heckler & Koch handgun model, and a Walther handgun model.

Sealed App. 185-86 (DSMF 14). Although the Glock would be his preferred carry

weapon because it is compatible with a variety of parts, accessories, and holsters,

he has not tried to purchase it in the private market. Sealed App. 186 (DSMF 15).

Granata wishes to purchase the Sig Sauer models as collector's items; he does not

intend to carry or shoot either gun. Sealed App. 186 (DSMF 16).

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.[12] Sealed App. 184-86

(DSMF 10-11, 18). ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████. Sealed App. 186-87 (DSMF 19-20). ██████████████████

---

[12] Since Prosperi was deposed in this case, ████████████████████████
██████████████████████████████████████████████████████.
Sealed App. 185 (DSMF 11).

██████████████████████████████████████████████████████████████

████. Sealed App. 187 (DSMF 21).[13] ████████████████████████████

████████████████████████████████████████████████████████████

█████. Sealed App. 188 (DSMF 24). But for the handgun safety regulations, Prosperi has identified at least eight additional handgun models from CZ, Beretta, and Atlas Gunworks, one or more of which he wishes to purchase from retailers in Massachusetts. Sealed App. 188 (DSMF 25).

In 2023 alone, The Gunrunner, LLC (the "Gunrunner"), a retailer located in Middleborough, sold 1,074 firearms, which it estimated to comprise about 700 handguns, spanning 15-30 different brands and multiple models across each brand. Sealed App. 188 (DSMF 26). The Gunrunner keeps about 300 handguns in stock at any given time, representing about 30-35 different models of handguns, from 15-20 brands. Sealed App. 188-89 (DSMF 27). "More often than not," customers who wish to purchase handgun models that cannot be sold by retailers instead purchase another handgun model that is authorized for commercial sale. Sealed App. 189 (DSMF 28). The Gunrunner sells handgun models to meet different self-defense related needs, such as models more suited for individuals with different sized hands or with conditions like arthritis or neuropathy. Sealed App. 189 (DSMF 29).

---

[13] ████████████████████████████████████████████████████

██████████████████████████████████ Sealed App. 187 (DSMF 22-23).

## III. Procedural History and Decision Below

Appellants filed their initial complaint in June 2021. App. 4 (ECF No. 1). In May 2022, the District Court allowed the Commonwealth's motion to dismiss under the then-prevailing interest-balancing approach for Second Amendment claims. App. 5 (ECF Nos. 24-25). Shortly after Appellants filed their notice of appeal, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), which set forth the current framework for Second Amendment claims. After argument, this Court vacated the District Court's judgment, and remanded for the District Court to apply *Bruen* in the first instance. App. 5 (ECF Nos. 32-33); *Granata v. Campbell*, No. 22-1478, 2023 WL 4145911 (1st Cir. 2023). Appellants filed their First Amended Complaint in September 2023, App. 5 (ECF No. 34), and after fact and expert discovery, the parties cross-moved for summary judgment. App. 7 (ECF Nos. 61-68, 79-84).

The District Court (Casper, J.) denied Appellants' motion for summary judgment and granted the Commonwealth's cross-motion for summary judgment. Add. 27. The District Court held that the individual Appellants' proposed conduct does not fall within the plain text of the Second Amendment because the challenged regulations do not infringe their right to possess handguns, "as they both own various handguns suitable to keep and carry in the event of a confrontation." Add. 14. The District Court further held that the handgun safety

regulations "impose safety standards and conditions on the commercial sale of handguns by licensed dealers/retailers, which in turn render a subset of handguns eligible for private sales only, but not unpossessable," because the individual Appellants can "choose to buy one of the hundreds of handguns that are on the Approved Firearms Roster and comply with the Attorney General's regulations." Add. 15-16. The District Court rejected the Appellants' argument that the appropriate inquiry is whether the restricted handguns are in "common use," concluding that Appellants "have not shown that the Massachusetts handgun regulations ban all handguns as a class." Add. 17-18.

Finally, the District Court held that, even assuming the Appellants' proposed conduct was covered by the Second Amendment's plain text, the Commonwealth had satisfied its burden to demonstrate that the handgun safety regulations are consistent with the Nation's historical tradition of firearms regulation, based on historical analogues including firearm and gunpowder "proving" laws and practices, firearm and gunpowder storage laws, "trap gun" restrictions, and laws to protect minors from firearms. Add. 19-27.

## SUMMARY OF THE ARGUMENT

The requirements for the commercial sale of handguns codified at Mass. Gen. Laws ch. 140, § 123(o), and the Attorney General's regulations, 940 Mass. Code Regs. §§ 16.01 et seq. (together, the "handgun safety regulations"), protect

handgun users, their families, and other bystanders against accidental injury or death. The regulations do not implicate the text of the Second Amendment because they do not constrain, in any meaningful way, the right of law-abiding citizens to engage in armed self-defense. And even if they did, they are fully consistent with the Nation's historical tradition of firearm regulation.  Thus, the District Court's decision should be affirmed.

First, Appellants' claim fails at step one of the test laid out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), because the handgun safety regulations do not infringe their Second Amendment right to keep and bear arms in case of confrontation, as Appellants Granata and Prosperi ████████ ████████████████, could buy over 1,000 more models from dealers like Appellant the Gunrunner, and could purchase additional models in private sales.

Second, the regulations are presumptively lawful conditions and qualifications on the commercial sale of arms that are not a *de facto* ban on handguns in Massachusetts, nor have they been put to abusive ends. Appellants' proposed "common use" test has no application here, where the regulations do not "ban" an entire "class of arms."

Finally, even if the Court reaches *Bruen*'s second step, the handgun safety regulations are consistent with the Nation's historical tradition of firearms

regulation, which includes laws since the Founding requiring weapons to be tested for quality and safety, among other analogous traditions.

## ARGUMENT

This Court "review[s] the entry of summary judgment de novo." *Marcus v. American Cont. Bridge League*, 80 F.4th 33, 43 (1st Cir. 2023). On cross-motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (citation omitted). Here, there are no disputed material facts and the District Court correctly granted summary judgment to the Commonwealth for the reasons set forth below.

## I.    The Second Amendment Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held the Second Amendment protects an individual right "to possess and carry weapons in case of confrontation" and that a "ban on handgun possession in the home violates the Second Amendment[.]" *Id.* at 592, 635. Two years later, the Supreme Court ruled that the Second Amendment applies to the States, striking down ordinances that likewise functioned to entirely ban handgun possession. *McDonald v. City of Chicago*, 561 U.S 742, 750 (2010).

*Heller* made clear, though, that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. "[N]othing in our opinion," the Court emphasized, "should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms," among other "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. The Court "repeat[ed] those assurances" in *McDonald*, 561 U.S. at 786 (plurality), "appl[ied]" *Heller*'s framework in *Bruen*, 597 U.S. at 26, and favorably cited *Heller*'s reference to "presumptively lawful" measures more recently in *United States v. Rahimi*, 602 U.S. 680, 699 (2024).

Following *Bruen*, Second Amendment challenges now involve two inquiries. *Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38, 43 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025). First, courts ask whether the Second Amendment's "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, if the conduct is covered by the plain text, courts ask if the government has met its burden to show the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition" of firearms regulation. *Rahimi*, 602 U.S. at 692. To do so, courts reason by analogy to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (citing *Bruen*, 597

U.S. at 29). "[A]t least two metrics" are "*central* considerations" in analyzing whether historic and modern regulations are relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. The Supreme Court explained that in some cases, this inquiry would be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 26. By contrast, in cases involving "unprecedented societal concerns" or "dramatic technological changes," a "more nuanced approach" is appropriate. *Id.* at 27, 30.

This analysis does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692. Indeed, *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* as requiring "a law trapped in amber." *Id.* at 691. But properly understood, the Second Amendment "permits more than just those regulations identical to those existing in 1791." *Id.* at 680*; see also id.* at 740 (Barrett, J., concurring) ("[h]istorical regulations reveal a principle, not a mold"). And even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the lawfulness of such prohibitions," a court can "assume it settled" that the restriction is "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30.

**II.** **Appellants' Proposed Conduct Does Not Fall Within the Plain Text of the Second Amendment.**

Appellants have not demonstrated that "the Second Amendment's plain text covers" their proposed conduct, for two independently sufficient reasons. *Bruen*, 597 at 17. First, as the District Court correctly concluded, the handgun safety regulations do not meaningfully constrain Granata and Prosperi's individual rights to "possess and carry weapons in case of confrontation." [14] *See Heller*, 554 U.S. at 592. Second, as the District Court likewise correctly concluded, the handgun safety regulations are presumptively lawful "conditions and qualifications on the commercial sale of arms" that do not meaningfully impair Granata and Prosperi's ability to access a wide range of handguns to keep and carry for self-defense. *Id.* at 626-27 & n.26.

---

[14] The Gunrunner does not have its own rights under the Second Amendment. *See Teixeira v. County of Alameda*, 873 F.3d 670, 683-87 (9th Cir. 2017) (en banc). The Second Amendment "does not confer a freestanding right [upon retailers], wholly detached from any customer's ability to acquire firearms." *Id.* at 682. Although *Teixeira* is a pre-*Bruen* case, the Ninth Circuit recently affirmed that because this holding in *Teixeira* "was based on the type of text-and-history analysis mandated by the Supreme Court in *Heller*, and *Bruen*, it remains good law." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 n.18 (9th Cir. 2024); *see also United States v. Vlha*, 142 F.4th 1194, 1198 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 625 ("A vendor challenging a firearms regulation must be able to demonstrate that the would-be purchasers' core right of possession is being meaningfully constrained").

**A. The Handgun Safety Regulations Do Not Meaningfully Constrain Appellants' Right to Keep and Bear Arms.**

The handgun safety regulations regulate conduct—which particular handgun models are commercially available for sale—that is only ancillary to, or one step removed from, the "individual right to possess and carry weapons in case of confrontation" protected by the plain text of the Second Amendment. *See Heller*, 554 U.S. at 592; *see also Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) ("Second Amendment allows a 'variety' of gun regulations"). [15]

When looking at the plain text of the Second Amendment under *Bruen*, the question is not "whether the regulation affects firearms in some way, but whether the regulation infringes the right to own and bear arms in case of confrontation." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, 145 S.Ct. 603; *see also Vlha*, 142 F.4th at 1198 ("Where the challenger is an individual whose direct possessory right to 'keep and bear Arms' is not implicated . . . our ancillary-rights doctrine applies."); *B & L Prods.*, 104 F.4th at 118 ("Ancillary rights are protected to the extent necessary to serve [self-defense] purposes; otherwise, the Second Amendment is not implicated by restraints on such rights.").

---

[15] Appellants reference Founding-era dictionary definitions of the word "have," Brief at 17-18, but that word does not appear in the text of the Second Amendment.

The plain text of the Second Amendment simply does not protect Appellants' proposed course of conduct here, which is to be able to commercially purchase approximately a dozen particular handgun models sold elsewhere in the United States, and that they may purchase in the private market in Massachusetts. It is undisputed that they can commercially purchase over 1,000 models of handgun in Massachusetts, and the handgun safety regulations do not prohibit them from keeping and carrying any handgun. [16]

The handgun safety regulations in no way regulate Granata or Prosperi's ability to lawfully possess and carry ███████████████ for self-defense in Massachusetts. Granata ████████████████████████████████. Prosperi ███████████████████████████████████ ████████████████████. *See* pp. 8-10 above. Granata and Prosperi have not shown that purchasing the additional weapons they desire, much less from retailers specifically, rather than in the private market, is "necessary to effectuate their Second Amendment rights" to carry a weapon in case of confrontation. *See*

---

[16] The handgun safety regulations are further removed from the individual right guaranteed by the Second Amendment because they depend on firearm manufacturers submitting their firearms for testing and adding specific safety features. Many models may be excluded from what retailers may sell simply because the manufacturer has decided not to submit it for testing, or to add safety features, perhaps because Massachusetts is not an important sales market, or for other business-related reasons.

*Oakland Tactical*, 103 F.4th at 1198.[17] Nor have they shown that the handgun

safety regulations inhibit them from acquiring handguns at all; ██████████

████████████████████████████████████████████████████

███████████.[18] *See Vlha*, 142 F.4th at 1200 (requiring licenses for commercial

firearm manufacturers did not "meaningfully constrain would-be purchasers from

obtaining firearms" because of number of already-licensed manufacturers and

firearms manufactured); *Teixeira*, 873 F.3d at 680 (firearm retailer failed to state

claim that ordinance prohibiting firearm retailer in specific location "meaningfully

inhibits residents from acquiring firearms within their jurisdiction"). Thus,

Appellants have failed to demonstrate their proposed conduct falls under the plain

text of the Second Amendment.

---

[17] In addition, the meaning of the plain text is informed by the historical understanding of the Second Amendment, *see Bruen*, 597 U.S. at 20, and here, amassing a large collection of weapons would have been "deeply alien" in the colonial era, when only a very small percentage of gun owners owned multiple guns. App. 268-69 (DeLay ¶ 9). Those that owned more than five guns did so for a distinct purpose unrelated to self-defense (or even militia service): One study of probate records showed that over two-thirds of gun owners with more than five guns were slaveholders; all gun owners with more than ten guns ran vast slaveholding enterprises. *Id.*

[18] Indeed, ████████████████████████████████████████████████████
████████████████████████████████████████████████████
Sealed App. 186 (DSMF 16).

**B.** **The Handgun Safety Regulations Are Presumptively Lawful Conditions or Qualifications on the Sale of Firearms.**

The Appellants' Second Amendment claim also fails at step one of the *Bruen* analysis because the handgun safety regulations are "presumptively lawful" "conditions and qualifications on the commercial sale of firearms." *See Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786 (plurality opinion); *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring). Courts have assessed conditions or qualifications on the sale of firearms at step one by considering whether the state regulation "meaningfully impairs [the Appellants'] ability to access firearms." *B & L Prods.*, 104 F.4th at 119 ("[C]ommercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test."); *see also Gazzola v. Hochul*, 88 F.4th 186, 198 (2d Cir. 2023), *cert denied*, 144 S. Ct. 2659 (2024) (presumptive lawfulness of regulation of retailers not overcome where "there is no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms"). As other courts have explained, "'the Second Amendment does not elevate convenience and preference over all other considerations,' nor does it 'guarantee[] a certain type of retail experience.'" *B&L Prods.*, 104 F.4th at 119 (quoting *Teixeira*, 873 F.3d at 680 & n.13).

The handgun safety regulations are conditions and qualifications on the commercial sale of firearms: they require that handguns commercially sold in

Massachusetts are not defective; are accompanied by safety mechanisms; have childproofing features; and have tamper-resistant serial numbers. The Attorney General's regulations are issued under her authority to declare that certain activity—here, the selling of handguns that lack minimum safety features— constitutes an unfair and deceptive act or practice in the conduct of trade or commerce. *See* Mass. Gen. Laws ch. 93A, § 2(c). Both the Attorney General's regulations and the statute apply only to retailers, not to individuals who sell fewer than four firearms a year. Nor do they impact an individual's license-to-carry issued under Mass. Gen. Laws ch. 140, § 131, or prohibit or restrict the possession or carrying of any handgun. *See* pp. 3-7 above.

Appellants have not identified any evidence to rebut the presumptive lawfulness of the handgun safety regulations. For example, they have not shown that the handgun safety regulations are being employed for "abusive ends," or that they result in a *de facto* ban on the sale of handguns in Massachusetts. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 122 (10th Cir. 2024) (explaining that conditions and qualifications on commercial sale of firearms are presumptively outside Second Amendment unless put to "abusive ends"); *see also New York State Firearms Ass'n v. James*, 157 F.4th 232, 245 (2d Cir. 2025) (commercial sales restrictions presumptively lawful unless they have "the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms" or are "put toward

abusive ends") (citations omitted)); *McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024) ("condition or qualification" resulting in 10-day wait to purchase firearm not "put towards abusive ends" or "*de facto* prohibition on possession").

Here, there are at least 1,000 handgun models that licensed retailers in Massachusetts may sell, and it is undisputed that, in fact, retailers sell tens of thousands of handguns each year, and that tens of thousands more handguns are sold on the private market. Appellants Granata and Prosperi ███████████ ████████████████████████████████████████████ ████████████. Thus, because the handgun safety regulations do not meaningfully constrain Appellants' individual rights to keep and carry a firearm in the event of a confrontation, the handgun safety regulations are lawful conditions and qualifications on the commercial sale of firearms, and this Court should affirm the District Court. *See Heller*, 554 U.S. at 626-27 & n.26; *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring).

### III. The "Common Use" Inquiry Has No Relevance To This Case Because the Handgun Safety Regulations Are Not a "Ban" on a "Class of Arms."

Appellants mistakenly urge this Court to apply an overly broad version of a "common use" test derived from *Heller* and circumvent any further analysis on either the plain text or historical inquiry. Brief at 30-40. But any so-called "common use test" is not applicable here, whether at step one or step two of *Bruen*, where the challenged law does not constitute a ban on an entire class of arms.

The contours of how "common use" is considered in Second Amendment challenges are still being developed in the lower courts. *See, e.g., Capen v. Campbell*, 134 F.4th 660, 670 (1st Cir. 2025) (noting Supreme Court has not held that "a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual'"); *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) ("Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms."), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534.[19] This Court need not wade into that analytical territory here. Where a regulation does not prohibit, either explicitly or in practice, the possession or use of "an entire class of 'arms,'" *see Heller*, 554 U.S. at 628, any "common use" inquiry is not implicated.

*Heller* did not complete this case's "historical work" because that Court was faced with an entirely different and more sweeping regulation. Brief at 31. *Heller* involved a District of Columbia law that "totally ban[ned] handgun possession in the home." 554 U.S. at 628. The Court held that a government may not prohibit possession "of an entire class of 'arms' that is overwhelmingly chosen by

---

[19] For further discussion of the historical flaws in Appellants' proposed "common use" test, as well as the related "dangerous and unusual" test, see App. 229-31 (Cornell ¶¶ 44-48). As *Rahimi* correctly cited, historical sources often used the disjunctive "dangerous *or* unusual." *See* 602 U.S. at 697. Sources that used the conjunctive "and" were employing a rhetorical structure translating in modern grammar to "unusually dangerous." App. 229-30 (Cornell ¶ 46).

American society for [the] lawful purpose [of self-defense]." *Id.* at 628. *Heller*

relied in part on the historical fact that, during the colonial period, individuals

called for militia service "were expected to appear bearing arms supplied by

themselves and *of the kind* in common use at the time." *Id.* at 624 (quoting *United*

*States v. Miller*, 307 U.S. 174, 179 (1939)) (emphasis added). *Heller*'s reference to

"common use" thus distinguished some "kinds" of weapons, like handguns, from

other "kinds" of arms, such as short-barreled shotguns or fully automatic rifles,

that receive *no* Second Amendment protection. *Id.* at 624-25, 627.

While *Heller* held that handguns, as "an entire class of 'arms,'" cannot be

banned, it said nothing about lesser restrictions that may affect some handguns in

some manner, explicitly noting that States retain "a variety of tools" for addressing

concerns related to firearms, "including some measures regulating handguns." *Id.*

at 628, 636. The Court further cautioned that it "d[id] not undertake an exhaustive

historical analysis … of the full scope of the Second Amendment." *Id.* at 626. And

more recent scholarship has uncovered "hundreds of laws" related to gun

regulation in early America that were largely unavailable to the *Heller* Court. App.

211-12 (Cornell ¶ 8).

In *Capen v. Campbell*, this Court rejected a similar argument to the one

Appellants make here that where a law acts to restrict *any* model of handgun, it is

necessarily invalid under *Heller*. In *Capen*, the law at issue restricted "only

semiautomatic handguns that are either specifically enumerated or exhibit a combination of certain features," 134 F.4th at 674, much like the law at issue here restricts only handguns that fail either the required safety testing or lack basic safety features. This Court rejected the "implied premise" that "a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class." *Id.* The Court did "not read *Heller*" to "support [that] proposition" and declined to "exten[d]" "*Heller*'s holding to cover all bans that extend to some handguns." *Id.* Appellants again urge the same extreme result rejected in *Capen*: that any restriction on any particular handgun is "the same" as *Heller* and should be struck down without further analysis. Appellants brush aside the language in *Capen* as dicta, Brief at 34-35, but this Court's sound reasoning applies equally here.

Like the regulation at issue in *Capen,* the handgun safety regulations are distinguishable from the total possession ban in *Heller* on any number of grounds, most saliently: (1) the regulations do not restrict possession in any way, only commercial sale, pp.2-7 above; (2) handguns, as a "kind" of arm, remain widely available for commercial sale in Massachusetts, p.8 above; (3) even the handgun models that may not be sold commercially can be sold on the active Massachusetts

private gun market, pp.3-8 above;[20] and (4) Granata and Prosperi make no claim that they are unable to adequately arm themselves with handguns for self-defense, nor is the Gun Runner unable to sell handguns suitable for their customers' self-defense needs, pp.8-10 above.

Appellants argue *Heller*, *McDonald*, and *Bruen* assessed handgun restrictions in "categorical terms."[21] Brief at 35-36. But those cases spoke in categorical terms because they involved categorical restrictions that barred the use of *any* handgun. *See Heller*, 554 U.S. at 574 ("The District of Columbia generally prohibits the possession of handguns."); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) ("Chicago's firearms laws … effectively ban[] handgun possession by almost all private citizens who reside in the City."); *Bruen*, 597 U.S. at 12 (reviewing New York licensing regime requiring "proper cause" "to 'have and carry' a concealed 'pistol or revolver'" in public); *see also id.* at 76 (Alito, J., concurring) (challenged law made it "virtually impossible for most New Yorkers"

---

[20] With no citation to the record, Appellants characterize the private market as "necessarily" more expensive than the dealer market and the chances of finding a particular firearm "slim at best." Brief at 33. Indeed, deposition testimony contradicts the characterization that private sales are more expensive. *See* Sealed App. 185 (DSMF No. 12); Sealed App. 187 (DSMF No. 23).

[21] Appellants repeatedly cite Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), *see* Brief at 32, 34, 37, but this Court rejected over-reliance on that opinion, which is not "binding authority." *See OST*, 95 F.4th at 51.

to carry a handgun in public). The particular model of handgun that a plaintiff sought to use (but could not) was irrelevant in those cases because *all* handguns were restricted in the same manner. But particular models are highly relevant in this case, where the challenged regulations distinguish between handgun models that may be sold commercially in Massachusetts and those that may not.[22]

Appellants make the perplexing assertion that what "mattered in *Heller* was not that the law in question banned an entire class of arms in common use," Brief at 36, but *Heller* repeatedly emphasized precisely that point. *See, e.g.*, 554 U.S. at 629 (explaining "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban" and "a complete prohibition of [handgun] use is invalid"). The fact that Massachusetts consumers may purchase a range of handguns suitable for self-defense goes directly to the degree of burden that the regulations place on the right to self-defense—one of the "central" considerations in *Bruen*'s analogical historical reasoning. *See Bruen*, 597 U.S. at

---

[22] The two California district court cases cited, Brief at 36-37, 39, should not guide this Court for several reasons. First, those plaintiffs did not challenge California's similar testing requirements, *only* the additional safety features. *See Renna v. Bonta*, 667 F. Supp. 3d 1048, 1058 (S.D. Cal. 2023); *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1080 (C.D. Cal. 2023). Second, California imposes a "microstamping" requirement, which the district court in *Boland* found is "not technologically feasible and commercially practical" and has the effect of "restrict[ing]" California's roster to "models from over sixteen years ago," 662 F. Supp. 3d at 1080, whereas Massachusetts has no such requirement. Third, both decisions are currently on appeal. *Renna v. Bonta*, No. 23-55367 (9th Cir.); *Boland v. Bonta*, No. 23-55276 (9th Cir.).

29. While state regulation of particular handgun models could be so encompassing that it constitutes a *de facto* ban, *see* Brief at 37, that is not the case here, where the record contains undisputed evidence of a robust handgun market in Massachusetts in which Appellants are very active participants.

Finally, as an alternative to their primary argument that *Heller* categorically compels judgment in their favor, Appellants argue "[t]he specific handguns Massachusetts bans are among the most popular in the country." Brief at 38. This fails on multiple fronts. First, this Court squarely rejected a "popularity test" for Second Amendment protection. *See OST*, 95 F.4th at 50-51 ("Despite plaintiffs' fixation on [] ownership rates . . ., such statistics are ancillary to the inquiry the Supreme Court has directed us to undertake."); *Capen*, 134 F.4th at 670 (reaffirming "*Ocean State Tactical* forecloses [] reliance on ownership statistics" alone to show "common use"). And, as other courts assessing "common use" have recognized, that proposed approach would illogically allow manufacturers to control the scope of constitutional protection. *E.g.*, *Bianchi*, 111 F.4th at 461 ("We decline to hold that arms manufacturers can secure constitutional immunity for their products so long as they distribute a sufficient quantity before legislatures can react."). Here, deference to manufacturers' sales numbers is particularly inappropriate because compliance with the handgun safety regulations is squarely within those same manufacturers' hands. Manufacturers should not be able to rely

on their marketing success elsewhere to skirt basic and attainable safety regulations that protect handgun owners and their families in Massachusetts.

Second, Appellants fail to support their claim of popularity with an evidentiary showing—they point to only one handgun manufacturer, Glock, and cite to a single news article from 2020 about sales information, without any authentication of the underlying factual data. Brief at 38-39. Moreover, the record contains undisputed evidence that Glocks are part of the Massachusetts handgun market. *See* Sealed App. 186-89 (DSMF No. 19, 21, 30).[23] In addition, Appellants do not distinguish in their claims or requested relief between the regulations' application to particulars makes and models. App. 30 (prayer for relief seeking a "permanent injunction restraining Defendants . . . from enforcing the Handgun Ban"). On such a facial challenge, Appellants cannot prevail "if the law is constitutional in at least some of its applications." *Rahimi*, 602 U.S. at 701 n.2 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Capen*, 134 F.4th at 674–75 ("The validity of one application means that the [challenged law] is not facially invalid.") Appellants' unsubstantiated claims about the popularity of

---

[23] Prosperi ████████████████████████████████████████
████████████████████████. Sealed App. 186-87 (DSMF Nos. 19, 21).

a single firearms model cannot serve as a basis to invalidate the entire regime, which applies to firearms that fail basic drop and firing safety tests.

Where, as here, a state enacts a regulation that does not regulate possession and preserves the state's extensive commercial and private handgun market, Appellants cannot simply label the regulation a "handgun ban" to circumvent the full analysis required by *Heller, Bruen* and *Rahimi*. Because the handgun safety regulations are not a ban on handguns as a "class of arms," any "common use" inquiry—whatever its contours—has no application here.

## IV. The Handgun Safety Regulations Are Consistent with Historical Regulations of Firearms.

Even if this Court were to undertake a history-and-tradition inquiry at the second step of *Bruen*, the handgun safety regulations easily pass constitutional muster, as the District Court correctly concluded in the alternative. Add. 19-27. Massachusetts, like many other states, has long had relevantly similar laws in place to reduce the dangers posed by firearms and ammunition.

While the Supreme Court has left open whether a court should "primarily" look to Founding-era or Reconstruction-era history, *Rahimi,* 602 U.S. at 692 & n.1, lower courts have looked to both sources in assessing state laws. *E.g.*, *Antonyuk v. James*, 120 F.4th 941, 972-74 (2d Cir. 2024) ("[T]he prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."). That approach is logical since states are "bound to respect the right to keep and

31

bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37. As a result, "evidence from the Reconstruction era regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is *at least as relevant* as evidence from the Founding Era regarding the Second Amendment itself." *Antonyuk*, 120 F.4th at 988 & n.30. This Court has likewise rejected attempts to ignore nineteenth- and even twentieth-century regulations in the Second Amendment context, holding instead that such laws can "provide insight as apt historical precursors." *OST*, 95 F.th at 51-52.

Here, analogues from both the Founding and Reconstruction eras are relevantly similar to the modern regulations. The first category of "proving" laws and practices alone provides conclusive evidence of a "relevantly similar" tradition to the modern handgun safety regulations. *Bruen*, 597 U.S. at 29. But if there were any doubt, additional categories of historic laws provide further "relevantly similar" analogues, including firearm and gunpowder storage laws, laws banning "trap guns," and laws to reduce minors' access to dangerous weapons.

### A. Laws and Governmental Practices Requiring the Inspection or "Proving" of Firearms and Ammunition Are Relevantly Similar to the Handgun Safety Regulations.

For as long as firearms have existed, so too have laws, regulations, and other methods of ensuring quality control and safety in order to address the dangers of firearm accidents and to ensure their fitness for their intended purpose. App. 159-

60 (Rivas ¶ 13) (noting early modern English and French rules for "testing the strength of barrels"). Indeed, government-mandated safety testing in America was not only widely accepted, but it "ultimately helped American gun manufacturers innovate and become the international leader in firearms production by the middle of the nineteenth century." App. 122 (Regele ¶ 9). While a "historical twin" is not required, *Rahimi*, 602 U.S. at 701, "proving" and inspection laws and practices at both the state and federal levels come remarkably close to a "twin" given the differences in technology and historical context.

In 1805, fourteen years after the Second Amendment's ratification, Massachusetts enacted a law requiring the "proof," or satisfactory inspection, of all firearms manufactured within the Commonwealth before they could be sold. App. 160-61 (Rivas ¶ 14); App. 217 (Cornell ¶ 20). The law was enacted because, absent such legislation, "many [Firearms] may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed." App. 103-05 (1804 Mass. Acts. 111, ch. 81).[24] The law authorized the appointment of "provers of fire arms," "whose duty it shall be to prove all Musket Barrels and Pistol barrels[.]" App. 103

---

[24] The court may take judicial notice of the existence and content of historical laws and cases, including those reproduced directly in the record appendix and those cited within the Commonwealth's expert reports. *See Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.") (citation omitted).

(*Id.* § 1). The law specified in detail the manner in which provers were to test and inspect the weapons. If the weapons passed inspection, the prover was to stamp the weapon with the inspector's initials and the year, "so deeply impressed on said barrel as that the same cannot be erased or disfigured." *Id.* Weapons that failed this inspection, such that they were "unfit for use," were returned to the owner and could not be sold in the Commonwealth. App. 103-04 (*Id.* §§ 1, 3).[25] Maine passed a similar law in 1821. App. 115 (1821 Me. Laws 546, ch. 162).

These state laws mirrored a Revolutionary tradition of colonial governing bodies requiring the "proving" of militia weapons. *See, e.g.*, App. 87-88 (Resolution of the Maryland Council of Safety (Aug. 29, 1775, Archives of Maryland, 11:75)) (approving purchase of "proved" muskets); App. 89-91 (Resolutions of the Pennsylvania Committee of Safety (Oct. 27, 1775, Col. Rec. Penn. 10:383)) (directing commissary to "prove all the Muskets made in this City for the Provincial Service"). George Washington notably was concerned with the quality of arms brought by militia members, complaining in 1776 that "of Arms those brought in by the Soldiers are So very indifferent that I Cannot place Confidence in them." App. 272-73 (DeLay ¶ 18). This concern persisted after the war—in a letter to Congress in 1783, Washington recommended that militia

---

[25] This law was amended in 1814 to add additional requirements, App. 109-111 (1814 Mass. Acts 464, ch. 192); and then revised again in 1837 and 1859. App. 217 (Cornell ¶ 20 n.25).

members be regularly mustered and trained, and "have their Arms and Accoutrements inspected at certain appointed times, not less than once or twice in the course of every year." National Archives, Washington's Sentiments on a Peace Establishment (May 1, 1783).[26]

As the American government became more involved in promoting domestic gun manufacturing in the early to mid-nineteenth century, the federal government imposed "federal standards" requiring that all gun parts "pass regular inspection." App. 126-27 (Regele ¶ 17). These inspection regimes, which also form part of the American tradition of firearms regulation, applied directly to federal armories, as well as to private armories supplying army and militia weapons. App. 121-22 (Regele ¶ 8). By 1818, the federal government's Ordnance Department "mandated that all contract arms be examined by a government proof-master, who would verify that all 'contractors' arms be equal to those produced at the national armories.'" App. 127 (Regele ¶ 18). And this inspection requirement was enforced—condemned barrels were "discarded" or might be auctioned for parts. App. 129-30 (Regele ¶ 20).

Federal quality and safety testing of firearms continued into the 1830s, when military officers rejected such arms as Samuel Colt's new revolver after testing in 1837 showed the weapon's "liability to accidents." App. 134-36 (Regele ¶ 25).

---

[26] https://founders.archives.gov/documents/Washington/99-01-02-11202.

Later testing of Colt's carbine (short rifle) models involved ten experiments designed to test the firearm's performance under various conditions, including when "slung to a man mounted, who galloped rapidly for a mile, the piece swinging against the side of the horse." App. 136-37 (Regele ¶ 26). When testing showed certain safety risks, such as "the possibility of two or more chambers going off at the same time," Colt "improved the safety and practicality of his firearms" and eventually secured government contracts in 1841. App. 136-37 (Regele ¶ 26).

It was thus well-accepted in colonial and early America that states and the federal government had the authority to ensure through a testing process that weapons would perform as intended and did not pose a heightened risk of accidental harm. Appellants argue federal patronage is distinguishable from the modern regulations because it addressed the military, rather than civilian, market. Brief at 49. But those distinctions were less meaningful in colonial and early America. Militias members had to "provide themselves" with necessary weaponry, so "civilian" and "military" purchases were not cleanly divided. App. 122-23 (Regele ¶ 10); App. 273 (DeLay ¶ 19) (noting "line between" "military and civilian arms" was "not rigid" in early America). Further, practically speaking, the early American arms industry relied on federal patronage to survive. App. 139 (Regele ¶ 30); *see also* App. 140 (Regele ¶ 33) ("[The firearms industry owes its existence to federal oversight."). Federal patronage provides an apt comparison for modern

36

state regulation that takes into account the historical context. *See* App. 187-88 (Rivas ¶ 44) (noting importance of placing "historical gun and weapons laws" into "proper context").

Furthermore, state laws requiring the proving and inspection of gunpowder were prevalent. Gunpowder regulation had a clear and direct impact on early Americans' ability to keep and bear arms, because, until the mid-nineteenth century, "firearms had to be muzzle-loaded with gunpowder and ball before every shot[.]" App. 269 (DeLay ¶ 10). Many gunpowder proving laws were enacted squarely in the Founding era and "stretched across the country." App. 161-63 (Rivas ¶ 15). *See, e.g.*, App. 92-93 (1776 R.I. Pub. Laws 25 (Oct. Sess.)); App. 94-96 (1776-77 N.J. Laws 6-7, ch. 6); App. 112-114 (1820 N.H. Laws 274, ch. 25). For example, a 1794 Pennsylvania law mandated a specific device for proving gunpowder. App. 97-102 (1794 Pa. Laws 764, ch. 337). The measure sought to protect "the purchaser and consumer" against "inferior" gunpowder, both "imported from abroad, and manufactured within this state," whose "defects" may not be "discovered until brought into actual use." *Id.* In Massachusetts, an 1809 law set requirements for the quality and composition of gunpowder; authorized appointed provers to mark as "condemned" gunpowder that failed inspection; and forbade the sale of condemned or uninspected gunpowder. App. 106-08 (1808 Mass. Acts 444, ch. 52).

These inspection laws and practices are "relevantly similar" to the handgun safety regulations in the "central" ways that matter under *Bruen*: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," i.e. the "how," and "whether that burden is comparably justified," i.e. the "why." *Bruen*, 597 U.S. at 29. Starting with the "how," the court looks at "how a regulation actually burdens the right of armed self-defense, not how it might be imagined to impose such a burden." *OST*, 95 F.4th at 45. Like the historical laws, the modern regulations impose sales restrictions based on whether a weapon has passed particular safety tests, but do not limit residents' ability to keep and carry weapons for self-defense—the record reflects that Massachusetts residents have access to a broad array of handguns for self-defense, capable of serving gun owners with varied needs. *See* pp. 8-10, above. Appellants argue that the proving laws are dissimilar because they "were aimed at finding *defective* firearms," but did not "ban any types of or models of firearms." Brief at 46. Prior to interchangeable parts, though, firearms had to be inspected on an individual basis. This was *more* onerous for a manufacturer or seller, who could not simply show the safety of an entire product line—as the modern regulations allow—but instead had to subject every single weapon to inspection. The historical laws thus imposed a *greater* burden on sellers and manufacturers than the modern regime, but both sets of laws aim to ensure that firearms are fit for use.

And the "why" is also relevantly similar: like the handgun safety regulations, the historical proving laws and governmental inspection practices aimed to eliminate the dangers of weapons and gunpowder that were unfit for their intended purpose and liable to cause preventable accidents. Appellants themselves describe both the firearm and gunpowder proving laws as "a shield against latent defects caused by shoddy manufacturing." Brief at 50. That is precisely the purpose of the modern regulations as well—key provisions of the modern regime ensure that firearms are not constructed such that they will fire repeatedly without a trigger pull or will fire upon being dropped. Mass. Gen. Laws ch. 140, § 123(o)(i)-(iii). The handgun safety regulations reflect modern technology that addresses these same basic concerns that have existed since the Founding. *See Rahimi*, 602 U.S. at 692 (analogical reasoning applies "the balance struck by the founding generation to modern circumstances"). Appellants' claim that proving laws "simply mirrored the protection offered today by product liability law" is wrong. Brief at 15. The point of proving laws was to *avoid* harms caused by unsafe products, not to compensate victims of avoidable injuries after the fact.

Although not all States passed firearms proving laws like Massachusetts and Maine, *see* Brief at 48, it is not surprising that proving laws originated in

Massachusetts, which was home to significant firearms manufacturing.[27] Massachusetts's Springfield Armory, which began production in 1795, was one of two official armories for the federal government. App. 123-24 (Regele ¶ 11). While the Springfield Armory was exempt from the Massachusetts law, it had its own exacting quality control requirements and its location was significant in the development of American firearms manufacturing. App. 216-17 (Cornell ¶¶ 19-20). To supplement the armories, the federal government "subsidized production in private armories," many of which were located close to Springfield. App. 124-25 (Regele ¶¶ 12, 14). Gun manufacturing remained concentrated in this area for decades—seven of the eight companies from which the U.S. military purchased weapons during the Civil War were within 100 miles of the Springfield Armory. App. 140 (Regele ¶ 31). Appellants argue the Springfield Armory standards are like modern manufacturers' internal quality control mechanisms, Brief at 47-48, but that is plainly wrong: the Springfield Armory was operated by the federal government so its quality control was government mandated.

In addition, the relatively small number of state proving laws makes sense in historical context. The federal government was the most significant patron of early

_____

[27] Massachusetts was also more heavily armed than many other states. App. 219-20 (Cornell ¶ 26); App. 270-71 (DeLay ¶ 14) (New England more armed than other regions in colonial period). Massachusetts gun regulation is thus particularly instructive when looking at the early American period.

American firearms—the Ordnance Department oversaw inspection "of all arms provided for the army and militia," and "most weapons" distributed to state militias under that authority "became state property." App. 126 (Regele ¶ 17). As a result, it is unsurprising that most governmental regulation in the interest of quality control happened primarily via federal patronage, rather than state law. It is also unsurprising that no similar state laws existed in the pre-Revolutionary period, at least as far as the current historical record shows. Prior to the American Revolution, there was little domestic manufacturing of firearms and the colonies "had to rely on imports for the majority of their ordnance and ordnance stores," App. 124 (Regele ¶ 12), so there was little reason to regulate arms manufacturing in earlier years. *See also* App. 130 (Regele ¶ 21) (noting that United States did not manufacture a majority of its own weapons until 1810).

In any event, even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the lawfulness of such prohibitions," then a court can "assume it settled" that the restriction could be imposed "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. The Commonwealth found no indication of any challenge to the lawfulness of these firearms or gunpowder proving laws, much less any court ruling deeming them to violate the right to keep and bear arms. This is unlike *Bruen*, where the Court held that a "single state statute" could not support New

41

York's broad ban on public carry because that restriction had such a significant burden on individual self-defense and contradicted the weight of other evidence. *Id.* at 65-66. Here, by contrast, the burden on self-defense is *de minimis* and the regulations correspond directly with an unchallenged historical tradition of safety-oriented quality control approved by George Washington himself and exemplified across a wide variety of state laws and federal practice.

Finally, Appellants argue the proving laws are not sufficiently analogous to the Attorney General's regulatory requirements mandating certain safety features, even if—as Appellants appear to concede—the laws may be analogous to the modern regulations' testing requirements. Brief at 46. But Appellants' complaint does not separately challenge the Attorney General's additional safety feature requirements. Appellants instead bring a facial challenge seeking to enjoin enforcement of the entire regime, without distinction between the testing and the safety feature requirements. App. 30 (prayer for relief seeking to enjoin "the Handgun Ban"). "The validity of one application means that the [challenged law] is not facially invalid." *Capen,* 134 F.4th at 674–75. Here, the regulations' testing requirements—which are part of the Appellants' facial challenge—are directly analogous to colonial and early American "proving" laws and practices, and that alone warrants affirmance of the judgment for the Commonwealth.

To the extent the Court undertakes a requirement-by-requirement assessment of the law, though, the historical "proving" tradition is also analogous to the Attorney General's regulations requiring specific safety features. Safety mechanisms such as chamber load indicators or magazine safety disconnects did not exist at the time of the Founding or Reconstruction, nor was there any need for them, as weapons were overwhelmingly single-shot devices that were kept unloaded to avoid corrosion. App. 269 (DeLay ¶ 10).[28] Under the "more nuanced approach" that applies where developments in technology make direct comparison impossible, the handgun safety regulations easily match the how and why of historic proving laws and practices. *See Bruen*, 597 U.S. at 27. The proving laws and practices aimed to reduce harm caused by accidental discharge of ammunition by banning the sale of particular weapons that carried a higher risk of causing such accidental injuries. The modern regulations similarly ensure that handguns sold on the commercial market are less likely to cause accidental injuries and death, while preserving access to handguns that meet the self-defense needs of the Commonwealth's residents. *Bruen* requires no more.

---

[28] The first patent for a chamber load indicator was filed in 1888, and for a magazine safety disconnect in 1911. *See* Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW, *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries*, Journal of Public Health Policy 20(4):427-440, 1999, cited at App. 308-09 (Hargarten ¶ 29 n.13) and available at https://www.jstor.org/stable/pdf/3343129.pdf.

**B. Firearms and Gunpowder Safe Storage Laws Further Support the Constitutionality of the Handgun Safety Regulations.**

Further, a host of laws from the colonial period through the end of the nineteenth century imposed requirements on the storage of weapons and gunpowder to minimize the risk of fire, accidental discharge, and explosion. App. 161-64 (Rivas ¶¶ 15-16) (citing state and city regulations); App. 215 (Cornell ¶ 17, n.17) (citing storage statutes from five states ranging from 1771 to 1832).

This Court has recognized that "founding-era" governments "limited the quantity of gunpowder that a person could possess, and/or limited the amount that could be stored in a single container" in response to "risks posed" if that gunpowder were "ignited." *OST*, 95 F.4th at 49 & n.16 (citing statutes). Another example discussed by the *Heller* Court was a 1783 Massachusetts law that imposed a fine on "any Person" who "shall take into any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of *Boston*, any ... Fire-Arm, loaded with, or having Gun-Powder" and allowed seizure of loaded firearms found in such buildings. *See* App. 84-86 (1771-72 Mass. Province Laws 167, ch. 9). The *Heller* Court characterized this law as a "fire-safety law" that did not "remotely burden the right of self-defense as much as an absolute ban on handguns," and confirmed that "laws regulating the storage of firearms to prevent accidents" are permissible. 554 U.S. at 632.

These laws were considered valid exercises of the state police power by both federal and state high courts. Chief Justice Marshall noted in 1827 that "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States." *Brown v. Maryland*, 25 U.S. 419, 443 (1827); App. 161-64 (Rivas ¶¶ 15-16); App. 226-27 (Cornell ¶ 40). And Massachusetts's highest court recognized the same. *See Commonwealth v. Alger*, 61 Mass. 53, 85 (1851) ("There are many cases in which [the police] power is exercised by all well ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable," including "laws to prohibit the use of warehouses for the storage of gunpowder near habitations or highways[.]"); App. 226-27 (Cornell ¶ 40).

These laws are relevantly similar to the modern handgun safety regulation along *Bruen*'s "how" and "why" metrics. As to the "why," both sets of laws were intended to reduce what might be called the collateral dangers of firearms—*i.e.*, dangers separate and apart from the intended function of the weapons, such as fire, explosion, and accidental discharge. Indeed, laws about "the manufacture, storage, and use of gunpowder" were historically understood to be public health measures aimed at addressing "nuisances … which often occasion direct accidental injury or death" and that "should be so regulated as to not become dangerous to health and

life." App. 195-96 (Rivas ¶ 56). The modern regulations are likewise consumer protection measures aimed to reduce "accidental injury or death."

And in terms of "how" the regulations burden the right to self-defense, the Court in *Heller* stated that "fire-safety" storage laws, and regulations intended to "prevent accidents," do not "remotely burden the right of self-defense," and thus are valid. 554 U.S. at 632. The same is true of the challenged regulations, which restrict commercial sales of handgun models that lack certain safety features or have not passed safety testing, but do not ban an "entire class of 'arms'" like the complete handgun ban in *Heller*. *Id.* at 628.

Appellants argue these analogues are insufficient because even if they "could be analogues for the drop test component of the Handgun Ban," they are not analogous to other requirements. Brief at 52. Again, Appellants have chosen to bring a facial challenge to all components of the handgun safety regulations. As a result, they must show that *every* application of the challenged law is unconstitutional. *See Capen*, 134 F.4th at 675 (explaining that where a plaintiff "chose to litigate [a] case[] as [a] facial challenge[]," "that decision comes at a cost") (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). If the gunpowder storage laws are at least an analogue for the "test component of the Handgun Ban," Appellants necessarily cannot make the facial challenge contained in their complaint or obtain the sweeping relief sought therein.

Appellants also argue the gunpowder storage laws are not analogous because they were aimed specifically at fire suppression, rather than other forms of firearms accidents. Brief at 52-53. But that reasoning would constrain the required analogical reasoning too narrowly. *See Rahimi*, 602 U.S. at 691-92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). Modern firearms and ammunition do not pose the same fire risk as Founding-era equivalents, so the proper analysis is that the historic laws aimed to prevent accidental ignition of ammunition, just like the modern regulations. Indeed, this Court found gunpowder storage laws to be "especially apt" analogs to modern criminal laws forbidding the possession of large-capacity magazines, which are arguably more distinct along the "why" metric in that a magazine limitation aims to prevent *intentional* misuse of firearms, whereas the handgun safety regulations, like the historic gunpowder laws, are both aimed at the *unintended* harm of accidental ignition. *See OST*, 95 F.th at 49.

*Heller* did not consider the gunpowder storage laws to be "irrelevant to the scope of the Second Amendment's protection" as Appellants claim. Brief at 52-53. Rather, *Heller* was careful to note that its analysis did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Heller*, 554 U.S. at 632. A historical analogue that is too dissimilar to support one modern regulation might nonetheless be similar enough to support another. This is precisely what

happened in *Rahimi*, which relied upon historic surety laws that had been rejected in *Bruen*. The Supreme Court explained: "The conclusion that focused regulations like the surety laws are not a historical analogue for a broad prohibitory regime . . . does not mean that they cannot be an appropriate analogue for a narrow one." *Rahimi*, 602 U.S. at 700. Similarly, here, while gunpowder storage laws were not a proper historical analogue for the complete handgun prohibition at issue in *Heller*, they are "an appropriate analogue" for the far narrower restrictions imposed by the handgun safety regulations.

### C. Trap Gun Restrictions Are Yet Another Example of a Relevantly Similar Historical Tradition.

A third type of analogous historical tradition involves restrictions on "trap guns" (also known as "spring guns" and "infernal machines"), which were firearms configured in a way to fire remotely, typically by rigging the firearm to be fired by a string or wire when tripped. App. 172-73 (Rivas ¶ 23). Colonial laws from Plymouth in 1670 and New Jersey in 1771 made it unlawful to set trap guns. App. 172-73 (Rivas ¶ 23); *see* App. 76-78 (Records of the Colony of New Plymouth in New England: Laws, 1623-1682); App. 79-83 (1763-1775 N.J. Laws 346, ch. 540, § 10). Other states followed suit in later decades, including through the common law, either by prohibiting the practice directly or imposing criminal liability for injuries or deaths caused by trap guns. App. 173-77 (Rivas ¶¶ 24-27).

These laws were relevantly similar to the modern regulations in both "how" and "why" they burden self-defense. These laws did not ban an entire class of weapons, but only targeted devices *configured* in a certain way that rendered them unusually dangerous. Citizens remained free to keep and carry a rifle or musket, but were barred from setting those weapons to be fired remotely because of the unacceptable risk of harm to others. Similarly, under the handgun safety regulations, Massachusetts residents remain free to keep and carry handguns, they are simply barred from purchasing through a retailer particular models that pose undue risk of collateral harm. Restrictions on trap guns protected "innocent people who might unsuspectingly trip the device," App. 174 (Rivas ¶ 25), just as the modern regulations protect innocent people who might unsuspectingly drop a handgun that then fires without a pull of the trigger, or unsuspectingly fire a bullet they did not realize was in the chamber. Again, a challenged regulation need not "precisely match its historical precursors," so long as it "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

**D.** **Law Protecting Minors From the Dangers of Firearms Have a Long Historical Pedigree.**

The final category of analogous historical laws specifically aimed to protect children against the harms caused by firearms. Appellants again fault these analogues for supporting "just *one* facet of the Handgun Ban," *i.e.*, the childproofing requirement. Brief at 55. As discussed above, though, it is

Appellants who launched a wholesale challenge on the regulations and so the validity of *any* application of the handgun safety regulations dooms their facial challenge. Moreover, Appellants do not identify any model of handgun they want but cannot obtain commercially due specifically to the childproofing requirement. Thus, they cannot challenge the childproofing requirement in isolation. But if this Court were to consider analogues specific to that requirement, there is ample historical support for laws protecting children from firearm injuries.

There exists "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns" dating back to at least the 1850s. *United States v. Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009).[29] *See also* App. 243 (Cornell ¶ 72); *e.g.*, App. 116 (1884 Mass. Acts. 57, ch. 76) (banning sale or furnishing of firearms to children under 15 years old, except for militia service). Appellees have not identified any cases invalidating such laws—to the contrary, they were applied and approved by courts. *State v. Callicut*, 69 Tenn. 714, 716-17 (1878) (law preventing sale of pistols to minors "not only constitutional as tending to prevent crime but wise and salutary in all its provisions"); *Coleman v. State*, 32 Ala. 581, 582-53 (1858) (upholding indictment under 1856 law making it a crime to sell, give, or lend a pistol to a minor). *See also Rene E.*, 583 F.3d at 15-16 (describing

---

[29] Although *Rene E.* predated *Bruen*, it did not apply the interest-balancing approach rejected in *Bruen* and instead engaged in historical reasoning consistent with the Supreme Court's recent precedent. *See Rene E.*, 583 F.3d at 12-16.

"evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms").

Another source of historical support for the childproofing requirement is the regulation of toy pistols in the nineteenth century. "Toy pistols" were "[d]eceptively named"—while "ostensibly designed for childhood amusement," toy pistols "were essentially miniaturized guns." App. 167-68 (Rivas ¶ 20). Because they could accept "live rounds" and were "capable of shooting projectiles," toy pistols could turn quickly into "a deadly weapon." App. 167-69 (Rivas ¶¶ 20-21). In addition, the design of many toy pistols made them prone to "causing tetanus infections and deaths as a result of lockjaw." App. 169 (Rivas ¶ 21). At least fifteen states, plus additional municipalities, restricted sales and possession of toy pistols in the 1880s, with additional states following in later decades. App. 169-71 (Rivas ¶ 22).

These two traditions together form historical principles that underpin the modern childproofing requirement. *See Rahimi*, 602 U.S. at 698 ("tak[ing] together" two strains of tradition). These historical laws are relevantly similar in their recognition that restrictions should be placed on the ability of children to fire guns. The toy pistol regulations also restricted sales of particular devices that were

dangerous due to their design and poor manufacture.[30] And both sets of regulations

maintained the ability of adults to access weapons well-suited to self-defense.

These analogues should be viewed through the "more nuanced approach"

called for in "cases implicating unprecedented societal concerns or dramatic

technological changes." *Bruen*, 597 U.S. at 27. Significant changes in technology

have materially increased the risk of accidents to children involving firearms since

the Founding era. In the Founding era, over ninety percent of guns were "long

guns," which were "heavy and difficult to use." App. 241 (Cornell ¶ 68). In

addition, guns were rarely kept loaded. App. 269 (DeLay ¶ 10). As a result, there

was little concern that children would accidentally discharge a firearm and

regulation logically did not respond to that concern. App. 241 (Cornell ¶ 68). *See*

*also Rahimi*, 602 U.S. at 749-40 (Barrett, J., concurring) (assumption that

"founding-era legislatures maximally exercised their power to regulate" is

"flawed"). But concern about "accidents involving minors" increased following the

---

[30] Other historical traditions also support regulations that prohibit sales of particularly dangerous *subsets* of weaponry, including pistols, while leaving ample access to weapons suited to self-defense. *See* App. 165-67 (Rivas ¶¶ 18-19) (slung shots), App. 177-81 (Rivas ¶¶ 28-34) (Bowie knives), App. 182-85 (Rivas ¶¶ 35-39) (subsets of pistols). If anything, these historical regulations were more onerous because they were defined by the nature of the weapon, whereas modern manufacturers can show their products do *not* pose inordinate risk through straightforward safety testing and the inclusion of basic safety features.

Civil War, corresponding with both historical traditions discussed above. App. 241-43 (Cornell ¶¶ 69-70).

In stark contrast to earlier periods, firearms are now the leading cause of death among children, surpassing motor vehicle crashes for the first time in 2020.[31] And many fatal firearms injuries to children involve guns that were stored loaded, unlocked, or both, App. 307-08 (Hargarten ¶ 26)—a factual circumstance that would have been virtually unknown at the Founding, App. 269 (DeLay ¶ 10). Among the modern risks are that the small size of pistols—which have become more prevalent—"allow[s] easier access and handling of these weapons," including by children "with smaller hands." App. 307 (Hargarten ¶ 25). There are now ways to protect children from the dangers of firearms, including such options as "altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun," or "requiring a series of multiple motions in order to fire the handgun." 940 C.M.R. § 16.05. The state can rely on prior historical traditions related to the safety of minors to devise new, but analogous, solutions to this unprecedented threat.

*     *     *

---

[31] *See* Jason E. Goldstick, Ph.D., Rebecca M. Cunningham, M.D., Patrick M. Carter, M.D., "Current Causes of Death in Children and Adolescents in the United States," N. Engl. J. Med. Vol. 386, No. 20 (Apr. 20, 2022), cited at App. 306 (Hargarten ¶ 24 & n.9) and available at https://www.nejm.org/doi/full/10.1056/NEJMc2201761.

Whether viewed as a "straightforward" question considering the "distinctly similar" firearms and ammunition "proving" laws and practices, or one requiring a "more nuanced approach" due to "dramatic technological changes" that entails analysis of additional "relevantly similar" analogues, *Bruen*, 596 U.S. at 27, the result is the same: the handgun safety regulations are fully consistent with the historical understanding, no less than the text, of the Second Amendment.

## **CONCLUSION**

For these reasons, the judgment should be affirmed.

Respectfully submitted,

ANDREA J. CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; GINA KWON, in her official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

By their attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban, 1st Cir. No.1198575
Grace Gohlke, 1st Cir. No. 1204282
*Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2589
phoebe.fischer-groban@mass.gov
Dated: March 25, 2026    grace.gohlke@mass.gov

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT, TYPEFACE, AND TYPE-STYLE REQUIREMENTS

I hereby certify that:

1. This brief complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because the brief contains 12,978 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point, Times New Roman font.

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban
Counsel for the Defendants-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be served electronically through the Court's e-notification system to all participants registered for service through the Court's electronic system, on March 25, 2026.

*/s/ Phoebe Fischer-Groban*
Counsel for the Defendants-Appellees

# Addendum

Memorandum and Order in *Granata, et al. v. Campbell, et al.*,
  United States District Court, District of Massachusetts,
  No. 21-CV-10960 (August 29, 2025).......................................Add.2

Mass. Gen. Laws ch. 140, § 123 (as amended Oct. 2, 2024)..........................Add.28

Mass. Gen. Laws ch. 140, § 131¾ (as amended Oct. 2, 2024) .......................Add.36

Mass. Gen. Laws ch. 140, § 131K (as amended Oct. 2, 2024)........................Add.38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEFANO GRANATA, et al., ) ) ) ) **Plaintiffs** ) ) **v.** ) ) ) **ANDREA JOY CAMPBELL, in her** ) **official capacity as Attorney General** ) **of the Commonwealth of Massachusetts,** ) **et al.,** ) **Defendants.** ) ) ) ) | Case No. 21-cv-10960-DJC |

**MEMORANDUM AND ORDER**

CASPER, C.J.                                                                August 29, 2025

## I.    Introduction

Plaintiffs Stefano Granata ("Granata") and Cameron Prosperi ("Prosperi") ("Individual Plaintiffs"), The Gunrunner, LLC (" The Gunrunner"), and Firearms Policy Coalition, Inc. ("FPC") (collectively, the "Granata Plaintiffs")[1] have filed this lawsuit against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts ("AG Campbell"), and Terrence M. Reidy, in his official capacity as Secretary of the Executive Office of Public Safety and Security ("EOPSS") of the Commonwealth of Massachusetts ("Secretary Reidy") (collectively, "Defendants"), seeking permanent injunctive relief and a declaratory judgment that the challenged Massachusetts handgun laws and regulations violate the

---

[1] Two other individual Plaintiffs were voluntarily dismissed from this case by joint stipulation of the parties.  D. 52.

1

Add.2

Second and Fourteenth Amendments to the U.S. Constitution facially and as applied. D. 34. Both parties have now moved for summary judgment, D. 61; D. 79. For the reasons stated below, the Court DENIES Plaintiffs' motion for summary judgment, D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

## II.    Standard of Review

To succeed on a facial constitutional challenge to state law, the moving party must demonstrate "that the statute lacks any 'plainly legitimate sweep.'" Hightower v. City of Boston, 693 F.3d 61, 77-78 (1st Cir. 2012) (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)). To succeed on an as-applied challenge, the moving party must show that the challenged statute is unconstitutional as applied to the particular circumstances in his case. See id. at 71-72.

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary

2

Add.3

judgment, the court must consider each motion separately, drawing inferences against each movant in turn."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

**III.    The Challenged Handgun Regulatory Scheme**

The Massachusetts legislature has codified certain handgun safety requirements at Mass. Gen. L. c. 140, § 123(o).  The statutory requirements do not apply to private sellers, and instead apply only to licensed firearm dealers/retailers.  Id. (referring to the prohibitions of selling any such firearm to a firearm retailer or consumer by any "licensee"); see 501 C.M.R. § 7.02 (defining "licensee" as "a firearm dealer licensed in Massachusetts under [Mass. Gen. L.] c. 140, § 122"); see also 940 C.M.R. § 16.01 (defining "handgun purveyor" to exclude, among other categories, a "person or entity [that] transfers less than five handguns per year").

Accordingly, the regulatory scheme (between the statute and the applicable regulations) require that handguns lawfully sold by licensees within the Commonwealth, must, among other things:  (1) meet specified minimum melting points, tensile strength, and density; or pass a make and model performance test (940 C.M.R. §§ 16.01, 16.04(1) and (3); Mass. Gen. L. c. 140 § 123(o)); (2) not be prone to either repeated firing from a single trigger pull or explosion upon firing with standard ammunition (940 C.M.R. § 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (3) not be prone to accidental discharge (940 C.M.R. §§ 16.01, 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (4) have a "safety device" that prevents unauthorized use of the firearm (940 C.M.R. § 16.05(1)); (5) have a tamper-resistant serial number (940 C.M.R. § 16.03); (6) have a mechanism that "effectively precludes an average five-year-old child from operating the handgun when it is ready to fire" (i.e., a form a childproofing), "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions

3

Add.4

in order to fire the handgun" (940 C.M.R. § 16.05(2)); and (7) for semi-automatic handguns, have either "a load indicator or a magazine safety disconnect" (940 C.M.R. § 16.05(3) and (4)).

The legislature also directed the Secretary of the EOPSS to "compile and publish a roster" of handguns that meet the § 123 requirements, known as the "Approved Firearms Roster." Mass. Gen. L. c. 140, § 131 ¾ (a); 501 C.M.R. § 7.01 *et seq*.[2] To be listed on the Approved Firearms Roster, the Secretary must receive a final test report from an approved testing laboratory certifying that the handgun satisfies the Mass. Gen. L. c. 140, § 123(o) requirements. 501 C.M.R. § 7.03(1). The Approved Firearms Roster lists firearms that have meet the § 123(o) requirements, but because the Attorney General's regulations regarding childproofing, load indicators or magazine disconnect mechanisms, and tamper-resistant serial numbers have not been codified by the Legislature they are not tested for inclusion on the Approved Firearms Roster. See Enforcement Notice #3: Attorney General's Handgun Safety Regulations. It is unlawful for a licensed dealer/retailer to sell a firearm that is not so listed. 501 C.M.R. § 7.05.

## IV.    Factual Background

The Court draws the following undisputed facts from the parties' statement of undisputed facts and accompanying exhibits. D. 65; D. 81-1; D. 93-1; D. 97; D. 98.

### A.    Parties

AG Campbell is responsible for promulgating and enforcing regulations found at 940 C.M.R. §§ 16.01-16.09. D. 65 ¶ 1; D. 81-1 ¶ 1. Secretary Reidy has promulgated the regulations found at 501 C.M.R. §§ 17.01-17.16. Id. AG Campbell and Secretary Reidy have the authority to cease enforcement of the handgun regulations challenged by Plaintiffs. D. 65 ¶ 2; D. 81-1 ¶ 2.

---

[2] See Enforcement Notice #3: Attorney General's Handgun Safety Regulations (940 C.M.R. 16.00), February 2002, https://perma.cc/XA22-QCJX.

Granata and Prosperi each hold a License to Carry Firearms ("LTCF").  D. 65 ¶ 7; D. 81-1 ¶ 7.  Granata and Prosperi also both wish to acquire several makes and models of firearms not on the Approved Firearms Roster or that do not satisfy the Attorney General's handgun sales regulations.  D. 65 ¶ 8; D. 81-1 ¶ 8.  Granata currently owns fourteen guns, including nine different handgun models.  D. 81-1 ¶ 9; D. 93-1 ¶ 9.  But for the Massachusetts handgun regulations, Granata would commercially purchase a Glock 19 Gen 5, two Sig Sauer handgun models, possibly other Sig Sauer, CZ and Smith & Wesson models, a Heckler & Koch handgun model and a Walther handgun model.  D. 81-1 ¶ 14; D. 93-1 ¶ 14.  Although the Glock would be Granata's preferred carry weapon and he would buy a fifth generation Glock, he is not aware of anyone who has one in Massachusetts and he has not yet tried to purchase one on the private market.  D. 81-1 ¶ 15; D. 93-1 ¶ 15.  Granata wishes to purchase the Sig Sauer models as collector's items; he does not intend to carry or shoot either gun.  D. 81-1 ¶ 16; D. 93-1 ¶ 16.

As of August 22, 2024, Prosperi owned fourteen firearms and nine different handgun models, all of which he purchased in Massachusetts.  D. 81-1 ¶ 10; D. 93-1 ¶ 10.  Prosperi possesses six different Glock handgun models that he has purchased in Massachusetts both in the private market and from retailers. D. 81-1 ¶ 19; D. 93-1 ¶ 19.  One of the Glock handgun models Prosperi possesses is the same Glock model that Granata wishes to purchase commercially.  D. 81-1 ¶ 20; D. 93-1 ¶ 20.  But for the Massachusetts handgun regulations, Prosperi has identified one or more of at least eight additional handgun models from CZ, Beretta and Atlas Gunworks, that he would purchase from retailers in Massachusetts if he could.  D. 81-1 ¶ 25; D. 93-1 ¶ 25.

The Gunrunner keeps about 300 handguns in stock at any given time, representing about thirty to thirty-five different models of handguns, from fifteen to twenty brands.  D. 81-1 ¶ 27; D. 93-1 ¶ 27.  The Gunrunner would like to make available for sale makes and models of handguns,

Add.6

a subset of which do not appear on the Approved Firearms Roster and do not satisfy the Massachusetts sales regulations. D. 65 ¶ 9; D. 81-1 ¶ 9. "More often than not," customers who wish to purchase handgun models that cannot be sold by retailers instead purchase another handgun model that is authorized for commercial sale. D. 81-1 ¶ 28; D. 93-1 ¶ 28.

FPC is a nonprofit organization incorporated under the laws of Delaware, whose essential purposes include defending and promoting people's rights under Second Amendment rights. D. 65 ¶ 11; D. 81-1 ¶ 11. FPC has members in Massachusetts, including Granata, Prosperi and the Gunrunner. D. 65 ¶ 13; D. 81-1 ¶ 13. FPC is suing on behalf of its members who wish to acquire one or more handguns from a licensed retailer, like the Gunrunner, that are not on the Approved Firearms Roster or do not satisfy the Massachusetts sale regulations. D. 65 ¶ 14; D. 81-1 ¶ 14.

### B.     Firearms Market in Massachusetts

In Massachusetts, licensed retailers are prohibited from transferring handguns that do not appear on either the Approved Firearms Roster or the Formal Target Shooting Roster and that do not comply with the Massachusetts sales regulations. D. 65 at 2; D. 81-1 at 2. Handguns that are not on the Approved Firearms Roster or Formal Target Shooting Roster and that do not satisfy the Massachusetts sales regulations still may be sold or purchased in private sales. See D. 65 ¶ 15; D. 81-1 ¶ 15.

Between 2019 and 2024, approximately 113 firearms have been added to the Approved Firearms Roster. D. 81-1 ¶ 1; D. 93-1 ¶ 1. Of the semiautomatic handgun models on the Approved Firearms Roster, over 500 handguns also comply with the Attorney General's regulations. D. 81-1 ¶ 2; D. 93-1 ¶ 2. Of 1,160 models on the Approved Firearms Roster as of June 2024, at least 1,029 handgun models also comply with the Attorney General's regulations. D. 97 ¶ 31; D. 98 ¶ 31.

Add.7

In 2022, Massachusetts licensed dealers/retailers reported 72,502 handgun sales and 20,813 private sales of handguns were reported.  D. 81-1 ¶¶ 5, 8; D. 93-1 ¶¶ 5, 8.  In 2023, Massachusetts licensed dealers/retailers reported 67,652 handgun sales and 24,213 private sales of handguns were reported.  D. 81-1 ¶¶ 4, 7; D. 93-1 ¶¶ 4, 7.  In 2024, Massachusetts licensed dealers/retailers reported 76,409 handgun sales and 16,051 private sales of handguns were reported.  D. 81-1 ¶¶ 3, 6; D. 93-1 ¶¶ 3,6.  In 2024, Massachusetts licensed dealers/retailers reported 4,028 Glocks sold and 3,156 Glocks were reported as sold in private sales.  D. 81-1 ¶ 30; D. 93-1 ¶ 30.

## V.    Procedural History

Plaintiffs instituted this action against the former Massachusetts Attorney General and former EOPSS Secretary on June 8, 2021 before a different session of this Court (Zobel, J.).[3] D. 1.  On May 19, 2022, the Court granted Defendants' motion to dismiss, D. 24; D. 25, and shortly thereafter the Granata Plaintiffs appealed, D. 26.  The First Circuit later vacated the district court's judgment and remanded the matter for further proceedings on April 7, 2023 in light of the Supreme Court's decision in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022).  D. 32; D. 33.  The Granata Plaintiffs then filed an amended complaint on September 21, 2023, D. 34, and Defendants filed an answer on November 20, 2023, D. 38.  On December 7, 2023, this matter was reassigned to this session.  D. 41.  The Granata Plaintiffs have now moved for summary judgment, D. 61, and Defendants have cross moved for summary judgment, D. 79.  The Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") and the Brady Center to Prevent Gun Violence ("Brady Center") filed an amicus brief.  D. 88.  The Court heard the parties on the pending motions

---

[3] AG Campbell and EOPSS Secretary Reidy were substituted pursuant to Fed. R. Civ. P. 25(d).

Add.8

and took these matters under advisement.  D. 99.

## VI.    Discussion

### A.    The Supreme Court's Second Amendment Jurisprudence

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court held in Heller that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense," and held in McDonald that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller."  McDonald v. City of Chicago, Ill., 561 U.S. 742, 749, 791 (2010) (citing District of Columbia v. Heller, 554 U.S. 570 (2008)).  In McDonald, the Supreme Court reiterated that it "made it clear in Heller that [its] holding did not cast doubt on such longstanding regulatory measures as . . . 'laws imposing conditions and qualifications on the commercial sale of arms.'"  Id. at 786 (quoting Heller, 554 U.S. at 626-27); see United States v. Rahimi, 602 U.S. 680, 699 (2024) (noting that "Heller never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home" and that "[the Heller] opinion stated that many such prohibitions [given as examples in Heller], are 'presumptively lawful'") (quoting Heller, 554 U.S. at 627 n.26); see also Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring) (noting that the Supreme Court "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive") (quoting Heller, 554 U.S. at 627 n.26).

In Bruen, the Supreme Court held that Heller and McDonald "do not support applying means-end scrutiny in the Second Amendment context" and ruled that "[i]nstead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  Bruen, 597 U.S. at 17, 19; see United States v. Turner, 124 F.4th 69, 75 (1st Cir. 2024) (recognizing that in Bruen "the Court explained that, to

8

Add.9

overcome a properly preserved Second Amendment challenge to a restriction on firearm possession, the government bears the burden of demonstrating that the restriction at issue is 'consistent with the Nation's historical tradition of firearm regulation'") (quoting Bruen, 597 U.S. at 24). Bruen thus provided "the standard that courts must use to evaluate the constitutionality of regulations that burden an individual's Second Amendment right to bear arms:  [i]f the regulation at issue burdens conduct that falls within the plain text of the Second Amendment, then it is unconstitutional unless the government can prove that its regulation is 'consistent with the Nation's historical tradition of firearm regulation.'"  United States v. Crater, 93 F.4th 581, 588 (1st Cir. 2024) (quoting Bruen, 597 U.S. at 24).

As to the first step of Bruen, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  Bruen, 597 U.S. at 17.  The relevant inquiry for courts is "not simply whether the regulation [at issue] affects firearms in some way, but whether the regulation infringes the right to own and bear arms in the case of confrontation."  Oakland Tactical Supply, LLC v. Howell Township, Michigan, 103 F.4th 1186, 1196 (6th Cir. 2024).  "[I]n defining a plaintiff's proposed conduct, courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do."  Id.; see Doe v. Bonta, 101 F.4th 633, 639 (9th Cir. 2024) (noting that the relevant proposed conduct is "what the plaintiffs wanted to do and what the challenged law prevented them from doing"); B&L Prods., Inc. v. Newsom, 104 F.4th 108, 117 & n.17 (9th Cir. 2024) (same).

With respect to the second step of Bruen, courts must ask whether "[t]he government [can] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  Bruen 597 U.S. at 24.  Cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to historical analysis,

Add.10

including "analogical reasoning" to determine whether historical analogues are "relevantly similar." Bruen, 597 U.S. at 27-30; see Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 44 (1st Cir. 2024), cert. denied, No. 24-131, 2025 WL 1549866 (U.S. June 2, 2025). In evaluating whether the historical analogues are "relevantly similar," courts must compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29. "Analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Bruen, 597 U.S. at 30 (emphasis in original); see Rahimi, 602 U.S. at 692 (explaining that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations . . . [t]he law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin"). In Rahimi, the Supreme Court clarified the approach set forth in Bruen by noting that the appropriate analysis involves whether the challenged regulation is "'consistent with the principles that underpin our regulatory tradition,'" such that it is 'relevantly similar' to laws that our tradition is understood to permit." Rahimi, 602 U.S. at 692, 698 (concluding that a federal statute, which bars individuals determined by a court to be credible threats to another's physical safety from possessing a firearm, was "relevantly similar" to surety and going armed laws, two founding era regimes, because the statute, like the two regimes, "applies to individuals found to threaten the physical safety of another," "restricts gun use to mitigate demonstrated threats of physical violence, just as the [two regimes] do" and "does not broadly restrict arms use by the public generally") (quoting Bruen, 597 U.S. at 24, 29).

**B.    The Massachusetts Handgun Regulatory Scheme Is Not Covered by the Plain Text of the Second Amendment**

"[Bruen] first asks whether the proposed conduct affected by the challenged law is protected by 'the Second Amendment's plain text'" because "[a]s carefully detailed in Heller, the right covered by the Second Amendment's plain text is the right to possess and carry arms in case of confrontation." Oakland Tactical, 103 F.4th at 1195  (noting that in Bruen, "[r]ather than defining the proposed conduct at the high level of generality urged by Plaintiffs—i.e., 'carrying handguns'—the Court's definition incorporated the purpose and location of the plaintiffs' desired action") (quoting Bruen, 597 U.S. at 32).

The Defendants argue that the Granata Plaintiffs' proposed conduct does not fall within the plain text of the Second Amendment because the Massachusetts handgun regulations do not infringe the Granata Plaintiffs' individual right to possess handguns in case of confrontation and because they are "presumptively lawful 'conditions and qualifications on the sale of arms' that do not meaningfully impair the [Granata Plaintiffs'] ability to access firearms.  D. 80-2 at 16 (quoting Heller, 554 U.S. at 626-27 & n.26).  As noted above, the Supreme Court has recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are part of a non-exhaustive list of "presumptively lawful regulatory measures."  Heller, 554 U.S. at 626-27 & n.26; see McDonald, 561 U.S. at 786; Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring); Rahimi, 602 U.S. at 735 (Kavanaugh, J., concurring).  In picking up this tenet, some Circuits have adopted an "ancillary-rights" doctrine and employed a "meaningful-constraint on the right to acquire firearms" test "to determine whether the conduct at issue is presumptively protected by the Second Amendment" under the first step of the Bruen analysis.  B&L Prods., 104 F.4th at 118; see United States v. Vlha, 142 F.4th 1194, 1198 (9th Cir. 2025).

The ancillary-rights doctrine is "based on the text of the Second Amendment, which [the Ninth Circuit has] interpreted as prohibiting 'meaningful constraints' on the right to possess firearms." Vlha, 142 F.4th at 1198 (citing B&L Prods., 104 F.4th at 118). Pursuant to the ancillary-rights doctrine, the Second Amendment protects some activities ancillary to the core possessory right, including the ability to acquire weapons . . . [b]ut [it] is limited in this context [and] it protects ancillary activities only if the regulation of such activities 'meaningfully constrain[s]' the core individual possessory right." Id.; see B&L Prods., 104 F.4th at 118 n.18. The Second, Fifth and Tenth Circuits also have adopted the Ninth Circuit's "meaningful-constraint test or something like it." Vlha, 142 F.4th at 1198; see Gazzola v. Hochul, 88 F.4th 186, 196-97 (2d Cir. 2023) (recognizing the Ninth Circuit's "meaningful constraint" test and concluding that "there [was] no evidence that [New York law] will impose such burdensome requirements on firearms dealers that they restrict protections conferred by the Second Amendment"); McRorey v. Garland, 99 F.4th 831, 839 (5th Cir. 2024) (affirming denial of challenge to expanded background checks for 18-to-20-year-old prospective firearms purchasers noting that "[t]he right to 'keep and bear' can implicate the right to purchase . . . [which] is why the [Supreme] Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping" but noting that "such an implication is not the same thing as being covered by the plain text of the amendment"); see also Rocky Mountain Gun Owners, 121 F.4th at 120 (agreeing with the Ninth Circuit that "[t]he most reasonable interpretation of th[e] passage [from Heller carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the Bruen test").

The relevant proposed conduct here is "what the [Granata Plaintiffs] want[] to do and what the challenged [Massachusetts handgun regulations] prevent[] them from doing." See Doe, 101

Add.13

F.4th at 640.  The Granata Plaintiffs assert that the proposed conduct is "possessing common handguns that Massachusetts has barred from sale."  D. 62 at 13.  The Massachusetts regulatory scheme at issue here, however, does not ban the possession of handguns by eligible individuals wishing to "keep and bear" these "[a]rms" in the Commonwealth.  See U.S. Const. amend. II. Rather, the Massachusetts handgun regulations apply to licensed dealers/retailers and require them to only sell handgun models from the Approved Firearms Roster that have met certain manufacturing standards and safety features to comply with the Attorney General's regulations. See Mass. Gen. L. c. 140 §§ 123(o), 131 ¾; 940 C.M.R. §§ 16.00 et seq.  Given that "[t]here is a longstanding distinction between the right to keep and bear arms and commercial regulation of firearms," Morehouse Enters., LLC v. BATFE, No. 22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022) (citing Heller, 554 U.S. at 626-27), and that the proposed conduct here involves the commercial sale by licensed dealers/retailers of certain handguns that do not comply with the Commonwealth's laws and regulations, the Court considers whether the Commonwealth's handgun regulatory scheme "meaningfully constrains the would-be purchasers from possessing firearms."  Vlha, 142 F.4th at 1200.

The undisputed record here indicates that Granata and Prosperi have not been prevented from possessing handguns in Massachusetts and the Massachusetts handgun laws have not "meaningfully constrain[ed] [their] core possessory right," Vlha, 142 F.4th at 1198, as they both own various handguns suitable to keep and carry in the event of a confrontation.  D. 93-1 ¶¶ 9-10; see Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015), aff'd on other grounds, 827 F.3d 1 (1st Cir. 2016) (concluding the Second Amendment did not apply to requirement that firearms for sale possess a "load indicator" because it "in no way prevents citizens from obtaining a wide array of firearms").  Specifically, Granata owns fourteen firearms, including nine different handgun

13

Add.14

models, D. 93-1 ¶ 9; D. 82-14 at 48-49, and he rotates two of his handguns for concealed carry while the rest are for target shooting or kept as collector's items, D. 93-1 at 3; D. 82-14 at 24, 28, 33, 35-37, 41, 43, 46. Although Granata wishes to purchase a fifth generation Glock to use as his preferred carry weapon and he is unaware of anyone in Massachusetts that has one, he has not tried to purchase the Glock in the private market. See D. 93-1 ¶ 15; D. 82-14 at 60-61; see also D. 83-2 ¶ 14 (attesting that in 2024, 3,156 Glocks were reported as sold in private sales in Massachusetts). Granata has also stated that he does not intend to carry or shoot the Sig Sauer handgun models he wishes to purchase, which are not available for commercial sale, because he intends to have them as collector's items. See D. 93-1 ¶ 16; D. 82-14 at 63-64. Similarly, as of August 22, 2024, Prosperi owned fourteen firearms, including nine different models of handguns, all bought in Massachusetts. D. 93-1 ¶ 10; D. 82-13 at 16, 19-20, 28-33, 57-58; see D. 82-2 at 12 n.13. Prosperi possesses six different Glock handguns, purchased in Massachusetts from licensed dealers/retailers or the private market, and he carries seven of his handguns for self-defense, varying between them based on the weather and his ability to conceal the handgun with his clothing. See D. 93-1 ¶¶ 19; D. 82-13 at 14-15, 18-22, 27-30.

Plaintiffs contend that the Massachusetts handgun regulations are not presumptively lawful as "conditions [or] qualifications on the sale of arms" because they are "a *de facto* ban on the acquisition and possession of handguns that lack required features," D. 62 at 16, like the ban in Heller, and, even assuming the regulations are conditions or qualifications, they "[still] must be analyzed to determine whether [the] specific condition or qualification is ultimately constitutional under the Bruen test," D. 92 at 10. Unlike what amounted to a prohibition against an entire class of arms in Heller, 554 U.S. at 628 (concluding that the law "totally bans handgun possession in the home"), the Massachusetts handgun regulations at issue here impose safety standards and

14

Add.15

conditions on the commercial sale of handguns by licensed dealers/retailers, which in turn render a subset of handguns eligible for private sales only, but not unpossessable.  See Mass. Gen. L. c. § 123(o); 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1), 16.05(2), 16.05(3).  Ultimately, the handguns that do not appear on the Approved Firearms Roster or that do appear but do not also meet the Attorney General's regulations can still be purchased from a person that is not a licensed dealer/retailer.  Mass. Gen. L. c. § 123(o); 501 C.M.R. § 7.02; 940 C.M.R. § 16.01.

Neither Reese v. BATFE, 127 F.4th 583, 590 (5th Cir. 2025) nor Hirschfeld v. BAFTE, 5 F.4th 407, 416, vacated as moot, 14 F.4th 322 (4th Cir. 2021), cited by the Granata Plaintiffs, D. 92 at 10-11, compel a different conclusion.  In Reese, the Court broadly defined the relevant proposed conduct as "commercial purchases" and concluded that statutory provisions prohibiting Federal Firearms Licensees ("FFLs") from selling handguns to eighteen-to-twenty-year-olds were covered by the text of the Second Amendment and were inconsistent with the Nation's historical tradition of firearm regulation.  Reese, 127 F.4th at 590, 595-600.  Unlike the challenged Massachusetts handgun regulatory scheme, the statutory provisions in Reese functioned as an "outright ban" on purchasing a handgun from the FFLs because they prohibited all individuals within the specified age range from making a purchase irrespective of any conditions or qualifications on the sale.  Id. at 590 & n.2.  In Hirschfeld, a case also involving laws prohibiting FFLs from selling handguns to eighteen-to-twenty-year-olds, the Court determined the laws were not presumptively lawful.  Hirschfeld, 5 F.4th at 416-18, 441.  There, the Court noted "the restrictions operat[ed] as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms" because "[t]here was nothing a law-abiding 18-to-20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21."  Id. at 416 (emphasis in original).  Such is not the case here, where, the Granata Plaintiffs can buy

choose to buy one of the hundreds of handguns that are on the Approved Firearms Roster and comply with the Attorney General's regulations. The Granata Plaintiffs also argue that the relevant inquiry for the Court is whether the restricted handguns are "in common use." D. 62 at 16. Specifically, the Granata Plaintiffs argue that the analysis of historical analogues to determine whether the Massachusetts handgun regulations are consistent with the historical tradition of firearm regulations (the second step of the Bruen analysis) is unnecessary because the handguns at issue are in common use and "a complete prohibition of their use is invalid." Id. at 15-19. Relying upon Heller and Bruen, the Granata Plaintiffs assert that "'the Second Amendment protects' arms that are 'in common use at the time' which are in turn "necessarily not 'dangerous and unusual.'" Id. at 15-16 (quoting Bruen, 597 U.S. at 47). Defendants, on the other hand, contend that the "common use" test is deficient and dispute the necessity of the inquiry "where a regulation does not prohibit, either explicitly or in practice, the possession or use of 'an entire class of arms.'" D. 80-2 at 19-20 (quoting Heller, 554 U.S. at 628); see Bianchi v. Brown, 111 F.4th 438, 460 (4th Cir. 2024) (noting that "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms"), cert. denied sub nom. Snope v. Brown, 605 U.S. __, 145 S. Ct. 1534 (2025).

In Capen v. Campbell, the First Circuit recently held that, unlike the "complete prohibition" in Heller, the Massachusetts law prohibiting the sale, transfer or possession of "an assault weapon or large capacity feeding device," Mass. Gen. L. c. 140 § 131M, "restricts only semiautomatic handguns that are either specifically enumerated or exhibit a combination of certain features." Capen v. Campbell, 134 F.4th 660, 674 (1st Cir. 2025). The Court rejected appellants' argument that "a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class," noting that Heller does not support the

16

Add.17

"sweeping proposition that any ban whose scope includes any handguns at all is unconstitutional." Id.

Here, the Granata Plaintiffs have not shown that the Massachusetts handgun regulations ban all handguns as a class. As of September 2024, the Approved Firearms Roster contained over 1,000 handgun models compliant with the requirements enumerated in Mass. Gen. L. c. 140 § 123 and included over thirty-five manufacturers. See D. 83-1 at 2-31. While not all the handguns on the Approved Firearms Roster comply with the Attorney General's regulations, thereby enabling them to be commercially sold by licensed dealers/retailers, over 500 of the semiautomatic handgun models on the Approved Firearms Roster do. See D. 93-1 ¶ 2; D. 84 ¶ 4 (attesting that of the 694 semiautomatic handguns on the Approved Firearms Roster, 562 satisfy the Attorney General's regulations). Between 2019 and 2024, approximately 113 firearms were added to the Approved Firearms Roster. D. 93-1 ¶ 1; D. 83-2 ¶ 7. Further, the undisputed evidence indicates licensed dealers/retailers reported 72,502 handgun sales in 2022, 67,652 handgun sales in 2023, and 76,409 handgun sales in 2024. D. 93-1 ¶¶ 3-5; D. 83-2 ¶¶ 8-10. With respect to private sales, 20,813 were reported in 2022, 24,213 in 2023 and 16,051 in 2024 respectively. D. 93-1 ¶¶ 6-8; D. 83-2 ¶¶ 11-13. It is also undisputed that both Granata and Prosperi have been able to purchase firearms in Massachusetts. D. 93-1 ¶ 9-10; D. 82-12 at 6-7; D. 82-11 at 5-7. Finally, it is uncontroverted that "[m]ore often than not," customers who wish to purchase handgun models that cannot be sold by licensed dealers/retailers, purchase another handgun model authorized for commercial sale. D. 93-1 ¶ 28; D. 82-10 at 41-42. The record shows that in 2023, for instance, the Gunrunner sold approximately 700 handguns, which were manufactured by approximately fifteen to thirty brands and which consisted of multiple models across each brand. D. 93-1 ¶ 23. Given this record, the Granata Plaintiffs have not shown that the Massachusetts handgun regulatory scheme regarding

17

Add.18

the commercial sale of handguns by licensed dealers/retailers has "meaningfully constrained" their ability to possess handguns in Massachusetts and "restrict[ed] protections conferred by the Second Amendment." Gazzola, 88 F.4th at 197 (concluding that "on the record . . . there is no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms"); see B&L Prods., 104 F.4th at 119 (noting that "the record suggests that no individual's access to firearms would be limited").

For these reasons, the Court concludes that the Granata Plaintiffs' proposed conduct of purchasing certain handguns that do not comply with the Massachusetts handgun regulatory scheme from licensed dealers/retailers is not covered by the plain text of the Second Amendment under the first step of Bruen.

**C.** **There are Historical Analogues for the Massachusetts Handgun Regulatory Scheme Consistent with the Nation's Historical Tradition of Firearm Regulation**

Even assuming *arguendo* that the regulatory scheme challenged here was covered by the plain text of the Second Amendment, Plaintiffs' claims would still fail under the second step of Bruen since there are historic analogues for these regulations. At this step of the Bruen analysis, the government bears the burden of demonstrating that the challenged handgun regulations are "consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24. When reviewing the government's historical sources, it is not this Court's job "to resolve historical questions in the abstract" but to "resolve *legal* questions" and to do so according to "the principle of party presentation." Id. at 30 n.6 (emphasis in original).

While the Supreme Court has indicated that "'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation[,]" the Supreme Court "has also relied upon 'how the Second Amendment was interpreted immediately after its

18

Add.19

ratification through the end of the 19th century[,]'" and "likewise left open the possibility that 'late-19th-century evidence' and '20th-century historical evidence' may have probative value if it does not 'contradict[] earlier evidence.'" Ocean State Tactical, 95 F.4th at 51 (quoting Bruen, 597 U.S. at 27 and Heller, 554 U.S. at 605); see Antonyuk v. James, 120 F.4th 941, 972-74 (2d Cir. 2024) (noting that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis"). In Bruen, the Supreme Court did not weigh in on the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1869 when defining its scope," and it considered regulations from various periods both before and after the founding era since it concluded that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." Bruen, 597 U.S. at 37-38; see D. 88 at 16 (discussing regulations from various time periods considered in Bruen); see also Ocean State Tactical, 95 F.4th at 52 (noting that 19th-century and 20th-century historical evidence can "provide insight as apt historical precursors"). Based on the pre-and-post founding era evidence that courts have considered when assessing historical analogues, which has been in compliance with Bruen's historical analysis, the Court considers the evidence of historical traditions presented by Defendants from the founding era and thereafter.

Here, the Defendants have presented four different categories of historical traditions to demonstrate that the Massachusetts handgun regulations are consistent with the historical tradition of regulating firearms for public safety. These categories include: (1) firearm and gunpowder "proving" laws and practices; (2) firearm and gunpowder storage laws; (3) "trap gun" restrictions; and (4) laws to protect minors from firearms. D. 80-2 at 23-34. As indicated below, this case implicates "dramatic technological changes" in handguns that have significantly increased the risk

Add.20

of accidents related to their use, which "may require a more nuanced approach." Bruen, 597 U.S. at 27. "The metric [the Court] employ[s] in this comparability analysis is 'how and why these regulations burden a law-abiding citizen's right to armed self-defense.'" Capen, 134 F.4th at 669. As the First Circuit has directed, "'[f]irst, we consider the "how," comparing the "burden on the right of armed self-defense" imposed "by the new regulation to the burden imposed by historical regulations." Second, we turn to the "why," comparing the justification for the modern regulation to the justification for historical regulations.'" Id. (quoting Ocean State Tactical, 95 F.4th at 44-45).

### 1.    Firearm and Gunpowder "Proving" Laws

Defendants submit that in the same way that the Massachusetts handgun regulations are aimed at ensuring the safe use of firearms sold commercially by imposing requirements on the commercial sale of firearms, so too were 19th century "proving" and inspection laws that required firearms and gunpowder to be "proved" prior to sale to prevent "collateral dangers of firearms," or accidental discharges, malfunctions, explosions and related safety risks. See D. 80-2 at 24; see D. 88 at 18. The "proving" process for a firearm entailed testing a weapon by firing it using "different levels of charges" to confirm that it would "withstand the pressure and wear of use" and then stamping the weapon with a "proof mark" to demonstrate it had passed the test. D. 88 at 19. Proving and the subsequent proving marks "ensur[ed] that firearms met certain safety standards before being sold and create[d] a chain of custody to track how and when they were inspected." Id. at 20.

20

Add.21

Defendants point to 1804 Mass. Acts 111 c. 81 § 35, a Massachusetts law enacted in 1805 that required an inspection of all firearms manufactured in the state before they could be sold. See D. 80-1 at 41-43; D. 88 at 23-24. The purpose of the law, or the "why" was to "ensure that the guns sold to the public were safe and suitable for use," D. 82-3 ¶ 20, and to prevent "the lives of the Citizens [from being] exposed" to unsafe firearms. D. 80-1 at 41. With respect to "how," the law indicated the process by which the appointed "provers" needed to "prove all Musket Barrels and Pistol barrels," the frequency, and the specific charge before marking the firearms with a stamp if they passed inspection. Id. Firearms that "burst or shall in any manner fail in the proving . . . [were deemed] unfit for use." Id. at 42. Massachusetts amended its proving laws to include additional requirements in 1814, 1837 and 1859. See D. 80-1 at 47-49; D. 82-3 ¶ 20 n.25; D. 88 at 25. Similarly, Maine enacted a proving law in 1821. D. 80-1 at 53; D. 88 at 25; see 1821 Me. L. 546, c. 162. The evidence in the record indicates that concern with the quality of firearms brought by militia members, see D. 82-4 ¶ 18, spurred state laws and federal laws that continued the "Revolutionary tradition of colonial governing bodies requiring the 'proving' of militia weapons." See D. 80-2 at 24; D. 88 at 25-29; see also D. 82-1 ¶¶ 17-18, 20; D. 88 at 22-23.

A "dramatic technological change[]," Bruen, 597 U.S. at 27, since the colonial era is the "widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century." See D. 82-4 ¶ 10. Prior to that, firearms at the time were not "kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly." Id. State laws were, therefore, enacted that required the proving and inspection of gunpowder. See 1776 R.I. Pub. L. 25; 1776-77 N.J. L. 6-7 c. 6; 1820 N.H. L. 274 c. 25; 1794 P.A. L. 764 c. 337; D. 80-1 at 30-40, 50-52. The purpose of these gunpowder laws, specifically the Pennsylvania law which required a specific device to prove the gunpowder, was to protect "the purchaser and consumer"

21

Add.22

against "inferior" gunpowder with defects not readily discoverable otherwise.  See D. 80-1 at 35. Similar to the Massachusetts proving law, a law regarding gunpowder proving dictated requirements pertaining to the quality and composition of the gunpowder and restricted the sale of uninspected or damaged gunpowder.  See 1808 Mass. Acts c. 52; D. 80-1 at 44-46.

The Massachusetts handgun regulatory scheme at issue in this case places requirements on commercial sellers to sell firearms that comply with safety requirements in various forms to protect the customer or user from inadvertent accidents (e.g., firing tests, density and melting point, drop tests).  See 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1)-(2); Mass. Gen. L. c. 140, § 123(o); D. 80-1 at 42, 46.  Thus, when comparing the "why" of the Massachusetts handgun regulatory regime to the "why" of the historical "proving" laws, they are "relevantly similar" in that they include requirements for firearms prior to sale to ensure safe usage by firearm owners and to minimize harm due to malfunction to both the user and the public.  Bruen, 597 U.S. at 29.  Although the Massachusetts handgun regulations imposes an addition to firearms via a load indicator or magazine safety, see 940 C.M.R. § 16.05(3), as contended by the Granta Plaintiffs, the effect is nonetheless the same–the prohibition on the sale of unfit firearms or condemned gunpower–while reflecting the use of modern technology that addresses the same core safety concern present during the founding and colonial era.  See Rahimi, 602 U.S. at 692.  Any "burden" here is similar to that imposed by the firearm and gunpowder proving laws that similarly barred the sale of firearms and gunpowder deemed "unfit."

Based on the uncontroverted evidence in the record, the Massachusetts handgun regulations are "consistent with the principles that underpin our regulatory tradition" as demonstrated by the firearm and gunpowder "proving" laws.  Rahimi, 602 U.S. at 681; see United States v. Sharkey, 693 F. Supp. 3d 1004, 1007-09 (S.D. Iowa 2023) (analyzing proving laws of

Add.23

Massachusetts and other states as a historical analogue and rejecting Second Amendment challenge).

### 2.    *Firearm and Gunpowder Storage Laws*

Defendants also rely upon laws regarding the storage of gunpowder and weapons from the colonial period through the 19th century as historical analogues to the Massachusetts handgun regulations.  See D. 80-2 at 30; D. 82-2 ¶¶15-16; D. 82-3 ¶ 17 & n.17.  These city storage statutes and regulations were aimed at reducing the individual limits of gunpowder possession to minimize associated fire risks, including the accidental discharge of weapons, explosions and "accidental injury or death."  D. 82-2 ¶ 56.  The record here indicates that gunpowder regulations "stretched across the country."  D. 82-2 at 9.  In Ocean State Tactical, the First Circuit referenced the gunpowder storage laws, see 1771-72 Mass. Province Laws 167, c. 9.; D. 80-1 at 22-24, and noted they were enacted to address "risks posed" resulting from the ignition of gunpowder.  Ocean State Tactical, 95 F.4th at 49, n.16.  The Granata Plaintiffs assert that these regulations are not historical analogues to the Massachusetts handgun regulations because in Heller, the Supreme Court analyzed a Massachusetts colonial law requiring the storage of excess gunpowder in a "special container or on the top floor of the home," and determined these laws "did not clearly prohibit loaded weapons" and that those "fire-safety laws" did not burden the right of self-defense as much as a ban on handguns.  D. 92 at 22-23; See Heller, 554 U.S. at 632.  As noted, the Massachusetts handgun regulations do not constitute a ban on handguns and under the "nuanced approach" to historical analysis, it is appropriate to conclude that the historic laws' "why" of protecting users from unintended accidents and fire-related explosions is "relevantly similar" to the regulations' purpose of restricting the commercial sale to the public of handguns that are "prone to repeated firing based on a single pull of the trigger," explosion or accidental discharge, see, e.g., id. § 16.04(2); Mass. Gen. L. c. § 123(o).  See Bruen, 597 U.S. at 27, 29.  The Court concludes that

23

Add.24

there is sufficient uncontroverted evidence in the record to conclude the firearm and gunpowder storage laws are a historical analogue for the Massachusetts handgun regulations.

### 3.    "Trap Gun" Restrictions

Defendants next point to restrictions on "trap gun," "spring gun" or "infernal machines" as another type of analogous historical tradition to the Massachusetts handgun regulations. D. 80-2 at 31. These types of firearms were "configured in a way to fire remotely, typically by rigging the firearm to be fired by a string or wire when tripped." Id.; D. 82-2 ¶ 23. In the late 17th century and early 18th century, colonial Plymouth and New Jersey enacted colonial laws that made the setting of trap guns unlawful, with other jurisdictions following suit over time by banning the activity or imposing criminal liability. See D. 82-2 ¶¶ 24-27; D. 80-1 at 14-21. Defendants argue that the "how" of these restrictions on trap guns and the Massachusetts handgun regulations are "relevantly similar" in that neither regulation banned an entire class of firearms and instead focused on regulating firearms that had been configured "in a certain way that rendered them unusually dangerous" while other firearms, like rifles or muskets, remained available to citizens. D. 80-2 at 31. With respect to the "why," the trap gun law restrictions served to protect "innocent people who might unsuspectingly trip the device," D. 82-2 ¶ 25, in the same way that the Massachusetts handgun regulations protect unsuspecting individuals who may drop a loaded handgun that discharges without the pull of the trigger. The Granata Plaintiffs assert that "there is a world of a difference between a law prohibiting intentionally rigging a firearm to go off in a reckless manner" and one prohibiting the commercial sale of firearms that need to comply with manufacturing requirements. See D. 92 at 24. The common safety concern, however, addressed by both the Massachusetts safety regulations and the trap laws is that an unattended firearm, either with rigged features or lacking safety features such as a load indicator or childproof mechanism, would present

24

Add.25

a danger to an unsuspecting person that handled the firearm.  See, e.g., 940 C.M.R. §§ 16.05(2), 16.05(3); see Rahimi, 602 U.S. at 692.  The uncontroverted record here shows that courts in the 19th and 20th century recognized that using trap guns to protect property, for example, was "using means dangerous to life" and that "[t]he preservation of human life and of limb and member from grievous harm, is of more importance to society than the protection of property."  D. 82-2 at ¶ 26.  Even when the trap guns were employed for the specific purpose of harming a potential burglar, the historic evidence suggests "the gun-setter could be held civilly or criminally liable."  Id. ¶ 27.  Thus, trap gun restrictions are a type of historic analogue "relevantly similar" to the Massachusetts handgun regulations.  Bruen, 597 U.S. at 29.

### 4.    Laws to Protect Minors from Firearms

Lastly, Defendants argue that laws protecting minors from harm caused by firearms are historical laws analogous to the Massachusetts handgun regulations.  D. 80-2 at 32-34.  The uncontroverted evidence in the record also suggests the same based on various laws aimed at banning the sale or furnishing of firearms to children under fifteen, see D. 80-1 at 54; State v. Callicut, 69 Tenn. 714, 716-17 (1878); Coleman v. State, 32 Ala. 581, 582-83 (1858).  Defendants rely upon these laws, D. 80-2 at 32, and also point to the historical regulation of toy pistols, id.; D. 82-2 ¶¶ 20-21.  The evidence in the record shows that toy pistols were heavily regulated in the 19th century because they were "miniaturized guns" capable of shooting blank rounds "though live rounds could easily be substituted."  D. 82-2 ¶ 20.  Given that the toy pistol functionally operated as a deadly weapon, see id. ¶ 21, toy pistol sales were restricted to prevent children from suffering fatal infections and injuries from projectiles, id. ¶ 22.  The evidence in the record supports the argument that "dramatic technological changes" have led to an increase of accidents involving children based on modern smaller and lighter designs, that are kept loaded.  See D. 82-3 ¶ 68; D.

Add.26

82-4 ¶ 10; D. 82-5 ¶¶ 25-26.  The Massachusetts handgun regulatory scheme at issue here require

that handguns sold by retailers have a "mechanism which effectively precludes an average five

year old child from operating the handgun when it is ready to fire."

See 940 C.M.R. § 16.05(2).  The purpose for the regulations is "relatively similar" to that of the

historical evidence, which was to prevent children from accidently discharging a firearm given

their ability to handle and operate the firearm.  As to the "how," the Massachusetts handgun

regulations draw from the historical analogues presented while addressing the advancements in

technology to prevent firearm accidents involving children.

Given this record and for the reasons discussed above, the Court concludes that the

Defendants have sufficiently established that the Massachusetts handgun regulatory scheme is

"consistent with the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.

## VII.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment,

D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

26

Add.27

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 123

§ 123. Conditions of licenses

Currentness

<[ Text of section effective until October 2, 2024. For text effective October 2, 2024, see below.]>

A license granted under section one hundred and twenty-two shall be expressed to be and shall be subject to the following conditions:-- First, That the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be strictly adhered to. Second, That every licensee shall, before delivery of a firearm, rifle or shotgun, make or cause to be made a true, legible entry in a sales record book to be furnished by the commissioner of the department of criminal justice information services and to be kept for that purpose, specifying the complete description of the firearm, rifle or shotgun, including the make, serial number, if any, type of firearm, rifle or shotgun, and designation as a large capacity weapon, if applicable, whether sold, rented or leased, the date of each sale, rental or lease, the license to carry firearms number or permit to purchase number and the identification card number in the case of a firearm or the identification card number or the license to carry firearms number in the case of a rifle or shotgun, the sex, residence and occupation of the purchaser, renter or lessee, and shall before delivery, as aforesaid, require the purchaser, renter or lessee personally to write in said sales record book his full name. Said book shall be open at all times to the inspection of the police. Third, That the license or a copy thereof, certified by the official issuing the same, shall be displayed on the premises in a position where it can easily be read. Fourth, That no firearm, rifle or shotgun, or machine gun shall be displayed in any outer window of said premises or in any other place where it can readily be seen from the outside. Fifth, That the licensee shall submit a record of all sales, rentals and leases forthwith at the time of such sale, rental or lease via electronic communication link to the commissioner of the department of criminal justice information services. Sixth, That every firearm, rifle or shotgun shall be unloaded when delivered. Seventh, That no delivery of a firearm shall be made to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one nor shall any delivery of a rifle or shotgun or ammunition be made to any minor nor to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one or a firearm identification card issued under the provisions of section one hundred and twenty-nine B nor shall any large capacity firearm or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under section 131 nor shall any large capacity rifle or shotgun or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under said section 131; provided, however, that delivery of a firearm by a licensee to a person possessing a valid permit to purchase said firearm issued under the provisions of section one hundred and thirty-one A and a valid firearm identification card issued under section one hundred and twenty-nine B may be made by the licensee to the purchaser's residence or place of business, subject to the restrictions imposed upon such permits as provided under section 131A. Eighth, That no firearm shall be sold, rented or leased to a minor or a person who has not a permit then in force to purchase, rent or lease the same issued under section one hundred and thirty-one A, and a firearm identification card issued under the provisions of section one hundred and twenty-nine B, or unless such person has a license to carry firearms issued under the provisions of section one hundred and thirty-one; nor shall any rifle or shotgun be sold, rented or leased to a person who has not a valid firearm identification card as provided for in section one hundred and twenty-nine B, or has a license to carry firearms as provided in section one hundred and thirty-one; that no large capacity firearm nor large capacity feeding device therefor shall be sold, rented, leased or transferred to any person not having (i) a license to carry firearms issued under section 131 or (ii) a proper permit issued under section 131A and a firearm identification card issued under section 129B; that no large capacity rifle or shotgun nor large capacity feeding

Add.28

device therefor shall be sold to any person not having a license to carry firearms issued under said section 131; and that no machine gun shall be sold, rented or leased to any person who has not a license to possess the same issued under section one hundred and thirty-one. Ninth, That upon the sale, rental or lease of a firearm, subject to a permit to purchase issued under the provisions of section one hundred and thirty-one A, the licensee under section one hundred and twenty-two shall take up such permit to purchase and shall endorse upon it the date and place of said sale, rental or lease, and shall transmit the same to the executive director of the criminal history systems board; and that upon the sale, rental or lease of a machine gun shall endorse upon the license to possess the same the date and place of said sale, rental or lease, and shall within seven days transmit a notice thereof to said executive director. In case of a sale under the provisions of section one hundred and thirty-one E the licensee under section one hundred and twenty-two shall write in the sales record book the number of the license to carry firearms issued the purchaser under the provisions of section one hundred and thirty-one, or the number of the firearm identification card issued the purchaser under the provisions of section one hundred and twenty-nine B, whichever is applicable under the provisions of condition Eighth of this section. Tenth, That this license shall be subject to forfeiture as provided in section one hundred and twenty-five for breach of any of its conditions, and that, if the licensee hereunder is convicted of a violation of any such conditions, this license shall thereupon become void. Eleventh, That the second, fifth, eighth and ninth conditions shall not apply to a gunsmith with regard to repair or remodeling or servicing of firearms, rifles or shotguns unless said gunsmith has manufactured a firearm, rifle or shotgun for the purchaser, but said gunsmith shall keep records of the work done by him together with the names and addresses of his customers. Such records shall be kept open for inspection by the police at all times. Twelfth, That any licensee shall keep records of each sale, rental or lease of a rifle or shotgun, specifying the description of said rifle or shotgun, together with the name and address of the purchaser, renter or lessee, and the date of such transaction. Thirteenth, That the current validity of any firearm identification card, license to carry firearms or permit to purchase, rent or lease firearms presented, and that the person presenting said card, license or permit is the lawful holder thereof, shall be verified by the licensee prior to any sale, rental or lease of a rifle, shotgun, firearm or large capacity feeding device; and, upon being presented with such card or license that is expired, suspended or revoked, the licensee shall notify the licensing authority of the presentment of such expired, suspended or revoked card, license or permit; and further, the licensee may take possession of such card or license provided that, in such case, such licensee shall: (i) issue a receipt, in a form provided by the commissioner of the department of criminal justice information services, to the holder thereof which shall state that the holder's card or license is expired, suspended or revoked, was taken by such licensee and forwarded to the licensing authority by whom it was issued and such receipt shall be valid for the date of issuance for the purpose of providing immunity from prosecution under section 10 of chapter 269 for unlawfully possessing a firearm, rifle or shotgun or large capacity weapon; (ii) notify the cardholder or licensee of his requirement to renew said card or license; and (iii) forward such expired card or license to the licensing authority forthwith; provided, however, that such licensee shall be immune from civil and criminal liability for good faith compliance with the provisions herein. Fourteenth, That the licensee shall conspicuously post at each purchase counter the following warning in bold type not less than one inch in height: "IT IS UNLAWFUL TO STORE OR KEEP A FIREARM, RIFLE, SHOTGUN OR MACHINE GUN IN ANY PLACE UNLESS THAT WEAPON IS EQUIPPED WITH A TAMPER-RESISTANT SAFETY DEVICE OR IS STORED OR KEPT IN A SECURELY LOCKED CONTAINER.", and that such licensee shall provide said warning, in writing, to the purchaser or transferee of any firearm, rifle, shotgun or machine gun in bold type not less than one-quarter inch in height, and further that the licensee shall conspicuously post and distribute at each purchase counter a notice providing information on suicide prevention developed and provided by the division on violence and injury prevention within the department of public health. The department of public health shall develop and make available on its website for download a sign providing the information on suicide prevention. Fifteenth, That all licensees shall maintain a permanent place of business that is not a residence or dwelling wherein all transactions described in this section shall be conducted and wherein all records required to be kept under this section shall be so kept. Sixteenth, That no licensee shall sell, lease, rent, transfer or deliver or offer for sale, lease, rent, transfer or delivery to any person any assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Seventeenth, That any licensee from whom a rifle, shotgun, firearm or machine gun is lost or stolen shall report such loss or theft to the licensing authority and the executive director of the criminal history systems board forthwith. Such report shall include a complete description of the weapon, including the make, model, serial number and caliber and whether such weapon is a large capacity weapon. Eighteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm, to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from

Add.29

reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a frame, barrel, cylinder, slide or breechblock that is composed of: (i) any metal having a melting point of less than 900 degrees Fahrenheit; (ii) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (iii) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of firearm for which a sample of three firearms in new condition all pass the following test: Each of the three samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than six malfunctions and completes the test without any crack or breakage of an operating part of the firearm. The term "crack" or "breakage" shall not include a crack or breakage that does not increase the danger of injury to the user. For purposes of evaluating the results of this test, malfunction shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism. Nineteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearms wholesaler, and the sale, by its terms, prohibits such purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to accidental discharge which, for purposes of this clause, shall mean any make and model of firearm for which a sample of five firearms in new condition all undergo, and none discharge during, the following test: Each of the five sample firearms shall be: (a) test loaded; (b) set so that the firearm is in a condition such that pulling the trigger and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the handgun; and (c) dropped onto a solid slab of concrete from a height of one meter from each of the following positions: (i) normal firing position; (ii) upside down; (iii) on grip; (iv) on the muzzle; (v) on either side; and (vi) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger, and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings. Twentieth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery, any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler, and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to: (i) firing more than once per pull of the trigger; or (ii) explosion during firing. Twenty-first, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a barrel less than three inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee, deliveree or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purposes of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire five rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in a test target shall be measured and recorded. This procedure shall be repeated two more times on the firearm. The arithmetic mean of each of the three recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. No licensee shall sell any rifle or shotgun, contrary to the provisions of section one hundred and thirty or section 131E.

Add.30

Clauses Eighteenth to Twenty-first, inclusive, of the first paragraph shall not apply to: (i) a firearm lawfully owned or possessed under a license issued under this chapter on or before October 21, 1998; (ii) a firearm designated by the secretary of public safety, with the advice of the gun control advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm solely designed and sold for formal target shooting competition; (iii) a stun gun, as defined in section 121; or (iv) a firearm designated by the secretary of public safety, with the advice of the gun control advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm or pistol solely designed and sold for Olympic shooting competition. The secretary of public safety shall compile lists, on a bi-annual basis, of firearms designated as "formal target shooting firearms" and "Olympic competition firearms" in accordance with this paragraph. Such lists shall be made available for distribution by the executive office of public safety and security.

No person licensed under the provisions of section 122 or section 122B shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device contrary to the provisions of section 130 or section 131E; and no such licensee shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device to any person who does not have in his possession the required firearm identification card or proof of exemption therefrom, license to carry firearms or permit to purchase, rent or lease firearms and who does not present such card, proof, license or permit to the licensee in person at the time of purchase, rental or lease. No person licensed under the provisions of section 122 or section 122B shall fill an order for such weapon, ammunition or ammunition feeding device that was received by mail, facsimile, telephone or other telecommunication unless such transaction or transfer includes the in-person presentation of the required card, proof, license or permit as required herein prior to any sale, delivery or any form of transfer of possession of the subject weapon, ammunition or ammunition feeding device. Transactions between persons licensed under section 122 or between federally licensed dealers shall be exempt from the provisions of this paragraph.

The licensing authority shall enter, one time per calendar year, during regular business hours, the commercial premises owned or leased by any licensee, wherein such records required to be maintained under this section are stored or maintained, and inspect, in a reasonable manner, such records and inventory for the purpose of enforcing the provisions of this section. If such records and inventory contain evidence of violations of this section, the inspecting officer shall produce and take possession of copies of such records and, in the event that the licensee subject to inspection does not possess copying equipment, the inspecting officer shall arrange to have copied, in a reasonable time and manner, such records that contain evidence of such violations and the costs for such copying shall be assessed against the owner of such records. Licensees found to be in violation of this section shall be subject to the suspension or permanent revocation of such license issued under section 122 and to the provisions of section 128. Nothing herein shall prohibit the licensing authority or the department of state police from conducting such inspections pursuant to a valid search warrant issued by a court of competent jurisdiction.

Notwithstanding the provisions of this section, a person licensed under the provisions of section one hundred and twenty-two, or section one hundred and twenty-two B, may sell or transfer firearms, rifles, shotguns, machine guns or ammunition at any regular meeting of an incorporated collectors club or at a gun show open to the general public; provided, however, that all other provisions of this section are complied with and that such sale or transfer is in conformity with federal law or regulations applicable to the transfer or sale of firearms, rifles, shotguns, machine guns or ammunition, including the restrictions imposed upon firearm identification cards issued under section 129B, licenses to carry firearms issued under section 131 and permits to purchase, lease or rent firearms issued under section 131A.

### § 123. Conditions of licenses

<[ Text of section as amended by 2024, 135, Sec. 37 effective October 2, 2024. For text effective until October 2, 2024, see above.]>

(a) As used in this section "licensee" shall mean a person with a license to sell under section 122.

Add.31

(b) Licensees shall maintain a business premise that is not a residential dwelling wherein all transactions shall be conducted and wherein all records shall be kept.

(c) Licensees shall display their license to sell or a copy thereof, certified by the licensing authority, in a position where it can be easily read; provided, however, that no firearm shall be displayed in any outer window of the business premises or in any other place where it can be readily seen from outside the business premises.

(d) Licensees shall conspicuously post and distribute at each purchase counter a notice providing information on: (i) safe transportation and storage of firearms developed and provided by the department of criminal justice information services, which shall develop and maintain on its website for download a sign providing such information; and (ii) suicide prevention information pursuant to subsection (e).

(e) The executive office of public safety and security, in collaboration with the department of public health, shall develop a notice providing information on suicide prevention, which shall be posted on the executive office's website and posted and distributed in accordance with subsection (d). Such notice shall include, but not be limited to: (i) information on signs and symptoms of depression; (ii) state and federal suicide prevention hotlines; and (iii) resources for individuals at risk of suicide.

(f) Prior to any transfer, a licensee shall verify the status of any license, card, permit or exemption documentation including a verification that the person presenting the license, card, permit or documentation is the lawful holder thereof. No transfer of any firearm or ammunition shall be made to any person not in possession of the required license, card, permit or exemption documentation at the time of the transaction.

(g) Upon being presented with an expired, suspended or revoked license, card or permit a licensee shall: (i) immediately report the attempted transaction to the department of criminal justice information services using its electronic firearms registration system, including, but not limited to, all information recorded pursuant to subsection (h); (ii) take possession of such card, permit or license and immediately forward the same to the licensing authority for the city or town where the licensee conducts business; (iii) issue the license, card or permit holder a receipt, in a form provided by the commissioner of the department of criminal justice information services, which shall state that the holder's license, card or permit is expired, suspended or revoked, was taken by the licensee, and forwarded to the licensing authority, and which shall be valid for 90 days for the purpose of providing immunity from prosecution under section 10 of chapter 269; and (iv) notify the license, card or permit holder of their duty to surrender their firearms forthwith to their local licensing authority under section 129D. The licensee shall be immune from civil and criminal liability for good faith compliance with the provisions herein.

(h) The licensee shall make and keep an on-site or electronic record of all firearm transactions and said record shall be open at all times to the inspection of the police. Before transfer or delivery of any sold, rented, leased or otherwise transferred firearm or ammunition, a legible entry in the on-site or electronic record shall be made and kept specifying: (i) the complete description of the firearm and ammunition transferred, including the make, serial number, type of firearm and designation as a large capacity firearm, if applicable; (ii) whether the firearm or ammunition has been sold, rented or leased and the date of such transaction; (iii) the license, permit or card identification number of the person acquiring the firearm, or ammunition along with their sex, residence address and occupation; and (iv) the purchaser, renter or lessee's name as personally written by said person in the sales record book and as confirmed by valid state or federal identification. This subsection shall not apply to a gunsmith with regard to repair or remodeling or servicing of firearms unless said gunsmith has manufactured a firearm for the purchaser but said gunsmith shall keep records of their work together with the names and addresses of their customers.

Add.32

(i) Licensees shall, immediately upon notice of any loss or theft of a firearm or ammunition from the licensee or licensee's business premises immediately report such loss or theft to the department of criminal justice information services via the electronic firearms registration system created pursuant to section 121B.

(j) A licensee may sell or transfer firearms and ammunition at any regular meeting of an incorporated collectors club or at a gun show open to the general public; provided, however, that a licensee shall comply with all other provisions of this section and that such sale or transfer is in conformity with both federal and state law and regulations.

(k) No licensee shall fill an order for any firearm or ammunition received by mail, facsimile, telephone, internet or other telecommunication unless such transaction includes the in-person presentation of the required license, card, permit or documentation as required herein prior to any sale, delivery or any form of transfer or possession. Transactions between federally licensed dealers shall be exempt from this subsection.

(l) Licensees shall ensure that all firearms and ammunition shall be unloaded when delivered and that delivery shall be only made to a person with the proper license card or permit or exemption to possess the firearms or ammunition included in the delivery.

(m) Any licensee, or any employee or agent of such a licensee, who violates this section shall be punished by a fine of not less than $1,000 nor more than $10,000, by imprisonment for not less than 1 year nor more than 10 years, or by both such fine and imprisonment.

(n) The local licensing authority shall enter the business premises of any licensee at least once per calendar year during regular business hours and shall make inquiries and inspect the licensee's records, inventory, policies and procedures for the purpose of enforcing this section. Licensees found to be in violation of this section shall be subject to the suspension or revocation of their license to sell. The department of state police may assume licensing responsibilities of a local licensing authority for the calendar year if a written request is provided at least 6 months in advance of any required inspection. Upon the failure of a local licensing authority to inspect licensees in accordance with this subsection the department of state police may become the inspecting authority. The executive office of public safety and security shall promulgate rules and regulations to effectuate the purposes of this subsection, which shall include, but not be limited to: (i) inspection timing, procedure, standards and reporting requirements; (ii) procedures and penalties for licensee violations and re-inspections; and (iii) processes and standards for a local licensing authority requesting or removing inspection responsibilities to the department of state police or failing to inspect as mandated by this subsection. Nothing herein shall prohibit any other law enforcement agency from conducting such inspections pursuant to a valid search warrant issued by a court of competent jurisdiction.

(o) No licensee under section 122 shall sell, rent, lease or otherwise transfer any firearm described in this subsection except to a business entity that is primarily a firearm wholesaler, and such transfer shall, by its terms, prohibit the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth. This subsection shall apply to:

(i) a firearm that has a frame, barrel, cylinder, slide or breechblock that is composed of: (A) any metal having a melting point of less than 900 degrees Fahrenheit; (B) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (C) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of a firearm for which a sample of 3 firearms in new condition all pass the following test: each of the 3 samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For

Add.33

any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for 10 minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard of ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than 6 malfunctions and completes the test without any crack or breakage of an operating part of the firearm that does not increase the danger of injury to the user. For purposes of this clause "malfunction" shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism;

(ii) a firearm that is prone to accidental discharge, which, for purposes of this clause, shall mean any make and model of firearm for which a sample of 5 firearms in new condition all undergo, and none discharge during, the following test: each of the 5 sample firearms shall be: (A) test loaded; (B) set so that the firearm is in a condition such that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the firearm; and (C) dropped onto a solid slab of concrete from a height of 1 meter from each of the following positions: (1) normal firing position; (2) upside down; (3) on grip; (4) on the muzzle; (5) on either side; and (6) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger and taking any action that shall simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings;

(iii) a firearm that is prone to: (A) firing more than once per pull of trigger; or (B) explosion during firing; and

(iv) a firearm that has a barrel less than 3 inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at 7 yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purpose of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire 5 rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in the test target shall be measured and recorded. This procedure shall be repeated 2 more times on the firearm. The arithmetic mean of each of the 3 recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual, if none is recommended, any standard ammunition of the correct caliber in new condition.

(p) Subsection (o) shall not apply to: (i) a firearm lawfully owned or possessed under a license issued under this chapter on or before October 21, 1998; (ii) a stun gun; or (iii) a firearm designated by the secretary of public safety, with the advice of the firearm control advisory board, established pursuant to section 1311/2, as a firearm solely designed and sold for formal target shooting competition or for Olympic shooting competition and listed on the rosters pursuant to section 131 ¼.

**Credits**
Amended by St.1957, c. 688, § 7; St.1959, c. 296, § 4; St.1968, c. 737, § 3; St.1969, c. 799, § 3; St.1981, c. 541; St.1987, c. 249; St.1996, c. 151, §§ 309 to 311; St.1998, c. 180, §§ 14 to 22; St.1998, c. 358, § 3; St.2006, c. 177, eff. Oct. 24, 2006; St.2010, c. 256, § 88, eff. Nov. 4, 2010; St.2014, c. 284, §§ 23, 24, eff. Jan. 1, 2021; St.2014, c. 284, § 25, eff. Jan. 1, 2015; St.2014, c. 284, § 26, eff. Aug. 13, 2014; St.2018, c. 123, § 8, eff. July 3, 2018; St.2024, c.135, § 37, eff. Oct. 2, 2024.

Add.34

Add.35

Notes of Decisions (12)

M.G.L.A. 140 § 123, MA ST 140 § 123
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131 3/4

§ 131 ¾ . Roster of large capacity rifles, shotguns, firearms, and feeding devices

Currentness

<[ Text of section effective until October 2, 2024. For text effective October 2, 2024, see below.]>

The secretary of public safety shall, with the advice of the gun control advisory board established pursuant to the provisions of section 131 ½, compile and publish a roster of large capacity rifles, shotguns, firearms and feeding devices, all as defined in section 121, and such weapons referred to in clauses Eighteenth to Twenty-first, inclusive, of section 123.

The secretary shall, not less than three times annually, publish the roster in newspapers of general circulation throughout the commonwealth, and shall send a copy thereof to all dealers licensed in the commonwealth under the provisions of said section 122 of said chapter 140; and further, the licensing authority shall furnish said roster to all cardholders and licensees upon initial issuance and upon every renewal of the same.

The secretary may amend the roster upon his own initiative or with the advice of said board. A person may petition the secretary to place a weapon on, or remove a weapon from, the roster, subject to the provisions of this section. A person who so petitions shall give the reasons why the roster should be so amended.

A petition to amend the roster shall be submitted in writing to the secretary and shall be in the form and manner prescribed by the secretary. Upon receipt of the petition to place a weapon on the roster, the secretary shall, within 45 days of receipt of the petition, either notify the petitioner by certified mail that the petition is denied, or it shall modify the roster. An addition to the roster shall be effective on the date it is included in the next publication in newspapers of general circulation as provided under this section.

The secretary may promulgate rules and regulations relative to the appeal of a decision on a petition to modify the roster and any other regulations consistent with the provisions of this section and section 2SS of chapter 29, sections 11 and 14 of chapter 131, sections 121, 122, 122B, 123, 128, 128A, 128B, 129B, 129C, 129D, 130, 131, 131A, 131E, 131F and 131K of chapter 140 to effectuate the purposes of each said section.

**§ 131 ¾. Roster of assault-style firearms; shooting competitions; roster amendments**

<[ Text of section as amended by 2024, 135, Sec. 51 effective October
2, 2024. For text effective until October 2, 2024, see above.]>

(a) The secretary of public safety and security shall, with the advice of the firearm control advisory board established in section 131 ½ compile and publish a roster of assault-style firearms banned under section 131M and a roster of firearms approved for sale and use in the commonwealth using the parameters set forth in section 123. The secretary shall, not less than 3 times annually, review, update, and publish the rosters online, and send a copy to all persons licensed in the commonwealth pursuant

Add.36

to section 122. Licensing authorities shall provide information on these rosters to all permit and card holders and licensees upon initial issuance and every renewal.

(b) The secretary, with the advice of the firearm control advisory board, shall also compile and publish a roster of firearms solely designed and sold for formal target shooting competitions or Olympic shooting competitions. The board shall, not less than biannually, review, update and publish these rosters and make them available for distribution.

(c) The secretary may amend any roster upon their own initiative. A person may petition the secretary to place a firearm on, or remove a firearm from, the roster, subject to the provisions of this section. A petition to amend a roster shall be submitted in writing to the secretary, in the form and manner prescribed by the secretary, and include reasons why the roster should be amended. Upon receipt of a petition to amend a roster, the secretary shall, within 45 days, either notify the petitioner that the petition is denied or modify the roster. An addition to the roster shall be effective on the date it is published online by the board.

**Credits**
Added by St.1998, c. 180, § 41. Amended by St.1998, c. 463, § 107; St.2024, c.135, § 51, eff. Oct. 2, 2024.

M.G.L.A. 140 § 131 3/4, MA ST 140 § 131 3/4
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add.37

> Massachusetts General Laws Annotated
>   Part I. Administration of the Government (Ch. 1-182)
>     Title XX. Public Safety and Good Order (Ch. 133-148a)
>       Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131K

§ 131K. Firearms or large capacity weapons without safety devices; liability

Currentness

<[ First paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

Any firearm or large capacity weapon, both as defined in section 121, sold within the commonwealth without a safety device designed to prevent the discharge of such weapon by unauthorized users and approved by the colonel of state police including, but not limited to, mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or authorized user, by solenoid use-limitation devices, key activated or combination trigger or handle locks, radio frequency tags, automated fingerprint identification systems or voice recognition, provided, that such device is commercially available, shall be defective and the sale of such a weapon shall constitute a breach of warranty under section 2-314 of chapter 106 and an unfair or deceptive trade act or practice under section 2 of chapter 93A. Any entity responsible for the manufacture, importation or sale as an inventory item or consumer good, both as defined in section 9-102 of chapter 106, of such a weapon that does not include or incorporate such a device shall be individually and jointly liable to any person who sustains personal injury or property damage resulting from the failure to include or incorporate such a device. If death results from such personal injury, such entities shall be liable in an amount including, but not limited to, that provided under chapter 229. Contributory or comparative negligence shall not be valid defenses to an action brought under this section in conjunction with section 2 of chapter 93A or section 2-314 of chapter 106 or both; provided, however, that nothing herein shall prohibit such liable parties from maintaining an action for indemnification or contribution against each other or against the lawful owner or other authorized user of said weapon. Any disclaimer, limit or waiver of the liability provided under this section shall be void.

<[ First paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

Any firearm or large capacity firearm, both as defined in section 121, sold within the commonwealth without a safety device designed to prevent the discharge of such firearm by unauthorized users and approved by the colonel of state police including, but not limited to, mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or authorized user, by solenoid use-limitation devices, key activated or combination trigger or handle locks, radio frequency tags, automated fingerprint identification systems or voice recognition, provided, that such device is commercially available, shall be defective and the sale of such a firearm shall constitute a breach of warranty under section 2-314 of chapter 106 and an unfair or deceptive trade act or practice under section 2 of chapter 93A. Any entity responsible for the manufacture, importation or sale as an inventory item or consumer good, both as defined in section 9-102 of chapter 106, of such a firearm that does not include or incorporate such a device shall be individually and jointly liable to any person who sustains personal injury or property damage resulting from the failure to include or incorporate such a device. If death results from such personal injury, such entities shall be liable in an amount including, but not limited to, that provided under chapter 229. Contributory or comparative negligence shall not be valid defenses to an action brought under this section in conjunction with section 2 of chapter 93A or section 2-314 of chapter 106 or both; provided, however, that nothing herein shall prohibit such liable parties from maintaining an action for indemnification or contribution against each other or against the lawful owner or other authorized user of said firearm. Any disclaimer, limit or waiver of the liability provided under this section shall be void.

Add.38

<[ Second paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

No entity responsible for the manufacture, importation or sale of such a weapon shall be liable to any person for injuries caused by the discharge of such weapon that does not include or incorporate a safety device as required under this section if such injuries were: (i) self-inflicted, either intentionally or unintentionally, unless such injuries were self-inflicted by a person less than 18 years of age; (ii) inflicted by the lawful owner or other authorized user of said weapon; (iii) inflicted by any person in the lawful exercise of self-defense; or (iv) inflicted upon a co-conspirator in the commission of a crime.

<[ Second paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

No entity responsible for the manufacture, importation or sale of such a firearm shall be liable to any person for injuries caused by the discharge of such firearm that does not include or incorporate a safety device as required under this section if such injuries were: (i) self-inflicted, either intentionally or unintentionally, unless such injuries were self-inflicted by a person less than 18 years of age; (ii) inflicted by the lawful owner or other authorized user of said firearm; (iii) inflicted by any person in the lawful exercise of self-defense; or (iv) inflicted upon a co-conspirator in the commission of a crime.

<[ Third paragraph effective until October 2, 2024. For text effective October 2, 2024, see below.]>

This section shall not apply to any weapon distributed to an officer of any law enforcement agency or any member of the armed forces of the United States or the organized militia of the commonwealth; provided, however, that such person is authorized to acquire, possess or carry such a weapon for the lawful performance of his official duties; and provided further, that any such weapon so distributed is distributed solely for use in connection with such duties. This section shall not apply to any firearm manufactured in or prior to the year 1899, or to any replica of such a firearm if such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition.

<[ Third paragraph as amended by 2024, 135, Sec. 66 effective
October 2, 2024. For text effective until October 2, 2024, see above.]>

This section shall not apply to any firearm distributed to an officer of any law enforcement agency or any member of the armed forces of the United States or the organized militia of the commonwealth; provided, however, that such person is authorized to acquire, possess or carry such a firearm for the lawful performance of his official duties; and provided further, that any such firearm so distributed is distributed solely for use in connection with such duties. This section shall not apply to any firearm manufactured in or prior to the year 1899, or to any replica of such a firearm if such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition.

**Credits**
Added by St.1998, c. 180, § 47. Amended by St.1999, c. 1, § 3; St.2001, c. 26, § 40; St.2024, c. 135, § 66, eff. Oct. 2, 2024.

M.G.L.A. 140 § 131K, MA ST 140 § 131K
Current through Chapter 196 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add.39