No. 25-1918

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY COALITION, INC.; CAMERON PROSPERI,

*Plaintiffs-Appellants*,

*v.*

ANDREA J. CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; GINA KWON, in her official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees.*

On appeal from the United States District Court for the District of Massachusetts

## BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue,
P.O. Box 4184
New York, NY 10163

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

April 1, 2026

# CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**INTEREST OF AMICUS CURIAE** ...................................................... 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ...................... 1

**ARGUMENT** ................................................................................... 4

    I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct ...................................................................................... 4

        A.    Under the *Bruen-Rahimi* Framework, Purchase Regulations that Do Not Meaningfully Constrain the Right to Keep and Bear Arms Do Not Implicate Conduct Within the Second Amendment's Text ................................................................. 4

        B.    The Commonwealth's Handgun Safety Regulations Do Not Meaningfully Constrain the Right to Keep and Bear Arms ... 7

    II.    The "Common Use" Test Plaintiffs and the United States Propose is Incorrect ...................................................................10

    III.    Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis ...........................................16

        A.    Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus .....17

        B.    If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era ...........................................22

**CONCLUSION** ................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*,
 120 F.4th 941 (2d Cir. 2024),
 *cert. denied*, 145 S. Ct. 1900 (2025) ................................. 21, 23, 25, 30

*Bevis v. City of Naperville*,
 85 F.4th 1175 (7th Cir. 2023),
 *cert. denied*, 144 S. Ct. 2491 (2024) ............................................... 11, 15

*Bianchi v. Brown*,
 111 F.4th 438 (4th Cir. 2024) (en banc),
 *cert. denied*, 145 S. Ct. 1534 (2025) ............................................ *passim*

*Capen v. Campbell*,
 134 F.4th 660 (1st Cir. 2025) ..................................................... *passim*

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ...................................................................... 4, 18

*Duncan v. Bonta*,
 133 F.4th 852 (9th Cir. 2025),
 *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025) ............... *passim*

*Ezell v. City of Chicago*,
 651 F.3d 684 (7th Cir. 2011) ............................................................ 24

*Frey v. City of New York*,
 157 F.4th 118 (2d Cir. 2025) ....................................................... 18, 21

*Friedman v. City of Highland Park*,
 784 F.3d 406 (7th Cir. 2015) ............................................................ 14

*Gamble v. United States*,
 587 U.S. 678 (2019) ........................................................................ 30

*Gould v. Morgan*,
 907 F.3d 659 (1st Cir. 2018) ............................................................ 24

*Hanson v. District of Columbia*,
 120 F.4th 223 (D.C. Cir. 2024),
 *cert. denied*, 145 S. Ct. 2778 (2025) ............................................... 4, 21

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
*aff'd in part and vacated in part on other grounds*,
149 F.4th 476 (4th Cir. 2025),
*cert. denied*, --- S. Ct. ----, 2026 WL 642852 (Mar. 9, 2026)..................25

*Lane v. Cacace*,
No. 7:22-cv-10989, 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025) ..........13

*Lara v. Comm'r Pa. State Police*,
125 F.4th 428 (3d Cir. 2025), *petition for cert. filed*, No. 24-1329 (June
26, 2025) ...............................................................................................30

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024), *cert. granted, judgment vacated,
case remanded*, 145 S. Ct. 369 (2024)................................................29

*Mahanoy Area Sch. Dist. v. B. L.*,
594 U.S. 180 (2021) .........................................................................27

*Md. Shall Issue v. Moore*,
116 F.4th 211 (4th Cir. 2024) (en banc),
*cert. denied,* 145 S. Ct. 1049 (2025) ..................................................... 7

*McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
140 F.4th 568 (4th Cir. 2025),
*petition for cert. filed*, No. 25-24 (July 3, 2025) ..................................21

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .........................................................................23

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .........................................................................27

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024) ............................................................ 7

*Md. Shall Issue, Inc. v. Montgomery County*,
680 F. Supp. 3d 567 (D. Md. 2023),
*appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023)........................25

*Nat'l Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025),
*petition for cert. filed*, No. 25-421 (U.S. Oct. 3, 2025) ...................11, 14

*Nat'l Ass'n for Gun Rights v. Lamont*,
  685 F. Supp. 3d 63 (D. Conn. 2023), *aff'd, NAGR*, 153 F.4th 213.......15

*Nat'l Rifle Ass'n v. Bondi*,
  133 F.4th 1108 (11th Cir. 2025) (en banc),
  *petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*,
  No. 24-1185 (May 16, 2025)....................................................21, 25, 26

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*,
  72 F.4th 1346 (11th Cir. 2023) ....................................................25, 26

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) .......................................................................*passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*,
  103 F.4th 1186 (6th Cir. 2024),
  *cert. denied*, 145 S. Ct. 603 (2024)...................................................6, 7

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024),
  *cert. denied*, 145 S. Ct. 2771 (2025) .............................................*passim*

*Pinales v. Lopez*,
  765 F. Supp. 3d 1024 (D. Haw. 2025)...............................................30

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  127 F.4th 583 (5th Cir. 2025) ...........................................................30

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ..........................................................5, 7

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*,
  No. 24-2583 (9th Cir. Apr. 24, 2024) ...........................................25, 31

*Schoenthal v. Raoul*,
  150 F.4th 889 (7th Cir. 2025), *petition for cert. filed*,
  No. 25-541 (Oct. 31, 2025) ...............................................................21

*United States v. Gomez*,
  159 F.4th 172 (2d Cir. 2025),
  *cert. denied*, --- S. Ct. ----, 2026 WL 795188 (Mar. 23, 2026)...........9, 13

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012)............................................................24

*United States v. Morgan*,
  150 F.4th 1339 (10th Cir. 2025),
  *cert. denied,* 146 S. Ct. 907 (2025) ...............................................12, 13

*United States v. Rahimi*,
  602 U.S. 680 (2024) ........................................................ 2, 4, 19, 22

*United States v. Veasley*,
  98 F.4th 906 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024) ........13

*United States v. Vereen*,
  152 F.4th 89 (2d Cir. 2025),
  *cert. denied*, --- S. Ct. ----, 2026 WL 79986 (Jan. 12, 2026) .......5, 6, 7, 9

*United States v. Vlha,*
  142 F.4th 1194 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 625 (2025) ..... 6

*We the Patriots, Inc. v. Lujan Grisham*,
  697 F. Supp. 3d 1222 (D.N.M. 2023),
  *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024)............................25

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024),
  *cert. denied*, 145 S. Ct. 1924 (2025) ............................................29, 30

## Other Authorities

Evan D. Bernick, *Fourteenth Amendment Confrontation*,
  51 Hofstra L. Rev. 1 (2022)..............................................................26

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the
  Fifth Amendment May Not Protect Against Regulatory Takings, But
  the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008)....26

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the
  Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .........................27

Transcript of Oral Argument, New York State Pistol & Rifle Ass'n v.
  Bruen (No. 20-843) ..........................................................................26

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Massachusetts's regulations prohibiting the commercial sale of weapons that do not meet state safety standards (the "handgun safety regulations") are constitutional under the approach to Second

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons set out in the Brief of the Defendants-Appellees, Dkt. 00118422062 ("Commw. Br."). Everytown submits this amicus brief to expand on three methodological points relevant to that inquiry.

*First,* at the initial, textual step of the *Bruen-Rahimi* framework, Plaintiffs have the burden to establish that the law's requirements infringe their right to keep and bear arms, and they have not met that burden. They have not shown that the Second Amendment protects a right to purchase at retail specific handgun models that do not meet the Commonwealth's safety standards—particularly where they are free to choose from over 1,000 handgun models that are available commercially for their self-defense needs. Plaintiffs' failure to meet this burden is sufficient for this Court to affirm the district court.

*Second*, while it need not reach the issue in this case, if it does so, this Court should reject the "common use" standards that Plaintiffs and amicus the United States propose. *See* Dkt. 00118398182 ("Pls. Br.") 30-40; Dkt. 00118401491 ("U.S. Br."). Their arguments are flawed in multiple respects: most egregiously, they purport to ground

2

constitutional protection in ownership statistics in conflict with this Court's precedents, the *Bruen-Rahimi* framework, and common sense.

*Third*, if this Court were to reach the second, historical step of the *Bruen-Rahimi* framework, binding caselaw makes clear that this Court should give significant weight to Reconstruction-era and later evidence. *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48, 51-52 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025); *Capen v. Campbell*, 134 F.4th 660, 670-73 (1st Cir. 2025). This is so regardless of which time period is the central focus of the historical inquiry: the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the states through the Fourteenth Amendment. Accordingly, there is no reason to resolve which period should be the central focus—though if the Court chooses to do so, originalist principles require focusing on the Reconstruction era.

3

## ARGUMENT

I.    **Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct**

A.    **Under the *Bruen-Rahimi* Framework, Purchase Regulations that Do Not Meaningfully Constrain the Right to Keep and Bear Arms Do Not Implicate Conduct Within the Second Amendment's Text**

The Second Amendment right to "keep and bear" arms is "not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), but rather is subject to a range of textually and historically grounded constraints, *see, e.g.*, *id.* at 626-27, 627 n.26, 635 (explaining that Court cast no doubt on, among other laws, "conditions and qualifications on the commercial sale of arms"). Courts assess whether a regulation impermissibly infringes the right to keep and bear arms in two steps. First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. Second, the court assesses if the regulation is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

The burden to satisfy the initial, textual inquiry is on the party challenging a law. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025). If the

4

challenger fails to carry that burden, the inquiry ends: self-evidently, if the regulated conduct falls outside the Second Amendment's protection, then the government may restrict it without infringing the right to keep and bear arms. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*") ("Should the plaintiff not satisfy this burden, they fail to allege a Second Amendment violation and [the Court's] analysis ends.").

The handgun safety regulations do not address directly the conduct specified in the Second Amendment's text—to "keep" or to "bear." Rather, they regulate firearm *sale*, by determining which handgun models are safe enough to be commercially available for retail sale in Massachusetts. To be sure, a sales regulation could be so restrictive as to prevent someone from "keep[ing]" or "bear[ing]" arms. Accordingly, in a case involving "ancillary" or "implied" rights like purchasing arms, the correct approach is to ask whether the law "*meaningfully constrains* … would-be purchasers from possessing firearms"—as the district court recognized. Add. 13 (emphasis added) (quoting *United States v. Vlha*, 142 F.4th 1194, 1200 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 625 (2025)); *see also, e.g.*, *United States v.*

5

*Vereen*, 152 F.4th 89, 95, 97 (2d Cir. 2025) (explaining that ancillary rights "only implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms," such that they have "the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms" (citation omitted)), *cert. denied*, --- S. Ct. ----, 2026 WL 79986 (Jan. 12, 2026). Put differently, because these ancillary rights are "one step removed from the plain text," *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024), the application of the Second Amendment is "limited," *Vlha*, 142 F.4th at 1198 (ancillary rights do not implicate the "direct possessory right to 'keep and bear Arms'"). The ability to purchase is "only protected to the extent that" it is "'necessary to the realization' of the textually specified right to keep and bear arms." *Vereen*, 152 F.4th at 95 (citation omitted).

While this Court has not yet had the opportunity to opine on the doctrine, several of its sister circuits have "adopted the Ninth Circuit's 'meaningful-constraint test or something like it.'" Add. 12 (quoting *Vlha*, 142 F.4th at 1198). As *Vlha* explained, in addition to the Ninth Circuit, decisions of the Second, Fifth, and Tenth Circuits have applied

similar tests.[2] The Sixth Circuit has done so too.[3] This Court should follow suit.

In short, Plaintiffs must show that "the constraint on an ancillary right is sufficient to constitute an infringement of the textually enumerated right to 'keep' and 'bear' arms." *Vereen*, 152 F.4th at 96— not just that the regulation merely "affects firearms in some way," *Oakland Tactical*, 103 F.4th at 1196.

### B. The Commonwealth's Handgun Safety Regulations Do Not Meaningfully Constrain the Right to Keep and Bear Arms

Plaintiffs have not demonstrated that the handgun safety regulations implicate their Second Amendment rights. *See* Commw. Br. 18-20. Their inability to purchase from a licensed retailer the particular handgun models and special editions they desire, but that do not meet Massachusetts's safety standards, does not "meaningfully constrain"

---

[2] *See, e.g.*, *Vereen*, 152 F.4th at 95-97; *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024); *RMGO*, 121 F.4th at 120.

[3] *See Oakland Tactical Supply*, 103 F.4th at 1196, 1198. The en banc Fourth Circuit has also asked a similar question in a licensing case. *See Md. Shall Issue v. Moore*, 116 F.4th 211, 225 (4th Cir. 2024) (en banc) (assessing whether licensing requirements "effectively den[ied] the right to keep and bear arms"), *cert. denied,* 145 S. Ct. 1049 (2025).

their ability to keep and bear arms. To the contrary, they can still purchase over 1,000 handgun models that meet the safety requirements to effectuate their self-defense needs. *See id.* at 19.[4] The undisputed record amply bears this out. For example:

- Granata and Prosperi each own fourteen guns, including nine different handgun models. *See* Add. 6 (citing statement of undisputed facts).

- Retail Plaintiff Gunrunner "keeps about 300 handguns in stock at any given time, representing about 30-35 different models of handguns, from 15-20 brands." *Id.*

- Reported handgun sales in Massachusetts in 2024 totaled 76,409 from licensed dealers/retailers and 16,051 in private sales. *See* Add. 7.

Ignoring this record, Plaintiffs attempt to wave away their textual burden by labelling Massachusetts's safety regulations a "Handgun Ban," comparing them to the laws struck down in *Heller* and *Bruen*. *See* Pls. Br. 1-3, 8, 14. But this Court has already rejected the argument that "a law that bans certain handguns with certain features is

---

[4] In addition, Plaintiffs can purchase in the private market handgun models that Massachusetts's safety regulations restrict from commercial sale. Plaintiff Prosperi, for example, acquired in a private transaction one of the Glock models that Plaintiff Granata alleges he would purchase commercially but for the handgun safety regulations. *See* Add. 6.

equivalent for constitutional purposes to a law that bans all handguns as a class." *Capen*, 134 F.4th at 674. *Capen* is correct, and Plaintiffs have not shown that the handgun safety regulations have "the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms," particularly where residents are left with "ample alternative means of acquiring firearms for self-defense purposes." *Vereen*, 152 F.4th at 97 (first quoting *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024), then quoting *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012)); *see also United States v. Gomez*, 159 F.4th 172, 177 (2d Cir. 2025) ("Some burden on the commercial sale of firearms is 'presumptively lawful' and is acceptable so long as the regulation does not *meaningfully* infringe on the right to self-defense."), *cert. denied*, --- S. Ct. ----, 2026 WL 795188 (Mar. 23, 2026). Thus, they have not carried their text-step burden, and this Court may affirm on that basis alone.[5]

---

[5] As explained in detail in the Commonwealth's brief, Plaintiffs' challenge also fails at step one of the *Bruen-Rahimi* framework because the handgun safety regulations are "presumptively lawful" "conditions and qualifications on the commercial sale of firearms." *See* Commw. Br. 21-23.

## II.   The "Common Use" Test Plaintiffs and the United States Propose is Incorrect

Plaintiffs and amicus the United States argue that this Court should resolve this case exclusively under an overly broad "common use" test, focused on the popularity of the restricted firearms. *See* Pls. Br. 30-40; U.S. Br. 5-12, 16-18. As the United States puts the argument, because the handgun safety regulations bar "some of the most commonly manufactured weapons in America," they are unconstitutional "[f]or this reason alone." U.S. Br. 17-18; *see* Pls. Br. 38-39. But that is not the law.

To be sure, this Court need not address the "common use" question at all. As the Commonwealth has explained, the challenged regulations "are not a ban on handguns as a 'class of arms.'" Commw. Br. 31. And so "any 'common use' inquiry—whatever its contours—has no application here." *Id.*; *see id.* at 23-31; *see also* Add. 17-18 (rejecting Plaintiffs' argument that the appropriate inquiry is whether the restricted handguns are in "common use").

But if the Court does choose to delve into "common use," it is clear that a statistics-driven, popularity-based test is not the proper inquiry. Indeed, the law of the Circuit—which, notably, the United States does

not cite or discuss in its brief—leaves no doubt on this point. Since *Bruen*, this Court has twice expressly "rejected [the] suggestion 'that the constitutionality of arms regulation is to be determined based on the ownership rate of the weapons at issue.'" *Capen*, 134 F.4th at 670 (quoting *Ocean State Tactical*, 95 F.4th at 51); *see id.* (reaffirming that "*Ocean State Tactical* forecloses [plaintiffs'] reliance on ownership statistics"). As this Court has explained, relying on a "popularity test" to decide Second Amendment claims "contravenes case law in addition to logic." *Ocean State Tactical*, 95 F.4th at 50.

Other courts—including the Second, Fourth, Seventh, Ninth, Tenth, and D.C. Circuits—have likewise rejected the contention that the "common use" inquiry reduces to a "trivial counting exercise." *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025); *see, e.g.*, *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 232-33 (2d Cir. 2025) ("*NAGR*"), *petition for cert. filed*, No. 25-421 (U.S. Oct. 3, 2025); *Duncan v. Bonta*, 133 F.4th 852, 882-83 (9th Cir. 2025) (en banc) (citing cases), *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025); *Bevis v. City of Naperville*, 85 F.4th 1175, 1198-99 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024).

11

As these courts have explained, "'the [Supreme] Court's choice of the phrase common *use* instead of common *possession*' means more than 'the number of a certain weapon in private hands.'" *United States v. Morgan*, 150 F.4th 1339, 1347 (10th Cir. 2025) (quoting *Bianchi*, 111 F.4th at 460, and *Hanson*, 120 F.4th at 233), *cert. denied*, 146 S. Ct. 907 (2025); *see Ocean State Tactical*, 95 F.4th at 50-51 (adopting similar analysis).

The Second Amendment's protection instead extends only to arms "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). Applying that standard requires consideration of a weapon's actual use and objective design and features, which demonstrate the uses for which it is suited. *See, e.g.*, *Morgan*, 150 F.4th at 1344, 1348 (citing, *inter alia*, *Ocean State Tactical*, 95 F.4th at 45); *Bianchi*, 111 F.4th at 450-52, 458-61 (same). Weapons that are commonly used in and suitable for self-defense can fall within the scope of the Second Amendment right, but those that are "most useful in military service," *Morgan*, 150 F.4th at 1348, or "ill-suited and

12

disproportionate to the need for self-defense," *Bianchi*, 111 F.4th at 441,

do not.[6]

Assessing "common use" through a popularity test of the sort

Plaintiffs and the United States propose, on the other hand, would

mean that no government could prohibit a weapon "any time an

undefined number of people own an undefined number" of that weapon,

regardless of how rarely it is used in self-defense, its suitability for that

purpose, or its excessive dangerousness. *Duncan*, 133 F.4th at 883.

Such an approach "defies reason." *Ocean State Tactical*, 95 F.4th at 50

(rejecting argument that "legislatures can only ban a weapon if they

ban it at (or around) the time of its introduction, before its danger

becomes manifest"). And it "would 'lead[] to absurd consequences' where

---

[6] This Court has not yet decided whether the "common use" analysis belongs at the text or history step of the *Bruen-Rahimi* framework—and it need not do so in this case. But despite Plaintiffs' contention that "common use" is situated at the second, historical step, *see* Pls.' Br. 31, "[t]he overwhelming majority of courts considering Second Amendment challenges"—including the Second, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits—"address common use questions at step one." *Lane v. Cacace*, No. 7:22-cv-10989, 2025 WL 903766, at *7 (S.D.N.Y. Mar. 25, 2025) (citing cases from five of these six circuits); *see also, e.g.*, *Gomez*, 159 F.4th at 176-78; *Morgan*, 150 F.4th at 1345-46; *Bianchi*, 111 F.4th at 453; *United States v. Veasley*, 98 F.4th 906, 910 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024). If the Court reaches the question here, it should hold the same.

unusually dangerous arms like the M-16 or 'the W54 nuclear warhead' can 'gain constitutional protection merely because [they] become[] popular before the government can sufficiently regulate [them].'" *NAGR*, 153 F.4th at 233 (quoting *Bianchi*, 111 F.4th at 460).

This approach is further contradicted by historical tradition. Throughout this nation's history, jurisdictions have often moved to prohibit weapons precisely because they were becoming "all too common," *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015), thereby creating a genuine public safety problem. "[S]ince the Founding era, legislatures have enacted laws to protect innocent persons from especially dangerous uses of weapons *once those perils have become clear*." *Duncan*, 133 F.4th at 876-77 (emphasis added); *see also, e.g.*, *Ocean State Tactical*, 95 F.4th at 50 (describing "devices that have historically been prohibited once their danger became manifest"). That pattern followed the path of the common law, which reveals a tradition of regulation "emerg[ing] from concern about danger to the public, not statistical commonality of the threatening weapon." *NAGR*, 153 F.4th at 252 (Nathan, J., concurring); *see id.* at 234 (majority opinion) ("We fully join in Judge Nathan's concurrence.").

14

This "ownership-statistics theory" of common use, *Duncan*, 133 F.4th at 883, is also inconsistent with traditional constitutional principles more generally. As other courts have found, no other right is "read to expand or contract based on nothing more than contemporary market trends." *Bianchi*, 111 F.4th at 461; *see Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 102 (D. Conn. 2023) (observing that "no other constitutional right waxes and wanes based solely on what manufacturers choose to sell"), *aff'd*, *NAGR*, 153 F.4th 213. That makes perfect sense, as the reasoning of such an approach is inescapably "circular." *Bevis*, 85 F.4th at 1190; *see Bianchi*, 111 F.4th at 461 (rejecting position that "arms manufacturers can secure constitutional immunity for their products so long as they distribute a sufficient quantity before legislatures can react"). "[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Bevis*, 85 F.4th at 1190 (quoting *Friedman*, 784 F.3d at 409).

The United States acknowledges these concerns but attempts to discount them as "implausible." U.S. Br. 12. That is rather surprising, given that it has recently rejected a popularity approach to "common

15

use" in other cases for similar reasons—referring to "plaintiffs' reliance on the number of [weapons and accessories]" in public circulation as "misplaced," and supporting its contrary position on "common use" through some of the very same cases it now argues to this Court are "incorrect."[7] Plaintiffs, for their part, do not appear to recognize any significant concerns with their framing of the "common use" standard; instead, they confidently assert that the specific handguns restricted by the challenged safety regulations "are among the most popular firearms of any type in the country," and so "are categorically protected." Pls. Br. 38-39. But, as explained, that "simplistic approach" to common use, *Duncan*, 133 F.4th at 882, is not the law in this Circuit or other courts. This Court should not follow it here.

## III. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

Given the threshold issues that defeat Plaintiffs' Second Amendment claim, this Court need not reach *Bruen*'s second, history-

---

[7] Reply Supp. Defs.' Mot. Summ. J. 22-23, *Brown v. ATF*, No. 4:25-cv-01162 (E.D. Mo. Feb. 20, 2026), Dkt. 58; *compare id.* at 23 (favorably citing *Bianchi*, 111 F.4th at 460-61), *with* U.S. Br. 10 (calling *Bianchi*'s reasoning "incorrect"); *see also* Reply Supp. Defs.' Mot. Summ. J. 22, *Jensen v. ATF*, No. 2:25-cv-00223 (N.D. Tex. Feb. 12, 2026), Dkt. 60.

focused step. If it does so, however, it will confront Plaintiffs' suggestion that the founding era has primacy over the Reconstruction era in the historical analysis. *See* Pls. Br. 41-42. That issue, too, does not require resolution: after making their time-period suggestion, Plaintiffs never mention it in criticizing the district court's analysis, which examined historical traditions that each had roots in the founding period. *See id.* at 44-56. And the Supreme Court and this Court both have made clear that evidence from Reconstruction and beyond is an important part of the analysis. Just as this Court did in *Ocean State Tactical* and *Capen,* it should consider the consistent arc of regulatory tradition that Massachusetts has identified stretching from the founding through Reconstruction and into the 20th century. If, however, the Court wishes to answer the question of which time period is the central focus, the correct originalist answer is to focus on the Reconstruction era and 1868.

    **A.**    **Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus**

*Heller, Bruen,* and *Rahimi* all make clear that Reconstruction-era and later history is crucial to the Second Amendment analysis. After

17

calling post-ratification history a "critical tool of constitutional interpretation," Justice Scalia's opinion for the Court in *Heller* examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." 554 U.S. at 605. In doing so, it relied on "19th century cases that interpreted the Second Amendment," "discussion of the Second Amendment in Congress and in public discourse after the Civil War," and "how post-Civil War commentators understood the right." *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen* "reaffirmed the appropriateness of relying on post-Founding history." *Frey v. City of New York*, 157 F.4th 118, 129 (2d Cir. 2025). It relied on mid-19th-century cases and statutes, *see Bruen*, 597 U.S. at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. And in discussing sensitive places, *Bruen* indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added).

18

*Rahimi* then put the relevance of 19th-century evidence even further beyond doubt. It rested its decision upholding a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 695 (relying on Massachusetts surety statute from 1836); *id.* at 696 (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23, which cites 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws). As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. *Id.* at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and]

19

settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Following the Supreme Court, this Court and other circuits have likewise recognized that 19th-century and later evidence is critical to the historical inquiry. In *Ocean State Tactical*, this Court relied on historical laws restricting sawed-off shotguns and machine guns that first appeared in the twentieth century and on restrictions on Bowie knives "[f]rom the beginning of the 1830s through the early twentieth century." 95 F.4th at 46-48. In so doing, it expressly rejected the argument that these laws were too late to inform the historical analysis, noting that *Heller* and *Bruen* also acknowledged the value of post-ratification evidence. *Id.* at 51-52. And then in *Capen*, this Court relied again on these same 19th- and 20th-century laws in rejecting challenges to Massachusetts's assault-weapon and large-capacity-magazine restrictions. *See* 134 F.4th at 670, 672-74.

Numerous other circuits have likewise recognized that Reconstruction-era and later laws are crucial to the *Bruen-Rahimi*

20

historical analysis.[8] Appreciating the relevance of postenactment

history accords not only with Supreme Court and appellate caselaw, but

also with common sense. If a regulation passed in the decades around

Reconstruction did not raise a constitutional challenge at the time of its

passage, and there is no separate historical evidence showing that the

regulation would have raised constitutional concern in earlier decades,

then it can be inferred that the regulation comports with the founding-

era public understanding of the right. In other words, absent

affirmative evidence to the contrary, a court should presume that a

---

[8] *See, e.g.*, *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives,* 140 F.4th 568, 578-79 (4th Cir. 2025) (considering "later nineteenth-century history" in upholding age restriction), *petition for cert. filed*, No. 25-24 (July 3, 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (en banc) ("*Bondi II*") (relying on "[m]id-to-late nineteenth-century laws consistent with [earlier] principles" in upholding age restriction), *petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (May 16, 2025); *Duncan,* 133 F.4th at 860, 873-77 (tracing consistent tradition from 18th through 19th century and later); *Frey,* 157 F.4th at 129 ("comfortably rely[ing]" on post-founding history); *Bianchi,* 111 F.4th at 465-71 (relying on 19th- and 20th-century evidence); *Hanson,* 120 F.4th at 237-40, 238 n.7  (same); *Schoenthal v. Raoul,* 150 F.4th 889, 912-13 (7th Cir. 2025) (concluding that the "government is not constrained to only Founding Era laws" (citation omitted)), *petition for cert. filed*, No. 25-541 (Oct. 31, 2025); *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024) (instructing that "evidence from the Reconstruction Era ... is at least as relevant as evidence from the Founding Era" in a case against a state), *cert. denied*, 145 S. Ct. 1900 (2025).

Reconstruction-era tradition also reflects the founding-era understanding. Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

In sum, under the precedents of the Supreme Court and this Court, Reconstruction-era and later history plays a crucial role in the *Bruen-Rahimi* historical analysis.

### B.    If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era

The Supreme Court has expressly left open which time period to privilege in the Second Amendment analysis. In both *Bruen* and *Rahimi*, it found the public understanding of the right to have remained consistent throughout our nation's history. *See id.* at 37-38; *Rahimi*, 602 U.S. at 692 n.1. The same is true here, and so this Court, too, does not need to resolve this question. But if the Court chooses to address the issue, it should conclude that the proper focus of the inquiry is on the Reconstruction era and 1868, when the Fourteenth Amendment was ratified.

22

In a case involving a state law, that conclusion follows directly from the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 37. Accordingly, focusing on 1868 in a case challenging a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption?

The Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reinforces this conclusion. *McDonald* analyzed at length the public understanding around 1868 before holding that the Second Amendment constrains the states. *See id.* at 770-78. That approach is hard to square with a belief that only the 1791 understanding informs the content of the right: "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

Courts—including this one—recognized even before *Bruen* that the Reconstruction era should be the primary focus for evaluating state and local gun laws. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *see also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).[9]

After *Bruen*, this Court has not yet revisited *Gould*'s focus on 1868. In *Ocean State Tactical*, the Court read *Bruen* to have "indicated" that founding-era evidence was "of primary importance" (while emphasizing that the Supreme Court also relied on later evidence). 95 F.4th at 51. But that remark did not purport to settle the question *Bruen* and *Rahimi* expressly left open—nor did it repudiate the Court's earlier reasoning in *Gould*. Several well-reasoned and persuasive decisions from other courts, meanwhile, have continued to "recogniz[e]

---

[9] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny) but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era" in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *aff'd in part and vacated in part on other grounds*, 149 F.4th 476 (4th Cir. 2025), *cert. denied*, --- S. Ct. ----, 2026 WL 642852 (Mar. 9, 2026); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("*Bondi I*") ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[10] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi I*), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222,

---

[10] Despite being vacated for rehearing en banc, *Bondi I*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (finding *Bondi I* persuasive on this point after vacatur). The en banc Eleventh Circuit subsequently reached the same outcome as the panel in *Bondi I*, but declined to resolve this time-period question "because the law of both eras restricted the purchase of firearms by minors." *Bondi II*, 133 F.4th at 1117.

1234 (D.N.M. 2023) (agreeing with *Bondi I* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). And as noted, still more courts have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See supra* Section III.A; *see also Capen*, 134 F.4th at 670, 672 (considering evidence from both eras, as well as later evidence); *Ocean State Tactical*, 95 F.4th at 46-49, 51-52 (same).

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[11] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi I*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see Bondi II*, 133 F.4th at 1154 (Rosenbaum, J., concurring) (same).[12] Both Justice

---

[11] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[12] *See also, e.g.*, Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism*

26

Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

This conclusion raises the additional question, not directly presented in this case, as to the correct temporal focus in challenges to

---

*and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

*federal* laws. The originalist answer to that question is more complex, because the Second Amendment has bound the federal government since 1791, and yet *Bruen* stated that individual rights applicable against the states and against the federal government "have the same scope." 597 U.S. at 37.

But *Bruen* itself charted the path through this complexity. After identifying the issue, it cited scholars Akhil Amar and Kurt Lash, who have explained that the 1868 understanding should apply to both levels of government. *See id.* at 37-38 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998); Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022)). As Professor Lash wrote (and as quoted in *Bruen*), adoption of the Fourteenth Amendment "'invested those original 1791 texts [of the Bill of Rights] with new 1868 meanings.'" *Id.* at 38 (citation omitted). The Court's choice to highlight only these two scholars is compelling evidence that it considered them to be correct,

28

and thus that Reconstruction should be the central focus of the historical inquiry in challenges to both state and federal laws.[13]

This Court should follow the path *Bruen* marked in citing Professors Amar and Lash, and not (as Plaintiffs urge, *see* Pls. Br. 41-42) the focus on 1791 in a vacated Third Circuit opinion in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024) ("*Lara I*"), *cert. granted, judgment vacated, case remanded*, 145 S. Ct. 369 (2024), or the Eighth Circuit's similar approach in *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1924 (2025). Instead of engaging with originalist principles, *Lara I* based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. 91 F.4th at 133-34.[14] *Worth* pointed to this

---

[13] *Bruen* identified no scholarship or other authority explaining how an originalist could accept the contrary position—inflicting upon the states an understanding of the Second Amendment different from the one the Reconstruction generation believed it was extending to them.

[14] On remand for reconsideration in light of *Rahimi*, the Third Circuit moderated its earlier position by emphasizing that "*Rahimi* teaches that public meaning is not just 'those regulations ... that could be found in 1791[,]' but rather 'the principles underlying the Second Amendment,' with historical regulations providing evidence of those principles. That evidence can include laws 'through the end of the 19th century[,]' which the Supreme Court has recognized can be 'a "critical tool of constitutional interpretation"' because they can be evidence of a

same assumption to conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." 108 F.4th at 692-93, 697.[15] But this general assumption did not resolve the time-period issue—otherwise, the Supreme Court would have simply said so in *Bruen* and *Rahimi*, instead of expressly leaving the issue open.[16] Moreover, the cases *Bruen* cited in describing that assumption did not address the significance of the Fourteenth Amendment's ratification for this issue. Accordingly, *Lara I* and *II* and *Worth* are simply not persuasive. *See, e.g.*, *Antonyuk*, 120 F.4th at 974 (disagreeing with *Lara I*); *Pinales v.*

---

historical tradition and shed important light on the meaning of the Amendment as it was originally understood." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("*Lara II*") (citations omitted), *petition for cert. filed*, No. 24-1329 (June 26, 2025). *Lara II*'s continued adherence to 1791 if positive founding-era laws "irreconcilabl[y] conflict" with Reconstruction-era laws, however, *see id.* at 438-42, suffers from the same error that appeared in its prior decision: elevating a "general assumption" to an authoritative statement, *see id.* at 440 (citing *Bruen*, 597 U.S. at 37).

[15] In *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 599-600 (5th Cir. 2025), the Fifth Circuit also relied on this assumption to discount Reconstruction-era laws, without even acknowledging it was only an assumption. *See id.* at 600.

[16] Likewise, Plaintiffs' citation to *Gamble v. United States*, 587 U.S. 678, 702 (2019), cannot rescue them, because *Gamble* predated both *Bruen* and *Rahimi* and cannot have resolved the issue they left open.

*Lopez*, 765 F. Supp. 3d 1024, 1042 (D. Haw. 2025) (disagreeing with

*Lara II* and *Worth*); *Rupp*, 723 F. Supp. 3d at 877-78 (declining to follow

*Lara I* because, "[r]ather than elevate an assumption to a holding, the

Court thinks it best to address the issue from first principles").

\*     \*     \*

In sum, this Court should follow Supreme Court caselaw and its

own methodology in *Ocean State Tactical* and *Capen* in considering

evidence from the Reconstruction era and beyond as part of this nation's

historical tradition of firearm regulation—regardless of which time

period is central to the Second Amendment inquiry. But if it chooses to

settle the time-period issue, it should hold that 1868 is the focus.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: April 1, 2026          Respectfully submitted,

/s/ Sana S. Mesiya
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

Janet Carter
William J. Taylor, Jr.

31

Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6434 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Sana S. Mesiya

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2026, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Sana S. Mesiya

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

34