No. 25-1918

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STEFANO GRANATA; GUNRUNNER, LLC; FIREARMS POLICY
COALITION INC.; CAMERON PROSPERI,

*Plaintiffs-Appellants,*

JUDSON THOMAS; COLBY CANNIZZARO,

*Plaintiffs,*

v.

ANDREA J. CAMPBELL, in the official capacity as Attorney
General of the Commonwealth of Massachusetts; TERRENCE M.
REIDY, in the official capacity as Secretary of the Executive Office of
Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees.*

**On Appeal from United States District Court
for the District of Massachusetts**
Civil Case No. 1:21-cv-10960-DJC
The Honorable Denise Jefferson Casper, Judge

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................................iii

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 4

I.   The Handgun Ban Is a Presumptively Unconstitutional
     Regulation on Activity Covered by the Plain Text of the Second
     Amendment........................................................................ 4

     A. A Ban on Commercial Acquisition of Certain "Arms"
        Necessarily Implicates the "Right to Keep and Bear
        Arms." ....................................................................... 4

     B. A Ban on Sale of Certain "Arms" Is Not a "Condition" or
        "Qualification" On Commercial Sale...................................... 8

     C. *Beckwith* Is Not Inconsistent with Plaintiffs' Position. ....... 10

II.  The Handgun Ban Is Historically Unjustifiable....................... 12

     A. Arms In Common Use Cannot Be Banned. ......................... 12

        1. The Supreme Court Has Already Held That Handguns
           Are Protected Arms....................................................... 12

        2. The Specific Handguns Banned by Massachusetts Are
           Common in Their Own Right............................................ 17

     B. The Historical Regulations the Commonwealth Cites Cannot
        Support the Ban............................................................... 21

        1. Proving Laws Do Not Support an Arms Ban.................. 21

        2. Firearm and Gunpowder Storage Laws Were Fire Safety
           Regulations That Are Not Informative About the Scope of
           the Right. .................................................................... 29

        3. Trap Gun Laws and Restrictions On Minors Are
           Irrelevant. .......................................................................... 31

CONCLUSION .................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Beckwith v. Frey*,
No. 25-1160, 2026 WL 914624 (1st Cir. Apr. 3, 2026)......... 9, 10, 11

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .................................................................... 19

*Capen v. Campbell*,
134 F.4th 660 (1st Cir. 2025) ..................................................... 16

*Citizens United v. FEC*,
558 U.S. 310 (2010) .................................................................... 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................... 1, 12, 13, 16, 17, 18, 19, 26, 30

*Gebremichael v. INS*,
10 F.3d 28(1st Cir. 1993) ........................................................... 18

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)................................................... 30

*In re Grand Jury Subpoenas*,
123 F.3d 695 (1st Cir. 1997) ...................................................... 11

*Ind. Harbor Belt. R.R. Co. v. Am. Cyanamid Co.*,
916 F.2d 1174 (7th Cir. 1990) .................................................... 18

*Interstate Cir., Inc. v. City of Dallas*,
390 U.S. 676 (1968) ...................................................................... 7

*Langevin v. Chenango Ct., Inc.*,
447 F.2d 296 (2d Cir. 1971) ....................................................... 18

*New York State Rifle and Pistol Association v. Bruen*,
597 U.S. 1 (2022) ..................................................... 2, 20, 21, 27, 28

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .................................................... 16, 17

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) .................................................... 19

*People v. Yanna*,
824 N.W.2d 241 (Mich. Ct. App. 2012)...................................... 19

*Reese v. BATFE,*
 127 F.4th 583 (5th Cir. 2025) ............................................. 6, 7, 8, 18

*United States v. Hunt,*
 63 F.4th 1229 (10th Cir. 2023) ...................................................... 18

*United States v. Rahimi,*
 602 U.S. 680 (2024) .................................................................. 5, 14

*Worman v. Healey,*
 922 F.3d 26 (1st Cir. 2019) ............................................................ 6

## Constitutional Provisions and Rules

U.S. CONST. amend. II ........................................................................ 1

FED. R. EVID. 201, 1972 Advisory Comm. Notes ..................................... 18

## Other Authorities

J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13 (2025) ........ 14, 15

Catie Carberry, *The Origin of Toy Guns in America*, DUKE CTR.
 FIREARMS L. (July 18, 2019), https://perma.cc/JAQ6-LRQL.... 31, 32

**INTRODUCTION**

The Second Amendment protects "the right of the people to keep and bear arms," including, at a minimum, all arms that are " 'in common use.' " *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); U.S. CONST. amend. II. And constitutional protection means that the right is secure against both direct and indirect attacks—a state can no more ban acquiring arms than it can possessing them, because without acquisition, there can be no possession.

Nevertheless, that is both how the law at issue in this case functions and Massachusetts' primary defense of it. The law in question bans the ordinary commercial sale of dozens of models of common handguns, some among the most popular in the country, because they either have not been submitted to the Commonwealth for testing or they lack certain features that the Commonwealth wishes all firearms would have.

Massachusetts advances two principal arguments for why the Second Amendment does not reach its Handgun Ban, both of which lack merit. First, it argues that the law is not a total ban because it does not

1

reach noncommercial sales of used firearms. Second, Massachusetts argues that it is regulating purchasing, not possessing.

Neither of these arguments is correct. First, it is irrelevant that some of the banned handguns potentially may be acquired in Massachusetts through non-commercial means. The secondary market only exists downstream of the commercial market, so if every state acted as Massachusetts has—or if Massachusetts eliminated the exceptions to its law that are not a relevant aspect of its defense of the Ban—the restriction would become total. And in any event, the implication of Massachusetts' argument would be that the Commonwealth could ban *all* new firearm sales without even implicating the Second Amendment. That cannot possibly be right. Second, the Constitution is not so easily manipulated as to be evaded simply by regulating a *predicate* to a constitutionally protected activity. If the government banned newspaper ink, there would be no question that would at least *implicate* the First Amendment.

The constitutionality of the Ban rises and falls, therefore, with the historical analysis required by *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). The historical work in this case has

already been done. The Ban restricts the acquisition—and through that restriction, the "keep[ing]" and "bear[ing]"—of handguns, and the Supreme Court has held that handguns are protected as arms that are "in common use" today. But even if this Court declines to find that reasoning dispositive, the Commonwealth has still failed to demonstrate the Handgun Ban's constitutionality.

Massachusetts cites to four different strands of historical regulation to cobble together support for the Ban, but they are individually and collectively inadequate to the task. Historical "proving" laws, which required the testing of gunpowder or firearm barrels to ensure that latent defects would be discovered before a product made it to market are poor analogues. They mandated no specific features, as Massachusetts does, and they did not ban *any* make or model of arms, only specific, defective items. Historical laws regulating the storage of gunpowder and of firearms are likewise disanalogous. They too, did not bar the sale of any firearms—they did not even prevent the sale of gunpowder, only its unsafe storage (based on the volatility of gunpowder at the time and the flammability of the structures). The Handgun Ban says nothing about how to store flammable or explosive items. Laws

regulating the use and setting of trap guns similarly were no impediment to ownership of any particular firearm. Those laws merely regulated a use of firearms that facilitated the deployment of lethal force in circumstances when it was not justified. And finally, laws regulating the acquisition of firearms by "minors" on account of their age are utterly irrelevant. Massachusetts separately prohibits anyone under 21 from acquiring or possessing handguns; the laws at issue here apply across the board to those who are indisputably adults.

## ARGUMENT

### I. The Handgun Ban Is a Presumptively Unconstitutional Regulation on Activity Covered by the Plain Text of the Second Amendment.

#### A. A Ban on Commercial Acquisition of Certain "Arms" Necessarily Implicates the "Right to Keep and Bear Arms."

The Commonwealth argues that the plain text of the Second Amendment is not implicated in this case because the Handgun Ban does not "meaningfully constrain" Plaintiffs' ability to " 'possess and carry weapons in case of confrontation.' " Br. of Defs.-Appellees at 17 (Mar. 25, 2026) ("Mass. Br.") (quoting *Heller*, 554 U.S. at 592). It emphasizes that the right to acquire firearms is "one step removed from" the right to "keep" or to "bear" them, *id.* at 18, and it argues, as a result, that "[t]he

plain text of the Second Amendment simply does not protect … [a right] to be able to commercially purchase approximately a dozen particular handgun models sold elsewhere in the United States and that [people] may purchase in the private market in Massachusetts." *Id.* at 19.

But this sort of reasoning would excuse anything short of a complete deprivation of the right. First, that an activity is "one step removed" from the specific activities listed in the constitution ("keeping" and "bearing"), is irrelevant. *United States v. Rahimi* stated that the plain text is implicated whenever "the Government regulates arms-bearing conduct," 602 U.S. 680, 691 (2024), and a law that limits *which* arms a person can acquire in the ordinary commercial market and therefore creates impediments to "keep[ing]" and "bear[ing]" them undoubtedly "regulates arms-bearing conduct." Under *Bruen*, Massachusetts cannot ban the carry of handguns for self-defense, but under the Commonwealth's theory, it could ban the commercial sale of all handguns, since that activity is "one step removed" from the right to carry handguns.

Furthermore, it is not clear what work the "one step removed" point is doing in Massachusetts' argument, since its claim that there is no right

to commercially acquire "approximately a dozen particular handgun models sold elsewhere in the United States and that they may purchase in the private market," Mass. Br. at 19, is supported by its claim that Plaintiffs have not "shown that the handgun safety regulations inhibit them from acquiring handguns at all" because it has not prevented them from acquiring certain models of the banned handguns on the secondary market. *Id.* at 20. But the plain text is implicated even where the right is not eliminated. The contrary analysis that the Commonwealth is advocating for here would entirely undermine *Bruen*'s rejection of "interest balancing" in Second Amendment cases by effectively making it part of the "plain text" threshold step; indeed, it makes it worse. Whereas before laws that were not found to "implicate the core Second Amendment right or fail[ed] to impose a substantial burden on that right" were at least subject to intermediate scrutiny, *Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019), under Massachusetts' framework those laws evade scrutiny altogether.

It is also irrelevant that an alternative channel exists, in the form of the secondary market, for individuals to acquire the restricted handguns. The commercial market is "the most prevalent, accessible, and

safe market used to exercise the right." *Reese v. BATFE*, 127 F.4th 583, 590 (5th Cir. 2025). Indeed, the secondary market only exists *downstream* from the commercial market, so the availability of the banned firearms in that market is contingent upon Massachusetts providing exceptions for some purchasers, like law enforcement officials, and the fact that other states have not similarly banned these arms. But that Massachusetts is an outlier does not excuse its ban when the logical conclusion of its argument would be to excuse bans across the country that would destroy the commercial and secondary markets alike. After all, "what [Massachusetts] may constitutionally do, so may other cities and States." *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 684 (1968). As *Reese* explained, in holding that a commercial ban on sales of handguns to 18-to-20-year-olds implicated the Second Amendment (as here, notwithstanding the existence of a secondary market that they could legally access), "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether." 127 F.4th at 590; *see also id.* at 590 n.2 ("We fail to see

how a purchase ban unknown at the time of the founding can evade *Bruen* analysis.").

Finally, the Commonwealth reiterates its argument below that, if such a regulation *is* to be considered as implicating the plain text, it must be shown to "meaningfully constrain" the exercise of the right. Plaintiffs addressed this argument in their opening brief—the "meaningful constraint standard," aside from having no basis in constitutional text or in Supreme Court precedent, has not been interpreted by the courts that have recognized it to be any impediment in cases where a challenged law *actually precludes* certain types of firearms purchases. *See* Br. of Pls.-Appellants at 25–29 (Jan. 21, 2026) ("Pls.' Br."). Massachusetts does not respond to that argument.

## B. A Ban on Sale of Certain "Arms" Is Not a "Condition" or "Qualification" On Commercial Sale.

The Commonwealth next argues that the Handgun Ban falls outside the plain text because it is merely a "condition[] [or] qualification[] on the commercial sale of firearms," Mass. Br. at 21 (quoting *Heller*, 554 U.S. at 626–27 & n.26), a category of regulation which it claims should only be subject to scrutiny if it can be shown to "meaningfully impair[] [the Appellants'] ability to access firearms," *id.*

(quoting *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024)). In characterizing the Handgun Ban that way, the Commonwealth argues that the regulations "require that handguns commercially sold in Massachusetts are not defective; are accompanied by safety mechanisms; have childproofing features; and have tamper-resistant serial numbers," and faults Plaintiffs for not demonstrating that the Ban is being put to "abusive ends" or that it "result[s] in a *de facto* ban on the sale of handguns in Massachusetts." *Id.* at 21–22.

As Plaintiffs explained in their opening brief, "conditions and qualifications on the commercial sale of arms" are not exceptions to the "plain text." Pls.' Br. at 22–23. Although this Court recently, in *Beckwith v. Frey*, suggested that "conditions and qualifications on the commercial sale of firearms *that do not directly restrict the textual rights protected by the Second Amendment*" are constitutional, No. 25-1160, 2026 WL 914624, at *6 (1st Cir. Apr. 3, 2026) (emphasis added), this case is different. In *Beckwith* the condition was a required waiting period, after which a lawful purchaser would, in fact, acquire a firearm. The law did not ban the commercial sale of any type of arm. In this case, the alleged "condition," by contrast, is a law that *forbids* the commercial sale of

certain arms. That is not a condition or qualification on sale, but a prohibition. *Heller* never suggested such a law would be presumptively constitutional.

### C. *Beckwith* Is Not Inconsistent with Plaintiffs' Position.

More broadly, *Beckwith* does not support the Commonwealth's cramped interpretation of the Second Amendment's "plain text." *Beckwith* reasoned that "laws regulating the purchase or acquisition of firearms do not target conduct covered by the Second Amendment's 'plain text.'" *Id.* Because the law before it "impose[d] a limitation in some circumstances on when a person can acquire a firearm after the person purchased it," the panel concluded that waiting period laws only "impose[d] conditions and qualifications on the commercial sale of firearms that do not directly restrict the textual rights protected by the Second Amendment." *Id.* As such, the Court held the Second Amendment was not implicated "unless plaintiffs demonstrate that the [waiting period law] is abusive toward Second Amendment rights." *Id.* The Court likewise held that Beckwith had failed to make that showing.

Plaintiffs disagree with the holding of *Beckwith* and reserve the right to argue it was wrongly decided to a court competent to overturn it.

Although *Beckwith* purported to identify some category of laws that "regulate conduct that is outside the Second Amendment's plain text but nevertheless burden a person's right to keep and bear arms," and to treat such laws as "presumptively constitutional," no such category can exist under *Bruen*. *Id.* at *3. A law that "burdens the right to keep and bear arms" necessarily implicates the Second Amendment's "plain text" protection of "the right to keep and bear arms."

Plaintiffs, however, recognize that *Beckwith* is binding on this panel. *In re Grand Jury Subpoenas*, 123 F.3d 695, 697 n.2 (1st Cir. 1997). It does not change the result in this case, because unlike in *Beckwith*, the regulatory regime challenged here bars the commercial sale of certain firearms. It was critical to *Beckwith*'s holding that the waiting-period law in Maine did not "<u>indefinitely</u> den[y]" the ability to exercise the right, but merely "delay[ed]" it, with the panel likening the waiting period to the delay incurred in complying with a "shall-issue" permitting regime which the Supreme Court commented on favorably in *Bruen*, as distinct from the possible denial of the right resulting from the "may-issue" regimes *Bruen* struck down. 2026 WL 914624, at *7. By contrast, Massachusetts' scheme for banning handguns challenged here *does* "prevent a law-

11

abiding and responsible citizen from obtaining and then keeping or bearing a firearm" if the firearm is a non-approved model of handgun and the buyer is not willing or able to forego the ordinary commercial market. As discussed above, the possibility of acquiring a firearm on the secondary market cannot excuse the Ban. The noncommercial secondary market only exists downstream of the commercial market, meaning that such firearms can only be available because Massachusetts provides for exceptions to the commercial ban (as in the case of law enforcement officers) or because other states permit their sale and they enter Massachusetts' market across a border. But Massachusetts cannot seek shelter for its unconstitutional regulation in the fact that other states show a greater respect for the right.

## II. The Handgun Ban Is Historically Unjustifiable.

### A. Arms In Common Use Cannot Be Banned.

#### 1. The Supreme Court Has Already Held That Handguns Are Protected Arms.

The historical analysis in this case, as Plaintiffs explained in their opening brief, should be very simple. *Heller* held that handguns are protected arms because they are "in common use," a rule of decision it derived from the historical tradition of restricting "dangerous and

unusual weapons." *Heller*, 554 U.S. at 627 (quotation marks omitted). Massachusetts bans certain handguns despite their commonality. Applying *Heller* here is the end of the matter. *See* Pls.' Br. at 32.

Massachusetts disagrees. It argues that "the contours of how 'common use' is considered in Second Amendment challenges are still being developed in the lower courts" and urges this Court to "not wade into that analytical territory here." Mass. Br. at 24. Even accepting that some cases might require this Court to confront unsettled questions about the "contours" of "common use"—and Plaintiffs maintain that it is, in fact, a relatively simple historical principle to apply—this is not one of them because this is *precisely* the same application of that principle as in *Heller*. The only feature of the Handgun Ban that Massachusetts can point to differentiate it from the District of Columbia's law at issue in that case is the fact that it does not ban *all* handguns and so does not ban "an entire class of 'arms,'" a distinction that renders the common use inquiry totally irrelevant. *Id.* (quoting *Heller*, 554 U.S. at 628).

The Commonwealth places significant weight on this distinction, arguing that *Heller* "said nothing about lesser restrictions that may affect some handguns in some manner" and emphasizes that "the fact that

Massachusetts consumers may purchase a range of handguns suitable for self-defense goes directly to the degree of burden that the regulation places on the right to self-defense." *Id.* at 25, 28. But that misunderstands how to apply the *Bruen* historical analysis, and the distinction Massachusetts offers here is, properly understood, one without a difference. As *Rahimi* explained, the goal of historical analysis in Second Amendment cases is to discern "the principles that underpin our regulatory tradition" and then to ask whether those principles extend to cover a modern regulation. 602 U.S. at 692. The principle identified in *Heller* was that "dangerous and unusual weapons" could be banned, while arms that are of a type that is "in common use" are necessarily *not* both dangerous and unusual and hence cannot be banned. 554 U.S. at 627 (quotation marks omitted). The only question then is simply, does the Handgun Ban apply to arms in common use? That it does not apply to *all* arms in common use is irrelevant. Nothing in the principle *Heller* derived from history depended on the fact that D.C.'s ban was particularly egregious (though the Supreme Court understandably remarked on that fact to underscore how little respect D.C. accorded the right). It was, to use one scholar's helpful framework, a merely

"incidental" feature of the unconstitutional law that it was nearly total, while the critical, or "substantive" point, was that the ban restricted protected arms that were otherwise in common use. *See* J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 52–53 (2025).

Massachusetts points to *Heller*'s quotation of *Miller* that militia members at the Founding "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time," for support of its contrary position, taking that statement to mean that what is relevant for protection is the "kind" of weapon. Mass. Br. at 25 (quoting *Heller*, 554 U.S. at 624). But that is not actually at odds with Plaintiffs' reading. Plaintiffs have maintained that the "kind" of weapon at issue here—handguns—is broadly common and therefore protected, *including* the specific models Massachusetts bans. To say that a "kind" of weapons is protected does not explain why Massachusetts thinks it can ban items *of that kind*; it raises the question of what it could mean for a "kind" of weapon to be protected if Massachusetts could choose for itself some subset of that kind to ban. In other words, even if the Second Amendment's protection depends upon what "kind" of arm is at issue, it protects *specific* arms that people own within that category, not the

categories generally. *See* Pls.' Br. at 35. The Commonwealth's position, that as long as it does not eradicate a category of arms, it is on solid ground, is in fact directly inconsistent with *Heller*'s statement that it is "no answer" for a government banning common firearms to note that other types of firearms are left to their citizens—the Second Amendment "takes [that] policy choice[] off the table." 554 U.S. at 629, 636.

Massachusetts cites this Court's decisions in *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) and *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024), to reinforce its reading, *see* Mass. Br. at 26, 29. But as Plaintiffs explained in their opening brief, *Capen*'s proffered distinction between "laws that ban[] certain handguns with certain features" and a "law that bans all handguns as a class," 134 F.4th at 674, is contrary to Supreme Court precedent and was dicta, Pls.' Br. at 35. *Ocean State*, for its part, permitted the banning of so-called "large capacity" magazines despite their commonality. This too was contrary to Supreme Court precedent and moreover, as Plaintiffs explained in their opening brief, *Ocean State*'s analysis was founded on the panel's conclusion that "magazine capacity directly corresponds to lethality" and that banning them "imposes no meaningful burden" on self-defense. 95

16

F.4th at 45, 47. Neither claim applies to handguns, which the Supreme Court recognized in *Heller* as the "quintessential self-defense weapon," 554 U.S. at 629.

### 2. The Specific Handguns Banned by Massachusetts Are Common in Their Own Right.

As Plaintiffs explained in their opening brief, *even if* this Court were to decline to look at the commonality of handguns generally as establishing the impropriety of the Ban, effectively treating "Banned Handguns" as their own "type" or "kind" of arm, it still must hold the law unconstitutional under the "common use" principle, because the Banned Handguns are themselves common. *See* Pls.' Br. at 38–39. The Commonwealth offers two responses to this, neither adequate.

First, it complains that Plaintiffs have not made an "evidentiary showing" on this point and only cited to un-authenticated data regarding the commonality of Glock handguns, which it argues "are part of the Massachusetts handgun market." Mass. Br. at 30. This is problematic for several reasons. As discussed above, the fact that some Glocks, which are banned for ordinary commercial sale to ordinary purchasers, still wind up available in the Massachusetts market is only because of exceptions that, under Massachusetts' own reasoning, it does not have to offer.

Furthermore, those firearms are only available on the secondary market, and closing off the ordinary commercial channel for ordinary commercial buyers is enough to violate the Second Amendment. *See Reese*, 127 F.4th at 590. There is no historical tradition allowing the government to limit citizens to used handguns.

Moreover, any lack of authentication of the data supporting Glock's (indisputable) commonality is no impediment to this Court relying upon it. Whether an arm is "common" is a "legislative fact[]" or a "general fact[] which help[s] the tribunal decide questions of law." *Langevin v. Chenango Ct., Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, C.J.) (quotation marks omitted); *see also Gebremichael v. INS*, 10 F.3d 28, 37 n.25 (1st Cir. 1993). As such, the ordinary rules of evidence simply do not apply. *See* FED. R. EVID. 201, 1972 Advisory Comm. Notes. Such facts can be found anywhere, *Ind. Harbor Belt. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990), and by judges at any level of the proceedings, *United States v. Hunt*, 63 F.4th 1229, 1250 (10th Cir. 2023). In concluding that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *Heller*, 554 U.S. at 628–29 (quotation marks and citation omitted), *Heller* looked

to a similarly un-authenticated source. The claim was supported not with a citation to record evidence, but rather to the D.C. Circuit's decision below, which in turn relied on a social science paper, *see Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007). And there was no evidentiary record in the case, since it had been decided in district court on a motion to dismiss. *Id.* at 374. The same was true in *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam). When Justice Alito stated that the electronic weapons that Massachusetts banned were "in common use" because "hundreds of thousands of Tasers and stun guns have been sold," *id.* at 420 (Alito, J., concurring) (cleaned up), he cited a law review article for that proposition and the law review article, in turn, relied on "a newspaper article from 1985," *People v. Yanna*, 824 N.W.2d 241, 245 n.5 (Mich. Ct. App. 2012). In other words, the very sources Plaintiffs have cited to show how common the banned arms are common are the same types of sources on which the Supreme Court has relied.

Second, Massachusetts argues that, even if this Court accepts that Glocks are in common use, then Plaintiffs' claim should still fail because Plaintiffs sought an injunction against the "Handgun Ban" writ large in their complaint and that, the Commonwealth claims, renders Plaintiffs'

claim a "facial" one. Because, it argues, there would still be lawful applications of the Ban even if Glocks are protected, Plaintiffs have failed to show that the Ban is unconstitutional in all applications and therefore their claim fails. But Glocks are no different than the other banned firearms and are, instead, representative of them. If Glocks, as a specific example of the banned firearms, are "in common use" by themselves, then the banned firearms are in common use as a group.

Moreover, the framing of the relief sought in the complaint is not dispositive of the relief that can be granted. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010). That Plaintiffs sought to have the entire Handgun Ban held unconstitutional does not foreclose them from showing that *part* of it is. Rather, the correct practice in such a situation would be to enjoin the law *to the extent* a violation has been found. *Id.* ("The distinction … goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."). That should be especially true in this context, given that the *Bruen* analysis hinges on finding that historical laws and modern laws are "relevantly similar" in both "how" and "why" they burden the right. To the extent a modern law exceeds historical practice in that regard, the modern law is

unconstitutional at least insofar as it exceeds historical bounds. *See Bruen*, 597 U.S. at 30. That means that, if common use is as the *sine qua non* of constitutional protection, and Plaintiffs have shown that *at least* Glock handguns are in common use, then the Handgun Ban is unconstitutional *at least* as to Glock Handguns. Or if this Court concludes that the "features-based" parts of the Ban—the requirements, for instance, that handguns incorporate a chamber load indicator or magazine safety disconnect—are unconstitutional while the "drop test" requirement is historically justified, then it should still hold the former requirements to be invalid.

## B. The Historical Regulations the Commonwealth Cites Cannot Support the Ban.

Even if this Court concludes that the commonality of the banned firearms is not enough to establish the unconstitutionality of the Handgun Ban, the Commonwealth still bears the burden to offer an adequate historical justification for the law. It has failed to do so.

### 1. Proving Laws Do Not Support an Arms Ban.

Massachusetts first points to historic "proving" laws, which mandated safety testing of gun barrels or of gunpowder. Mass. Br. at 32–33. It claims these laws "come remarkably close to a 'twin'" to the

Handgun Ban. *Id.* at 33. Its sources for this historical tradition include laws requiring proving or inspection of firearms and gunpowder laws providing that arms bought by the government itself should be manufactured to certain standards. *Id.* at 33–35.

**i.** Taking these in reverse order, as Plaintiffs explained in their opening brief, that the federal government declined to purchase a certain weapon itself did not restrict the commercial market for those arms. When for instance, as the State points out, the military declined to purchase Samuel Colt's revolver in 1837, *id.* at 35, the American people still could and did buy it if it suited their needs. Indeed, as Plaintiffs pointed out in their opening brief, the federal government still has requirements for the firearms it purchases—and while some of those firearms are commercially available to civilians, many arms that do not meet federal standards are also available. Pls.' Br. at 47–48.

The Commonwealth responds by claiming that, since militia members at the Founding supplied their own weapons, the distinction between "federal patronage" and "modern regulation[]" is "less meaningful" than it might otherwise appear, especially given that federal purchases were extremely economically important for firearms

manufacturers at earlier periods in our history. Mass. Br. at 36. This response is unpersuasive for multiple reasons. First, even granting the premise that federal economic power exerted a significant effect on the firearm market in early America, Massachusetts' modern strategy of banning commercial sale of arms is not "relevantly similar" and imposes a disproportionate and different-in-kind burden on the right today. Massachusetts still could use its economic power to push firearms technology development, but banning firearms it does not like (and which the American people very much do) it cannot do. Second, that militias used personally owned firearms early in our country's history might mean that there was not a clear line between "civilian" and "military" weaponry—civilian-owned arms were used for military purposes—but that is a red herring. It does not mean that restrictions on the arms that were actually purchased by the government, distinct from the arms that militia members brought with them to military service, somehow amounted to anything like a *ban* on the arms the government did not purchase. Third, this line of argument really serves to demonstrate that what the Commonwealth has done in this case is effectively the *opposite* of the historical regime it posits. The Commonwealth's historical story is

that governments, controlling the types of arms used by government actors, have historically had downstream effects on the arms available to civilians, fostering arms the government likes and discouraging arms it does not. But here, the government has banned the commercial sale to civilians of government-disfavored arms, while making exceptions for the people who bear arms in service of the government itself. Indeed, the fact that there is a secondary market still in Massachusetts for these firearms, as the Commonwealth repeatedly emphasizes, is downstream of the government or government employees being the sole commercial purchasers of these firearms in the Commonwealth.

**ii.** The proving and inspection laws are likewise poor analogues for the Handgun Ban. As Massachusetts candidly admits, the purpose of the gunpowder proving laws was "to protect 'the purchaser and consumer' against 'inferior' gunpowder, … whose 'defects' may not be 'discovered until brought into actual use.'" *Id.* at 37. The purpose of the two firearm proving laws was also, as Plaintiffs explained in their opening brief, to detect latent defects and protect purchasers from buying malfunctioning firearms, as the exception for the Springfield Armory from the Massachusetts ban shows. Pls.' Br. at 47. That is different from the

24

Handgun Ban which does not protect purchasers from defective products, but instead constrains the category of legal products available in the Commonwealth's commercial markets to those that have features, like a magazine safety disconnect or a chamber load indicator, that Massachusetts would prefer they have. Under a proving law, Glock handguns would be generally legal, and only defective Glock handguns would be illegal to sell. That defeats any analogy.

The Commonwealth responds that individual inspection of firearms, instead of categorical approval of them under its rostering system, is a different approach that approximates to the same historical tradition, with the historical approach being actually more onerous and necessitated by the lack of interchangeable firearm parts. Mass. Br. at 38. And it further argues that the "why" of the law is relevantly similar because the proving laws "aimed to eliminate the dangers of weapons and gunpowder that were unfit for their intended purpose." *Id.* at 39. But the difference is not in whether every firearm is checked or just a sample—it is in what Massachusetts is looking for. That Massachusetts allows military and police to purchase and use these firearms, and even lets ordinary civilians purchase them on the secondary market, *after* initial

product safety inspections offered by the manufacturer are out of date, demonstrates that the target of this law is not the ferreting out of *defective* firearms as it was historically, but in eliminating certain firearms that function as intended, but that it wishes functioned differently. The concept of an "unfit" weapon is carried too far when it devolves to the government judging for itself which firearms Americans should use. The fitness of a weapon is something the American people are empowered under the Second Amendment to judge for themselves. *See Heller*, 554 U.S. at 629.

Massachusetts has two responses to this, but neither is adequate. *First*, it says that even if the proving laws historically cannot be analogized to the requirement that firearms have certain safety features, they can at least be likened to the Ban's "testing requirements," and if that is the case, then the entire Handgun Ban must be constitutional because " '[t]he validity of one application means that the [challenged law] is not facially invalid.' " Mass. Br. at 42 (quoting *Capen*, 134 F.4th at 674–75 (brackets in brief)).

The problems with this argument about the facial/as-applied distinction are discussed above. The various requirements of the

Handgun Ban are severable and their constitutionality may be assessed separately, so that even if the drop test is itself constitutional, that cannot save the other provisions of the law that are without any historical antecedents. Moreover, the drop test is also unlike the historical proving laws because it is not looking for manufacturing defects in individual arms.

*Second*, Massachusetts argues that the proving laws can be extended even to cover the "regulations requiring specific safety features" because "chamber load indicators or magazine safety disconnects did not exist at the time of the Founding or Reconstruction" and as such the "more nuanced approach' that applies whenever developments in technology make direct comparison impossible" should be used here to sanction this expansion in the regulatory tradition. *Id.* at 43.

This gets things backwards. The Supreme Court has already addressed the way in which advances in firearms technology impact the types of arms that are protected by the Second Amendment, and it did so through application of the common use test. While *Bruen* allowed that it was possible that handguns were, in the colonial period, considered dangerous and unusual, it held that what mattered today was that "they

27

are indisputably 'in common use' for self-defense today." 597 U.S. at 47. Massachusetts may well seek to push firearms without these features into desuetude, but under *Bruen* and *Heller*, that is not its choice to make, but the American people's.

Moreover, it is a major leap from a requirement that barrels not explode when used or that gunpowder not be dangerously defective—both effectively a requirement of any functioning firearm—and an affirmative requirement that a firearm incorporate features that many common firearms lack. Even at a high level of generality, no such principle can be drawn from these historical proving laws.

Finally, as Plaintiffs argued in their opening brief, wholly apart from the above analysis, the proving laws are poor analogues for the Handgun Ban because there were only *two* such laws at the Founding, and two laws are insufficient to create a "well-established and representative" tradition. *Id.* at 30; Pls.' Br. at 48. Massachusetts argues that the explanation for the relative dearth of regulation is the fact that "there was little domestic manufacturing of firearms" so that most were imported, Mass. Br. at 41, but it is hard to understand why that should matter since most firearms purchased on the commercial market in

Massachusetts today also are manufactured elsewhere. The fact is that there have been advancements in the field of firearms technology for as long as there have been firearms—but there is no evidence, from any period in our history, of a state seeking to mandate that its people adopt advancements for their safety. That defeats any claim to historical legitimacy for the Handgun Ban.

### 2. Firearm and Gunpowder Storage Laws Were Fire Safety Regulations That Are Not Informative About the Scope of the Right.

Massachusetts next relies upon laws that regulated the manner of storage of firearms and gunpowder. *Id.* at 44. It argues these laws were similar to the Ban because "both sets of laws were intended to reduce what might be called the collateral dangers of firearms," the storage laws, by preventing mass casualty accidents and fires when improperly stored gunpowder exploded, and the Handgun Ban is "aimed to reduce 'accidental injury or death.'" *Id.* at 45–46. It further argues that, even if that analogy holds for only the "drop test" requirement and none of the others, that still validates the Handgun Ban in full because of the Commonwealth's characterization of Plaintiffs' claims as "facial." *Id.* at 46.

The "facial" point has been addressed above. As Plaintiffs have explained, the Handgun Ban should be held unconstitutional and enjoined to the extent it is found to be historically unjustified. Moreover, *Heller* itself rejected the idea of reading these laws as broadly as the State does now for the simple reason that they did not impede *anyone* from acquiring or keeping *any* type of arm. 554 U.S. at 632; *see also Hanson v. District of Columbia*, 120 F.4th 223, 235 (D.C. Cir. 2024) ("The suggestion that [gunpowder storage laws] limited the Second Amendment right to keep and bear arms is silly."). The Commonwealth casts these laws as "relevantly similar" because they "aimed to prevent accidental ignition of ammunition," as do some of the components of the Handgun Ban, Mass. Br. at 47, but the burden of the two laws is entirely different. While the Handgun Ban bars commercial sale of certain arms, the storage regulations permitted the ownership of *whatever* common firearms a person desired, and they made no demands that those arms have any safety features, only that the owner not stockpile unreasonable amounts of gunpowder in his home.

### 3. Trap Gun Laws and Restrictions On Minors Are Irrelevant.

Finally, Massachusetts points to "trap gun" laws and to laws restricting firearm access by minors. *Id.* at 48–49. The trap gun laws were not targeted at specific arms or accidental discharge of ordinary arms, but instead were aimed at ending a dangerous and reckless misuse of firearms that could cause them to go off when deadly force was not justified. Pls.' Br. at 54. The burden of a law that forbids the commercial sale of a distinct model of handgun is different in magnitude and in kind than of a law that permits purchase of any common arm and only forbids mishandling it.

The minor laws and "toy pistol" regulations are similarly unhelpful to the Commonwealth. First of all, they long post-date the ratification of the Second Amendment and therefore should be disregarded entirely. *See Id.* at 41. They are also utterly unlike the Handgun Ban, in that they did not forbid the sale of any type of firearm. The Commonwealth casts them as similar to the Handgun Ban's requirement that handguns have certain child-safety features, but these laws (except for a minority of the toy gun laws from the last two decades of the 19th century) did not affect adults at all, making them poor analogues for the Handgun Ban's restrictions

and ordinary, law-abiding adults. *See* Catie Carberry, *The Origin of Toy Guns in America,* DUKE CTR. FIREARMS L. (July 18, 2019), https://perma.cc/JAQ6-LRQL. And even as to the minority of those laws that were written broadly enough to cover adults, they still targeted a weapon that was "marketed for children," which is not the case for the ordinary handguns Massachusetts targets here.

Even rejecting the notion that "common use" is dispositive here, none of Massachusetts' historical evidence justifies the Ban.

## CONCLUSION

The judgment of the district court should be reversed and the case remanded with instruction to enter summary judgment in Plaintiffs' favor.

Dated: April 15, 2026

Respectfully submitted,

Richard Cullin Chambers, Jr.
CHAMBERS LAW OFFICE
220 Broadway, Suite 404
Lynnfield, MA 01940
Tel: (781) 581-2031

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER AND KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 6,499 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: April 15, 2026

/s/David H. Thompson
David H. Thomspon
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 15, 2026

/s/David H. Thompson
David H. Thomspon
*Counsel for Plaintiffs-Appellants*